# FREEDOM COURT REPORTING ORIGINAL

```
1
2
3                    STATE OF ALABAMA
4                    COVINGTON COUNTY
5
6
7
8
9
10           *  *  *  *  *  *  *  *  *  *  *  *  *
11
12           SWORN STATEMENT OF JOANN D. EZELL,
13      taken before Jackie Parham, Certified
14      Shorthand Reporter and Commissioner for the
15      State of Alabama at Large, at 21868 Wood
16      Avenue, Florala, Alabama, on Friday, the 11th
17      day of August, 2006, commencing at approxi-
18      mately 10:30 a.m.
19
20           *  *  *  *  *  *  *  *  *  *  *  *  *
21
22
23
```

EXHIBIT

ℬ

# FREEDOM COURT REPORTING

1                   APPEARANCES

2

3      DENNIS R. BAILEY, ESQUIRE

4      Rushton, Stakely, Johnston & Garrett

5      184 Commerce Street

6      Montgomery, Alabama  36104

7

8

9              * * * * * * * * * * * * *

10                 JOANN D. EZELL,

11        The witness, after having first been duly

12     sworn to speak the truth, the whole truth, and

13     nothing but the truth, testified as follows:

14                  EXAMINATION

15     BY MR. BAILEY:

16     Q.      State your full name.

17     A.      Joann D. Ezell.

18     Q.      And your address?

19     A.      21868 Wood Avenue, Florala.

20     Q.      Ms. Ezell, how old are you?

21     A.      I'm seventy-one.

22     Q.      My name is Dennis Bailey.  I am an

23             attorney.

# FREEDOM COURT REPORTING

3

| | | |
|---|---|---|
| 1 | A. | Uh-huh (positive response). |
| 2 | Q. | I represent Louisiana Pacific. |
| 3 | A. | Yes. |
| 4 | Q. | Do you understand that? |
| 5 | A. | Yes, I do. |
| 6 | Q. | Do you understand that there is a lawsuit |
| 7 | | -- or a bunch of lawsuits pending in which |
| 8 | | people are suing Louisiana Pacific |
| 9 | | relating to activities at the Lockhart |
| 10 | | plant? |
| 11 | A. | Yes, I do. |
| 12 | Q. | Are you represented in that lawsuit by any |
| 13 | | lawyer? |
| 14 | A. | No, I'm not. |
| 15 | Q. | And before today did you call anyone at |
| 16 | | Louisiana Pacific to try to get -- make |
| 17 | | contact with Louisiana Pacific to talk |
| 18 | | about this case? |
| 19 | A. | I called Ronnie Paul. |
| 20 | Q. | And why did you call him? |
| 21 | A. | Because I trust him. |
| 22 | Q. | And who is that? |
| 23 | A. | He was the -- What you call it?  The -- He |

# FREEDOM COURT REPORTING

4

1     was a manager.  I mean, he was over the

2     whole thing.

3  Q.   And the "whole thing" being the

4     Lockhart --

5  A.   Lockhart.  Louisiana Pacific.

6  Q.   Okay.  Did anyone from Louisiana Pacific

7     call you to try to get you to call him?

8  A.   No.  He called me back --

9  Q.   Okay.

10  A.   -- and told me to -- give me Shirley

11     Davis's number and told me to call her.  I

12     called and left a message and she called

13     me back.

14  Q.   And when you called her, what did you tell

15     Shirley?

16  A.   I just told her that I felt like they need

17     to hear my side of the story.

18  Q.   Why did you want to tell her your side of

19     the story?

20  A.   Because they're not saying -- Can I say my

21     husband?

