1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3        NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6  MELANIE CHAMBERS, who sues by

7  and through her Mother and next

8  of friend, GAIL TATUM,

9        Plaintiff,

10        vs.

11  PACTIV CORPORATION and

12  LOUISIANA-PACIFIC CORPORATION,

13        Defendants.

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16  between the parties through their respective

17  counsel, that the videotaped deposition of

18  Sandra Cobb may be taken before Angela

19  Smith, RPR, CRR, at the Embassy Suites

20  Hotel, at 300 Tallapoosa Street, Montgomery,

21  Alabama 36104, on the 28th day of July,

22  2006.

23        DEPOSITION OF SANDRA COBB

2

1     IT IS FURTHER STIPULATED AND

2  AGREED that the signature to and the reading

3  of the deposition by the witness is not

4  waived, the deposition to have the same

5  force and effect as if full compliance had

6  been had with all laws and rules of Court

7  relating to the taking of depositions.

8     IT IS FURTHER STIPULATED AND

9  AGREED that it shall not be necessary for

10  any objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties

13  may make objections and assign grounds at

14  the time of the trial, or at the time said

15  deposition is offered in evidence, or prior

16  thereto.

17     IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21     * * * * * * * * * * * * *

22

23

3

1          * * * * * * * * * * * * *

2              I N D E X

3              EXAMINATION

4                      PAGE

5   By Mr. Palmer ...................... 8

6   By Mr. Lockard .................... 32

7          EXAMINATION CONTINUED

8                      PAGE

9   By Mr. Palmer .................... 73

10          DEFENDANT'S EXHIBITS

11                     PAGE

12  Ex. 1 - The advertisement from

13          the Florala newspaper .... 49

14  Ex. 2 - Ms. Cobb's client

15          information

16          questionnaire ............ 61

17          * * * * * * * * * * * * *

18

19

20

21

22

23

4

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3         NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6

7  MELANIE CHAMBERS, who sues by

8  and through her Mother and next

9  of friend, GAIL TATUM,

10        Plaintiff,

11        vs.

12  PACTIV CORPORATION and

13  LOUISIANA-PACIFIC CORPORATION,

14        Defendants.

15

16  BEFORE:

17        ANGELA SMITH, Commissioner.

18

19  APPEARANCES:

20        GREGORY A. CADE, ESQUIRE, of

21  ENVIRONMENTAL LITIGATION GROUP, 3529 7th

22  Avenue South, Birmingham, Alabama 35255,

23  appearing on behalf of the Plaintiff.

5

1   APPEARANCES (continued):

2        ROBERT L. PALMER, ESQUIRE, of

3   ENVIRONMENTAL LITIGATION GROUP, 3529 7th

4   Avenue South, Birmingham, Alabama 35255,

5   appearing on behalf of the Plaintiff.

6        BERNARD TAYLOR, SR., ESQUIRE, of

7   ALSTON & BIRD, One Atlantic Center, 1201 W.

8   Peachtree St., Atlanta, Georgia 30309,

9   appearing on behalf of the Defendant,

10  Louisiana-Pacific Corporation.

11       ORLYN O. LOCKARD, III, ESQUIRE, of

12  ALSTON & BIRD, One Atlantic Center, 1201 W.

13  Peachtree St., Atlanta, Georgia 30309,

14  appearing on behalf of the Defendant,

15  Louisiana-Pacific Corporation.

16       MATTHEW C. SOSTRIN, ESQUIRE, of

17  MAYER, BROWN, ROWE & MAW, 71 S. Wacker

18  Drive, Chicago, Illinois 60606, appearing on

19  behalf of the Defendant, Pactiv Corporation.

20       VIDEOGRAPHER:  Paul Brewer

21           * * * * * *

22

23

6

1          I, ANGELA SMITH, RPR, CRR, a Court

2  Reporter of Wetumpka, Alabama, acting as

3  Commissioner, certify that on this date, as

4  provided by the Federal Rules of Civil

5  Procedure and the foregoing stipulation of

6  counsel, there came before me at the Embassy

7  Suites Hotel, 300 Tallapoosa Street,

8  Montgomery, Alabama 36104, beginning at 9:08

9  a.m., Sandra Cobb, witness in the above

10  cause, for oral examination, whereupon the

11  following proceedings were had:

12          VIDEOGRAPHER:  This begins

13  videotape number one in the deposition of

14  Sandra Cobb in the matter of Melanie

15  Chambers, who sues by and through her mother

16  and next of friend, Gail Tatum, Plaintiff,

17  versus Pactiv Corporation and

18  Louisiana-Pacific Corporation, Defendants.

19  Case number 83-LES-CSC.

20          We're on the Record.  The time

21  is 9:08 a.m.  Today is Friday, July 28,

22  2006.  My name is Paul Brewer.

23          Counsel, please identify

7

1  yourself and state whom you represent.

2          MR. PALMER:  I am Robert

3  Leslie Palmer, and I'm one of the attorneys

4  representing the Plaintiffs in this case.

5          MR. LOCKARD:  Orlyn Lockard,

6  appearing on behalf of Defendant,

7  Louisiana-Pacific Corporation.

8          MR. TAYLOR:  Bernard Taylor,

9  appearing on behalf of Louisiana-Pacific.

10          MR. SOSTRIN:  Matthew Sostrin,

11  appearing on behalf of Defendant, Pactiv

12  Corporation.

13          MR. CADE:  Gregory N. Cade,

14  appearing on behalf of Mrs. Sandra Cobb and

15  the Plaintiffs.

16          VIDEOGRAPHER:  Would the

17  reporter please swear in the witness.

18          SANDRA COBB,

19  being first duly sworn, was examined and

20  testified as follows:

21          COURT REPORTER:  Usual

22  stipulations?

23          MR. PALMER:  No.

8

1          EXAMINATION

2 BY MR. PALMER:

3     Q.    Good morning, Mrs. Cobb.

4     A.    Good morning.

5     Q.    How are you today?

6     A.    Okay.

7     Q.    Would you please introduce

8 yourself to the jury by stating your full

9 name for the Record, please.

10     A.    My name is Sandra Elaine

11 Thomas, which is my maiden name, Cobb.

12     Q.    And do you understand that

13 you're under oath and that you have to tell

14 the truth today?

15     A.    Yes, sir.

16     Q.    And are you aware that even

17 though you are not in a courtroom, that your

18 testimony today can be used in a court of

19 law, just the same as it would be if you

20 were in a courtroom?

21     A.    Yes, sir.

22     Q.    When and where were you born,

23 ma'am?

9

1     A.    I was born February 19, 1950,

2  in Valparaiso, Florida, V-A-L-P-A-R-A-I-S-O.

3     Q.    Where do you currently live?

4     A.    I live in Florala, Alabama.

5     Q.    When did you move to Florala,

6  Alabama?

7     A.    Permanently in September of

8  1971.

9     Q.    And did you live there any

10  other time?

11     A.    Yes, sir.  For approximately

12  six months prior to that.

13     Q.    All right.  When was that?

14     A.    When I got married to my

15  husband, July 9, 1969.

16     Q.    And in 1971, where did you --

17  you moved -- You've lived in Florala since

18  1971?

19     A.    Yes, sir.

20     Q.    What is your address, ma'am?

21     A.    Currently, it's 23400 Third

22  Avenue.  Previously, before the E-911, it

23  was 605 East Third Avenue.

10

1    Q.    Are you currently married?

2    A.    I'm recently widowed.

3    Q.    And when did your husband pass

4  away, ma'am?

