1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3        NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6  MELANIE CHAMBERS, who sues by

7  and through her Mother and next

8  of friend, GAIL TATUM,

9        Plaintiff,

10        vs.

11  PACTIV CORPORATION and

12  LOUISIANA-PACIFIC CORPORATION,

13        Defendants.

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16  between the parties through their respective

17  counsel, that the videotaped deposition of

18  Deborah Reynolds may be taken before Angela

19  Smith, RPR, CRR, at the Embassy Suites

20  Hotel, at 300 Tallapoosa Street, Montgomery,

21  Alabama 36104, on the 26th day of July,

22  2006.

23        DEPOSITION OF DEBORAH REYNOLDS

1       IT IS FURTHER STIPULATED AND

2   AGREED that the signature to and the reading

3   of the deposition by the witness is not

4   waived, the deposition to have the same

5   force and effect as if full compliance had

6   been had with all laws and rules of Court

7   relating to the taking of depositions.

8       IT IS FURTHER STIPULATED AND

9   AGREED that it shall not be necessary for

10  any objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties

13  may make objections and assign grounds at

14  the time of the trial, or at the time said

15  deposition is offered in evidence, or prior

16  thereto.

17      IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21      * * * * * * * * * * * * *

22

23

3

1         * * * * * * * * * * * * *

2              I N D E X

3            EXAMINATION

4                      PAGE

5  By Mr. Palmer ...................... 8

6  By Mr. Ter Molen .................. 48

7  By Mr. Taylor  .................... 71

8         PLAINTIFF'S EXHIBITS

9                      PAGE

10  Ex. 1 - The map ................... 17

11  Ex. 2 - a map of the facility  ..... 41

12         DEFENDANT'S EXHIBITS

13                      PAGE

14  Ex. 1 - The questionnaire .......... 51

15         * * * * * * * * * * * * *

16

17

18

19

20

21

22

23

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3         NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6

7  MELANIE CHAMBERS, who sues by

8  and through her Mother and next

9  of friend, GAIL TATUM,

10         Plaintiff,

11         vs.

12  PACTIV CORPORATION and

13  LOUISIANA-PACIFIC CORPORATION,

14         Defendants.

15

16  BEFORE:

17         ANGELA SMITH, Commissioner.

18

19  APPEARANCES:

20         W. EASON MITCHELL, ESQUIRE, of THE

21  COLOM LAW FIRM, 200 Sixth Street N., Ste:

22  102, Columbus, Mississippi 39701, appearing

23  on behalf of the Plaintiff.

1 APPEARANCES (continued):

2      GREGORY A. CADE, ESQUIRE, of

3 ENVIRONMENTAL LITIGATION GROUP, 3529 7th

4 Avenue South, Birmingham, Alabama 35255,

5 appearing on behalf of the Plaintiff.

6      ROBERT L. PALMER, ESQUIRE, of

7 ENVIRONMENTAL LITIGATION GROUP, 3529 7th

8 Avenue South, Birmingham, Alabama 35255,

9 appearing on behalf of the Plaintiff.

10      BERNARD TAYLOR, SR., ESQUIRE, of

11 ALSTON & BIRD, One Atlantic Center, 1201 W.

12 Peachtree St., Atlanta, Georgia 30309,

13 appearing on behalf of the Defendant,

14 Louisiana-Pacific Corporation.

15      ORLYN O. LOCKARD, III, ESQUIRE, of

16 ALSTON & BIRD, One Atlantic Center, 1201 W.

17 Peachtree St., Atlanta, Georgia 30309,

18 appearing on behalf of the Defendant,

19 Louisiana-Pacific Corporation.

20      MARK R. TER MOLEN, ESQUIRE, of

21 MAYER, BROWN, ROWE & MAW, 71 S. Wacker

22 Drive, Chicago, Illinois 60606, appearing on

23 behalf of the Defendant, Pactiv Corporation.

1 APPEARANCES (continued):

2      ALSO PRESENT:  Wendy Garmon

3      VIDEOGRAPHER:  Paul Brewer

4        * * * * * *

5      I, ANGELA SMITH, RPR, CRR, a Court

6 Reporter of Wetumpka, Alabama, acting as

7 Commissioner, certify that on this date, as

8 provided by the Federal Rules of Civil

9 Procedure and the foregoing stipulation of

10 counsel, there came before me at the Embassy

11 Suites Hotel, 300 Tallapoosa Street,

12 Montgomery, Alabama 36104, beginning at 2:28

13 p.m., Deborah Reynolds, witness in the above

14 cause, for oral examination, whereupon the

15 following proceedings were had:

16        VIDEOGRAPHER:  This begins

17 videotape number one in the deposition of

18 Deborah Reynolds in the case of Melanie

19 Chambers who sues by and through her mother

20 and next of friend, Gail Tatum, Plaintiff,

21 versus Pactiv Corporation and

22 Louisiana-Pacific Corporation.  Case number

23 83-LES-CSC.

1          We're on the Record.  The time

2  is 2:28 p.m.  Today is Wednesday, July 26,

3  2006.  My name is Paul Brewer.  Would

4  Counsel please identify yourselves and state

5  whom you represent.

6          MR. PALMER:  My name is Robert

7  Leslie Palmer.  I am one of the lawyers

8  representing the Plaintiff.

9          MR. TER MOLEN:  I am Mark

10  Ter Molen, one of the attorneys representing

11  Pactiv, a Defendant in this case.

12          MR. TAYLOR:  My name is

13  Bernard Taylor, and I'm representing

14  Louisiana-Pacific Corporation.

15          MR. LOCKARD:  Orlyn Lockard,

16  also for Louisiana-Pacific Corporation.

17          MR. CADE:  Gregory A. Cade,

18  for the Plaintiffs.

19          MR. MITCHELL:  W. Eason

20  Mitchell, and I represent the Plaintiff.

21          VIDEOGRAPHER:  Would the

22  reporter please swear in the witness.

23          DEBORAH REYNOLDS,

1  being first duly sworn, was examined and

2  testified as follows:

3         COURT REPORTER:  Usual

4  stipulations?

5         MR. PALMER:  No.

6          EXAMINATION

7  BY MR. PALMER:

8     Q.    Good afternoon, Mrs. Reynolds.

9     A.    Good afternoon.

10    Q.    How are you today?

11    A.    I'm good.

12    Q.    Would you please introduce

13  yourself to the jury by stating your full

14  name for the Record, please.

15    A.    Deborah Ann Reynolds.

16    Q.    And would you spell that,

17  please.

18    A.    D-E-B-O-R-A-H, A-N-N,

19  R-E-Y-N-O-L-D-S.

20    Q.    And what is the date of your

21  birth, please?

22    A.    October 3, 1956.

23    Q.    I can see that you're wearing

1 a mask.  Can you tell us why you're wearing

2 the mask?

3     A.    To keep myself from getting

4 sick because if I come in contact with

5 someone that has a cold it means pneumonia

6 for me, and my doctors advised me to wear a

7 mask.

8          MR. TAYLOR:  Objection.  Lacks

9 foundation.

10          MR. PALMER:  I'm sorry, I

11 didn't hear what you said.  I couldn't hear

12 what you said.

13          MR. TAYLOR:  Objection.  Lacks

14 foundation.

15          MR. TER MOLEN:  Also, object

16 as hearsay.

17     Q.    Mrs. Reynolds, you understand

18 that you're under oath and that you have to

19 tell the truth; correct?

20     A.    Yes.

21     Q.    And are you aware that even

22 though you're not in a courtroom, your

23 testimony today is being recorded and could

10

1  be used in Court?

2     A.    Yes.

3     Q.    Where were you born, ma'am?

4     A.    Florala, Alabama.

5     Q.    Did you grow up in Florala?

6     A.    Yes.

7     Q.    And, again, you were born in

8  1956?

9     A.    Yes.

10     Q.    What did your father do for a

11  living when you were growing up?

12     A.    He worked at the sawmill.

13     Q.    And what sawmill was that?

14     A.    Louisiana-Pacific, Lockhart

15  sawmill.

