# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| M.C. who sues by and through her<br>mother and next friend, GAIL TATUM | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06cv83-LES: |
| | ) | |
| PACTIV CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# PLAINTIFFS' SUPPLEMENTAL RESPONSE
# TO DEFENDANTS' JOINT MOTION TO COMPEL

COME NOW the Plaintiffs in the above-styled action, by and through undersigned counsel of record, and file this supplement to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), which was filed on December 15, 2006 in response to *Defendants' Joint Motion to Compel* (Document 69), which itself was filed on August 7, 2006.[1] This *Plaintiff's Supplemental Response to Defendants' Joint Motion to Compel* is filed in compliance with this Honorable Court's directive at the April 10, 2007 hearing (1) that the Plaintiffs' counsel file an affidavit of counsel concerning the nature of the meetings with the Plaintiffs and (2) that both Plaintiffs' counsel and Defendants' counsel brief the Court on the nature of the federally required commencement date under Section 309 of the COMPREHENSIVE ENVIRONMENTAL

---

1.    By *Order* dated August 23, 2006 (Document 81), the Court scheduled oral argument on *Defendants' Joint Motion to Compel* and other matters for August 30, 2006.  However, by *Order* dated August 30, 2006 (Document 86), the Court stayed all proceedings in this case pending mediation.  Thereafter, by *Order* dated November 30, 2006 (Document 107), the Court ordered the Plaintiffs to show cause on or before Friday, December 15, 2006 why *Defendants' Joint Motion to Compel* should not be granted.  By *Order* dated April 17, 2007 (Document 224), the Court reiterated its request for supplemental briefs to be filed on or before Monday, April 30, 2007.

RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980 ("CERCLA"), 42 U.S.C. §§ 9601,

9658. Finally, the Plaintiffs have also included a brief discussion of the context in which the

Defendants' joint motion to compel was filed, for the Defendants' desire to breach the attorney-

client privilege must be viewed in the light of (1) their direct and covert contact with at least one

Plaintiff and (2) their destruction of documents relevant to this case. In short, the Defendants'

joint motion to compel is part of a larger pattern of conduct intended to disrupt the Plaintiffs'

ability to prosecute this case. For these reasons, as well as those advanced in *Plaintiffs'*

*Response to Defendants' Joint Motion to Compel*, this Honorable Court should deny *Defendants'*

*Joint Motion to Compel*.

## "Public" Meetings or Legal Consultation:
## What Was The Nature Of The Meetings?

In their motion the Defendants make the unsupported and erroneous assertion that the

"Plaintiffs' counsel hosted ***public*** meetings at the former Florala armory hall ***prior*** to

establishing an attorney-client relationship with any of the deponents or initiating litigation."

*Defendants' Joint Motion to Compel* (Document 69), filed on August 7, 2006, page 3, *emphasis*

*added*. The Defendants also state in their motion that they seek to compel the Plaintiffs to

answer questions concerning these meetings, and "for the Plaintiffs to produce documents and

information relating to the meetings." *Defendants' Joint Motion to Compel* (Document 69), filed

on August 7, 2006, page 2. In fact, the meetings were ***not public*** and were open only to clients

and prospective clients. *Affidavit of Gregory Andrews Cade*, April 30, 2007, attached as

**EXHIBIT A** hereto; *Affidavit of Debra Brooks Hughes*, December 13, 2006, attached as **EXHIBIT**

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**     **Page 2**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

B hereto.[2]  The mere fact that the Plaintiffs' jointly sought legal advice does not render the attorney-client privilege a nullity and joint clients may assert the privilege "as against outsiders." GAMBLE'S ALABAMA RULES OF EVIDENCE, § 502, p. 121 (1995).

## The "Federally Required Commencement Date" Established by CERCLA Section 309

Section 309 of the COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980 ("CERCLA"), 42 U.S.C. §§ 9601, 9658, amends state statutes of limitations governing personal injury actions arising out of exposure to any "hazardous substance" or "pollutant or contaminant" "released" into the "environment" from a "facility," as those terms are defined by CERCLA.  Under Section 309,[3] the state statute of limitations continues to be applicable,[4] but a federally required commencement date (sometimes referred to as the "FRCD") based on discovery of the cause of action[5] is substituted for the accrual date under the state statute, if it is earlier.[6]  The federally required commencement date preempts not

_____

2.        Also attached as **EXHIBIT K** to _Plaintiffs' Response to Defendants' Joint Motion to Compel_ (Document 114), filed on December 15, 2006.

3.        Section 309 was added by the SUPERFUND AMENDMENT AND REAUTHORIZATION ACT OF 1986 ("SARA"), (codified as amended in scattered sections of the UNITED STATES CODE).

4.        "Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility."  42 U.S.C. § 9658(a)(2).

5.        "Except as provided in subparagraph (B), the term 'federally required commencement date' means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."  42 U.S.C. § 9658(b)(4)(A).

6.        "In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**                    **Page 3**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

only the applicable accrual rule, but also Alabama's rule of repose.  *Morgan v. Exxon Corporation*, 869 So.2d 446 (Ala. 2003).

In applying section 309, a court should bear in mind that CERCLA is a remedial statute that should be construed liberally in order to effectuate its goals.  *U.S. v. Alcan Aluminum Corporation*, 964 F2d 252 (3rd Cir. 1992), *rehearing en banc denied.*

## Facility

The wood treatment facility formerly operated by the Defendants is a "facility" as that term is defined by CERCLA.  The term "facility" is defined by 42 U.S.C. § 9601(9), as follows:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

There can be "no room for doubt" that a wood treatment facility of the type operated by the Defendants in this case is a "facility" within the meaning of CERCLA.  *Tanglewood East Homeowners v. Charles Thomas, Inc*., 849 F.2d 1568, 1573 (5th Cir. 1988).  Thus, the federally required commencement date mandated by Section 309 applies to state law claims arising out of exposures to hazardous substances released from a wood treatment facility.  *Tucker v. Southern Wood Piedmont Company*, 28 F.3d 1089, 1091 (11th Cir. 1994).

