1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3         NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6  MELANIE CHAMBERS, who sues by

7  and through her Mother and next

8  of friend, GAIL TATUM,

9         Plaintiff,

10         vs.

11  PACTIV CORPORATION and

12  LOUISIANA-PACIFIC CORPORATION,

13         Defendants.

14       S T I P U L A T I O N

15       IT IS STIPULATED AND AGREED by and

16  between the parties through their respective

17  counsel, that the videotaped deposition of

18  Dorothy DeVaughn may be taken before Angela

19  Smith, RPR, CRR, at the Embassy Suites

20  Hotel, at 300 Tallapoosa Street, Montgomery,

21  Alabama 36104, on the 27th day of July,

22  2006.

23       DEPOSITION OF DOROTHY DEVAUGHN

2

1      IT IS FURTHER STIPULATED AND

2  AGREED that the signature to and the reading

3  of the deposition by the witness is not

4  waived, the deposition to have the same

5  force and effect as if full compliance had

6  been had with all laws and rules of Court

7  relating to the taking of depositions.

8      IT IS FURTHER STIPULATED AND

9  AGREED that it shall not be necessary for

10  any objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties

13  may make objections and assign grounds at

14  the time of the trial, or at the time said

15  deposition is offered in evidence, or prior

16  thereto.

17      IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21      * * * * * * * * * * * * *

22

23

3

1          * * * * * * * * * * * * *

2             I N D E X

3          EXAMINATION

4                        PAGE

5  By Mr. Palmer ....................... 8

6  By Mr. Taylor ..................... 24

7          DEFENDANT'S EXHIBITS

8                        PAGE

9  Ex. 1 - Ms. DeVaughn's discovery

10         deposition ............... 39

11  Ex. 2 - Ms. DeVaughn's medical

12         and general

13         questionnaires  ......... 112

14          * * * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

4

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3        NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-cv-83-LES-CSC (LEAD CASE)

6

7  MELANIE CHAMBERS, who sues by

8  and through her Mother and next

9  of friend, GAIL TATUM,

10      Plaintiff,

11      vs.

12  PACTIV CORPORATION and

13  LOUISIANA-PACIFIC CORPORATION,

14      Defendants.

15

16  BEFORE:

17      ANGELA SMITH, Commissioner.

18

19  APPEARANCES:

20      W. EASON MITCHELL, ESQUIRE, of THE

21  COLOM LAW FIRM, 200 Sixth Street N., Ste:

22  102, Columbus, Mississippi 39701, appearing

23  on behalf of the Plaintiff.

1 APPEARANCES (continued):

2        GREGORY A. CADE, ESQUIRE, of

3 ENVIRONMENTAL LITIGATION GROUP, 3529 7th

4 Avenue South, Birmingham, Alabama 35255,

5 appearing on behalf of the Plaintiff.

6        ROBERT L. PALMER, ESQUIRE, of

7 ENVIRONMENTAL LITIGATION GROUP, 3529 7th

8 Avenue South, Birmingham, Alabama 35255,

9 appearing on behalf of the Plaintiff.

10        BERNARD TAYLOR, SR., ESQUIRE, of

11 ALSTON & BIRD, One Atlantic Center, 1201 W.

12 Peachtree St., Atlanta, Georgia 30309,

13 appearing on behalf of the Defendant,

14 Louisiana-Pacific Corporation.

15        ORLYN O. LOCKARD, III, ESQUIRE, of

16 ALSTON & BIRD, One Atlantic Center, 1201 W.

17 Peachtree St., Atlanta, Georgia 30309,

18 appearing on behalf of the Defendant,

19 Louisiana-Pacific Corporation.

20        MARK R. TER MOLEN, ESQUIRE, of

21 MAYER, BROWN, ROWE & MAW, 71 S. Wacker

22 Drive, Chicago, Illinois 60606, appearing on

23 behalf of the Defendant, Pactiv Corporation.

6

1  APPEARANCES (continued):

2       MATTHEW C. SOSTRIN, ESQUIRE, of

3  MAYER, BROWN, ROWE & MAW, 71 S. Wacker

4  Drive, Chicago, Illinois 60606, appearing on

5  behalf of the Defendant, Pactiv Corporation.

6       VIDEOGRAPHER:  Paul Brewer

7          * * * * * *

8       I, ANGELA SMITH, RPR, CRR, a Court

9  Reporter of Wetumpka, Alabama, acting as

10  Commissioner, certify that on this date, as

11  provided by the Federal Rules of Civil

12  Procedure and the foregoing stipulation of

13  counsel, there came before me at the Embassy

14  Suites Hotel, 300 Tallapoosa Street,

15  Montgomery, Alabama 36104, beginning at

16  11:56 a.m., Dorothy DeVaughn, witness in the

17  above cause, for oral examination, whereupon

18  the following proceedings were had:

19       VIDEOGRAPHER:  This begins

20  videotape number one in the deposition of

21  Dorothy DeVaughn in the matter of Melanie

22  Chambers, who sues by and through her Mother

23  and next of friend, Gail Tatum, Plaintiff,

1   versus Pactiv Corporation and

2   Louisiana-Pacific Corporation, Defendants,

3   Case Number 83-LES-CSC.  We're on the

4   Record.  The time is 11:56 a.m.  Today is

5   Thursday, July 27, 2006.  My name is Paul

6   Brewer.

7           Would Counsel please state

8   yourselves and state whom you represent.

9           MR. PALMER:  My name is Robert

10  Leslie Palmer.  I'm an attorney representing

11  the Plaintiffs in these cases.

12          MR. TER MOLEN:  Mark

13  Ter Molen, on behalf of a Defendant, Pactiv

14  Corporation.

15          MR. TAYLOR:  Bernard Taylor,

16  on behalf of Defendant, Louisiana-Pacific

17  Corporation.

18          MR. LOCKARD:  Orlyn Lockard,

19  also appearing on behalf of the Defendant,

20  Louisiana-Pacific Corporation.

21          MR. SOSTRIN:  Matthew Sostrin

22  also appearing on behalf of Defendant,

23  Pactiv Corporation.

8

1          MR. CADE:  Gregory A. Cade, on

2  behalf of the Plaintiffs.

3          MR. MITCHELL:  I'm Eason

4  Mitchell, and I represent the Plaintiff.

5  And, for the Record, I will not be here for

6  much of the deposition, and it may not

7  reflect that I leave, due to a medical

8  appointment.

9          VIDEOGRAPHER:  Will the

10  reporter please swear in the witness?

11          DOROTHY DEVAUGHN,

12  being first duly sworn, was examined and

13  testified as follows:

14          COURT REPORTER:  Usual

15  stipulations?

16          MR. PALMER:  No.

17           EXAMINATION

18  BY MR. PALMER:

19     Q.    Good morning, Mrs. DeVaughn.

20     A.    Good morning.

21     Q.    How are you today?

22     A.    All right.  How are you?

23     Q.    I'm fine.  Thank you.  Would

9

1  you please introduce yourself to the jury by

2  giving your full name.

3      A.    My name is Dorothy Ann

4  DeVaughn.

5      Q.    And you understand that you're

6  under oath?

7      A.    Yes.

8      Q.    And you understand that you

9  have to tell the truth?

10      A.    Yes.

11      Q.    And do you also understand

12  that even though you're not in a courtroom

13  today, that the testimony you're about to

14  give can be used in a courtroom?

15      A.    Yes.

16      Q.    When were you born, ma'am?

17      A.    September 4, 1935.

18      Q.    I'm sorry, if you could speak

19  up, please.

20      A.    September the 4th, 1935.

21      Q.    And where were you born?

22      A.    In Opp, Alabama.

23      Q.    That's Opp, Alabama?

1    A.   Uh-huh.

2    Q.   Spelled O-P-P?

3    A.   O-P-P.

4    Q.   Where do you live now?

5    A.   Florala.

6    Q.   When did you move to Florala,

7 ma'am?

8    A.   When I was eighteen.

9    Q.   So, that would have been in

10 about 1953?

11    A.   Yes.

12    Q.   And have you lived in Florala

13 continuously since that time?

14    A.   Yes.

15    Q.   Where did you live when you

16 first moved to Florala?

17    A.   The Plaza.

18    Q.   Is that the Northside Plaza?

19    A.   Right.

20    Q.   And how long did you live at

21 the Northside Plaza, ma'am?

22    A.   About -- I know my daughter

23 was six when I moved from the Plaza, and she

11

1  is forty-five now.

2      Q.    Well, if you don't remember

3  the exact year, that's fine.

4      A.    No, no, I don't remember the

5  year.

6      Q.    Okay.

7      A.    I'm not good at that.

8      Q.    That's fine.  Where did you

9  live next in Florala?

10     A.    On Ninth Street.

11     Q.    Okay.  Was that 706 North

12  Ninth Street?

13     A.    Right.

14     Q.    And that street is now known

15  as Martin Luther King Street?

16     A.    Right.

17     Q.    And where did you live in

18  Florala next?

19     A.    1818 West Twelfth Avenue.

20     Q.    1818 West Twelfth Avenue?

21     A.    Uh-huh.

22     Q.    Okay.  And is that street now

23  known as Tenth Street?

12

1    A.    Right.

2    Q.    Okay.  And is that where you

3  live now?

4    A.    Yes.

5    Q.    And the address is 1938?

6    A.    Yes.

7    Q.    Are you a member of a church,

8  ma'am?

9    A.    Yes.

10    Q.    What church is that that

11  you're a member of?

12    A.    New Bethlehem Baptist Church.

13    Q.    How long have you been a

14  member of that church?

15    A.    Since I moved to Florala, ever

16  since I was eighteen.

17    Q.    Okay.  That's a pretty long

18  time.

19    A.    Uh-huh.

20    Q.    Do you have any position in

21  the church?

22    A.    Yes.  I'm a missionary worker.

23  And on the steward board.

13

1          MR. TER MOLEN:  Objection.

2 Relevance.

3     Q.    All right.  And what do you do

4 as a member of the steward board?

5          MR. TER MOLEN:  Same

6 objection.

7     A.    See to the pastor being set up

8 on Sunday morning.

9     Q.    All right.  And what do you do

10 as a missionary for the church?

11          MR. TER MOLEN:  Same

12 objection.

13     A.    We go around and visit the

14 sick and to the hospital and to the nursing

15 home.

16     Q.    And how often do you do that?

17          MR. TER MOLEN:  Same

18 objection.

19     A.    Once a month.

20          MR. TAYLOR:  I assume we all

21 agree that defendants, that we join in the

22 objections of the other defendants.

23          MR. PALMER:  I have no problem

14

1  with that.

2          MR. TAYLOR:  Okay.  I think we

3  agreed to that yesterday.  I just want to be

4  sure.

5          MR. PALMER:  Yes.

6      Q.   Do you currently work outside

7  the home?

8      A.   No.

9      Q.   Have you, in the past, worked

10  outside the home?

11     A.   Yes.

12     Q.   Okay.  Where did you work,

13  ma'am?

14     A.   Franklin Ferguson.

15     Q.   Franklin Ferguson?

16     A.   Right.

17     Q.   And that's a sewing factory?

18     A.   Right.

19     Q.   And that's located in Florala?

20     A.   Yes.

21     Q.   How long did you work at

22  Franklin Ferguson?

23     A.   I can't remember that far

15

1  back, but I think it was about twenty-eight,

2  twenty-nine, or might be thirty years.

3       Q.    Okay.  Twenty-eight,

4  twenty-nine, or thirty years?

5       A.    Yes.

6       Q.    What did you do at that

7  factory?

8       A.    I sewed button holes.

9       Q.    You sewed button holes the

10  whole time you were there?

11       A.    Yes.

12       Q.    That's a lot of button holes?

13       A.    Yeah.

14       Q.    Have you ever smoked, ma'am?

15       A.    No.

16       Q.    Have you ever worked with

17  chemicals?

