# The Colom Law Firm, L.L.C.

200 SIXTH STREET NORTH
COLUMBUS, MS 39701

WILBUR O. COLOM
SHIRLEY C. BYERS
KELLY HARDWICK
BRIAN A. HINTON

MAILING ADDRESS:
POST OFFICE BOX 866
COLUMBUS, MS 39703
TELEPHONE: (662) 327-0903
FACSIMILE: (662) 329-4832
WEBSITE: www.colom.com

September 27, 2004

Louisiana Pacific Corp.
David Harvey, Vice President of Environmental Affairs
414 Union Street
Suite 2000
Nashville, TN 37219

    RE:    Notice of Contamination – Lockhart Wood Treatment Facility

Dear Mr. Harvey:

    This letter is intended to serve as a pre-litigation settlement demand to Louisiana-Pacific Corporation ("LP") and to Pactiv Corporation ("Pactiv"). This matter involves personal injuries and property damage resulting from the negligent and intentional release of toxic and carcinogenic substances from the Lockhart LP/Pactiv wood treatment facility into the environment surrounding Florala and Lockhart, two small towns in Covington County, Alabama.

    To date, we represent 1,246 individuals ("Exposure Group") who have been injured and damaged as a result of exposure to dangerous levels of creosote, pentachlorophenol ("PCP"), and/or chromated copper arsenic ("CCA"), that was released into the soil, water and air from this facility over the period from 1953 to 1998. The injuries in the Exposure Group include birth defects, respiratory diseases, neurological disorders, cancers, and other exposure injuries, and, many of these people have also suffered property damages. I have enclosed a list of the individuals comprising the Exposure Group and their respective ages. I will soon provide you with a list specifically identifying illnesses and other pertinent information.

    The types of injuries identified in the Exposure Group are the types of injuries that the medical literature clearly links to creosote, PCP, and/or to CCA exposure. They are also consistent with the types of injuries identified in a study of similarly exposed individuals that was conducted by James Dahlgren, a nationally recognized physician/toxicologist with extensive experience in evaluating individuals exposed to a broad array of toxic chemicals. See, Dahlgren, James. 2003. *Health effects on nearby residents of a wood treatment plant*. Environmental Research. 92-98.

**PLAINTIFF'S
EXHIBIT "D"**

Should we have to litigate these claims, we will prove that LP and/or Pactiv supervisory personnel directed their employees to disregard State and Federal regulations for both air and water discharges. We will also prove that it was common practice for this facility to release plumes of black smoke late at night and early in the morning, which is suggestive of an attempt to hide the release of these toxic substances. And further, we will show that numerous fish kills occurred in nearby streams, creeks, and ponds, all within close proximity to the facility and to four drinking water supply wells used by residential and commercial sources for both Florala & Lockhart.

Additionally, regulatory records obtained from State (ADEM) and Federal (EPA) agencies show serious air, water, and soil contamination at and around this facility prior to and after regulations were implemented. Specifically, the entire site lacked proper surface impoundments, one monitoring well was contaminated with PCP and arsenic, and waste PCP and creosote-contaminated wood chips were customarily burned in the facility boilers thereby emitting considerable levels of particulate matter into the environment surrounding the Florala/Lockhart community. LP and/or Pactiv intentionally violated the Clean Air Act and the Resource Conservation Recovery Act (RCRA) requirements following both State and Federal instructions to officials at LP/Pactiv to cease these practices.

Also, a 1984 State site inspection revealed the need to monitor the groundwater which services approximately 700 residents of Lockhart and 2,165 residents of Florala, due to the fact that the Florala Water Works obtained its water from comparable depths to an identified contaminated plume which originated from the LP/Pactiv facility. Not only did PCP appear in these test results, but also, many toxic components of creosote, including, phenanthrene, fluoranthene, pyrene, and chrysene, appeared in the waste stream escaping the site. This 1984 study confirmed that it was common practice for LP and/or Pactiv to intentionally release creosote, PCP, and, in later years, CCA, into the environment surrounding this facility.

Further, in response to the complaint of a neighboring property owner that creosote from this facility was contaminating his property, a 1994 cooperative effort between the EPA and ADEM, under the authority of the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), and the Superfund Amendments and Reauthorization Act of 1986 (SARA), verified threats to human health and to the environment as a result of past activities at the LP/Pactiv site. This study revealed that uncontrolled creosote landfill pits, suspected hazardous substances entering the groundwater beneath the site, and soil exposure pathways, all posed considerable threats to human health and safety. This study also confirmed the significant degree of contamination reported in the 1984 study and echoed the State's high recommendation for continued sampling due to the very poor past treatment methods that LP and Pactiv had employed since 1953.

And finally, records submitted to ADEM by LP in April of 2004 clearly indicate that a substantial plume of creosote has migrated from this facility across Pond Creek, thus further contaminating the residential area immediately west of the LP site. Should we be forced to litigate these claims, we are confident that we will be able to convince a

jury that LP/Pactiv knew, or should have known, of the presence of this significant plume, and we are equally confident that it will be difficult, if not impossible, for LP/Pactiv to explain to a jury why they allowed this plume to migrate offsite.

With all of that said, the purpose of this letter is not simply to catalog some of the negligent and intentional acts of LP and Pactiv at this site, but rather to facilitate a settlement that would reasonably compensate the 1,246 victims who have been injured or whose property has been damaged as a result of LP's and/or Pactiv's wrongdoing. In past cases of this type, we have utilized a value matrix to compensate the victims of toxic exposures whose conditions ranged from cancers to less severe exposure injuries. We believe that this would be an appropriate way to value these claims.

Based on the overwhelming evidence of wrongdoing by LP and/or Pactiv and on the resulting significant injuries and damages suffered by the Exposure Group, in addition to the favorable venue in which these cases would be filed, we believe that individually litigating these claims could result in substantial verdicts and judgments against your companies. As I am sure you are very aware, a verdict for $11 billion was obtained in this area only a few months ago.

Nevertheless, our objective is not to bankrupt LP and Pactiv but to address the continued contamination and health issues caused by the conduct at this facility and to compensate the victims of these toxic exposures. To that end, we are willing to apply a value matrix to these claims in an attempt to settle all of these claims prior to filing numerous individual lawsuits. This would obviously save your companies an enormous amount in defense costs while eliminating your potential liability at trial.

If you wish to discuss a possible resolution of these claims, please call me within ten (10) days of receipt of this letter. In the event I do not hear from you in that time, we will assume that you do not wish to attempt to resolve these claims, and we will use all legal means available to seek redress for these innocent victims.

I look forward to hearing from you and to a prompt and amicable resolution in this regard.

Sincerely,

Wilbur O. Colom
One of the Attorneys for the
Exposure Group

/woc

Enclosure