22  Q.   You can.  Yes.

23  A.   My husband has been being harassed by

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | | Eason Mitchell. |
| 2 | Q. | Who is Eason Mitchell? |
| 3 | A. | He is a lawyer for the people that's |
| 4 | | suing. |
| 5 | Q. | Does he represent you? |
| 6 | A. | No, he don't. |
| 7 | Q. | Have you ever given him permission to say |
| 8 | | that he represented you? |
| 9 | A. | No. |
| 10 | Q. | And before I met you today here in your |
| 11 | | home did you tell me that you were not |
| 12 | | represented by counsel? |
| 13 | A. | Yes, I did. |
| 14 | Q. | Did you invite me to come? |
| 15 | A. | Right. |
| 16 | Q. | And am I here with your consent? |
| 17 | A. | Yes. |
| 18 | Q. | And do you understand that there's a court |
| 19 | | reporter in the room taking down -- |
| 20 | A. | Yes, I do. |
| 21 | Q. | -- what we say? |
| 22 | A. | Uh-huh (positive response). |
| 23 | Q. | And do you consent to give a statement |

# FREEDOM COURT REPORTING

1    relating to this matter to me at this

2    time?

3  A.  Yes, I do.

4  Q.  And do you do that of your free will?

5  A.  I do it of my free will.

6  Q.  Has anybody promised you anything of any

7    nature to encourage you to talk to me

8    today?

9  A.  No.

10  Q.  Ms. Ezell, let me ask you some

11    questions --

12  A.  Okay.

13  Q.  -- about your ability to understand my

14    questions.

15  A.  Okay.

16  Q.  Tell me how far you went in school.

17  A.  To the eleventh grade.

18  Q.  After the eleventh grade -- Are you able

19    to read and write?

20  A.  You're right.

21  Q.  Okay.  What kind of work have you done in

22    your life?

23  A.  I've always been a housewife.

# FREEDOM COURT REPORTING

1    Q.    Who handles the finances at your house?

2    A.    I do.

3    Q.    How long have you been doing that?

4    A.    About twenty-five years.

5    Q.    You are married?

6    A.    Right.

7    Q.    I understand your husband is Roy?

8    A.    Right.

9    Q.    And you have grandchildren?

10   A.    I have one granddaughter and two

11         great-grandchildren.

12   Q.    I know.  One of your grandchildren is here

13         today.

14   A.    That's him.

15   Q.    Do you have any physical condition that

16         would make it difficult for you to

17         understand my questions or give me answers

18         to my questions?

19   A.    No.

20   Q.    Are you on any medications that would

21         affect your ability to understand and give

22         me answers?

23   A.    No.

# FREEDOM COURT REPORTING

1   Q.   All right.  Now, let's get back to why I'm

2        here.

3   A.   Okay.

4   Q.   You mentioned earlier generally.  What

5        triggered your desire to want to call

6        somebody at Louisiana Pacific?

7   A.   The last letter I got from -- my husband

8        got from Eason Mitchell, that made me mad.

9   Q.   Okay.  Now, I'm not going to ask you

10       what's in that letter.

11  A.   Okay.

12  Q.   Because that's a letter that was written

13       to your husband.  And I want to explain on

14       the Record here, that as long as Eason

15       Mitchell and others contend he is their

16       client, I can have no contact with him.

17  A.   I understand.

18  Q.   And do not want to have any contact with

19       him.

20  A.   I understand.

21  Q.   And I don't want to know the contents of a

22       letter that his lawyer sent to him.

23  A.   I haven't told you either.

# FREEDOM COURT REPORTING

1   Q.   And you haven't.  But something in one of

2        those letters triggered --

3   A.   Yeah.

4   Q.   -- your desire to want to contact somebody

5        at Louisiana Pacific?

6   A.   Yes.

7   Q.   And it's my understanding you wanted to

8        talk to a lawyer for Louisiana Pacific

9        about what's going on in this area?

10  A.   Right.

11  Q.   Before I ask you what you want to tell me,

12       what do you understand this litigation to

13       be about?

14  A.   Something about creosote or ever what it

15       was, you know, in the plant in there.  I

16       don't know.  I really don't know.  He's

17       never explained it to us.

18  Q.   Okay.

19  A.   It's somebody that had cancer and died and

20       done all these things.  Well, my husband

21       worked -- He built the mill over there,

22       the Lockhart Lumber Company.  He was there

23       when TMA took it and he was there when

# FREEDOM COURT REPORTING

10

1          Louisiana Pacific went out of business.

2          And he's never had no problems with it.

3     Q.   We are here today at your home in Florala.

4          How far are we from the plant?

5     A.   We're not even a mile.  It's right across

6          there (indicating).