5    A.    April 23, 2006.

6    Q.    What was your husband's name?

7    A.    Kenneth Eugene.

8    Q.    And so that -- You said, I

9  think, you were married on July 9, 1969?

10   A.    Yes, sir.

11   Q.    So, you've been married -- You

12  were married for almost thirty-seven years,

13  then?

14   A.    Yes, sir.

15   Q.    Do you have any children?

16   A.    I have two.

17   Q.    And can you tell us what their

18  names are and how old they are?

19   A.    I have a son, Kevin Eugene,

20  he'll be thirty-four in September.  And I

21  have a daughter, Kristin Elaine, she's Brown

22  now, she's married, and she'll be

23  twenty-five.  Yeah.  Twenty-five in

11

1  September.

2      Q.    Did your children attend

3  school in Florala?

4      A.    My son graduated from Florala

5  High School and my daughter went there until

6  the fifth grade.

7      Q.    Are you a member of a church,

8  ma'am?

9          MR. LOCKARD:  Objection.

10  Relevance.

11      A.    Yes.

12      Q.    I'm sorry, what was your

13  answer?

14      A.    Yes.

15      Q.    What is the name of that

16  church?

17          MR. LOCKARD:  Objection.

18  Relevance.

19      A.    Westside Baptist.

20      Q.    If you'll -- If he starts to

21  state an objection, if you could hold off

22  and answer after his objection.

23      A.    Okay.

12

1     Q.    What is the name of your

2  church, again?

3          MR. LOCKARD:  Same objection.

4     A.    Westside Baptist Church.

5     Q.    How long have you been a

6  member of that church?

7          MR. LOCKARD:  Same objection.

8     A.    About six and a half, seven

9  years.

10    Q.    How many people attend that

11  church?

12         MR. LOCKARD:  Same objection.

13    A.    In the worship service,

14  there's about seventy-five to eighty.

15    Q.    Do you know the other members

16  of your church pretty well?

17         MR. LOCKARD:  Objection.

18  Relevance.

19    A.    Yes, sir.

20    Q.    And have you met some of their

21  friends and relatives?

22         MR. LOCKARD:  Same objection.

23    A.    Yes, sir.

13

1      Q.     Do you hold any positions in

2  the church?

3          MR. LOCKARD:  Same objection.

4      A.     Yes, sir.

5      Q.     What are those positions,

6  ma'am?

7          MR. LOCKARD:  Same objection.

8      A.     I teach Sunday school, I'm the

9  pianist, a member of the choir, soloist,

10  assistant music director, and I prepare the

11  bulletin and the projection material for the

12  Sunday morning worship services.

13     Q.     Is there a prayer list

14  included in the church bulletin?

15         MR. LOCKARD:  Same objection.

16     A.     Yes, sir, there is.

17     Q.     And do you prepare that prayer

18  list as well?

19         MR. LOCKARD:  Same objection.

20     A.     Yes, sir, I do.

21     Q.     How long have you been

22  preparing that prayer list?

23         MR. LOCKARD:  Same objection.

14

1      A.    Approximately six years.

2      Q.    What is the most common prayer

3  request that you see?

4           MR. LOCKARD:  Objection.

5  Relevance.  Foundation.  Hearsay.

6      A.    Most of the time it's cancer.

7      Q.    And what percentage of those

8  prayer requests -- You said it's cancer?

9      A.    Yes, sir.

10           MR. LOCKARD:  Same objection.

11      Q.    What percentage of those

12  prayer requests relate to cancer?

13           MR. LOCKARD:  Same objection.

14      A.    About ninety percent.

15      Q.    Are there a lot of people in

16  Florala and Lockhart with cancer?

17           MR. LOCKARD:  Objection,

18  relevance.  Foundation.  Speculation.

19           MR. SOSTRIN:  For the Record,

20  Defendant Pactiv, when one Defendant

21  objects, we object as well.

22           MR. PALMER:  We can have that

23  stipulation.

15

1    Q.    I'm sorry.  Let me restate the

2  question so that it will be clear.  Are

3  there a lot of people in Florala and

4  Lockhart with cancer?

5         MR. LOCKARD:  Relevance.

6  Foundation.  Speculation.

7    A.    In my personal opinion, yes.

8    Q.    Do you personally know anyone

9  in Florala and Lockhart who has died of

10  cancer?

11         MR. LOCKARD:  Objection.

12  Relevance.  Foundation.

13    A.    Yes, sir, I do.

14    Q.    Can you -- Were you close to

15  any of those people?

16         MR. LOCKARD:  Same objections.

17    A.    Yes, sir.

18    Q.    Who are they?

19         MR. LOCKARD:  Same objections.

20    A.    One was my mother-in-law who

21  died of breast cancer.  And my

22  daughter-in-law's mother died of ovarian

23  cancer.

16

1      Q.    Have you also been diagnosed

2  with any kind of cancer?

3      A.    Yes, I have.

4      Q.    What kind of cancer were you

5  diagnosed with, ma'am?

6      A.    Breast cancer.

7      Q.    Have you ever worked with

8  chemicals?

9      A.    No, sir.

10      Q.    Have you ever smoked?

11      A.    No, sir.

12      Q.    How did you learn that you had

13  breast cancer?

14          MR. LOCKARD:  Objection.

15  Hearsay.

16      A.    I found a lump on the

17  anniversary -- my wedding anniversary, July

18  9, 2003.

19      Q.    How did you feel when you

20  learned that you had breast cancer?

21      A.    Like sitting on a stack of

22  bricks and they're knocked out from under

23  you.

17

1     Q.     Were you -- When were you

2 diagnosed with breast cancer, ma'am?

3     A.     They did a biopsy on that same

4 day, July 9th, and the very next week the

5 results came back that it was malignant.

6     Q.     July 9th, isn't that your

7 anniversary?

8     A.     Yes, sir.

9          MR. LOCKARD:  Objection.

10 Relevance.

11     Q.     How did you tell your family

12 that you had breast cancer?

13          MR. LOCKARD:  Objection.

14 Relevance.

15     A.     Well, my daughter was with me

16 when I went to the doctor that day.  And on

17 the way home she called on the cell phone

18 and told my husband and my son, because I

19 couldn't tell them.

20     Q.     How did your daughter react to

21 the news?

22          MR. LOCKARD:  Objection.

23 Relevance.

18

1    A.    She started crying.

2    Q.    How did your husband react to

3  the news?

4         MR. LOCKARD:  Same objection.

5    A.    He -- He was crying.  He's not

6  a -- He wasn't one to openly show his

7  emotions, but when I got home, he was crying

8  profusely.  And when I walked in the door he

9  got up and hugged my neck and was crying.

10    Q.    What was your health like,

11  ma'am, before you were diagnosed with breast

12  cancer?

13    A.    In my opinion, I was a fairly

14  healthy person outside of, you know,

15  pneumonia and bronchitis occasionally.  But

16  other than that, I was -- I felt I was

17  healthy.

18    Q.    What has your health been like

19  since you were diagnosed with breast cancer?

20    A.    Well, my immune system is

21  extremely weak and the medication they put

22  me on after the treatments, Arimidex, causes

23  joints and bone pain.

19

1    Q.    Is that constant?

2    A.    Yes, sir.

3    Q.    Did you have any surgery for

4  your breast cancer?

5    A.    Yes, sir.

6    Q.    And what kind of surgery did

7  you have?

8    A.    I had a lumpectomy, and they

9  also removed three lymph nodes.

10    Q.    Did you have any other medical

11  treatment for your breast cancer?

12    A.    Yes, sir.  I had chemotherapy

13  and radiation treatments.

14    Q.    Can you describe for us the

15  chemotherapy?