16     Q.    I'm sorry, what?

17     A.    Louisiana-Pacific, Lockhart

18  sawmill is what we always called it.

19     Q.    How many children were there

20  in your family?

21     A.    It's twelve of us.

22     Q.    Okay.  How many boys?

23     A.    Six boys and five girls.

11

1    Q.    Okay.  That makes eleven, oh,

2  you're counting yourself as the -- So

3  there's six girls and six boys, including

4  you?

5    A.    Yes.

6    Q.    And where are you in the

7  family?

8    A.    The third oldest.

9    Q.    When you were growing up, did

10  you have to work?

11    A.    House chores, yes.

12    Q.    I'm sorry, what?

13    A.    Yes.

14    Q.    And what type of house chores

15  did you do?

16    A.    Washing, ironing,

17  baby-sitting.

18    Q.    Did you do any cooking?

19    A.    Yes.  Cooking and cleaning.

20    Q.    Are you married, ma'am?

21    A.    Yes.

22    Q.    And who is your husband?

23    A.    Charles Mask.

12

1     Q.     What does he do for a living?

2     A.     He's retired, retired Air

3 Force.

4     Q.     And what did he do in the Air

5 Force?

6     A.     He was a mechanic.

7     Q.     Where do you live currently?

8     A.     In Crestview, Florida.

9     Q.     And can you tell us where that

10 is, please?

11     A.     It's south of Florala.

12     Q.     South of Florala?

13     A.     Yes.

14     Q.     Do you have any children,

15 ma'am?

16     A.     Yes.

17     Q.     Can you tell us what their

18 names are and how old they are?

19     A.     Kelvin is thirty, Crystal is

20 twenty-seven, Amanda is twenty-two and April

21 is seventeen.

22     Q.     So, that's one son and three

23 daughters?

13

1     A.    Yes.

2     Q.    Did any of your children ever

3 live in Florala or Lockhart?

4     A.    Yes.  Kelvin and Crystal.

5     Q.    Did they attend school in

6 Florala or Lockhart?

7     A.    Kelvin attended school in

8 Lockhart.

9     Q.    And where did he attend

10 school?

11     A.    W. S. Hardin.

12     Q.    Is that -- What type of

13 school?

14     A.    Elementary school, I'm sorry.

15     Q.    That's an elementary school.

16 Do your children remember you on Mother's

17 Day?

18     A.    Yes.

19     Q.    Can you tell me what Kelvin

20 did on Mother's Day of this year?

21          MR. TER MOLEN:  Objection.

22 Relevance.

23     Q.    Go ahead.

14

1     A.    Yes.  Kelvin gave me a hundred

2  dollars to go to Birmingham.

3     Q.    And why did he give you a

4  hundred dollars to go to Birmingham?

5     A.    Because we were going with my

6  husband and we didn't know how long we would

7  be there.

8     Q.    And what were you going to

9  Birmingham for?

10     A.    For my husband to see the

11  doctors.  He had been diagnosed with brain

12  cancer.

13     Q.    How long have you lived in

14  Crestview?

15     A.    About seventeen years.

16     Q.    And I understand that you're

17  in school now?

18     A.    Yes.

19     Q.    What school are you in?

20     A.    Okaloosa Walton College.

21     Q.    And what are you studying?

22     A.    Elementary Ed.

23     Q.    What motivated you to go back

1  to school after raising a family?

2      A.    I was a housewife, and my

3  daughter Crystal.

4      Q.    Your daughter Crystal

5  motivated you?

6      A.    Yes.

7      Q.    What do you do for a living?

8      A.    I'm a mother, a wife and a

9  student.

10     Q.    Have you ever worked outside

11  the home?

12     A.    Yes.

13     Q.    And where did you work?

14     A.    I worked at Franklin Ferguson,

15  and I worked at Wal-Mart and Eglin Base

16  laundry.

17     Q.    What is Franklin Ferguson?

18         MR. TAYLOR:  Excuse me,

19  Counselor, I apologize, but because of the

20  nature of the mask, the various answers

21  she's giving I just don't understand.

22         THE WITNESS:  Speak up --

23         MR. TAYLOR:  She said she

16

1  worked at Franklin Ferguson and somewhere

2  else.

3          MR. PALMER:  I believe she

4  said Wal-Mart?

5      A.    Yes.

6      Q.    And you said the Base laundry?

7      A.    Yes.  Base laundry.

8      Q.    And, for the Record, if you

9  could try to speak as clearly as possible.

10     A.    All right.

11     Q.    What is Franklin Ferguson?

12     A.    A sewing factory.

13     Q.    And where is that located?

14     A.    Florala.

15     Q.    And what did you do at

16  Franklin Ferguson?

17     A.    A machine operator.

18     Q.    And what type of machine did

19  you operate?

20     A.    A sewing machine.  Sorry.

21     Q.    When did you work at Franklin

22  Ferguson?

23     A.    I worked at Franklin Ferguson

17

1  from the time I graduated, which was the

2  year of '75, until '83, 1983.

3          (Plaintiff's Exhibit 1 was

4            marked for identification

5            purposes.)

6    Q.    All right.  I'm going to hand

7  you now what has previously been marked as

8  Plaintiff's Exhibit Reynolds 1, which has

9  also been shown to defense counsel before

10  the deposition.

11          MR. TER MOLEN:  Defense

12  counsel objects to the map as lacking

13  foundation.

14    Q.    Have you seen this document

15  before, ma'am?

16    A.    Yes.

17    Q.    And did you make some markings

18  on it?

19    A.    Yes.

20    Q.    There is a -- some writing in

21  red that says:  Facility.  Do you see that?

22    A.    Yes.

23    Q.    Is that your writing?

18

1     A.    Yes.

2     Q.    And can you tell us what that

3  is?

4     A.    The Lockhart Mill.

5     Q.    Okay.  That's the Lockhart

6  Mill that you talked about?

7     A.    Yes.

8          MR. TER MOLEN:  Defense also

9  objects to this map for purposes of

10  authenticity.

11     Q.    Is the map marked as

12  Plaintiff's Exhibit Reynolds 1 a fair and

13  accurate depiction of Florala and Lockhart,

14  Alabama?

15          MR. TER MOLEN:  Objection.

16  Foundation.

17     A.    Yes.

18     Q.    Now, did you mark your home or

19  homes in green?

20     A.    Yes.

21     Q.    Okay.  And can you point to

22  them on the map, please?

23     A.    That's where I was born at

1  (indicating).

2      Q.    And what did you write there

3  in green?

4      A.    One.

5      Q.    Okay.  So, that's the first

6  house that you lived in in Florala?

7      A.    Yes.

8      Q.    Okay.  And did you have

9  another marking on there?

10     A.    Yes.  That's the second house

11  we lived in.

12     Q.    Okay.  And that's --

13     A.    In Florala.

14     Q.    And what did you mark that

15  with?

16     A.    Two.  A green pen.

17     Q.    And could you tell us the

18  address of the first house?

19     A.    I don't remember.  The first

20  house was where I was born.

21     Q.    Okay.  Do you remember the

22  address of the second house?

23     A.    No, I don't.

20

1      Q.    All right.  Did you -- You

2  testified that you attended school in

3  Florala.

4      A.    Yes.

5      Q.    Okay.  Did you mark the

6  schools in orange ink?

7      A.    Yes.

8      Q.    All right.  What is the first

9  school that you attended?

10      A.    Elementary, George Washington

11  Carver.

12      Q.    George Washington Carver?

13      A.    Yes.

14      Q.    I notice that there are some

15  schools that are printed on the map but

16  there's no school that is printed on the map

17  where you marked the Carver school.  Do you

18  see that?

19      A.    Yes.

20      Q.    Okay.  Is that school still in

21  existence?

22      A.    No.

23      Q.    All right.  Did you attend

1 more than one school in Florala?

2     A.    Yes.

3     Q.    Okay.  Can you point to the

4 second school that you attended?