---

commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute."  42 U.S.C. § 9658(a)(1).

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 4**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

# Hazardous Substances

The substances to which the Plaintiffs were exposed are "hazardous substances" as that term is defined by CERCLA.  The term "hazardous substances" is defined by 42 U.S.C. § 9601(14) as follows:

> The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 USCS §§ 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606].  The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

To be a "hazardous substance" for the purposes of CERCLA, a substance need only be designated as hazardous under any one of the statutes listed above or under Table 302.4 of 40 CFR § 302.  _B.F. Goodrich Company v Murtha_, 958 F.2d 1192 (2nd Cir. 1992).  The Plaintiffs have alleged – and the evidence demonstrates – that the Defendants' operations released the following by-products, each of which is listed in Table 302.4 and therefore constitutes a hazardous substance within the meaning of CERCLA (shown with their "chemical abstract service registry number," or "CASRN"):

1. Creosote (CASRN 8001-58-9), including, without limitation, coal tar pitch (CASRN 8007-45-2).
2. Pentachlorophenol (CASRN 87865).
3. Tetrachlorodibenzo-p-dioxins (CASRN 1746016).
4. Pentachlorodibenzo-p-dioxins (CASRN 39227-61-7).
5. Hexachlorodibenzo-p-dioxins (CASRN 57653-85-7).

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**     **Page 5**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

6.   Heptachlorodibenzo-p-dioxins (CASRN 35822-46-9).
7.   Octachlorodibenzo-p-dioxins (CASRN 3268-87-9).
8.   Furans (CASRN 110009), including, without limitation, tetrachloro-dibenzo-furans, pentachlorodibenzo-furans, hexachlorodibenzo-furans, heptachloro-dibenzo-furans, and octachlorodibenzo-furans.
9.   Polycyclic aromatic hydrocarbons, including, without limitation, benzo[a]pyrene (CASRN 50-32-8).
10.  Benzene (CASRN 71-43-2).
11.  Arsenic (CASRN 7440382).
12.  Copper chromate arsenate (CASRN 7440-38-2).
13.  Hexavalent chromium (CASRN 7440473).

It does not matter whether the source of the hazardous substance is industrial, commercial, municipal, or household.  _B.F. Goodrich Company v Murtha_, 958 F.2d 1192 (2nd Cir. 1992).  A hazardous substance may be a consumer product, a manufacturing by-product, or an element of a waste stream.  _Id_.  Quantity and concentration are not factors in determining whether a substance is a hazardous substance.  _Id_.

The Plaintiffs have not identified as hazardous substances in this case any petroleum, crude oil, or fraction thereof nor any natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel, or mixtures of natural gas and synthetic gas, and so the petroleum exclusion is not applicable.  Moreover, if the Defendants intend to assert the benefit of the petroleum exclusion, they bear the burden of proof on that issue.  _Tosco Corporation v. Koch Industries, Inc._, 216 F.3d 886 (10th Cir. 2000).

## Release into the Environment

The hazardous substances to which the Plaintiffs were exposed were "released" into the "environment" as those terms are defined by CERCLA.  The term "release" is defined by 42 U.S.C. § 9601(22) as follows:

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**     **Page 6**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 USCS §§ 2011 et seq.], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 USCS §§ 2210], or, for the purposes of section 104 of this title [42 USCS § 9604] or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 [42 USCS § 7912(a) or 7942(a)], and (D) the normal application of fertilizer.

The term "environment" is defined by 42 U.S.C. § 9601(8) as follows:

The term "environment" means (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act [*16 USCS §§ 1801* et seq.], and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

These definitions of "release" and "environment" are so broad that they easily encompass the allegations of this case.

A release into the environment encompasses not only active conduct, such as "disposal," *U.S. v. CDMG Realty Company*, 96 F.3d 706 (3rd Cir. 1996), but also passive activity, such as "leaching." *Id*. at 715. Thus, a release into the environment "does not require active participation by any responsible parties," *Westfarm Associates Limited Partnership v. International Fabricare Institute*, 846 F.Supp. 422, 431 (D.Md. 1993), and a release into the environment has been found where waste material contained hazardous substances, there were piles of drums stacked up with some partially buried in a sinkhole, there were stained soils, strong chemical orders were perceived at the site, there were no storm water runoff controls, and drums with waste materials were burned in open. *U.S. v. JG-24, Inc*., 331 F.Supp.2d 14 (D.P.R.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**        **Page 7**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

2004).  Similarly, a finding of cyanide, lead, cadmium, and other hazardous substances at the site of an electroplating business, when combined with evidence that no party was willing to assert control of the hazardous substances, was found to constitute a release or threat of release of hazardous substances into the environment.  *U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989), *cert. denied*, 494 U.S. 1057 (1990).