18       A.    No.

19       Q.    I understand that you have

20  been diagnosed with breast cancer?

21       A.    Yes.

22       Q.    How did you learn that you had

23  breast cancer?

16

1      A.    By my breast was leaking.

2      Q.    Your breast was leaking?

3      A.    Yes.

4      Q.    What was it leaking?

5      A.    Blood.

6      Q.    Blood.  And did that cause you

7  to go see your doctor?

8      A.    Yes, yes.

9      Q.    And did he perform a biopsy?

10     A.    Yes.

11     Q.    Did you have to have surgery?

12     A.    Yes.

13     Q.    And was your breast removed?

14     A.    Yes.

15     Q.    When was it that you were

16  diagnosed with breast cancer, do you recall?

17     A.    No, I don't recall the year.

18     Q.    Okay.  Do you recall who

19  diagnosed you with breast cancer?

20     A.    Yes.

21     Q.    And who was that, ma'am?

22     A.    Dr. Sperling.

23     Q.    And where is he located?

1     A.    In Opp.

2     Q.    In Opp.  Was he your family

3  physician at the time?

4     A.    At the time, he was.

5     Q.    All right.  What was your

6  health like before you were diagnosed with

7  breast cancer?

8     A.    Good.

9     Q.    What has your health been like

10  since that time?

11     A.    Up and down.

12     Q.    Up and down.  Did you have

13  chemotherapy for your breast cancer?

14     A.    Yes.

15     Q.    I'm sorry, could you --

16     A.    Yes.

17     Q.    And did you suffer any side

18  effects as a result of having chemotherapy?

19     A.    Yes.

20     Q.    Can you tell us about the side

21  effects you suffered?

22     A.    Loss of hair, lost weight, and

23  had a bad cough afterwards.

1     Q.    And did you have any

2  discoloration of your skin?

3     A.    Yes.

4     Q.    Where did that occur?

5     A.    My hands was black, my feet

6  was black, real black.

7     Q.    Did you miss work to receive

8  chemotherapy?

9     A.    I wasn't working at the time.

10     Q.    Okay.  Did you have radiation

11  therapy for your breast cancer?

12     A.    Yes.

13     Q.    So, you had both chemotherapy

14  and radiation?

15     A.    Chemo and radiation.

16     Q.    Did you suffer any side

17  effects from the radiation therapy?

18     A.    Yes.

19     Q.    Can you tell us what side

20  effects you suffered?

21     A.    Real bad cough, and some scar

22  tissue inside.

23     Q.    Inside what?

1      A.     Inside -- I had scar tissues

2   inside of my body, my lungs.  It developed

3   some scar tissues in them.

4      Q.     Okay.  Now, I understand that

5   you've also been diagnosed with lung cancer;

6   is that correct?

7      A.   Yes.

8      Q.    How did you learn that you had

9   lung cancer?

10      A.     By the -- By the doctor keep a

11   check on me and taking X-rays and all, and

12   they learned I had lung cancer.

13      Q.    Was this during checkups for

14   your breast cancer?

15      A.    Yes, yes.

16      Q.    If you could wait until I

17   finish my question.

18      A.    Okay.

19      Q.    This was during a checkup for

20   your breast cancer?

21      A.    Yes.

22      Q.    How did you feel when you

23   learned that you had lung cancer?

20

1     A.    Bad.

2     Q.    Did you have to have surgery

3  for your lung cancer?

4     A.    Yes.

5     Q.    And what was done during those

6  surgeries?

7     A.    They took out two tumors and

8  left one.

9     Q.    Took out two tumors?

10     A.    Yes.  And left one.

11     Q.    Do you recall when you were

12  diagnosed with lung cancer?

13     A.    No, I don't recall.  No, I

14  don't.

15     Q.    Okay.  Do you recall who

16  diagnosed you with lung cancer?

17     A.    Dr. Stokes.

18     Q.    Where is he located?

19     A.    In Dothan, Alabama.

20     Q.    Did you have chemotherapy for

21  your lung cancer?

22     A.    Yes.

23     Q.    Did you suffer any side

21

1  effects from that chemotherapy?

2        MR. TER MOLEN:  Objection.

3  Foundation.  Hearsay.

4     Q.    Did you suffer any side

5  effects from that chemotherapy?

6     A.    Yes.  Hair loss.

7     Q.    Okay.  Any other side effects?

8        MR. TER MOLEN:  Same

9  objections.

10     A.    Just hair loss.

11     Q.    Okay.  Did you also have

12  radiation therapy for the lung cancer?

13     A.    Yes, yes.

14     Q.    And did you suffer any side

15  effects from that radiation therapy?

16        MR. TER MOLEN:  Same

17  objections.

18     A.    Yes, I had.

19     Q.    I'm sorry, what was the

20  answer?

21     A.    Yes, I had a cough afterward.

22     Q.    Now, even after being

23  diagnosed with breast cancer and lung

1  cancer, have you continued your missionary

2  work for the church?

3      A.    When I feel like it.

4          MR. TER MOLEN:  Objection.

5  Relevance.

6      Q.    And so, even though you've had

7  breast cancer and lung cancer, you've

8  continued to visit sick people?

9      A.    When --

10          MR. TER MOLEN:  Same

11  objections.

12          MR. TAYLOR:  And objection.

13  Leading.

14      A.    What was your question?

15      Q.    Have you continued to visit

16  people in nursing homes and the hospital

17  since having your lung cancer and breast

18  cancer?

19          MR. TER MOLEN:  Same

20  objections.

21      A.    No.  Not really.

22      Q.    Are you familiar with the

23  Louisiana-Pacific facility between Lockhart

23

1  and Florala?

2      A.    Yes.

3      Q.    And did the owners of that

4  facility ever tell you about the chemicals

5  they were using?

6          MR. TER MOLEN:  Objection.

7          MR. TAYLOR:  Objection.

8  Leading.  Lacks foundation.

9      A.    No.

10     Q.    Did they ever have any town

11  meetings?

12         MR. TAYLOR:  Objection.

13     A.    Yes.

14     Q.    Did the owners of the facility

15  ever have any town meetings, ma'am?

16     A.    No.

17     Q.    Did you give blood for dioxin

18  testing?

19     A.    Yes.

20     Q.    And where did you give that

21  blood, ma'am?

22     A.    At the hospital.

23     Q.    Which hospital is that?

24

1    A.    Florala Memorial.

2    Q.    And can you tell us why you

3 decided to file this lawsuit?

4    A.    I don't know, I reckon.

5    Q.    Okay.  Do you recall giving a

6 deposition approximately a couple of weeks

7 ago for the defendants?

8    A.    Yes.

9    Q.    And did you have an

10  opportunity to read the deposition?

11    A.    Some of it, I did.

12    Q.    Okay.  And did you -- Did you

13 note some errors in the deposition?

14       MR. TAYLOR:  Objection.

15 Leading.

16    A.    Yes.

17    Q.    Is that --

18    A.    Yes.

19       MR. PALMER:  Thank you,

20 Ms. DeVaughn.  I don't have any further

21 questions for you at this time.  I think

22 these gentlemen may have some questions for

23 you.

1                    EXAMINATION

2 BY MR. TAYLOR:

3       Q.   Ms. DeVaughn, you remember I'm

4 Bernard Taylor.  We met before.  And it

5 really is a pleasure to see you again.  It

6 is good to see you here and I hope you're

7 doing well.

8             I have a few questions for

9 you.  And I'm going to start where your

10 lawyer ended up, which was about your

11 deposition transcript.  Did you hear what I

12 just said?

13      A.   Uh-huh.

14      Q.   Your deposition transcript and

15 the fact that you reviewed it and made some

16 changes that you felt needed to be made; is

17 that correct?

18      A.   Yes.

19      Q.   I'm going to refer you to page

20 ninety-five of your transcript.

21           MR. TAYLOR:  And I don't want

22 to reach across.

23      Q.   This is your deposition

26

1  transcript from your discovery deposition

2  that was taken on July 11, 2006.  Do you

3  remember that?  We were down in Andalusia

4  and we talked together, visited together for

5  a while?

6        A.    Yes.

7        Q.    And you remember that you were

8  telling the truth then; right?

9        A.    Yes.

10       Q.    Let's look at page

11  ninety-five, and start with line ten.  Are

12  you on page ninety-five?

13       A.    Yes.

14       Q.    Yeah.  The transcript is

15  difficult to follow.  Starting with line

16  ten, tell me if I'm reading this correctly.

17  It says:  As far as you know, though, as we

18  sit here today, is Mr. Cade or Mr. Mitchell

19  your lawyers?  Do you see that in the

20  transcript?

21       A.    Yes.

22       Q.    Okay.  And did I read that

23  properly?

1     A.    Yes.

2     Q.    Okay.  Now, that's where I

3  want to start from.  Okay?  We're going to

4  read a couple of pages.  So I'll start

5  again.  As far as you know --

6          MR. PALMER:  Ms. DeVaughn, are

7  you able to read?

8          THE WITNESS:  Yes.

9          MR. TAYLOR:  I'm sorry, was

10  that an objection or what?

11          MR. PALMER:  I just wanted to

12  make -- You asked her if she could read.

13  And I wanted to make sure she could read, if

14  she was able to follow you.

15     Q.    As far as you know, though, as

16  we sit here today, is Mr. Cade or

17  Mr. Mitchell your lawyers?  Answer:  Yes.  I

18  guess so.  Question:  Okay.  Do you recall

19  if you signed an agreement with them, a

20  written agreement that you may have signed

21  to say:  Okay.  I want you guys to represent

22  me as my lawyer?  Answer:  Yes.

23          Question:  Do you recall when

28

1 that happened? Answer: No, I don't.

2 Question: You got any idea how long ago

3 that may have been? Could it have been this

4 year? Answer: I think it was last year.

5 Question: Last year, 2005? Answer: Yeah.

6 Question: Understood. So you think it was

7 in 2005 when you hired a lawyer?

8          Now, I'll read that again: So

9 you think it was in 2005 when you hired a

10 lawyer? Answer: Yes. Question: And that

11 was after all of these public meetings, the

12 four public meetings we talked about?

13 Answer: Yes.

14          Do you recall -- This is the

15 question: Do you recall the circumstances;

16 that is, where were you when you hired these

17 lawyers? Were you in a meeting or a phone

18 call, or were you guys -- This is a compound

19 question, but you know why I'm making it

20 compound. But were you guys just together

21 somewhere at a private meeting? Answer:

22 Not in a private meeting. Question: Okay.

23 Were you in a meeting with a lot of other

1  people when you made that decision?  Answer:

2  Yeah.  Question --

3        MR. PALMER:  How much of this

4  are you going to read?

5        MR. TAYLOR:  Until I finish,

6  Counsel.  Unless you have an objection.

7        MR. PALMER:  I'm going to

8  object to you reading -- Unless you're

9  referring to something that she's changed,

10  I'm going to object to you reading this

11  deposition transcript into the Record.

12        MR. TAYLOR:  The Record should

13  reflect that Counsel indicated that you read

14  the transcript.  Counsel indicated that you

15  found some errors in the transcript.  I'm

16  reading from a portion of the transcript

17  that you reviewed.  And I will complete my

18  reading.

19        MR. PALMER:  By Counsel, if

20  you're referring to me.

21        MR. TAYLOR:  Yes.

22        MR. PALMER:  I asked her

23  questions about that.  I have not personally

1  seen -- I don't know what changes she made.

2         MR. TAYLOR:  Okay.  Then you

3  probably shouldn't have asked the question.

4  You opened the door, I'm walking through it.

5         MR. PALMER:  No.  I'm asking

6  the questions because I don't want you just

7  reading the entire transcript.  I don't

8  think you're entitled to do that.

9         MR. TAYLOR:  Do I need to go

10  back and start again?  You can finish after

11  I ask my question, and you then can raise

12  your objection.