7     Q.   And y'all have lived here for how long?

8     A.   Fifty-four years.

9     Q.   All right.  And your husband, as I

10         understand it, was the plant manager

11         there --

12    A.   Yeah.

13    Q.   -- for all the time it was in operation?

14    A.   Right.

15    Q.   Now, his current condition, how would you

16         describe it?

17    A.   Well, two years ago he got -- I got to

18         noticing he couldn't, you know -- I could

19         tell him something and he couldn't

20         remember what I had told him.  So I took

21         him to Dr. -- I call him Dr. D in

22         Pensacola.  He's a neurologist.

23    Q.   Lee, L-e-e?  How do you spell his name?

# FREEDOM COURT REPORTING

1    A.    Let me get his medicine bottle. I can't

2          even pronounce it.  That's his name right

3          there.  He takes that twice a day.

4    Q.    Dr. George D-n-y-t-r-e-n-k-o.

5    A.    That's his doctor.

6    Q.    And what do you understand your husband's

7          current mental state to be?

8    A.    As far as his mental state, he's all right

9          but his memory is just -- it's just going.

10   Q.    Okay.  And is that a problem that runs in

11         his family, or is that --

12   A.    His mother had Alzheimer's.  And he's got

13         the first steps of Alzheimer's is what

14         this neurologist told us.

15   Q.    Okay.  And this developed approximately

16         how long ago?

17   A.    About two years ago.  And everybody that

18         we know real well is beginning to notice

19         that he can't remember and they just pass

20         that off.

21   Q.    Now, are you aware that your husband is

22         listed as one of the persons suing

23         Louisiana Pacific in this litigation?

# FREEDOM COURT REPORTING

1   A.   That's what they told me.  But he's never

2        been sworn in or something else to take a

3        statement or anything.

4   Q.   Well, do you know how it came to be that

5        he was listed as a party in that suit?

6   A.   No, I don't.  We never attended any

7        meetings.  We never went down there.  We

8        never contacted anybody.

9   Q.   Do you know whether or not -- Have you had

10       any contact with any lawyers representing

11       people who are suing Louisiana Pacific?

12  A.   Only Eason Mitchell.

13  Q.   Would you describe Mr. Mitchell for us?

14  A.   Oh, he's a big, fat man, about 350 pounds,

15       and he'll run you crazy.

16  Q.   Well, what do you mean by that?

17  A.   He just keeps on and on and on.  I mean,

18       he just -- he's persistent.  And I don't

19       like that.  He keeps asking Roy the same

20       questions, and Roy, it gets him

21       frustrated.  And it irritates me to no

22       end.

23  Q.   Have you been present --

# FREEDOM COURT REPORTING

13

```
1    A.    Yes.  I've been there every time.

2    Q.    So you have been in the room when

3          Mr. Mitchell was talking to your husband?

4    A.    You've got that right.

5    Q.    And what about that questioning upset you?

6    A.    Roy would keep repeating his-self.  I

7          said, I told you that he cannot remember

8          what happened two or three, four years

9          ago.

10   Q.    Who did you tell that to?

11   A.    I told Eason Mitchell.

12   Q.    And what did you mean by that?

13   A.    He just kept on asking him what happened,

14         you know, when they put creosote in.  I

15         said, he don't remember that.  He can tell

16         you how to put it in and all but he don't

17         know what happens after that.  But

18         creosote was put in when Lockhart Lumber

19         Company had it, because my husband helped

20         put it in.

21   Q.    Well, how many times have you been present

22         when Mr. Mitchell has attempted to talk to

23         your husband?
```

# FREEDOM COURT REPORTING

1    A.    Let me count them.

2    Q.    Okay.

3    A.    Let's see.  The first one, I didn't know

4    who he was.  He introduced his-self as

5    Eason -- Lawyer Eason Mitchell.  He was

6    representing the L. P. people.  I said,

7    well, why are you here?  We haven't filed

8    a claim.  Well, we need to take a

9    statement from Roy.  I said, I don't think

10    you need to.  He said, yes, ma'am, we do.

11    And Roy said, it'll be all right.  That's

12    Roy.  We sat right out there in that swing

13    and he wrote it -- I mean, he -- she

14    dictated -- You know, he talked and Roy --

15    he had a microphone.