16    A.    It was a little piece of hell

17  on earth, to put it mildly.  I lost all my

18  hair and my husband called me Kojack because

19  I was like a peeled onion.  And after the

20  treatments, it would be about two or three

21  days that I was just sick on my stomach,

22  nauseous, laying in bed.

23    Q.    Can you recall how long the

20

1  chemotherapy lasted?

2      A.    They put the port in in

3  September, and I think the first treatment

4  was either the last of September or the

5  first of October, and I finished it up in

6  December, the same year, 2003.

7      Q.    How did you feel when you lost

8  all your hair?

9      A.    How would you expect one to

10  feel?  I mean, I was -- I was always very

11  blessed with a head full of thick, very --

12  what I considered pretty hair, and then to

13  look like a peeled onion, it was

14  devastating, to say the least.

15      Q.    Can you describe for us the

16  radiation therapy that you underwent?

17      A.    Long and tiring.  There were

18  thirty-seven treatments that began sometime

19  in January and finished in February of 2004.

20  And I had them done in Opp, Alabama.  So I

21  would go to work, and work very early in the

22  morning until about two or two-thirty in the

23  afternoon, and then drive from Eglin Air

21

1  Force base to Opp for my treatment and then

2  back home.

3      Q.    You said there were

4  thirty-seven treatments, how frequently did

5  you have those treatments?

6      A.    They were daily, Monday

7  through Friday.

8      Q.    How far away is Opp from

9  Florala?

10     A.    About eighteen to twenty

11  miles.

12     Q.    And you drove that every day?

13     A.    Yes, sir.

14     Q.    Did your breast cancer affect

15  your family?

16     A.    Yes, sir.

17     Q.    Can you tell us how it

18  affected your family?

19          MR. LOCKARD:  Objection.

20  Relevance.

21     A.    It -- It worried them, you

22  know, that -- that it would come back and

23  that they would lose me.  And they're still

22

1  constantly worrying about my health, whereas

2  before it didn't seem to, you know, cross

3  their mind.  Just overly concerned for my

4  well-being.

5      Q.    Did your breast cancer affect

6  your ability to enjoy life?

7      A.    Yes, sir.  To a degree, it did

8  and does.

9      Q.    And how did it do that?

10      A.    Well, whenever the cancer word

11  is ever said to you, you're -- you're always

12  scared and worried that it's going to come

13  back.  So, you know, a pain in your side or

14  a pain in your chest or, you know, that

15  constant pain in my breast where the lump

16  was always makes you wonder is it coming

17  back.

18      Q.    So, it never really leaves

19  you?

20      A.    No, sir.

21      Q.    Have your doctors talked to

22  you about your chances for a complete

23  recovery?

23

1      A.    Well, I asked them, you know,

2  what was the probability --

3           MR. LOCKARD:  Objection.

4  Hearsay.

5      Q.    You can answer the question

6  now.

7      A.    I asked them about the

8  probability of it coming back, and they said

9  they couldn't give me any guarantee.  That

10  they felt sure that we got it early enough

11  and with the treatments that it wouldn't,

12  but they couldn't give me a guarantee.

13      Q.    You've testified that you have

14  two children.  Have you ever had any

15  miscarriages?

16      A.    Yes, sir.

17      Q.    How many miscarriages have you

18  had, ma'am?

19           MR. LOCKARD:  Objection.

20  Relevance.

21      A.    I had two.  I had two.

22      Q.    And when did you have those

23  miscarriages?

24

1        MR. LOCKARD:  Same objection.

2     A.    One before my son was born, I

3  believe sometime in '71.  And the other one

4  was '73, '74, shortly after -- '74.  Shortly

5  after he was born.

6     Q.    Have you also been diagnosed

7  with endometriosis?

8        MR. LOCKARD:  Objection.

9  Relevance.

10     A.    Yes, sir, I have.

11     Q.    When were you diagnosed with

12  endometriosis?

13     A.    Again, if memory serves me

14  right, it was about 1976.

15        MR. TAYLOR:  Excuse me.  I'm

16  sorry.  And I hate to interrupt, but the

17  witness seems to be in some kind of pain.

18  Do we need to stop the deposition?

19        THE WITNESS:  It will ease

20  off.  It comes and goes.  It's from where

21  the breast cancer was.  And they said that

22  would not go away.

23        MR. LOCKARD:  Just let me know

25

1  if you want a break.

2         THE WITNESS:  I will.  I will.

3         MR. LOCKARD:  Okay.

4     Q.     I'm sorry.  Are you in pain

5  right now?

6     A.     Yeah.  But it will ease off.

7  Like I said, it comes and goes.

8     Q.     Now, you told us you were

9  diagnosed with endometriosis?

10         MR. LOCKARD:  Objection.

11  Relevance.

12     A.     Yes, sir.

13     Q.     And you said that was in 1976?

14     A.     As close I can remember, yeah.

15     Q.     Wasn't your daughter born

16  after that diagnosis?

17     A.     Yes, sir.  I call her my

18  miracle baby.

19     Q.     Was her birth a normal birth?

20         MR. LOCKARD:  Objection.

21  Relevance.

22     A.     Not exactly.  I was

23  hospitalized three times while I was

26

1 carrying her. She was due in October, and I

2 spent almost the full month of July before,

3 because she was trying to come early, I was

4 going through, you know, early labor pains.

5        And when she was born

6 September the 23rd, the umbilical cord was

7 completely white and almost in two. Again,

8 I call her my miracle baby.

9    Q.    Was your daughter born with

10 any birth defects?

11       MR. LOCKARD: Objection.

12 Relevance.

13    A.    Yes, sir. She has scoliosis

14 of the spine and -- Well, she's flat-footed,

15 but she also has what the doctors term

16 prolapsed ankle bones to where they turn in

17 instead of holding her foot straight up.

18    Q.    Do you currently work outside

19 the home?

20    A.    No, sir. I'm retired.

21    Q.    Have you ever worked outside

22 the home?

23    A.    Yes, sir.

27

1    Q.    What did you do for a living?

2    A.    I -- From the time I graduated

3 from high school in 1968 to 1971, I did a

4 clerical work for a contractor on Eglin Air

5 Force Base called Vitro Services.

6        And then in September of '71,

7 I went to work for Civil Service there on

8 Eglin Air Force Base, and worked there in

9 contracting until I retired in 2004.

10 Outside of two years, I worked for the

11 Social Security office in Andalusia,

12 Alabama, from '76 to '78, also Civil

13 Service.

14    Q.    Are you familiar with the

15 Louisiana-Pacific facility between Lockhart

16 and Florala?

17    A.    Yes, sir.

18    Q.    Did the owners of that

19 facility ever identify for you the chemicals

20 that they were releasing into your

21 community?

22        MR. LOCKARD:  Objection.

23 Foundation.  Calls for speculation.

28

1 Leading.

2      A.   Not to my knowledge, no, sir.

3      Q.   Did they ever have any town

4 meetings?

5           MR. LOCKARD:  Same objections.

6      A.   No, sir.

7      Q.   Did they ever send any letters

8 to you or other residents of the community?

9           MR. LOCKARD:  Same objections.

10     A.   No, sir.

11     Q.   Did they ever put any notices

12 in the newspapers?

13          MR. LOCKARD:  Same objections.

14     A.   No, sir.

15     Q.   Did they ever post any signs

16 on the fence talking about the chemicals

17 that they were using?

18          MR. LOCKARD:  Same objections.

19     A.   No, sir.

20     Q.   Did the owners of that

21 facility ever tell you that the chemicals

22 they were releasing into your community

23 could cause cancer?