5     A.    (Witness complies.)

6     Q.    Okay.  What school is that?

7     A.    That's the middle school.

8     Q.    And that's the one that was

9 already printed on the map as middle school?

10     A.    Yes.

11     Q.    And did you attend high school

12 in Florala as well?

13     A.    Yes.

14     Q.    And you're pointing to that

15 now?

16     A.    Yes.

17     Q.    Is that already printed on the

18 map as high school?

19     A.    Yes.

20     Q.    You marked, also, did you not,

21 work, where you worked at the Ferguson

22 Franklin sewing --

23     A.    Yes.

22

1     Q.    Okay.  And what color did you

2  mark that in?

3     A.    Purple.

4     Q.    And what did you write there?

5     A.    Work.

6     Q.    Work.  And did you also attend

7  church in Florala?

8     A.    Yes.

9     Q.    And where did you attend

10  church?

11     A.    First AB Church in Florala.

12     Q.    I'm sorry, what was that?

13     A.    First AB.

14     Q.    First AB Church?

15     A.    Yes.

16     Q.    Okay.  And what does the AB

17  stand for?

18     A.    First African Baptist Church.

19     Q.    Okay.  Did you mark that on

20  the map?

21     A.    Yes.

22     Q.    And what did you call that?

23     A.    Church.

23

1    Q.    And what color ink did you

2  use?

3    A.    Blue.

4    Q.    During what years did you

5  attend church in Florala?

6    A.    From the time we were born

7  until I left in '83, and now my husband and

8  I are members of that church now.

9    Q.    Okay.  When did you resume

10  attending?

11    A.    I'm not sure about the date,

12  but it's been seven or eight years ago.

13    Q.    All right.  What years did you

14  live in the very first home that you lived

15  in in Florala?

16    A.    The first home was '56, when I

17  was born.

18    Q.    Just that first year?

19    A.    When I was born.

20    Q.    Okay.  And the second house,

21  how long did you live there?

22    A.    We lived there about five

23  years, I think.

24

1     Q.    Okay.  Did you live in another

2  home in Florala?

3     A.    Yes.

4          MR. TER MOLEN:  Objection.

5  Vague.

6     Q.    You lived in a third home in

7  Florala?

8     A.    Yes.

9     Q.    And did you mark that on the

10  map as well?

11     A.    Yes.

12     Q.    Okay.  Could you point to

13  that?

14     A.    (Witness complies.)

15     Q.    And did you mark that on the

16  map?

17     A.    Yes.

18     Q.    And what did you call that?

19     A.    Three.

20     Q.    Three.  And what years did you

21  live there?

22     A.    I'm not sure how old I was

23  when we moved there, but I lived there up

25

1  until I was about twelve years old.

2      Q.    All right.  Did you live in a

3  fourth house in Florala?

4      A.    Yes.

5      Q.    And did you mark that with a

6  four?

7      A.    Yes.

8      Q.    And, again, what color ink is

9  that?

10      A.    Green.

11      Q.    And during what years did you

12  live there?

13      A.    From the age of twelve until I

14  graduated high school.

15      Q.    Have you been diagnosed with

16  chronic myologic leukemia?

17      A.    Yes.

18      Q.    And how did you learn that you

19  had CML?

20      A.    In '92, I got sick and I had a

21  tumor, and I had to have a hysterectomy.

22  And I couldn't get well.  And at that time,

23  I had my hysterectomy on a Tuesday and the

1  doctor said that I would be out Friday,

2  which I wound up staying in the hospital for

3  three weeks.  And that's when I found out I

4  had leukemia.

5        Q.    How did you feel when you

6  learned you had leukemia?

7        A.    At first, when the doctor said

8  cancer, I don't remember at that particular

9  time anything that he said.  And then when

10  we talked again, I just felt like my world

11  was falling apart.

12        Q.    And I believe you just said

13  this was in 1992?

14        A.    Yes.

15        Q.    Who diagnosed you with

16  leukemia?

17        A.    Dr. William P. Barnes.

18        Q.    And is he an oncologist?

19        A.    Yes, he is.

20        Q.    Who is your family physician?

21        A.    Dr. Wayne Campbell.

22        Q.    And how long have you been

23  Dr. Campbell's patient?

1     A.    About fifteen years.

2     Q.    Is he aware of your leukemia

3 diagnosis?

4     A.    Yes, he is.

5     Q.    Did you tell your family that

6 you had leukemia?

7     A.    Yes.

8     Q.    And how did you tell your

9 family?

10     A.    It was one rainy day when I

11 had came home from the hospital, and I was

12 laying on the couch, and the children was

13 sitting down on the floor beside me.  And I

14 told them that I had cancer.

15     Q.    And how did they react to the

16 news?

17          MR. TER MOLEN:  Objection,

18 hearsay.  Relevance.

19     A.    The little ones didn't know,

20 but the two oldest ones, they just cried.

21 So we all cried.

22     Q.    What was your health like

23 before you were diagnosed with leukemia?

1     A.    Excellent.

2     Q.    And what has your health been

3  like since you were diagnosed with leukemia?

4     A.    So very different.  It's just

5  been -- Everything is just different now.

6  Everything is so different.

7     Q.    Do you still consider yourself

8  to be healthy?

9     A.    No.

10     Q.    And is your leukemia the

11  reason that you're wearing the mask today?

12     A.    Yes.

13     Q.    And have you undergone any

14  treatments for the leukemia?

15     A.    Yes.

16     Q.    Can you tell us what you've --

17  what treatments you've undergone?

18     A.    I had a bone marrow transplant

19  in '93.  And I took chemo pills.  I took a

20  hundred and thirty-six chemo pills twice a

21  day for four days, and on the fifth day I

22  took chemo through IV.  And then I did IDG,

23  which is another drug, and just a lot.

1     Q.    How long did all that

2  chemotherapy last?

3     A.    I think my chemo, I think,

4  maybe like -- Maybe, like -- Oh, I don't

5  remember.  Maybe, like, three years.  But I

6  stayed sick, in and out of the hospital

7  constantly for seven years.

8     Q.    Did you miss any work to

9  receive the chemotherapy treatments?

10     A.    When I was diagnosed with

11  leukemia, I didn't -- I didn't go back to

12  work after I had a hysterectomy.  The doctor

13  sent me home and gave me three months to

14  heal for a bone marrow transplant.

15     Q.    And then did you work after

16  that?

17     A.    Yes.

18     Q.    Have you suffered any side

19  effects as a result of the chemotherapy?

20     A.    Yes.

21     Q.    What side effects have you

22  suffered?

23          MR. TER MOLEN:  Objection.

30

1 Foundation.  Hearsay.

2      A.   I was a diabetic.  I was on

3 insulin for a year and a half.  I stayed in

4 a wheelchair for a year and a half.  I

5 gained three hundred pounds.  I've had eye

6 surgery.  Just a lot -- I use inhalers and a

7 breathing machine.  And I'm on antibiotics a

8 lot.

9      Q.   Did you have -- Did your hair

10 fall out?

11          MR. TAYLOR:  Objection.

12 Leading.

13     A.   Yes, yes.

14     Q.   And did it ever grow back?

15     A.   No.

16     Q.   And so today what looks like

17 your hair, is that a wig?

18     A.   Yes.

19     Q.   Did you ever expect your hair

20 to grow back?

21     A.   I hoped and prayed it would,

22 but it didn't.  But, yes, I did.

23     Q.   Did the chemotherapy have any

1  affect on your skin?

2       MR. TER MOLEN:  Objection.

3  Foundation.  Hearsay.

4       A.    Yes.

5       Q.    What affect did have?

6       A.    It left my skin, like, burnt

7  (indicating), and that's what it looked

8  like.  I don't wear short sleeves.  I always

9  keep my arms and things covered, always.

10      Q.    Has your leukemia affected

11  your relationship with your family at all?

12      A.    Yes.  It was hard on my

13  brothers and sisters.  They had to keep my

14  children.  And we spent a lot of time apart.