## Underlying CERCLA Claim

The Defendants assert that the federally required commencement date in section 309 is not applicable unless there is an underlying CERCLA claim for cleanup or remedial activities. In support of this assertion, the Defendants cite *dicta* in *Becton v. Rhone-Poulenc, Inc.*, 706 So.2d 1134 (Ala. 1997).  *Becton*, however, concerned an individual whose personal injury was the result of an ***occupational exposure***, which is expressly excluded from coverage under section 309.[7]  Moreover, the court in *Becton* did not rule that an underlying CERCLA action was required, but merely cited four cases for the proposition that some courts have limited section 309 to cases in which an underlying CERCLA claim had been made ***or could exist*** based on the presence of hazardous waste.  Clearly, an underlying CERCLA claim could be maintained against the Defendants in this case.  In addition, the four cases cited in *Becton* are all inapplicable to this case.[8]

---

7.    The definition of "release" in 42 U.S.C. § 9601(22) specifically excludes "any release which results in exposure to persons solely within a workplace."

8.    Like *Becton*, two of the cases involved occupational exposures that are statutorily excluded from coverage under CERCLA.  "The interior of a place of employment is not 'the environment' for purposes of CERCLA – at least to the extent employees are the injured persons – and § 309(a)(1) therefore does not apply to Covalt's claim." *Covalt v. Carey Canada, Inc*., 860 F.2d 1434, 1439 (7th Cir. 1988).  "The decedent's work site would not qualify as a facility under CERCLA."  *Knox v. AC&S, Inc*., 690 F.Supp. 752, 756 (S.D. Ind. 1988).  One case is based on the

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**    **Page 8**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

In stark contrast to the *dicta* in *Becton*, it is clear that section 309 itself does not require an underlying CERCLA action, nor does the legislative history:

> There is nothing in the language of the section that requires an underlying CERCLA action in order to apply the federally required commencement date preemption of the state statute of limitations. The Congressional reports accompanying and explaining the legislation also makes no reference to an underlying CERCLA action.

*Kowalski v. The Goodyear Tire & Rubber Company*, 841 F.Supp. 104, 107 (W.D.N.Y. 1994).

> The plain reading of § 9658 in the context of the mandate which resulted in the SARA amendments suggests that the preemption of a state statute of limitations was passed as an additional remedy, not one confined to actual CERCLA actions.

*Id*. at 108.

Thus, because the Plaintiffs suffered injuries caused by hazardous substances released into the environment from a facility, they may invoke CERCLA's federally required commencement date and "need not have an underlying CERCLA action in order to seek damages under that statute." *Tower Asphalt, Inc. v. Determan Welding and Tank Service, Inc*., 530 N.W.2d 872, 875 (Minn.Ct.App. 1995).

## Application of Section 309

Under section 309, the Plaintiffs' causes of action did not accrue until the Plaintiffs *knew* or *reasonably should have known* that the injuries they sustained were caused by the release of hazardous substances from the Defendants' wood treatment facility. In essence, the standard

---

statutory exclusion in 42 U.S.C. § 9604(a)(3)(B) that prohibits CERCLA removal or remedial action in response to a release "from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures." *First United Methodist Church v. United States Gypsum Company*, 882 F.2d 862 (4th Cir. 1989), *cert. denied*, 493 U.S. 1070 (1990). Finally, one case involved a miniscule release from something other than a typical facility. "This Court does not believe that the leaking of a relatively small quantity of dielectric fluid from a damaged transformer, within the confines of a penthouse containing electrical equipment, is the type of 'release into the environment' contemplated or intended by the CERCLA." *Electric Power Board of Chattanooga v. Westinghouse Electric Corporation*, 716 F.Supp. 1069, 1081 (E.D. Tenn. 1988), *affirmed*, 879 F.2d 1368 (6th Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990).

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 9**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

requires that the Plaintiffs knew or should have known that they had a ***cause of action*** against the Defendants. ***Mere suspicion is not enough*** to trigger the federally required commencement date:

> The discovery-of-cause standard set by the FRCD, defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury" was caused or contributed to by the hazardous materials, focuses on knowledge, actual or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be equated with knowledge; and the fact that a claimant had only a "reasonable suspicion" that the injuries were caused by the Landfill is not a sufficient basis for ruling as a matter of law that the claimant "reasonably should have known" (emphasis added) that the injuries were caused by the Landfill. Accordingly, the district court applied an erroneous legal standard in interpreting the FRCD.

_Freier v. Westinghouse Electric Corporation_, 303 F.3d 176, 205-206 (2nd Cir. 2002).

It is not enough that the Plaintiffs knew that they were injured. The federally required commencement date was not triggered until they also knew (or in the exercise of reasonable diligence, should have known) that their injuries were caused by exposure to hazardous substances released from the Defendants' wood treatment facility. Thus, a two-pronged test is employed:

> In applying the FRCD's "reasonably should have known" standard, courts apply a two-pronged test. First, they assess "whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury." [_Citation omitted_]. If the plaintiff was on inquiry notice, then courts consider whether such inquiry "would have disclosed the nature and cause of plaintiffs injury so as to put him on notice of his claim," and charge plaintiff with knowledge of facts that would have been discovered through that process.

_LaBauve v. Olin Corporation_, 231 F.R.D. 632, 659 (S.D. Ala 2005).