13         MR. PALMER:  Is there a

14  question?

15         MR. TAYLOR:  I'm finishing the

16  question.

17     Q.    Question:  And that was after

18  all of these public meetings, the four

19  public meetings we talked about?  I have to

20  go back to give it some reference here.

21  Answer:  Yes.  Do you recall the

22  circumstances; that is, where were you when

23  you hired these lawyers?  Were you in a

1  meeting or a phone call or were you guys --

2  this is a compound question, but you know

3  why I'm making it compound.  But were you

4  guys just together somewhere in a private

5  meeting?  Answer:  Not in a private meeting.

6          Question:  Okay.  Were you in

7  a meeting with a lot of other people when

8  you made that decision?  Answer:  Yeah.

9  Question.  Okay.  When was that?  I guess it

10  was the last meeting, I guess.  Question:

11  Okay.  So you think at the last -- the

12  fourth public meeting is when you hired

13  Mr. Cade and Mr. Mitchell as your lawyers?

14  Answer:  Yes.

15          Did I read that all correctly,

16  ma'am?

17      A.    Yeah --

18          MR. PALMER:  Let me object

19  first.

20          MR. TAYLOR:  Go ahead.

21          MR. PALMER:  I'm going to

22  object to the question as being compound, as

23  being argumentative, as mischaracterizing

32

1  testimony.  That's it.

2      Q.    Did I read that correctly,

3  ma'am?

4      A.    Yes, you read it correctly.

5      Q.    Was that your testimony on

6  July 11, 2006, ma'am?

7      A.    Yes.  But I --

8      Q.    Okay.

9      A.    I didn't understand.

10      Q.    Well, let me finish the

11  question.  Was that your testimony?

12      A.    Yes.

13      Q.    And were you telling the truth

14  then?

15      A.    Well, at the time I didn't

16  understand what was -- you know, you was

17  talking -- you was asking me.

18      Q.    But you were telling the truth

19  then, to the best of your ability; is that

20  correct?

21          MR. PALMER:  Objection.  Asked

22  and answered.  She's explaining to you that

23  she didn't understand.

33

1        MR. TAYLOR:  Are you finished?

2        MR. PALMER:  Yes, I'm

3 finished.

4    Q.    You were telling the truth

5 then, to the best of your ability; correct?

6        MR. PALMER:  Objection.  Asked

7 and answered.

8        MR. TAYLOR:  Are you

9 instructing the witness not to answer?

10       MR. PALMER:  I didn't instruct

11 her not to answer.  You've asked her this

12 several times.  And because you don't like

13 the answer, you can't just keep asking the

14 question over again.  She's told you two

15 times already on the transcript, in this

16 Record, that she did not answer.

17    Q.   Did you -- You can give your

18 answer.

19    A.   I didn't understand then, but

20 I was thinking that you asked did I go out

21 and hire a lawyer.

22    Q.   Uh-huh.

23    A.   I mean, not them, but did I

1  hire a lawyer on my own, go to an office and

2  hire a lawyer.

3     Q.    Okay.

4     A.    And I didn't.  I didn't.

5     Q.    Are you finished, ma'am?

6     A.    Yes.

7     Q.    Okay.  My question, I believe,

8  was, were you telling the truth at the time

9  you gave that answer, to the best of your

10  ability?

11        MR. PALMER:  Objection.  Asked

12  and answered.

13     Q.    You can answer the question,

14  ma'am.

15     A.    To the best of my ability, I

16  thought I was telling the truth.

17     Q.    All right.  Now, since that

18  time, you've had a chance to review the

19  transcript; correct?

20     A.    Yes.

21     Q.    And you made changes to the

22  transcript and the portions of your

23  testimony that you thought were not

35

1   accurate; isn't that correct?

2      A.   Yes.

3      Q.   You didn't change this portion

4   of the testimony, did you, ma'am?

5      A.   I beg your pardon?

6      Q.   You didn't change this portion

7   of the testimony, did you, ma'am?

8           MR. PALMER:  Are you talking

9   about when she just testified now or are you

10  talking about what she wrote?

11     Q.   What I've just read from, from

12  the deposition transcript, you did not

13  change that, did you?

14     A.   What you -- What you mean, I

15  did not change it?

16     Q.   You didn't write into the

17  transcript, you've got it in front of you,

18  that that testimony should be changed in any

19  way, shape, or form, did you?

20          Okay.  Did you make any

21  changes to the pages I just read you?

22     A.   No, I didn't.

23     Q.   Okay.  Now, you looked at --

36

1  And that was pages ninety-five through

2  ninety-seven.  And I -- I don't -- I'm

3  probably going to have to get that copy of

4  the transcript back from you again because I

5  don't -- we just received your changes just

6  before the deposition.  I'm going to point

7  you to where you did make some changes, if I

8  could get that back from you.

9      A.   (Witness complies.)

10     Q.   What I'm going to do is just

11 write the page numbers down.

12         MR. PALMER:  Would you mind

13 telling us, too.

14         MR. TAYLOR:  As soon as I get

15 them written down, sir.  Okay.  Here is the

16 problem we've got.  This is the -- This

17 should -- Well, we can leave it on the

18 Record.  It looks like there are about --

19 Well, there's more.

20         Okay.  It looks like there are

21 several pages that handwritten changes

22 appear on here.  And I would like to have

23 these copied and made an exhibit to this

37

1  deposition for purposes of trial.

2          MR. PALMER:  Do you want to

3  take a break to go have them copied, because

4  there's a business center right here?

5          MR. TAYLOR:  I hadn't -- You

6  probably didn't understand, I hadn't

7  finished yet.

8          MR. PALMER:  I'm sorry.

9          MR. TAYLOR:  And then I'm

10  going to want to ask the witness some

11  questions about these changes.

12          So, I guess the best thing to

13  do is to take a short break to request on

14  the Record that no one from the -- of the

15  Plaintiff's lawyers or the Plaintiffs'

16  representatives, or the witness's daughter,

17  Ms. Sonya, and I don't know her --

18      Q.   Your daughter's name is Sonya,

19  your daughter's name?

20      A.   DeVaughn.

21      Q.   Sonya DeVaughn.

22          MR. TAYLOR:  -- speak with the

23  witness during the time of this break.

38

1        MR. PALMER:  Speak with her at

2  all?

3        MR. TAYLOR:  Speak with her at

4  all.

5        MR. PALMER:  Well, I don't

6  know.  How long is the break going to be?

7        MR. TAYLOR:  Five minutes, I

8  guess, however long it takes to make copies.

9        MR. PALMER:  I mean, obviously

10  we need to be able to take her out, we need

11  to be able to call her back in.  That's

12  speaking to her as well.

13        MR. TAYLOR:  You know what I'm

14  talking about, Counselor.

15        MR. PALMER:  We  won't talk to

16  her about her testimony.

17        MR. TAYLOR:  She actually can

18  sit here, if she's not uncomfortable.  We

19  can go in and out.

20        MR. PALMER:  Okay.

21        MR. TAYLOR:   All right.  So

22  we're off the Record.

23        VIDEOGRAPHER:  Off the Record.

1  The time is 12:23.

2  (Recess taken.)

3  VIDEOGRAPHER: Back on the

4  Record. The time is 12:34 p.m.

5  (Defendant's Exhibit 1 was

6  marked for identification

7  purposes.)

8  Q.  Ms. DeVaughn, I'm going to

9  hand your counsel to hand to you, since

10  we're sitting in this awkward situation,

11  what has been marked as Defendant's Exhibit

12  1 to Ms. DeVaughn's deposition, so it will

13  be DeVaughn 1. And ask him to hand it to

14  you.

15  And I'm going to want to

16  discuss with you so counsel can write down

17  the pages, the page marked number

18  thirty-five, number forty, number fifty-six,

19  fifty-seven, fifty-eight, and sixty-one.

20  MR. PALMER: Those are page

21  numbers?

22  MR. TAYLOR: Those are page

23  numbers.

40

1          MR. PALMER:  That was forty,

2  fifty-six, fifty-seven, fifty-eight --

3          MR. TAYLOR:  Let me go over it

4  again.

5          MR. PALMER:  Okay.  Sorry.

6          MR. TAYLOR:  Thirty-five,

7  forty, fifty-six, fifty-seven, fifty-eight

8  and sixty-one.  I'll ask counsel if he would

9  give those, what has been marked as

10  Defendant's Exhibit 1.

11          MR. PALMER:  Do you want the

12  court reporter to mark it?

13          MR. TAYLOR:  Yes.

14      Q.    Ms. DeVaughn, if you look at

15  the front page of what has been marked as

16  Defendant's Exhibit Number 1, and tell me if

17  it indicates that this is the -- as follows:

18  United States District Court, Middle

19  District of Alabama, Northern Division,

20  Civil Action Number 2:06-CV-187, Sherri L.

21  Davis, et al., Plaintiff, versus TMA Forest

22  Products Group, et al., Defendants.

23  Deposition testimony of Dorothy DeVaughn.

1 And then it says:  Commissioner, Renny D.

2 McNaughton, July 11, 2006, Andalusia,

3 Alabama.  Did I read that correctly?

4      A.    Yes.

5      Q.    Okay.  If you'll look at the

6 first page of your deposition transcript,

7 that's the big document that's right before

8 you.

9      A.    (Witness complies.)

10      Q.    The first page of Defendant's

11 Exhibit 1, is that exactly the same as the

12 first page of your deposition transcript

13 that was taken on July 11, 2006?

14      A.    No.  No, it's not --

15      Q.    Okay.  What's different,

16 ma'am?  Take your time.  It's all right.

17         MR. PALMER:  You may want to

18 look at what you handed her.

19         MR. CADE:  Let's go off the

20 Record and give her an opportunity to review

21 that first.  How about that?  You had an

22 opportunity to review it.  You just handed

23 her something and you're asking her to

42

1 compare something. Let her see what that

2 is.

3          MR. TAYLOR: I thought I was

4 giving her an opportunity to review it.

5          MR. CADE: Well, let's go off

6 the Record and let her get caught up with

7 you.

8          VIDEOGRAPHER: Off the Record.

9 The time is 12:38 p.m.

10          (Off-the-Record discussion

11          was held.)

12          VIDEOGRAPHER: Back on the

13 Record at 12:38 p.m.

14     Q.   All right. Now, let me ask

15 the question again. If you look at the

16 first page of what's been marked as

17 Defendant's Exhibit Number 1 for

18 Ms. DeVaughn, and then look at the first

19 page of your deposition transcript that was

20 taken on July 11, 2006, are they identical,

21 ma'am?

22     A.   Yes.

23     Q.   Okay. Good. Now, looking,

43

1  again, at what has been marked as

2  Defendant's Number 1, now that's the small

3  packet of materials you have, turn over the

4  first page and you'll see a page on the

5  inside.

6      A.    (Witness complies.)

7      Q.    It's marked thirty-five.  Do

8  you see that at the top?

9      A.    Yes.

10      Q.    Okay.  Would you turn to the

11  same page in your deposition transcript.

12      A.    (Witness complies.)

13      Q.    Page thirty-five.  Let's hope

14  in the copying it didn't get turned around.

15  Do you have it there, ma'am?

16      A.    Yes.

17      Q.    Okay.  What I'm going to want

18  you to do is to look at the page that's

19  marked thirty-five in Defendant's Exhibit

20  Number 1, that's the small packet of

21  materials, and look at the page that's

22  marked thirty-five in your deposition

23  transcript.  Take as much time as you need,

1  and just tell us if those two pages are the

2  same.  Any time you need to do that, ma'am,

3  is fine with us.

4      A.    Yeah.

5      Q.    They're the same?

6      A.    Yeah.

7      Q.    Okay.  Now, I noticed on page

8  thirty-five there is some handwriting.  Do

9  you see that?