16    Q.    Okay.

17    A.    Or, you know -- and he asked Roy to sign a

18    piece of paper.  And about two weeks later

19    we got the whole thing out of there.  We

20    got the whole thing and something Roy

21    hadn't said was in there.  I didn't like

22    that.  And several things.  And it's just

23    on and on and on and on, and I'm tired of

# FREEDOM COURT REPORTING

```
 1        it.

 2   Q.   And would you like it to stop?

 3   A.   I sure would.

 4   Q.   What would you like us to do if we -- to

 5        help, if anything, make it stop?

 6   A.   Tell them to leave us alone.

 7   Q.   And by "us," who do you mean?

 8   A.   Louisiana Pacific's lawyers.

 9   Q.   Do you want us to --

10   A.   Tell them to leave us alone.  We are not

11        interested.

12   Q.   Who is "we?"

13   A.   Me and my husband.

14   Q.   Not interested in what?

15   A.   In this lawsuit they've got going.

16   Q.   This first time that Mr. Mitchell sat out

17        in the swing --

18   A.   Uh-huh (positive response).

19   Q.   -- can you tell us when that was,

20        approximately?

21   A.   Wait just a minute.  I can tell you.  Just

22        wait and give me time to find that little

23        paper.  Because when I look at them, I get
```

# FREEDOM COURT REPORTING

1           mad all over again.  Okay.  Let me see.

2           Sorry about this.  I get mad every time --

3           It says April the 1st, 2006.

4   Q.    So it would have been a little before

5           then?

6   A.    Yeah.

7   Q.    When Mr. Mitchell introduced himself, were

8           you present?

9   A.    Yes.

10   Q.    Did he say he represented Louisiana

11           Pacific?

12   A.    No.  He said he -- the people that were

13           suing Louisiana Pacific.

14   Q.    Okay.  So he made it clear that he was

15           suing --

16   A.    Yeah.  I said, well, we don't have nothing

17           to sue about.

18   Q.    And did you say that to Mr. Mitchell?

19   A.    Yes, I did.  He said, I'm your lawyer,

20           too.  I said, no, you're not.  You're not

21           anything to me.

22   Q.    And this was the first time you met him?

23   A.    Right.

# FREEDOM COURT REPORTING

1   Q.   Did he ask you to try to sign something to

2        indicate --

3   A.   He said, you need to sign up.  I said, I

4        don't need to sign up for anything.

5   Q.   And why did you tell him that?  Why didn't

6        you feel you needed to sign up for

7        anything?

8   A.   Because there's nothing wrong with me that

9        -- that that caused.

10  Q.   Well, what about your husband's

11       Alzheimer's, did you believe that it might

12       be caused by --

13  A.   No, no.

14  Q.   Well, why didn't you consider whether his

15       Alzheimer's was being caused by his

16       exposure at the mill?

17  A.   Because it had been caused a long, long

18       time before this.

19  Q.   Were you present when anyone gave

20       Mr. Mitchell permission to represent your

21       husband?

22  A.   Roy didn't give him permission.

23  Q.   How do you know that?

# FREEDOM COURT REPORTING

1    A.    He told Roy -- he was just taking

2         affidavits.  That's what he said.  I said

3         -- I said -- He said, you need to sign up.

4         I said, let me tell you something, I don't

5         sue people.  I said, we've always worked

6         hard for what we had.  And I said, Roy

7         can't remember these things and he don't

8         need to be included in this mess.  I said,

9         y'all had meetings down there we never

10       attended.  I said, they had meetings that

11       we never attended.  They had three.  We

12       never went down there.  And Roy is

13       supposed to meet him over there at Lake

14       House Breakfast over there and Roy didn't

15       go.  I told Roy he's not going anywhere.

16       So he -- We've never been to nothing they

17       did.

18    Q.    Okay.

19    A.    The only time we've ever seen Mitchell is

20       in that swing out there.