29

1       MR. LOCKARD:  Same objections.

2    A.   No, sir.

3    Q.   Did you give blood for dioxin

4 testing?

5    A.   Yes, sir.

6    Q.   Where was your blood drawn,

7 ma'am?

8    A.   At the Florala Hospital there

9 in Florala.

10    Q.   Was your church tested for

11 dioxins?

12       MR. LOCKARD:  Objection.

13 Relevance, foundation.

14    A.   Yes, sir, it was.

15    Q.   Do you now understand that you

16 were exposed to dioxins and other chemicals

17 from that facility?

18       MR. LOCKARD:  Same objections.

19    A.   Yes, sir, I do.

20    Q.   Do you believe that those

21 dioxins and other chemicals were the cause

22 of your cancer?

23       MR. LOCKARD:  Same objections.

30

1      A.    Yes, sir, I now do.

2      Q.    Do you believe that those

3  dioxins and other chemicals were the cause

4  of your miscarriage?

5          MR. LOCKARD:  No foundation.

6  Calls for speculation.

7      A.    Yes, sir, I do now.

8      Q.    Do you believe that those

9  dioxins and other chemicals were the cause

10  of your endometriosis?

11         MR. LOCKARD:  No foundation.

12  Speculation.

13     A.    Yes, sir.

14     Q.    Do you believe that those

15  dioxins and other chemicals were the cause

16  of your daughter's birth defects?

17         MR. LOCKARD:  No foundation.

18  Calls for speculation.

19     A.    Yes, sir, in my opinion.

20     Q.    Do you believe it's right for

21  a company to release dioxins and other

22  dangerous chemicals into a community?

23         MR. LOCKARD:  No foundation.

31

1 Speculation.  Leading.

2      A.    No, sir.

3      Q.    Do you believe that the owners

4 of the Louisiana-Pacific facility have

5 treated your community right?

6           MR. LOCKARD:  Same objections.

7      A.    No, sir.

8      Q.    Do you believe that the owners

9 of that facility have been honest with your

10 community?

11          MR. LOCKARD:  Same objections.

12     A.    No, sir.

13     Q.    Why did you decide to

14 participate in this lawsuit?

15     A.    I think when a company doesn't

16 handle their materials, chemical or

17 otherwise, in an appropriate and responsive

18 manner, they should be held accountable and

19 responsible for the possible outcomes of

20 their actions.

21          MR. PALMER:  Thank you,

22 Mrs. Cobb.  I have no further questions at

23 this time.

32

1          MR. LOCKARD:  Can we go off

2  the Record?

3          VIDEOGRAPHER:  Off the Record.

4  The time is 9:28 a.m.

5            (Recess taken.)

6          VIDEOGRAPHER:  Back on the

7  Record.  The time is 9:39 a.m.

8            EXAMINATION

9  BY MR. LOCKARD:

10     Q.    Ma'am, my name is Skip

11  Lockard.  And we had the opportunity to meet

12  a couple of weeks ago when you had your

13  deposition taken in Andalusia, Alabama.  Do

14  you recall that?

15     A.    Yes, sir.

16     Q.    Good.  It's nice to see you

17  again.  And I'm glad that you are here with

18  us today.

19     A.    Okay.

20     Q.    I'm going to ask you some

21  questions.  And I need to start by noticing

22  that you're wearing a pink ribbon for an ear

23  ring.

33

1      A.    Yes, sir.

2      Q.    I also notice that you have a

3    pink ribbon on your necklace.

4      A.    Yes, sir.

5      Q.    It's my understanding that

6    those pink ribbons indicate a breast cancer

7    support.

8      A.    Breast cancer awareness.

9      Q.    Breast cancer awareness.  Yes,

10   ma'am.  Now, you do understand that your

11   testimony today here is being videotaped;

12   correct?

13     A.    Yes, sir.

14     Q.    And do you also understand

15   that those ribbons may engender some

16   sympathy with the jury?

17          MR. PALMER:  I'm going to

18   object to the question.  It calls for

19   speculation.  It's argumentative.

20     A.    I did not wear it for that

21   purpose.  I wore it because I like it.

22     Q.    Yes, ma'am.

23     A.    It kind of matched the outfit.

34

1  That's the only reason that -- I did not

2  intend for it to sway anybody in any way.

3       Q.    Yes, ma'am.  Well, if it did

4  engender any sympathy with the jury, you

5  would want the jury to focus on the truth in

6  this matter; correct?

7       A.    Absolutely.

8       Q.    Okay.  And solely on the truth

9  in this matter; correct?

10      A.    Yes, sir.

11      Q.    And not be unduly influenced

12  by the sympathy that they may feel; is that

13  correct?

14      A.    Absolutely.

15      Q.    Thank you.  Now, you also

16  indicated a few moments ago that you were

17  experiencing some pain as you're sitting

18  here today.

19      A.    Yes, sir.

20      Q.    And if I heard you correctly,

21  you indicated that one of your doctors had

22  told you that that would be a long-term

23  condition; is that correct?

35

1      A.    Correct.

2      Q.    Can you tell me which doctor

3  it was that told you that?

4      A.    Dr. Boatright.

5      Q.    I'm sorry.  Can you say that

6  again?

7      A.    Dr. Boatright.

8      Q.    Yes, ma'am.  And when did

9  Dr. Boatright tell you that?

10      A.    February of this year.

11      Q.    Okay.  Did he tell you what is

12  causing that specifically?

13      A.    It's where the breast cancer

14  was removed, the lump, as well as the three

15  lymph nodes that they took out during the

16  lumpectomy.

17      Q.    Did he indicate whether that

18  was some type of regrowth pain, or can you

19  give me any more information?

20      A.    All I asked him was:  How long

21  will I have this pain in my breast?  And he

22  said:  For a long, long time.

23      Q.    Okay.  Did he give you a --

36

1  Let me start that over.

2          What did you understand him to

3  mean by a long, long time?

4      A.    That it wasn't going to go

5  away any time soon.

6      Q.    Okay.  Did he actually tell

7  you it would persist for a period of years?

8      A.    He didn't give a specific

9  number of years, no.

10      Q.    Now, at the time of your

11  deposition a couple of weeks ago, you

12  indicated that you were taking a medicine

13  called Arimidex; is that correct?

14      A.    Correct.

15      Q.    You also indicated at your

16  deposition that it was your belief that

17  Arimidex may have some side effects which

18  could hamper your memory; is that correct?

19      A.    Correct.

20      Q.    And are you still taking

21  Arimidex?

22      A.    Yes, sir.

23      Q.    Okay.  When was the last time

37

1  that you took the Arimidex?

2      A.    As I stated in the deposition

3  before, I take it daily, and it's prescribed

4  that I take it every night before going to

5  bed.

6      Q.    Does that mean that you took

7  it last night?

8      A.    Correct.

9      Q.    Do you think that the Arimidex

10  may hamper your memory here today?

11     A.    That, and my age, but more

12  importantly, the recent passing of my

13  husband affects my memory a great deal.

14     Q.    So, you believe that the

15  Arimidex may hamper your memory; correct?

16     A.    Yes, sir, that's one of the

17  side effects.

18     Q.    Yes, ma'am.  And you believe

19  that your age may hamper your memory?

20     A.    Yes, sir.

21     Q.    And you believe that the

22  passing of your husband may hamper your

23  memory?

38

1      A.    Correct.

2      Q.    Is there anything else that

3  you think may hamper your memory as you are

4  testifying today?

5      A.    No, sir.

6      Q.    Ma'am, you've never been

7  diagnosed with a medical condition that

8  impairs your memory; is that correct?

9      A.    Correct.

10      Q.    I understand that you were

11  born in 1950; is that true?