15  I had to eventually move to Birmingham.  And

16  I stayed a year and a half in Birmingham by

17  myself.  And the doctors told me if I wanted

18  to live, I had to move to Birmingham.  So we

19  moved to Birmingham.  The girls and me.  But

20  my son, they wouldn't let him come, so he

21  had to stay home.

22      Q.    And when was this that you had

23  to move to Birmingham?

1    A.    It was -- I think it was in --

2 I think, like, '95.

3    Q.    And why was it that you had to

4 move to Birmingham in order to live?

5    A.    Because every time I came back

6 to Crestview I would get sick.  And I was so

7 far away from my doctors.  And the medicine

8 I needed, it just was not available at the

9 little hospital at home.  So we had to move

10 to Birmingham.

11    Q.    How long did you live in

12 Birmingham?

13    A.    Three years.

14    Q.    Did you move back, then, to

15 Florala?

16    A.    No.  We moved back to

17 Crestview.

18    Q.    I'm sorry.  Crestview.  Has

19 your doctor told you anything about your

20 chances of making a complete recovery?

21        MR. TER MOLEN:  Objection.

22 Hearsay.  Foundation.

23    A.    No, I won't, because it's

33

1 cancer and it's in remission, but it can

2 come back at any time.

3     Q.    That's what your doctor told

4 you?

5         MR. TER MOLEN:  Objection.

6 Hearsay.  Foundation.

7     A.    Yes.

8     Q.    And you mentioned earlier that

9 you have six brothers and five sisters.

10    A.    Yes.

11    Q.    Have any of your sisters been

12 diagnosed with cancer?

13        MR. TER MOLEN:  Objection.

14 Relevance.  Foundation.

15    A.    Two.  And a third one is sick,

16 but I don't know what she have, but two

17 have.

18    Q.    Which sisters have been

19 diagnosed with cancer?

20        MR. TER MOLEN:  Same

21 objection, and in addition, hearsay.

22    Q.    You have to wait till he

23 finishes objecting.

1          MR. TER MOLEN:  That's all

2  right.

3      Q.    Go ahead.  You can answer.

4      A.    Catherine and Sheila.

5      Q.    What kind of cancer have they

6  been diagnosed with?

7          MR. TER MOLEN:  Same

8  objections.

9      A.    Sheila was ovarian cancer and

10  Catherine was ovarian cancer.

11      Q.    And the third sister you said

12  that is sick?

13      A.    Yeah.  She's sick, but I don't

14  know what's wrong with her.

15      Q.    And what's her name?

16      A.    Dale.

17      Q.    Did the owners of the Lockhart

18  Lumber, Louisiana-Pacific facility ever

19  identify for you the chemicals that they

20  were releasing into the community?

21          MR. TER MOLEN:  Argumentative.

22  Foundation.  Leading.

23      A.    No.

35

1      Q.    I'm sorry, what was the

2  answer?

3      A.    No.

4      Q.    Did they ever have any town

5  meetings to tell the citizens of Florala, or

6  Lockhart, what they were doing there?

7          MR. TER MOLEN:  Objection.

8  Argumentative.  Foundation.  Leading.

9      A.    No.

10     Q.    Did they ever send any letters

11  to you or to other residents that you are

12  aware of about the chemicals that were being

13  used there?

14          MR. TER MOLEN:  Same

15  objections.

16     A.    No.

17     Q.    Did they put any notices in

18  the newspaper about any of the chemicals

19  they were using?

20          MR. TER MOLEN:  Same

21  objections.

22     A.    No.

23     Q.    Did they have any signs on the

36

1  fence at the facility telling you about

2  chemicals they were using?

3          MR. TER MOLEN:  Same

4  objections.

5      A.    No.

6      Q.    Did the owners of that

7  facility ever tell you that the chemicals

8  they were releasing into your community

9  could cause disease?

10          MR. TER MOLEN:  Same

11  objections.

12     A.    No.

13     Q.    Do you now understand that you

14  were exposed to dioxins and other chemicals

15  from that facility?

16          MR. TER MOLEN:  Objection.

17  Foundation.  Leading.

18     A.    Yes.

19     Q.    And what was the circumstance

20  of which you first learned this?

21          MR. TER MOLEN:  Same

22  objection, in addition, hearsay.

23     A.    At a meeting at the Armor

37

1 Hall.

2      Q.    And was this a meeting with

3 Mr. Cade?

4      A.    Yes.

5      Q.    And before that meeting, you

6 didn't know that you had been exposed to

7 dioxins or other chemicals from that

8 facility?

9           MR. TER MOLEN:  Same

10 objections.

11     A.    No.

12     Q.    And before that meeting, you

13 didn't know that the dioxins and other

14 chemicals that had been released by that

15 facility were capable of causing your

16 cancer?

17          MR. TER MOLEN:  Objections,

18 foundation, leading.

19     A.    No.

20     Q.    Did you give blood for dioxin

21 testing?

22     A.    Yes.

23     Q.    Have you ever smoked?

38

1    A.    Never.

2    Q.    Have you ever seen smoke

3 coming from the Lockhart Lumber,

4 Louisiana-Pacific facility?

5    A.    Yes.

6    Q.    Can you tell us what the smoke

7 looked like?

8    A.    It was blackish gray smoke.

9    Q.    Anything else about the smoke?

10    A.    It had a smell to it, and it

11 just hovered over the town.

12    Q.    Can you tell us when you --

13 When do you first recall seeing that smoke?

14    A.    All my life.

15    Q.    When did you last see it?

16    A.    When I left Florala, when I

17 moved.

18    Q.    And what year was that, again?

19    A.    '83.

20    Q.    1983?

21    A.    Yes.  I'm sorry.

22    Q.    How often did you see the

23 smoke?

39

1      A.    Every day.

2      Q.    And where were you in Florala

3  when you would see the smoke?

4      A.    At home, downtown, just all

5  over, church.  All over Florala.

6      Q.    All over Florala?

7      A.    Yes.

8      Q.    Was the smoke worse at any

9  particular time?

10        MR. TAYLOR:  Objection.

11  Excuse me.

12      A.    After lunch.

13        MR. TAYLOR:  Excuse me.

14  Objection.  Leading.  Vague.  Lacks

15  foundation.

16      A.    After lunch.

17      Q.    Now, you mentioned also that

18  you had some -- you smelled some odors?

19      A.    Yes.

20      Q.    Can you tell us what the odors

21  were like?

22        MR. TER MOLEN:  Objection.

23  Foundation.

40

1    A.    Turpentine.  Put me in the

2 mind of turpentine.

3    Q.    Reminded you of turpentine?

4    A.    Yes.  The smell.

5    Q.    And when do you recall first

6 smelling those odors?

7    A.    All my life.

8    Q.    When do you recall last

9 smelling them?

10    A.    When I left Crestview in 1993

11 -- When I left Florala for Crestview in

12 1993.

13    Q.    1993?

14    A.    '83.  I'm sorry.

15    Q.    How often did you smell those

16 odors?

17    A.    Every day.

18    Q.    And where in Florala would you

19 be when you would smell those odors?

20    A.    All over.  Downtown.

21        MR. TER MOLEN:  Objection.

22 Foundation.

23    Q.    Everywhere?

41

1          MR. TER MOLEN:  Objection.

2  Foundation.

3      A.    Yes.  Everywhere.  Church.

4      Q.    Were the odors the same at all

5  times?

6      A.    Yes.

7              (Plaintiff's Exhibit 2 was

8              marked for identification

9              purposes.)

10      Q.    I'm going to hand you what has

11  previously been marked as Plaintiff's

12  Exhibit Reynolds 2, which has previously

13  been furnished to defense counsel for their

14  review.

15          MR. TER MOLEN:  Defense

16  counsel rejects as lacking foundation,

17  lacking authentication, and a description as

18  a source of this map.

19      Q.    And do you recognize having

20  seen Plaintiff's Exhibit Reynolds 2?

21      A.    Yes.

22      Q.    And do you see the word

23  written in red ink "facility" there?