***It is this two-pronged test that will determine, ultimately, whether the Plaintiffs' cases were timely filed, and it is this two-pronged test, then, that must be the focal point of the Defendants' discovery efforts***. First, the Defendants are clearly entitled to discovery about whether a reasonable person stepping into the shoes of a particular Plaintiff should have ***inquired***

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**    **Page 10**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

about the ***cause*** of his or her injury.  Second, the Defendants are also clearly entitled to discovery about whether such an inquiry by the Plaintiff would have actually ***revealed*** to him or her that his or her condition was caused by toxic releases from the Defendants' wood treatment facility. ***What is significant about this test in light of the Defendants' joint motion to compel is that the test hinges on what the Plaintiff himself knew or should have known, not the source of that knowledge!***

Considering the law, then, it is difficult to understand just why the Defendants insist that they must shatter the attorney-client privilege and ask questions about anything and everything that was discussed during the Plaintiffs' meetings with their lawyers, especially given the fact that it was repeatedly made clear during the depositions (1) that the Defendants could ask about when the meetings occurred, where they occurred, who was present, and just about anything other than the actual ***content*** of the attorney-client privileged communications and (2) that the Defendants could ask the Plaintiffs what they themselves understood, so long as the questions were about the Plaintiff's own understanding and not the content of attorney-client privileged communications:

> Q.      And the reason you believe that there is some relationship between the operations of the Lockhart facility and the cause of your leukemia, is because your lawyers have told you that; correct?
>
> MR. PALMER:  Objection.  I'm going to – Are you trying to delve into attorney-client privilege?
>
> MR. TAYLOR:  She's already testified to that.
>
> Q.      Is that correct, ma'am?
>
> A.      Ask me again.  I'm sorry.
>
> MR. PALMER:  Hold on.  Don't say anything, yet.  What are you saying, Mr. Taylor?
>
> MR. TAYLOR:  I'm saying that she's already testified that she went to a meeting at the Armory and her lawyers told her that it was as a result of the operations of the Lockhart facility that she developed her leukemia.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 11**
***Tatum v. Pactiv Corporation, et al.*, Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

MR. PALMER:  I don't believe that's correct.  I believe what she said is, she was not aware until she went to that meeting.  And I'm going to instruct the – my client not to answer any questions that deal with what your lawyers told you.

Q.       Well, then, let me ask this next question.  Based upon your prior testimony, Ms. Reynolds, and, again, we appreciate your taking the time you've spent with us.  But based upon your prior testimony, it wasn't until you went to the meeting with your lawyers at the Armory that you were advised that there may be some relationship between the development of your cancer, your leukemia, and the operations of the facility, the Lockhart facility, is that correct, ma'am?

MR. PALMER:  I'm sorry.  I didn't realize.  Several times it seemed like you stopped.  I'm still going to instruct the witness not to answer because you're still talking about what she was advised.

MR. TAYLOR:  Okay.

MR. PALMER:  She has not disclosed, according to my recollection, the content of conversations.  If you want to ask her what her understanding is – Don't answer that.

MR. MITCHELL:  Why don't we take a break until I can read the context?  I'm almost finished.

MR. PALMER:  Well, I just want to make sure that you understand that we're not waiving attorney-client privilege.

*Preservation Deposition of Deborah Ann Reynolds*, July 26, 2006, page 73, line 13 – page 76, line 1, attached as **EXHIBIT C** hereto.[9]

MR. PALMER:  At this point I'm going to object to any questions relating to the content of discussions at the meeting.  You can ask where the meetings occurred, who was there, when they occurred, but I'm not going to permit the witness to answer.  I'm going to instruct my client not to answer any questions about any discussions that went on, the content of any discussions at all, and I'm asserting the attorney-client privilege as the basis for that.

*Preservation Deposition of Sandra Elaine Cobb*, July 28, 2006, page 51, line 1 – 12 (attached as **EXHIBIT D** hereto.[10]

Because the Defendants persisted in focusing their questions on the Plaintiffs' meetings with their lawyers – ***not just the large joint meetings attended by clients and prospective clients, but also one-on-one meetings between the Plaintiffs and their lawyers prior to the depositions*** – the Plaintiffs' counsel clearly and unequivocally explained to the Defendants that the initial

---

9.       Also attached as attached as **EXHIBIT J** to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), filed on December 15, 2006.

10.      Also attached as **EXHIBIT B** to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), filed on December 15, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 12**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

meetings were not public meetings and that they were open only to clients and prospective clients:

> Q.    Now, when you met with your lawyers last night, did you guys discuss your deposition transcript?
>
> MR. PALMER:  I'm going to instruct the witness not to answer.  Mrs. DeVaughn, you cannot – do not answer any questions about our discussions.  I'm invoking the attorney-client privilege on your behalf.  You do not have to answer questions about what we discussed with you.
>
> MR. TAYLOR:  Are you finished?
>
> MR. PALMER:  I'm finished.
>
> MR. TAYLOR:  Okay.  Then I've got a series of questions that you're probably going to object to.
>
> Q.    When you – You met with your lawyers last night; correct?
>
> A.    Yes.
>
> Q.    How long did you spend with your lawyers?
>
> A.    Not long.
>
> Q.    Did you and your lawyers review your deposition transcript?
>
> MR. PALMER:  Objection.  I'm going to instruct the witness not to answer about any content of our communications.  You can ask her questions about how long we met, where we met, when we met, but I'm not going to permit her to answer any questions about the content of our conversations.  I will instruct her not to answer any questions about the content of privileged communications.
>
> *****
>
> MR. PALMER:  Mr. Taylor has finished that line of questioning, that's the reason I'm placing this objection now.  I'm objecting to the entire line of questioning that is trying to pry into attorney-client privileged communications.  The defense counsel, I understand, have all been made aware of the fact that no meetings were held at which the general public was invited; that all the meetings included only individuals who were clients or who were anticipating hiring lawyers; and, therefore, all communications are privileged, subject to the attorney-client privilege.  And perhaps it's because you do not represent individuals who are elderly.  Perhaps it's because you do not represent people who have cognitive impairments because of the toxic substances to which they were exposed.  Perhaps it's because you don't represent clients who are unsophisticated and perhaps less well-educated.  And so for some strange reason you feel compelled to take advantage of those weaknesses in individuals who are unable to clearly understand everything around them.  You know what the truth is.  I am speaking as an officer of the Court now because I believe that the truth is important.  And the truth of the matter is, that Mrs. DeVaughn did not attend any meetings at which the attorneys were speaking and which any communications were held or received any letters until after she had either become a client or was anticipating becoming a client