10     A.    Yes.

11     Q.    And it's both the same

12 handwriting of Defendant's Exhibit 1 and on

13 your deposition transcript; is that correct?

14     A.    Yes.

15     Q.    All right.  Is that your

16 handwriting?

17     A.    No.

18     Q.    Whose handwriting is that?

19     A.    Sonya, my daughter.

20     Q.    All right.  Can you read into

21 the Record what the handwriting says?

22     A.    I can't read her writing.

23     Q.    Okay.  So, you don't know what

45

1  it says?  Take your time.

2      A.   Yes.

3      Q.   Okay.  Can you read into the

4  Record what it says?

5      A.   Yes.  She was saying that

6  Chrissy and them didn't make a speech to the

7  crowd, they asked people to sign in and

8  come -- they asked the peoples to sign in

9  and be seated.

10      Q.   Okay.  I'm going to read it to

11  you.  And I want you to tell me if I've read

12  it appropriately.  Okay?  Are you with me?

13      A.   Yes.

14      Q.   Okay.  Tell me if I've read

15  this appropriately; that is, on page

16  thirty-five of your deposition transcript,

17  and of Defendant's Exhibit 1:  DD.  Who is

18  DD?  Is that you?

19      A.   Yes.

20      Q.   Is that -- Did you put that

21  initial there?

22      A.   Yes.

23      Q.   Okay.  It says:  Correction,

46

1  Chrissy did not make a presentation to the

2  crowd.  She only asked the people to sign in

3  and be seated.  Did I read that correctly?

4      A.    Yes.

5      Q.    Okay.  Now, I'm going to ask

6  you some more questions about that, but I

7  just want to make sure I understand what's

8  written on each of these pages.  And then

9  we're going to come back and we need to talk

10  about it in just a few minutes.

11          Let's go to page forty in your

12  deposition transcript, please.

13      A.    (Witness complies.)

14      Q.    Okay.  You're looking at

15  Defendant's 1, and that's good, we can do it

16  either way.  Do you see that the -- there's

17  a page there that's marked page forty in

18  Defendant's Exhibit 1; right?  That's the

19  small packet; correct?

20      A.    Yes.

21      Q.    Okay.  Now find the same page

22  in your deposition transcript, please.

23      A.    (Witness complies.)

47

1    Q.   Do you see it?

2    A.   Yes.

3    Q.   Page forty?

4    A.   Uh-huh.

5    Q.   Okay.  Just to shorten things

6  up, let me ask you this.  Is this your

7  handwriting?

8    A.   No.

9    Q.   Okay.  The initials that are

10  there, are those your initials?

11    A.   Yes.

12    Q.   Did you put those initials

13  there?

14    A.   Yes.

15    Q.   Okay.  Let me read to you what

16  the handwriting says, and please tell me if

17  I've read it correctly.  It says:  DD, then

18  there's a number sign one, Northside, and I

19  assume that's Plaza, it's P-L-A-Z, and it

20  may have been cut off on my copy, '53-'69,

21  now.  And then there's a line to parentheses

22  that has MLK on the inside of it; and then

23  number two, Ninth Street, '69-'77; and then;

1  number three, Twelfth Avenue, now Tenth

2  Street, '77-'06.  Did I read that

3  appropriately; ma'am?

4      A.   Yes.

5      Q.   Now, who's handwriting is

6  that?  I noted the DD is your handwriting,

7  your initials, but who wrote the other --

8      A.   Sonya.

9      Q.   -- information on there?  That

10  was Sonya?

11     A.   Uh-huh.

12     Q.   And that's Miss Sonya

13  DeVaughn?

14     A.   Right.

15     Q.   And that's your daughter?

16     A.   Yes.

17     Q.   Okay.  If you stay on

18  Defendant's Exhibit Number 1 and go to page

19  fifty-six, please.

20     A.   (Witness complies.)

21     Q.   Do you have page fifty-six?

22     A.   Yeah.

23     Q.   Find the same page in your

Case 2:06-cv-00083-LES-CSC     Document 229-6     Filed 04/30/2007     Page 49 of 117

49

1  deposition transcript.

2      A.    (Witness complies.)

3      Q.    Are those two pages both the

4  same, page fifty-six in the Defendant's 1,

5  the small packet, and page fifty-six in your

6  deposition transcript?

7      A.    Yes.

8      Q.    Okay.  And, again, on page

9  fifty-six, there are the initials DD, those

10  are your initials?

11      A.    Yes.

12      Q.    And did you affix those

13  initials to this page?

14      A.    Yes.

15      Q.    I'm going to read to you what

16  I think it says and you tell me if I've read

17  it appropriately:  Misunderstood the

18  question.  I thought I was being asked if I

19  had hired an attorney on my own outside of

20  Mr. Cade law firm.  Did I read that

21  appropriately?

22      A.    Yes.

23      Q.    Now, whose handwriting is

50

1  that?

2      A.    Sonya.

3      Q.    Sonya.  That's Sonya,

4  DeVaughn, your daughter; correct?

5      A.    Right.

6      Q.    Let's go to the next page,

7  page fifty-seven.  Do you see that there?

8      A.    Yes.

9      Q.    Is page fifty-seven on

10  Defendant's 1 identical with page

11  fifty-seven on the -- your deposition

12  transcript?

13      A.    Yes.

14      Q.    Okay.  And it also has what

15  appears to be the initials DD on page

16  fifty-seven; is that correct?

17      A.    Yes.

18      Q.    Are those your initials?

19      A.    Yes.

20      Q.    Did you affix those initials

21  on the page?

22      A.    Yes.

23      Q.    Okay.  Now, let me see if --

51

1  Am I going too fast, now?  Ms. DeVaughn, am

2  I going too fast?

3      A.    You're all right.

4      Q.    Okay.  Thank you.  Let me

5  read, or try to read, what I think is

6  written on here.

7      A.    Okay.

8      Q.    You tell me if I've got it

9  right.

10      A.    Okay.

11      Q.    Everybody that had filled out

12  the original paperwork, that --

13      A.    Was.

14      Q.    -- was turned back in to

15  Deborah; is that correct?

16      A.    Yes.

17      Q.    Now let's go to the next page,

18  page fifty-eight.

19      A.    (Witness complies.)

20      Q.    Okay.  Would you look on page

21  fifty-eight of Defendant's Exhibit Number

22  1 and page fifty-eight of your deposition

23  transcript and tell us if those are

52

1  identical, those two pages are identical.

2      A.    Yes.

3      Q.    Okay.  And on page

4  fifty-eight, there are initials DD, again,

5  those are your initials?

6      A.    Yes.

7      Q.    And you affixed those initials

8  on the page?

9      A.    Yes.

10      Q.    Okay.  And I'm going to read

11  what else is there, it says:  See

12  corrections on page fifty-six.  Did I read

13  that appropriately?

14      A.    Yes.

15      Q.    And is that also Sonya's

16  handwriting?

17      A.    Yes.

18      Q.    Let's go to sixty-one.

19      A.    (Witness complies.)

20      Q.    And that's sixty-one on both

21  Defendant's Exhibit 1 and sixty-one on your

22  deposition transcript, are they identical,

23  those two pages?

53

1      A.     Yes.

2      Q.     Okay.  And there's also on

3  page sixty-one the initials DD; is that

4  correct?

5      A.     Yes.

6      Q.     And the DD there, those are

7  your initials?

8      A.     Yes.

9      Q.     And you affixed those initials

10  on the page?

11     A.     Yes.

12     Q.     Okay.  And let me see if I can

13  also read what's written here.  It says:

14  See correction on page fifty-six.  Did I

15  read that correctly?

16     A.     Yes.

17     Q.     And is that your daughter

18  Sonya's handwriting?

19     A.     Yes.

20     Q.     And I think the last page is

21  page sixty-four.  I think it's on the back,

22  Ms. DeVaughn.  Would you look on that page,

23  page sixty-one in Exhibit 1 and page

54

1  sixty-four in your deposition transcript,

2  please.

3        A.    (Witness complies.)

4        Q.    Do you have the pages?

5        A.    Yes.

6        Q.    And are those two pages

7  identical?

8        A.    Yes.

9        Q.    Okay.  And on page sixty-four,

10  it looks like there are initials DD; is that

11  correct?

12        A.    Yes.

13        Q.    And are those your initials?

14        A.    Yes.

15        Q.    Did you affix those initials

16  on the page?

17        A.    Yes.

18        Q.    Okay.  Let me see if I can

19  also read what you have here.  It says:

20  Correction.  Not Sherri Davis, Shannon

21  Davis.  Did I read that appropriately?

22        A.    Yes.

23        Q.    And is that your daughter,

1 Sonya's, handwriting?

2     A.    Yes.

3     Q.    Okay.  Let me go back because

4 I forgot to ask you one question about

5 forty.  Can we go back to page forty, both

6 on -- I believe I did, and I just want to be

7 sure I'm accurate, forty in your deposition

8 transcript and forty on Defendant's Exhibit

9 1.

10     A.    (Witness complies.)

11     Q.    Okay.  I think I forgot to ask

12 you, when you look at page forty on

13 Defendant's Exhibit 1 and page forty in your

14 deposition transcript, are they identical?

15     A.    Yes.

16     Q.    All right.  Now, let's go --

17 You've got these corrections here.  And I,

18 particular, want to focus on the corrections

19 on page fifty-six, fifty-seven, fifty-eight,

20 sixty-one, so that's fifty-six, fifty-seven,

21 fifty-eight and sixty-one.

22          The -- You indicated that you

23 -- your daughter wrote those corrections; is

56

1  that correct?

2      A.    Yes.

3      Q.    When did that occur?

4      A.    She went over with -- We did

5  that this morning.

6      Q.    This morning?

7      A.    Yeah.

8      Q.    Now, when did you -- When did

9  you first see the deposition transcript, the

10  first time you saw it?

11      A.    When it came to the house.

12      Q.    And when was that?

13      A.    I don't remember.

14      Q.    Okay.  Did you review it when

15  it came to the house?

16      A.    Some of it.  I don't like to

17  read.

18      Q.    All right.  But you reviewed

19  it today with your daughter; is that

20  correct?

21      A.    Yes.

22      Q.    Okay.  And that was this

23  morning?

57

1     A.   Yes.

2     Q.   Now, when did you arrive here

3  at the hotel to begin your -- for the

4  deposition?

5     A.   Last night.

6     Q.   Last night.  So, you spent the

7  night here at the hotel?

8     A.   Yes.

9     Q.   And you came with your

10  daughter, Sonya?

11     A.   Yes.

12     Q.   Did you meet with your lawyers

13  last night?

14     A.   Yes.

15     Q.   Did you meet with your lawyers

16  this morning?

17     A.   No.  Not really.  No, no.

18     Q.   So, you met with your lawyers

19  last night and then you met with Sonya this

20  morning?

21     A.   No.  We stayed together.

22     Q.   Sonya and you stayed together.

23  Okay.

58

1    A.   Yes.

2    Q.   Now, when you met with your

3  lawyers last night, did you guys discuss

4  your deposition transcript?

5         MR. PALMER:  I'm going to

6  instruct the witness not to answer.

7  Mrs. DeVaughn, you cannot -- do not answer

8  any questions about our discussions.  I'm

9  invoking the attorney-client privilege on

10  your behalf.  You do not have to answer

11  questions about what we discussed with you.

12         MR. TAYLOR:  Are you finished?

13         MR. PALMER:  I'm finished.

14         MR. TAYLOR:  Okay.  Then I've

15  got a series of questions that you're

16  probably going to object to.

17    Q.   When you -- You met with your

18  lawyers last night; correct?

19    A.   Yes.

20    Q.   How long did you spend with

21  your lawyers?

22    A.   Not long.

23    Q.   Did you and your lawyers

1  review your deposition transcript?

2        MR. PALMER:  Objection.  I'm

3  going to instruct the witness not to answer

4  about any content of our communications.