21    Q.    Is that the only time he's been here?

22    A.    Oh, he's been here several times.

23    Q.    After the first time he was here when you

# FREEDOM COURT REPORTING

19

```
 1            told him what you've said --
 2    A.     Yes --
 3    Q.     -- has he been back and talked to you
 4            again?
 5    A.     Yeah.  He said, I'm sure you need -- I
 6            said, let me tell you something.  I told
 7            you -- He said, I'm your lawyer, too.  I
 8            said, no, you're not.  I said, I don't
 9            need a lawyer.  If I do I'll hire me one.
10    Q.     How many times have you told him that?
11    A.     Three times.
12    Q.     And have you ever authorized him to do
13            anything on your behalf?
14    A.     No.
15    Q.     And have you made that perfectly clear?
16    A.     You've got that right.  I don't like that
17            man.  I guess that sums it up right.  I'm
18            sorry.
19    Q.     That's okay.
20    A.     He's -- I don't know how to explain it.  I
21            just --
22    Q.     Get it off your chest.
23    A.     I'd love to pinch his head off.
```

# FREEDOM COURT REPORTING

1   Q.    Well --

2   A.    He is -- You can't get rid of him.  And

3         they even sent somebody back here in the

4         summer when -- the first of spring, I

5         guess it was, there was somebody -- Wait a

6         minute.  Let me get it straight before you

7         put it down.  That little Brooks girl --

8         Hughes girl, her and two men come out here

9         one day about lunchtime.  And I went to

10        the -- rung the doorbell, and I went to

11        the door and she said, we'd like to look

12        up in your attic.  I said, for what?  For

13        dust and all.  I said, well, let me tell

14        you something, little lady, we've got

15        blown-in insulation.  If you want to go,

16        help yourself.  She said -- I said, what

17        are y'all doing?  Well, it probably

18        accumulated in this house.  I said, what?

19        I said, I may have dust but it wasn't from

20        Louisiana Pacific.

21  Q.    Describe these people.  I've never heard

22        of them.  Who are you talking about?

23  A.    Oh, this was just two boys, and she said

# FREEDOM COURT REPORTING

1        they had hired them to go around to

2        people's houses and I guess our house in

3        general.  And boy did that make me mad.

4        This is Debra Hughes.  Her mama -- they've

5        got a suit against them.  Anyway, I get

6        mad every time I think about it.

7    Q.    Well, if you need to take a break, let me

8        know.  It's obvious that you're upset

9        about this.

10   A.    I could not comprehend them -- They didn't

11       go up in the attic.  I said, you're not

12       going in my attic.  I said, we have

13       blown-in insulation.  She's the one, I

14       think, that got this started down here.

15   Q.    Is she a local person?

16   A.    No.  She lives out at Corner Creek on the

17       Samson Highway.

18   Q.    Is she a lawyer or --

19   A.    No.

20   Q.    I assume this lawsuit is fairly well-known

21       around here, I mean, the idea that this

22       lawsuit is existing?

23   A.    Oh, yeah.

# FREEDOM COURT REPORTING

1   Q.   There's apparently a lot of people who

2        have joined up with the --

3   A.   We've got a list of the names of them.

4        And there's people that's never even lived

5        here before that's just moved here that's

6        got their name on there.  So I don't

7        understand that.

8   Q.   Oh, really?

9   A.   Yes.

10  Q.   Do you know any names?

11  A.   I'll have to --

12  Q.   That's okay.  But you mean there are

13       people that are just -- that have just

14       moved here are claiming --

15  A.   They haven't been here over a year and

16       they're claiming that they had all this

17       here cancer.  If I have cancer, it's

18       caused from something besides L. P.  If

19       Roy has Alzheimer's, it's -- if he has

20       memory loss, it's not caused from that

21       over there.

22  Q.   Has his doctor indicated to you personally

23       that his mental situation is caused by any

# FREEDOM COURT REPORTING

1          exposure to anything?

2   A.    No.  I asked him -- He asked me did anyone

3          in his family ever, you know, have

4          Alzheimer's.  I said, his mother did.  She

5          died about three years ago and she was

6          ninety-five years old.

7   Q.    Wow.

8   A.    And that's -- He has health problems.

9          He's got arthritis and he's got back

10         problems, but he's had them for a long

11         time.