12      A.    True.

13      Q.    And when you were born, your

14  parents lived in Laurel Hill, Florida;

15  correct?

16      A.    Correct.

17      Q.    Laurel Hill is approximately

18  seventeen miles from the Lockhart area;

19  correct?

20      A.    Correct.

21      Q.    And you grew up in Laurel

22  Hill?

23      A.    Right.

39

1     Q.     You lived with your parents in

2 Laurel Hill until you got married; correct?

3     A.     Yes.

4     Q.     And I understand that you were

5 married in 1969?

6     A.     Correct.

7     Q.     And I also understand that in

8 1969 you and your husband moved to Florala

9 for a period of about six months; correct?

10     A.     Correct.

11     Q.     And I understand that after

12 six months in Florala, you and your husband

13 moved to Paxton, Florida; correct?

14     A.     Yes.

15     Q.     You lived in Paxton, Florida

16 from approximately 1969 to 1971?

17     A.     Well, if you do the math it

18 was probably from 1970 to '71, because six

19 months from July to December would make it

20 into the new year.

21     Q.     So, you lived in Paxton

22 Florida from approximately 1970 to 1971;

23 correct?

40

1       A.    Correct.

2       Q.    Correct?

3       A.    Yes, sir.

4       Q.    I'm sorry, I think we

5   accidentally spoke over you and I apologize.

6             I understand that the home

7   where you lived in Paxton, Florida was

8   approximately five to six miles from the

9   Lockhart Lumber Mill; is that correct?

10      A.    Yeah.  I'm not good with

11   mileage, but it would probably be safer to

12   say four to six miles, somewhere along in

13   there.

14      Q.    Four to six miles is your best

15   estimate?

16      A.    Yes.

17      Q.    And then I understand that in

18   1971 you moved to 23400 Third Avenue, in

19   Florala, Alabama; is that correct?

20      A.    When I moved in '71, it was

21   still called 605 East Third Avenue.

22   Remember the E 911 is what changed it to

23   23400, but that's correct.

41

1     Q.    So, in 1971 you moved to the

2  residence which is currently associated with

3  23400 Third Avenue?

4     A.    Yes, sir.

5     Q.    Thank you.  And as I

6  understand it, you have lived at that same

7  residence since 1971?

8     A.    Yes, sir.

9     Q.    As I think we discussed at

10  your prior deposition, you worked at Eglin

11  Air Force Base from 1968 to 1976; is that

12  accurate?

13     A.    Yes, sir.

14     Q.    That was a full-time position;

15  correct?

16     A.    Yes, sir.

17     Q.    And I understand that you

18  worked in Andalusia, Alabama, from the

19  period 1976 to 1978; is that correct?

20     A.    Yes, sir.

21     Q.    That was also a full-time

22  position?

23     A.    Yes, sir.

42

1      Q.    And I understand that you

2  worked back at Eglin Air Force Base from

3  1978 to 2004; is that correct?

4      A.    Yes, sir.

5      Q.    Can you tell me where Eglin

6  Air Force Base is located?

7      A.    It's about fifty miles from my

8  residence, and it's in the panhandle of

9  Florida.

10     Q.    Ma'am, you never worked at the

11  Lockhart Lumber Mill; is that correct?

12     A.    Correct.

13     Q.    And you never went to the

14  Lockhart Lumber Mill; is that correct?

15     A.    Correct.

16     Q.    And you have no personal

17  knowledge of operations at the mill;

18  correct?

19     A.    Correct.

20     Q.    Now, your father never lived

21  in Lockhart; correct?

22     A.    Correct.

23     Q.    Your father never lived in

43

1 Florala; correct?

2      A.    That's true.

3      Q.    Your father did have prostate

4 cancer, however; correct?

5      A.    Yes, sir.  That's not what he

6 died of.

7      Q.    Yes, ma'am.  But he did have

8 prostate cancer?

9      A.    Yes, sir.

10      Q.    Your father was a smoker; is

11 that correct?

12      A.    Yes, sir.

13      Q.    And I understand that your

14 husband was also a smoker; correct?

15      A.    Correct.

16      Q.    And your husband smoked

17 throughout your marriage, up until

18 approximately the year 2000; is that

19 correct?

20      A.    '99, 2000, somewhere along in

21 there, yes.

22      Q.    And he smoked about a pack and

23 a half to two packs a day; correct?

44

1    A.    Correct.

2    Q.    Your mother also lived in

3  Laurel Hill, Florida for her entire life;

4  correct?

5    A.    Correct.

6    Q.    Your mother never lived in

7  Lockhart?

8    A.    No, sir.

9    Q.    And your mother also never

10  lived in Florala; correct?

11    A.    Correct.

12    Q.    Your mother did have uterine

13  cancer?

14    A.    Yes, sir.

15    Q.    And your mother did also have

16  breast cancer; is that correct?

17    A.    Correct.

18    Q.    Ma'am, I understand that at

19  one point you had a benign cyst in your

20  breast; correct?

21    A.    Correct.

22    Q.    Is that what they also call

23  fibrocystic breast disease?

45

1      A.    He didn't term the lump that

2  was removed as that, but I do have fibroid

3  cysts, yes.

4      Q.    And the cysts -- The cyst that

5  you initially had in your breast was benign;

6  correct?

7      A.    The first one, yes, sir.

8      Q.    And that benign cyst was

9  removed; correct?

10     A.    Correct.

11     Q.    And so, if the time frame is

12  correct, that benign cyst was removed before

13  you developed breast cancer; correct?

14     A.    Correct.

15     Q.    I understand that your breast

16  cancer has also been removed; correct?

17     A.    Correct.

18     Q.    That's good.  And you have had

19  regular medical exams since your breast

20  cancer surgery; correct?

21     A.    Yes, sir.  Every six months.

22     Q.    Every six months?

23     A.    Yes, sir.

46

1      Q.    And the purpose of those exams

2  is to make sure that the breast cancer has

3  not returned; correct?

4      A.    Correct.

5      Q.    And to date, the cancer has

6  not returned; correct?

7      A.    Correct.

8      Q.    And you have never asked your

9  doctors whether there is a genetic link

10  between your breast cancer and your mother's

11  breast cancer, have you?

12      A.    No, sir.  I think I told you

13  before, once they say the cancer word to

14  you, you don't ask any questions, you just

15  want them to get it out and get it well so

16  you can live.

17          MR. LOCKARD:  Move to strike

18  the nonresponsive portion.

19      Q.    Ma'am, you've seen several

20  doctors since you were first diagnosed with

21  breast cancer; correct?

22      A.    Yes, sir.

23      Q.    And you've never had any

47

1   conversations with your doctors about the

2   cause of your breast cancer; correct?

3        A.    Correct.

4        Q.    And, thus, none of your

5   doctors has ever told you that your breast

6   cancer was related to the Lockhart Lumber

7   Mill; correct?

8        A.    Correct.

9        Q.    I understand that you have a

10  doctor named Dr. Weaver.

11       A.    Yes, sir.

12       Q.    And I understand that you

13  visited Dr. Weaver's offices on or about

14  January 6th of 2004; correct?

15       A.    Yes, sir.

16       Q.    And as we discussed at your

17  prior deposition, you recall that at that

18  time you indicated that you had not been

19  exposed to any hazardous substances;

20  correct?

21       A.    Yes, sir.

22       Q.    Ma'am, you understand that the

23  litigation that we're here for today is

48

1  about the health effects that people have

2  allegedly suffered as a result of chemical

3  exposures; is that correct?