42

1      A.    Yes.

2      Q.    Is that your handwriting?

3      A.    Yes.

4      Q.    And is that the

5  Louisiana-Pacific, Lockhart Lumber facility

6  we've been talking about?

7      A.    Yes.

8      Q.    There's kind of an orange

9  circle with the word "smoke" around it.  Did

10  you put that on there?

11      A.    Yes, I did.

12      Q.    Okay.  And what were you

13  trying to depict with that?

14      A.    Where we -- Where the smoke

15  could be seen in Florala.

16      Q.    Where the smoke could be seen?

17      A.    And in Lockhart.

18      Q.    In Florala and Lockhart?

19      A.    Yes.

20      Q.    Did you also write the word

21  "odor" in green on the map?

22      A.    Yes.

23      Q.    And I see that that's on the

43

1  map in several different locations.

2      A.    Yes.

3      Q.    And what is that intended to

4  depict?

5      A.    Where I could smell the odor

6  from the smoke from the lumber yard.

7      Q.    Now, with respect to both

8  Plaintiff's Exhibits Reynolds 1 and 2, are

9  those fair and accurate representations of

10  the towns of Florala and Lockhart, Alabama?

11          MR. TER MOLEN:  Objection.

12  Foundation.

13          MR. TAYLOR:  Objection.  Lacks

14  foundation.

15      A.    Yes.

16      Q.    I'm sorry, the answer was?

17      A.    Yes.

18      Q.    And do you believe it's right

19  to release dioxins and other dangerous

20  chemicals into a community?

21          MR. TER MOLEN:  Objection.

22  Argumentative.  Leading.  Foundation.

23      A.    No, no.

44

1     Q.    Do you believe that the owners

2  of the facility have treated your community

3  right?

4          MR. TER MOLEN:  Objection.

5  Argumentative.  Leading.  Foundation.

6     A.    No.

7     Q.    Do you believe that they have

8  been honest with your community?

9          MR. TER MOLEN:  Objection.

10  Argumentative.  Leading.  Foundation.

11     A.    No.

12     Q.    What do you hope to achieve

13  through participation in this lawsuit?

14     A.    Justice.

15          MR. TER MOLEN:  Objection.

16  Relevance.  Argumentative.

17          MR. PALMER:  I'd like to take

18  a break for just a moment.

19          VIDEOGRAPHER:  Off the Record.

20  The time is 2:58 p.m.

21             (Recess taken.)

22          VIDEOGRAPHER:  Back on the

23  Record.  The time is 3:05 p.m.

45

1      Q.    (Mr. Palmer) Mrs. Reynolds,

2  let me ask you a few questions about your

3  mask.  I believe you testified that your

4  physician, family physician, told you to

5  wear the mask?

6            MR. TAYLOR:  Objection.

7  Leading.

8      A.    Yes, yes.

9      Q.    And under what circumstances

10  did he tell you to wear the mask?

11            MR. TAYLOR:  Objection.

12  Leading.

13      A.    When I'm out around a crowd of

14  people.  And pretty much he said when I'm

15  away from home.  If I'm not home, to wear

16  the mask.

17      Q.    Okay.  Do you enjoy wearing

18  the mask?

19      A.    No.  I hate it.  I mean, I

20  know I have to wear it, but do I enjoy it?

21  No, I don't enjoy wearing it.

22      Q.    Do people react to you when

23  you're wearing the mask in public?

46

1          MR. TER MOLEN:  Objection.

2  Foundation.

3      A.    Yeah.  Like, when I was in

4  school, when I first came in, nobody wanted

5  to sit beside of me.  Just this one girl

6  that I knew, and she knew why I had to wear

7  the mask, so I sit by her, but didn't nobody

8  want to sit by me.  And one class I took,

9  the teacher explained to them why I was

10  wearing the mask.

11          And then, like, when I go to

12  Wal-Mart and places, I see people pointing

13  at me.  And I see -- You know, I hear

14  children ask their moms things like:  Why

15  she got that on her face?  Something like

16  that.

17          MR. TER MOLEN:  Objection.

18  Hearsay.

19      A.    And I used to be ashamed to go

20  out with my children with it on my face, but

21  they know why I have to wear it, so they're

22  good about it.  So a lot of times if I got

23  to go to Wal-Mart or whatever, I just try to

1  go late at night.

2          And my doctor said that's the

3  best time for me to go so, like I say, I

4  don't have to run into a whole lot of people

5  that time of the night.

6      Q.    This deposition is being taken

7  in a hotel, the Embassy Suites Hotel in

8  Montgomery.  Have you been wearing your mask

9  around the motel?

10      A.    I didn't wear it when we first

11  came in yesterday, because I was hoping we

12  could just get in and go up to our room and

13  I had left it in the car.  But then when we

14  went back to the car -- And when I went back

15  to the car to get it, I put it on and I've

16  been wearing it ever since.  Not in the

17  room, just when I go outside of the room.

18      Q.    Outside of your room.  And

19  none of the lawyers representing you told

20  you to wear the mask?

21      A.    No.

22          MR. TER MOLEN:  Objection.

23  Leading.

48

1          MR. PALMER:  That's all the

2  questions I have at this time.  Thank you,

3  Mrs. Reynolds.

4          MR. TER MOLEN:  Thank you.

5  We'll take a few minutes and then we'll have

6  a few questions for you, ma'am.

7          VIDEOGRAPHER:  Off the Record.

8  The time is 3:09.

9            (Recess taken.)

10          VIDEOGRAPHER:  Back on the

11  Record.  The time is 3:47 p.m.

12          EXAMINATION

13  BY MR. TER MOLEN:

14      Q.    Good afternoon, Mrs. Reynolds.

15  My name, again, is Mark Ter Molen.  I'm here

16  on behalf of Pactiv.  We've had a chance to

17  meet earlier today and then we met about ten

18  days ago, I guess, in your deposition in

19  Andalusia.

20      A.    Yes.

21      Q.    And on behalf of myself and

22  co-counsel here, we're all regretful that

23  you've had to -- that you've undergone some

49

1  of the medical issues that you have.  And,

2  obviously, we wouldn't wish that on anybody.

3          We're here today because you

4  and your lawyers are claiming that our

5  clients are responsible for that, and that's

6  what has brought us here today.

7          Ma'am, we'll start, if we may,

8  talking about the maps that are in front of

9  you, that have been marked as Exhibits 1 and

10  2.  Ma'am, do you consider yourself good

11  with maps?

12          MR. MITCHELL:  What?

13          MR. PALMER:  Objection.

14  Vague.

15     Q.    Do you consider yourself as

16  being good with maps?

17          MR. PALMER:  Same objection.

18          MR. MITCHELL:  I didn't

19  understand that.  Apparently I didn't hear

20  it right.

21     Q.    Do you understand me, ma'am?

22     A.    Say it again.

23     Q.    Do you consider yourself to be

1  someone who is good with maps?

2            MR. PALMER:  Objection.

3  Vague.

4      A.    No.  Which I told you two

5  weeks ago.

6      Q.    That's right.  You told me

7  before that you don't -- you consider

8  yourself to be someone who is not good with

9  maps; is that fair to say?

10     A.    The maps we had the last time

11 were not as plain as these are, so, yes, to

12 answer your question.  These are way better

13 than what we had the last time.

14     Q.    I see.  So let's just be

15 clear.  At your deposition last time?

16     A.    Okay.  I told you no.

17     Q.    And I'm referring to pages

18 twenty-two and twenty-three.

19            (Off-the-Record discussion

20              was held.)

21     Q.    And do I understand your

22 testimony today to be that you are good with

23 these maps in front of you?

51

1     A.     No.  These maps are better

2  printed than the ones.  But, no, I don't

3  claim to be good at maps, no.

4     Q.     Okay.  All right.  That's what

5  I wanted to be clear on.  Thank you.  And at

6  your deposition, it was difficult, I know,

7  for you to get yourself oriented on the map

8  and where different things would be; is that

9  fair to say?