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 13**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

of one or more of the attorneys involved in the case today. I object to this entire line of questioning. I object to you badgering her, basically, when she's told you even in the very first deposition, she answered some of the questions: I don't know. It's clear, just from her demeanor, that even if she reads English, she doesn't read it very well. She has not got the same capacity to sit here and argue as you do, and you're taking advantage of that. I don't think that's appropriate. I don't think it's right as an officer of the Court for you to pursue a line of questioning that you know is eliciting answers that are not correct. And I'm actually – Because I wasn't involved in those meetings, I'm going to ask Mr. Cade to make a comment about what occurred during those meetings – or not attorney-client communication, but –

MR. CADE: Again, the content of the meeting – The content of the meeting is attorney-client privilege. And with respect to how the meetings occurred, we were invited to come to meetings associated with people being exposed to chemical substances believed to be emitted from the Louisiana-Pacific or Pactiv facility. Every meeting that took place down there was a privileged meeting. Every client that attended – Well, every person that attended from meeting one, two, three, or four, were clients or they were in anticipation of becoming clients of this litigation.

MR. PALMER: That's it. We're done with the objection.

*****

Q.        And at the meetings, there was discussion regarding the release of smoke containing chemicals from the Lockhart wood treatment facility; is that correct?

MR. PALMER: I'm going to object to any questions about the content of the conversations. You've just been told these are attorney-client conversations. And I'm going to instruct the witness not to answer any questions about the content of those conversations. Furthermore, you know, the witness is not going to be subjected to this harassment. If you keep asking questions only about the content of those conversations, you obviously have nothing else to ask and I'm going to terminate the deposition. I'm instructing the witness not to answer any questions about the content of any of the attorney-client conversations. Let's not waste our time asking those questions.

*Preservation Deposition of Dorothy Ann DeVaughn*, July 27, 2006, page 58, line 2 – page 59, line 11, page 81, line 21 – page 85, line 6, page 86, line 15 – page 87, line 14, attached as **EXHIBIT E** hereto.[11]

Rather than ask appropriate questions about the Plaintiffs' own knowledge, the Defendants insisted on asking only questions about what the Plaintiffs' lawyers told them, and when the Plaintiffs were instructed not to answer, the Defendants simply quit asking questions:

---

11.        Also attached as **EXHIBIT H** to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), filed on December 15, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 14**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

> MR. TER MOLEN: Question: Then, how did you come to that belief? Answer: They kept talking about it and everything. Question: When you say "they," who is "they"? Answer: These two lawyers. Okay. Let me just ask, having done that, are you going – will you continue in instructing the witness not to answer if I ask her those questions again?
>
> MR. PALMER: Yes. We do not waive the attorney-client privilege. It's just – It's not been waived ever.
>
> MR. TER MOLEN: I won't debate that on this transcript, and I have no further questions.

*Preservation Deposition of Kandy Marie Creech*, July 27, 2006, page 28, lines 5 – 19, attached as **EXHIBIT F** hereto.[12]

Significantly, although the Defendants' joint motion is ostensibly based on the Plaintiffs' invocation of the attorney-client privilege, that privilege was never invoked during the deposition of Plaintiff Sherri Lynn Davis, and she was never instructed to refrain from answering any of the Defendants' questions. *Preservation Deposition of Sherri Lynn Davis*, July 26, 2006, attached as **EXHIBIT G** hereto.[13] ***Nevertheless, the Defendants ask this Court to permit them to take her deposition for a third time***.[14]

The Defendants assert that they must invade the attorney-client privilege in order to learn "when each Plaintiff indeed knew or should have known of a potential claim." But what attorneys tell their clients is not necessarily relevant and may not trigger the federally required

12. Also attached as **EXHIBIT D** to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), filed on December 15, 2006.

13. Also attached as **EXHIBIT F** to *Plaintiffs' Response to Defendants' Joint Motion to Compel* (Document 114), filed on December 15, 2006.

14. The Defendants are apparently aware that Sherri Lynn Davis was never instructed not to answer their questions, for they do not mention her deposition when they raise that issue in their motion. "During the recent preservation depositions for plaintiffs Deborah Reynolds, Kandy Creech, Dorothy DeVaughn, and Sandra Cobb, Plaintiffs' counsel asserted broad, unsubstantiated claims of attorney-client privilege over topics relating to the public meetings, and the deponents refused to answer questions concerning the same." *Defendants' Joint Motion to Compel* (Document 69), filed on August 7, 2006, page 2. Nevertheless, the Defendants include Plaintiff Sherri Lynn Davis among the Plaintiffs whose depositions they want to take for the third time. *Defendants' Joint Motion to Compel* (Document 69), filed on August 7, 2006, page 11.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel** **Page 15**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

commencement date. Consider _Wilkerson v. Burlington Northern Railroad Co._, 795 So.2d 663 (Ala. 2000), a case brought under FEDERAL EMPLOYERS LIABILITY ACT, 45 U.S.C. §§ 51, _et seq_., which has a similar discovery accrual rule. The plaintiff in that case attended a meeting organized by his union at which attorneys told union members that they could have been exposed to asbestos and offered medical examinations to determine whether they were suffering from asbestos-related diseases. The plaintiff signed up for an evaluation and received a report stating that his chest x-ray revealed some abnormalities but that they were of borderline significance in regard to pneumoconiosis. On further evaluation, he received another report indicating that he had certain findings expected in early pulmonary asbestosis and that because of his occupational exposure to asbestos he should have lifelong, periodic medical examinations directed toward early detection of any asbestos-related diseases. Because he had not actually been diagnosed with an asbestos-related disease, no lawsuit was filed on his behalf. Many years later, after again being screened for asbestos-related disease, the plaintiff was diagnosed with asbestosis and filed an FELA lawsuit against his employers. The trial court granted summary judgment, ruling that the case was not timely filed because it was not filed within three years after the initial reports, which admittedly fell short of diagnosing the plaintiff with an asbestos-related disease. On appeal, the Alabama Supreme Court declined to rule that the plaintiff's initial meeting with attorneys triggered the statute of limitations:

> Based on the evidence discussed above, we conclude that a disputed question of fact exists as to "when the plaintiff possessed sufficient critical facts from which the injury and its cause, including its work-relatedness, should [have been] plainly known." [_Citation omitted_]. Accordingly, the date Wilkerson's cause of action accrued is a question for the jury. The summary judgment for the defendants was therefore inappropriate, and the Court of Civil Appeals' judgment affirming it is due to be reversed.

_Wilkerson v. Burlington Northern Railroad Company_, 795 So.2d 663, 667 (Ala. 2000).

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**        **Page 16**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

Remarkably, the Defendants assert that they must invade the attorney-client privilege in order to learn "when each Plaintiff indeed knew or should have known of a potential claim." This assertion is simply ridiculous. The attorney-client privilege does not prevent the disclosure of a person's own knowledge, but it does protect the content of communications between attorney and client. Even the principal case upon which the Defendants rely, *In re Pfohl Brothers Landfill Litigation*, 175 F.R.D. 13 (W.D.N.Y. 1997), recognized this very important distinction, stating that the privilege "protects communications rather than facts." *Id*. at 21. Thus, rather than asking what the Plaintiffs' attorneys said to the Plaintiffs, counsel for the Defendants could have asked – and, indeed, were repeatedly ***invited*** to ask – what the Plaintiffs themselves knew and when they knew it. This the Defendants chose not to do, and they should not now be given a ***third*** bite at the apple.

## The Motion to Compel Is Part of a Larger Scheme That Includes Direct Contact with the Plaintiffs

The joint motion to compel filed by the Defendants must be considered in the light of their gross misconduct, for the Defendants' real purposes in seeking to breach the attorney-client privilege are not stated in their motion but are instead demonstrated by their conduct in directly contacting at least one Plaintiff!

Lawyers representing Louisiana-Pacific contacted Joann D. Ezell, the wife of Plaintiff Roy Ezell, and one of those lawyers, Dennis Ray Bailey, Esq.,[15] took her "sworn statement"

---

15.    Dennis Ray Bailey, Esq. is an attorney with the firm Rushton, Stakely, Johnston & Garrett, P.A., Post Office Box 270, Montgomery, Alabama 36101-0270. He may be contacted by e-mail at drb@rsjg.com, by telephone at (334) 206-3234, and by facsimile at (334) 262-6277.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 17**
**Tatum v. Pactiv Corporation, et al.**, Civil Action No. 2:06cv83-LES
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

before a court reporter.  In so doing, the Defendants failed to give notice to the Plaintiffs or their

counsel.  Perhaps more significant and disturbing is the fact that in the absence of the lawyers

representing Mrs. Ezell's husband – ___*a Plaintiff*___ – defense lawyer Dennis Bailey asked leading

questions obviously intended to elicit from Mrs. Ezell statements that the lawyers representing

Louisiana-Pacific and Pactiv ___*knew*___ or ___*should have known*___ were false – that her husband, Roy

Ezell, had not signed a contract for representation by the Plaintiffs' counsel and that he wanted

no part of the litigation.

> Q.      Now, are you aware that your husband is listed as one of the persons suing Louisiana Pacific in this litigation?
>
> A.      That's what they told me.  But he's never been sworn in or something else to take a statement or anything.
>
> Q.      Well, do you know how it came to be that he was listed as a party in that suit?
>
> A.      No, I don't.  We never attended any meetings.  We never went down there.  We never contacted anybody.
>
> <div align="center">*****</div>
>
> Q.      Okay.  Do you have any information as to why Mr. Mitchell would believe that Roy would want to be represented in this lawsuit that –
>
> A.      Roy told him he didn't want to be represented.  He said, we're already represented.  He said – I said, no, I'm not.
>
> Q.      All right.  You're going to need to explain that.  It's going to be hard – For somebody reading this, I want them to understand exactly what you mean.
>
> A.      Okay.  Every time he comes, he tells Roy he is represented.  I said, well, when did you get to represent Roy because he never asked you to represent him?  And he didn't.  He just takes it on his-self to – And he said that I needed to – I said, no.  You don't represent me.  Never have or never will.

___Sworn Statement of Joann D. Ezell___, August 11, 2006, page 11, line 21 – page 12, line 8; page 25,

line 20 – page 26, line 16, attached as **EXHIBIT H** hereto.[16]

---

16.      Also attached as **EXHIBIT B** to ___Defendants' Joint Motion for Protective Order___ (Document 71), filed on August 14, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**       **Page 18**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

In fact, Plaintiff Roy Ezell had signed an attorney employment agreement on November 15, 2004, *__a year and nine months prior to the date on which defense lawyer Dennis Bailey took the sworn statement from Mr. Ezell's wife__*.  A copy of that attorney employment agreement is attached as **EXHIBIT I** hereto.[17]  Significantly, despite the best efforts of defense lawyer Dennis Bailey to lead Mrs. Ezell, and despite the absence of Plaintiffs' counsel, *__the truth emerged when she testified that it was Louisiana-Pacific's lawyers that were harassing her__*:

> Q.     What would you like us to do if we – to help, if anything, make it stop?
> A.     Tell them to leave us alone.
> Q.     And by "us," who do you mean?
> A.     Louisiana Pacific's lawyers.