5  You can ask her questions about how long we

6  met, where we met, when we met, but I'm not

7  going to permit her to answer any questions

8  about the content of our conversations.  I

9  will instruct her not to answer any

10  questions about the content of privileged

11  communications.

12        MR. TAYLOR:  I just don't want

13  to talk until I'm sure you're finished.

14        MR. PALMER:  I'm finished.

15  You can go ahead and talk.

16        MR. TAYLOR:  Good.

17    Q.    Did you meet with your lawyers

18  here in this room?

19    A.    Yes.

20    Q.    And when you met with your

21  lawyers, he's already objected to this one

22  question, but I'll ask it again to be sure I

23  asked it properly, did you and your lawyers

60

1  discuss your deposition transcript?

2          MR. PALMER:  Objection.  I'm

3  invoking the attorney-client privilege.  I'm

4  instructing the witness not to answer.

5      Q.    Did you and your lawyers

6  discuss any changes that needed to be made

7  to your deposition transcript?

8          MR. PALMER:  Objection.  I'm

9  instructing the witness not to answer and

10  invoking the attorney-client privilege.

11      Q.    You have heard your lawyer

12  invoke the attorney-client privilege to the

13  last two questions I asked you.  Do you

14  intend to follow your lawyer's instructions?

15      A.    Yes.  I supposed to.

16      Q.    All right.  Did you and your

17  lawyers discuss -- Excuse me, before I ask

18  that question.

19          When you met with your

20  lawyers, who else was in the room with you?

21          MR. PALMER:  Objection.

22  Assumes facts not in evidence.  You're

23  assuming that there was someone other than

61

1  her lawyers?

2          MR. TAYLOR:  I'll strike that

3  question.

4          MR. PALMER:  Okay.

5      Q.    When you met with your

6  lawyers, which lawyers did you meet with?

7      A.    All of them.

8      Q.    And that would be

9  Mr. Mitchell, he was the young man who was

10  sitting right there?

11      A.    Yes.

12      Q.    Mr. Cade?

13      A.    Yes.

14      Q.    Mr. Palmer?

15      A.    Yes, yes.

16      Q.    Other than Mr. Mitchell,

17  Mr. Cade and Mr. Palmer, was anyone else in

18  the room with you at the time of your

19  meeting with the lawyers?

20      A.    Sonya.

21      Q.    Sonya was here?

22      A.    Yes.

23      Q.    Anyone else?

1          THE WITNESS:  What that name?

2   Chrissy?

3          MR. CADE:  Wendy.

4      Q.    Wendy?

5      A.    Wendy.

6      Q.    Do you know Wendy's last name?

7      A.    No.

8      Q.    Do you know if Wendy is a

9   lawyer?

10     A.    She work with Mr. --

11     Q.    Works with Mr. Cade.  Anyone

12   else?

13     A.    That's all.

14     Q.    That's all.  And when you had

15   this meeting with these folks being here,

16   the people you've identified, did you all

17   discuss the changes that -- or the testimony

18   that you gave that's listed on page

19   thirty-five of your deposition transcript?

20          MR. PALMER:  I'm going to

21   object again on the basis of attorney-client

22   privilege.  And I'm going to instruct the

23   witness not to answer.

1    Q.    Did you all discuss the

2 corrections you've made on page fifty-six of

3 your deposition transcript?

4        MR. PALMER:  I'm going to

5 object again to the question on the basis of

6 attorney-client privilege, and instruct the

7 witness not to answer.

8    Q.    Did you all discuss the

9 corrections or changes you made to page

10 fifty-seven of your deposition transcript?

11        MR. PALMER:  I'm going to

12 object to the question on the basis of

13 attorney-client privilege and instruct the

14 witness not to answer.

15    Q.    And did you all discuss the

16 changes or corrections you've made on -- and

17 I'll try to shorten it up some, page

18 fifty-eight or sixty-one of your deposition

19 transcript?

20        MR. PALMER:  I'm going to

21 object to the question on the basis of

22 attorney-client privilege and instruct the

23 witness not to answer.

64

1      Q.     You've heard your counsel

2  assert the attorney-client privilege, and

3  instruct you not to answer.  Do you intend

4  to follow those instructions?

5      A.     Yes.

6      Q.     Absent those instructions that

7  counsel gave you, would you be able to

8  answer the questions I've asked you?

9      A.     Ask that -- Ask that again.

10      Q.     Yes.  If counsel had not made

11  the objection and instructed you not to

12  answer, would you be able to answer the

13  question I asked you -- the questions I've

14  asked you?

15      A.     Yes.

16      Q.     Now, you had your -- You said

17  you and Sonya reviewed the deposition

18  transcript this morning; is that correct?

19      A.     Yes.  And she went over with

20  me some last night and finished this

21  morning.

22      Q.     Now, when -- So you went over

23  some last night?

65

1    A.   Yes.

2    Q.   Where were you all when you

3 and Sonya went over the transcript last

4 night?

5    A.   In the room.

6    Q.   In your room here in the

7 hotel?

8    A.   Yes.

9    Q.   You were in the room, Sonya

10 was in the room, was anyone else in the room

11 with you?

12    A.   No.

13    Q.   Last night.

14    A.   No.

15    Q.   Did Sonya get on the phone and

16 discuss the changes to the deposition

17 transcript with anybody?

18    A.   No.

19    Q.   While you were there?

20    A.   No.

21    Q.   And then you had some

22 discussions about the changes to the

23 transcript this morning; is that correct?

66

1     A.    Yes.

2     Q.    And where did you have that

3  discussion?

4     A.    In the room.

5     Q.    And you had that discussion

6  with Sonya?

7     A.    Yes.

8     Q.    Was anyone else in the room

9  with you then, other than you and Sonya?

10     A.    When you talking about, this

11  morning?

12     Q.    Yes, ma'am.

13     A.    Sonya.

14     Q.    Sorry?

15     A.    Sonya.

16     Q.    Okay.  You had those

17  discussions with Sonya last night.  Between

18  the time you had the discussions with Sonya

19  last night and this morning, did you meet

20  with your lawyers again?

21     A.    Mr. Cade.

22     Q.    Mr. Cade.

23          MR. CADE:  No, Mr. Mitchell

1  and Mr. Cade.  Yeah.

2      A.    Okay.  Mr. Mitchell.

3      Q.    So, you had those discussions

4  with Sonya, and then you had a meeting with

5  Mr. Mitchell.

6      A.    No.  He came and told me to

7  tell the truth.

8      Q.    Okay.

9      A.    That's all he did.

10     Q.    Did you and he discuss the

11  changes to the deposition transcript?

12     A.    No.

13     Q.    Then you -- This morning you

14  had some -- you had your discussion with

15  Sonya; correct?

16     A.    Yes.

17     Q.    And after that discussion, did

18  you have any discussions with your lawyers?

19     A.    No.  I didn't see them.

20     Q.    Didn't see them at all?

21     A.    Until I got out there

22  (indicating).

23     Q.    I'm sorry this is taking so

1  long, but with the changes it's taking us

2  some time to get through this.

3         Now, when you say -- I'm going

4  to page fifty-six now.  Now, on page

5  fifty-six, and I'll read it again, it says:

6  Misunderstood the question.  I thought I was

7  being asked if I had hired an attorney on my

8  own, outside of Mr. Cade's law firm.  What

9  question did you misunderstand?

10        MR. PALMER:  I'm going to

11  object to the question as being vague, and

12  assuming facts not in evidence.

13     Q.    You can go ahead and respond

14  to the question, ma'am.

15     A.    I thought the question that he

16  was asking me, did I hire a lawyer outside

17  -- go to a lawyer's office and hire a

18  lawyer.

19     Q.    Okay.  Now, so can you point

20  me -- Do you see that there are numbers next

21  to the -- going down the side of the page?

22     A.    Yes.

23     Q.    Can you point me to the

1  question or the answer next to the number

2  that you didn't understand?

3         MR. PALMER:  I'm going to

4  object on the same basis again.  You're

5  assuming she misunderstood only one

6  question.

7      Q.    Go right ahead, ma'am.  You

8  can answer the question.

9      A.    What was the -- What did

10  you --

11      Q.    Do you see the numbers on the

12  side of the page?

13      A.    Yes.

14      Q.    On page fifty-six.

15      A.    Uh-huh.

16      Q.    Can you look at those numbers

17  and tell me which one of those questions or

18  answers you didn't understand?

19         MR. PALMER:  Same objections.

20  You can answer it.

21      A.    I think it was number sixteen.

22  Number sixteen, I'm thinking.

23      Q.    Okay.  Let's look at number

1 sixteen.  The question starts at --

2     A.    Yes, yes.

3     Q.    I'm sorry.

4     A.    No, no.

5     Q.    Should I go ahead?

6     A.    Yes.

7     Q.    The question starts at line

8 sixteen.  It says:  Okay.  Now let's talk

9 about the third meeting.  How did you find

10 out about that meeting?  And then your

11 answer is:  We got a letter.  What about

12 that didn't you understand?

13     A.    I'm sorry.  She probably put

14 it on the wrong one.

15     Q.    So, you're -- Everything you

16 -- I'm sorry.  I don't want to rush you.

17 Just take my time -- take your time.

18     A.    She probably put this on the

19 wrong one.

20     Q.    So when you're looking at page

21 fifty-six, everything you say --

22     A.    Oh, I'm looking at

23 fifty-seven.

71

1       Q.    Oh, all right.

2       A.    I'm sorry.  I'm sorry.

3       Q.    That's all right.  Page

4  fifty-six.  Have you got it?

5       A.    Yeah.

6       Q.    Okay.  Now you look at the

7  numbers down the side of the page.  Can you

8  tell us which one of those questions or

9  answers corresponding to those numbers

10  didn't you understand, or you did not

11  understand?

12       A.    All of these I -- All of these

13  (indicating) I understand.

14       Q.    You understood all of that?

15       A.    Yes.

16       Q.    Okay.  And you gave accurate,

17  truthful answers to those questions, didn't

18  you?

19            MR. PALMER:  Objection.

20  Argumentative.  Assumes facts not in

21  evidence.

22       Q.    You can answer the question,

23  ma'am.

72

1      A.    Yes.

2      Q.    Okay.  Now let's go to page

3  fifty-seven.  And on page fifty-seven, it

4  says -- I'm reading the handwriting now, it

5  says:  Everybody that had filled out the

6  original paperwork, that was turned back in

7  to Deborah.

8           Looking -- I'm not certain

9  what that refers to.  So looking down the

10  side of the page where the numbers are,

11  again, can you tell me what question and

12  what answer that correction refers to?

13           MR. PALMER:  Objection.

14  You're assuming that there's only one

15  question.  It's argumentative.

16      Q.    You can answer the question,

17  ma'am.

18      A.    It was number fifteen.

19      Q.    Okay.  Let's look at number

20  fifteen.  It says:  Question:  Okay.  Do you

21  recall signing a list or anything at any of

22  the meetings where you put your name and

23  your address and your phone number on the

73

1  list?  Answer:  I think so.  I'm not sure.

2  I'm not sure -- I'm not for sure.

3        What about that question and

4  that answer is -- needed to be corrected?

5       A.    Well, that one needed to be

6  corrected because we did sign a list as we

7  was going in the door.

8       Q.    Okay.

9       A.    We put our name and address

10  on --

11       Q.    On a list?

12       A.    On it.

13       Q.    Okay.  All right.  Good.  Now,

14  let's go to page fifty-eight.  And on page

15  fifty-eight it says:  See -- The handwriting

16  says:  See corrections on page fifty-six.

17  Now, those were the corrections we've

18  already talked about.  Do you remember

19  those?

20       A.    Yes.

21       Q.    Can you -- Looking down the

22  numbers that are along the side of the page

23  of page fifty-eight, can you tell me which

1 question or questions were -- needed to be

2 corrected?  Which question or answers needed

3 to be corrected, or you didn't understand?