12  Q.    Is there anything else you want to tell me

13         about this situation before I end the

14         interview?  And, again, I just -- I don't

15         want to know anything that only your

16         husband has told you in confidence, as

17         you're his wife.  But anything that you

18         have heard or seen about the lawsuit that

19         you want to tell me?

20  A.    Oh, all these people keep asking me, when

21         are we going to get our money?  I said,

22         what money?  I said, I didn't know I was

23         supposed to get any money.  I said, I've

# FREEDOM COURT REPORTING

24

1    always worked for mine.  Oh, yeah, we're

2    going to get a bundle out of L. P.   I

3    said, I'm afraid you're going to get

4    disappointed.

5  Q.   And these people are people who are in

6    this lawsuit?

7  A.   Yeah.  And they know because Roy -- You

8    know, I see them in the grocery store and

9    the beauty shop and all.  I said, listen,

10    folks, I haven't signed up for any money.

11    I said, they don't owe me anything.

12  Q.   When Roy -- Were you present when Roy was

13    taped by Mr. --

14  A.   Yes.

15  Q.   -- Mitchell?

16  A.   Uh-huh (positive response).

17  Q.   Has he been taped more than once?

18  A.   No.

19  Q.   After that do you know whether or not the

20    information that Roy gave to them had any

21    information that was inaccurate or --

22  A.   Well, he couldn't remember dates, you

23    know.  And it's just -- it's just the same

# FREEDOM COURT REPORTING

1    old thing over and over and over and over.

2    That's -- I said, I told you one time my

3    husband does not remember.  Well, it could

4    be caused from chemicals.  I said, it's

5    caused because it runs in his family.

6  Q.  And you said that to Mr. Mitchell?

7  A.  You've got that right.  And then I got a

8    letter that said they might have to --

9    they wanted Roy to -- I said -- I thought,

10   you may want horns but you won't never get

11   that, brother.  He's got a doctor in

12   Pensacola he'll see.  And I've never given

13   permission to get Roy's records from his

14   doctors.

15 Q.  Are you handling his affairs now?

16 A.  That's right.

17 Q.  Has he given -- Do you have a power of

18   attorney that --

19 A.  No.  But I could get it in a heartbeat.

20 Q.  Okay.  Do you have any information as to

21   why Mr. Mitchell would believe that Roy

22   would want to be represented in this

23   lawsuit that --

# FREEDOM COURT REPORTING

1    A.    Roy told him he didn't want to be

2          represented.  He said, we're already

3          represented.  He said -- I said, no, I'm

4          not.

5    Q.    All right.  You're going to need to

6          explain that.  It's going to be hard --

7          For somebody reading this, I want them to

8          understand exactly what you mean.

9    A.    Okay.  Every time he comes, he tells Roy

10         he is represented.  I said, well, when did

11         you get to represent Roy because he never

12         asked you to represent him?  And he

13         didn't.  He just takes it on his-self to

14         -- And he said that I needed to -- I said,

15         no.  You don't represent me.  Never have

16         or never will.

17   Q.    Well, aren't you aware that he thinks he's

18         representing Roy, that Mr. Mitchell

19         believes --

20   A.    Yes.  He thinks he is.  But I told him

21         he's not.  If I have to get a doctor's

22         thing for Roy not to go up to Andalusia to

23         court to be -- to have a -- What do you

# FREEDOM COURT REPORTING

1        call it?

2   Q.   Deposition?

3   A.   Deposition.  I'll get it from Dr. D that

4        he cannot remember.  He wanted to know

5        every doctor Roy had been to and all this

6        stuff from way back when.  I said, my God,

7        man, we haven't been to the doctor for a

8        long time till we got older.  And I said,

9        all the time he's working he never went to

10       the doctor because he's never had to.

11       When you get old you have to start doing

12       things.

13  Q.   Joann, is there anything you would like to

14       add that I haven't asked you about that

15       you'd like to put on the Record?  We may

16       file this in an effort to -- in the court

17       to ask the court to take some kind of

18       action.  And a judge may read this.  And

19       is there anything you'd like to add?

20  A.   I wished that we could get the harassment

21       stopped from Mr. Mitchell.  He is the --

22       he -- he is something else.  I've

23       considered getting a lawyer myself.