4      A.    Correct.

5      Q.    And you understand that there

6  are claims in this litigation that chemicals

7  from the Lockhart Lumber Mill might have

8  caused or have caused people to develop

9  various diseases; is that correct?

10     A.    Correct.

11     Q.    And you indicated previously

12  that you'd seen an advertisement in the

13  Florala newspaper relating to those issues;

14  correct?

15     A.    Yes, sir.  Vaguely, but, yes,

16  sir.

17     Q.    Do you read the Florala

18  newspaper regularly?

19     A.    No, sir.  My husband did.

20     Q.    Did you ever discuss the

21  advertisement that you saw in the Florala

22  newspaper with anyone?

23     A.    No, sir.

49

1          (Defendant's Exhibit 1 was

2            marked for identification

3            purposes.)

4          MR. LOCKARD:  And I'm going to

5  ask the court reporter to mark that as

6  Exhibit 1.

7          MR. PALMER:  Is this exactly

8  as you found it?

9          MR. LOCKARD:  That's exactly

10  as I received it.

11          MR. PALMER:  So, this was

12  printed like this in the original -- You

13  don't know what the original is like?

14          MR. LOCKARD:  I don't have the

15  original.  That's the copy that I have.

16          MR. PALMER:  You've never seen

17  the original?

18          MR. LOCKARD:  That's the copy

19  that I have.

20          MR. PALMER:  I'm going to

21  object to the exhibit as lacking any proper

22  foundation, also, as lacking relevance.

23     Q.    Ma'am, the court reporter has

50

1  handed you Exhibit 1.  And my question is,

2  whether this is the advertisement that you

3  recalled seeing in the Florala News?

4      A.    Yes, sir.

5      Q.    That's the advertisement that

6  you recall?

7      A.    Well, similar to that, yeah,

8  if not that one.

9      Q.    Thank you.  You can hand that

10  back to the court reporter, please.

11      A.    (Witness complies.)

12      Q.    Now, I understand that

13  sometime after January 6th of 2004, when you

14  were in Dr. Weaver's offices, you attended

15  meetings that were held by attorneys at the

16  Lockhart Armory Hall; correct?

17      A.    Correct.

18      Q.    And, in fact, you attended at

19  least two different meetings at the Armory;

20  is that correct?

21      A.    Correct.

22      Q.    And those meetings related to

23  the Lockhart Lumber Mill; correct?

51

1          MR. PALMER:  At this point I'm

2   going to object to any questions relating to

3   the content of discussions at the meeting.

4   You can ask where the meetings occurred, who

5   was there, when they occurred, but I'm not

6   going to permit the witness to answer.

7          I'm going to instruct my

8   client not to answer any questions about any

9   discussions that went on, the content of any

10  discussions at all, and I'm asserting the

11  attorney-client privilege as the basis for

12  that.

13      Q.   Okay.  Ma'am, I'm going to ask

14  you a series of questions about meetings

15  that were at the Armory that I think that

16  I'm entitled to ask.  And your attorney is

17  going to object however he thinks that he

18  needs to object.  And we'll just proceed

19  accordingly and resolve that at a later time

20  with the Court.  Okay?  But I'm just going

21  to read into the Record the questions that I

22  need to ask you.  Okay?

23          You did attend meetings at the

52

1 Lockhart Lumber Mill -- Excuse me.  Strike

2 that and let me start over.

3        You did attend meetings at the

4 Armory that related to the Lockhart Lumber

5 Mill; correct?

6    A.    Yes, sir.

7    Q.    And there were a lot of people

8 at those meetings that you attended;

9 correct?

10    A.    Yes, sir.

11    Q.    Was there a sign-in sheet at

12 the first meeting that you attended at the

13 Armory?

14        MR. PALMER:  Objection.

15 Attorney-client privilege.  Instruct the

16 witness not to answer.

17    Q.    Ma'am, did you understand the

18 question that I asked you?

19    A.    Yes, sir.

20    Q.    Okay.  And other than -- But

21 for your attorney's objection, could you

22 answer that question?

23    A.    Yes, sir.

53

1      Q.    Okay.  And you intend to

2  follow his instruction not to answer the

3  question?

4      A.    Yes, sir.

5      Q.    Now, before you attended your

6  first meeting at the Armory, you had not

7  hired any lawyer to represent you in

8  connection with any claims relating to the

9  Lockhart Lumber Mill; correct?

10      A.    Correct.

11      Q.    And you did not sign anything

12  at the first meeting you attended at the

13  Armory, stating that you were hiring a

14  lawyer to represent you; correct?

15          MR. PALMER:  I'm going to

16  object to the question as calling for

17  attorney-client privileged information.  I'm

18  going to instruct the witness not to answer.

19      Q.    Ma'am, did you understand the

20  question that I asked you?

21      A.    Yes, sir.

22      Q.    And you intend to follow your

23  attorney's instruction not to answer it?

54

1     A.   Yes, sir.

2     Q.   But for his instruction not to

3 answer, could you answer the question that I

4 asked you?

5     A.   Yes, sir.

6     Q.   In fact, it was only after you

7 attended your first meeting at the Armory

8 that you signed anything hiring a lawyer to

9 represent you in connection with the

10 Lockhart Lumber Mill; is that correct?

11    A.   Correct.

12    Q.   And you told me earlier, I

13 believe, at your deposition, there were

14 about one hundred to a hundred and fifty

15 people at the first meeting you attended at

16 the Armory; is that correct?

17    A.   Correct.

18    Q.   Mr. Cade spoke to the crowd at

19 the first Armory meeting you attended; is

20 that correct?

21    A.   Best I can remember.

22    Q.   And at the first Armory

23 meeting that you attended, Mr. Cade talked

55

1  about the Lockhart Lumber Mill; is that

2  correct?

3          MR. PALMER:  I'm going to

4  object to the question as calling for

5  information privileged by the attorney --

6  subject to the attorney-client privilege and

7  I'm going to instruct the witness not to

8  answer.

9      Q.    Ma'am, did you understand the

10  question that I asked you?

11     A.    Yes, sir.

12     Q.    And but for your attorney's

13  instruction, would you be able to answer

14  that question?

15     A.    Yes, sir.

16     Q.    And do you intend to follow

17  your attorney's instruction not to answer?

18     A.    Yes, sir.

19     Q.    At the first Armory meeting

20  that you attended, Mr. Cade indicated that

21  some chemicals had come from the mill; is

22  that correct?

23          MR. PALMER:  I'm going to

56

1  object to the question.  It's calling for

2  information subject to the attorney-client

3  privilege.  I'm going to instruct the

4  witness not to answer.

5      Q.    Did you understand my

6  question?

7      A.    Yes, sir.

8      Q.    Do you intend to follow your

9  attorney's instruction not to answer?

10     A.    Yes, sir.

11     Q.    But for that instruction,

12  could you answer my question?

13     A.    Yes, sir.

14     Q.    At the first Armory meeting

15  that you attended, did Mr. Cade indicate

16  that the lawyers were thinking about filing

17  a lawsuit relating to the Lockhart Lumber

18  Mill?

19         MR. PALMER:  I'm going to

20  object to the question as calling for

21  information subject to the attorney-client

22  privilege.  I'm going to instruct the

23  witness not to answer.

57

1     Q.    Ma'am, did you understand my

2  question?

3     A.    Yes, sir.

4     Q.    Do you intend to follow your

5  attorney's instruction not to answer it?

6     A.    Yes, sir.

7     Q.    And but for his instruction,

8  would you be able to answer my question?

9     A.    Yes, sir.

10     Q.    Okay.  I understand you

11  attended a second meeting at the Armory; is

12  that correct?