10     A.     Yes.

11          (Defendant's Exhibit 1 was

12            marked for identification

13            purposes.)

14     Q.     Okay.  I'd like us to look at

15  another document that we looked at during

16  your deposition.  And if we could mark this

17  Defendant's Exhibit 1.

18          MR. TAYLOR:  Could we go off

19  the Record just a second?

20          VIDEOGRAPHER:  Off the Record.

21  Time is 3:51.

22          (Recess taken.)

23          VIDEOGRAPHER:  Back on the

52

1  Record at 3:53.

2      Q.    Ma'am, I'm handing what we've

3  marked as Defendant's Exhibit 1, which was

4  also previously marked as Defendant's

5  Exhibit 4 at your deposition, ma'am.

6           If you need to put glasses on,

7  ma'am, please, go ahead.  Ma'am, this is a

8  copy of the questionnaire that we had

9  reviewed at your deposition.  And I'm happy

10  to give you as much time as you'd like to

11  review it.

12           But, ultimately, what I want

13  -- The questions I want to ask you are,

14  first of all, did you complete this

15  questionnaire?  And then secondly, are these

16  answers true and correct, to the best of

17  your knowledge and ability?

18           If you're able to answer those

19  questions now, ma'am, based on the

20  deposition, that's fine.  If you'd like --

21  Or if you would or your counsel would like

22  you to take a look through this document,

23  take as much time as you'd like.

53

1    A.    What did you ask me, again?

2  I'm sorry.

3    Q.    Sure.  Let me ask them to you

4  one by one.

5    A.    Thank you.

6    Q.    First of all, I want to ask

7  you, are you the one who completed this

8  questionnaire?  Is this your handwriting on

9  this document?

10    A.    Yes.

11    Q.    Okay.  And I know you've had a

12  chance to previously look at this.  And if

13  you could turn to the second page in this

14  document, that's your signature, isn't it,

15  correct, ma'am?

16    A.    Yes.

17    Q.    And then if you can keep

18  turning.  And you'll see the next page is

19  marked as:  Client Information, Page One.

20  Do you see that, ma'am?

21    A.    Yes.

22    Q.    And then if you turn to the

23  page, ten pages after that, that's marked:

54

1  Client Information, page eleven, ma'am.  Do

2  you see that?

3      A.   Yes.

4      Q.   And then that's your signature

5  on that page as well; correct?

6      A.   Yes.

7      Q.   And then, if you'll turn to

8  the next page, ma'am, you'll see at the very

9  bottom it says:  Client or family member

10  with listed disease.  Do you see that?

11     A.   Yes.

12     Q.   And then, if you turn to the

13  very -- If you turn to the page -- I'm

14  sorry.  I thought there was a signature at

15  the end of this, there is not.  At least on

16  my copy, there is not.

17         Could I just ask you, ma'am,

18  to turn to the last page of that Exhibit 1.

19  Do you have it before you?  Turn to the very

20  last page.

21     A.   (Witness complies.)

22     Q.   And if you turn to the

23  previous page just before that.

55

1      A.    (Witness complies.)

2      Q.    Okay.  And the handwriting

3  throughout this document, ma'am, is your

4  handwriting; correct?

5      A.    Yes.

6      Q.    Okay.

7            MR. TAYLOR:  I didn't hear

8  that.

9      A.    Yes.

10     Q.    And the answers -- The

11  responses, ma'am, that are set forth in this

12  entire document that we've marked as

13  Defendant's Exhibit 1, those answers are

14  true and correct, to the best of your

15  knowledge and understanding; correct?

16     A.    Yes.

17     Q.    Now, I want to ask you some

18  questions, ma'am, about the different

19  locations that you lived at in Florala.  I

20  think I heard you say this this afternoon,

21  earlier, please tell me if I'm mistaken,

22  that you lived at four different locations

23  in Florala; is that correct?

56

1      A.    Yes.

2      Q.    Okay.  If I could ask you,

3   ma'am, to take this questionnaire, and if

4   you could turn to the fourth page in this

5   document.  I think you're there, ma'am.  Do

6   you see that right there?

7      A.    Yes.

8      Q.    Do you see that little chart

9   that's asking you to list different places

10   that you lived?

11      A.    Yes.

12      Q.    As I understand it, ma'am,

13   you've got the first two entries there are

14   both on Seventh Avenue; correct?

15      A.    Yes.

16      Q.    And that that's the same

17   location, but it's the -- the address at

18   that house changed when they redid the

19   numbering for the emergency system in

20   Florala; is that correct?

21      A.    Yes.

22      Q.    Okay.  And then I see that

23   there is a second house that's listed at 700

57

1  North Tenth Street; correct?

2      A.    Yes.

3      Q.    And so, on this questionnaire,

4  ma'am, I just see -- in Florala, I just see

5  two different homes that are listed there.

6  Is that what is on this questionnaire?

7      A.    Uh-huh.

8      Q.    Is that a yes?

9      A.    Yes, yes.

10      Q.    And what I understood from

11  your testimony this morning, ma'am, is that,

12  in fact, it wasn't two homes, but it was

13  four different homes that you lived in in

14  Florala?

15      A.    Yes.

16      Q.    Okay.  And can you please give

17  us the addresses, ma'am, and the time frames

18  of the homes that are not included on this

19  questionnaire?

20      A.    The other two addresses, I

21  don't know.  I don't know the addresses.  I

22  was young.  I don't know the addresses.

23      Q.    Okay.  All right.  And can you

58

1  tell us how long you lived at those other

2  two addresses, ma'am?

3      A.    I don't know.

4      Q.    Okay.  Could have been more

5  than a year, could have been more than four

6  years?

7      A.    I don't know.

8      Q.    Okay.  Could have been as much

9  as ten years?

10      A.    I don't know.

11      Q.    All right.  We can put this

12  exhibit aside for the moment, ma'am.  I'd

13  like to ask you now about the smoke that you

14  talked about a bit during your responses to

15  your attorney earlier, because I think that

16  you heard -- I think that I heard you say

17  that you were describing the smoke as

18  smelling like turpentine; is that correct?

19      A.    Yes.

20      Q.    Ma'am, isn't it true that at

21  your deposition you told me that the smoke

22  smelled like perfume?

23      A.    I don't remember.  I'm not

59

1 saying I didn't.  I don't remember telling

2 you that.

3     Q.    All right.  Well, let me ask

4 -- Let me show you -- Let's see.  Let's make

5 sure this is the one you signed, ma'am.

6 This was the deposition that you signed.

7 And I'm going to refer you to page

8 one-twenty-four.

9        MR. TER MOLEN:  And Counsel,

10 this is lines two through seven.

11     Q.    Ma'am, I'm going to put this

12 in front of you.  And I'm looking at page

13 one-twenty-four, which is in the top, right

14 -- bottom, right-hand corner.  Do you see,

15 of the page that I've opened for you?

16     A.    Yes.

17     Q.    Do you see that, ma'am?

18     A.    Yes.

19     Q.    And do you see lines two

20 through seven there?

21     A.    Yes.

22     Q.    I'll read the question:  Okay.

23 And did that smoke have anything unique

60

1  about it?  Did it have a funny color, a

2  funny odor to it?  Answer:  It was a smell.

3  Question:  What was that smell?  Answer:  It

4  was a perfume smell.  Do you see that,

5  ma'am?

6      A.    I see it.

7      Q.    And that's the testimony that

8  you gave at your deposition?

9      A.    Yes.

10     Q.    All right.  And you were under

11  oath at that deposition; correct?

12     A.    Yes.

13     Q.    And you were telling the truth

14  at that deposition; correct?

15     A.    Yes.

16     Q.    All right.  Ma'am, also, with

17  regard to the smoke -- If I could have that

18  back, please, ma'am.

19     A.    (Witness complies.)

20     Q.    Thank you.  Also, with regard

21  to smoke, ma'am, isn't it true that you do

22  not know today -- Ma'am, with regard to the

23  smoke, isn't it true, ma'am, that you do not

61

1 know today whether the smoke that you say

2 came from the Florala wood treatment plant

3 smelled any differently than smoke from a

4 regular fire?