*Sworn Statement of Joann D. Ezell*, August 11, 2006, page 15, lines 4-8, attached as **EXHIBIT H** hereto.[18]

The defense lawyers were obviously trapped by their own zeal, for when they used Mrs. Ezell's statements to coerce her and her husband – *__a Plaintiff__* – to visit "independent" counsel selected by Louisiana-Pacific, the Ezells declined such biased representation.  As Louisiana-Pacific was forced to explain in its *Response to Plaintiffs' "Motion for In Camera Inspection"* (Document 77) filed on August 18, 2006, "Mr. and Mrs. Ezell met with potential independent counsel and determined that they do not desire independent counsel at this time," and "despite the information in Mrs. Ezell's sworn statement, *__Mr. Ezell may wish to remain a named Plaintiff in this litigation__*."  *Emphasis added*.  The use of the term "remain" is an admission that

---

17.     Mr. Ezell signed the attorney employment agreement with The Cade Law Firm, L.L.C. and the Colom Law Firm, L.L.C.  Gregory Andrews Cade subsequently joined Environmental Litigation Group, P.C. and brought this case with him.

18.     Also attached as **EXHIBIT B** to *Defendants' Joint Motion for Protective Order* (Document 71), filed on August 14, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 19**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

the Defendants _knew_ that Mr. Ezell was an adverse party!  Even more troubling is the fact that it appears to the Plaintiffs' counsel that Defendant Louisiana-Pacific not only **_arranged_** for Plaintiff Roy Ezell to meet with "independent" counsel,[19] but that the Defendants might have actually **_paid_** for that meeting!

> **_The Plaintiffs' counsel has initiated an investigation to determine whether the Defendants have contacted any other Plaintiffs.  That investigation is not yet complete, but the Plaintiffs' lawyers intend to advise this Honorable Court if they learn that the Defendants or their agents have had direct contact with any additional Plaintiffs_**.

It appears to the Plaintiffs' counsel that the Defendants' purposes in directly contacting Plaintiff Roy Ezell – an adverse party – are two-fold.  First, by attempting to steer Plaintiff Roy Ezell away from the lawyers that he hired and persuade him instead to hire lawyers subject to the Defendants' influence, it appears that the Defendants hoped to gain a strategic advantage by "dividing and conquering" the Plaintiffs – i.e., preventing the uniform and coordinated prosecution of their cases now possible primarily because all of the Plaintiffs are currently represented by the same counsel.  Second, and perhaps most significant, by contacting Plaintiff Roy Ezell, who has unique knowledge of the Defendants' illegal and dirty practices in operating the wood treatment facility, **_it also appears that the Defendants' intent is the spoliation of valuable evidence in the form of testimony_**, for if the rest of the Plaintiffs and their lawyers are denied access to these valuable witnesses, the value of their cases is severely diminished.  **_This_**

---

19.    Although the Defendants never identified the "independent" counsel for this Honorable Court, the Plaintiffs' counsel now understand that he is Benjamin Max Bowden, Esq., an attorney with the law firm Albrittons, Clifton, Alverson, Moody & Bowden, P.C., Post Office Box 880, Andalusia, Alabama 36420-0880.  He may be contacted by e-mail at bbowden@albrittons.com, by telephone at (334) 222-3177, and by facsimile at (334) 222-2696.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**                    **Page 20**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

*spoliation is consistent with the Defendants' destruction of documents at the outset of this case*.

### The Motion to Compel and Direct Contact with a Plaintiff Are Part of a Larger Scheme that Includes Spoliation of Evidence

It is *undisputed* that the Defendants both owned and operated the same wood treatment facility in Lockhart, Alabama, Defendant Pactiv from approximately 1978 through about 1984 and Defendant Louisiana-Pacific from about 1984 through about 1998. The primary function of the wood treatment facility was the treatment and chemical preservation of lumber and other wood products with pentachlorophenol, copper chromium arsenate, their constituents, and other hazardous substances. Through this activity the Defendants released toxic substances, including both dioxins and furans, into the environment and thereby caused the injuries made the basis of this lawsuit. *Affidavit of Roy Ezell*, April 10, 2006, attached as **EXHIBIT J** hereto.[20]

Both Defendants operated the wood treatment facility in a manner that violated federal law, for they both failed to comply with state and federal laws requiring them to report the identity and quantity of toxic and lethal substances they were releasing from the facility. These laws required the Defendants to notify not only the public – including the Plaintiffs – but also the United States Environmental Protection Agency (the "EPA") and the Alabama Department of Environmental Management ("ADEM") about the identity and quantity of toxic and lethal substances they were releasing from the Facility. TOXIC CHEMICAL RELEASE REPORTING: COMMUNITY RIGHT-TO-KNOW, 40 CFR 372. *That the Defendants failed to file the required*

---

20.      Also attached as **EXHIBIT B** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 21**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

*reports is evidenced by the fact that the required records are simply not available from either the EPA or ADEM*.