4    A.   I think it was number eighteen

5 she was referring to.

6    Q.   Okay.  Let's read number

7 eighteen:  Did you have new discussions with

8 -- That is, let's talk about prior to the

9 third meeting.  Had you had any discussions

10 with any lawyers about the concerns

11 regarding the wood treatment facility, other

12 than those discussions -- I've got to go to

13 fifty-nine, because I don't have fifty-nine

14 here, just a second.  -- other than -- Now

15 I'm going to page fifty-nine.  -- other than

16 those discussions you had at the meetings?

17 Answer:  No.

18    What was confusing about that

19 or needed to be corrected about that answer

20 you gave to that question?

21    A.   I think Sonya was just writing

22 something down.

23    Q.   Okay.  Because that is an

75

1  accurate answer, isn't it?

2      A.    Right.

3      Q.    Okay.  Now let's go to page

4  sixty-one.

5      A.    (Witness complies.)

6      Q.    Are you with me, ma'am?  Take

7  your time.  I know this is not something you

8  do all the time.  Are you on page sixty-one,

9  ma'am?

10      A.    Yes.

11      Q.    Okay.  Now, the handwriting

12  there says:  See corrections on page

13  fifty-six.  You remember the corrections on

14  page fifty-six we talked about and you said:

15  Really, that page was all right?

16      A.    Yes.

17      Q.    Can you look down the side of

18  that page, looking at the numbers, and look

19  at the questions and answers and tell us

20  which question or which answer you didn't

21  understand and needed to be corrected?

22          MR. PALMER:  Objection.

23  Assumes facts not in evidence.  It is

76

1 argumentative.

2     Q.    You can answer the question.

3     A.    Looks good.

4     Q.    Everything is okay with those

5 questions and those answers you gave, aren't

6 they, ma'am?

7         MR. PALMER:  Objection.

8 Argumentative.  Assumes facts not in

9 evidence.

10     Q.    Let me strike -- withdraw the

11 question and ask it this way.  Ma'am, your

12 answers are truthful as given on that page,

13 aren't they?

14     A.    Yes.

15         MR. PALMER:  Objection.

16 Argumentative.  Assumes facts not in

17 evidence.

18     Q.    The answer was yes, is that

19 correct, ma'am?

20     A.    Yes.

21     Q.    And as a matter of fact, when

22 you -- I want you to go to page ten of your

23 deposition.  Do you see at the top of the

1  page?  Do you see where it says:  Question.

2  Are you okay, Ms. DeVaughn?

3      A.    Yes.

4      Q.    Are you sure?

5      A.    Yes.

6      Q.    Do you want to take a break,

7  ma'am?

8      A.    No.

9      Q.    Would you like some water or

10  anything?

11      A.    No.  I have some.

12      Q.    Okay.  At the top of the page,

13  ma'am, where it says:  Will you let us know?

14  Do you see that?

15      A.    On page ten?

16          MR. PALMER:  I'm sorry.  Where

17  are you reading from?

18          THE WITNESS:  I'm on page ten.

19      Q.    I'm sorry.  You know, it's

20  line thirteen what is marked as page ten.

21  Do you see line thirteen, if you look down

22  the side of the page?

23      A.    Yes.

78

1     Q.   Do you see that?

2     A.   Yes.

3     Q.   Do you see where it says:

4  Will you let us know?

5     A.   Yes.

6     Q.   I'll read that to you, and see

7  if that answer you gave at that time was

8  accurate.  It says -- The question is:  Will

9  you let us know if, indeed, at any point I

10  ask you a question and if for any reason you

11  don't understand the question and you want

12  me to repeat it, or if you get tired and you

13  want to take a break, or if you're just

14  saying, you know, I'm a little tired of this

15  and I want to stop.  And your answer was:

16  Yeah.  Did I read that appropriately?

17     A.   Yes.

18     Q.   And that's what you really

19  tried to do during the entire course of your

20  deposition, isn't it?

21          MR. PALMER:  Objection.

22  Argumentative.

23     Q.   You told the truth during the

1 entire time of your deposition; correct?

2        MR. PALMER:  Objection.

3 Argumentative.

4      Q.    You can answer the question,

5 ma'am.

6      A.    Yes.  As best of my knowledge.

7        MR. TAYLOR:  Okay.  Let's take

8 just a short break and I think we can get

9 through some -- go back to some other

10  questions afterward.

11        VIDEOGRAPHER:  Off the Record.

12  The time is 1:15 p.m.  This ends tape number

13  one.

14          (Recess taken.)

15        VIDEOGRAPHER:  Back on the

16  Record.  The time is 1:16 p.m.  This begins

17  tape two.

18          (Off-the-Record discussion

19            was held.)

20      Q.    All right.

21        MR. PALMER:  Before you speak

22  I'd like to make an objection to the entire

23  last line of questioning.  I believe that

80

1  that entire line of questioning -- Frankly,

2  I'm shocked and appalled that you persist in

3  the same line of questioning because you

4  know good and well, you've been told how

5  this has been set up.

6          And maybe you don't represent

7  unsophisticated people.  Maybe you don't

8  represent people who are elderly.  Maybe you

9  don't represent people who have cognitive

10  impairments.  But the truth of the matter

11  is, you know good and well that the meetings

12  that were held were meetings of attorneys

13  with either -- I'm making an objection.  Let

14  me finish my objection.

15      MR. TAYLOR:  Let me ask you

16  for some professional courtesy, and to ask

17  you to act as an officer of the Court.

18          MR. PALMER:  I am acting as an

19  officer of the Court right now.

20      MR. TAYLOR:  May I finish?

21          MR. PALMER:  Why should I

22  allow you to finish when you're not allowing

23  me to finish?  I was in the middle of

81

1 speaking an objection.

2          MR. TAYLOR:  Right.  But you

3 shouldn't be speaking this kind of objection

4 that deals with testimony in front of a

5 witness who is under cross-examination.

6          MR. PALMER:  You have finished

7 your questions on this point.  I am

8 objecting -- If you would like to stop and

9 let the witness out, I'll make the objection

10 on the Record without her present, if that's

11 what you want to do.

12          MR. TAYLOR:  That's fine.

13 Let's go off the record and do that.

14          MR. PALMER:  Okay.  We'll take

15 a brief break.

16          VIDEOGRAPHER:  Off the Record.

17 1:18.

18            (Recess taken.)

19          VIDEOGRAPHER:  Back on the

20 Record.  It's 1:19 p.m.

21          MR. PALMER:  Mr. Taylor, has

22 finished that line of questioning, that's

23 the reason I'm placing this objection now.

1  I'm objecting to the entire line of

2  questioning that is trying to pry into

3  attorney-client privileged communications.

4        The defense counsel, I

5  understand, have all been made aware of the

6  fact that no meetings were held at which the

7  general public was invited; that all the

8  meetings included only individuals who were

9  clients or who were anticipating hiring

10  lawyers; and, therefore, all communications

11  are privileged, subject to the

12  attorney-client privilege.

13        And perhaps it's because you

14  do not represent individuals who are

15  elderly.  Perhaps it's because you do not

16  represent people who have cognitive

17  impairments because of the toxic substances

18  to which they were exposed.

19        Perhaps it's because you don't

20  represent clients who are unsophisticated

21  and perhaps less well-educated.  And so for

22  some strange reason you feel compelled to

23  take advantage of those weaknesses in

83

1  individuals who are unable to clearly

2  understand everything around them.

3          You know what the truth is.  I

4  am speaking as an officer of the Court now

5  because I believe that the truth is

6  important.  And the truth of the matter is,

7  that Mrs. DeVaughn did not attend any

8  meetings at which the attorneys were

9  speaking and which any communications were

10  held or received any letters until after she

11  had either become a client or was

12  anticipating becoming a client of one or

13  more of the attorneys involved in the case

14  today.

15          I object to this entire line

16  of questioning.  I object to you badgering

17  her, basically, when she's told you even in

18  the very first deposition, she answered some

19  of the questions:  I don't know.  It's

20  clear, just from her demeanor, that even if

21  she reads English, she doesn't read it very

22  well.

23          She has not got the same

1  capacity to sit here and argue as you do,

2  and you're taking advantage of that.  I

3  don't think that's appropriate.  I don't

4  think it's right as an officer of the Court

5  for you to pursue a line of questioning that

6  you know is eliciting answers that are not

7  correct.

8          And I'm actually -- Because I

9  wasn't involved in those meetings, I'm going

10  to ask Mr. Cade to make a comment about what

11  occurred during those meetings -- or not

12  attorney-client communication, but --

13          MR. CADE:  Again, the content

14  of the meeting -- The content of the meeting

15  is attorney-client privilege.  And with

16  respect to how the meetings occurred, we

17  were invited to come to meetings associated

18  with people being exposed to chemical

19  substances believed to be emitted from the

20  Louisiana-Pacific or Pactiv facility.

21          Every meeting that took place

22  down there was a privileged meeting.  Every

23  client that attended -- Well, every person

1  that attended from meeting one, two, three,

2  or four, were clients or they were in

3  anticipation of becoming clients of this

4  litigation.

5          MR. PALMER:  That's it.  We're

6  done with the objection.

7          MR. TAYLOR:  Okay.  You can

8  bring the witness back in.

9          VIDEOGRAPHER:  Off the Record.

10  The time is 1:22 p.m.

11              (Recess taken.)

12          VIDEOGRAPHER:  Back on the

13  Record.  The time is 1:25 p.m.

14      Q.    All right.  Ms. DeVaughn, how

15  are you now?  Are you okay?

16      A.    All right.

17      Q.    Did you want to have that

18  bottle of water there?  It's okay with me,

19  if it's okay with you.

20      A.    Okay.

21      Q.    Are you feeling okay?

22      A.    Yes.

23      Q.    You're sure you're okay for us

1  to keep going here today?

2     A.   Yes.

3     Q.   All right.  You attended at

4  least four meetings at the Armory Hall; is

5  that correct?

6     A.   Yes.

7     Q.   And you believe the first of

8  those four meetings occurred around October

9  of 2004, is that correct, ma'am?

10     A.   I'm for certain one of them,

11  anyway.

12     Q.   Do you think there might have

13  been one before October of 2004?

14     A.   No.

15     Q.   And at the meetings, there was

16  discussion regarding the release of smoke

17  containing chemicals from the Lockhart wood

18  treatment facility; is that correct?

19        MR. PALMER:  I'm going to

20  object to any questions about the content of

21  the conversations.  You've just been told

22  these are attorney-client conversations.

23  And I'm going to instruct the witness not to

1  answer any questions about the content of

2  those conversations.

3          Furthermore, you know, the

4  witness is not going to be subjected to this

5  harassment.  If you keep asking questions

6  only about the content of those

7  conversations, you obviously have nothing

8  else to ask and I'm going to terminate the

9  deposition.

10          I'm instructing the witness

11  not to answer any questions about the

12  content of any of the attorney-client

13  conversations.  Let's not waste our time

14  asking those questions.

15      Q.    You heard the instructions

16  from your counsel, Ms. DeVaughn; is that

17  correct?

18      A.    Yes.

19      Q.    Do you intend to follow those

20  instructions, ma'am?

21      A.    Yes.

22      Q.    Let me refer you to page

23  forty-eight of your deposition transcript,

88

1 please.

2     A.    (Witness complies.)

3     Q.    Do you have it there in front

4 of you, ma'am?

5     A.    Yes.

6     Q.    And I'm going to read from

7 line five on page forty-eight.  Question:

8 Okay.  Do you recall anyone ever telling you

9 that you had been exposed to chemicals

10 released from the Louisiana-Pacific wood

11 treatment facility?  Answer:  Yes, yes.

12 That was going on when they -- Deborah had

13 called us to a meeting, and that was when we

14 were -- we was told that.  Question:  Okay.