# FREEDOM COURT REPORTING

1    Q.    Okay.

2    A.    I'm tired of it.

3    Q.    Have you understood my questions?

4    A.    I sure have.

5    Q.    Have I been clear?

6    A.    Sure.

7    Q.    And do you understand that I represent --

8          I'm one of the lawyers representing

9          Louisiana Pacific?

10   A.    Yes, I do.

11   Q.    Do you understand that we are part of the

12         lawyers who are defending these claims

13         that something at the plant caused injury

14         to other people?

15   A.    Yes, I do.

16   Q.    Did you contact Louisiana Pacific to ask

17         them to have somebody contact you about

18         this?

19   A.    Yes, I did.

20   Q.    Have you given these comments of your own

21         free will?

22   A.    Yes, I have.

23   Q.    Has anyone pressured you to say anything

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | | to me -- |
| 2 | A. | No. |
| 3 | Q. | -- at all? |
| 4 | A. | No. |
| 5 | Q. | Present today in the room in your house |
| 6 | | are just me, you and the court reporter; |
| 7 | | is that correct? |
| 8 | A. | That's right. |
| 9 | Q. | Have I had any contact with your husband |
| 10 | | today? |
| 11 | A. | No.  You haven't even seen him. |
| 12 | Q. | Have I ever talked to him in the last |
| 13 | | year? |
| 14 | A. | No. |
| 15 | Q. | Now, you had present today some letters on |
| 16 | | a table that appear to be addressed to |
| 17 | | Mr. Ezell. |
| 18 | A. | Right. |
| 19 | Q. | Have I looked at any of those letters? |
| 20 | A. | No, you have not. |
| 21 | Q. | Have I allowed you to tell me anything in |
| 22 | | those letters? |
| 23 | A. | No. |

# FREEDOM COURT REPORTING

```
1    Q.    Joann, after Ms. Parham writes up this

2          report verbatim of what we've said --

3    A.    Okay.

4    Q.    -- she is going to send it to you to look

5          over.

6    A.    Okay.

7    Q.    And if it's correct, to sign it and send

8          it back to her.  Is that okay?

9    A.    Sure will.

10   Q.    And what is the address that she needs to

11         send that to?

12   A.    Just 21868 Wood Avenue, Florala  36442.

13   Q.    Is there anything you would like to add?

14   A.    I appreciate you coming.

15   Q.    Well, thank you for inviting me into your

16         home.

17   A.    I sure do.

18   Q.    With that, we'll end the statement.

19              * * * * * * * * * * * *

20              FURTHER DEPONENT SAITH NOT

21              * * * * * * * * * * * *

22              REPORTER'S CERTIFICATE

23   STATE OF ALABAMA,
```

# FREEDOM COURT REPORTING

1    MONTGOMERY COUNTY,

2         I, Jackie Parham, Certified Shorthand

3    Reporter and Commissioner for the State of

4    Alabama at Large, do hereby certify that I

5    reported the sworn statement of:

6              JOANN D. EZELL,

7    who was first duly sworn by me to speak the

8    truth, the whole truth, and nothing but the

9    truth, on Friday, the 11th day of August, 2006.

10        The foregoing 30 computer-printed pages

11   contain a true and correct transcript of the

12   examination of said witness by counsel for the

13   parties set out herein.  The reading and signing

14   of same is hereby not waived.

15        I further certify that I am neither of kin

16   nor of counsel to the parties to said cause, nor

17   in any manner interested in the results thereof.

18

19        --------------------------------

20        JACKIE PARHAM, Certified

21        Shorthand Reporter and

22        Commissioner for the State

23        of Alabama at Large

# FREEDOM
# COURT REPORTING

367 Valley Avenue
Birmingham, Alabama 35209
205.397.2397
877.373.3660


## WITNESS CERTIFICATION


I, WITNESS, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.


_____
WITNESS


Sworn to and subscribed before me, this
the 14th day of August_____, 2006.

_____
Notary Public
My Commission expires: 4/19/2010


Sworn Statement:     Joann Ezell
Taken:               8/11/06
Court Reporter:      Jackie Parham