13     A.    Yes, sir.

14     Q.    Was there a sign-in sheet at

15  the second meeting you attended at the

16  Armory?

17         MR. PALMER:  I'm going to

18  object to the question as calling for

19  information subject to the attorney-client

20  privilege.  I'm going to instruct the

21  witness not to answer.

22     Q.    Ms. Cobb, did you understand

23  my question?

58

1      A.    Yes, sir.

2      Q.    And do you intend to follow

3  your attorney's instruction not to answer

4  it?

5      A.    Yes, sir.

6      Q.    But for your attorney's

7  instruction, would you be able to answer my

8  question?

9      A.    Yes, sir.

10      Q.    Mr. Cade spoke at the second

11  Armory meeting you attended; is that

12  correct?

13      A.    Yes, sir.

14      Q.    And at that second Armory

15  meeting, Mr. Cade talked about the Lockhart

16  Lumber Mill; correct?

17          MR. PALMER:  I'm going to

18  object to the question as calling for

19  information subject to the attorney-client

20  privilege and I'm instructing the witness

21  not to answer.

22      Q.    Ma'am, did you understand my

23  question?

59

1     A.   Yes, sir.

2     Q.   And do you intend to follow

3  your attorney's instruction not to answer my

4  question?

5     A.   Yes, sir.

6     Q.   And but for his instruction,

7  could you answer my question?

8     A.   Yes, sir.

9     Q.   At the second Armory meeting

10  that you attended, Mr. Cade indicated that

11  dioxin had come from the Lockhart Lumber

12  Mill; is that correct?

13        MR. PALMER:  I'm going to

14  object to the question as calling for

15  information subject to the attorney-client

16  privilege and I instruct the witness not to

17  answer.

18     Q.   Did you understand my

19  question?

20     A.   Yes, sir.

21     Q.   And you intend to adhere to

22  your attorney's instruction not to answer

23  the question?

60

1       A.    Yes, sir.

2       Q.    And but for his instruction,

3  could you answer my question?

4       A.    Yes, sir.

5       Q.    At the second Armory meeting

6  that you attended, I believe you indicated

7  that Mr. Cade said that bad chemicals were

8  being released from the mill; is that

9  correct?

10            MR. PALMER:  I'm going to

11  object to the question as calling for

12  information subject to the attorney-client

13  privilege and I instruct the witness not to

14  answer.

15      Q.    Ma'am, did you understand my

16  question?

17      A.    Yes, sir.

18      Q.    And you intend to adhere to

19  your attorney's instruction not to answer my

20  question?

21      A.    Yes, sir.

22      Q.    And but for his instruction,

23  could you answer my question?

61

1    A.    Yes, sir.

2    Q.    Is Mr. Cade one of your

3  attorneys representing you here today?

4    A.    Yes, sir.

5         (Defendant's Exhibit 2 was

6           marked for identification

7           purposes.)

8         MR. LOCKARD:  I'm going to ask

9  the reporter to mark what I've just handed

10  your counsel as Exhibit 2.

11    Q.    Are you okay, ma'am?

12    A.    Yes, sir.

13    Q.    And please take as much time

14  as you need to review that.  And it might be

15  easier if I break it down.  If I could just

16  ask you to review pages one through eleven

17  at the very start of Exhibit 2.  And you'll

18  see at the bottom --

19    A.    Excuse me.

20    Q.    Are you okay, ma'am?

21    A.    Yes.

22    Q.    Okay.  You'll see at the

23  bottom of those first eleven pages there's a

62

1  little footer that says:  Client information

2  questionnaire.

3      A.    Yes, sir.

4      Q.    Is that your handwriting on

5  pages one through eleven?

6      A.    Yes, sir.

7      Q.    Is that your signature at page

8  one -- Excuse me.  Let me start that over.

9  Is that your signature on page eleven?

10     A.    Yes, it is.

11     Q.    And did you complete pages one

12  through eleven?

13     A.    Yes, sir, I did.

14     Q.    And when you completed those

15  pages, did you fill out that questionnaire

16  truthfully?

17     A.    Yes, sir.

18     Q.    And did you fill it out

19  accurately?

20     A.    To the best of my knowledge,

21  yes, sir.

22     Q.    Yes, ma'am.  Now, if I could

23  ask you to flip past page eleven on Exhibit

63

1  2.

2      A.   (Witness complies.)

3      Q.   And you'll see that there are

4  pages numbered one through forty-two, and at

5  the bottom of the pages it says:  The client

6  or family member with listed disease.  Do

7  you see those pages?

8      A.   Yes, sir.

9      Q.   And take as much time as you

10  would like to review those.  I'm going to

11  ask you whether you completed those pages

12  one through forty-two.

13      A.   Yes, sir.

14      Q.   You completed pages one

15  through forty-two?

16      A.   Yes, sir.

17      Q.   And is that your handwriting

18  on pages one through forty-two?

19      A.   Yes, sir.

20      Q.   And I see you've got it open

21  to page forty-two.  Is that your signature

22  on page forty-two?

23      A.   Yes, sir, it is.

64

1    Q.    And when you completed this

2  questionnaire with the footer:  Client or

3  family member with listed disease, did you

4  complete it truthfully?

5    A.    To the best of my knowledge,

6  yes, sir.

7    Q.    And you completed pages one

8  through forty-two there accurately?

9    A.    Yes, sir.

10    Q.    Ma'am, you indicated that you

11  had had two prior miscarriages; is that

12  correct?

13    A.    Correct.

14    Q.    And I believe you indicated

15  that the first of those miscarriages was in

16  1971; correct?

17    A.    Correct.

18    Q.    So, that would be about the

19  time that you moved to Florala; is that

20  correct?

21    A.    Correct.

22    Q.    Do you know whether it was

23  before or after you moved?

65

1      A.   It was before.

2      Q.   Ma'am, no one has ever told

3  you that the Lockhart Lumber Mill might have

4  caused either of your miscarriages, have

5  they?

6      A.   No, sir.

7      Q.   In response to some of your

8  attorney's questions you indicated that you

9  had a mother-in-law, I believe, with breast

10  cancer.

11      A.   Yes, sir.

12      Q.   Can you tell me that

13  mother-in-law's name?

14      A.   Isa, I-S-A, Mae, M-A-E, her

15  maiden name was Egerton, E-G-E-R-T-O-N,

16  Cobb.

17      Q.   Where did she reside?

18      A.   She resided in Florala.  For

19  the last five and a years she lived in the

20  home with me.

21      Q.   How long did she reside in

22  Florala?

23      A.   All of her life.

66

1     Q.     Has anyone ever told you that

2  your mother-in-law's breast cancer was

3  related to the Lockhart Lumber Mill?

4     A.     No, sir.

5     Q.     And I think you said that your

6  daughter-in-law's mother also has some type

7  of cancer?

8     A.     She had ovarian cancer.

9     Q.     Ovarian cancer.  Where did she

10  reside?

11     A.     In Lockhart.

12     Q.     How long did she reside there?

13     A.     All of her life.

14     Q.     Okay.  Has anyone ever told

15  you that your daughter-in-law's mother's

16  ovarian cancer was related in any way to the

17  Lockhart Lumber Mill?

18     A.     No, sir.

19     Q.     You indicated that your church

20  had been tested for dioxin; correct?

21     A.     Correct.

22     Q.     When did that testing occur?

23     A.     I don't know the exact date.

67

1  I know they were there because when I went

2  to do the bulletin, they were still in the

3  yard with their chem gear on.

4      Q.    Do you remember what season of

5  the year that was?

6      A.    No, sir.  It -- It might have

7  been spring or fall.  It wasn't cold and it

8  wasn't real hot, but I don't know exactly

9  when.