5     A.    It smelled -- Restate that,

6 please.

7     Q.    All right.  Isn't it true that

8 you do not know today whether -- You do not

9 remember today whether the smoke that you

10 say came from the Florala wood treatment

11 plant, smelled any differently than smoke

12 from a regular fire?

13         MR. PALMER:  Objection.

14 Argumentative.  Asked and answered.  Lacks

15 foundation.

16     A.    Ask me that in -- Ask me that

17 again.  I'm sorry.  Do --

18     Q.    All right.  The smoke you

19 think came from the mill, you don't know

20 whether that smoke smelled differently than

21 smoke from a regular fire; correct?

22         MR. PALMER:  Same objections.

23     A.    I'm not sure.

62

1    Q.    Okay.  You're not sure that

2  you don't understand the question, or you're

3  not sure that you don't --

4    A.    No.  I don't understand the

5  question.

6    Q.    Okay.  Let me try it again.

7  Did the smoke that you think came from the

8  mill have a different smell about it than

9  smoke from an ordinary fire?

10    A.    Yes.

11    Q.    Okay.  You're saying today

12  yes?

13    A.    Yes.

14    Q.    All right.  I'd like to show

15  you, ma'am, page one-twenty-five of your

16  deposition, lines twelve through sixteen.

17  And I will hand that to you, ma'am.  Again,

18  I'm going to read this to you, beginning on

19  line twelve on page one-twenty-five.

20        Question:  And, what I'm

21  trying to understand is, did the smoke that

22  you think came from the mill have a

23  different smell about it than smoke from an

63

1  ordinary fire?  Answer:  I don't know.

2  That's correct, ma'am, that's what your

3  testimony says here; correct?

4      A.    Yes.

5      Q.    All right.  And, again, you

6  were under oath at your deposition; correct?

7      A.    Yes.

8      Q.    And you told the truth at your

9  deposition; correct?

10      A.    Yes.

11      Q.    Thank you, ma'am.  If you

12  could hand that back to me, please.

13      A.    (Witness complies.)

14      Q.    Ma'am, I'd like to ask you

15  several questions about your father.  Your

16  father smoked at home while you were growing

17  up; correct?

18      A.    Yes.

19      Q.    And your father did not work

20  at the mill that we've been calling the

21  facility for his entire career, did he?

22      A.    No.

23      Q.    And, in fact, it's fair to say

1  that you do not know the time frame that

2  your father worked at the mill; is that

3  correct?

4      A.    Correct.

5      Q.    And it's true, ma'am, that

6  you, yourself, never visited the mill;

7  correct?

8      A.    Correct.

9      Q.    Now, I'd like to talk a bit

10  about your employment, ma'am.  Earlier in

11  responses and questions that your attorney

12  asked, when he asked you what jobs you had

13  worked at over the course of your employment

14  career, I heard you mention three things.  I

15  just want to be clear on that.  You

16  mentioned Franklin Ferguson?

17      A.    Yes.

18      Q.    You mentioned Wal-Mart?

19      A.    Yes.

20      Q.    And you mentioned the Eglin

21  Air Force Base?

22      A.    Yes.

23      Q.    But you worked at other jobs

1  as well; correct?

2      A.    Yes.

3      Q.    All right.  Well, let's talk

4  about those other jobs for a minute.  You

5  also worked at Dorothy's Hair Care in

6  Crestview; correct?

7      A.    Yes.

8      Q.    And you worked there for

9  approximately a year?

10      A.    Yes.

11      Q.    And your duties there included

12  washing; correct?

13      A.    Yes.

14      Q.    And styling; correct?

15      A.    Yes.

16      Q.    And perming; correct?

17      A.    Yes.

18      Q.    You also worked at another

19  sewing factory called Russell's; correct?

20      A.    Yes.

21      Q.    And you worked there for

22  approximately three years; correct?

23      A.    Yes.

1     Q.     And that was also in

2  Crestview?

3     A.     Yes.

4     Q.     And you talked a bit about

5  your work at Franklin Ferguson with your

6  attorney.  And I just wanted to make sure I

7  understood at least one point, and that is

8  that Franklin Ferguson was a large operation

9  that had several hundred employees; correct?

10     A.     Yes.

11     Q.     And you worked in a large,

12  open room during the seven or so years you

13  worked there; correct?

14     A.     Yes.

15     Q.     I'd like to talk a bit about

16  your leukemia, ma'am.  You were diagnosed, I

17  think you told us earlier today, in 1992;

18  correct?

19     A.     Yes.

20     Q.     About fourteen years ago;

21  correct?

22     A.     Yes.

23     Q.     And I understand that you

67

1 underwent some chemotherapy?

2      A.   Yes.

3      Q.   And I want to make sure I

4 understand just what that chemotherapy was

5 and how long that chemotherapy lasted.  I

6 understand that you took pills for

7 approximately four days; correct?

8      A.   Yes.

9      Q.   And then I understand that you

10 took chemo through an intravenous tube for

11 an additional two days; correct?

12      A.   Yes.

13      Q.   And then my understanding is

14 that that was it for chemotherapy, that

15 after that six-day period approximately, you

16 did not have more chemotherapy; is that

17 correct?

18          MR. PALMER:  Objection.

19 Argumentative.  Contradicts prior testimony.

20      A.   I don't remember.

21      Q.   You don't remember?

22      A.   No.

23      Q.   There may have been more

68

1  chemo, you just don't recall?

2      A.    No.

3      Q.    Okay.  And it's true that you

4  did not undergo any radiation therapy;

5  correct?

6      A.    Correct.

7      Q.    And it's true, ma'am, that

8  over the last thirteen or fourteen years,

9  since you've had your bone marrow transplant

10  and after the -- what you've described as a

11  tumor, an ovarian-related tumor was removed,

12  that you've not had any developments of any

13  cancer; is that correct?

14      A.    Correct.

15      Q.    And it's true, ma'am, that you

16  do have a family history of leukemia;

17  correct?

18      A.    I'm not sure.

19      Q.    Okay.  Your mother's father

20  died of leukemia; correct?

21      A.    Yes.  I think.

22      Q.    And as far as where you live,

23  ma'am, I want to make sure I have this fixed

69

1   in my mind here.  You moved to Crestview, as

2   I understand it, in 1983?

3        A.   Yes.

4        Q.   And except for three years

5   that you lived in Birmingham in the late

6   1990s, you've lived in Crestview ever since;

7   correct?

8        A.   I lived in Fort Walton awhile.

9        Q.   After 1983?

10       A.   Yes.

11       Q.   Okay.  I understood that you

12   had lived at Fort Walton before 1983?

13       A.   Before, before, sorry.

14       Q.   That's okay.  I just want to

15   be clear.  So let me go back to this line of

16   questioning here, then.  From 1983 to the

17   present, you've lived in Crestview --

18       A.   Yes.

19       Q.   -- except for approximately

20   three years you lived in Birmingham?

21       A.   Yes.

22       Q.   All right.  So, you've been in

23   Crestview approximately twenty years?

1     A.   Yes.

2     Q.   And you're currently married,

3 ma'am?

4     A.   Yes.

5     Q.   And you've -- Before this

6 marriage, you were married and divorced

7 three times?

8     A.   Yes.

9     Q.   Yes?

10    A.   Yes.

11    Q.   Do you read a newspaper called

12 the Florala News?

13    A.   No.

14    Q.   Does your mother read that

15 newspaper?

16    A.   I'm not sure.

17    Q.   Have you ever been diagnosed

18 with any memory issues, ma'am?

19    A.   No.

20    Q.   Okay.  Ma'am, since -- from --

21 Certainly from the time that you underwent

22 your various surgeries back in the early

23 1990s, and up until the present, you have

1 seen a number of medical doctors; correct?

2    A.   Yes.

3    Q.   Probably more than you care to

4 see, I suspect?