Undoubtedly the reason the Defendants failed to report their release of toxic substances from the facility, including dioxins and furans, is because the releases themselves were violations. Both Pactiv and Louisiana-Pacific burned wood contaminated with pentachlorophenol and copper chromium arsenate in an ordinary boiler rather than a hazardous waste incinerator. *Affidavit of Roy Ezell*, April 10, 2006, attached as **EXHIBIT J** hereto;[21] *Affidavit of Jacky Partridge*, April 10, 2006, attached as **EXHIBIT K** hereto.[22] In addition, both Pactiv and Louisiana-Pacific disposed of water contaminated with pentachlorophenol and copper chromium arsenate as steam, using the same ordinary boiler. *Affidavit of Roy Ezell*, April 10, 2006, attached as **EXHIBIT J** hereto;[23] *Affidavit of Jacky Partridge*, April 10, 2006, attached as **EXHIBIT K** hereto.[24] Both of these practices are illegal. STANDARDS FOR THE MANAGEMENT OF SPECIFIC HAZARDOUS WASTES AND SPECIFIC TYPES OF HAZARDOUS WASTE, 40 CFR 266, SUBPART H – HAZARDOUS WASTE BURNED IN BOILERS AND INDUSTRIAL FURNACES.

When Louisiana-Pacific assumed control of the facility in about 1984, it had an affirmative obligation to notify both the EPA and ADEM that Pactiv, its predecessor in interest, had failed to accurately report the identity and quantity of toxic and lethal substances that Pactiv

---

21.    Also attached as **EXHIBIT B** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

22.    Also attached as **EXHIBIT C** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

23.    Also attached as **EXHIBIT B** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

24.    Also attached as **EXHIBIT C** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**          **Page 22**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

had released from the Facility.  STANDARDS FOR OWNERS AND OPERATORS OF HAZARDOUS WASTE TREATMENT, STORAGE, AND DISPOSAL FACILITIES, 40 CFR 264.  Louisiana-Pacific failed to do so.

In addition, although Pactiv apparently contends that its responsibility for the facility ceased in 1984, under law **_both Defendants_** continued to be legally responsible for contamination from the Facility.  42 U.S.C. § 9613.  Moreover, Pactiv and Louisiana-Pacific have entered into an agreement in which each Defendant has assumed responsibility for the legally-mandated environmental remediation at their wood treatment facility.  _February 18, 2004 letter from Phillip D. Davis, Alabama Department of Environmental Management, to Mr. Neil Sherman, Louisiana-Pacific Corporation_, attached as **EXHIBIT L** hereto.

On September 27, 2004, the Plaintiffs sent the Defendants a demand letter, attached as **EXHIBIT M** hereto,[25] and **_almost immediately thereafter the Defendants began destroying documents_**.  Carlton Dukes testified that in January 2005 he observed Louisiana-Pacific officials at the facility "cleaning out paperwork to be shredded or disposed of."  _Affidavit of Carlton Dukes_, March 31, 2006, attached as **EXHIBIT N** hereto.[26]  Similarly, Connie Wayne Adams, an employee of Allied Waste, Inc., testified that although the now-closed facility rarely generates any trash, for about a four-week period beginning in about the middle of January 2005, the facility generated "two to three boxes full of documents each week, along with plastic bags that

---

25.    Also attached as **EXHIBIT G** to _Plaintiff's Response to Defendants' Motion to Dismiss_ (Document 21), filed on April 24, 2006.

26.    Also attached as **EXHIBIT J** to _Plaintiff's Response to Defendants' Motion to Dismiss_ (Document 21), filed on April 24, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**      **Page 23**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

appeared to be full of paper or other similar trash." *Affidavit of Connie Wayne Adams*, April 10, 2006, attached as **EXHIBIT O** hereto.[27]

The Plaintiffs submit that there is little or no difference between the destruction of documents and tampering with witnesses, including the Plaintiffs themselves. All such actions are intended to gain an illicit advantage. ***The Defendants' joint motion to compel is consistent with their complete disregard for the Plaintiffs' right to counsel and to the benefit of unmolested evidence, and the Defendants now seek to involve this Court in their misconduct. This Court should decline that invitation and deny the motion to compel***.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray that this Honorable Court will deny the Defendants' joint motion to compel.


/s/ *Robert Leslie Palmer*
Robert Leslie Palmer, State Court ID No. PAL007
Environmental Litigation Group, P.C.
3529 Seventh Avenue South
Birmingham, Alabama 35222
Telephone: 1-205-328-9200
Facsimile: 1-205-328-9206

ATTORNEYS FOR THE PLAINTIFF

---

27.    Also attached as **EXHIBIT K** to *Plaintiff's Response to Defendants' Motion to Dismiss* (Document 21), filed on April 24, 2006.

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**    **Page 24**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**

# CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2007, I caused the foregoing *Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel* to be electronically filed with the Clerk of the Court using the ECF system and notification of such filing to sent to the following:

W. Eason Mitchell, Esq.
Gregory A. Cade, Esq.
Fred R. DeLeon, Jr., Esq.
W. Lee Gresham, III, Esq.
John C. Berghoff, Jr., Esq.
Matthew C. Sostrin, Esq.
Mark R. Ter Molen, Esq.
H. Thomas Wells, Jr., Esq.
John A. Earnhardt, Esq.
Bernard Taylor, Esq.
Douglas S. Arnold, Esq.
Orlyn O. Lockhard, III, Esq.
Dennis R. Bailey, Esq.
R. Austin Huffaker, Esq.
Laura Porter, Esq.
Abner Riley Powell III, Esq.
Benjamin Max Bowden, Esq.
Edwin Bryan Nichols, Esq.

*/s/ Robert Leslie Palmer*
Of Counsel

**Plaintiffs' Supplemental Response to Defendants' Joint Motion to Compel**     **Page 25**
**Tatum v. Pactiv Corporation, et al., Civil Action No. 2:06cv83-LES**
**In the United States District Court**
**For the Middle District of Alabama, Northern Division**