15 So, it was at the meeting at the Armory

16 Hall?

17     A.    Yes.

18     Q.    Answer:  Right.  Did I read

19 that correctly now?

20         MR. PALMER:  I'm going to

21 object.  And I'm going to instruct the

22 witness not to answer about any

23 conversations that occurred during

89

1   attorney-client privileged meetings.  And,

2   furthermore, I'm going to object to this

3   line of questioning in the prior deposition

4   as well.

5        Q.    Did I read that correctly,

6   ma'am?

7             MR. PALMER:  Objection.  Same

8   objection.  I'm instructing the witness not

9   to answer questions about what occurred

10  during the meeting.

11       Q.    And, ma'am, were you -- This

12  was your -- I was reading from -- Was I

13  reading from your deposition of July 11,

14  2006, is that correct, the deposition you

15  gave a couple of weeks ago?

16       A.    Yes.

17       Q.    And were you telling the truth

18  then?

19            MR. PALMER:  I'm going to

20  object to the question.  Are you talking

21  about specifically those questions?

22       Q.    When you took the deposition,

23  ma'am, were you -- did you swear to tell the

90

1  truth?

2          MR. PALMER:  Asked and

3  answered.

4      A.    Yes.

5      Q.    Okay.  And did you tell the

6  truth?

7      A.    Yes.

8      Q.    Now -- And focusing upon those

9  public meetings, most of Florala -- Most of

10  the people in Florala attended at least some

11  of those meetings; isn't that correct?

12          MR. PALMER:  I'm going to

13  object to the question.  I'm going to --

14  First of all, I'm going to object to the

15  question as mischaracterizing testimony, as

16  being argumentative.  You're calling it a

17  public meeting.  It's not a public meeting.

18          We've already told you these

19  are meetings between attorneys and either

20  clients or prospective clients.

21          Now, would you like to

22  terminate the deposition, or do you have

23  other questions other than your questions

91

1  about these meetings?

2          MR. TAYLOR:  Are you finished?

3          MR. PALMER:  I'm finished, but

4  I'm asking you a question.

5      Q.    Did you understand the

6  question, ma'am?

7          MR. PALMER:  I'm going to

8  instruct the witness not to answer questions

9  about the content of any conversations of

10  those meetings.

11     Q.    I'm going to ask the question

12  again to be sure that you and your counsel

13  understood what I asked.  Most of the people

14  of Florala attended at least one or some of

15  those meetings; isn't that correct?

16         MR. PALMER:  Objection.

17  Assumes facts not in evidence.  Calls for

18  speculation.  It's argumentative.  And

19  you're trying to get into the content of the

20  meetings.

21     Q.    Can you answer the question,

22  please?

23         MR. PALMER:  I'm going to

92

1  instruct the witness not to answer about

2  those meetings.

3      Q.    Okay.  Would you turn to page

4  fifty-two of your deposition transcript,

5  please.

6      A.    (Witness complies.)

7      Q.    And let's start at -- on page

8  fifty-two.  Let's start at line seventeen.

9  I'm going to -- This is your deposition that

10  you've already told us on July 11th you

11  swore to tell the truth, and you were giving

12  truthful answers.  Now, let me hold on a

13  second.  Ms. DeVaughn, are you okay?

14      A.    Yes.

15      Q.    And do you want to continue?

16  Are you sure you want to continue, ma'am?

17      A.    Yes.

18      Q.    Page fifty-two, line

19  seventeen.  Question:  Okay.  At the second

20  meeting, can you recall if anyone spoke to

21  the group attending?  Answer:  Yes.

22  Question:  Approximately how many people

23  attended the meeting?  Don't know?  Answer:

93

1  Florala.  Question:  You think it was most

2  of the people in Florala?  Answer:  Right.

3  Did I read that correctly, ma'am?

4         MR. PALMER:  I'm going to

5  object to the question as being

6  argumentative, as assuming facts not in

7  evidence, as being calling for speculation.

8     Q.    Did I read that question

9  correctly, ma'am?

10     A.   Yes.

11     Q.    And the answer, was that a

12  truthful answer at the time you gave it?

13         MR. PALMER:  I'm going to

14  object to the question, again, as being

15  argumentative, as calling for speculation.

16     Q.    The answer --

17         MR. PALMER:  Lack of

18  foundation.

19         MR. TAYLOR:  I'm sorry.

20     Q.    The answer you gave, was that

21  a truthful answer?

22     A.   Yes.

23     Q.    Now, prior to attending those

94

1  meetings, you had not hired any lawyers to

2  represent you regarding the release of smoke

3  from the facility; isn't that correct?

4         MR. PALMER:  I'm sorry.  Could

5  you restate the question.

6         MR. TAYLOR:  Restate the

7  question.

8            (Requested portion of the

9             Record was read by the

10            Reporter.)

11         MR. PALMER:  Objection.  It's

12  compound.  It's argumentative.  It assumes

13  facts not in evidence.

14     Q.   Can you answer the question,

15  ma'am?

16     A.   I didn't quite understand what

17  he was --

18     Q.   Okay.  I'll say it again.

19     A.   Okay.

20     Q.   Prior to attending the

21  meetings you attended, the annual -- the

22  meetings you went to at the Armory, you had

23  not hired any lawyers to represent you

1  regarding the release of smoke from the

2  facility, had you?

3          MR. PALMER:  Objection.  It's

4  compound, argumentative, and it assumes

5  facts not in evidence.

6      Q.    You can answer the question.

7      A.    Did I hire any lawyer?

8      Q.    Prior to attending the

9  meetings.

10     A.    You --

11         MR. PALMER:  Same objections.

12     Q.    You can answer the question,

13 ma'am.

14     A.    You mean, go out and hire a

15 lawyer, I mean, go to an office and --

16     Q.    Let me state it again.

17     A.    Yes.

18     Q.    I'm not asking you if you went

19 to an office or anything.

20     A.    Okay.

21     Q.    I'm just asking you, and I'll

22 make it even more specific.  Prior to

23 attending the fourth meeting, you said there

96

1  were four of them, you hadn't hired a lawyer

2  to represent you in regards to the smoke

3  being released from the facility; isn't that

4  correct?

5          MR. PALMER:  Objection.  It's

6  argumentative.  It assumes facts not in

7  evidence.

8      Q.   Can you answer the question,

9  ma'am?

10     A.   Well, I'm answering you the

11  best I know.  I thought when we signed the

12  papers when we was going into the meeting,

13  that was to -- for the lawyers to work with

14  us then.

15     Q.   Let me refer you to page

16  fifty-nine of your deposition transcript.

17     A.   (Witness complies.)

18     Q.   Let me know when you get

19  there.

20     A.   Okay.

21     Q.   Are you ready?

22     A.   Yes.

23     Q.   All right.  And starting from

1 page fifty-nine, starting at line three, I'm

2 going to read these questions and answers

3 and I want you to tell me if I read them

4 appropriately.  Line three:  Okay.  Then

5 there was a fourth meeting; correct?

6 Answer:  Yeah.  How long ago was that

7 meeting?  Answer:  It haven't been too long.

8 I don't remember what month, but it hadn't

9 been too long.

10          Question:  Was it this year?

11 This year is 2006.  Answer:  No.  I don't

12 think it was this year.  I think it was last

13 year.  Question:  Would it have been last

14 winter, or fall of last year, if you recall?

15 Answer:  It was the fall, I'm thinking.

16 Question:  Fall.  Was it also at the Armory

17 Hall?  Answer:  Yes.

18          Now, Ms. DeVaughn, are you

19 okay?

20     A.    Yes.

21     Q.    Question:  And how did you

22 find out about the meeting?  Answer:  By a

23 letter.  Question:  Okay.  Letter from the

1  same lawyers?  Answer:  Yes.  Was the letter

2  from Mr. Cade?  Answer:  Yeah.  And his law

3  firm?  Answer:  Uh-huh.  Question:  Is that

4  a yes?  Answer:  Yes.

5         And what did that letter tell

6  you, if you recall?  Answer:  About it was

7  going to be a meeting at the Armory Hall,

8  and what time.  Question:  Okay.  Answer:

9  It was going to be.

10         Question:  All right.  Prior

11  to the fourth meeting, had you ever seen any

12  ads in any of the newspapers about the

13  concerns concerning chemicals from the wood

14  treatment facility?  Answer:  No.

15         Question:  Prior to receiving

16  the fourth letter, had you hired any lawyers

17  to represent you in regards to these

18  concerns regarding the operation of the wood

19  treatment facility?  Answer:  No.

20         Did I read that correctly,

21  ma'am?

22    A.    Yes.

23    Q.    Okay.  And were your answers

99

1  to those questions truthful at the time you

2  gave them?

3        MR. PALMER:  I'm going to

4  object to the question as being

5  argumentative.  She's already explained to

6  you the changes she has made to her

7  testimony, and she's explained why she's

8  made them.  And you know good and well why

9  she's made them.

10      Q.   Can you answer the question,

11  please?

12      A.   As far as my knowledge.  But

13  about the lawyers, had I hired any lawyers?

14  Well, on the second meeting that we went to

15  the Armor, I'm thinking that's when we hired

16  the lawyers because we signed a petition

17  when we went in, and they turned the

18  petition in to the lawyers.

19      Q.   Did I read the answers to the

20  questions I just read to you accurately?

21        MR. PALMER:  Asked and

22  answered.

23      Q.   You can answer the question.

1     A.    Yes.

2     Q.    And were you telling the truth

3 at that time?

4          MR. PALMER:  Same objections I

5 stated to this question before.

6     Q.    You can answer the question.

7     A.    As far as I know.

8     Q.    Thank you.

9     A.    I was telling the truth, to

10 the best of my knowledge.

11     Q.    Okay.  Thank you.  Now, prior

12 to those public meetings, you didn't have

13 any belief that smoke from the facility was

14 exposing you to any chemicals; isn't that

15 correct?

16     A.    Say that again.

17     Q.    Yeah.  I probably said it too

18 fast, and I apologize.  You went to the

19 public meetings.  We know that.  We've

20 already established it.  But prior to going

21 to any of those meetings, you really did not

22 believe that smoke from the facility -- you

23 did not have any belief that smoke from the

101

1 facility was causing -- was exposing you to

2 any chemicals; isn't that correct?

3        MR. PALMER:  I'm going to

4 object to any reference to these meetings as

5 being public meetings.

6    Q.    You can answer.

7        MR. PALMER:  Can I have a

8 standing objection to that?

9        MR. TAYLOR:  Sure, sure.

10    Q.    You can answer the question.

11    A.    I didn't.

12    Q.    Okay.  And when you went to

13 the public meetings, lawyers spoke at the

14 meetings; correct?

15    A.    Yes.

16    Q.    And Mr. Cade was one of those

17 lawyers; correct?

18    A.    Yes.

19    Q.    And after hearing what the

20 lawyers had to say at the meetings, you

21 thought smoke was exposing you to chemicals;

22 isn't that correct -- smoke from the

23 facility was exposing you to chemicals; is

102

1  that correct?

2     A.   Yes.

3     Q.   And one of the ways you found

4  out about the meetings is that you received

5  letters from Mr. Cade or his law firm; isn't

6  that correct?

7        MR. PALMER:  I'm going to

8  object to the question as compound.  Which

9  meeting are you talking about?  You keep

10  lumping them together, the meetings.

11     Q.   Did you understand what I just

12  said?  You attended the meetings -- The only

13  meetings I'm talking about are the meetings

14  you attended at the Armory.

15        MR. PALMER:  Objection.

16  Compound.

17     Q.   Okay.  So, one of the ways you

18  found out about any of those meetings was

19  that you received letters from Mr. Cade or

20  his law firm; isn't that correct?

21        MR. PALMER:  Objection.

22  Compound.

23     Q.   Can you answer the question?

103

1    A.    No.  Because the first meeting

2  they had, we didn't get a letter.

3    Q.    Okay.  Strike off the first

4  meeting then.