10      Q.    Can you tell me what year that

11  was?

12      A.    I want to say it was last

13  year, 2005.

14      Q.    And when you said "they" were

15  out in the yard, who is "they"?

16      A.    I believe Mr. Mitchell was out

17  there.  And I didn't know the other people

18  that were out there with him.

19      Q.    How many other people were out

20  there?

21      A.    Again, if memory serves me

22  right, there was two other people out there

23  with him.

68

1     Q.     Were they male or female?

2     A.     I believe they were male.

3     Q.     Were they wearing any sort of

4  protective gear?

5     A.     Yes, sir.

6     Q.     Okay.  Can you describe that

7  for me?

8     A.     It looked like jump suits

9  with, like, a shield over their head and

10  face that they were holding, they had had it

11  on, but they were holding it in their hands.

12     Q.     And was Mr. Mitchell also

13  wearing similar protective gear?

14     A.     Yes, sir.

15     Q.     He was?

16     A.     Best I can remember, yes, sir.

17     Q.     And where on the church

18  property was that testing conducted?

19     A.     I don't know.  They were still

20  on the -- in the yard, just outside between

21  the church and the fellowship hall when I

22  got there.

23     Q.     Can you tell me what they were

69

1  doing when you saw them?

2      A.    They had some containers out

3  there they were doing something with.  I

4  don't know if they were just getting ready

5  to do the testing or had just finished the

6  testing.

7      Q.    Were they taking -- Did you

8  see them taking soil samples?

9      A.    No, sir, I didn't.

10     Q.    Did you see that they had

11  taken any soil samples?

12     A.    No, sir.  I didn't know what

13  was in the containers.  I just knew they

14  were containers that they had.

15     Q.    Did you have any discussions

16  with the gentlemen that were doing the

17  testing?

18     A.    No, sir.

19     Q.    Did you ever have any

20  conversations with anyone else about the

21  testing that you observed?

22     A.    No, sir.

23     Q.    Other than the incident you

70

1  just described, are you aware of any other

2  testing that was done at your church?

3      A.    No, sir.

4      Q.    Did you ever see the results

5  of that testing?

6      A.    No, sir.

7      Q.    Do you know how long they were

8  conducting the testing?

9      A.    No, sir.

10     Q.    Can you tell me the address of

11  that church?

12     A.    Used to be Lockhart Boulevard,

13  but I think now it's 29697, or something

14  like that, Covington Street.

15     Q.    And are you referring to the

16  church of which you are a member?

17     A.    Yes, sir.

18     Q.    And it's the same location

19  today as it was when you observed the

20  testing; is that correct?

21     A.    Correct.

22     Q.    Did anybody ever tell you the

23  results of that testing?

71

1     A.    No, sir.

2     Q.    Are you aware of any other

3  dioxin testing that has occurred in the

4  Florala, Lockhart area?

5     A.    Nothing except the blood work

6  that they drew.

7     Q.    And you're talking about your

8  blood work?

9     A.    Yes, sir.

10     Q.    Do you know of anyone else who

11  has had their blood drawn?

12     A.    There was a young man waiting

13  in the hallway in the hospital when I walked

14  out, but I do not know his name.  He looks

15  familiar because I know he's in the Florala

16  area, but I do not know his name.

17     Q.    Anyone else that you can think

18  of?

19     A.    No, sir.

20     Q.    And you never received the

21  results of your dioxin blood testing; is

22  that true?

23     A.    True.

72

1    Q.    You indicated in response to a

2  prior question from your attorney that when

3  a company doesn't handle their materials,

4  chemical or otherwise, in an appropriate or

5  responsive manner they should be held

6  accountable and responsible for the possible

7  outcomes of their actions.  Do you recall

8  saying that?

9    A.    Yes, sir.

10    Q.    You don't have any personal

11  knowledge of the way that any chemicals were

12  handled at the Lockhart Lumber Mill; is that

13  correct?

14    A.    Personal knowledge, no.

15    Q.    You don't have any personal

16  knowledge of the way any materials were

17  handled at the Lockhart Lumber Mill; is that

18  correct?

19    A.    Correct.

20    Q.    And so, is it fair to say,

21  then, that one of the things that you hope

22  to get from this lawsuit is the truth?

23    A.    Correct.

73

1       Q.     And whatever the truth may be,

2    you would want the jury to consider that

3    truth; is that correct?

4       A.     Correct.

5              MR. LOCKARD:  Let's take a

6    break.

7              VIDEOGRAPHER:  Off the Record.

8    The time is 10:13 a.m.

9                (Recess taken.)

10             VIDEOGRAPHER:  Back on the

11   Record.  The time is 10:17 a.m.

12             MR. LOCKARD:  Ms. Cobb, I

13   appreciate your time here today.  I truly am

14   sorry for what you've gone through with your

15   cancer.  I appreciate you being here.  And

16   unless your attorney has additional

17   follow-up questions, I have no further

18   questions at this time.

19             MR. SOSTRIN:  Pactiv has no

20   further questions.

21             EXAMINATION CONTINUED

22   BY MR. PALMER:

23       Q.     Ms. Cobb, I just have a

74

1  handful of questions.  You mentioned that

2  you have some memory affect from your

3  medication, Arimidex, from your age, and

4  from the passing of your husband.  And I'm

5  assuming what you mean by that is that

6  sometimes you don't remember things?

7      A.    Clearly.  I remember them, but

8  not specifics.

9      Q.    Do any of those things cause

10  you to hallucinate or have incorrect

11  memories?

12      A.    No, sir.

13          MR. LOCKARD:  Objection.

14  Foundation.

15      Q.    So, everything that you've

16  testified to is correct, it's not affected

17  by those?

18      A.    To the best of my knowledge,

19  yes, sir.

20      Q.    You also talked a little bit

21  about your first miscarriage in 1971.  And

22  that occurred before you moved to Florala

23  permanently; is that correct?

75

1     A.    Yes, sir.

2          MR. LOCKARD:  Objection.

3     Q.    Was that before or after you

4  lived in Florala for the six-month period

5  after you were married?

6          MR. LOCKARD:  Objection.

7  Compound.  Leading.

8     Q.    Well, did the -- Let me

9  rephrase the question.  Did your first

10  miscarriage occur before or after the

11  six-month period that you lived in Florala,

12  immediately after you were first married?

13     A.    After.

14          MR. PALMER:  I have no further

15  questions.  I thank you for your time,

16  Mrs. Cobb.

17          THE WITNESS:  Thank you.

18          MR. LOCKARD:  I have no

19  follow-up.  Thank you.

20          THE WITNESS:  Thank you.

21          VIDEOGRAPHER:  Off the Record.

22  The time is 10:19 a.m.  This concludes the

23  deposition.

76

1  (The deposition was concluded at 10:19 a.m.,

2   July 28, 2006.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

77

1           REPORTER'S CERTIFICATE

2   STATE OF ALABAMA,

3   ELMORE COUNTY,

4           I, Angela Smith, Registered

5   Professional Reporter and Commissioner for

6   the State of Alabama at Large, do hereby

7   certify that the above and foregoing

8   proceeding was taken down by me by

9   stenographic means, and that the content

10  herein was produced in transcript form by

11  computer aid under my supervision, and

12  that the foregoing represents, to the best

13  of my ability, a true and correct

14  transcript of the proceedings occurring on

15  said date and at said time.

16          I further certify that I am neither

17  of kin nor of counsel to the parties to the

18  action; nor in any manner interested in the

19  result of said case.

20

21

        _____
22          Angela Smith, RPR, CRR,
        for the State of
23          Alabama at Large.