5    A.   Yes.

6    Q.   And it's true, is it not,

7 ma'am, that you have never asked any of

8 those doctors whether or not any of the

9 issues that you have suffered are associated

10 with the wood treatment facility?

11        MR. PALMER:  Objection.

12 Argumentative.

13    A.   Yes.

14        MR. TER MOLEN:  No further

15 questions.  Thank you.

16            EXAMINATION

17 BY MR. TAYLOR:

18    Q.   Ms. Reynolds, I'm Bernard

19 Taylor.  As you know, I represent

20 Louisiana-Pacific Corporation.  I only have

21 a couple of questions for you.  You know

22 that -- Hopefully, you know that we have

23 sympathy and empathy for what you're going

1  through in regards to your illness.

2         And, obviously, the fact that

3  you have to walk around with that mask at

4  times engenders sympathy and empathy also.

5  And you understand that there's a

6  possibility that some jurors may feel some

7  sympathy and empathy for you, you understand

8  that; correct?

9     A.   I'm not sure.

10    Q.   Not sure.  You know what

11  sympathy is?

12    A.   Yes, I know what it is.

13    Q.   All right.  And as counsel

14  just asked you, you have not had any doctor

15  tell you that your leukemia is related in

16  any way to the operations of the Lockhart

17  facility; isn't that correct?

18         MR. PALMER:  Objection.

19  Compound, argumentative, asked and answered,

20  assumes facts not in evidence.

21    Q.   You can answer the question,

22  ma'am.

23    A.   No.

73

1      Q.    And the reason you believe --

2 Just to be sure that I'm clear on your

3 response to my question, and I know I'm

4 going to draw an objection, it is correct

5 that you have not had any doctor tell you

6 that your leukemia is related in any way to

7 the operations of the Lockhart facility;

8 isn't that correct?

9          MR. PALMER:  Same objections.

10      A.    Right.

11      Q.    Is that a yes?

12      A.    Yes.

13      Q.    And the reason you believe

14 that there is some relationship between the

15 operations of the Lockhart facility and the

16 cause of your leukemia, is because your

17 lawyers have told you that; correct?

18          MR. PALMER:  Objection.  I'm

19 going to -- Are you trying to delve into

20 attorney-client privilege?

21          MR. TAYLOR:  She's already

22 testified to that.

23      Q.    Is that correct, ma'am?

74

1     A.    Ask me again.  I'm sorry.

2          MR. PALMER:  Hold on.  Don't

3  say anything, yet.  What are you saying,

4  Mr. Taylor?

5          MR. TAYLOR:  I'm saying that

6  she's already testified that she went to a

7  meeting at the Armory and her lawyers told

8  her that it was as a result of the

9  operations of the Lockhart facility that she

10  developed her leukemia.

11          MR. PALMER:  I don't believe

12  that's correct.  I believe what she said is,

13  she was not aware until she went to that

14  meeting.  And I'm going to instruct the --

15  my client not to answer any questions that

16  deal with what your lawyers told you.

17     Q.    Well, then, let me ask this

18  next question.  Based upon your prior

19  testimony, Ms. Reynolds, and, again, we

20  appreciate your taking the time you've spent

21  with us.

22          But based upon your prior

23  testimony, it wasn't until you went to the

1  meeting with your lawyers at the Armory that

2  you were advised that there may be some

3  relationship between the development of your

4  cancer, your leukemia, and the operations of

5  the facility, the Lockhart facility, is that

6  correct, ma'am?

7          MR. PALMER:  I'm sorry.  I

8  didn't realize.  Several times it seemed

9  like you stopped.  I'm still going to

10  instruct the witness not to answer because

11  you're still talking about what she was

12  advised.

13          MR. TAYLOR:  Okay.

14          MR. PALMER:  She has not

15  disclosed, according to my recollection, the

16  content of conversations.  If you want to

17  ask her what her understanding is -- Don't

18  answer that.

19          MR. MITCHELL:  Why don't we

20  take a break until I can read the context?

21  I'm almost finished.

22          MR. PALMER:  Well, I just want

23  to make sure that you understand that we're

1   not waiving attorney-client privilege.

2           MR. TAYLOR:  Do you want to

3   take a break and talk because I'm almost

4   finished.  I can have the court reporter go

5   back and read that portion of the transcript

6   if you would like.

7           MR. PALMER:  Fine.

8           MR. TAYLOR:  Would you go back

9   and read the portion of the transcript

10  dealing with the Armory, please, and what

11  she was told at the Armory.

12              (Requested portion of the

13               Record was read by the

14               Reporter.)

15      Q.    Did you understand that

16  testimony that the court reporter just read

17  to you?

18      A.    Yes.

19      Q.    And were you being truthful at

20  the time you gave that testimony?

21      A.    Yes.

22      Q.    Okay.  Now, you indicated that

23  in answer to a question from your counsel

77

1  that what you wanted was justice.  Do you

2  remember saying that?

3      A.   Yes.

4      Q.   And included within that

5  justice, I'm assuming, is you want the

6  truth; correct?

7      A.   Yes.

8      Q.   And if, indeed, the truth is

9  that nothing with regards to the operation

10  of the Lockhart facility caused you to have

11  the cancer or leukemia that you have, you

12  would want the jury to consider that truth;

13  correct?

14         MR. PALMER:  Objection.  It

15  calls for speculation and assumes facts not

16  in evidence, and is argumentative.

17      Q.   You may answer.

18      A.   Ask me again, I'm sorry.

19      Q.   If it turns out that nothing

20  in regard to the operation of the Lockhart

21  facility is related in any way to the cause

22  of your leukemia, you would want the jury to

23  consider that truth, wouldn't you, ma'am?

78

1          MR. PALMER:  Same objections.

2     A.    That's the only question you

3  asked me?

4     Q.    You want the truth to be

5  known, don't you?

6     A.    Yes.

7          MR. TAYLOR:  Okay.  No further

8  questions.

9          MR. PALMER:  Let's take a

10  break.  Off the Record.

11          VIDEOGRAPHER:  Off the Record

12  at 4:16 p.m.

13            (Recess taken.)

14          VIDEOGRAPHER:  Back on the

15  Record.  The time is 4:24 p.m.

16     Q.    (Mr. Taylor) Ms. Reynolds,

17  thank you for bearing with us.  We're almost

18  finished -- At least I'm almost finished

19  with my question.

20          You indicated that you moved

21  to Crestview in 1983; is that correct?

22     A.    Yes.

23     Q.    And you moved there shortly

1 after your daughter was born; is that

2 correct?

3    A.   Yes.

4    Q.   And your daughter was born on

5 August 6, 1983; correct?

6    A.   Yes.

7    Q.   So, was it within a few days

8 of that, or a month, or what?

9    A.   About a month.

10    Q.   About a month.  Okay.

11       MR. TAYLOR:  No further

12 questions.  Thank you, ma'am.

13       MR. PALMER:  I have no further

14 questions.  Thank you, Mrs. Reynolds.  And I

15 think we're done.

16       VIDEOGRAPHER:  Off the Record.

17 The time is 4:45 p.m.  This concludes the

18 deposition.

19 (The deposition was concluded at 4:45 p.m.,

20  July 26, 2006.)

21

22

23

80

1          REPORTER'S CERTIFICATE

2  STATE OF ALABAMA,

3  ELMORE COUNTY,

4          I, Angela Smith, Registered

5  Professional Reporter and Commissioner for

6  the State of Alabama at Large, do hereby

7  certify that the above and foregoing

8  proceeding was taken down by me by

9  stenographic means, and that the content

10  herein was produced in transcript form by

11  computer aid under my supervision, and

12  that the foregoing represents, to the best

13  of my ability, a true and correct

14  transcript of the proceedings occurring on

15  said date and at said time.

16          I further certify that I am neither

17  of kin nor of counsel to the parties to the

18  action; nor in any manner interested in the

19  result of said case.

20

21

22          _____
                Angela Smith, RPR, CRR,
                for the State of
23                Alabama at Large.