5    A.    Then I think Mr. Cade and them

6  came down the second meeting they had.

7    Q.    Okay.

8    A.    And I'm thinking.  And then we

9  signed the papers at the door, what they had

10  us to sign.

11    Q.    Okay.  I want to refer you to

12  -- Were you finished, ma'am?

13    A.    Yes.

14    Q.    Okay.  -- refer you to page

15  fifty-five of your deposition transcript.

16    A.    (Witness complies.)

17    Q.    Are you ready?

18    A.    Yes.

19    Q.    Starting at line thirteen on

20  page fifty-five:  Can I go back to the

21  second meeting for just a second?  This is a

22  question.  How did you find out about the

23  second meeting?  Answer:  I think I got a

1   letter.  I'm not for sure.  Question:  And

2   the letter was from whom?  Answer:  The law

3   firm, I think.  Question:  Okay.  Answer:

4   I'm thinking, not for sure.  Question:  All

5   right.  Did you keep a copy of that letter?

6   Answer:  Yes, I did.  Question:  Do you

7   still have a copy of it, do you think?

8   Answer:  Yes.

9           Am I going too fast, ma'am?

10  I'll slow down, because I want you to keep

11  up with me.  I'm on page fifty-six now, line

12  four.

13      A.    Yes.

14      Q.    Answer:  Yes.  But I don't

15  have it with me.  Question:  Okay.  Do you

16  have it at home?  Answer:  Yes.  Question:

17  Would you be able to retrieve it if your

18  lawyer asked you to give it to him?  Answer:

19  Yes.  Question:  -- Let me be sure I'm in

20  the right place.

21          Okay.  Question:  Now, up

22  until the time of the second meeting, had

23  you hired a lawyer to represent you in this

1  lawsuit?  Answer:  No.  Question:  Okay.

2  Now, let's talk about the third meeting.

3  How did you find out about that meeting?

4  Answer:  We got a letter.

5         Question:  Okay.  The letter

6  you received from that -- you know, before

7  the second meeting, and the letter you

8  received from before the third meeting, can

9  you tell us what those letters said to you

10  about -- And then it says:  I mean, what did

11  they convey to you in regards to the

12  meeting?  Answer:  It was just saying it

13  would be another meeting, and where it was

14  going to be at, that was all.

15         Question:  Okay.  Do you

16  wonder before you -- once you received those

17  letters, how the lawyers knew to send you a

18  letter to ask you to come to the meeting?

19  Answer:  Well, I think everybody around

20  there got those letters.

21         Question:  Okay.  So, you

22  think it went to everyone in the community?

23  Answer: Yes.  Everyone.  Question:  Okay.

106

1  Do you recall signing a list or anything at

2  any of the meetings where you put your name

3  and your address and your phone number on

4  the list?  Answer:  I think so.  I'm not

5  sure.  I'm not for sure.

6          All right.  Do you recall what

7  was discussed at the third meeting?  Answer:

8  The same thing.  They just went over the

9  same thing.  Question:  And the same thing

10  would have been -- Answer:  Concerning of

11  the mill.  Question:  Concerns about the

12  Lockhart facility?  Answer:  Right.

13          Are you still with me?

14      A.   Yes.

15      Q.   Okay.  Question:  All right.

16  After that meeting; that is, the third

17  meeting, you don't recall when that meeting

18  occurred; correct?  Answer:  No.  Question:

19  Okay.  After that meeting, and this is the

20  third meeting we're talking about, did you

21  at that point hire a lawyer to represent you

22  in regards to these concerns concerning the

23  wood treatment facility?  Answer:  No.

107

1          Question:  All right.  Did you

2  have any discussions with; that is, let's

3  talk about prior to the third meeting, had

4  you had any discussions with any lawyers

5  about the concerns regarding the wood

6  treatment facility, other than those

7  discussions you had at the meetings?

8  Answer:  No.

9          Question:  Okay.  There was a

10  fourth meeting; correct?  Answer:  Yeah.

11  How long ago was that meeting?  Answer:  It

12  hadn't -- hadn't been too long.  I don't

13  remember what month, but it hadn't been too

14  long.  Question:  Was it this year?  This

15  year is 2006.  Answer:  No.  I don't think

16  it was this year.  I think it was last year.

17          Question:  Would it have been

18  last winter or fall of last year, if you

19  recall?  Answer:  It was the fall, I'm

20  thinking.  Question:  Fall.  Was it also at

21  the Armory Hall?  Answer:  Yes.  Question:

22  And how did you find out about that meeting?

23  Answer:  By a letter.

1          Question:  Okay.  Letter from

2    the same lawyers?  Answer:  Yes.  Was the

3    letter from Mr. Cade?  Answer:  Yeah.  And

4    his law firm?  Answer:  Uh-huh.  Question:

5    Is that a yes?  Answer:  Yes.

6          And what did that letter tell

7    you, if you recall?  Answer:  About it was

8    going to be a meeting at the Armory Hall and

9    what time.  Question:  Okay.  Answer:  And

10   it was going to be --

11         Question:  All right.  Prior

12   to the fourth meeting, had you ever seen any

13   ads in any of the newspapers about the

14   concerns concerning chemicals from the wood

15   treatment facility?  Answer:  No.

16         Question:  Prior to receiving

17   the fourth letter, had you hired any lawyers

18   to represent you in regards to these

19   concerns regarding the operation of the wood

20   treatment facility?  Answer:  No.

21         Did I read those questions and

22   those answers correctly, ma'am?

23         MR. PALMER:  Objection, it's

1 compound.  It's argumentative.  It's been

2 asked.  It's been answered.  And, frankly,

3 you're harassing the witness.

4     Q.   Did I read those questions and

5 answers appropriately, Ms. DeVaughn?

6     A.   Yes.

7     Q.   And were your answers truthful

8 at the time you gave them?

9     A.   At the time I gave them, it

10 was, but my daughter made me think we -- she

11 made me think about the meetings and the

12 letters and all.

13     Q.   Okay.

14     A.   At the time, they was.

15     Q.   Okay.  Now, so before you

16 talked to your daughter at the time, your

17 answers were truthful; correct?

18     A.   Uh-huh.

19     Q.   All right.  Is that a yes?

20     A.   Yes.

21     Q.   Okay.  Now, there were a large

22 number of people who received those letters;

23 correct?

110

1          MR. PALMER:  Objection.  Calls

2  for speculation.  Lacks foundation.

3      Q.    Can you answer that question,

4  ma'am?

5      A.    I beg your pardon?  I thought

6  he --

7      Q.    Did a large number of people

8  in the community receive those letters?

9          MR. PALMER:  Same objections.

10      A.    I don't know, but --

11      Q.    I've read this to you before,

12  but I'm going to refer you back to your

13  transcript.  And page fifty-seven.  Starting

14  with line six on page fifty-seven:  Okay.

15  Did you wonder before you -- once you

16  received those letters, how the lawyers knew

17  to send you a letter to ask you to come to

18  the meeting?  Answer:  Well, I think

19  everybody around there got those letters.

20  Question:  Okay.  Do you think it went to

21  everyone in the community?  Answer:  Yes.

22  Everyone.

23          Did I read those questions and

111

1  those answers correctly, ma'am?

2      A.    Yes.

3      Q.    Okay.  And were you telling

4  the truth at the time you gave those

5  answers?

6      A.    Yes.

7      Q.    Okay.  Thank you.  Now, we

8  took your deposition a couple of weeks ago,

9  and at the time we took your deposition, you

10  thought you might have copies of the letters

11  that the lawyers sent you; isn't that

12  correct?

13      A.    Yes.

14      Q.    No doctor ever told you that

15  your breast cancer is related to smoke from

16  the mill or from the facility, that's

17  correct, isn't it?

18      A.    No.

19      Q.    Let me ask it another way.

20  You have not had a doctor tell you that the

21  smoke from the facility caused your breast

22  cancer, isn't that correct, ma'am?

23      A.    No, no doctor have ever told

1  me that.

2      Q.    No doctor has ever told you

3  that; correct?

4      A.    No.

5      Q.    Is that correct, yes?

6      A.    Right.

7      Q.    And your lawyer has never sent

8  you to a doctor to have you evaluated to

9  determine the cause of your cancer; isn't

10  that correct?

11      A.    That's correct.

12      Q.    And your lawyer has already

13  said that you were diagnosed with cancer,

14  and you've agreed to that, of your left

15  breast, and we are all so sorry about that.

16  And I'm sorry to see you going through that.

17  But you knew you had the mass in your left

18  breast for four to five years, and possibly

19  longer, before you went to get any

20  treatment; isn't that correct?

21      A.    Yes.

22      Q.    And you held off getting that

23  treatment because you were just scared;

113

1  isn't that correct?

2      A.    Yes.

3              (Defendant's Exhibit 2 was

4                marked for identification

5                purposes.)

6      Q.    Let me show you what has been

7  -- what will be marked Defendant's Exhibit

8  Number 2 for the DeVaughn deposition.  I

9  think if we don't have a copy, we can do

10  this pretty quickly.

11            I'm going to hand to your

12  counsel for the court reporter to mark what

13  is -- to appropriately mark what we've

14  identified as Defendant's Exhibit 2 for

15  purposes of this deposition, before we give

16  it to you.

17            Thanks.  I'm going to show --

18  You have in front of you, Ms. DeVaughn, what

19  has been marked as Defendant's Exhibit 2 for

20  your deposition and this testimony.  And

21  you'll see that it is a medical

22  questionnaire and a general questionnaire.

23  Do you remember you and your daughter

114

1  working together to fill this -- these

2  questionnaires out?

3      A.    Yes.  She do all of my

4  paperwork.

5      Q.    Okay.  And so, you and your

6  daughter worked together to put down what's

7  on these documents; is that correct?

8      A.    Yes, yes.

9      Q.    Okay.  If you look at page

10  eleven, early on there, can you get to page

11  eleven, the first page eleven?  Take your

12  time.

13      A.    (Witness complies.)

14      Q.    And you see there's a

15  signature there on Defendant's Exhibit

16  Number 2 that says:  Signed, Dorothy

17  DeVaughn?

18      A.    Yes.

19      Q.    Is that your signature?

20      A.    Yes.

21      Q.    Did you sign it?

22      A.    Yes.

23      Q.    And is it -- You agree that

1  all of the markings on this document, up to

2  the point of that signature, are -- you

3  intended for them to be accurate and

4  truthful; isn't that correct?

5      A.   Yes.

6      Q.   Okay.  Now, look at the last

7  page of the document, of Defendant's 2.  And

8  you see also on that last page, which on

9  this document is marked page forty-two, it

10  also has a signature of Dorothy A. DeVaughn.

11  Is that your signature?

12     A.   Yes.

13     Q.   Okay.  Did you fill that out?

14  You put that signature there?

15     A.   Yes.

16     Q.   And did you also intend that

17  all of the writings on this document,

18  Defendant's Exhibit 2, that appear on the

19  various pages before page forty-two, were

20  meant to be accurate and truthful; is that

21  correct?

22     A.   Yes.

23          MR. TAYLOR:  Give me one

116

1  second.  Can we take a break just for one a

2  second?

3          MR. PALMER:  Certainly.

4          VIDEOGRAPHER:  Off the Record.

5  The time is 1:56 p.m.

6          (Recess taken.)

7          VIDEOGRAPHER:  Back on the

8  Record.  The time is 1:59 p.m.

9          MR. TAYLOR:  Ms. DeVaughn,

10  thank you very much for your candor, your

11  honesty, and your truthfulness, and for

12  taking time to come out here and talk to us.

13  We have no further questions at this time.

14          THE WITNESS:  Thank you.

15          MR. PALMER:  I have no

16  questions at this time.

17          VIDEOGRAPHER:  Off the Record.

18  The time is 1:59 p.m.  This concludes the

19  deposition.

20

21

22

23