2002 OCT -7 PM 4: 20
PRR

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KETCHIKAN PULP COMPANY, et. al, )
)
)
Plaintiffs, )
)
v. )    Case No. A01-223 CIV [JWS]
)
ACE INDEMNITY INSURANCE )
COMPANY, et. al, )
)
Defendants. )
)

## PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY, ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION

Plaintiffs Ketchikan Pulp Company and Louisiana-Pacific Corporation (collectively, "Plaintiffs") respectfully request the Court to issue an Order that designates the Thorne Bay, Alaska site as the Site to tried in the initial trial in this action. This motion is made pursuant to the Court's April 17, 2002 minute order, wherein the Court ordered the parties to make a motion advocating the Site or Sites to be tried at the initial trial if the parties could not agree on a representative Site or Sites.

Plaintiffs base this motion upon the Affidavit of Kenneth H. Frenchman, Esq., sworn to on October 4, 2002, including all exhibits thereto, Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion to Designate the Thorne Bay, Alaska

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

64

Site as the Initial Trial in this Action, and upon all other prior pleadings and papers filed in this action.

ASHBURN & MASON, P.C.

DATED: 10-7-02

By: _____
Mark E. Ashburn, Alaska Bar No. 7405017

Ashburn & Mason, P.C.
1130 West 6th Avenue, Suite 100
Anchorage, Alaska 99501
(907) 276-4331 (Phone)
(907) 277-8235 (Facsimile)

Robin L. Cohen, Esq.
Kenneth H. Frenchman, Esq.
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 835-1471

R. Edward Poole
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

Attorneys for Plaintiffs Ketchikan Pulp
Company and Louisiana-Pacific Corporation

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing were ( ) mailed
( ) hand delivered ( ) faxed on the _____ day of October, 2002,
to the following attorneys/parties of record:

Steven Soha, Esq.
Soha & Lang
801 Second Avenue, Suite 1210
Seattle, WA 98104

Clay A. Young, Esq.
Delaney Wiles Hayes, Gerety,
  Ellis & Young, Inc.
1007 W. 3rd Ave., Suite 400
Anchorage, AK 99501

W. David Campagne, Esq.
Sinnott Dito Moura & Puebla PC
Two Embarcadero Center, Suite 2330
San Francisco, CA 94111-3910

Kenneth H. Frenchman, Esq.
Robin L. Cohen, Esq.
Dickstein Shapiro Morin & Oshinsky
2101 L Street NW
Washington, DC 20037-1526

ASHBURN & MASON

By: _____
Debbie Traver
N:\DAT 9641\SITE SELECTION M (021007).DOC

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV [JWS]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| KETCHIKAN PULP COMPANY, et. al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. A01-223 CIV [JWS] |
| ) | |
| ACE INDEMNITY INSURANCE ) | |
| COMPANY, et. al, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DESIGNATE THE THORNE BAY, ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION

Pursuant to the Court's Order of April 17, 2002, Plaintiffs Ketchikan Pulp Company ("KPC") and Louisiana Pacific Corporation ("L-P") (collectively, "Plaintiffs"), submit this memorandum in support of their motion to designate the Thorne Bay Logging Camp/Sort Yard and Landfills Site ("Thorne Bay Site" or "Thorne Bay"), as the initial trial Site in this action.

Following Plaintiffs' initial responses and two sets of supplemental responses to discovery propounded by defendants Granite State Insurance Company, the Insurance Company of the State of Pennsylvania, and New Hampshire Insurance Company (collectively, the "AIG Defendants"), and ACE Indemnity Insurance Company ("ACE," collectively with the AIG Defendants, "Defendants"), the parties participated in two

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE. ALASKA
99501-5914
(907) 276-4331

conferences in an attempt to reach agreement on the designation of an initial trial Site in this matter.    The parties were unable to reach agreement and, pursuant to this Court's Order of April 17, 2002, this motion follows.

The positions of the parties are as follows:   Plaintiffs propose Thorne Bay, Alaska, as the initial trial Site; Defendant ACE proposes Ward Cove, Alaska; and the AIG Defendants state they have inadequate information to enable them to propose a Site.

### Preliminary Statement

This Court observed in its April 17, 2002 Order that the goal of the initial pre-trial development of this action is "to identify no more than two [representative] sites," in the "hop[e] that following the initial trial, the parties will be able to settle their differences regarding the remaining sites."  April 17, 2002 Order at 1, attached hereto as Exhibit 1 to the Affidavit of Kenneth H. Frenchman ("Frenchman Aff.").  To that end, in the nearly six months since the Court's Order, KPC and L-P have dedicated enormous time and several hundreds of thousands of dollars of expense to supply Defendants with information to enable them to propose a representative Site.  Frenchman Aff. ¶ 3.  The goal has been to select a Site that is truly representative, so that the resolution of the issues arising at that Site will also assist in the resolution of similar issues arising at other Sites.  For the reasons set forth below, Plaintiffs believe that Thorne Bay is the Site most

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

representative of the Sites at issue, that it is the most "manageable" of the two Alaska Sites identified by the Parties[1] and that it is the Site that can be tried most efficiently.

## STATEMENT OF FACTS

This Action was filed almost 15 months ago. After nine months of procedural wrangling, a duplicative action filed by the Defendants in California was transferred to this Court and consolidated with this Action. Thereafter, the Court held a conference on April 17, 2002 to consider the scheduling and planning for the initial phase of this litigation.

In the post-conference Order, the Court directed the Plaintiffs to provide a list of their past costs at all Sites by April 26, 2002, and ordered that the initial Phase I discovery be limited to Sites at which Plaintiffs have actually spent money and issues relevant to the selection of a representative test Site.   See April 17, 2002 Order at 1-2 (Frenchman Aff. Exh. 1). Defendants were directed to serve their Interrogatories no later than May 10, 2002, with Responses being due June 28, 2002 (a date extended by stipulation to July 1, 2002). Id. The Court also set a timetable for the completion of

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

---

[1]The Sites proposed by Plaintiffs and ACE, Thorne Bay and Ward Cove, are both in Alaska.   The Sites as to which the AIG Defendants say they need additional information are Thorne Bay and Ward Cove and three Sites in California, which they brought into this action despite being told that Plaintiffs are making no claim for reimbursement for past expenses at any California Sites. See Frenchman Aff. ¶¶ 4-5 & Exh. 6.

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV [JWS]            Page 3 of 14

Phase I that would enable the parties to select a trial Site or Sites no later than September 6, 2002 (a date extended by stipulation to October 7, 2002). Id.

Defendants propounded their interrogatories on May 14, 2002, and on July 1, 2002, Plaintiffs served over 200 pages of responses directed to more than 1000 separate interrogatories covering all Alaska Sites and the top 30 non-Alaskan Sites (in terms of past costs incurred). See Frenchman Aff. Exh. 2. Subsequent to their receipt of these responses, Defendants requested additional information. See id., Exh. 3. Accordingly, Plaintiffs furnished supplemental Responses on August 14, 2002, and again on September 18, 2002, as to 10 Sites which were allegedly under serious consideration by Defendants. See id., Exhs. 4, 5.

On the basis of this discovery, Defendant ACE proposed Ward Cove, Alaska, as the test Site. Frenchman Aff. ¶ 6. The AIG Defendants declined to propose any Site, arguing that they lacked sufficient information as to five Sites they had under consideration; and they requested yet further responses from Plaintiffs as to those five Sites.[2] Id. ¶ 4. Plaintiffs viewed that request as a blatant delay tactic and they declined to

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

---

[2]See Frenchman Aff. ¶ 4 & Exh. 6.

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV [JWS]        Page 4 of 14

provide the  further discovery requested because it was unnecessary, unrelated to Site selection, and was largely contained in documents previously offered to the Defendants.[3]

## ARGUMENT

## I.     THE INITIAL TRIAL SITE SHOULD BE AN ALASKAN SITE

Plaintiffs have proposed an Alaskan Site for the same reason they chose to file this Action in Alaska:  almost 75% of the dollar value of the claims for which Plaintiffs seek reimbursement arise out of environmental Sites in this state. Frenchman Aff. ¶ 7. Not only are those Sites in Alaska, but also the majority of the witnesses with knowledge relevant to them reside here or can be made available to testify in Alaska. Id. Defendant ACE also has proposed a Site in Alaska. Id. ¶ 6.  Because the ACE policies apply only to liabilities arising within Alaska, the issues between Plaintiffs and Defendant ACE could only be resolved if an Alaska Site is selected as the initial trial Site.

The AIG Defendants have identified five Sites, two of which are the Alaska Sites proposed by Plaintiffs and ACE and three of which are California Sites. See id. ¶¶ 4, 6 & Exh. 6. The California Sites are inappropriate because there is no "case or controversy"

---

[3]In its initial responses filed on July 1, 2002 and in each of its supplemental responses filed on August 14 and September 18, Plaintiffs offered to produce documents to Defendants which may contain information responsive to their requests. Defendants have never taken Plaintiffs up on their offer.  Indeed, the first time that the AIG Defendants expressed any interest in reviewing KPC or L-P documents occurred during the October 3, 2002 teleconference between the Parties' counsel, when counsel to the AIG Defendants indicated that his client might be interested in reviewing a certain sub-set of documents relating to the five Sites supposedly under serious consideration, but only if Plaintiffs  agreed to delay Site selection. See Frenchman Aff. ¶¶ 13, 14. Plaintiffs have no objection to producing the documents, but they do object to any delay in the selection of a representative site because the documents requested relate to the merits of the case not to the identification of the most appropriate representative site.

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV [JWS]          Page 5 of 14

between the Parties as to any of them. As Plaintiffs have repeatedly advised the AIG Defendants, Plaintiffs make no claim for reimbursement for past environmental expenditures incurred at the California Sites identified by AIG. See id. ¶ 5.

## II.   THORNE BAY IMPLICATES NUMEROUS COMMON ISSUES AND TYPES OF ENVIRONMENTAL DAMAGE AND IS, THEREFORE, A "REPRESENTATIVE" SITE APPROPRIATE FOR DESIGNATION AS THE INITIAL TRIAL SITE

### A.   Thorne Bay Is Similar to Other Logging Camps

The 18 Alaska Sites at issue include 16 remote logging camps, in addition to Ward Cove (pulp mill) and Annette Island (saw mill). See Frenchman Aff., Exh. 2 at Site-Specific Responses for Alaska Sites. The Thorne Bay facilities are similar to the other Alaska remote facilities in terms of the operations that occurred there. See id. at Site-Specific Response for Thorne Bay. This includes housing for employees, a shop area, fuel storage and fueling areas, heavy equipment storage areas, and log transfer facilities ("LTFs") to move timber into and out of marine waters. See id. Moreover, the LTFs involve environmental impacts – namely, deposition of bark and wood-related sediments into the associated watercourses – common to all of KPC and L-P's facilities where timber was supplied by over-water transport, including at Ward Cove where large quantities of logs were stored prior to their use in the pulp mill operation. Id.

### B.   The Thorne Bay Landfills Are Similar to Other KPC and L-P Landfills

In support of its operations, the Thorne Bay facility developed three interconnected landfills under the active oversight of the USFS in compliance with applicable standards. See Frenchman Aff., Exh. 2 at Site-Specific Response for Thorne Bay. Landfill No. 1 was used primarily to dispose of woodwaste and is representative of

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

other such landfills which appear at the majority of KPC and L-P environmental Sites, both within and outside of Alaska.  See, e.g., id. at Site-Specific Responses for Coffman Cove, Alaska, Thorne Bay, and Pendleton, Oregon.  Such areas are used to dispose of debris that collects in LTFs and sawmills' log yards.  Generally the material that is disposed of includes bark, other wood material, rock and dirt.  See Frenchman Aff., Exh. 2.

Thorne Bay Landfills No. 2 and No. 3 were primarily used to dispose of solid wastes associated with the facility and associated living areas, and are representative of similar landfills established at other remote camps.  See Frenchman Aff., Exh. 2 at Site-Specific Response for Thorne Bay.  All three landfills have characteristics that are common to the landfill operated at Ward Cove.  See id. at Site-Specific Responses for Ward Cove and Thorne Bay.

## C. The Thorne Bay Site is Representative of the Regulatory History of the Investigation and Remediation of the Alaska Sites

The Thorne Bay Site – like other camps – was cleaned up under the auspices of the United States Forest Service ("USFS") and the Alaska Department of Environmental Conservation ("ADEC").  See Frenchman Aff., Exh. 2 at Site-Specific Response for Thorne Bay.  The regulatory issues – overlapping state and federal requirements and federal contractual issues – are similar from Site to Site within Alaska.  See id. at Site-Specific Responses for Alaska Sites.

The claims and bases for legal liability at both Thorne Bay and the remote logging camps were grounded in both Federal and Alaskan environmental law and federal government's insistence that cleanup actions were required by KPC pursuant to

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

applicable law. <u>See</u> Frenchman Aff., Exh. 2 at Site-Specific Responses for Alaska Sites. At the Thorne Bay Landfills, there was also a claim made under CERCLA, but this regulatory action was in addition to – not instead of – the common remedial actions taken at all other camps. <u>See id.</u>, at Site-Specific Response for Thorne Bay. Moreover, a trial of the CERCLA issues at Thorne Bay would be helpful in resolving any similar CERCLA issues at Ward Cove.

### D. The Thorne Bay Site is Representative of the Witnesses, Factual Circumstances, and Other Evidence at Issue in Alaska

Many of the witnesses and documents that will be raised in the context of litigating Thorne Bay will be relevant to the other logging facilities. KPC's Timber Division was responsible for establishing camps. In some instances, logging contractors actually operated camps (KPC operated some with its own people) but the basic framework for establishing where a camp should be located and how it should be constructed arose from a common nucleus of KPC representatives working in conjunction with the Forest Service. In particular, Thorne Bay operated for a long period of time (approaching 40 years) and the effort to locate witnesses for this facility will yield many of the same people that would be relevant for other logging facilities over this timeframe. Hence, if the parties litigate Thorne Bay, that effort will yield results that should increase the likelihood of settling issues at the other camps.

With respect to the camp, most contamination was the result of conditions common to all Alaskan Sites, including petroleum spills and releases from fueling operations, broken hoses and malfunctions, leaks, and other accidents. <u>See</u> Frenchman Aff., Exh. 2 at Site-Specific Responses for Alaska Sites. Litigating these issues at Thorne

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

Bay should yield guidance on the potential applicability of the "sudden and accidental" pollution exclusion and "expected or intended" exclusion of the "occurrence" definition, and therefore guide the resolution of claims at all the other logging camp Sites.   In addition, there are issues at Ward Cove (e.g., fuel spills, leaks from bulk fuel tanks, leaks from the railroad locomotives) that are similar to those arising at the logging camps, and the litigation of those issues at Thorne Bay would provide guidance as to how similar issues would be resolved at Ward Cove.   See id. at Site-Specific Response for Ward Cove.   With respect to the Thorne Bay Landfills, litigating Thorne Bay would raise the same policy exclusions and issues that would be raised in the context of other landfills (e.g., Ward Cove and the battery disposal area at Coffman Cove).   See id. at Site-Specific Responses for Coffman Cove, Thorne Bay & Ward Cove.

        In addition, the documentation of the work and associated expenses at Thorne Bay has been well maintained and is already organized, which should allow for a more efficient and less costly discovery process and presentation of evidence at trial. KPC canvassed its internal documents in 1995-1996 in order to respond to a USFS CERCLA 104(e) information request, and Plaintiffs already have several bankers' boxes of Bates-stamped documents organized and ready for production.   The cost documentation underlying the $6.8 M in work at the Landfills is in order.  From a timing perspective, Thorne Bay could be litigated much sooner than Ward Cove due to the fact that finding and organizing the Ward Cove documents will take many months.

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

## III.  WARD COVE IS NOT AN APPROPRIATE "REPRESENTATIVE" SITE

### A.  Ward Cove Raises Unique Issues That Would Not Assist in the Resolution of Other Sites

Ward Cove is a very complex Site, which is different from the other Alaska Sites.  Virtually all of the sites in Alaska existed to supply logs to the pulp mill operation at Ward Cove.  See Frenchman Aff., Exh. 2 at Site-Specific Response for Ward Cove. The pulp mill was atypical for KPC, being a complex manufacturing operation that used vast amounts of chemicals.  Id.  The primary sources of contamination at the Ward Cove Pulp Mill  – air emissions and wastewater discharges – resulted from near-constant releases throughout the period of the operation of the facility.  Id.  In contrast, contaminant releases at the logging camp Sites primarily resulted from intermittent spills, leaks, and, in the case of landfills, leachate releases.  See id. at Site-Specific Responses for Alaska Sites.

Ward Cove presents other unique environmental conditions, the resolution of which will provide little guidance for resolving issues at other Sites.  For example, the contamination and remediation of the "Marine Operable Unit" at Ward Cove involved the study and remediation of highly organic pulp sludge residing on the bottom of Ward Cove. See Frenchman Aff., Exh. 2 at Site-Specific Responses for Ward Cove.  The nature of this material and the legal circumstances associated with the processes that led to its discharge are very different from any other Site in Alaska.  Taken as a whole, Ward Cove is not representative of any Site in Alaska and is similar to non-Alaskan Sites in very limited aspects.  Id.  The issues at Ward Cove that are common to other Sites – i.e., certain types of contamination associated with the landfills unit and woodwaste

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

disposal – are better represented by the Thorne Bay Site, where they may be addressed more efficiently and cost effectively.

Finally, the issues raised by the Thorne Bay Site will have relevance to the future liabilities arising at Sites requiring environmental cleanup in Alaska. Whereas the Ward Cove remediation is complete except for long-term monitoring, KPC has potential future liability at its remote logging camps and LTFs. See Frenchman Aff., Exh. 2 at Site-Specific Responses for Alaska Sites. Ward Cove has little or nothing in common with those Sites, and litigating the Ward Cove issues would provide no guidance for the resolution of the coverage issues affecting the greatest part of KPC's future liability in Alaska.

**B.    The Complexity of Ward Cove's Facilities and Environmental Issues Would Result in Costly and Inefficient Litigation of its Insurance Coverage Issues**

Ward Cove is so complex that a disproportionate amount of resources would be required to litigate the relevant issues. In comparison to Thorne Bay, litigating the Ward Cove Site would require a commitment of time and resources at least equal to what would be required to try all of the remaining sites in Alaska and the in the lower 48 states. Inefficiencies would necessarily result because Ward Cove involves a large number of potential witnesses, a very complicated manufacturing process that extended over several decades, and literally thousands of boxes of documents relevant to those operations that are now in storage. It would take a tremendous effort to locate, interview, and depose these relevant witnesses and to identify, produce and examine the documentation relevant to the decades of pulp mill operations. While the trial of the

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

issues at Ward Cove would resolve the unique issues at Ward Cove, it would not resolve the issues at any other relevant site. In contrast, the trial of the issues at Thorne Bay would also resolve the issues at the other camps and LTFs in Alaska, as well as important issues at Ward Cove respecting its land fill and wood waste disposal facilities.

**C.    The Ward Cove Site is Not Representative of the Regulatory History of the Investigation and Remediation of the Other Alaska Sites**

The Ward Cove pulp mill was highly regulated and, in this regard, the Ward Cove Site is unique among all Alaskan and non-Alaskan Sites. Surveying the regulatory compliance associated with the various historical discharges and releases during the operation of the facility would be an enormously time-consuming and expensive process. There are countless permits and authorizations that would need to be reviewed and understood. In contrast, the regulatory schemes applicable to Thorne Bay and other camps were relatively straightforward, and it would be much easier and simpler for the parties to determine the relevant regulatory status of spills and releases.

Moreover, the Ward Cove remediation was handled under a regulatory scheme distinct from the treatment of the other Alaska Sites. At Ward Cove, the cleanup was largely overseen by EPA (marine, uplands soil, and Ward Cove Landfills) with ADEC also involved as "second chair" to EPA. The process was very formal and governed by a CERCLA consent decree. In contrast, the work at the logging camps was governed, in part, by the USFS with the ADEC taking a significant role in the enforcement of KPC's cleanup obligations.

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully submit that the Thorne Bay Site is the most representative Site, which addresses most or all of the common issues implicated by the environmental liabilities, and should be selected as the initial trial Site in this action.

ASHBURN & MASON, P.C.

DATED: 10-7-02

By: _____

Mark E. Ashburn, Alaska Bar No. 7405017

Ashburn & Mason, P.C.
1130 West 6th Avenue, Suite 100
Anchorage, Alaska 99501
(907) 276-4331 (Phone)
(907) 277-8235 (Facsimile)

Robin L. Cohen, Esq.
Kenneth H. Frenchman, Esq.
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 835-1471

R. Edward Poole
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
2101 L Street, NW
Washington, DC  20037-1526
(202) 785-9700

Attorneys for Plaintiffs Ketchikan Pulp Company and Louisiana-Pacific Corporation

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV [JWS]

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing were ( X ) mailed
( ) hand delivered ( ) faxed on the ___11th___ day of October, 2002,
to the following attorneys/parties of record:

Steven Soha, Esq.
Soha & Lang
801 Second Avenue, Suite 1210
Seattle, WA 98104

Clay A. Young, Esq.
Delaney Wiles Hayes, Gerety,
    Ellis & Young, Inc.
1007 W. 3rd Ave., Suite 400
Anchorage, AK 99501

W. David Campagne, Esq.
Sinnott Dito Moura & Puebla PC
Two Embarcadero Center, Suite 2330
San Francisco, CA 94111-3910

Kenneth H. Frenchman, Esq.
Robin L. Cohen, Esq.
Dickstein Shapiro Morin & Oshinsky
2101 L Street NW
Washington, DC 20037-1526

ASHBURN & MASON

By: _Debbie Traver_
    Debbie Traver
N:DAT\9641\SITE SELECTION ME (021007).DOC

ASHBURN AND MASON
LAWYERS
A PROFESSIONAL CORPORATION
SUITE 100
1130 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
99501-5914
(907) 276-4331

PLAINTIFFS' MOTION TO DESIGNATE THE THORNE BAY,
ALASKA SITE AS THE INITIAL TRIAL IN THIS ACTION
Ketchikan Pulp, et al. v. Ace Indemnity Ins. Co., et al., Case No. A01-223 CIV **[JWS]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KETCHIKAN PULP COMPANY, et al.,      )
)
)
        Plaintiffs,         )
)
         v.           )      Civil Action No. A01-223 CIV
)
ACE INDEMNITY INSURANCE    )
COMPANY, et al.,               )
)
         Defendants.       )
)

## AFFIDAVIT OF KENNETH H. FRENCHMAN, ESQ.

KENNETH H. FRENCHMAN, Esq., being duly sworn, deposes and says:

1.       I am an attorney with the law firm of Dickstein Shapiro Morin & Oshinsky LLP, counsel to plaintiffs Ketchikan Pulp Company and Louisiana Pacific Corporation ("Plaintiffs") in this action. I make this affidavit in support Plaintiffs Motion to Designate the Thorne Bay, Alaska Site for the Initial Trial in this Action. I have personal knowledge of the facts set forth herein.

2.       Annexed hereto as Exhibit 1 is a true and correct copy of this Court's Order, dated April 17, 2002.

3.       In the nearly six months since the Court's April 17 Order, Plaintiffs have dedicated enormous time and several hundreds of thousands of dollars of expense to

supply Defendants with extensive information to enable them to propose a representative site.

4.      Defendants Granite State Insurance Company, the Insurance Company of the State of Pennsylvania, and New Hampshire Insurance Company (the "AIG Defendants"), have represented through their attorneys that they have inadequate information to enable them to propose a site as the initial trial site. Although the AIG Defendants are unable to select the trial site, the AIG Defendants have identified five sites that they are still considering: Thorne Bay, Alaska; Ward Cove, Alaska; and three other California sites.

5.      Plaintiffs make no claim for reimbursement for past environmental expenditures incurred at the California sites identified by the AIG Defendants.

6.      Defendant ACE Indemnity Insurance Company has stated through its attorneys that it will advocate that the Ward Cove, Alaska site should be the initial trial site.

7.      Plaintiffs filed this action in Alaska because almost 75% of the dollar value of the claims for which Plaintiffs seek reimbursement are located in Alaska. The sites at which those claims arose are in Alaska and the majority of the witnesses with knowledge relevant to them is in Alaska or can be made available to testify in Alaska.

8.      Annexed hereto as Exhibit 2 is a true and correct copy of Plaintiffs' Responses to Defendants' First Set of Specially Prepared Interrogatories: Site Information, dated July 1, 2002.

9.    Annexed hereto as Exhibit 3 is a true and correct copy of a letter from the AIG Defendants counsel, Kenneth H. Sumner, Esq., to Plaintiffs' counsel, Kenneth H. Frenchman, Esq., dated July 29, 2002.

10.    Annexed hereto as Exhibit 4 is a true and correct copy of a letter from Plaintiffs' counsel, R. Edward Poole, Esq., to the AIG Defendants counsel, Kenneth H. Sumner, Esq., dated August 14, 2002.

11.    Annexed hereto as Exhibit 5 is a true and correct copy of Plaintiffs' Supplemental Responses to Defendants' First Set of Specially Prepared Interrogatories: Site Information, dated September 18, 2002.

12.    Annexed hereto as Exhibit 6 is a true and correct copy of a letter from the AIG Defendants counsel, Kenneth H. Sumner, Esq., to Plaintiffs' counsel, Kenneth H. Frenchman, Esq., dated September 30, 2002.

13.    Although in its initial responses filed on July 1, 2002 and in each of its supplemental responses filed on August 14 and September 18, Plaintiffs offered to produce documents to Defendants which may contain information responsive to their requests, Defendants have never taken Plaintiffs up on their offer.

14.    Indeed, the first time that Defendants expressed any interest in reviewing KPC or L-P documents occurred during the October 3, 2002 teleconference between the Parties' counsel, when counsel to the AIG Defendants indicated that his client

3

might be interested in reviewing a certain sub-set of documents relating to the five Sites

supposedly under serious consideration, but only if Plaintiffs first identified how many

documents were at issue and agreed to delay Site selection to allow the AIG Defendants to

review the new material.  Plaintiffs refused this untimely request, which appears to have

been made only to delay these proceedings.

_____
Kenneth H. Frenchman

Sworn to before me this
4th day of October, 2002


_____
Notary Public


Nanci K. Ship
Notary Public, State of New York
No. 02SH6072815
Qualified in New York
Certificate filed in New York
Commission Expires May 28, 2006

# MINUTES OF THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

APR 1 7 2002

UNITED STATES DISTRICT C
DISTRICT OF ALASKA
By _____

<u>KETCHIKAN PULP CO., et al.</u>  v.  <u>ACE INDEMNITY INSURANCE CO., et al.</u>

THE HONORABLE JOHN W. SEDWICK          CASE NO.  <u>A01-0223 CV (JWS)</u>

<u>Deputy Clerk</u>                        <u>Official Recorder</u>

<u>Pam Richter</u>

PROCEEDINGS:     ORDER FROM CHAMBERS

This minute order memorializes decisions made at the scheduling and planning conference held on April 17, 2002.

By way of background, the court observes that this case involves disputes respecting insurance coverage for the cost of environmental clean up at 253 separate sites.  The parties have agreed on a structure for the pre-trial development of the case. The initial effort will be to identify representative sites to be considered at an initial trial.  It is hoped that following the initial trial, the parties will be able to settle their differences regarding the remaining sites.  For planning purposes, the court has advised the parties to try to identify no more than two sites which would be the subject of the initial trial.  However, the court has not foreclosed the possibility that there might be more sites in the initial trial, or that there would be a second trial before it would be reasonable to expect the parties to settle claims relating to the other sites.    Of the 253 sites, approximately 166 are sites where plaintiffs have spent no money to date on clean up.  These 166 sites will not be considered as candidates for the initial trial or trials.

IT IS ORDERED:

1.  On or before April 26, 2002, plaintiffs shall provide a list of all 253 sites to defendants which will show how much has been spent to date (meaning the latest date for which the information is

(FORMS+TA*)

EXHIBIT  2
Page  1  of  2

available and such date shall be specified on the list) on clean up at each site. Defendants shall not seek discovery at this time regarding any site where nothing has been spent on clean up. Defendants are discouraged, but not prohibited, from seeking discovery on sites where relatively modest amounts have been spent.

2. On or before May 10, 2002, defendants may propound not more than 20 interrogatories per site for those sites where money has been spent on clean up and 20 interrogatories of a general nature that seek information of a class or type that would relate to multiple sites or otherwise touch and concern discoverable information that is not site specific.

3. Plaintiffs shall answer the interrogatories not later than June 28, 2002.

4. Defendants shall diligently evaluate the answers to the interrogatories during the month of July, 2002.

5. The parties shall meet and confer during the month of August at mutually convenient times.

6. Not later than September 6, 2002, the parties shall file a joint designation of one or more sites for the initial trial, and failing agreement, each party shall file a motion advocating the site or sites it proposes for the initial trial. Any such motion will be briefed on the schedule contemplated by D.Ak.LR 7.1(e).

7. Not later than 10 days after the filing of a joint designation or the court's order disposing any motion made pursuant to paragraph 6 above, the parties shall file a joint notice specifying at least two dates that would be convenient for a further planning and scheduling conference to address the next two phases of pre-trial development, fact discovery and expert discovery relating to the representative site or sites. If consistent with the court's other obligations a conference will be set for one of the suggested dates.

DATE: __April 17, 2002__

ENTERED AT JUDGE'S DIRECTION

INITIALS: __BKT__

Deputy Clerk

A01-0223--CV (JWS)

2. ASHBURN (ASHBURN)
C. YOUNG (OELLNER)
S. GULL

EXHIBIT __2__
Page __2__ of __2__

Robin L. Cohen, Esq.
R. Edward Poole, Esq.
Kenneth H. Frenchman, Esq.
DICKSTEIN SHAPIRO MORIN
    & OSHINSKY LLP
1177 Avenue of the Americas
New York, NY 10036
Phone: (212) 835-1400
Fax: (212) 997-9880

Mark E. Ashburn, Esq.
Ashburn & Mason, P.C.
1130 West Sixth Avenue
Suite 100
Anchorage, AK 99501
Phone: (907) 276-4331
Fax: (907) 277-8235

Attorneys for Plaintiffs Ketchikan Pulp Company
and Louisiana-Pacific Corporation

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KETCHIKAN PULP COMPANY and LOUISIANA-PACIFIC CORPORATION, <br><br> Plaintiffs, <br><br> vs. <br><br> ACE INDEMNITY INSURANCE COMPANY, formerly known as Alaska Pacific Assurance Company; GRANITE STATE INSURANCE COMPANY; THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; and NEW HAMPSHIRE INSURANCE COMPANY, <br><br> Defendants. | Case No. A01-223 Civil [JWS] <br><br><br> **PLAINTIFFS' RESPONSES TO DEFENDANTS' FIRST SET OF SPECIALLY PREPARED INTERROGATORIES: SITE INFORMATION** |

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs Ketchikan Pulp

Company ("KPC") and Louisiana-Pacific Corporation ("L-P"), hereby submit their

1

responses and objections to the Defendants' First Set of Specially Prepared Interrogatories:

Site Information ("Site-Specific Interrogatories" or "Interrogatories").

## GENERAL OBJECTIONS

The General Objections contained in this section form a part of Plaintiffs' response to each and every Interrogatory and are set forth here to avoid repeating them within each response. Thus, the absence of a reference to a particular General Objection in Plaintiffs' response to any given Interrogatory should not be construed as a waiver of that particular General Objection to the Interrogatory. Plaintiffs' specific objections to each Interrogatory are in addition to the General Objections included in this section.

1.    Plaintiffs object to the Site-Specific Interrogatories on the grounds that they are unduly burdensome, vexatious, and oppressive in light of the issues relevant to this action.

2.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they seek legal conclusions.

3.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they require expert testimony.

4.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they are vague, ambiguous, overly broad, or seek to impose obligations on KPC and L-P beyond those set forth in the Federal Rules of Civil Procedure.

5.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they seek information that is irrelevant to the issues raised in this action and not reasonably calculated to lead to the discovery of admissible evidence. Nothing herein is intended to constitute or is to be construed as an admission by KPC or L-P regarding the admissibility

2

or relevance of any fact or document, or as an admission of the truth or accuracy of any characterization by the Site-Specific Interrogatories.

6.    To the extent that the Site-Specific Interrogatories seek information not related to the specific Sites in issue in this action, Plaintiffs object to them on the grounds that they seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

7.    To the extent that they are not limited to the time periods at issue in this action, Plaintiffs object to the Site-Specific Interrogatories on the grounds that they seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

8.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they seek discovery that is unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome, and less expensive.

9.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they seek information protected by the attorney-client privilege, the work-product doctrine, the joint-defense privilege, or other applicable privileges or immunities, and will not disclose such information. Plaintiffs expressly reserve the right to object at any stage of this litigation to the introduction into evidence at trial, or the use by Defendants for any purpose at any stage of this action, of documents or information that are subject to the attorney-client privilege, the work-product doctrine, the joint-defense privilege, or other applicable privileges and immunities.

10.    Plaintiffs object to the Site-Specific Interrogatories to the extent that they seek information subject to a confidentiality agreement or protective order in other actions or proceedings, including those for which this action seeks insurance coverage. Plaintiffs

3

will provide such information subject to a confidentiality agreement or protective order if and when an appropriate confidentiality agreement or protective order is in place in this action.

     11.    Plaintiffs object to the Site-Specific Interrogatories to the extent they seek information of any type, category, or subject matter to which the Defendants have objected or will object in response to Plaintiffs' discovery requests.

## OBJECTIONS TO DEFINITIONS

### Definition of "COMPLAINT"

     The term "COMPLAINT" means the civil complaint filed on behalf of PLAINTIFFS on or about July 20, 2001, case no. A01 223 CIV, in the United States District Court for the District of Alaska.  "COMPLAINT" shall also refer to the civil complaint filed by plaintiffs in the San Francisco Superior Court, case no. 401228, and subsequently removed and transferred by YOU to the United States District Court for the District of Alaska.

     Plaintiffs object generally to this Definition on the grounds that it is unintelligible as written, and because Plaintiffs did not file the California action.

### Definition of "SITE" and "SITES"

     "SITE" and "SITES" refer to the physical locations identified in the COMPLAINT, and, shall also include those physical locations identified in Defendants' separate action originally filed as San Francisco Superior Court case no. 401228, subsequently removed and transferred by YOU to the United States District Court for the District of Alaska.

     Plaintiffs object generally to this Definition on the grounds that it is overly broad and unintelligible.  Moreover, this Definition has been modified pursuant to the Parties' agreement, as discussed in a telephone conversation on or before June 11, 2002.  Pursuant to this agreement, the definition of "SITE" and "SITES" was modified to include only:  (1) non-Alaskan sites where Plaintiffs' past environmental liabilities total $350,000 or more; (2) Alaskan sites put in issue in Defendants' separate action originally filed as San Francisco

4

Superior Court case no. 401228, but which were not included in Plaintiffs' complaint filed in the Alaska litigation, where Plaintiffs' past environmental liabilities total $250,00 or more; and (3) Alaskan sites included in Plaintiffs' complaint filed in the Alaska litigation, where Plaintiffs' past environmental liabilities are greater than zero.

## Definition of "BODILY INJURY", "PROPERTY DAMAGE", and "PERSONAL INJURY"

"BODILY INJURY", "PROPERTY DAMAGE" and "PERSONAL INJURY" shall have the same definition as that found in the POLICIES at issue in the COMPLAINT.

Plaintiffs object to these Definitions on the grounds that they are vague and ambiguous to the extent that any of the Policies do not define one or more of the terms or use definitions that are not identical to those used in the other Policies.

## Definition of "HAZARDOUS MATERIAL"

"HAZARDOUS MATERIAL" means any "hazardous substance" as now defined in or listed pursuant to the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §9601(14), as amended by the Superfund Amendments and Reauthorization Act of 1986; and "pollutant or containment" as now defined in or listed pursuant to 42 U.S.C. §9601(33); and material now defined or listed as a "hazardous waste" pursuant to 40 C.F.R. Part 260; and petroleum products, including crude oil or any fraction thereof; natural gas, natural has [sic] liquids, liquefied natural gas, synthetic gas usable as fuel; wood by-products and wood waste materials; and any other substance, regardless of physical form, regulated by any environmental or natural resources government agency to protect human health or the environment from injury or contamination. Any mixture of a HAZARDOUS MATERIAL with other materials shall be considered a HAZARDOUS MATERIAL. Any material derived from a HAZARDOUS MATERIAL shall be considered a HAZARDOUS MATERIAL.

Plaintiffs object generally to this Definition on grounds that it is overly broad, vague, and unintelligible as written. Moreover, Plaintiffs object generally to this Definition to the extent that substances that would not, on their own, satisfy the Definition are treated as "Hazardous Material" if "derived" from a "Hazardous Material."

5

## Definition of "FUTURE LIABILITY"

"FUTURE LIABILITY" refers to all costs and expenses YOU may become legally obligated to pay in connection with the "Underlying Liabilities" referred to in the COMPLAINT.

Plaintiffs object generally to this Definition on grounds that it is vague, ambiguous, and inconsistent with the Interrogatories' Definition of "Liability."

## Definition of "CLAIMANT"

"CLAIMANT" means any PERSON who has made a claim of LIABILITY against YOU.

Plaintiffs object generally to this Definition on grounds that it is vague, ambiguous, and unintelligible as written.

## Definition of "IDENTIFY" with respect to DOCUMENTS

"IDENTIFY", when used with respect to DOCUMENTS, means for each DOCUMENT to state the following:  its exact name and title; its date and all other identifying numbers on it; its general subject matter; its kind (e.g., letter, memorandum, newspaper article); its author and all who took part in preparing it; and the person(s) to whom it was addressed or for whom it was created, if that person is not the same as the person to whom it was addressed.

Plaintiffs object generally to this Definition on grounds that it is overly broad and unduly burdensome.

## Definition of "IDENTIFY" in reference to a human PERSON

"IDENTIFY", when used in reference to a human PERSON, means to state the PERSON's full name, present or last known business affiliation, present or last known job title, present or last known business address and telephone number, and present or last known residence address and telephone number.

Plaintiffs object generally to this Definition on grounds that it is overly broad and unduly burdensome.

6

# RESPONSES AND SPECIFIC
## OBJECTIONS TO INTERROGATORIES

### Interrogatory No. 1

Separately describe the location of each SITE. For those SITES having a street or local address, please provide the street or local address for the SITE.

### Response

Subject to and without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the separate attachments for each Site subject to discovery.

### Interrogatory No. 2

Separately state the time period of YOUR operations at each SITE.

### Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous in light of the undefined term "operations." Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the chart attached as Exhibit 1. Moreover, Plaintiffs refer Defendants to additional information responsive to this Interrogatory contained in Plaintiffs' Responses to Interrogatory No. 3 set out in the separate attachments for each Site subject to discovery.

### Interrogatory No. 3

Separately describe the past and present activities and/or operations taking place at each SITE, including the dates and nature of the activities and/or operations taking place before, during and after YOUR involvement with the SITE. If the activities at the SITE changed over time, please describe the activities in chronological order, including the different dates for each activity and/or operation.

### Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous in light of the undefined term "operations." Subject to these objections and

7

without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the separate attachments for each Site subject to discovery.

## Interrogatory No. 4

Separately describe YOUR activities and/or operations at each SITE.

## Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous in light of the undefined term "operations." Moreover, Plaintiffs object to this Interrogatory to the extent it is redundant in light of Interrogatory No. 3. Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference their prior responses to Interrogatory No. 3, as set out in the separate attachments for each Site subject to discovery.

## Interrogatory No. 5

For each SITE, separately describe all HAZARDOUS MATERIAL used, stored, generated or disposed of at the SITE, before, during and after YOUR involvement with the SITE.

## Response

Plaintiffs object to this Interrogatory on the grounds that it is overly broad and unduly burdensome. Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the separate attachments for each Site subject to discovery.

## Interrogatory No. 6

For each SITE, separately describe any and all releases of HAZARDOUS MATERIAL at the SITE.

## Response

Plaintiffs object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and vexatious and that the term "releases" is vague and ambiguous.

8

Subject to these objections and without waiving their General Objections, Plaintiffs state that, for each Site subject to discovery, the environmental damage at issue was caused by continuous or nearly continuous exposure to the hazardous materials used, generated or stored on Site. For certain unusual or extraordinary incidents that resulted in environmental damage, records documenting the incident would have been created pursuant to the reporting requirements of applicable law. Any such records that were created would be maintained at the Site where the incident occurred or in central corporate records storage, and will be made available for Defendants' inspection and copying at a mutually agreed upon time and location. Plaintiffs refer Defendants to additional information responsive to this Interrogatory contained in Plaintiffs' response to Interrogatory No. 8 as set out in the separate attachments for each Site subject to discovery.

### Interrogatory No. 7

For each release of HAZARDOUS MATERIAL described above, when did the release occur?

### Response

Plaintiffs object to this Interrogatory on the grounds that it is overly burdensome and vexatious and that the term "releases" is vague and ambiguous. Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference their prior Response to Interrogatory No. 6 and refer Defendants to the records being produced in response to Interrogatory No. 6 for additional information responsive to this Interrogatory.

### Interrogatory No. 8

For each SITE, separately IDENTIFY the CLAIMANT or CLAIMANTS asserting claims against YOU.

9

Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and

ambiguous in light of the undefined term "claim." Subject to these objections and without

waiving their General Objections, Plaintiffs incorporate by reference the responses to this

Interrogatory set out in the separate attachments for each Site subject to discovery.

Interrogatory No. 9

For each SITE, separately state the nature of the allegations made by each CLAIMANT or
CLAIMANTS, including, whether the claim alleges or relates to alleged PERSONAL
INJURY, BODILY INJURY or PROPERTY DAMAGE.

Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and

ambiguous. Subject to these objections and without waiving their General Objections,

Plaintiffs incorporate by reference their prior responses to Interrogatory No. 8, as set out in

the separate attachments for each Site subject to discovery.

Interrogatory No. 10

For each SITE, separately state when the alleged PERSONAL INJURY, BODILY INJURY
or PROPERTY DAMAGE occurred.

Response

Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous,

and premature. Moreover, the information sought by this Interrogatory is the subject of

ongoing investigations. Subject to these objections and without waiving their General

Objections, Plaintiffs state that, on information and belief, the environmental property

damage at each Site subject to discovery began immediately or in a short time after the Site

began operations and occurred continuously thereafter through out the operations period

of each Site, or until discovered and remediated. Additionally, Plaintiffs refer Defendants

10

to their prior responses to Interrogatory Nos. 6 and 8 for further information responsive to this Interrogatory.

## Interrogatory No. 11

For each SITE, separately state when the CLAIMANT or CLAIMANTS first alleged YOU were responsible for PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE.

## Response

Plaintiffs object to this Interrogatory on the grounds that it is vague, ambiguous, and calls for speculation regarding the timing of allegations that may or may not have been reported contemporaneously to L-P. Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference their prior responses to Interrogatory No. 8, as set out in the separate attachments for each Site subject to discovery.

## Interrogatory No. 12

For each SITE, separately state whether YOU are involved in civil litigation, an administrative action or other type of action, and describe with particularity the venue or location, title and identifying number for each lawsuit, administrative action or other type of action.

## Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous. Subject to these objections and without waiving their General Objections, Plaintiffs incorporate by reference their prior responses to Interrogatory No. 8, as set out in the separate attachments for each Site subject to discovery.

## Interrogatory No. 13

For each SITE, IDENTIFY all orders and directives received by YOU from any governmental agency in connection YOUR LIABILITY.

11

Response

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous and, as applied to non-written orders and directives, it is unduly broad and vexatious. Subject to these objections and without waiving their General Objections, Plaintiffs state that written orders or directives received from government agencies would be maintained at the Site affected or in central corporate records, and any such records will be made available for Defendants' inspection and copying at a mutually agreed upon time and location. For additional information responsive to this Interrogatory, Plaintiffs refer Defendants to Plaintiffs' prior responses to Interrogatory No. 8, as set out in the separate attachments for each Site subject to discovery.

Interrogatory No. 14

For each SITE, IDENTIFY all other PERSONS which are, or may be, responsible for the PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE alleged by each CLAIMANT or CLAIMANTS.

Response

Plaintiffs object to this Interrogatory on the grounds that it is overly broad and calls for legal conclusions. Subject to these objections and without waiving their General Objections, Plaintiffs state that any predecessor or successor to Plaintiffs at the Sites potentially could be responsible for some or all of damage or injury alleged. Although there may be additional owners or operators of the Sites presently unknown to Plaintiffs, those that have been identified are referenced in Plaintiffs' prior responses to Interrogatory No. 3, as set out in the separate attachments for each Site subject to discovery.

Interrogatory No. 15

For each SITE, separately state the amount of YOUR LIABILITY.

12

Response

Subject to and without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the chart attached as Exhibit 1.

**Interrogatory No. 16**

For each SITE, separately state the amount of YOUR FUTURE LIABILITY.

Response

Subject to and without waiving their General Objections, Plaintiffs incorporate by reference the responses to this Interrogatory set out in the chart attached as Exhibit 1.

**Interrogatory No. 17**

For each SITE, separately state the amount of YOUR LIABILITY that resulted from sudden and accidental discharges or releases.

Response

Plaintiffs object to this Interrogatory on the grounds that it is premature, vague, ambiguous, and unduly burdensome. Plaintiffs further object to this Interrogatory on the grounds that the determination of "sudden and accidental" discharges or releases is a legal question. Subject to these objections and without waiving their General Objections, Plaintiffs state that the amount of liability that resulted from sudden and accidental "discharges" or "releases" is presently unknown, but is the subject of continuing investigations. Plaintiffs will supplement their Response to this Interrogatory, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

**Interrogatory No. 18**

For each SITE, separately state the amount of YOUR LIABILITY incurred as DEFENSE COSTS and/or DEFENSE EXPENDITURES.

13

**Response**

Subject to and without waiving their General Objections, Plaintiffs state that the amount of liability constituting "defense costs" and/or "defense expenditures" at each Site has yet to be determined, but is the subject of continuing investigations. Plaintiffs will supplement their Response to this Interrogatory, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

**Interrogatory No. 19**

For each SITE, IDENTIFY all PERSONS which may have knowledge of YOUR activities at the SITE.

**Response**

Plaintiffs object to this Interrogatory on the grounds that it is premature, vague, ambiguous, and unduly burdensome. Subject to these objections and without waiving their General Objections, Plaintiffs state that the persons most knowledgeable about Plaintiffs' activities at the Sites would include the present (where applicable) and former managers of the facilities, and the present (where applicable) and former environmental managers for the facilities. Further information regarding these individuals may be found in employment records maintained at the Sites or in central corporate records storage, and will be made available for Defendants' inspection and copying at a mutually agreed upon time and location.

**Interrogatory No. 20**

For each SITE, IDENTIFY all PERSONS which may have knowledge of any and all releases of HAZARDOUS MATERIAL at the SITE.

**Response**

Plaintiffs object to this Interrogatory on the grounds that it is unduly burdensome and vexatious. Subject to these objections and without waiving their General

14

Objections, Plaintiffs state that the persons most knowledgeable about releases of

hazardous materials at the Sites would include the present (where applicable) and former

manages of the facilities, and the present (where applicable) and former environmental

managers for the facilities.  Further information regarding these individuals may be found

in employment records maintained at the Sites or in central corporate records storage, and

will be made available for Defendants' inspection and copying at a mutually agreed upon

time and location.

Dated:  July 1, 2002                                   DICKSTEIN SHAPIRO MORIN
                                                              & OSHINSKY LLP


                                                       _____
                                                       Robin L. Cohen, Esq.
                                                       R. Edward Poole, Esq.
                                                       Kenneth H. Frenchman, Esq.
                                                       DICKSTEIN SHAPIRO MORIN
                                                          & OSHINSKY LLP
                                                       1177 Avenue of the Americas
                                                       New York, NY  10036
                                                       Phone:  (212) 835-1400
                                                       Fax:  (212) 997-9880

                                                       Mark E. Ashburn, Esq.
                                                       Ashburn & Mason, P.C.
                                                       1130 West Sixth Avenue
                                                       Suite 100
                                                       Anchorage, AK  99501
                                                       Phone:  (907) 276-4331
                                                       Fax:  (907) 277-8235


                                                       Attorneys for Plaintiffs Ketchikan Pulp
                                                       Company and Louisiana-Pacific Corporation

Exhibit 1

| Site | Dates of Site Operations | Dates of LP Operations | Past Costs* | Present Reserve† |
|---|---|---|---|---|
| Alexandria, Louisiana | 1923-1991 | 1978-1991 | 400,000 | 0 |
| Alto, GA | 1973-1992 | 1987-1992 | 300,000 | 0 |
| Arcata, CA | 1955-2002 | 1974-2000 | 590,000 | 255,000 |
| Ashland, Wisconsin | 1965-1988 | 1978-1988 | 528,000 | 37,000 |
| Calpella, CA | 1966-1988 | 1986-1988 | 646,649 | 100,000 |
| Caspar Landfill, CA | 1978-2000 | 1978-1992 | 684,000 | 1,400,000 |
| Cavenhan (Urania, Louisiana) | 1951-2000 | 1972-1974 | 6,263,082 | 2,122,000 |
| Chico, CA | 1969-1989 | 1977-1989 | 5,363,165 | 457,000 |
| Cloverdale, CA | 1972-1991 | 1978-1991 | 1,500,000 | 221,000 |
| Covelo, CA | 1953-1992 | 1973-1992 | 472,926 | 0 |
| Crescent Mills, CA | <1974-1986 | 1974-1986 | 315,460 | 0 |
| East Providence, RI | 1988-1995 | 1994-1995 | 544,000 | 0 |
| Elk Creek, CA | 1952-1981 | 1974-1981 | 448,002 | 239,000 |
| Fort Bragg, CA | 1956-2000 | 1972-1998 | 3,045,658 | 1,000,000 |
| Lockhart, Alabama | 1983-1998 | 1983-1998 | 2,600,000 | 150,000 |
| Marianna/Cypress, FL | 1981-2002 | 1981-2002 | 345,000 | 0 |
| Missoula, Montana | 1969-2002 | 1976-2002 | 592,663 | 0 |
| Mohawk, Michigan | 1956-1985 | 1974-1985 | 300,000 | 216,000 |
| New Waverly, Texas | 1972-1998 | 1972-1998 | 500,000 | 578,000 |
| Oroville, CA | 1969-2000 | 1973-2000 | 4,021,081 | 1,447,000 |
| Pendleton, Oregon | 1940-1989 | 1988-1989 | 350,000 | 1,537,000 |
| Philipsburg, Montana | 1962-1985 | 1973-1975 | 400,000 | 14,000 |
| Pilot Rock, OR | 1940-1996 | 1973-1996 | 316,552 | 0 |
| Potter Valley, CA | 1912-1989 | 1972-1989 | 1,224,388 | 180,000 |
| Red Bluff, CA | 1973-1988 | 1974-1990 | 1,181,868 | 1,006,000 |
| Samoa, CA | 1973-2000 | 1973-2000 | 1,977,181 | 600,000 |

* Information provided current for non-Alaska Sites as of December 31, 2001 and for Alaska Sites as of March 31, 2002

† Information provided current for non-Alaska Sites as of December 31, 2001 and for Alaska Sites as of April 30, 2002

M65547 v1 MWKH.H.DOC

| Site | Dates of Site Operations | Dates of LP Operations | Past Costs[*] | Present Reserve[†] |
|---|---|---|---|---|
| Tacoma, WA | 1973-2000 | 1978-2000 | 4,000,000 | 225,000 |
| Ukiah/York Ranch, CA | 1965-2000 | 1972-1998 | 810,301 | 133,000 |
| Walden, Colorado | 1937-1994 | 1983-1994 | 310,000 | 100,000 |
| Waynesboro, Georgia | 1974-1995 | 1984-1995 | 300,000 | 29,000 |
| Annette Island, Alaska | 1972-1999 | 1973-1999 | 3,205,608 | 0 |
| Coffman Cove, Alaska | 1955-2000 | 1973-1997 | 1,287,070 | 48,000[‡] |
| East 12 Mile, Alaska | 1959-2000 | 1973-2000 | <10,000 | 500,000 |
| Fire Cove, Alaska | 1973-1997 | 1972-1997 | 47,530 | 0 |
| Hassler Island, Alaska | 1971-2000 | 1973-2000 | 285,179 | 48,000[*] |
| Klu Bay, Alaska | 1956-1987 | 1973-1987 | 190,119 | 48,000[*] |
| Labouchere Bay, Alaska | 1976-1993 | 1976-1993 | 768,359 | 48,000[*] |
| Margaret Bay, Alaska | 1960-1996 | 1973-1996 | 368,320 | 48,000[*] |
| Naukati, Alaska | 1965-2000 | 1965-2000 | 387,895 | 48,000[*] |
| Polk Inlet, Alaska | 1985-2000 | 1986-2000 | 316,866 | 48,000[*] |
| Salmon Creek, California | 1980s-1996 | 1980s-1996 | <10,000 | 48,000[*] |
| Shelter Island, Alaska | 1995-1996 | 1995-1996 | 81,122 | 48,000[*] |
| Shrimp Bay, Alaska | 1977-2000 | 1977-2000 | 316,866 | 48,000[*] |
| Suemez Island, Alaska | 1960s-2000 | 1973-2000 | 31,687 | 48,000[*] |
| SW Neets Bay, Alaska | 1982-2000 | 1982-2000 | 221,806 | 48,000[*] |
| Thorne Bay, Alaska | 1962-2000 | 1973-2000 | 7,139,176 | 237,000 |
| Ward Cove, Alaska | 1953-1997 | 1973-1997 | 62,122,951 | 3,460,000[*] |
| Whale Pass, Alaska | 1970-1993 | 1973-1993 | 174,276 | 48,000[*] |
| Winter Harbor, Alaska | 1982-2000 | 1982-2000 | 285,179 | 48,000[*] |

2

[†] Represents share of 672,000 unallocated reserve for logging camps and LTFs.

1400547 v1\SF\8R0H11.DOC

Site Attachment
Alaska

## ANNETTE ISLAND, AK

### Response to Interrogatory No. 1

The Annette Island Sawmill Facility is on the western part of Annette Island, located approximately 15 miles southwest of Ketchikan.

### Response to Interrogatories No. 3 and 4

The Annette Island Sawmill Facility is owned by the Metlakatla Indian Community, a sovereign Native American tribe. KPC operated the mill and associated logging areas under a lease with the Metlakatla, which ran from 1979 (when KPC took over operating the mill), through 1999. In 1999, KPC closed the mill and its logging operations, and the facility has not returned to operations during the past three years. Prior to KPC's involvement, the Annette Island mill was operated until the late 1960's by FUJII and Company, Inc. On information and belief, FUJII transferred its interests in the mill and associated operations to Alaska Prince Timber Corporation and Annette Timber Corp.

KPC's operations at Annette Island consisted of an LTF and a sawmill with an onsite wood waste landfill, and the Main Metlakatla Woodwaste Disposal site (on Annette Island, but several miles outside of town and outside KPC's leasehold) that was used to dispose of solid wastes generated by the sawmill.

The Annette sawmill operations were substantially similar to L-P's sawmills in the continental United States. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's Sawmill Facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

The Main Metlakatla Woodwaste Disposal was on MIC property and was set-up and operated with MIC approval. The site was used to dispose of wood waste generated by the mill.

1

Response to Interrogatory No. 5

During its operational period, the Annette Island facility used or generated contaminants commonly found at KPC's sawmills and LTF's, including: gasoline and diesel fuels, lubricating and hydraulic oils, and lead-acid batteries. Fuel and oil were stored on-site in above ground tanks and 55 gallon drums. Remedial investigations established the presence of wood waste and petroleum hydrocarbons.

Response to Interrogatories No. 8, 9, 11 and 12

As both sovereign nation and property lessor, the MIC has taken the position that they have broad authority to require KPC to perform investigation and remediation of the Annette Island site. On this basis, KPC was careful to ensure that MIC orders and directives were followed closely, and sought the MIC's approval of proposed remedial alternatives and oversight of ongoing projects. By working closely with MIC, KPC hoped to (and largely succeeded in) limiting expansion of the remediation options originally selected. KPC's claim at the Annette Island site is based on environmental property damage to soil, groundwater contamination, and surface waters due to contamination by petroleum hydrocarbons, paint waste, and lead-acid batteries (soil) and wood debris sediments (watercourse).

The claimants for the Annette Island Sawmill included the MIC, the Bureau of Indian Affairs, and US EPA.

Closure of the Main Metlakatla Woodwaste Disposal site was completed in 2000. A remedial investigation and cleanup was performed at the sawmill site in 2000 and 2001. Cleanup consisted of closure of a woodwaste landfill at the southeast portion of the sawmill site and excavation and offsite disposal of petroleum contaminated soils. Marine (bottom sediments) conditions were assessed at the log transfer facility and at log storage

2

areas. Cleanup of metal banding at from the intertidal area of the LTF was completed in 2001.

## COFFMAN COVE, AK

### Response to Interrogatory No. 1

The KPC Coffman Cove logging camp site is adjacent to the City of Coffman Cove, on the northeast coast of Prince of Wales Island, approximately 55 miles northwest of Ketchikan, Alaska. The KPC facilities and the city of Coffman Cove are situated on a narrow peninsula of land, with the waters of Coffman Cove present to the west and Kashevarof passage to the east. The bay formed by the peninsula and Coffman Island, located just to the north, is Coffman Cove.

### Response to Interrogatories No. 3 and 4

KPC conducted its logging operations under a long-term timber contract with the USFS, typically on land owned or controlled by the agency within Tongass National Forest. Specific timber sales required operation to be established within various portions of the Revillagigedo and Prince of Wales Islands. The logging operations were conducted within certain localized boundaries, and the logs were transported by truck to a log transfer facility (LTF), which was immediately adjacent to a saltwater body. KPC's long-term timber contract ("LTK") with the USFS was altered unilaterally by the government, with the passage of the Tongass Timber Reform Act ("TTRA").

Because of the lack of infrastructure and their remote location, these logging facilities had to be designed as self-contained working and residential areas with supplies brought in from the outside. Generally, the sites are situated on shot-rock gravel fill overlying bedrock or, in some cases, overlying former tide lands.

The LTFs were large A-frame facilities (250 to 300 feet across) where the logs were unloaded from the trucks and transferred to the water, where they were assembled into rafts suitable for towing to Thorne Bay and, ultimately, Ward Cove. The additional

1

facilities established to support the LTFs generally included power generation, fuel storage and dispensing, maintenance shops for the heavy equipment, logging equipment storage, and offices. The logging camps were associated with the LTFs and provided housing and support services for the personnel in the logging and LTF operations. Some of the larger operations had offices, stores, and even schools and became permanent or semi-permanent communities, while some of the smaller operations had temporary floating housing and support facilities.

The logging camp at Coffman Cove originally was constructed by KPC in the late 1950s or early 1960s and included a shop, equipment yard, fuel storage, administrative offices, housing for LTF and camp personnel, and a school. The land camp and LTF are within the KPC-USFS long-term sale contract's Primary Sale Area, and have been in continued use through all subsequent operating periods and the Tongass Timber Reform Act (TTRA). The school was located at the east edge of the original camp housing area. The water supply was obtained from a stream approximately 0.75 mile uphill from the camp. Later expansion of the camp included construction of additional residences and commercial structures south of the original camp. In the late 1980s, KPC abandoned the lease rights to the school and the housing and commercial areas south of the original camp which were then incorporated into the current city of Coffman Cove.

Response to Interrogatory No. 5

The materials typically used, stored, and handled at the logging camps were those needed to support facility operations and personnel housing, and included gasoline and diesel fuels, lubricating and hydraulic oils, solvents and lead-acid batteries. Used oil was typically shipped to KPC's Ward Cove Pulp Mill and used for power generation or burned on-site for heat generation. Fuel and oil were stored on site at each camp in above

2

ground tanks and 55 gallon drums. Solid wastes from the operations and from the housing (most likely including minor amounts of paint waste, alkaline batteries and household chemicals) were typically sent to disposal centers away from town. Some marine bark deposition generally was associated with the LTFs.

## Response to Interrogatories No. 8, 9, 11 and 12

KPC's claim at the Coffman Cove site is based on environmental property damage to soil, groundwater, and surface waters due to contamination by petroleum hydrocarbons and lead from battery-waste.

The claimants at all of the logging camps and LTFs, including Coffman Cove, were the ADEC, under state CERCLA authority, and the USFS, under federal CERCLA authority.

KPC's cleanup at Coffman Cove primary was conducted as part of the ADEC's Contaminated Sites Program, between 1997-2001. A Cleanup Action Plan with Method Three cleanup levels was substantially approved by ADEC.

Closure of the Main Metlakatla Woodwaste disposal site (an off-site disposal area approved by MIC) was accomplished in 2000. A remedial investigation and cleanup was performed at the sawmill site in 2000 and 2001. Cleanup consisted of closure of a woodwaste landfill at the southeast portion of the sawmill site and excavation and offsite disposal (in KPC's Ward Cove Landfill) of petroleum contaminated soils. Marine (bottom sediments) conditions were assessed at the log transfer facility and at log storage areas. Cleanup of metal banding at from the intertidal area of the LTF was completed in 2001.

The site received a No Further Action letter from ADEC in December 2001.

3

In addition, the USFS-CERCLA action at Coffman Cove focused on the battery dump located in the area of former camp residences. The site received a No Further Action letter from the USFS in June 2002.

35318 /1 RS20'' DOC

## EAST 12 MILE, AK

**Response to Interrogatory No. 1**

The East 12 Mile site is approximately 42 miles northeast of Ketchikan on the eastern side of POW Island, Alaska.

**Response to Interrogatories No. 3 and 4**

KPC used the East 12 Mile LTF several times in the 1990s. Another independent operator has been using the site, post KPC. For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

**Response to Interrogatory No. 5**

During its operational period, the East 12 Mile site used or generated contaminants commonly found at KPC's logging camps and LTFs including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

**Response to Interrogatories No. 8, 9, 11 and 12**

The claim made against KPC was initiated by USFS pursuant to federal-CERCLA authority. Although KPC has been directed by USFS to investigate conditions at the East 12 Mile site, to date site characterization and remediation activities have not been completed.

## FIRE COVE, AK

**Response to Interrogatory No. 1**

The Fire Cove camp is located on USFS property at Neets Bay, Revillagigedo Island, approximately 30 air miles north of Ketchikan, Alaska.

**Response to Interrogatories No. 3 and 4**

The Fire Cove LTF was constructed in 1976 and was used by KPC about four times since construction. The Fire Cove remote camp logging facility also was operated by Phoenix Logging of Ketchikan for about 2 years. Prior to that, the camp was operated by Gildersleeve Logging and Sullivan Logging. In January 1997, Phoenix demobilized the camp and relocated to Prince of Wales Island for other operations.

A-Frames were used on the LTF and were moved in and taken out as part of each logging operation. In addition, there is a former fuel storage -area at the LTF near tidewater. Personnel and other support facilities were located on float camps and upland camps.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

**Response to Interrogatory No. 5**

During its operational period, the Fire Cove site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

1

Response to Interrogatories No. 8, 9, 11 and 12

        The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority.  The USFS was also a claimant.

        KPC and KPC contractors performed characterization and cleanup activities at this site in 1997 and 1998.  USFS undertook a removal action of a former KPC metal pit/solid waste dump in 1999 and allegedly spent in excess of $300,000.  It has taken the position that KPC is liable for its cost.  Additional information concerning the general discussion of the claimants involved and the basis of KPC's claim for environmental damage at KPC's logging camps and LTFs are contained in the Response to Interrogatory Nos. 8, 9, 11, and 12 for Coffman Cove, AK.

35318.1 RS261.DOC

# HASSLER ISLAND, AK

### Response to Interrogatory No. 1

The former Hassler Island camp and LTF site is located on a relatively small island at the north end of Revillagigedo Island approximately 35 miles north of Ketchikan, Alaska.

### Response to Interrogatories No. 3 and 4

KPC first used the Hassler Island site around 1976 to 1977 to water logs for a 120 acre unit located southwest of the LTF. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Hassler Island site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Hassler Island site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

Remedial investigation and cleanup were performed on the uplands only (2000-2001). Cleanup included excavation of petroleum contaminated soils, some of which were

1

removed to the Ward Cove landfills and some of which were screened, stockpiled and later spread on the surface of the site, having met the cleanup standard established for the site by the State.

35319 v1: R92011.DOC

# KLU BAY, AK

## Response to Interrogatory No. 1

The former Klu Bay camp and LTF site is at an inlet of the same name, located on the northwest side of Revilla Island, Alaska.

## Response to Interrogatories No. 3 and 4

KPC was the only contractor to have used the Klu Bay LTF, and its first use began approximately in 1956. The site was used again around 1987 to harvest timber.

## Response to Interrogatory No. 5

During its operational period, the Klu Bay site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Klu Bay site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

Remedial investigation and cleanup were performed on the uplands only (1998-2001). Cleanup included excavation of petroleum contaminated soils which were screened, stockpiled and later spread on the surface of the site, the resulting petroleum levels having met the cleanup standard established for the site by the State.

1

## LABOUCHERE BAY, AK

### Response to Interrogatory No. 1

The site of the former Labouchere Bay logging camp and LTF ("Lab Bay") is on the far north part of Prince of Wales island, approximately 90 miles northwest of Ketchikan, in southeast Alaska.

### Response to Interrogatories No. 3 and 4

The Lab Bay LTF and logging camp were constructed in 1976 and were used continuously through all subsequent operating periods and post-TTRA closed in 1993. The LTF consisted of a bulkhead and double A-Frame log watering machine.

The logging camp consisted of employee housing, shop and repair facilities, fuel storage and other support buildings. The site also included a school under special use permit to the Southeast Island School District. All of the camp and LTF equipment and facilities have been removed from the site. For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Lab Bay site used or generated contaminants commonly found at KPC's logging camps and LTF's, including: petroleum and wood waste.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

1

## Response to Interrogatories No. 8, 9, 11 and 12

KPC's claim at the Lab Bay site is based on environmental property damage to soil, surface waters, and groundwater due to contamination by petroleum hydrocarbons and wood waste.

The claim made against KPC was initiated by ADEC pursuant to state CERCLA authority. The USFS was also a claimant.

Cleanup included excavation of petroleum contaminated soils, which were screened, stockpiled and later spread on the surface of the site having met the cleanup standard established for the site by the State. The nearby dump was closed under State regulatory authority by KPC in 1994. There was also a scrap metal disposal pit about three miles south of the site that was closed under State regulatory authority in 1992.

Additional information concerning the general discussion of the claimants involved and the basis of KPC's claim for environmental damage at KPC's logging camps and LTFs are contained in the Response to Interrogatory Nos. 8, 9, 11, and 12 for Coffman Cove, AK.

# MARGARET BAY, AK

### Response to Interrogatory No. 1

The former Margaret Bay logging camp and LTF site is located in Margaret Bay, which is in Traitor's Cove on the western side of Revilla Island, Alaska.

### Response to Interrogatories No. 3 and 4

The LTF at Margaret Bay was constructed in approximately 1960 and was used approximately four times since construction, most recently by KPC in the mid-1990's. There was no land camp for personnel, but shop and fuel storage facilities were located next to the LTF.

The Margaret Bay LTF has been used post-KPC by an independent timber purchaser to remove timber from his sale. For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Margaret Bay site used or generated contaminants commonly found at KPC's LTFs, including: petroleum hydrocarbons and wood waste.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS is also a claimant.

1

KPC's claim at the Margaret Bay site is based on environmental property damage to soil, groundwater, and surface waters due to contamination by petroleum hydrocarbons.

Remedial investigation and cleanup involving the excavation and removal of petroleum-contaminated soil were performed in 1998-2001.

## NAUKATI, AK

### Response to Interrogatory No. 1

The former Naukati logging camp and LTF site is located on the western side of Prince of Wales Island.

### Response to Interrogatories No. 3 and 4

The Naukati camp and LTF were built in 1960s and were in use during subsequent operating periods and post-TTRA specified offerings until closure. The land camp consisted of employee housing trailers, fuel storage, and shop and other work facilities located on USFS lands.

For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Naukati site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Naukati site is based on environmental property damage to soil, groundwater, and surface waters due to contamination by petroleum hydrocarbons.

1

Remedial investigation and cleanup involving the excavation and removal of petroleum-contaminated soil were performed in 1998-2001. The nearby dump was closed by KPC under ADEC regulatory authority in 1994.

2

## POLK INLET, AK

### Response to Interrogatory No. 1

Polk Inlet site is located in Polk Inlet, which is part of Skowl Arm on the eastern side of POW Island, Alaska.

### Response to Interrogatories No. 3 and 4

The Polk Inlet LTF was constructed by the USFS, using appropriated capital investment funds, to support the independent timber sale program.

KPC was provided timber Offerings in the Polk area during a time when sufficient volume could not be made available from the Primary Sale Area.

The LTF site has included A-frame loading machines, maintenance shop and buildings, and fuel storage. Personnel quarters were mostly float camps, but there has been at least one small upland camp at the site. For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Polk Inlet site used or generated contaminants commonly found at KPC's log camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

1

Remedial investigation and cleanup were performed on the uplands only (2000-2001). Cleanup included excavation of petroleum contaminated soils, which were screened, stockpiled and later spread on the surface of the site, having met the cleanup standard established for the site by the State. Additional information concerning the general discussion of the claimants involved and the basis of KPC's claim for environmental damage at KPC's logging camps and LTFs are contained in the Response to Interrogatory Nos. 8, 9, 11, and 12 for Coffman Cove, AK.

## SALMON CREEK, AK

### Response to Interrogatory No. 1

Salmon Creek. We were not sure where this location is or why it's on the list. As you can imagine there are many creeks in Alaska with this name. We speculated that it may an area on the northeastern side of POW or northern side of POW (where there are creeks with this name in the area of historical logging operations).

The Salmon Creek facility is located approximately 4 miles south of Fields Landing, CA and approximately 0.5 miles east of Thompkins Hill Road along the northern bank of Salmon Creek (Sec 9, T3N, R1W, HBM).

### Response to Interrogatories No. 3 and 4

Salmon Creek is a timberlands property where logging and truck shop maintenance operations occurred.

### Response to Interrogatory No. 5

Information responsive to this Interrogatory is the subject of continuing investigations. Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

### Response to Interrogatories No. 8, 9, 11 and 12

Site characterization and remediation activities have not been completed. General contamination similar to the other logging camps is suspected.

During its investigation of Salmon Creek prior to the site's sale in 1996, L-P discovered 2 underground storage tanks and subsequently notified the California authorities. In response to L-P's notification, the Humboldt County Department of Environmental Health and the Regional Water Quality Control Board directed L-P to excavate the UST's, identify and dispose of any contaminated soil, and conduct a

1

groundwater assessment involving the installation of wells on adjacent properties not owned by L-P.

## SHELTER COVE, AK

### Response to Interrogatory No. 1

The former Shelter Cove LTF and camp site is located on the western side of Carroll Inlet, on the southwest side of Revilla Island, Alaska.

### Response to Interrogatories No. 3 and 4

Shelter Cove LTF was constructed by KPC in 1995 and operated as a logging camp and log transfer facility for the 1995 and 1996 seasons. Shelter Cove was built to use for independent sales that were converted to KPC Offerings when sufficient timber was not available from the Primary Sale Area.

### Response to Interrogatory No. 5

During its operational period, the Shelter Cove site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Shelter Cove site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

This site was occupied by KPC briefly (2-3 years) in the mid-1990s. There was some characterization at the site and the conclusion was that there were no cleanup issues at the site.

1

## SHRIMP BAY, AK

**Response to Interrogatory No. 1**

The former Shrimp Bay LTF site is located on the northern end of Revillagigedo Island, approximately 35 miles northeast of Ketchikan, Alaska.

**Response to Interrogatories No. 3 and 4**

Ketchikan Pulp Company was the only contractor to have used the Shrimp Bay LTF. This LTF dates back to the late 1970s. The LTF was initially used off and on from 1977 to 1990 to water logs. The site was reconstructed and used again in 1998 through 1999 for Offer 31. Fuel was stored onsite in fully contained tanks. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

**Response to Interrogatory No. 5**

During its operational period, the Shrimp Bay site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

**Response to Interrogatories No. 8, 9, 11 and 12**

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Shrimp Bay site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

1

Remedial investigation and cleanup were performed on the uplands only (2000-2001). Cleanup included excavation of petroleum contaminated soils, which were screened, stockpiled and later spread on the surface of the site, having met the cleanup. In addition, benzene and tetrachloroethylene contaminated soil was removed to the Ward Cove industrial landfill operated by KPC.

2

SUEMEZ ISLAND, AK

## Response to Interrogatory No. 1

The former Suemez Island camp and LTF site is located on a relatively small island to the west of Prince of Wales island, approximately 60 miles northwest of Ketchikan, Alaska.

## Response to Interrogatories No. 3 and 4

The Suemez Island LTF was constructed in the 1960s through an independent timber sale. Several independent sales have used the LTF through the years. For additional information responsive to this Interrogatory, **see** the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

## Response to Interrogatory No. 5

During its operational period, the Suemez Island site used or generated contaminants commonly found at KPC's logging camps and LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, **see** the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Suemez Island site is based on environmental property damage to soil, groundwater and surface water due to contamination by petroleum hydrocarbons.

1

A small hydraulic oil spill was cleaned up under the State Voluntary Cleanup Program with no-further-action approval from the State in 2000.

2

## SW NEETS BAY, AK

### Response to Interrogatory No. 1

The former SW Neets Bay LTF site is located on Revillagigedo Island, approximately 30 miles northeast of Ketchikan, Alaska.

### Response to Interrogatories No. 3 and 4

This LTF was constructed in 1982, and was used several times since then, most recently in 2000 by a KPC contractor. Fuel is stored near the LTF in fully contained tanks, and there is no logging camp associated with this facility. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the SW Neets Bay site used or generated contaminants commonly found at KPC's LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS is also a claimant.

KPC's claim at the SW Neets Bay site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

1

Remedial investigation and cleanup were performed on the uplands only (2000-2001). Cleanup included excavation of petroleum contaminated soils, which were screened, stockpiled and later spread on the surface of the site, having met the cleanup standard established for the site by the State.

2

## THORNE BAY, AK

### Response to Interrogatory No. 1

The Thorne Bay logging camp and sort yard sites are located near the city of Thorne Bay, which is on the east side of Prince of Wales Island, just north of the Kasaan Peninsula along Clarence Strait and approximately 40 miles northwest of Ketchikan. The Thorne Bay Landfill Site consists of three (3) separate but interconnected landfills located along the south side of Forest Service Road #30 approximately 1.5 miles west of Thorne Bay City.

### Response to Interrogatories No. 3 and 4

The Thorne Bay logging camp was originally constructed as a temporary floating facility in 1960 and was expanded onto adjacent upland property to form a permanent camp. By 1962, there were three main areas: the main camp which included residential, commercial, and administrative structures, the maintenance shop, and a log transfer area.

The Thorne Bay logging camp consisted of facilities necessary to support the logging operations themselves, and additional facilities providing housing and other support services for personnel in the Thorne Bay logging and LTF operations.

The maintenance facilities at the Thorne Bay site provided support for the equipment, machinery, and vehicles used in the logging and LTF/sort yard operations, including maintenance, fuel storage, and equipment/supply storage areas.

The sort yard at Thorne Bay was essentially a large, central LTF, which was used as an administrative and practical hub connecting KPC's other logging camps and LTFs with the Ward Cove pulp mill operations for which they provided the necessary raw materials. In addition to the functions common to all LTFs performed at the sort yard, namely the transfer of logs to and from land to water and assembly of log rafts to be

1

transported to Ward Cove, the Thorne Bay sort yard coordinated the accounting of timber from all of the remote camps and LTFs that was transferred through the Thorne Bay facility.  For additional information responsive to this Interrogatory, see the general discussion of KPC's logging camp and LTF operations contained in the Response to Interrogatory No. 3 for Coffman Cove, AK.

In support of its operations, the Thorne Bay facility developed three interconnected landfills in the mid-1960s.  Landfill No. 1 was primarily used to dispose of wood waste, Landfill No. 2 was primarily used to dispose of commercial, municipal, and industrial waste, and Landfill No. 3 was for the disposal of putrescible waste, primarily food.

On August 2, 1982, the City of Thorne Bay was incorporated.  The City continued to dump waste with camp debris until approximately 1984.  In 1984, the City assumed operation of Landfill #3 (Putrescible Landfill) and began routine collection of municipal waste.

With the agreement of the USFS, KPC abandoned most of the land at the main camp in 1982 so that these areas could be incorporated into the City of Thorne Bay.  Ownership of the structures on this now un-encumbered land was also transferred, in some cases to the City and in others to private individuals:  structures and equipment at the generator building (City of Thorne Bay), saw shop (Durette Construction), service station (Taquan Air), bulk fuel storage (Petro Alaska), and barge dock (Boyer Barge).

Response to Interrogatory No. 5

During its operational period, the Thorne Bay site used or generated contaminants commonly found at KPC's LTFs, including:  petroleum hydrocarbons, solvents, lead-acid batteries, and solid wastes generated by the residential facilities of the

2

logging camps. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

Additionally, remedial investigations have determined that contaminants are present in Landfill Nos. 1 and 2. PCB-laden transformers and arsenic containing waste were alleged to have been disposed of in one or more of the Thorne Bay Landfills. One or more of the landfills contain wastes which could include waste oil, waste fuel, solvent, paint, thinner, and batteries. Large volumes of bulky wastes (tires, scrap metal, and wood) were also found at the site.

## Response to Interrogatories No. 8, 9, 11 and 12

KPC's claim at the Thorne Bay logging camp and sort yard is based on environmental property damage to soil and surface water due to contamination by petroleum hydrocarbons.

The claim made against KPC was initiated by USFS and ADEC pursuant to CERCLA.

The areas of primary concern at Thorne Bay -- and the conditions drawing the greatest governmental attention -- are the three former landfill sites. KPC's claims at the Thorne Bay landfills are based on environmental property damage to soil, surface water, and groundwater due to contamination by landfill leachate, petroleum hydrocarbons, and other wastes deposited in the landfills.

The claim made against KPC was initiated by USFS and the State of Alaska pursuant to CERCLA.

Additional information concerning the administrative actions against KPC are detailed below.

3

In approximately 1988, the State of Alaska listed the Thorne Bay landfills site on the Superfund Review List. USFS initiated the CERCLA evaluation process in 1993.

On August 22, 1995, the USFS issued CERCLA § 104 Requests for Information to KPC regarding the Thorne Bay Landfills.

On March 3, 1997, the USFS, KPC, and L-P executed an Administrative Order on Consent which required KPC to undertake a time critical removal action at the landfill.

4

## WARD COVE, AK

### Response to Interrogatory No. 1

The former KPC Pulpmill site is located on the north shoreline and part of the south shoreline of Ward Cove, an estuary located on the north side of Tongass Narrows approximately 5 miles (8 km) north of Ketchikan, Alaska, a town approximately 235 miles south of Juneau.

### Response to Interrogatories No. 3 and 4

KPC operated the Ward Cove pulp mill from its construction in 1954 until pulping operations were terminated in March of 1997. Demolition of pulp mill improvements and landfill closure operations began at shut down and were virtually completed in April 2000, with final closeout of the last cell of the landfill occurring in 2001. Surface water drainage and leachate treatment improvements were completed throughout the landfill in June of 1998. In November 1999, KPC sold the sawmill and remaining Ward Cove assets to a new company, Gateway Forest Products, which has since gone out of business.

The Ward Cove facility was at the center of KPC's network of timber-related operations within Alaska. During its primary operating period, KPC's businesses included the Ward Cove chemical pulp mill, several sawmills, and numerous timber harvesting operations. KPC's logging activities spanned numerous locations in southeast Alaska, including Revillagigedo Island, Prince of Wales Island, and other smaller islands in their vicinity, including Annette Island.

The pulp mill at Ward Cove was a large and complex industrial chemical-processing facility, with all of the associated functions typically found at such sites, including chemical, fuels, and wood storage facilities, wood fiber handling systems,

1

maintenance shops to service vehicles and equipment, a solid waste landfill, a wastewater treatment plant, and boilers that provided the double benefits of energy generation that helped meet the facilities' power needs, and disposal of the wood wastes used to fire the boilers.

The basic outline of the pulp mill's operations remained largely the same throughout Ward Cove's operating history. Timber to supply the pulp mill would arrive in large log rafts and be directed into the cove and up to the mill's staging area, where logs would be transferred from the water to the land. Next, bark would be removed from the logs, and then the logs would be chipped. Once the logs were reduced to wood chips, the raw materials entered the pulp mill to begin the various steps in the chemical process involved in converting the chips into pulp. The Ward Cove facility produced a high-grade wood pulp, which KPC sold to numerous manufacturers for use in the production of diverse commercial products ranging from photographic papers to ice cream.

The pulp mill's capacity was approximately 1,200,000 pounds per day of pulp, which correlates to approximately 2,400,000 pounds per day of logs consumed. The chemical pulping process also required a significant amount of chlorine, acids, and other chemicals and consumed enormous quantities of energy and water. These operations generated large quantities of solid wastes, including ash produced by the wood-fired boilers and up to 35,000 pounds daily of pulp sludge and other solids suspended in the mill's waste water effluent.

KPC's logging operations in southeast Alaska were designed primarily to supply the Ward Cove pulp mill as well as several KPC sawmills. The operations were almost solely in the Tongass National Forest on land administered by the U.S. Forest Service ("USFS"). Timber was cut from typically remote locations covered by KPC's long-term

2

timber contracts, necessitating the creation of temporary but self-sustaining logging camps. After collection, timber would be transferred from the land to the water at log transfer facilities ("LTFs") and assembled into large log rafts. These rafts were then transported by water to Thorne Bay before continuing on to Ward Cove or Annette Island, while the Thorne Bay facility acted as the administrative and geographical conduit between the remote camps and the Ward Cove operations.

### Response to Interrogatory No. 5

The operations at the Ward Cove pulp mill necessitated the use, handling, storage, generation, and, in some instances, disposal of various hazardous materials. The primary contaminants found at the pulp mill included:

♦ asbestos-containing building materials ("ACBMs"), primarily insulation;

♦ chlorine, acid, and other chemicals used in the pulping process;

♦ contaminants associated with the maintenance and use of vehicles, equipment and machinery, including gasoline and diesel fuels, hydraulic oils and paint;

♦ arsenic contained in rock used as fill;

♦ polychlorinated biphenyls (PCBs);

♦ solid wastes generated as by-products of the pulping process, including dioxin found in pulping liquor residue, solids recovered by wastewater treatment, and ash generated by the boilers; and

♦ sediments deposited in Ward Cove, including pulp sludge from the mill's wastewater effluent, and bark from the logs rafted into the mill.

Additional information responsive to this Interrogatory is contained in the discussion of the claims, investigation, and remediation associated with the Ward Cove site in Plaintiffs' Response to Interrogatory Nos. 8, 9, 11, and 12, *infra*.

3

Response to Interrogatories No. 8, 9, 11 and 12

The environmental impacts within and surrounding the Ward Cove pulp mill site comprised two related areas of concern:  (1) contamination of surface water and the accumulation of contaminated solid wastes deposited as sediments in the Ward Cove watercourse (the "Marine Operable Unit"); and, (2) contamination of soil, groundwater, surface water runoff, and improvements at or adjacent to the former pulp mill site (the "Uplands Unit").

### Marine Operable Unit

The claim made against KPC with respect to the Ward Cove Marine Operable Unit was initiated by the USEPA and the Alaska Department of Environmental Conservation ("ADEC"), pursuant to the Clean Water Act and CERCLA.  KPC's liability at the Marine Operable Unit is based on environmental property damage to surface water and damage to natural resources, due to contamination by dioxin, pulp sludge decomposition products, and heavy metals found in pulp mill sludge and surface water run-off.  Additional information concerning the administrative actions against KPC related to the Marine Operable Unit are detailed below.

In September 1995, KPC entered into a Consent Decree ("Consent Decree I") with the USEPA that addressed environmental conditions at the Marine Operable Unit. The remediation work involved cleanup of pulp mill sludge deposited in Ward Cove, which was contaminated with dioxin, heavy metals, and pulp sludge degradation constituents including sulfides, ammonia, and 4-methyl phenol.  On this basis, natural resources – particularly fish – allegedly were damaged or threatened by this contamination.

4

## Uplands Unit

The claim made against KPC with respect to the Ward Cove Uplands Unit was initiated by the USEPA and the ADEC pursuant to CERCLA. KPC's liability at the Uplands Unit is based on environmental property damage to soil due to contamination by petroleum hydrocarbons, arsenic, ash, wood waste, paint waste, PCbs, dioxin, and organic compounds associated with wood waste decomposition. Additional information concerning the administrative actions against L-P are detailed below.

In June 1997, KPC, L-P, the USEPA, and the ADEC entered into an "Administrative Order on Consent for Response Actions" ("Consent Decree II") that incorporated Consent Decree I and ordered a remedial investigation and feasibility study ("RI/FS") for the Uplands Unit, which was completed in late 1999.

The remediation work at the Uplands Unit addressed ACBMs, petroleum hydrocarbons, PCBs, dioxin, arsenic, hazardous waste removal, and the disposal of large quantities of wood fuel. KPC also was directed to close and remediate the onsite landfill to address ash, wood waste and industrial waste contaminating the soil, and runoff and leachate from the landfill that was contaminating surface waters..

## WHALE PASS, AK

### Response to Interrogatory No. 1

The former Whale Pass LTF site is located within the KPC Long-term Primary Sale Area on Prince of Wales Island, approximately 70 miles northwest of Ketchikan, Alaska.

### Response to Interrogatories No. 3 and 4

The Whale Pass LTF was constructed in approximately 1976 and has had intermittent use through the subsequent operating periods and the TTRA Offerings. The facility has not been actively used as a log transfer site since 1993.

The site supported a log transfer machine, a light duty maintenance shop, and bulk fuel storage. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatory No. 5

During its operational period, the Whale Pass site used or generated contaminants commonly found at KPC's LTFs, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS is also a claimant.

KPC's claim at the Whale Pass site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

1

Remedial investigation and cleanup were performed on the uplands only (1997-1998). Cleanup included excavation of petroleum contaminated soils, which were screened, stockpiled and later spread on the surface of the site, having met the cleanup standard established for the site by the State. A small amount of petroleum contaminated soil was removed from the site and disposed of in an approved landfill in the State of Washington.

2

<u>WINTER HARBOR, AK</u>

<u>Response to Interrogatory No. 1</u>

The Winter Harbor LTF is located on the west side of Prince of Wales Island, approximately 65 miles northwest of Ketchikan.

<u>Response to Interrogatories No. 3 and 4</u>

This LTF was constructed in the early 1980s and has been used off and on during subsequent Operating Periods and TTRA Offerings. The Winter Harbor LTF has also been used by purchasers of independent timber sales from outside the Primary Sale Area.

The Winter Harbor camp consisted of a floating housing area and shop and repair facilities, fuel storage and other support buildings.

For additional information responsive to this Interrogatory, <u>see</u> the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

<u>Response to Interrogatory No. 5</u>

During its operational period, the Winter Harbor site used or generated contaminants commonly found at KPC's LTF, including: petroleum hydrocarbons and wood waste. For additional information responsive to this Interrogatory, <u>see</u> the general discussion of the contaminants found at KPC's logging camps and LTFs contained in the Response to Interrogatory No. 5 for Coffman Cove, AK.

<u>Response to Interrogatories No. 8, 9, 11 and 12</u>

The claim made against KPC was initiated by ADEC pursuant to state-CERCLA authority. The USFS was also a claimant.

KPC's claim at the Winter Harbor site is based on environmental property damage to soil, groundwater, and surface water due to contamination by petroleum hydrocarbons.

Remedial investigation and cleanup were performed on the uplands only (1998-1999). Cleanup included excavation of petroleum contaminated soils which were screened, stockpiled and left at the site, having met the cleanup standard established for the site by the State.

Site Attachment
Non-Alaska

## ALEXANDRIA, LA

### Response to Interrogatory No. 1

This site is located at 1028 Fenner Street approximately one mile south of downtown Alexandria, Rapides Parish, Louisiana.

### Response to Interrogatories No. 3 and 4

Portions of the existing facility at Alexandria were developed by the Roy O. Martin Lumber Company ("Martin Lumber") in 1923. Prior of 1923, three small lumber mills were located at the site. Martin Lumber operated the facility from 1923 until it was sold to L-P in 1978. L-P operated the mill from 1978 until its closure in 1991.

Sawmills such as L-P's Alexandria facility produce lumber from cut timber. Logs are brought to the facility and stored on log decks (historically logs may have been stored in log ponds). Logs are fed into the sawmill and rough cut into various dimensions of lumber (2x4, 2x6, 4x4 etc.). At some of L-P's sawmills, a planer mill further processes the rough cut lumber to a finish dimension. Ancillary facilities located at the majority of sawmills include:

- ♦ Boilers – which use reject wood and waste fiber to produce steam and electricity.

- ♦ Dry Kilns – which are used for drying lumber using steam or natural gas.

- ♦ Maintenance Shops – which are used for maintaining rolling stock (forklifts etc.) and other equipment.

- ♦ Fuel Storage Area – which service rolling stock and equipment.

- ♦ Woodwaste Landfills – such disposal areas are primarily associated with sawmills that do not have paved logyards. Bark, wood etc. that accumulates on the logyard are collected and disposed of at either an on-site or off-site landfill. Generally the material that is disposed of includes bark, other wood material, rock and dirt.

1

## Response to Interrogatory No. 5

A site assessment subsequent to the closure of the Alexandria sawmill revealed evidence of petroleum contamination in proximity to the facility's maintenance shop, the presence of possible asbestos-containing materials, and three out-of-service transformers contaminated with PCBs.

In general, the same contaminants are found at each of L-P's sawmills. Although not necessarily present at every sawmill, the typical contaminants include:

- Hydrocarbons associated with fuel storage areas and incidental spills from equipment and rolling stock.

- Pentachlorophenol ("PCP"), formally used as an anti-stain compound to prevent molds from developing on lumber.

- Dioxin, associated with technical grade PCP.

- Woodwaste from bark and other residuals that fall off logs that are stored in the logyard. Also includes reject product, shaving, chips and sawdust.

- Ash from the boiler.

- Solvents used for parts and equipment cleaning.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Alexandria site is based on environmental property damage to soil due to contamination by petroleum hydrocarbons. Additionally, L-P incurred liability for asbestos abatement required by federal law, and in response to EPA-mandated investigations and disclosures regarding PCBs associated with discarded transformers.

2

## ALTO, GA

### Response to Interrogatory No. 1

The former L-P sawmill at Alto was located at Old Cornelia Highway and Yonah Road, Alto, Georgia  30510.

### Response to Interrogatories No. 3 and 4

The Alto sawmill was constructed in 1973, and the previous owners were Blacklock Lumber Co. and Georgia Chip Wood.  L-P acquired the facility in 1987, but never operated it.  L-P sold the Alto sawmill in 1992.

For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

### Response to Interrogatory No. 5

During its operational period, the Alto sawmill used or generated contaminants commonly found at L-P's sawmills, including hydrocarbons and PCP.  For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

### Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Alto site is based on environmental property damage to soil due to contamination by PCP and hydrocarbons.  Information responsive to this Interrogatory is the subject of continuing investigations.  Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

1

## ARCATA, CA

### Response to Interrogatory No. 1

The Arcata Particleboard Plant is located within the city limits of Arcata, California, in portions of Sections 16 and 21, Township 06 North, Range 01 East, Humboldt Base and Meridian.

### Response to Interrogatories No. 3 and 4

The Arcata manufacturing facility was constructed in 1957 by Roddis Plywood. Weyerhaeuser acquired the site from Roddis in 1962 and Sierra Pacific Industries purchased it in 1965. L-P purchased the site from Sierra Pacific in 1974, and the plant remains active in the manufacture of particleboard. L-P has entered into a purchase and sale agreement to sell the site, which is scheduled to close on July 1, 2002.

The L-P particleboard facility is located adjacent to the former Simpson Lumber Company ("Simpson") log pond with the North Fork of Janes Creek passing through the facility as it travels along West End Road. Until the early-1940s, the West End Road area was largely a low-lying agricultural area with limited forest product activities. Beginning in the mid-1940s and continuing through the early-1960s, this area experienced a dramatic expansion of forest product activities. During that period much of the land along West End Road was filled to facilitate the construction of at least four lumber mills, a plywood plant operated by Simpson, and the Roddis particleboard plant, which was constructed in 1957 and purchased by L-P in 1974. Three separate log ponds were also constructed along West End Road during this time – the former Simpson pond, the Dolly Varden pond located immediately to the south of the Simpson pond, and the Alder Grove pond located immediately to the north of the Simpson pond.

1

By the late-1970s, the forest product activities in the West End Road area had diminished to the point where most of the facilities constructed during the 1940s -- 1960s expansion period were closed.  By 1980, the three log ponds were no longer in use and by the mid-1980s those ponds had largely disappeared as they were drained and vegetation naturally overtook the areas.  In the case of the Alder Grove pond, a portion of the area was filled to allow buildings to be constructed where the pond was formerly located.  The only remaining ponded areas are a small portion of the Alder Grove pond that was restored as a wetland mitigation project and the South pond area of the former Simpson pond, which was not drained in the 1980s but has, in large part, become overgrown with vegetation over the last 20 years.

Today, there are only two significant forest product facilities remaining in the West End Road area – the L-P particleboard facility and the Britt Lumber sawmill located immediately to the north of the L-P facility.  In conjunction with its sawmill, Britt Lumber also operates a log deck in an area immediately to the east of the former Simpson pond.

The Arcata plant is used in the manufacture of wood-based building products out of various types of wood scrap.  The processes that are employed at all L-P's manufacturing facilities share the same general outline:  glues and resins are used to bind sawdust, chips, and other wood scrap into board, which is then fashioned into various building products such as plywood, particleboard, hardboard, and OSB siding.  Raw materials (sawdust, chips, logs, etc.), frequently produced as by-products of milling operations, are delivered and stored onsite until incorporated into the process.

Ancillary facilities located at the majority of L-P's manufacturing plants include:

♦    Boilers – where reject wood and waste fiber are burned to
     produce steam and electricity used at the facility.

2

&#9830;    Maintenance Shops – used to maintain rolling stock (forklifts, etc.) and other equipment.

&#9830;    Fuel Storage Area – for rolling stock and equipment.

&#9830;    Resin and glue storage areas.

## Response to Interrogatory No. 5

The contaminants typically found at L-P's manufacturing plants such as Arcata include:

&#9830;    Hydrocarbons associated with fuel storage areas and incidental spills from equipment and rolling stock.

&#9830;    Woodwaste from bark and other residuals that fall off logs that are stored in the logyard. Also includes reject product, shaving, chips and sawdust.

&#9830;    Ash from the boiler.

&#9830;    Solvents used for parts and equipment cleaning.

## Response to Interrogatories No. 8, 9, 11 and 12

Pursuant to directives from California Department of Fish and Game ("DFG") and the California Regional Water Quality Control Board ("RWQCB"), L-P entered into a stipulated order which specifies the required environmental remediation at the site. Under the order and supplemental directives from the RWQCB, L-P has been required to investigate potential contamination of the former log pond, four offsite ponds, groundwater in the vicinity of the former log pond, and surface water (Janes Creek).

Site characterization was completed in August 2001.

## ASHLAND, WI

### Response to Interrogatory No. 1

The Ashland site property, located at 2200 Front Street in Ashland, Wisconsin, covers approximately 57 acres between Lake Shore Drive to the north, 6th Street to the south, 24th Avenue to the east, and 22nd Avenue to the West

### Response to Interrogatories No. 3 and 4

The Ashland site was first developed for residential housing in the late 1800's. The only remaining structure from this time is a school house that was built prior to 1946. The Board of Education of the City of Ashland purchased the site in June 1965. On September 27, 1965, the Beloit Hibob Corporation ("Beloit") obtained the site from the City of Ashland. While residing on the site, Beloit manufactured wood handling equipment. Beloit remained at the site until May 1, 1973, when the site was purchased by Continental Forest Products Company. L-P leased the property from approximately 1978 to 1988 when it operated its former stud mill. The former mill was erected in 1978 and was used in the production of 2x4 studs, agricultural poles, and wood blocks. The site is currently occupied by an active wood drying and processing facility for recycled materials (Superior Water- Logged Lumber Company) owned by Enviro-Recovery Inc. which purchased the property from the City of Ashland. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

A deep ravine (50 ft. – 60 ft.) runs through the property to the north and south. A small creek runs along the base of the ravine. The outer edges of the property are primarily trees and vegetation. A paved log yard, approximately four acres, lies to the south of the sawmill. Railroad tracks used for lumber and chip transport, are located to the south

and southeast of the sawmill. The concrete pad located south of the sawmill and north of the loading ramp was where the cut lumber was treated. Six UST's, four removed and two abandoned, are registered at the site. Three of the UST's contained diesel fuel, one contained gasoline, and the contents of the remaining two are unknown. The three diesel fuel UST's and one gasoline UST were removed in December 1989.

During a portion of the time L-P occupied the Ashland site, it used CCA to treat its wood products. Generally, at L-P's wood treating plants, which often are located at sawmill facilities, lumber is treated in pressure cylinders. Lumber, poles, and other wood products are loaded into pressured cylinders where they are impregnated with solutions of creosote, PCP or chromated copper arsenate ("CCA"). After treatment, the wood products are transported to a dripping area where excess solution is allowed to drip and be collected. At some treating plants, the drippage is collected on an engineered drip pad. Historically, solutions of creosote and PCP were stored and treated in both lined and unlined ponds. More recently, closed loop systems are used.

## Response to Interrogatory No. 5

During its operations as a wood treating facility, the Ashland mill used or generated several contaminants commonly found at such operations including CCA. Generally, the typical contaminants found at L-P's wood treating facilities include:

- Creosote and other byproducts.

- Copper.

- Chromium.

- Arsenic.

- PCP and other phenols.

2

Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the Wisconsin Department of Natural Resources pursuant to state environmental laws.

L-P's liability at the Ashland site is based on environmental property damage to soil and groundwater due to contamination by CCA.

## CALPELLA, CA

### Response to Interrogatory No. 1

The former Calpella Sawmill site is located at 6500 Durable Mill Road, Calpella, CA 95418.

### Response to Interrogatories No. 3 and 4

The Calpella site consists of a sawmill and an associated wood treating plant. The original owner of the Calpella site was Al Thrasher Lumber Co., which was purchased by Masonite in 1971. L-P purchased the Site from TRC, a wholly-owned subsidiary of Masonite, in 1986 and sold it to Mendocino Forest Products in 1997.

The Calpella Sawmill operated continuously from 1966 until 1988, when it was shut down by L-P. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA. The wood treating plant operated from 1966 until 1977.

### Response to Interrogatory No. 5

The primary contaminants requiring remediation at the Calpella sawmill were wood waste and organic compounds associated with decomposition. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

### Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at Calpella arises from legal obligations imposed by sta e environmental regulations and permit requirements. Plaintiffs will supplement this response as further information is developed.

1

## CASPAR LANDFILL, CA

### Response to Interrogatory No. 1

The Caspar site is located in Mendocino County, approximately 2.5 miles north of the town of Mendocino, California. Access to the site is to the south via Mendocino County road 409.

### Response to Interrogatories No. 3 and 4

The Caspar Woodwaste Disposal Site was developed by L-P and permits were obtained to operate a woodwaste landfill in early 1978. Prior to 1978, the site was undeveloped and covered by native coniferous and Pygmy forest. L-P used the Caspar Landfill continuously from 1978 until it was closed in 1992. L-P sold the Caspar site to Mendocino Forest Products in 1998.

Wood waste disposed at the landfill originates from deck cleanup at the Fort Bragg Studmill. Cleanup occurs several times annually; material consists primarily of redwood and Douglas fir wood bark that has fallen off logs during unloading and decking operations. In addition, aggregate and soil fines are collected with the tree bark from the log deck surface. This material is pushed into piles by a Caterpillar 966 and loaded into dump trucks for hauling to the landfill. With the exception of a one year period – beginning sometime in 1979 and ending sometime in 1980, when bark from the studmill log debarker was disposed – the landfill has been used exclusively for disposal of log deck debris.

### Response to Interrogatory No. 5

Contaminants typically associated with woodwaste landfills include:

- woodwaste materials generated by facilities such as sawmills and planar mills

1

- ◆ wood bark that has fallen off during unloading and decking operations

- ◆ rock and soil from logyards

- ◆ organic compounds associated with wood decomposition, including tanins & lignins

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Caspar Landfill is based on investigations initiated by California governmental agencies in response to citizen complaints. Property damage to soil, and groundwater at the Site has been alleged, and L-P was directed to investigate and close the Site after appropriate remediation. In November 1990, the California Department of Health Services ("DHS") conducted a site inspection in response to a complaint from an adjacent landowner. The DHS inspectors took samples from monitoring wells onsite and total petroleum hydrocarbons (oil and grease and TPHIR) were detected in three of the four samples collected.

On July 8, 1992, the RWQCB again sampled the monitoring wells and hydrocarbons were detected at a high concentration. L-P subsequently resampled the wells in late 1992, and the groundwater resampling results confirmed the presence of semi-volatile hydrocarbons.

As a result, the RWQCB directed L-P to conduct an investigation of the site to determine the potential source and extent of groundwater contamination and to close the site following evaluation of alternatives for remediation prior to closure.

2

## CAVENHAM (URANIA, LA)

### Response to Interrogatory No. 1

The site is located approximately a quarter mile southwest of Urania, in Section 7, Township 10 North, Range 2 East, La Salle Parish, Louisiana.

### Response to Interrogatories No. 3 and 4

The former wood treating facility in Urania, Louisiana was an active wood treating facility from the early 1950s until 1988. The facility was constructed and first operated by Urania Lumber Company as a sawmill. In 1951, Urania Lumber Company began operating the facility as a wood treatment plant. G-P acquired the site in 1968, as part of its purchase of Urania Lumber. G-P operated from 1968 until late 1972, when L-P acquired the site in the G-P spin-off. L-P operated the plant from 1972 to 1974, when it was purchased by Crown. Crown owned the site until 1986, when it was transferred to Cavenham Forest Industries, a wholly owned subsidiary of Crown Zellerbach Corporation. CFI's financial statements indicate that CFI was incorporated on January 14, 1986.

Crown/CFI continued and expanded the wood treating activities at the site, including the increasing use of wood treating chemicals, especially PCP. CFI began closure activities in 1988, which were completed in 1990. For additional information responsive to this Interrogatory, see the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

### Response to Interrogatory No. 5

The Cavenham wood treating operation used and stored creosote and PCP at the site. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's wood treating plants contained in the Response to Interrogatory No. 5 for Ashland, WI.

1

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Cavenham site is based on a contribution action brought by Crown/CFI to recover costs associated with its investigation and remediation of environmental property damage caused by contaminants from the wood treating process. As detailed below, Crown/CFI incurred its liability pursuant to administrative proceedings under RCRA and state environmental laws.

On March 27, 1981, the Louisiana Department of Environmental Quality ("LDEQ") learned that creosote and PCP were being stored at the facility. After a RCRA inspection of the facility, the LDEQ determined that the facility generated and stored hazardous waste, and that Crown had failed to notify the state of this activity.

On June 6, 1984, LDEQ issued a Compliance Order requiring Crown to present an appraisal plan for systematic geotechnical examination of the site, to conduct the appraisal as soon as technically feasible to present plans to evaluate migration of hazardous waste and submit a remedial action and monitoring plan.

On May 23, 1985, LDEQ issued an order to Crown in proceedings under the Louisiana Environmental Quality Act, La. R.S. 30:1051, et seq. This order referenced a number of prior letters, applications, and a Notice of Deficiency/Letter of Warning issued to Crown on January 14, 1985. On May 23, 1985, LDEQ issued a Compliance Order requiring Crown to "immediately submit" a Phase II Investigation/Feasibility Study (FS) work plan, Remedial Investigation/Feasibility Study (RI/FS) report and to submit a closure plan by August 13, 1985. On September 15, 1987, CFI submitted a Hazardous Waste Closure Plan to LDEQ.

In 1992, Cavenham filed suit against L-P in Cavenham Forest Industries v. Louisiana-Pacific Corp., seeking contribution for cleanup costs allegedly due to

2

contamination at the site resulting from L-P's operations at Cavenham.  L-P and Cavenham settled the lawsuit in 1996, with L-P agreeing to reimburse Cavenham for certain expenses related to contamination caused by L-P's operations.

3

## CHICO, CA

### Response to Interrogatory No. 1

The facility is located in Butte County, California, in Section 35, Township 22N, Range 1E.

### Response to Interrogatories No. 3 and 4

The Diamond Match Company purchased approximately 242 acres of land south of the City of Chico in January 1903. The purchase was part of a larger California investment that included the acquisition of timberland and other milling operations. By 1906, four separate divisions were operating: engineering department, millworks division, retail yard, and match factory. Diamond also began construction of an onsite railroad but never completed it.

Diamond sold the completed portion of the railroad to the Southern Pacific Railroad in October of 1903. The engineering department, millworks division, and retail yard were closed in 1915 due to economic conditions, and ownership of several of the buildings was transferred to the match factory. The capacity of the match factory more than doubled in 1916. The millworks division and retail yard were rebuilt and reopened in 1920. A second reconstruction of the millworks division was undertaken in 1940-41. Diamond added the existing finished wood products division to the site between 1969-70. The match factory was closed in 1975 and demolished in 1977. L-P purchased the site in 1984, and continued to operate the re-manufacturing portion of the facility until its closure in 1989. L-P also operated the finished wood products division between 1987 and 1989.

Rail spur lines were the primary means of moving raw materials and manufactured goods at the site beginning in 1906. When spur lines were removed or dismantled as operations changed over the years, the tracks were removed and the rock

1

ballast and underlying soil were graded. Herbicides including Roundup, Garlon, and sodium arsenate have been used to control weeds along the ballast. Prior to 1970, sodium arsenate is believed to have been the primary herbicide used. Roundup and Garlon have been used since the late 1970's.

The engineering department was established to service the Butte County railroad and to provide a foundry for the construction of equipment as needed for other divisions, including the logging operations. Just after L-P's purchase of the site in 1984, the fungicide dip systems and an underground tank used for storing fungicide were removed.

The match factory was the last major structure added during the initial construction and operated between 1906 and 1975.

At the finished wood product division ("FWPD"), processing of molding consisted of applying base coats of paint, drying the paint in an oven, applying simulated grain at an inking station, applying a protective top coat of lacquer. After L-P's purchase, the FWPD was used to process hardboard by applying veneer or paint. For additional information responsive to this Interrogatory, see the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

## Response to Interrogatory No. 5

Solvents, cutting oils, mineral oils, acids, and other petroleum distillates are suspected of being used during the operation of the engineering department from 1904 to 1916. Major compounds used in the re-manufacturing portion of the site included mercury-based and PCP-based fungicides and adhesives.

2

The chemicals used to produce matches included phosphorus, sulfur, formaldehyde, and chlorate of potash. The match factory also provided the necessary chemicals used for farming the used portions of the land on the site.

The major compounds used in the manufacturing operations were solvent-based paints, lacquer, ink and lacquer thinners. The primary solvent used by Diamond was stored in a 10,000-gallon underground storage tank and was used to thin the paint and ink and to clean the machinery. Other chemicals used include methyl ethyl ketone ("MEK") and tricholorroethylene ("TCE").

In addition to the contaminants known to have been used during operation at the site, post-closure investigations have established the following:

Elevated levels of arsenic were detected along the 1.7 miles of existing ballast where the onsite railroad track used to exist.

Chemicals detected in the soils at the site consist primarily of metals, although 2,3,7,8-tetrachlorodibenzodioxin was detected at one sample point and formaldehyde was found in several locations.

The Normal Avenue Burn Dump contains elevated levels of barium, chromium (VI), copper, lead, silver, and zinc as well as 2,3,7,8-tetrachlorodibenzodioxin.

The South Orchard Burn Dump contains elevated levels of arsenic, barium, cadmium, copper, lead, nickel, silver, and zinc.

The detention pond contains elevated levels of arsenic, barium, cadmium, chromium (III), chromium (VI), copper, lead, mercury, thallium, and zinc.

The fuel oil bunker contains levels of arsenic, barium, cadmium, chromium (III), copper, lead, mercury, and zinc.

3

The soil at the dry kiln area contains elevated levels of antimony, arsenic, barium, cadmium, copper, lead, silver, and zinc.

There are detectable PCP concentrations at the concrete impoundment.

Two areas of the plant received formaldehyde containing glue wastes. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA.

Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at Chico is based on claims brought by governmental agencies seeking the investigation and remediation of environmental property damage to soil and groundwater at the Chico site and adjacent land. The relevant administrative actions and orders are detailed below.

State-mandated testing of municipal well water within the City of Chico in 1984 revealed elevated levels of certain volatile organic compounds in local groundwater. In June 1986, the Department of Health Services ("DHS") began an investigation to determine the extent and potential sources of groundwater contamination in four distinct areas: Chico Municipal Airport, central Chico, southwest Chico, and southeast Chico. Fifteen potential sources areas in the areas in the central, southwest, and southeast Chico areas were identified during this investigation. Although the facility is located within the southeast Chico area, it was not identified as a potential source area.

Low levels of tetrachloroethene were detected at the facility during a soil gas study conducted in August 1989. In addition, DHS sampled 45 private wells in the vicinity of the southeast Chico plume, including three wells located at the facility, in August and September of 1989. At the direction of DHS, L-P submitted a Work Plan on

4

December 22, 1989, that outlined the tasks necessary to (1) identify possible source areas of volatile organic compounds and PCP and (2) began to characterize the extent of groundwater contamination beneath the site. L-P received DHS comments on this plan January 23, 1990..

Following a public meeting in December 1989 regarding groundwater contamination in south Chico, local residents provided DHS information on historic dumping locations and past waste handling practices at the site. DHS summarized this information and presented it to L-P at a meeting on January 25, 1990. This Work Plan presented a three-phased approach to the site investigation: Phase I- Source Evaluation, Phase 2- Source Characterization, and Phase 3- Well installation. L-P completed the Phase 1 report and submitted it to DHS in April 1990, completed the Phase 2 fieldwork in June 1990, and completed the Phase 3 characterization report and submitted it to DHS in October 1990.

The DHS issued an Imminent and Substantial Endangerment Determination and Order (Order) for the site in July 1991. In part, the Order required L-P to implement approved soil and groundwater remedial alternatives at the site.

PCP, ethylbenzene, dichloromethane, tetrachlorophenol, other organic compounds, lead, and total xylenes were detected in varying quantities in groundwater reports between 1992-1997. PCP and tetrachlorophenol has impacted groundwater in the vicinity PF the concrete impoundment. Ethylbenzene and xylene has impacted groundwater in the vicinity of the finished wood product division building..

L-P filed suit to recover funds for damage done to property while Diamond owned property. See Louisiana Pacific Corp. v. Diamond International, Diamond Lands Corp., Diamond Lumber, Inc., Generale Occidentale.

5

6

## CLOVERDALE, CA

### Response to Interrogatory No. 1

The Cloverdale site is located approximately two miles south of the town of Cloverdale in Sonoma County, California. The site is located in the southwest corner of Section 29 and the southwest corner of section 28, Range 10 west, Township 11 north, MDB&M. The site includes approximately 44 acres in two parcels. The main mill site is located in parcel APN-118-010-34. The 43 acres include the milling facility. The adjoining parcel, APN-118-010-15 is comprised of 1 acre that included the industrial supply for the mill facility. The two parcels are divided by the Northwestern Railroad.

### Response to Interrogatories No. 3 and 4

The Cloverdale Facilities site is made up of three related but distinct operations: (1) the Cloverdale Rounds Remanufacturing Plant; (2) the Cloverdale Sawmill and Wood Waste Disposal Site; and (3) the Truck Shop Site.

Activities and operations within the three areas included lumber milling (greenchain, resaw and planer), lumber drying operations (dry kilns and lumber drying yards), siding manufacturing (staining and treatment, and packaging and shipping). Supporting operations included a boiler house and steam piping system, a millwright's shop, a vehicle maintenance garage, fueling operations for the vehicles and trucks, a sawfiling shop, a woodwaste collection system and tepee burner, a fire suppression system and fire pond, domestic water wells and piping systems, and a main office complex.

Masonite Corp owned and operated the woodwaste landfill at Cloverdale from its creation in 1976 until the site was sold to Timber Realization Company ("TRC"). TRC leased the site to L-P until early 1984 when L-P purchased the property. L-P used the woodwaste landfill for the disposal of a bark and soil mixture from the log deck area, small

1

amounts of inert construction materials, and mill trimmings. For additional information responsive to this Interrogatory, see the general discussion of L-P's woodwaste landfill operations contained in the Response to Interrogatory No. 3 for Caspar Landfill, CA.

L-P operated the Cloverdale Sawmill from the time it was acquired in December 1972 until L-P closed it in 1991. The buildings on the Sawmill Complex were demolished in Spring 1996. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

The Remanufacturing Plant was developed as a lumber mill by Rounds and Kilpatrick Lumber Company ("R & K") in the late 1940's. In 1948, R & K began using the site for their lumber milling operations. The majority of the development presently remaining at the site was constructed by R & K. R & K sold the site to G-P in 1967, and L-P acquired it as part of the spin-off from G-P in December 1972. L-P operated the Remanufacturing Plant for the production of siding. For additional information responsive to this Interrogatory, see the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

L-P built the Truck Shop in the early-1980's and shut it down in the mid-1990's. The Truck Shop was used to service L-P's truck fleet for Western Region Operations.

Response to Interrogatory No. 5

Wood Tox, a water repellent formulation containing approximately 5% PCP in a mineral spirits base, was applied to siding in the Remanufacturing Plant. PCP use at the mill was discontinued in the mid 1970's. Remedial investigations established that the soil and groundwater at the Remanufacturing Plant was contaminated with PCP and Stoddard

2

Solvent. For additional information responsive to this Interrogatory, <u>see</u> the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA.

The following chemicals were also used at the sawmill and truck shop: Arbor Oil (equipment lubrication); Tanner Gas (aliphatic hydrocarbon used in air lines); Union Oil #2 Diesel (fork lift fuel); Union Hydraulic Oil (petroleum mid-distillate used in forklift); Union Motor Oil (highly refined base oil equipment lubrication); and Vistac Oil (highly refined base oil equipment lubrication). For additional information responsive to this Interrogatory, <u>see</u> the general discussion of hydrocarbon contamination found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Cloverdale site is based on environmental property damage to soils and groundwater at the Rounds Manufacturing facility (contamination by PCP and Stoddard Solvent); soil at the Sawmill and Woodwaste Disposal Complex (hydrocarbon contamination at the Mill); and soil at the Truck Shop (hydrocarbon contamination).

The claim made against L-P was initiated by the RWQCB pursuant to state law.

3

## COVELO, CA

### Response to Interrogatory No. 1

The sawmill was located in Round Valley, Mendocino County, adjacent to California Highway 162 (AKA Hurt Road), approximately 2.5 miles northwest of Covelo, California.. The property on which the sawmill is situated is known as S28, T23, R12W MDB&M, (Assessors Parcel # 032-380-14).

### Response to Interrogatories No. 3 and 4

F.M. Crawford Lumber Inc. ("F.M. Crawford") leased the Covelo site from 1953 until 1958, and it operated the sawmill during this period. In 1958, F.M. Crawford entered into a business combination agreement with G-P, which resulted in G-P succeeding to F.M. Crawford's interest in the Covelo site. In early 1973, G-P assigned the lease of the Covelo property to L-P as a part of the spin-off. L-P operated the sawmill on the site continuously from 1973 until 1992, when operations at the site were permanently discontinued. The site property was sold to California Land & Timber Company in 1997. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

### Response to Interrogatory No. 5

During its operational period, the sawmill used or generated contaminants commonly found at L-P's sawmill facilities, including hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

1

<u>Response to Interrogatories No. 8, 9, 11 and 12</u>

Information responsive to this Interrogatory is the subject of continuing investigations. Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

147261 6 v1. VK@0001.DOC

## CRESCENT MILLS, CA

### Response to Interrogatory No. 1

The L-P Crescent Mills facility site is located on the east side of Highway 89 in Crescent Mills, Plumas County, California. The project site consists of five individual parcels totaling approximately 67 acres. The parcels are identified as Plumas County Assessor's Parcels Nos. 111-050-54 (18.26 acres), 111-050-56 (41.00 acres), 111-102-07 (0.5 acres), 111-013-01 (0.26 acres), and 111-170-14 (8.0 acres).

### Response to Interrogatories No. 3 and 4

The Crescent Mills site was used for sawmill and related operations by L-P from 1974 until closure in 1986. Prior to L-P's purchase of the property in 1974, the site was operated by Plumas Lumber Company (a subsidiary of Erickson Lumber Company) and used for drying and planing operations with lumber storage, dry kilns, planing mill, and miscellaneous wood waste disposal. Plumas Lumber Company operated the site for an undetermined period of time until approximately 1974. L-P sold the Crescent Mills property to Greg Lehman, Jennifer Glanzmann and Gary Lehman in 1998.

The Crescent Mills site currently is vacant. Remaining improvements include graveled driveway areas, concrete building pads, access roads to State Highway 89 and Plumas County roads.

For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

### Response to Interrogatory No. 5

During its operational period, the Crescent Mills sawmill used or generated contaminants commonly found at L-P's sawmills, including petroleum products, such as

diesel, gasoline, waste oil, wood waste, and an antistain agent containing PCP. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the RWQCB pursuant to state environmental laws. L-P's liability at the Crescent Mills site is based on environmental property damage to soil due to contamination by PCP, wood waste, and associated contaminants.

2

## EAST PROVIDENCE, RI

### Response to Interrogatory No. 1

The East Providence facility is located at 3 Dexter Road in East Providence, Rhode Island.

### Response to Interrogatories No. 3 and 4

Highland America purchased the site from Arpad J. Merva in 1988 and used the site for gypsum-based wallboard production from 1990 to 1992. L-P bought the site in 1994, but never operated the facilities. Prior to 1988, the site was owned by Merva, Astro Sales Co. and Bird & Sons (which manufactured roofing materials and occupied the property as far back as the 1930's).

### Response to Interrogatory No. 5

The contaminants used at the site while operating are not presently known. L-P will supplement its response to this Interrogatory as additional information becomes available.

### Response to Interrogatories No. 8, 9, 11 and 12

Information responsive to this Interrogatory is the subject of continuing investigations. Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

1

## ELK CREEK, CA

### Response to Interrogatory No. 1

The Elk Creek sawmill is located in Glenn County, California about 1 mile (1.6 km) south of the community of Elk Creek, near the confluence of Stony Creek and Brisco Creek and just below Stony Gorge Dam.  L-P's woodwaste landfill is just northwest of the mill.

### Response to Interrogatories No. 3 and 4

The Elk Creek Sawmill was built in 1952.  The original mill included a sawmill, planer mill, dry kilns, boiler, maintenance shop, and numerous lumber storage buildings. The sawmill included the mill, sorter chain, dip tank, saw shop, and fuel shed.  Commander Industries purchased the facility in 1969 and operated it until L-P purchased the facility in 1974.  L-P continued the sawmill operations from 1974 until the facility was closed in 1981.  For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

The Elk Creek Woodwaste Disposal Site began operations in May 1976 to receive wood waste from L-P's Elk Creek Sawmill.  The landfill operated until the mill was closed in August 1981.  The landfill was closed and covered with a native soil cover in the spring of 1982.  The sorter chain east of the sawmill complex burned down in the mid-1980's after the mill was closed.

L-P leased the Elk Creek property to Whitney Construction Company from June 15, 1995 until Whitney purchased it in 2000.

1

Response to Interrogatory No. 5

During its operational period, the Elk Creek sawmill used or generated contaminants commonly found at L-P's sawmills, including PCP, hydrocarbons, and wood waste. Moreover, remedial investigations have determined the presence of contaminants at the site, including PCP and petroleum hydrocarbon contamination. PCP was detected in samples from the soil in the area of the site dip tank. Petroleum hydrocarbons (diesel) were detected in leachate from the landfill. Total petroleum hydrocarbons (diesel and gasoline) were detected in groundwater underlying the diesel tank that was removed from the site. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the RWQCB pursuant to state environmental law. L-P's liability at the Elk Creek site is based on environmental property damage to soil and groundwater due to contamination by PCP and hydrocarbons.

L-P received an order dated July 10, 1995 from the RWQCB regarding the Elk Creek site. Pursuant to this order and the proceedings of the RWQCB, L-P conducted an investigation and, in August 1995, submitted a Work Plan for Soils and Groundwater Investigation.

Remedial investigation has determined that PCP and hydrocarbons have contaminated the soil, and hydrocarbons have contaminated groundwater at the sawmill site. Groundwater at about five feet below the ground contains 250,000 ppb diesel hydrocarbons and 230 ppb gasoline hydrocarbons. The RWQCB thus found that L-P

2

degraded the groundwater quality and impaired the beneficial uses of the State's water, especially for water supply.

In addition to the PCP-contaminated groundwater in the vicinity of the dip system, groundwater underlying the historic underground tank has been contaminated by petroleum hydrocarbons. PCP and hydrocarbon contaminated soils have been excavated and properly disposed of, while groundwater monitoring at the site continues.

3

## FORT BRAGG, CA

### Response to Interrogatory No. 1

The Ft. Bragg sawmill is located approximately three miles south of Ft. Bragg, California on the east side of Highway 1. The facility is located in Section 31, Township 18 North, Range 17 West, Mount Diablo Meridian.

### Response to Interrogatories No. 3 and 4

L-P acquired the Fort Bragg property as part of the G-P spin-off in late 1972. L-P operated the facility until it was sold to Mendocino Forest Products in 1998. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

### Response to Interrogatory No. 5

During the period of its operations, the contaminants onsite at the Ft. Bragg sawmill included those typically found at all L-P sawmills: petroleum hydrocarbons, PCP, and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA. In addition, during remedial investigations, the major compounds detected at the site included PCP and TCP, BTEX, TPH-type compounds in the gasoline and diesel ranges, and volatile organic compounds such as tetrachloroethene.

### Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Ft. Bragg site is based on environmental property damage to soil, groundwater, and surface water due to contamination by PCP and hydrocarbons.

1

The claim made against L-P was initiated by the RWQCB pursuant to state environmental law. The relevant history of the administrative proceedings is detailed below.

The RWQCB issued Cleanup and Abatement Order No. 85-118 for the Fort Bragg Studmill on September 18, 1985. The Order directed L-P to investigate surface water discharges of PCP and develop a work plan for a groundwater investigation. On April 1, 1986, the RWQCB issued Revised Cleanup and Abatement Order No. 86-83 directing L-P to continue the ongoing investigation.

The RWQCB issued Revised Cleanup and Abatement Order No. 87-117 on August 19, 1987. This order directed L-P to define the source of groundwater and surface water contamination, and to define the areal and vertical extent of groundwater contamination.

On January 24, 1992, the RWQCB issued Cleanup and Abatement Order No. 92-21, directing L-P to investigate the extent of soil and groundwater contamination and addressing the domestic water systems impaired by discharges from L-P. L-P installed a groundwater remediation system in 1995.

2

## LOCKHART, AL

**Response to Interrogatory No. 1**

The Lockhart site is located in Lockhart, Covington County, Alabama, and consists of a 45.68 acre site.

**Response to Interrogatories No. 3 and 4**

L-P operated a sawmill and wood treating plant at the Lockhart site from 1983 until 1998. The facilities previously were owned and operated by the Tennessee River Pulp and Paper Company. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA and the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

**Response to Interrogatory No. 5**

During its operational period, the Lockhart facilities used contaminants typically found at L-P's sawmill and wood treating facilities, including creosote. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA and the general discussion of the contaminants found at L-P's wood treating plants contained in the Response to Interrogatory No. 5 for Ashland, WI.

**Response to Interrogatories No. 8, 9, 11 and 12**

L-P's liability at the Lockhart site is based on environmental property damage to groundwater and surface water due to contamination by creosote, PCP, and CCA wood treatment residuals.

The claim made against L-P was initiated by the Alabama Department of Environmental Management ("ADEM") under RCRA and state environmental law. Site

1

investigation and remediation has been conducted pursuant to Consent Order No. 98-029-CHW, issued by ADEM, dated December 13, 1997. The relevant history of the administrative proceedings is detailed below.

In December 1993, ADEM conducted a Comprehensive Monitoring Evaluation and noted that naphthalene was detected in a surface water sample of Pond Creek from L-P's property.

In July 1997, representatives from the ADEM conducted an inspection of the facility, including an inspection of the groundwater monitoring and pump-and-treat system.

In April 1998, the ADEM conducted a RCRA Facility Assessment of the Lockhart site. The objectives of the visual site inspection were to identify all solid waste management units and areas of concern located at the facility and to determine their potential for past or ongoing releases of hazardous constituents.

1472816 v1, VK@001.DOC

## MARIANNA/CYPRESS, FL

### Response to Interrogatory No. 1

The site is located at 6112 Old Spanish Trail Road, Cypress, FL 32432.

### Response to Interrogatories No. 3 and 4

L-P purchased the Marianna property on January 14, 1980 from Ruby Jernigan. The sawmill was constructed during 1981-82, and L-P began operating at the facility at that time. The Marianna sawmill has been operated continuously since construction and remains an active facility today. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

L-P also operated a wood treating plant at the Marianna facility to service the sawmill's products. For additional information responsive to this Interrogatory, see the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

### Response to Interrogatory No. 5

During its operational period, the Marianna facility used or generated contaminants commonly found at L-P's sawmills and treating plants, including: CCA and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's Sawmill Facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA, and the general discussion of the contaminants found at L-P's wood treating plants contained in the Response to Interrogatory No. 5 for Ashland, WI.

Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Marianna site is based on environmental property damage to property damage onsite due to contamination by CCA.  In addition, L-P incurred liability due to legal obligations under RCRA for closure of the treating plant.

2

## MISSOULA, MT

### Response to Interrogatory No. 1

The Missoula site is located at 3300 Raser Drive, Missoula, Montana 59802.

### Response to Interrogatories No. 3 and 4

The Missoula manufacturing facility was constructed by Evan Products, Inc. in 1969. L-P purchased the facility from Evans in 1976 and it is still operational. For additional information responsive to this Interrogatory, see the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

### Response to Interrogatory No. 5

The Missoula plant's operations require the use of contaminants commonly associated with L-P's manufacturing facilities, including wood waste and glues or resins. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the State of Montana pursuant to state environmental laws and permitting requirements associated with the closure of onsite and offsite ponds. The facts relating to environmental conditions and remediation at the Missoula manufacturing facility are part of an ongoing investigation. L-P will supplement its Responses to the Interrogatories relating to the Missoula site, as required by the Federal Rules of Civil Procedure, when additional responsive information is developed.

1

## MOHAWK, MI

### Response to Interrogatory No. 1

The Mohawk Site is located one mile northeast of the Town of Mohawk, MI along Highway U.S. 41.

### Response to Interrogatories No. 3 and 4

Calumet and Hecla Corp purchased the Mohawk property in May 1942 and built a sawmill in 1956. In 1968 Calumet and Hecla merged with Universal Oil Products Company. L-P purchased the property from Universal Oil in 1974, and operated the sawmill and wood treating plant until 1985.

Lumber was treated with PCP formulations while the mill operated, from 1956 to 1985. The PCP formulation was used as a means of sap-stan (anti-mold) control and not as a wood preservative. The PCP formulation was mixed in a mixing tank (located in the northeast corner of the former green chain building) which supplied formulation to the dipping tank). Rough-cut wood was treated in the PCP formulation by feeding the wood into the dip tank filled with the formulation. Lumber was placed along the east side of the property for drying. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA; and the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

### Response to Interrogatory No. 5

During its operational period, the Mohawk sawmill used or generated contaminants commonly found at L-P's sawmills, including PCP and hydrocarbons. For additional information responsive to this Interrogatory, see the general discussion of the

contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

### Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the Michigan Department of Environmental Quality pursuant to state environmental law. L-P's liability at the Mohawk site is based on environmental property damage to soil and groundwater due to contamination by PCP and hydrocarbons.

2

## NEW WAVERLY, TX

### Response to Interrogatory No. 1

The New Waverly site is located three miles north of New Waverly, Texas on Highway 75.

### Response to Interrogatories No. 3 and 4

L-P acquired the New Waverly site from G-P, as part of the spin off from G-P in December 1972. L-P still owns the complex, with the exception of the treating plant, which was sold to Universal Forest Products in 1998.

The site formerly included a wood treating plant, a bark bagging plant, an OSB-siding manufacturing facility, a plywood mill, and a sawmill. All of the New Waverly facilities have been closed, with the exception of the treating plant that was sold in 1998 and the bark bagging plant (which L-P currently operates). For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA, the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA, and the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

### Response to Interrogatory No. 5

During its operational period, the New Waverly site used or generated contaminants commonly found at L-P's sawmills, manufacturing facilities, and wood treating plants, including hydrocarbons and wood waste. The New Waverly site also used PCB-containing transformers. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA, the general discussion of the

1

contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA, and the general discussion of the contaminants found at L-P's wood treating plants contained in the Response to Interrogatory No. 5 for Ashland, WI.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the New Waverly site is based on environmental property damage to property at the site due to contamination by PCBs and wood waste.

Information responsive to this Interrogatory is the subject of continuing investigations. Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed.

2

## OROVILLE, CA

**Response to Interrogatory No. 1**

The Oroville mill consists of a sawmill and hardboard manufacturing plant and is located approximately one-quarter mile south of the city limits of Oroville, California. The area is bounded on the west by State Highway 70 and on the east by property owned by Koppers Company, Inc. Georgia-Pacific Way lies to the north, and Bagget-Marysville Road lies to the south.

The Oroville landfill is located approximately three miles south of the City of Oroville, California and one mile east of the Feather River. The 110.5–acre facility is located in the southwest 1/4 of Section 29 and the southeast 1/4 of Section 30, Township 19 North, Range 4 East, Mount Diablo Base and Meridian, in Butte County, California. The site includes Butte County Assessor Parcels No. 36-020-03, 36-020-15, 36-027-35 and 36-027-53.

**Response to Interrogatories No. 3 and 4**

In the late 1950's, the Natomas Company, a gold dredging operation, owned the property that later became the Oroville site. The National Wood Treating Company began preserving wood products on property adjacent to what is now the L-P site in 1948. In 1955, Koppers purchased National and continued National's wood preservation process. In 1968, G-P purchased the Oroville site from Natomas. At that time, the site consisted of an the undeveloped parcel located to the west of Koppers. Construction of the sawmill began in 1968 and was completed in 1969. The boiler well, the electric fire well, and the makeup well were also installed at this time. Operation of the sawmill began in 1970, and a fourth production well was completed that same year.

1

L-P acquired the Oroville sawmill as part of the spin-off from G-P in December 1972. In 1978, L-P finished the construction of the hardboard manufacturing plant and the woodwaste landfill. L-P closed the Oroville sawmill in 1993 and manufacturing plant in 2000. In 1994, L-P leased the log decks to Trinity River Lumber Company.

The Oroville mill processes ponderosa pines, sugar pine, Douglas fir, and white fir. Between 1970 and 1984, fungicides were used at the mill to prevent discoloration of the pine lumber. The log deck is a 48-acre area constructed on dredger tailings where logs are stored. Logs in the deck were continuously sprayed with water to prevent cracking or splitting prior to sawing. The water for the spray system was pumped from an adjacent unlined pond known as the log deck pond. Water for this pond was supplied by runoff from the Koppers facility and by groundwater. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

The Oroville plant facilities utilized sawmill by-products such as (1) sawdust produced during sawing operations, (2) shavings generated during planing operations, (3) chips from scrap wood using a chipping machine, and (4) bark. The wood by-products were utilized by the hardwood plant in a process involving a urea-formaldehyde resin to create hardboard. The sawdust from the sawmill was piled northeast of the sawmill and used as boiler fuel, feedstock for the hardboard plant, or for offsite sale. For additional information responsive to this Interrogatory, see the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

L-P began operating the woodwaste landfill at the Oroville site in 1978. In the late 1970's, wood waste and ash disposal began at WMU No. 1 and continued until its

closure in 1988. WMU No. 2 was opened in 1988 and stopped receiving wood waste from the Oroville sawmill when it was closed in 1992. Although WMU No. 3 was issued permits to operate on the Waste Discharge Requirements, it was never designed or developed. In 1987, WMU No. 4 was opened in response to RWQCB directives to L-P to dispose of the ash and wood waste generated at the Oroville hardboard plant and sawmill separately. In May of 1993, L-P submitted the Preliminary Closure Plan and Preliminary Post-Closure Maintenance Plans for WMU Nos. 2 and 4 to the Butte County Local Enforcement Agency ("LEA"), the California Integrated Waste Management Board ("CIWMB") and the RWQCB. For additional information responsive to this Interrogatory, see the general discussion of L-P's woodwaste landfill operations contained in the Response to Interrogatory No. 3 for Caspar Landfill, CA.

## Response to Interrogatory No. 5

During its operational period, the Oroville sawmill and manufacturing plant used or produced contaminants typically found at such facilities, including wood waste, PCP, and hydrocarbons. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA, the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA, and the general discussion of the contaminants found at L-P's woodwaste landfills contained in the Response to Interrogatory No. 5 for Caspar Landfill, CA.

Remedial investigation of the site revealed the presence of additional contaminants, including:

PCP was found in the log deck pond water and the western sump area.

3

Polynuclear Aromatic Hydrocarbons ("PAH") were found in high concentrations along and near the L-P/Koppers boundary in the southern part of the log deck pond and the southern ponds, and at the western sump.

Formaldehyde ("HCHO") was detected in two wells at the processing facility, ML-1 and W-4; W-4 is located near the western sump.

Arsenic was detected in all of the shallow groundwater monitoring wells located at the processing facility; maximum concentration observed south of the log deck pond.

PCP, PAH, and HCHO were detected in the dust around the plant.

Arsenic and total chromium were detected in the surface waters around the mill.

Formaldehyde was detected in the landfill material and the man-made ponds located along the base of the landfill.

Groundwater immediately downgradient of the landfill is contaminated with PCP, PAH, arsenic, chromium, and copper.

Landfill ponds 1, 2 and 4 were found to contain high concentrations of PCP, PAH, and arsenic.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Oroville facilities is based on environmental property damage to soil, groundwater, and surface water due to contamination by PCP, hydrocarbons, formaldehyde, arsenic, and metals.

The claim made against L-P was initiated by the USEPA and RWQCB pursuant to CERCLA and the California Water Code. The relevant portions of the administrative actions and lawsuits against L-P are detailed below.

The Oroville woodwaste site and the Koppers Oroville wood treatment facility were added to the CERCLA National Priority List ("NPL") in September 1984. The

4

landfill was included in the listing and subject to extensive investigation because wastes from the sawmill and hardboard plant were disposed of at the landfill, and both of these plants were known to have used PCP.

In the Record of Decision issued by the EPA dated September 6, 1990, L-P was directed to address soil and groundwater contamination at the Oroville site.

The Administrative Order for Remedial Design and Remedial Action, Docket No. 91-18 issued by the EPA, dated July 30, 1991, ordered L-P to perform a remedial design for the remedy described in the September 28, 1990 Record of Decision and to implement that design through remedial action.

The April 20, 1995 Government Order issued by the RWQCB pursuant to Section 13267 of the California Water Code ordered L-P to submit a technical and monitoring report describing an investigation of shallow groundwater west of the Oroville facility regarding formaldehyde contamination. Monitoring wells were to be installed by August 15, 1995, two sampling rounds of the wells to be completed by September 15, 1995 with a final report submitted to the Regional Board by October 15, 1995.

In the August 1, 1995 Record of Decision issued by the EPA, L-P was advised that no further remedial action was required. The results from soil sampling and groundwater monitoring conducted since the 1990 Interim Record of Decision indicated that the low levels of contamination at the site no longer posed a significant risk to either public health or the environment. The ROD was issued with the stipulation that L-P would complete the activities required to satisfy several outstanding concerns expressed by the California Department of Toxic Substances Control ("DTSC") and the RWQCB. To address these concerns, L-P agreed to install and sample four offsite groundwater

5

monitoring wells. The offsite wells were installed at the site in November 1995, and they were sampled in November 1995 and again in January 1996.

In addition to the foregoing administrative proceedings, L-P was named in two lawsuits arising out of the environmental damage at Oroville.

In December 1992, a complaint was filed by the United States against L-P alleging that L-P discharged formaldehyde containing waste water into a surface pond on the site and that L-P contaminated the soil at the site with arsenic. L-P was sued for cost recovery and L-P in turn filed a third party complaint for CERCLA contribution against Beazer mirroring the CERCLA declaratory relief claim in the existing L-P/Beazer action. EPA's suit was referred to Judge Karlton as a related case, and the two related cases were consolidated with EPA as plaintiff, L-P as defendant and Beazer as third party defendant.

In August 1993, the State of California filed a copycat suit against L-P for recovery of its "oversight" costs at the Oroville site (approximately $150,000). This suit also came to Judge Karlton and was consolidated with the main action.

In June 1989, L-P filed a complaint against Beazer Materials & Services, Koppers Industries and others in the United States District Court for the Eastern District of California under CERCLA and state law for cost recovery (the $600,000 cost of the CH2M Hill/L-P investigation) and for declaratory relief (holding Beazer liable to indemnify L-P for any cost recovery from L-P by EPA).

6

## PENDLETON, OR

### Response to Interrogatory No. 1

The Pendleton site is located northwest of the intersection between SW Court Place and SW 23rd Street, (2203 Southwest Court Place) in Pendleton, Oregon. This site is approximately 49 acres. Interstate I-84 borders the southern side of the property.

### Response to Interrogatories No. 3 and 4

In about 1940, the site and the neighboring property to the east were developed by Harris Pine Mill ("Harris Pine") into a lumber and box factory. In 1951, Harris Pine began producing finished furniture. In 1962, Harris Pine began sprinkling log deck areas. L-P purchased the western portion of the Harris Pine Mill, including the sawmill and lumber drying facilities. L-P began sawmill operations in 1988, but operated for only a few months. The sawmill was closed in about November 1988 and has been inactive since that time. In 1989, the property was listed for sale with Garton & Associates Realtors. In early 1992, McCarthy Management & Development Co. bought the property (both L-P and Harris Pine properties).

The major features of the site are the former log pond, three ponds, the former steam plant foundation, the steam plant clinkers pile and associated landfill, and the log storage areas. The primary operations at the L-P site included storing logs, drying them, and cutting them into lumber. Ancillary activities associated with operation of the site include stormwater and other surface water management (using drains, pond, and an outlet to the Umatilla River), septic system operation, and land-filling operations (in the southwest portion of the site). For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

1

## Response to Interrogatory No. 5

During its operational period, the Pendleton sawmill used or generated contaminants commonly found at L-P's sawmills, including: hydrocarbons and wood waste. Remedial investigation has revealed the presence of additional contaminants onsite, including:

- ◆ Polychlorinated biphenyl ("PCB") fluids were detected in the soils at the south side of the ditch area and at the dike road.

- ◆ PCB contamination was identified during an excavation of soil staining located near the west side of the former log pond.

- ◆ Volatile organic compounds (dichlorobenzene and toluene) were detected in the groundwater.

- ◆ Suspect asbestos-containing materials were identified at the lumber kilns, including thermal system insulation, interior coatings, roofing materials, and fabric insulation on electrical wires and cables.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by U.S. EPA pursuant to CERCLA and the Oregon DEQ based on their Solid Waste Regulations. L-P's liability at the Pendleton site is based on environmental property damage to soil due to contamination by PCBs and woodwaste landfill (leachate from the landfill may have impacted an adjacent river. Additional information concerning the administrative actions against L-P are detailed below.

In August 1991, the EPA conducted sampling and testing at a former transformer pad located in the sawmill building. Their test results indicated the presence of PCB adjacent to the transformer pad and PCB on the transformer pad. Based on these results, the EPA required that L-P evaluate and remediate the contamination.

2

In response to the August 1991 EPA findings, L-P hired environmental engineers to explore the former transformer pad to evaluate the nature and extent of the PCB contamination. These activities identified sawdust, concrete, and soil near the transformer pad to be contaminated with concentrations of PCBs above EPA cleanup levels. During the summer of 1992, materials with elevated levels of PCBs were removed.

In April 1996, the EPA, through its contractor, URS Consultants, completed its Superfund Preliminary Assessment for the Pendleton site. Based on the report and other pertinent information, EPA Region 10 does not anticipate further investigation under the Federal Superfund Program.

## PHILIPSBURG, MT

### Response to Interrogatory No. 1

The Philipsburg Site is located east of Montana State Highway 1 on the East 1/2 of Section 23 and the Southwest 1/4 of Section 24, T7N R14W of the MPM, in Granite County, MT.

### Response to Interrogatories No. 3 and 4

The Philipsburg Site was constructed as a sawmill in the early 1960's by Montana Forest Products. Northern Timber operated the sawmill from the late 1960's until L-P acquired the facility in 1973. L-P shut down the sawmill in 1975, and leased the property to Northwest Gold Inc. (later became Gold and Silver Milling) beginning in 1980. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

Gold and Silver Milling used the site between 1982-1986, but the company is now bankrupt, and the site has been inactive since 1986. Gold and Silver Milling used the former sawmill building as a warehouse to process gold ore using cyanide heap leaching techniques. The warehouse consists of a metal framed building with un-insulated sheet metal siding and a dirt floor on approximately 80% of the building. The remaining 20% of the warehouse floor has a concrete slab that slopes into a subgrade processing area. The leach pad or processing area was sloped at an approximate 10% grade where crushed ore was placed on the ramp and sprinkled with sodium cyanide (NaCN) solution and lime. The sodium cyanide soaked through the ore pile and drained down the ramp to the processing area. The solution was transferred to a vat processing system and treated with chemical reagents which was run through carbon extraction columns to recover precious

1

metals, primarily gold. Spent and un-neutralized tailings were unloaded from the leach pad and placed in piles outside the warehouse.

## Response to Interrogatory No. 5

During its operational period, the Phillipsburg sawmill used or generated contaminants commonly found at L-P's sawmills, including wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

In addition to typical sawmill-associated contaminants, remedial investigations have demonstrated the presence of contaminants associated with tailings leftover from the gold ore processing operation, including arsenic, lead, cadmium, chromium, and cyanide.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the Montana Department of Environmental Quality pursuant to environmental requirements of state and federal law. Investigation and remediation of the Site is being conducted pursuant to an agreement reached with the Montana DEQ under the Voluntary Cleanup and Redevelopment Act of the State Superfund law (Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Ann. §§75-10-701 – 752).

L-P's liability at the Philipsburg site is based on environmental property damage to soil due to contamination by arsenic, lead, and cyanide. Groundwater cyanide and arsenic contamination at the Site is believed to be within DEQ human health standards.

# PILOT ROCK, OR

## Response to Interrogatory No. 1

The Pilot Rock sawmill site it located in the City of Pilot Rock, Oregon (SE 1/4 of Section 8 and the SW 1/4 of Section 9, T1S, R32E Willamete Meridian).

## Response to Interrogatories No. 3 and 4

The Site was developed by Pilot Rock Lumber Company and began operations on July 1, 1940. G-P subsequently purchased the site, which L-P acquired in 1973 as part of spin-off from G-P. L-P operated the sawmill continuously from 1973 until it sold the property in 1996 to Pioneer. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

## Response to Interrogatory No. 5

During its operational period, the Pilot Rock sawmill used or generated contaminants commonly found at L-P's sawmills, including hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the current owner of the property under the pre-purchase investigation of environmental conditions at the site. L-P's liability at the Pilot Rock site is based on environmental property damage to soil and groundwater due to contamination by wood wastes and other contaminants. In order to resolve Pioneer's claim and extinguish further liability for environmental conditions at the site, L-P

1

paid $315,000 to Pioneer in consideration for a full environmental release and indemnification.

## POTTER VALLEY, CA

**Response to Interrogatory No. 1**

The Potter Valley facility is located on the south side of the Eel River, approximately two miles north of Potter Valley, California. The facility is located in portions of Sections 29, 30, 31, and 35, Township 18 North, Range 11 West, Mount Diablo Meridian.

**Response to Interrogatories No. 3 and 4**

The Desheld family constructed the first sawmill at the site in 1912 near Ridgeway Highway. In 1916, the Desheld mill was moved closer to the Eel River. The relocated mill was closed in 1918 and the site was not used again until 1938. Pacific Gas & Electric Company ("PG&E") acquired the property from Snow Mountain Power & Light in 1936. No early buildings remain on site.

In 1938, Ukiah Pine leased the land from PG&E and constructed a sawmill at the site. The original Ukiah Pine sawmill consisted of a sawmill and planer building. The sawmill was destroyed by fire in 1950 and was rebuilt in 1951. The original planer building and the rebuilt sawmill remain onsite. The existing dry kilns, boiler house, and dry lumber storage sheds were also added at this time. The boiler was subsequently sold to Ukiah Pine, moved to Potter Valley, and installed in 1948. The boiler was used until the facility was closed in 1989. Ukiah Pine sold the facility to F. Crawford Lumber in 1952.

G-P purchased the facility from F. Crawford in 1968, and L-P acquired the facility in the spin-off from G-P in December 1972.

The original maintenance shop was constructed in 1952. Additional onsite maintenance was performed in the cat shop. This building, located due north of the maintenance shop, was constructed in the late 1950's and was demolished in 1987. Over

1

the years, F.M. Crawford, G-P and L-P subleased the maintenance shop to several different logging companies, most recently to San Hedrin Logging. L-P closed the facility in 1989.

The existing facility includes a sawmill and associated greenchain, a planer mill and associated drychain, a 27-acre log storage area, a 14-acre lumber storage area, dry kilns, woodwaste-fired boiler, maintenance shop, dry lumber storage sheds, and an office building. The area around the sawmill and planer building is paved. The area was paved in sections beginning in 1984 and continuing through 1988. The east side of the sawmill greenchain and the planer greenchain are covered with a concrete slab. A demolition contractor removed all of the buildings, except the dry kilns, in 1993.

During operation, surface treatment with PCP was performed using dip systems at the head of the sawmill greenchain and at the head of the planer mill greenchain to control sap staining in the finished lumber. Containment of dipping facilities was constructed in the mid-1970's at the head of the sawmill and planer mill greenchain areas including containment of the storage and mixing areas. In 1985, the use of anti-stain fungicides was temporarily discontinued until July 1986, when application resumed using a different chemical.

For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

Response to Interrogatory No. 5

During its operational period, the Potter Valley mills used or produced contaminants commonly found at L-P's sawmills, including hydrocarbons, PCP, and wood waste. For additional information responsive to this Interrogatory, see the general

2

discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

In addition, remedial investigations have revealed the presence of contaminants onsite, including:

PCP has been detected in the soil near the sawmill, planer buildings, and burn dump.

Petroleum hydrocarbon compounds ("TPH") have been detected in the vicinity of the sawmill building, log deck pond, fire pond, maintenance shop, and two underground tanks.

PCP has been detected in the groundwater in excess of 1 ug/1 approximately 150 feet downgradient from the planer building and approximately 250 feet downgradient from the sawmill building.

Groundwater monitoring wells were found to contain hazardous levels of total petroleum hydrocarbons as diesel.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Potter Valley site is based on environmental property damage to soil, groundwater, and surface water due to contamination by PCP and hydrocarbons. The claim made against L-P was initiated by the RWQCB pursuant to state environmental laws. Additional information concerning the administrative actions against L-P are detailed below.

In October 1987, the RWQCB issued Clean-Up and Abatement Order No. 87-139, which ordered L-P to investigate the extent of groundwater contamination underlying the site, and to submit a work plan to clean-up contaminated groundwater, surface water, and soil at the site. In response to this order, L-P conducted additional soil and

3

groundwater work at the facility, and contaminated soils have been excavated and appropriately disposed of off-site.  Groundwater monitoring continues to the present.

## RED BLUFF, CA

### Response to Interrogatory No. 1

The Red Bluff sawmill is located approximately three miles south of the City of Red Bluff, off Reading and Tyler roads in Section 3, Township 26 north, Range 3 west MD B& M. The manufacturing facility ("VG and Jamb plant") is located on Reeds Avenue in Red Bluff, California, and the associated landfill is located on Callahan Road in Red Bluff, California.

### Response to Interrogatories No. 3 and 4

The Red Bluff site consisted of a sawmill, planing mill, remanufacturing plant, equipment maintenance shop, truck ship, vehicle maintenance shop, log sorting area, 7 acres of log decks, log deck sprinkling and recycling system, recycling ponds, 20 acres of spray irrigation fields, 2 fire ponds, 2 fungicide treatment systems and a drum waster storage shed. In addition, two woodwaste landfills were constructed nearby to service the mills.

L-P acquired the Red Bluff sawmill in 1974 and operated the facility until its closure in 1990. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

L-P operated the Red Bluff VG and Jamb plant from 1974, when it was acquired from Commander, until the plant was shut down in 1990 and sold to Fibreboard in 1991. Subsequently, Fibreboard sold the facility to its current operator, Sierra Pacific. For additional information responsive to this Interrogatory, see the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

1

The two woodwaste landfills associated with the operation of the Red Bluff facilities were constructed in 1973 by Commander Industries. The oldest landfill was a canyon fill, approximately 10 to 15 acres, located on leased property in a range area near the mills. The second landfill, adjacent to the first, has about a 10 acre footprint located on approximately 80 acres adjacent to the first landfill. The second landfill was active from the 1970s to 1992. From 1989 to 1992 the landfill took in only small amounts of waste. Both landfills received wood trim ends and other wood waste, bark and soil cleaned up from the log yard, strapping, and cables. Trim ends from the molding mill were also disposed at these landfills. For additional information responsive to this Interrogatory, see the general discussion of L-P's woodwaste landfill operations contained in the Response to Interrogatory No. 3 for Caspar Landfill, CA.

Aboveground storage tanks were used to store oil and fuels for use at the facility. The oil tanks were located adjacent to the ditch near the Southern Pacific railroad tracks.

Response to Interrogatory No. 5

During its period of operations, the Red Bluff mills used or generated contaminants typically found at L-P's sawmill and manufacturing facilities, including hydrocarbons, PCP, and wood waste. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA, the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA, and the general discussion of the contaminants found at L-P's woodwaste landfills contained in the Response to Interrogatory No. 5 for Caspar Landfill, CA

2

<u>Response to Interrogatories No. 8, 9, 11 and 12</u>

L-P's liability at the Red Bluff sawmill and VG and Jamb plant is based on environmental property damage to soil and groundwater due to contamination by PCP and hydrocarbons. The claim made against L-P was initiated by the RWQCB pursuant to state environmental laws. Additional information concerning the administrative actions against L-P are detailed below.

Under the direction of the RWQCB, L-P conducted a hydrogeologic investigation of the sawmill site in 1985. Levels of PCP were detected in two groundwater monitoring wells at or near the detection limit of 0.2 ug/1. L-P excavated approximately 1,000 cubic yards of PCP contaminated soil in the vicinity of the historic greenchain associated with the sawmill in 1997.

In its June 25, 1993 letter to L-P regarding Waste Discharge Requirements on Closed Facility, Sierra Division, Red Bluff Operation, the RWQCB ordered L-P to undertake certain investigation/remediation of PCP contamination emanating from the Red Bluff sawmill property, so as to address property damage caused by such contamination. The focus of the RWQCB directive was in the vicinity of two fungicide treatment areas associated with the closed mill.

In its April 15, 1998 Cleanup and Abatement Order No. 98-712, the RWQCB ordered L-P to clean up PCP and Stoddard Solvent contaminated soil and groundwater at L-P's VG and Jamb plant. Remediation has consisted of excavation and treatment of contaminated soil. Groundwater monitoring is in progress and remediation of the groundwater will be required.

3

## SAMOA, CA

### Response to Interrogatory No. 1

The site is located on a Samoa Peninsula along Samoa Road in Humboldt County, California. 40 49'15" North Longitude; 124 10'500" West Longitude; Section 16, T5N, R1W (HB&M).

### Response to Interrogatories No. 3 and 4

The Samoa sawmill and manufacturing plant were developed and originally operated by Hammond Lumber Company, which subsequently sold the site to G-P. L-P acquired the Samoa facility in December 1972 in the G-P spin-off.

Major maintenance of rail equipment occurred in and around a portion of the Samoa site known as the Round House. A parts washer and a paint booth are also located at the premises. Sandblasting of equipment prior to painting was performed adjacent to the paint booth.

In the main maintenance area a mechanics pit was used to collect waste oil. A sump was used to contain the fluids and reportedly overflowed to an underground piping and disposal system. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA, and the general discussion of L-P's manufacturing facility operations contained in the Response to Interrogatory No. 3 for Arcata, CA.

### Response to Interrogatory No. 5

During its operational period, the Samoa sawmill and manufacturing facility used or generated contaminants commonly found at L-P's sawmills and manufacturing facilities, including hydrocarbons.

1

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA, and the general discussion of the contaminants found at L-P's manufacturing facilities contained in the Response to Interrogatory No. 5 for Arcata, CA.

Response to Interrogatories No. 8, 9, 11 and 12

The investigation and remediation at Samoa has been conducted under a California voluntary notification program.

2

## TACOMA, (COMMENCEMENT BAY, HYLEBOS PLUS ASARCO), WA

### Response to Interrogatory No. 1

The Tacoma/Hylebos stud-mill facility is located on an 18-acre parcel of land at the head of the Hylebos Waterway in the Commencement Bay Industrial Area, at 3701-3825 Taylor Way in Tacoma, Washington.

The Commencement Bay Superfund site is located at Tacoma, Washington in the southern Puget Sound and consists of a bay of approximately 9 square miles surrounded by primarily industrial waterfront property.

### Response to Interrogatories No. 3 and 4

L-P has operated a studmill at the head of the Hylebos Waterway on Commencement Bay since it purchased it in 1973. The mill consists of a sawmill/kiln drying facility and a log sort yard. The mill processes logs into commercial grade studs to be used by the construction industry. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

The logs used by this mill are mostly transported by truck although about ten percent are rafted or barged into the Hylebos Waterway and transferred to the log sort yard with a tram. Several other companies have used or currently use the Hylebos Waterway to transport and store logs. Logs that are transported or stored in water tend to lose bark which can accumulate in sediments. After an extended time, bark can accumulate to levels that adversely affect the organisms that reside in or on the sediments.

The log sort yard at the sawmill is unpaved and requires that rock ballast be placed on the access roads during the wet season to insure access by log loading equipment and delivery vehicles. This ballast normally consists of gravel delivered by gravel yards,

1

although on a few occasions, slag from the nearby ASARCO Copper Smelter was applied by an independent contractor. Somewhere between 300-600 tons of slag from ASARCO were applied on the L-P log sort yard between 1974-1981. The L-P site is among ten log sort yards on the Commencement Bay waterways that have used the copper smelter slag as ballast material.

The use of the slag may lead to L-P incurring liabilities at other properties as well. Yard scrapings, including ASARCO slag, at the L-P site have on occasion been taken to other locations for disposal or recycling. Some material went to the B & L Landfill in Milton, WA and to the Murray Pacific property where bark is separated from soil and rock. Some material may have gone to the city or county landfills.

Numerous industrial and commercial operations are located in the area surrounding the Commencement Bay Superfund site including pulp and lumber mills, ship building, shipping, chemical production facilities, concrete production, non-ferrous metal smelting, oil refineries, and related storage and transportation services.

Response to Interrogatory No. 5

The Tacoma/Hylebos/Commencement Bay location consists of three environmental issues:

(1)   Contamination associated with the operation of the Hylebos stud mill;

(2)   Onsite and offsite contamination caused by ASARCO slag used to fortify access roads at the sawmill's sort yard; and

(3)   Contamination of Commencement Bay (of which Hylebos Waterway is a part) by industrial contaminants and wood wastes.

During its operational period, the Tacoma/Hylebos/Commencement Bay stud mill used or generated contaminants commonly found at L-P's stud mills, including

2

hydrocarbons and wood waste. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

In addition to typical sawmill contaminants, the Hylebos stud mill was contaminated because of the use of copper smelter slag from the nearby ASARCO facility as ballast material. At the time the slag was applied, scientific studies had indicated that the slag was environmentally inert and therefore safe to use for this purpose. Investigations have since concluded that the slag was emitting high levels of arsenic, copper, lead, and zinc. L-P ceased its use of ASARCO slag after the results were reported. However, L-P subsequently learned that slag from the sort yard was taken offsite for disposal.

The contamination of Commencement Bay involves multiple parties and different types of operations. Since the initial industrialization of the bay area, hazardous materials have been released into the environment surrounding the bay including arsenic, lead, copper, polychlorinated biphenyls, and pesticides. L-P's involvement at Commencement Bay is based on: (1) possible contamination of the watercourse due to the release of contaminants at the sort yard originating in the ASARCO slag; and (2) wood waste and sediment deposits in the watercourse due primarily to bark deposits from log rafts servicing the sawmill.

### Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Tacoma/Hylebos/Commencement Bay site is based on environmental property damage to soil and groundwater at the log sort yard due to contaminants associated with the ASARCO slag including arsenic, copper, lead, and zinc. L-P also has incurred liability for property damage to the Commencement Bay watercourse

3

and natural resource damages (primarily fish) due to contamination from the ASARCO slag and wood bark sediments from log rafts servicing the sawmill.

The claims made against L-P were initiated by Washington Department of Ecology ("WDOE") pursuant to state environmental laws and USEPA under CERCLA. Additional information concerning the administrative actions against L-P are detailed below.

In December 1986, the WDOE mailed a letter to L-P containing a proposed Consent Order, regarding a site investigation and cleanup of slag-related contamination migrating from the log sort yard. After WDOE and L-P failed to reach an accord on the Consent Order, the agency ordered L-P in 1987 to undertake a site investigation at the sort yard, and in 1988, WDOE ordered L-P to conduct a groundwater investigation. In response to these orders, L-P undertook the investigations and subsequently submitted a Feasibility Study to WDOE in April, 1989. Several cleanup alternatives for the site were examined in the FS.

On May 30, 1990, WDOE issued Remedial Action Order No. DE 90-S170 to L-P, which required L-P to evaluate the expected effectiveness of capping as a cleanup technology, to conduct subgrade testing of the site, and to prepare a preliminary cap design. L-P complied with this order and submitted the required reports in July and October, 1990. WDOE issued a Draft Cleanup Action Plan ("CAP") in 1992, and L-P was required to perform certain remedial actions in the Final CAP.

In December 1992, the WDOE also ordered L-P to undertake various site-specific measures, including capping the log sort yard with concrete.

Administrative proceedings related to the contamination of Commencement Bay began in 1983, when the U.S. EPA listed the Bay as a Superfund site. Although all the

4

waterways have had contamination issues, EPA has focused much of its attention on the chemical contamination with Hylebos Waterway. The Record of Decision (ROD) issued in 1989 outlined the general areas that needed to be cleaned up under the Superfund program. In 1993, a group of six companies called the Hylebos Cleanup Committee (HCC) entered into a consent order with EPA to delineate the boundaries of the chemical contamination and develop a preliminary design for the cleanup of the Hylebos Waterway. During the course of its investigation, the HCC found some sediments failed biological criteria but did not have high levels of the chemical contaminants that were being tested. To account for this unexplained toxicity, the HCC asserted to EPA and the Washington Department of Ecology (WDOE) that organic enrichment from wood debris deposited by log rafting activities was adversely affecting benthic organisms in the waterway. While the agencies did not accept the HCC's conclusions completely, they expressed a concern that wood could be causing adverse effects and requested additional investigation and delineation. EPA simultaneously approached several companies that had rafted logs into the Hylebos Waterway to ascertain their level of interest in investigating and cleaning up wood debris in the Hylebos Waterway.

After an intense period of discussions and negotiations in the later part of 1997, three companies formed the Wood Debris Group and entered into an agreed order with WDOE to address the accumulations of wood debris at the head of the Hylebos Waterway.

The agreed order with WDOE requires the companies to delineate the areas of wood debris at the head of the waterway, clean up these areas, and implement best management practices to reduce future accumulations.

The members of the Wood Debris Group recently signed a consent decree with the State of Washington to complete the clean up of the delineated areas of wood debris.

5

The decree has essentially the same conditions as the agreed order but also provides

contribution protection for matters covered by decree.

## UKIAH/YORK RANCH, CA

### Response to Interrogatory No. 1

The Ukiah site is located at 2801 North State Street in Ukiah, CA. The York Ranch woodwaste landfill site is located about 3 miles from the Ukiah sawmill site, off Pomo lane in Ukiah, CA.

### Response to Interrogatories No. 3 and 4

L-P acquired the Ukiah sawmill and treating plant facility as part of the G-P spin-off in December 1972. L-P operated the sawmill until the site was sold to Medocino Forest Products in 1998. For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA, and the general discussion of L-P's Wood Treating Plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

L-P leased the property where the York Ranch woodwaste landfill was located from Jack Cox and his company, Nor-Cal Investment Co., Inc. L-P operated the woodwaste landfill from 1976 until the landfill was closed in 1992. For additional information responsive to this Interrogatory, see the general discussion of L-P's woodwaste landfill operations contained in the Response to Interrogatory No. 3 for Caspar Landfill, CA.

### Response to Interrogatory No. 5

During its operational period, the Ukiah sawmill and wood treating plant used or generated contaminants commonly found at L-P's sawmills and wood treating plants, including PCP, CCA, and hydrocarbons.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's Sawmill Facilities contained in the Response

to Interrogatory No. 5 for Alexandria, LA, and the general discussion of the contaminants found at L-P's wood tTreating plants contained in the Response to Interrogatory No. 5 for Ashland, WI.

During its operational period, the York Ranch woodwaste landfill used or generated contaminants commonly found at L-P's woodwaste landfills, including woodwastes and organic compounds associated with wood decomposition. For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's woodwaste landfills contained in the Response to Interrogatory No. 5 for Caspar Landfill, CA.

## Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P with respect to the York Ranch site was initiated by RWQCB under permitting requirements and state environmental laws. Additional claims were asserted against L-P by the landowner of the property where the landfill was located.

L-P's liability at the York Ranch site is based on environmental property damage to alleged groundwater due to contamination by woodwaste and associated organics.

1472618 v1; VK@001!.DOC

## WALDEN, CO

### Response to Interrogatory No. 1

The Walden sawmill is located adjacent to the City of Walden (E ½ of the S ¼ Section 29-9-79 and SW ¼ of 28-9-79), Jackson County, Colorado 80480.

### Response to Interrogatories No. 3 and 4

Michigan River Timber Company purchased and began sawmill operations in 1937. the original Michigan River sawmill operated on diesel and produced products including posts, poles, ties, and telegraph cross arms. The first mill burned down in 1939 and was replaced with another small diesel mill, which itself was replaced in 1942 by a larger steam mill.

In 1947, Michigan Timber purchased a wood treatment plant in Laramie, WY to expand operations. Shortly thereafter, the Walden Mill began taking in raw timber from other locations for finishing.

In 1950 Nebraska Bridge Supply and Timber Company took over the existing operations at the Walden mill, constructed a new diesel-powered planer mill, and replaced the steam equipment with a diesel generator. In 1954, modifications were made to the planer and sawmill, and efforts to begin using natural gas in combination with wood waste to operate the mill were made. In 1961, the planer mill burned and was replaced by a larger and more efficient planer mill. The diesel generator was replaced by electrical power at the mill. In 1966, a dry kiln was constructed at the facility. In 1974, the mill was purchased by Edward Hines Lumber Company. The site was sold to L-P in 1983, which increased production and operated the mill continuously until July 1994. The mill closed in August the same year. In August 1995, an auction was held to dismantle and demolish the mill. For additional information responsive to this Interrogatory, see the general discussion of L-

1

P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA.

### Response to Interrogatory No. 5

Hazardous materials used at the mill included fuel and a variety of other petroleum products, materials used for refurbishing saw blades, end paint for bunks of lumber, boiler chemicals, transformer oil (PCBs), and materials used in performing routine maintenance activities.

Fuel consisted primarily of diesel with lesser amounts of gasoline. Generally, fuels were stored in underground storage tanks. Other petroleum products were also used including oils, greases, hydraulic fluid, and solvents. Transformers used on-site contained oil laden with PCBs. Boiler chemicals were also used including chemicals for scavenging oxygen, scale reducing agents, and pH control additives. Maintenance activities utilized a variety of chemicals including lead babbitt, spray paint, and lubricants. Larger amounts of paint were used to cover the ends of bunks of lumber. Lead acid batteries were also used for on-site equipment.

Underground storage tanks (USTs) were utilized at the mill in the maintenance area including three (3) 4,000 gallon tanks (2-diesel, 1-gas) and one (1) 10,000 gallon tank (1-diesel). The three (3) 4,000 gallon tanks were removed in the 1980s (approximately 1985). The 10,000 gallon tank was removed in 1995.

For additional information responsive to this Interrogatory, see the general discussion of the contaminants found at L-P's sawmill facilities contained in the Response to Interrogatory No. 5 for Alexandria, LA.

2

Response to Interrogatories No. 8, 9, 11 and 12

The claim made against L-P was initiated by the State of Colorado Department of Health & Environment pursuant to State law. L-P's liability at the Walden site is based on environmental property damage to soil due to contamination by hydrocarbons. Additionally, L-P was required to close the onsite landfill under the direction of Colorado DHE.

## WAYNESBORO, GA

### Response to Interrogatory No. 1

The Waynesboro Site is comprised of approximately 133 acres, located at 1224 Perimeter Road approximately two miles east of Waynesboro in Burke County, Georgia.

### Response to Interrogatories No. 3 and 4

Kimberly-Clark Corporation built the sawmill facility on site in 1974 and the wood treating plant in 1977. Eighteen buildings were located on the property comprising two sawmills, two kilns, a planer mill, and a wood treating plant. All the structures except the drip pad and sales buildings have been demolished and all debris removed from the site. Only foundations, former concrete floors and exterior slabs (drive ways, storage areas, etc.) remain.

Throughout its history, the plant utilized chromate-copper-arsenic (CCA) solutions as the wood preservative. L-P purchased the site from Kimberly-Clark in 1984 and performed wood treatment operations until early 1992. All manufacturing activities were discontinued in November 1995.

The wood treating plant is an open-sided steel building with approximately 23,000 square-feet of floor space. The concrete floor of the building is surrounded on three sides by a curb. Wood treating equipment formerly located in a contained area of the plant includes two 10,000-gallon "work tanks", one 4,000-gallon CCA concentrate tank, a pressure vessel, a mix tank, and a water storage tank. An elevated rail is located in front of the pressure vessel. This rail provided a system for placing and removing wood from the pressure vessel, as necessary.

The entire wood treating plant is covered. The portion of the plant's floor not contained by a curb is elevated which allowed access to forklifts and other heavy

1

equipment. The floor is sloped so that spilled liquids would ideally drain to a floor collection trench located along the west and south sides of the aforementioned curb. Liquids entering the floor collection trench flowed into a sump where they were subsequently pumped into one of the two work tanks.

Treated lumber was stored throughout the wood treating plant. Typically, freshly treated wood was stored in the front half of the main building until it became relatively dry. After drying, the treated wood was moved to another area of this building.

The southeastern one-half of the site was used by Kimberly-Clark primarily for disposal of the facility's wood waste. L-P also disposed wood wastes into the landfill, but not on a routine basis.

## Response to Interrogatory No. 5

During its operational period, the Waynesboro Site used or generated contaminants commonly found at L-P's sawmills and treatment facilities, including water treatment chemicals, which were stored in the boiler house; equipment maintenance materials such as lubricating oils, hydraulic fluid, parts cleaners and paints; and small amounts of diesel, gasoline, lubricating oils, and hydraulic fluid, which were stored in the facility's above-ground storage tanks ("ASTs"). For additional information responsive to this Interrogatory, see the general discussion of L-P's sawmill operations contained in the Response to Interrogatory No. 3 for Alexandria, LA; and the general discussion of L-P's wood treating plant operations contained in the Response to Interrogatory No. 3 for Ashland, WI.

## Response to Interrogatories No. 8, 9, 11 and 12

L-P's liability at the Waynesboro site is based on environmental property damage to soil due to contamination by CCA. The claims against L-P at Waynesboro are brought

under state environmental regulations (soil contamination and landfill closure) and the Georgia Hazardous Waste Response Act (landfill closure). Additional information responsive to this Interrogatory is the subject of continuing investigations. Plaintiffs will supplement their Response, as required by the Federal Rules of Civil Procedure, as additional responsive information is developed. Regulations required the closure of the treating plant. NFA from State. Regulations required the cleanup of PCP.

# SINNOTT, DITO, MOURA & PUEBLA

A PROFESSIONAL CORPORATION

TWO EMBARCADERO CENTER
SUITE 2330
SAN FRANCISCO, CA 94111-3910
(415) 352-6200
FAX (415) 352-6224

707 WILSHIRE BLVD.
SUITE 3200
LOS ANGELES, CA 90017
(213) 996-4200
FAX (213) 892-8322

E-MAIL SDMP.COM

Our File
188.255

July 29, 2002

*VIA FACSIMILE & U.S. MAIL*

Kenneth H. Frenchman, Esq.
Dickstein, Shapiro, Morin & Oshinsky LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036

      Re:   *Ketchikan Pulp Company et al. v. Granite State Insurance Company et al.*

Dear Mr. Frenchman:

We have reviewed your recent answers to interrogatories (Sets One and Two). With this letter we hope to initiate a productive meet and confer process over those responses. For the reasons set forth below, we respectfully request supplementary answers to the following interrogatories.

    First Set of Specially Prepared Interrogatories: Site Information:

Interrogatory No. 5:   This interrogatory seeks a description of hazardous material used, stored, generated and disposed at each site. General information is provided for many sites. However, no responsive information is provided as to the Salmon Creek or East Providence sites.

             As to Salmon Creek, your clients' response indicates that "We are not sure where this location is or why it's on the list." The remainder of the response refers to a site in California. Salmon Creek, Alaska, however, is one of the sites listed in Attachment A to your clients' complaint. Having sued our clients for breach of contract for alleged claims relating to Salmon Creek, Alaska, we find it difficult to understand how your clients are now unable to identify this site. To the extent that your clients' problems are due to the fact that there may be more than one Salmon Creek in Alaska, simply respond to the interrogatories with respect to the site your clients placed at issue.

I:\WPDOCS\AIGRC LOUIP\AC LETTERS\frenchman.802a.wpd

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 2

As to the East Providence site, your clients indicate that they do not know what hazardous materials were stored or used, but that your clients will supplement their responses as further information becomes available. This is not sufficient. The purpose of these interrogatories, as reflected in the Court's April 17, 2002 minute order, is to enable the parties to engage in meaningful discussions over the selection of sites for the initial trial in this matter. We have voluntarily limited the sites on which your client must respond to these interrogatories. Initial trial site selection will necessarily be frustrated unless adequate response is given as to all remaining sites. Please provide substantive information for the East Providence site.

Interrogatory No. 6:    This request seeks a description of releases of hazardous materials at each site. Your clients' response indicates that the "environmental damage at issue was caused by continuous or nearly continuous exposure to hazardous materials used, generated or stored on Site. For certain unusual or extraordinary incidents that resulted in environmental damage, records documenting the incident would have been created pursuant to the reporting requirements of applicable law." This response is insufficient in two regards.

First, the "continuous or nearly continuous exposure" cannot have caused damage unless hazardous materials were actually released. The nature and timing of such releases are critical to your clients' claims for coverage in this matter. The answer appears to indicate that your clients' contend some releases were continuous over a long period of time. Our clients are entitled to more precise information regarding the time frame your client contends the "continuous or nearly continuous exposure" took place. More importantly, our clients are entitled to know the mechanism through which the alleged exposure occurred. Your clients' answers contain no information as to how the alleged exposure took place. Please supplement your clients' responses to this interrogatory accordingly.

In addition to the "continuous or nearly continuous exposure," your response references "unusual or extraordinary incidents." The responses, however, contain no specific information regarding these alleged incidents, and simply refer our clients to unidentified records. This does not satisfy the requirements of Rule 33(d), which requires your client to

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 3

either describe the documents with specificity, or produce them.
Moreover, your clients' response is not consistent with the purpose of the
Court's case management directives. As indicated, the purpose of these
interrogatories is to enable the parties to make informed decisions on the
selection of initial trial sites. Information on the type and timing of the
alleged "unusual" incidents is critical to that process. By vaguely
referencing documents, rather than providing the requested information,
your clients are essentially forcing a massive document review effort on
each site, before initial trial site selection discussions can begin. The
purpose of the Court's case management order was to limit this type of
comprehensive document discovery. That purpose is frustrated by your
clients' lack of substantive response. Please supplement your clients'
responses to this interrogatory accordingly.

Interrogatory No. 7:   This interrogatory seeks information on the timing of the releases at the
sites. Your clients' response simply refers to their response to
interrogatory number 6. As described above, no substantive information
on the actual timing of the alleged continuous exposures, or unusual
incidents, is included in those responses. Please supplement your clients'
responses to this interrogatory accordingly.

Interrogatory No. 8:   Interrogatory 8 asks for the identity of each claimant at each site. This
information may impact your clients' substantive claims for coverage, and
will certainly have a bearing on the quantity and quality of non-party
evidence that may exist with respect to any particular site. You have
provided this information as to some sites, but it appears to have been
omitted for several sites, including: Salmon Creek, Alaska; Alexandria,
Louisiana; Alto, Georgia; Calpella, California; East Providence, Rhode
Island; Marianna/Cypress, Florida; New Waverly, Texas; Samoa,
California; and Waynesborro, Georgia. Again, the purpose of these
interrogatories is to allow for a meaningful and thoughtful dialogue on
initial trial site selection. Such a dialogue, and indeed site selection itself,
cannot happen until complete responses are provided.

Interrogatory No. 9:   This interrogatory asks your clients to state whether the claimants at each
site allege property damage, bodily injury and/or personal injury. This
information is critical to your clients' substantive claims for coverage.
Your response simply refers to its answer to interrogatory number 8. The

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 4
_____

implication in most of the responses is that the claimants allege property damage. This should, however, be made explicit. Moreover, information responsive to this interrogatory appears to have been omitted as to several sites, including those described above. Please supplement your clients' responses accordingly.

Interrogatory No. 10:  This interrogatory seeks information regarding the timing of any alleged property damage, personal injury or bodily injury. No coverage is provided under the subject policies for injuries taking place outside their respective policy periods. Accordingly, this information is critical to your clients' claims for coverage, and will influence decisions on initial trial site selection.

Your clients' response simply refers to prior answers to interrogatories 6 and 8. As discussed above, however, the responses to those interrogatories provide no information regarding the timing of any injury or damage. For the reasons described above, this interrogatory should also be supplemented.

Interrogatory No. 11:  Interrogatory 11 requests information as to when claims at each site were first asserted. Again, the responses simply reference your clients' answers to interrogatory 8. While the responses provide time frames in which investigative or remedial activities occurred at some sites, no definitive statement is provided as to when claims were first asserted against your clients. Please supplement your clients' responses accordingly.

Interrogatory No. 12:  This interrogatory asks whether the claims at each site involve a formal lawsuit, as compared to an administrative action or other type of proceeding. It also requests that your client identify, by venue, title and number, each such lawsuit or administrative action. Arguably, no coverage obligations arise absent a formal lawsuit. Accordingly, this information will impact site selection.

The response to this interrogatory also refers to the answers to interrogatory number 8. In many instances those answers refer to claims made by various administrative bodies. Implicit in your responses is the supposition that such claims involve administrative actions, rather than lawsuits. This critical distinction should be made explicit in your clients'

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 5

responses. Moreover, in almost no instance did your client state the venue, title or identifying number for the lawsuit, administrative action or other type of claim. Please supplement your clients' responses accordingly.

Interrogatory No. 13: This interrogatory asks your clients to identify all governmental directives or orders which may be the basis for the alleged liabilities. Your clients' responses simply refer to documents stored at the individual sites. This response fails to satisfy Rule 33(d), which requires your client to either identify the documents with particularity, or produce them.

More importantly, any attempt to refer to documents in response to these interrogatories is fundamentally at odds with the Court's case management directives. The Court's directives, and these interrogatories, were designed to avoid the over-arching document review process common in cases of this magnitude, at least in the near term. If your clients insist on providing basic site information through reference to unidentified documents, rather than substantive responses to these interrogatories, site selection will be delayed.

Interrogatory No. 17: This interrogatory seeks information on the amount of your clients' alleged liabilities attributable to sudden and accidental releases. Many, if not all, of the subject policies exclude coverage for damages arising from gradual releases. Accordingly, this information is critical to the case, and to site selection. Your clients provide no substantive response to this interrogatory. Instead, they state that the amount of liability attributable to such releases is currently "unknown." Not only should any alleged sudden and accidental releases be identified in response to interrogatory number 6, they should also be quantified, which, we will argue, is part of the policyholders' burden of proof.

Interrogatory No. 18: This interrogatory asks your client to state the amount of defense costs it claims to have incurred with respect to each site. Our clients' policies are excess policies. Even assuming the claims are covered, however, defense costs would be chargeable to the primary layer. This information, therefore, is essential to evaluating the claims at each site, and thus critical to site selection. Your clients respond by stating that the amount of such costs "has yet to be determined, but is the subject of continuing

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 6

investigations." If this response is meant to indicate that defense costs at certain sites are on-going, this interrogatory should at least be supplemented to state the amount of currently alleged defense costs. Please supplement your clients' responses to this interrogatory accordingly.

Interrogatory No. 19:  Interrogatory 19 requests the identity of persons with knowledge of your clients' activities at the sites. Site selection may be informed by the amount and quality of information which the parties expect to be available with respect to a given site. A list of individuals who may have responsive information, therefore, is important to the site selection process. Your clients' responses, however, simply refer to general categories of people. This is insufficient. Please supplement this answer to provide a list if individuals expected to have information regarding your clients' activities at the listed sites. So that we can assess the discovery burdens and/or prospects with regard to the subject sites.

Interrogatory No. 20:  This interrogatory seeks the identity of individuals with knowledge of the hazardous material used at each site. Again, only general categories of individuals are provided. For the reasons stated above, please supplement this answer to provide a list of individuals expected to have information regarding the hazardous substances used at each site.

Second Set of Specially Prepared Interrogatories:  General Information:

Interrogatory No. 1:  This interrogatory requests information regarding policies issued to KPC, or for its benefit. The General interrogatories are specifically allowed in the Court's April 17, 2002 minute order, granting authority to ask questions "that would relate to multiple sites or otherwise touch and concern discoverable information that is not site specific." KPC's operations at many sites pre-date the existence of L-P, and its insurance program. Insurance obtained by KPC is critical to allocation of alleged liabilities at sites operated by KPC. Your clients' responses, however, artificially limit themselves to policies issued to L-P. If KPC purchased no insurance of its own, it should so state under oath. Please supplement your clients' response to this interrogatory to provide information regarding any insurance issued to KPC.

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 7

Interrogatory No. 4:  This interrogatory seeks a description of assets or liabilities transferred from Georgia Pacific Corporation to L-P. This information is important: (1) to evaluate the nature and extent of L-P's liability at particular sites; and (2) to evaluate L-P's potential entitlement to G-P assets to satisfy this liability. Your clients' responses refer the general site descriptions, and agree to provide documents regarding the transfer. This does not satisfy the requirements of FRCP 33(d), which requires your clients to identify such documents with specificity, or produce them with their response. Please supplement this response accordingly.

Interrogatory No. 5:  This interrogatory seeks additional information on the transfer of assets and liabilities between Georgia Pacific Corporation and L-P. Your clients' response simply refers to their prior response. For the reasons stated above, this is insufficient.

Interrogatory No. 6:  This interrogatory seeks information as to policies issued to others, but which may benefit L-P. Your clients decline to answer based on several objections, none of which have merit.

Our clients provided excess insurance only. The existence of other insurance benefitting L-P, which may be primary, and required to respond before our clients' policies are implicated, if at all, impacts the core issues in this case. The interrogatory is simple, and clear as to the information it seeks. It requires no speculation on your clients' part, only a good faith assessment of its potential insurance assets.

Your clients' final objection is on the ground that it is beyond the scope of permitted discovery. We again refer you to the Court in its April 17, 2002 minute order, which allows interrogatories "of a general nature that seek information of a class or type that would relate to multiple sites or otherwise touch and concern discoverable information that is not site specific." This interrogatory falls within the authority granted by the Court. Please provide a substantive response to this interrogatory.

Interrogatory No. 16:  This interrogatory asks your clients to state their contention on the number of occurrences they believe have given rise to the alleged liability that is at issue in this litigation. You clients decline to respond on the ground that the interrogatory calls for a legal conclusion and is premature. We remind

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 8

you, however, that your client has alleged breach of contract in their complaint. Breach of an insurance contract requires tender of a covered occurrence, coupled with wrongful denial of policy benefits. Your clients cannot state a good faith cause of action for breach of contract, but disavow the ability to articulate the type, nature and number of covered occurrences tendered to our clients. At paragraph 20, your clients' complaint alleges that the subject liabilities arise out of "occurrences that resulted in property damage." Our clients are entitled to information characterizing and quantifying the alleged occurrences. Please provide a substantive response to this interrogatory.

Interrogatory No. 17: This interrogatory seeks additional information on the occurrences, which should have been enumerated in response to interrogatory number 16. No substantive response was provided. For the reasons stated above, our clients are entitled to information on the alleged occurrences. Please provide a substantive response to this interrogatory.

Interrogatory No. 18: This interrogatory also seeks additional information on the occurrences, which should have been enumerated in response to interrogatory number 16. No substantive response was provided. For the reasons stated above, our clients are entitled to information on the alleged occurrences. Please provide a substantive response to this interrogatory.

As you know, the Court has requested the parties to submit a joint designation of one or more sites for the initial trial in this matter. Absent agreement, separate briefs will be filed. For the reasons stated above, site selection cannot proceed without adequate responses to the foregoing interrogatories. Those submissions are currently due on September 6, 2002. So that site selection will not be delayed, we respectfully request your clients' supplemental responses within two weeks from the date of this letter.

We will make a good faith effort to continue any productive meet and confer dialogue in order to come to a reasonable resolution of any disputes regarding discovery. If possible, we would like to avoid motion practice on these issues. Absent a commitment from your clients to supplement their responses, however, we will be forced to seek an order from the Court compelling such responses.

If, after considering the issues contained in this letter, you wish to discuss the matter further, please feel free to contact us. You may contact me directly. For much of August, however, I will

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
July 29, 2002
Page 9

be out of the office, and will not be able to return telephone calls.  In my absence, matters
involving your clients' discovery responses will be handled by my colleague, David Yount.

Very truly yours,

SINNOTT, DITO, MOURA & PUEBLA, P.C.

Kenneth H. Sumner
KHS/sb

cc: Mike O'Clair

FILE COPY

DICKSTEIN  SHAPIRO  MORIN  *&*  OSHINSKY  LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 955-6618
E-Mail Address: PooleR@dsmo.com

August 14, 2002

**VIA FACSIMILE AND U.S.MAIL**

Kenneth H. Sumner, Esq.
Sinnott, Dito, Moura & Puebla, P.C.
Two Embarcadero Center
Suite 2330
San Francisco, California 94111-3910

Re:   *Ketchikan Pulp Company et al. v. Granite State Insurance Company et al.*

Dear Kenneth:

I am the person principally responsible for the interrogatory Responses served by Plaintiffs Ketchikan Pulp Company ("KPC") and Louisiana-Pacific Corp. ("L-P") in the above matter. For that reason, I am responding to your July 29, 2002, letter to Ken Frenchmen seeking additional information.

As an initial matter, we share your stated desire "to engage in meaningful discussions over the selection of sites for the initial trial in this matter." Accordingly, our goal in responding to both sets of interrogatories was to set out the most detailed information available to the KPC and L-P personnel most knowledgeable in the areas addressed by the interrogatories. To the extent that those individuals were able to provide the specific information requested, we included it in the nearly 200 pages of detailed Responses served July 1, 2002. In certain instances, where those individuals lacked knowledge of specific details sought by the interrogatories, they were able to identify where such information could be found, namely in documents maintained at the sites and central corporate records storage facilities.

The burden of deriving the desired information from the documents described in the interrogatory Responses is substantially the same for Defendants as it is for KPC and L-P. The Federal Rules specifically contemplate this situation and provide that a party providing discovery may satisfy its obligations by producing the appropriate records. *See* Fed. R. Civ. P. 33(d). Nothing in the Court's April 17, 2002 minute order precludes KPC and L-P from satisfying their discovery obligations in a manner authorized by the Federal Rules. As we noted in our Responses, KPC and L-P are willing to locate and produce, at a mutually convenient time and place, any non-privileged, responsive documents that defendants may request.[1]

---

[1] Although KPC and L-P doubt this type of broad document discovery will be the most efficient way of achieving our shared goal – the negotiated selection of one or more

1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalinnovators.com

1492018 v1; VZBY01!.DOC

Kenneth H. Sumner, Esq.
August 14, 2002
Page 2

The KPC and L-P Responses contain nearly 200 pages of currently available, detailed information regarding the KPC or L-P operations and environmental conditions at the relevant sites. This information includes: descriptions of the hazardous materials used during operations and discovered during investigation; the claimants involved at each site and the investigation and remediation implemented in Response to their claims, orders and directives (including the costs of same); business combinations, asset transfers, accounting practices and other financial matters; and, insurance coverage for KPC and L-P. Our expectation is that this information will be sufficient to allow the Parties to narrow the list of potential "test sites" to a manageable number of truly representative sites that implicate substantially all of the coverage issues in dispute. I suggest that Robin and Dave Campagne discuss this approach as soon as you have the opportunity to review the additional information provided in this letter.

With these thoughts in mind, I will now turn to your objections and comments regarding specific interrogatory Responses.

### First Set of Specially Prepared Interrogatories: Site Information

Interrogatory No. 5

*For each SITE, separately describe all HAZARDOUS MATERIAL used, stored, generated or disposed of at the SITE, before, during and after YOUR involvement with the SITE.*

Salmon Creek, CA

I apologize for the confusion that has arisen regarding the Salmon Creek site. I erroneously included this site in a memorandum I prepared nearly two years ago regarding KPC-Alaska sites; and we mistakenly relied on that memorandum when drafting the complaint in the Alaska coverage action. Consequently, the Salmon Creek, *California* site was listed as Salmon Creek, *Alaska*. There is no (and never has been) a KPC or L-P environmental site at "Salmon Creek, Alaska." Accordingly, we responded to the Interrogatory as if it related to the L-P environmental site at Salmon Creek, CA – which is this site that is now (and has been at all relevant times in the past) part of L-P's insurance coverage claims against Defendants.

representative sites for a bellwether trial – we will arrange for the production of responsive documents on all sites subject to the Interrogatories, should Defendants so request.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 3

East Providence, RI[2]

As our Response to Interrogatory Nos. 3 & 4 states: "Highland America purchased the site from Arpad J. Merva in 1988 and used the site for gypsum-based wallboard production from 1990 to 1992. L-P bought the site in 1994, but never operated the facilities." At the time of the acquisition, leased property that was part of the purchase contained a large pile of used gypsum board and rock that was adjacent to the Seekonk River. Hazardous materials from this pile – principally the components of gypsum board – threatened to migrate into the Seekonk River and the landlord demanded its removal. Under the relevant environmental regulations of the Rhode Island Department of Environmental Protection, L-P's options were to cap the pile or remove it. L-P elected to move the pile to a licensed landfill as the most cost-effective alternative.

Interrogatory No. 6

*For each SITE, separately describe any and all releases of HAZARDOUS MATERIAL at the SITE.*

Your objection relates to our use of the term "exposure" in our Response to Interrogatory No. 6. We used the word deliberately because, as noted in our Responses, we believe the term you suggested ("release") is ambiguous.[3] In addition, "exposure" is the term used in the definition of "occurrence" in the majority of policies at issue: "an accident or a happening or event or a continuous or repeated *exposure to conditions* which . . . results in . . . property damage . . . during the policy period." Our Response was intended to track this policy language and to convey the fact that property damage at the sites in question resulted, at least in part, from the environment being exposed continuously to hazardous materials used, generated or stored at the sites during the period of their operation.

The specific methods of exposure by operations are described in our Responses to Interrogatory Nos. 3 & 4. For example, at a wood-treating plant, wood products are treated with certain hazardous materials (e.g., PCP, creosote or CCA) used as anti-stain

---

[2] While we appreciate your need for adequate information on which to base the evaluation of the proper test site(s) and will, as our Responses indicate, continue to supplement our Response to this and other Interrogatories as further information is developed, East Providence is an atypical site and would not make for a representative or useful selection for a bellwether trial. Although we do not deny your right to discovery regarding this site, as a practical matter both Defendants and Plaintiffs would be better served by focusing their energies on the sites that are truly representative and, as such, may be used to litigate common issues in dispute with respect to all or many of the KPC/L-P environmental sites.

[3] To the extent that this Interrogatory seeks information regarding "releases" in the sense of when hazardous materials may have "escaped" from L-P's property or migrated from soil to groundwater, KPC and L-P expect to offer expert testimony on this issue to establish both the pathway and the timing of such migrations.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 4

treatments. The environment is exposed to these materials both during application (typically the wood products are dipped in a solution containing the anti-stain agent) and when the treated wood products are laid out for drying (exposures may occur if chemicals miss or overflow the collection area).

You also objected to our reference to documents that record "unusual or extraordinary incidents." However, to the extent the information you seek exists, it would be contained in such documents, although we have not reviewed them and cannot describe their contents. As stated previously, we are willing to produce such documents at the locations where they are maintained in the ordinary course of L-P's business and make them available for your inspection at mutually convenient times. *See* Fed. R. Civ. P. 33(d).

Interrogatory No. 7

*For each release of HAZARDOUS MATERIAL described above, when did the release occur?*

As stated above, L-P contends that the operations at the sites caused continuous, or near continuous, exposures of hazardous materials to the environment. Such exposures occurred throughout the operating periods of the facilities in question, except for those cases where the particular operation that caused the exposures was discontinued prior to the cessation of activities at other portions of the site. For example, at a given sawmill and wood treating plant, the wood treating operation may have ceased several years before the mill was shut down. In such a case, the environmental exposure to wood-treating chemicals would have been continuous only throughout the operating period of the wood treatment process. For "unusual or extraordinary incidents," the timing of the incident may be found in the documents previously discussed. As we have not searched for and reviewed these documents ourselves, it is impossible to provide more specific information regarding the timing of such incidents. However, we will work with defendants to locate and produce such documents as you may request.

Interrogatory No. 8

*For each SITE, separately IDENTIFY the CLAIMANT or CLAIMANTS asserting claims against YOU.*

Alexandria, LA

This site was on the CERCLA list, and the Louisiana Department of Environmental Quality was involved in the CERCLA assessment. The hazardous material at issue was asbestos, and the remediation conducted at the site was required by applicable State and Federal regulations. The Preliminary Assessment of the site was prepared by a contractor to the EPA.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 5

#### Alto, GA

The remediation conducted at the site – the excavation and disposal of hydrocarbon- and PCP-contaminated soils at an off-site landfill – was required regulations issued by the Georgia Department of Natural Resources – Environmental Protection Division.

#### East Providence, RI

*See* Supplemental Response to Interrogatory No. 5.

#### Marianna/Cypress, FL

Remediation at this site consisted of the closure of a wood treating plant and the containment and cleanup of associated hazardous materials, and was required by Subpart (W) of the federal Resource Conservation and Recovery Act ("Supplemental"), 42 U.S.C. §§ 6901 *et seq.*

#### New Waverly, TX

Remediation at this was required by regulations promulgated by the Texas Natural Resources Conservation Commission.

#### Samoa, CA

All remediation was conducted in accordance with mandates of the California Regional Water Quality Control Board and the Humboldt County Department of Environmental Health.

#### Waynesborro, GA

The Treating Plant Closure was required by Subpart (W) of Supplemental and the Georgia Department of Natural Resources – Environmental Protection Division. The PCP cleanup and landfill closure was accomplished in accordance with the Georgia Department of Natural Resources, Environmental Protection Division.

#### Interrogatory No. 9

*For each SITE, separately state the nature of the allegations made by each CLAIMANT or CLAIMANTS, including, whether the claim alleges or relates to alleged PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE.*

Within the site-specific attachments to our Responses, we grouped certain answers into logical categories to reduce redundancy and to provide more readable narrative responses. Thus, our Responses to Interrogatory No. 8 (identity of claimant), Interrogatory No. 9 (nature of claimants' allegations), Interrogatory No. 11 (timing of

Kenneth H. Sumner, Esq.
August 14, 2002
Page 6

claim), and Interrogatory No. 12 (type of claim) were combined into one narrative, for each site, outlining the claim-specific information in our possession. I apologize if this attempt at greater clarity resulted in the opposite.

To the extent that our Responses require clarification, please note that the claimants at each of the sites at issue have alleged property damage. To our present knowledge, no claimant has alleged bodily injury and/or personal injury.

Interrogatory No. 10

*For each SITE, separately state when the alleged PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE occurred.*

Generally, the property damage alleged commenced with the date on which the property was first exposed to hazardous materials in the course of KPC or L-P operations at the sites and continued from that initial exposure until remediated. Additional property was damaged as hazardous materials escaped or migrated from one location to another, although the exact pathways, dates and extent of such escape or migration necessarily will be the subject of expert testimony. For example, expert testimony will be required to establish when contaminants escaped or migrated from one location and the speed of migration through various types of materials or substances (e.g., the rate at which a given hazardous material travels through a particular type of soil may be introduced to establish when that material reached the subsurface groundwater beneath a site).

Interrogatory No. 11

*For each SITE, separately state when the CLAIMANT or CLAIMANTS first alleged YOU were responsible for PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE.*

The date(s) on which claims at each site were first asserted against L-P or KPC – to the extent known – are set forth in our prior Responses (for each site) to Interrogatory Nos. 8, 9, 11 and 12.[4] There may be additional information in the relevant site or corporate storage files. We have not examined such files and do not know their contents, but we will make them available to you at their respective locations at mutually convenient times upon request.

---

[4] It is somewhat misleading to state, as your letter does, that "the responses simply reference your clients' answers to interrogatory 8." While this is literally a true statement, it makes no reference to the fact that our "answers to interrogatory 8" actually are combined responses to Interrogatories 8, 9, 11, and 12 in the form of a single narrative for each site, including all of the facts which otherwise would be included in a stand-alone response to each Interrogatory.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 7

Interrogatory No. 12

*For each SITE, separately state whether YOU are involved in civil litigation, an administrative action or other type of action, and describe with particularity the venue or location, title and identifying number for each lawsuit, administrative action or other type of action.*

This information – where available – is contained on a site-specific basis in our Responses to Interrogatory Nos. 8, 9, 11 and 12. All actions referred to are administrative actions unless otherwise noted. We will supplement our Responses if we discover additional responsive information. Additionally, non-privileged portions of the files and records respecting such proceedings will be made available for your inspection at mutually convenient times upon request.

Interrogatory No. 13

*For each SITE, IDENTIFY all orders and directives received by YOU from any governmental agency in connection YOUR LIABILITY.*

To the extent the information requested is known to the responsible individuals within the company, it has been provided on a site-specific basis in our Responses to Interrogatory Nos. 8, 9, 11 and 12. Whatever additional information may exist would be contained in documents relevant to such orders or directives, the non-privileged portions of which will be made available to you for inspection at mutually convenient times upon request.

Interrogatory No. 17

*For each SITE, separately state the amount of YOUR LIABILITY that resulted from sudden and accidental discharges or releases.*

Because the Court has not made – or been asked to make – a determination as to what constitutes "sudden and accidental discharges or releases," our substantive Response to this Interrogatory necessarily is preliminary and conditional on the Court's eventual construction of the policy language at issue. Our position, which comports with decisions by the courts of Alaska, Washington and Oregon, is that "sudden and accidental" means "unexpected and unintentional." Under this definition and based on the facts as we currently understand them, all of L-P's and KPC's environmental liabilities resulted from "sudden and accidental discharges or releases."

Even if the unresolved legal issue did not prevent a definitive Response, the factual information linking particular "discharges" or "releases" to discrete quantities of property damage simply is not available to our clients at this time. Because such facts are irrelevant in the context of the underlying claims, KPC and L-P have yet to attempt an allocation of their liabilities that resulted from any specific releases/exposures. Assuming

Kenneth H. Sumner, Esq.
August 14, 2002
Page 8

that such an allocation is possible (or even necessary), it will be the subject of expert testimony.

Interrogatory No. 18

*For each SITE, separately state the amount of YOUR LIABILITY incurred as DEFENSE COSTS and/or DEFENSE EXPENDITURES.*

This information is not available at this time. First, neither L-P's nor KPC's accounting records break out such information, i.e., "defense costs" and "defense expenditures" are not reported separately from remediation expenses. Second, many such costs may pertain to both "defense costs" and "remediation costs" and cannot be differentiated. Moreover, because the Court eventually must define what constitutes a "defense expenditure" as opposed to a "liability expenditure," any allocation by KPC and L-P would necessarily be preliminary and conditional. Third, the AIG policies at issue provide coverage for "Ultimate Net Loss," which is defined to include, *inter alia*, defense costs, settlement amounts, and judgments. For coverage purposes, then, KPC and L-P had no reason to keep records of which expenses fell into which categories, and they did not. However, such an analysis could be made from original invoices (currently in storage), which could be made available for inspection by defendants at mutually convenient times.

Interrogatory No. 19

*For each SITE, IDENTIFY all PERSONS which may have knowledge of YOUR activities at the SITE.*

Interrogatory No. 20

*For each SITE, IDENTIFY all PERSONS which may have knowledge of any and all releases of HAZARDOUS MATERIAL at the SITE.*

Prior to 1996 – 1997, when most of the remediation efforts commenced, L-P was organized along regional lines: Southern Division; Northern Division; Western Division. At that time, each division had a Division Environmental Manager. In addition, for specific projects, often there were Environmental Project Managers. Subsequently, L-P shifted to a Product Line organization and each product line was supported by its own environmental management team.

The following environmental managers were most familiar with the remediation efforts undertaken by L-P/KPC: Western Division: Kelly Stalker*; Elizabeth Smith*; Jim Miller*; Kirk Girard*; Dwayne Arino; Jeff Pluim; Bob Vogt*; Neil Sherman; Jennifer Gommersall. Northern Division: Jamie Angley; Jim Evensen*; Randy Sandberg*; Sue Somers*; Keith Seelig*; Glen Patrick*; Don Gray*; Mike Anderson; Don Sodersten. Southern Division: Jason Sanders*; Jim Boswell*; Randy Bennett*; Larson Harsey*; Geri Shoop*; John Harrie*; Barabara McGuinness*; Tracy Gibson*; Wally Benbenick*; Scott Jacobs. KPC/Alaska: Randy Sandberg*; Andy Malloy*; Barry Hogarty*; Ray Hendricks*. (* indicates that the individual is no longer with L-P.)

Kenneth H. Sumner, Esq
August 14, 2002
Page 9

### First Set of Specially Prepared Interrogatories:  General Information

Interrogatory No. 1

*IDENTIFY any and all insurance policies issued to KPC, or for its benefit.*

  The **only** insurance polices "issued to KPC, or for its benefit" **of which we are aware** are the policies identified in our Response.  These policies were issued to "Louisiana-Pacific Corp." as the "Named Insured," for liabilities arising in the State of Alaska only (in effect, limiting coverage to KPC's liabilities).  As previously stated, there may have been additional insurance policies "issued to KPC, or for its benefit," but, at present, we are not aware of any.  Investigation is continuing, however, and our Response will be supplemented, if necessary.

Interrogatory No. 4

*If YOUR Response to Interrogatory number 3* ["Is L-P a successor in interest to any assets or liabilities formerly held by any other entity, including G-P?"] *is anything other than an unqualified "No," please describe any assets or liabilities transferred.*

Interrogatory No. 5

*For any transfer described in Response to Interrogatory number 4, describe the exact nature of the transfer, including the IDENTITY of the parties to the transfer.*

  To the extent that the sites at issue involve assets or liabilities formerly held by third-parties, details regarding the parties to the transactions and general descriptions of the assets transferred to KPC or L-P are contained in our Responses to Site-Specific Interrogatory Nos. 3 and 4.  The specific terms of the underlying transactions that effectuated the asset transfers, sales, or business combinations at issue are contained only in the formal documents executed at the time of the subject transactions, which may be made available to you at mutually convenient times upon request.

Interrogatory No. 6

*IDENTIFY any and all insurance policies issued to any other entity, including G-P, for which L-P may be entitled to policy benefits.*

  There very well may be other insurance policies that "benefit" KPC or L-P, which were sold to other policyholders, but – by definition – those policies are not owned by KPC or L-P, and they do not appear in our files.  Neither L-P nor KPC is currently aware of any such other policies, but if they subsequently become aware of any, they will supplement this Response appropriately.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 10


Interrogatory No. 16

*State the number of occurrences which YOU contend have given rise to the LIABILITY and/or
FUTURE LIABILITY at issue in this litigation.*

Interrogatory No. 17

*Separately describe each occurrence which YOU contend has given rise to the LIABILITY
and/or FUTURE LIABILITY at issue in this litigation.*

Interrogatory No. 18

*For each occurrence described in Response to Interrogatory number 17, state the amount of
LIABILITY and/or FUTURE LIABILITY attributable to the occurrence.*

   Interrogatories Nos. 16, 17 and 18 relate to the "number of occurrences" that
KPC and L-P contend gives rise to their environmental liabilities. At this time, neither
KPC nor L-P has made a final determination of the "number of occurrences" and,
therefore, neither has a "contention" with respect to the question. If it become necessary
during the course of this litigation to have a contention with respect to such matters, L-P
and KPC will supplement these Responses to state it.

   Moreover, we disagree with your statement that KPC's and L-P's breach of
contract claim is dependent on the number of occurrences giving rise to the environmental
liabilities. The ACE policies are primary policies, which respond to KPC's liability in excess
of "self-insured retentions" of $250,000 in the aggregate; the AIG policies are umbrella
policies, which respond in excess of the limit of liability of the underlying coverage in a
given year (primary policies with a $1 million aggregate limit in each year). There is no
question that the KPC and L-P environmental liabilities – in excess of $120 million – will
exceed the retentions and primary limits underlying the ACE and AIG policies at issue.
Because these retentions and primary limits are *aggregate limits*, the number of occurrences
giving rise to KPC's and L-P's liabilities has no effect on the amount of liability that must
be paid by the underlying insurance (or retained by the policyholders), before the AIG
policies are implicated. Indeed, even if KPC and L-P were required to assume liability
totaling the full underlying limits of the primary policies before accessing any AIG
coverage, there would be more than $100 million remaining in environmental liabilities to
allocate to the AIG policies.

Kenneth H. Sumner, Esq.
August 14, 2002
Page 11

     I sincerely hope that the foregoing provides the additional information you requested; and that it, together with such documents as you may care to inspect, will lead to prompt agreement on the selection of a representative site.

Sincerely,

R. Edward Poole

cc:  Robin Cohen, Esq.

Robin L. Cohen, Esq.
R. Edward Poole, Esq.
Kenneth H. Frenchman, Esq.
DICKSTEIN SHAPIRO MORIN
    & OSHINSKY LLP
1177 Avenue of the Americas
New York, NY 10036
Phone: (212) 835-1400
Fax: (212) 997-9880

Mark E. Ashburn, Esq.
Ashburn & Mason, P.C.
1130 West Sixth Avenue
Suite 100
Anchorage, AK 99501
Phone: (907) 276-4331
Fax: (907) 277-8235

Attorneys for Plaintiffs Ketchikan Pulp Company
and Louisiana-Pacific Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| KETCHIKAN PULP COMPANY and LOUISIANA-PACIFIC CORPORATION, | ) ) ) | Case No. A01-223 Civil [JWS] |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| ACE INDEMNITY INSURANCE COMPANY, formerly known as Alaska Pacific Assurance Company; GRANITE STATE INSURANCE COMPANY; THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; and NEW HAMPSHIRE INSURANCE COMPANY, | ) ) ) ) ) ) ) | PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF SPECIALLY PREPARED INTERROGATORIES: SITE INFORMATION |
| Defendants. | ) ) | |

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs Ketchikan Pulp

Company ("KPC") and Louisiana-Pacific Corporation ("L-P"), hereby supplement their

1

Responses to the Defendants' First Set of Specially Prepared Interrogatories: Site

Information, which were served July 1, 2002 ("July 1 Responses").

The present Supplemental Responses are made pursuant to the parties'

agreement delimiting the specific Sites, interrogatories, and categories of information to be

addressed herein ("August 28 Stipulation"), as follows:

- ♦ Plaintiffs agree to supplement their Responses to Site-Specific Interrogatory Nos. 7, 10, 11, 13, 17, 18, 19 and 20, and agree to provide discovery of certain responsive facts, if available after reasonable inquiry and review, notwithstanding Plaintiffs' prior objections pursuant to Federal Rule of Civil Procedure 33(d).

- ♦ As confirmed in the August 29, 2002 letter from AIG counsel David Yount to Plaintiffs' counsel Robin L. Cohen, Plaintiffs' Supplemental Responses to the Site-Specific Interrogatories, as described above, shall be limited to the following ten (10) Sites:

  (a) Coffman Cove, Alaska;

  (b) East 12 Mile Arm, Alaska;

  (c) Margaret Bay, Alaska;

  (d) Thorne Bay, Alaska;

  (e) Ward Cove, Alaska;

  (f) Arcata, California;

  (g) Caspar Landfill, California;

  (h) Cloverdale, California;

  (i) Fort Bragg, California; and,

  (j) Oroville, California.

In addition to the supplemental information provided pursuant to the August 28

Stipulation, the present Supplemental Responses incorporate the supplemental information

previously disclosed in correspondence. See August 14, 2002 letter from Plaintiffs' counsel

R. Edward Poole to AIG counsel Kenneth H. Sumner ("August 14 Supplemental

Responses"). Because they were completed before the August 28 Stipulation was made, several of the August 14 Supplemental Responses here reproduced concern Sites other than the ten Sites subject to the August 28 Stipulation. The inclusion of such information regarding other Sites should in no way be construed as a waiver or expansion of the Site-delimiting aspect of the August 28 Stipulation.

## OBJECTIONS

Plaintiffs KPC and L-P incorporate by reference, as if fully set forth below, the General Objections, Objections to Definitions, and Specific Objections to Interrogatories, as stated in the July 1 Responses to the Defendants' First Set of Specially Prepared Interrogatories: Site Information. Each Supplemental Response contained herein is made subject to and without waiving the General Objections, Objections to Definitions, and Specific Objections previously stated in the July 1 Response to the Interrogatory for which supplemental information is provided.

Plaintiffs' determination not to duplicate, as part of each Supplemental Response, the full text of previously stated objections is intended solely to conserve space and avoid redundancy. Thus, the absence of objections within the text of the Supplemental Responses should in no way be construed as a waiver of any applicable objections already asserted in the July 1 Responses.

# SUPPLEMENTAL RESPONSES
## TO SITE-SPECIFIC INTERROGATORIES

## Interrogatory No. 5

For each SITE, separately describe all HAZARDOUS MATERIAL used, stored, generated or disposed of at the SITE, before, during and after YOUR involvement with the SITE.

## Supplemental Responses

A.    August 14 Supplemental Response

## Salmon Creek, CA

The Salmon Creek site is located in California and not in Alaska; previous statements to the contrary apparently resulted from an editing error by Plaintiffs' counsel, which was repeated in additional documents before the error was discovered. There is no (and never has been a) KPC or L-P environmental site at "Salmon Creek, Alaska." Accordingly, the July 1 Response to this Interrogatory assumed that Defendants wanted information regarding L-P's environmental site at Salmon Creek, CA – which is the Site that is now (and has been at all relevant times in the past) part of L-P's insurance coverage claims against Defendants.

## East Providence, RI

As the July 1 Response provides: "Highland America purchased the site from Arpad J. Merva in 1988 and used the site for gypsum-based wallboard production from 1990 to 1992. L-P bought the site in 1994, but never operated the facilities." At the time of the acquisition, leased property that was part of the purchase contained a large pile of used gypsum board and rock that was adjacent to the Seekonk River. Hazardous materials from this pile – principally the components of gypsum board – threatened to migrate into the Seekonk River and the landlord demanded its removal. Under the relevant environmental regulations of the Rhode Island Department of Environmental Protection,

4

L-P's options were to cap the pile or remove it. L-P elected to move the pile to a licensed landfill as the most cost-effective alternative.

      B.    September 18 Supplemental Response

    This interrogatory is not subject to the August 28 Stipulation.

## Interrogatory No. 6

For each SITE, separately describe any and all releases of HAZARDOUS MATERIAL at the SITE.

## Interrogatory No. 7

For each release of HAZARDOUS MATERIAL described above, when did the release occur?

## Supplemental Responses

      A.    August 14 Supplemental Response

    Your objection relates to our use of the term "exposure" in our Response to Interrogatory No. 6. We used the word deliberately because, as noted in our Responses, we believe the term you suggested ("release") is ambiguous. To the extent that this Interrogatory seeks information regarding "releases" in the sense of when hazardous materials may have "escaped" from L-P's property or migrated from soil to groundwater, KPC and L-P expect to offer expert testimony on this issue to establish both the pathway and the timing of such migrations.

    In addition, "exposure" is the term used in the definition of "occurrence" in the majority of policies at issue: "an accident or a happening or event or a continuous or repeated *exposure to conditions* which . . . results in . . . property damage . . . during the policy period." Our Response was intended to track this policy language and to convey the fact that property damage at the sites in question resulted, at least in part, from the

environment being exposed continuously to hazardous materials used, generated or stored at the sites during the period of their operation.

The specific methods of exposure by operations are described in our Responses to Interrogatory Nos. 3 & 4. For example, at a wood-treating plant, wood products are treated with certain hazardous materials (e.g., PCP, creosote or CCA) used as anti-stain treatments. The environment is exposed to these materials both during application (typically the wood products are dipped in a solution containing the anti-stain agent) and when the treated wood products are laid out for drying (exposures may occur if chemicals miss or overflow the collection area).

You also objected to our reference to documents that record "unusual or extraordinary incidents." However, to the extent the information you seek exists, it would be contained in such documents, although we have not reviewed them and cannot describe their contents. As stated previously, we are willing to produce such documents at the locations where they are maintained in the ordinary course of L-P's business and make them available for your inspection at mutually convenient times. See Fed. R. Civ. P. 33(d).

B.  September 18 Supplemental Response

1.  Alaskan Sites

Alaskan Logging Camps

In the present Supplemental Responses, generally applicable information regarding KPC's logging camps is provided under the heading "Alaskan Logging Camps." Disclosures so-designated apply equally to all camps subject to the August 28 Stipulation, namely: Coffman Cove, East 12 Mile Arm, Margaret Bay, and the Logging Camp and Sort Yard at the Thorne Bay site.

At the Alaskan Logging Camps, hazardous materials entered the environment as a consequence of the continuous presence and use of heavy machinery and fueling equipment. Although there were few "catastrophic" spills and releases (e.g., catastrophic failures of fuel storage tanks or explosions), the Alaskan Logging Camps experienced recurring failures of equipment that occasioned discharges of 1 to 25 gallons of product per incident. These failures included leaks and ruptures of hydraulic oil hoses on logging trucks and logging equipment such as yarders and loader, leaks of ordinary engine oil and spills associated with the changing of oil, fuel leaks both from bulk storage tanks and during equipment-filling activities, leaks and spills associated with maintenance activities, and leaks of heavy oil and diesel from the diesel-fired log transfer facility ("LTF") devices. Each camp also had a cement floor shop and spills and releases of petroleum products occurred at a greater frequency in the vicinity of the shop area due to the nature and frequency of activities in these areas.

In the early to mid-1990's, the State of Alaska issued regulations requiring operators to report to the Alaska Department of Environmental Conservation ("ADEC") many types of fuel spills to soil or water. As a result of the new requirements, KPC has a record of such spills at its Camps from approximately the mid-1990's forward, although these reports are in long-term storage. The nature and frequency of incidents in the 1990's would provide an analogous model of similar incidents that occurred during the 1970's. The frequency of these spills have likely declined over the period from the 1970's through the present, because of the evolution of environmental laws and the resulting increased attention paid by industry and government toward environmental issues.

Thorne Bay, Alaska: Landfills

At the Thorne Bay Landfills, hazardous materials entered the environment through leaching and the ordinary processes that lead to release of chemicals from landfill facilities. The landfill was unlined, and the heavy rainfall in this area (approximately 160 inches per year) probably played a role in the escape of hazardous materials from the landfill's area of confinement and into the surrounding wetlands. In addition, unauthorized disposal by third parties and efforts by KPC, the Forest Service, and the City of Thorne Bay to manage the landfills (through compaction and movement of waste materials) probably lead to further releases of materials that had been disposed of in containers. As with the Camps, there were few, if any, catastrophic incidents at the Landfills, with the exception of a fire in landfill #1 (the woodwaste landfill) that burned continuously for several years in the late 1980's. The fire was underground (beneath the woodwaste) and KPC employed several employees on a nearly full-time basis in attempts to extinguish it.

Ward Cove, Alaska

At the Ward Cove facility, certain types of spills and releases associated with pulp mill operations of the were repeated with some frequency throughout the facility's operating period. One class of releases at Ward Cove, fuel spills associated with heavy equipment, was not the same type seen at the Logging Camps. The pulp mill had heavy machinery on-site as well as a rail line for moving pulp and raw materials. As an example, the rail line area was heavily contaminated due to releases of petroleum products from the locomotives. Similarly, the heavy equipment maintenance areas were heavily contaminated due to spills associated with maintenance activities.

8

Other spills involved unanticipated releases of asbestos from insulation products occasioned by maintenance activities, releases of PCB-containing fluids from transformers, and spills of products and waste products due to operational upsets and accidents associated with the pulping process. Many spills lead to releases of pulping chemicals into the environment because the mill's drainage system oftentime routed spills into the wastewater conveyance system. In addition, some spills caused the backing up of wastestreams through manholes (thereby causing spills onto surrounding soils). The pulp mill was constructed at the bottom of a steep hill, and it served as a natural drainage area for the surrounding area. The heavy rainfall seen in Ketchikan often played a significant role in spills since collected stormwater oftentimes caused sewers, pumping systems, and other conveyances to become overloaded thereby leading to spills of process chemicals and waste products.

KPC would have records of spills at Ward Cove beginning in the early 1990's, when the reporting obligation came into being; prior to this time, it is less likely that records of spills would exist.

## 2.     Non-Alaskan Sites

For the Arcata, Oroville, Caspar, Ft. Bragg, and Cloverdale California facilities, Plaintiffs do not know of any records of catastrophic spills or releases. As stated in the July 1 Responses, releases to the environment were repeated continuously (or nearly so) over an extended period of time roughly corresponding to the facilities' operating periods.

Arcata, California

In March 1999, the State of California alleged that repeated discharges of sawdust to Janes Creek occurred over an extended, but unspecified, period of time during L-P's operations, resulting in the deterioration of Janes Creek.

9

Caspar Landfill, California

At this time, Plaintiffs have no additional information responsive to Site-Specific Interrogatory Nos. 6 and 7, but will further supplement their Responses should such information be discovered.

Cloverdale, California

In August 1985, a 5,000-gallon underground tank failed a pressure test, and L-P notified the Sonoma County Health Department and the California Regional Water Quality Control Board. In September 1985, diesel-range petroleum hydrocarbons were detected at in a soil sample collected directly above the tank. In October 1985, diesel-range hydrocarbons were detected in a second soil sample collected from around the tank.

Fort Bragg, California

Although Plaintiffs have not discovered records of reported spills or releases at the Fort Bragg site, several regulatory matters provide some evidence of when releases and/or spills of hazardous materials may have occurred:

♦   The RWQCB issued Cleanup and Abatement Order No. 85-118 for the Fort Bragg Studmill on September 18, 1985. The Order directed L-P to investigate surface water discharges of PCP and develop a work plan for a groundwater investigation.

♦   On April 1, 1986, the RWQCB issued Revised Cleanup and Abatement Order No. 86-83 directing L-P to continue the ongoing investigation.

♦   The RWQCB issued Revised Cleanup and Abatement Order No. 87-117 on August 19, 1987. This order directed L-P to define the source of groundwater and surface water contamination, and to define the extent of groundwater contamination.

♦   On January 24, 1992, the RWQCB issued Cleanup and Abatement Order No. 92-21, directing L-P to investigate the

extent of soil and groundwater contamination and addressing the domestic water systems impaired by discharges from L-P.

## Oroville, California

Although Plaintiffs have not discovered records of reported spills or releases at the Oroville site, several regulatory matters provide some evidence of when releases and/or spills of hazardous materials may have occurred:

- In January 1973, California Regional Water Quality Control Board identified PCP surface contamination at several points on site.

- In July 1979, the California Regional Water Quality Control Board found PCP contamination in waste sawdust.

- In March 1981, the California Regional Water Quality Control Board conducted an inspection and found spillage of urea-formaldehyde and ammonium sulfate from the hardboard mill going to dredger tailings.

- In January 1984, the California Department of Health Services conducted an inspection and found high levels of PCP and oil spillage.

- In October 1984, the California Regional Water Quality Control Board inspected the landfill and found contamination in the landfill and a leachate pond.

- In May 1985, the California Regional Water Quality Control Board presents LP with results of tests showing high levels of PCP in landfill.

## Interrogatory No. 8

For each SITE, separately IDENTIFY the CLAIMANT or CLAIMANTS asserting claims against YOU.

Supplemental Responses

     A.    August 14 Supplemental Response

Alexandria, LA

     This site was on the CERCLA list, and the Louisiana Department of Environmental Quality was involved in the CERCLA assessment. The hazardous material at issue was asbestos, and the remediation conducted at the site was required by applicable State and Federal regulations. The Preliminary Assessment of the site was prepared by a contractor to the EPA.

Alto, GA

     The remediation conducted at the site – the excavation and disposal of hydrocarbon- and PCP-contaminated soils at an off-site landfill – was required regulations issued by the Georgia Department of Natural Resources – Environmental Protection Division.

East Providence, RI

     *See* August 14, 2002 Supplemental Response to Interrogatory No. 5.

Marianna/Cypress, FL

     Remediation at this site consisted of the closure of a wood treating plant and the containment and cleanup of associated hazardous materials, and was required by Subpart (W) of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*

New Waverly, TX

     Remediation at this was required by regulations promulgated by the Texas Natural Resources Conservation Commission.

<u>Samoa, CA</u>

All remediation was conducted in accordance with mandates of the California

Regional Water Quality Control Board and the Humboldt County Department of

Environmental Health.

<u>Waynesboro, GA</u>

The Treating Plant Closure was required by Subpart (W) of RCRA and the

Georgia Department of Natural Resources – Environmental Protection Division. The PCP

cleanup and landfill closure was accomplished in accordance with the Georgia Department

of Natural Resources, Environmental Protection Division.

      B.    <u>September 18 Supplemental Response</u>

This Interrogatory is not covered by the August 28 Stipulation, and Plaintiffs

have no further responsive information to report at this time.

**Interrogatory No. 9**

For each SITE, separately state the nature of the allegations made by each CLAIMANT or
CLAIMANTS, including, whether the claim alleges or relates to alleged PERSONAL
INJURY, BODILY INJURY or PROPERTY DAMAGE.

**Supplemental Responses**

      A.    <u>August 14 Supplemental Response</u>

Within the site-specific attachments to our July 1 Responses, certain answers

were grouped into logical categories to reduce redundancy and to provide more readable

narrative responses. Thus, Plaintiffs' Responses to Interrogatory No. 8 (identity of

claimant), Interrogatory No. 9 (nature of claimants' allegations), Interrogatory No. 11

(timing of claim), and Interrogatory No. 12 (type of claim) were combined into one

narrative, for each site, outlining the claim-specific information in our possession.

13

To the extent that our Responses require clarification, please note that the claimants at each of the sites at issue have alleged property damage. To our present knowledge, no claimant has alleged bodily injury and/or personal injury.

  B. September 18 Supplemental Response

Although this Interrogatory is not covered by the August 28 Stipulation, Plaintiffs refer Defendants to the Supplemental Responses to Site-Specific Interrogatory Nos. 10 and 11, for additional information responsive to this Interrogatory.

## Interrogatory No. 10

For each SITE, separately state when the alleged PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE occurred.

## Supplemental Responses

  A. August 14 Supplemental Response

Generally, the property damage alleged commenced with the date on which the property was first exposed to hazardous materials in the course of KPC or L-P operations at the sites and continued from that initial exposure until remediated. Additional property was damaged as hazardous materials escaped or migrated from one location to another, although the exact pathways, dates and extent of such escape or migration necessarily will be the subject of expert testimony. For example, expert testimony will be required to establish when contaminants escaped or migrated from one location and the speed of migration through various types of materials or substances (e.g., the rate at which a given hazardous material travels through a particular type of soil may be introduced to establish when that material reached the subsurface groundwater beneath a site).

  B. September 18 Supplemental Response

For additional information responsive to this interrogatory, see September 18 Supplemental Responses to Site-Specific Interrogatory Nos. 6 and 7.

Interrogatory No. 11

For each SITE, separately state when the CLAIMANT or CLAIMANTS first alleged YOU were responsible for PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE.

Supplemental Responses

    A.    August 14 Supplemental Response

    The date(s) on which claims at each site were first asserted against L-P or KPC – to the extent known – are set forth in our prior Responses (for each site) to Interrogatory Nos. 8, 9, 11 and 12. There may be additional information in the relevant site or corporate storage files. We have not examined such files and do not know their contents, but we will make them available to you at their respective locations at mutually convenient times upon request.

    B.    September 18 Supplemental Response

        1.    **Alaskan Sites**

Alaskan Logging Camps

    The claims that lead to the defense costs and remediation costs incurred by KPC at the Logging Camps arose in late 1996 and early 1997, as a consequence of the shutdown of KPC's operations in Alaska.

Thorne Bay, Alaska – Landfills

    The claims that lead to the defense costs and remediation costs incurred by KPC at the Thorne Bay Landfills arose in late 1996 and early 1997, as a consequence of the shutdown of KPC's operations in Alaska.

Ward Cove, Alaska

    The claims that lead to the defense costs and remediation costs incurred by KPC at the Ward Cove Pulp Mill arose in late 1996 and early 1997, as a consequence of the shutdown of KPC's operations in Alaska.

## 2.    Non-Alaskan Sites

Arcata, California

On January 31, 2000, the State of California, Department of Fish and Game, City of Arcata, California Regional Water Quality Control Board, Air Resources Board, District Attorney's office, and Attorney General's office filed a complaint for preliminary and permanent injunctive relief and civil penalties against L-P, arising out of environmental property damage associated with operations at the Arcata facility.

The January 2000 claim arose out of an earlier – and narrower – claim by the State of California regarding sawdust discharges into Janes Creek. The investigation that resulted in the State's March 1999 claim began in the summer of 1997, when the City of Arcata met with L-P representatives to address a recently identified saw dust problem in Janes Creek, that had been reported by a flood recovery crew. Inspections were conducted by California Department of Fish and Game personnel on October 16, October 30, and November 20, 1998. A site visit/meeting was conducted on January 11, 1999 with personnel from the Department of Fish and Game, California Regional Water Quality Control Board, and Louisiana Pacific Corporation. A subsequent inspection occurred on February 20, 1999.

On March 3rd 1999, the State of California filed a criminal complaint (CR991193) against L-P. This claim was limited to the alleged sawdust releases from the Arcata facility into Janes Creek, in violation of Section 5650 of the California Fish and Game Code and 13376 of the California Water Code. The January 2000 Claim, by contrast, was significantly broader and alleged violations of the prohibitions on discharges or releases of sawdust, formaldehyde, distillate, and tannin and lignins to waters of the state and violations of air emission requirements.

16

Caspar Landfill, California

The claim against L-P was first asserted in June 1994, after contamination was detected in groundwater beneath the site. Based on these results, the Regional Water Quality Control Board directed L-P to conduct an investigation of the site to determine the potential source and extent of groundwater contamination.

Prior to this time, however, the California Department of Health Services conducted a site inspection at the site in response to a compliant from an adjacent landowner. In November 1990, DHS inspectors detected total petroleum hydrocarbons in three of the four soil/bark samples collected from four locations at the site.

Cloverdale, California

The first claim against L-P for environmental property damage at the Cloverdale Rounds facility was first made on October 22, 1993. On that date, the California Regional Water Quality Control Board, pursuant to Section 13304 of the Porter-Cologne Water Quality Control Act, issued Cleanup and Abatement Order 93-111. This Order required L-P to conduct an investigation into environmental conditions at the Site, and to cleanup any contamination by TCP/PCP and petroleum hydrocarbons that may be discovered.

Although the claim was not asserted until 1993, the investigation by RWQCB and L-P that ultimately resulted in the 1993 claim began several years earlier, in 1989. This phase of the investigation came to a close when, in April 1992, RWQCB issued a notice to L-P that the case was being referred to Sonoma County Hazardous Material Management Program ("SCHD"). The notice further advised that additional investigation would be required to assess threatened and/or actual impacts to groundwater from contaminated soils onsite.

17

Fort Bragg, California

The claim made against L-P for environmental property damage at the Fort Bragg site was first asserted against L-P on September 18, 1985. On that date, the California Regional Water Quality Control Board issued Cleanup and Abatement Order No. 85-118, requiring L-P to investigate surface water discharges of pentachlorophenol and develop a work plan for a groundwater investigation. The RWQCB subsequently issued further orders, expanding the required investigation and remediation effort at Fort Bragg, in 1986 (Revised Cleanup and Abatement Order No. 86-83); 1987 (Cleanup and Abatement Order No. 87-117); 1988; and, 1992 (Cleanup and Abatement Order No. 92-21, revising No. 87-117).

Oroville, California

The claim was first asserted against L-P on or about February 13, 1986, when the U.S. EPA gave L-P notice that it intended to conduct an RI/FS for the L-P mill site and landfill. Subsequently, the Oroville site was added to the CERCLA National Priority List ("NPL") on June 10, 1986.

As a result of the EPA investigation and remediation at Oroville, the United States filed a lawsuit against L-P in December 1992, seeking recovery of clean-up costs arising out of the remediation of property damage to soil and surface water onsite that allegedly was caused by L-P's operations at Oroville. In August 1993, the State of California filed a copycat suit against L-P for recovery of its "oversight" costs at the Oroville site (approximately $150,000).

Interrogatory No. 12

For each SITE, separately state whether YOU are involved in civil litigation, an administrative action or other type of action, and describe with particularity the venue or location, title and identifying number for each lawsuit, administrative action or other type of action.

18

Supplemental Responses

      A.     August 14 Supplemental Response

      This information – where available – is contained on a site-specific basis in our Responses to Interrogatory Nos. 8, 9, 11 and 12. All actions referred to are administrative actions unless otherwise noted. We will supplement our Responses if we discover additional responsive information. Additionally, non-privileged portions of the files and records respecting such proceedings will be made available for your inspection at mutually convenient times upon request.

      B.     September 18 Supplemental Response

      1.     **Alaskan Sites**

Alaskan Logging Camps

      KPC is involved in administrative proceedings with respect to the contamination of the Logging Camps. At the Camps, three distinct authorities drove the cleanups. First, KPC entered into a settlement agreement with the Department of Justice and the Forest Service on February 21, 1997 to resolve breach of contract claims and litigation in U.S. Claims Court. Section V of that agreement obligated KPC and the United States to identify and address environmental obligations at KPC's various operating areas. Margaret Bay, Thorne Bay, and Coffman were specifically identified. Second, KPC's long term timber contract with the Forest Service required KPC to comply with applicable environmental laws. That created a contractual basis for the Forest Service to compel KPC to comply with State cleanup laws at the Camps. Upon the closure of the pulp mill in 1997, KPC began an active program of identifying cleanup responsibilities at its various logging camps. The cleanups were undertaken under State law with the active oversight of

ADEC as the relevant regulatory agency and the Forest Service as the landowner and overseer of KPC's timber contract and obligations under the 1997 settlement agreement.

Thorne Bay, Alaska

In re Thorne Bay Landfills Site, Forest Service Docket No. 1005049601 (March 1997). This was an administrative order under CERCLA entered into by KPC and L-P with the U.S. Forest Service to undertake a time critical removal action at the Thorne Bay Landfills.

Ward Cove, Alaska

KPC has been involved with a number of lawsuits, administrative actions and administrative proceedings regarding environmental issues at the Ward Cove pulp mill, as detailed below:

1.    In re Ketchikan Pulp Company, Docket No. [CWA] 1089-12-22-309(g). This was an administrative action filed by EPA Region 10 in 1989 pursuant to the Clean Water Act. The decision by the administrative law judge was appealed to the Environmental Appeal Board that affirmed in 1998. A penalty of $20,000 was assessed.

2.    Dredging Action. In 1994, the U.S. Army Corps of Engineers and KPC settled an administrative request for penalties associated with alleged violations of a dredging permit for Ward Cove. KPC agreed to provide $22,000 to fund the operation of a fish hatchery. A related action was commenced by the State of Alaska (AG File 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) alleging violations of the state certificate. A penalty of $12,500 was paid to the State.

3.    In re Ketchikan Pulp Company, Docket No. 1094-04-07-26.5. This was an administrative action filed in 1994 by EPA Region 10 pursuant to the Toxic Substances Control Act (TSCA) alleging violations of PCB regulations (recordkeeping). The matter was settled in 1996 for a penalty of $3,200.

4.  Other TSCA cases. There were two other administrative actions filed by Region 10 in which violations of the PCB regulations were alleged. One was settled in 1989 for a penalty of $245 and the other was adjudicated in 1985 or 1986 in which a penalty of about $5500 was assessed.

5.  In re Ketchikan Pulp Co., General Electric Co., and Qualified Contractors, Inc., Docket No. 1094-05-06-113. This was an administrative action filed in 1994 by EPA Region 10 alleging violations of asbestos regulations under the Clean Air Act. KPC was dismissed from the action in 1997.

6.  U.S. v. KPC, No. A92-587-CV (JKS) (D. Alaska 1992). This was a judicial enforcement case brought by EPA under the Clean Water Act and Clean Air Act. The case was resolved through a civil consent decree, which was entered with the court during September 1995. Under the decree, KPC paid a penalty of $3.1 Million and agreed to undertake a number of environmental projects. KPC also paid stipulated penalties on several occasions through 1999 for violations of its wastewater permit (which triggered penalties under the decree). The decree was terminated during December 2000.

7.  U.S. v. KPC, No. A95-0025-CR (JKS) (D. Alaska 1995). This was a criminal plea agreement entered into to resolve allegations that KPC violated the Clean Water Act. KPC plead guilty to one felony count and thirteen misdemeanors. KPC agreed to pay a $3 Million penalty; $1.75 Million of the penalty was suspended in lieu of KPC's agreement to undertake specified environmental projects. The Plea Agreement was entered by the court during September 1995 and KPC was placed on probation. Probation was terminated during September 1998.

8.  State of Alaska v. KPC, No. IJU-95-962-CI (S. Ct. Alas. – Juneau). This was a consent decree entered into with ADEC to resolve compliance issues associated with

the pulp mill's Clean Air Act permit. KPC agreed to undertake specified environmental projects in support of its permit. The decree was amended during August 1996 and terminated in early 1997 as a consequence of the shutdown of the pulp mill.

       9.    In re Ketchikan Pulp Company Site, EPA Docket No. 10-97-0055-CERCLA (June 1997). This was an administrative order under CERCLA entered into by KPC and L-P with EPA and ADEC to undertake an investigation and cleanup of contamination at the Ward Cove facility.

       10.    U.S. v. Gateway Forest Products, Civil No. A00-225 CV (JKS) (D. Alaska 2000). This was a CERCLA consent decree entered into by EPA, KPC, L-P, and Gateway Forest Products. It is still in effect and memorializes the cleanup actions and site controls imposed by EPA. It was a successor to the 1997 CERCLA administrative order.

       11.    U.S. v. KPC. KPC and the United States entered into a consent decree in 1976 to settle alleged violations of the Clean Water Act. The decree was filed with the US District Court for the District of Alaska. We believe that KPC agreed to pay a civil penalty of $80,000.

       12.    ACWA v. KPC, No. J96-0007-CV (JKS) (D. Alaska 1996). This was a citizen's suit brought against KPC in U.S. District Court by environmental groups under the Clean Water Act. The complaint alleged that KPC violated the Clean Water Act and the terms of its wastewater discharge permit. The case was dismissed by the District Court. The proceeding was settled on appeal with KPC agreeing to pay a portion of the plaintiffs'' attorneys' fees and to commit $100,000 towards a government environmental project.

## 2.    Non-Alaskan Sites

Arcata, California

On March 3, 1999, a criminal complaint (CR991193) was filed by the State of
California against Louisiana-Pacific Corporation for discharge of sawdust and/or shavings
on October 16, 1998 and on or about the months of October 1998 through February
1999, in violation of Section 5650 of the California Fish and Game Code and 13376 of the
California Water Code.

On January 31, 2000, the State of California, Department of Fish and Game,
City of Arcata, California Regional Water Quality Control Board, Air Resources Board,
District Attorney's office, and Attorney General's office filed a complaint for preliminary
and permanent injunctive relief and civil penalties alleging violations of the prohibitions on
discharges or releases of sawdust, formaldehyde, distillate, and tannin and lignins to waters
of the state and violations of air emission requirements. L-P entered into a Stipulated
Judgment pursuant to a compromise and settlement of disputed claims

Caspar Landfill, California

Administrative action: the California Regional Water Quality Control Board
issued a Cleanup and Abatement Order directed to L-P in June 1994, after contamination
was detected in groundwater beneath the site.

Cloverdale, California

Administrative action:  pursuant to Section 13304 of the Porter-Cologne Water
Quality Control Act, the California Regional Water Quality Control Board issued Cleanup
and Abatement Order 93-111 (October 22, 1993), requiring the investigation and cleanup
of TCP/PCP and petroleum hydrocarbon contamination.

23

Fort Bragg, California

Administrative action: pursuant to several Cleanup and Abatement Orders, the California Regional Water Quality Control Board has required investigations and remediation of identified contamination. For additional responsive information see September 18 Supplemental Response to Site-Specific Interrogatory No. 11.

Oroville, California

Administrative action: U.S.E.P.A. – RI/FS ordered in 1986; site listed on NPL (06/10/86). The Administrative Order for Remedial Design and Remedial Action, Docket No. 91-18 issued by the EPA, dated July 30, 1991, ordered L-P to perform a remedial design for the remedy described in the September 28, 1990 Record of Decision and to implement that design through remedial action.

Litigation: In December 1992, a complaint was filed by the United States against L-P alleging that L-P discharged formaldehyde containing waste water into a surface pond on the site and that L-P contaminated the soil at the site with arsenic. L-P was sued for cost recovery and L-P in turn filed a third party complaint for CERCLA contribution against Beazer mirroring the CERCLA declaratory relief claim in the existing L-P/Beazer action (Case No. CIV-S-89-0871 LKK PAN). EPA's suit was referred to Judge Karlton as a related case, and the two related cases were consolidated with EPA as plaintiff, L-P as defendant and Beazer as third party defendant.

In August 1993, the State of California filed a copycat suit against L-P for recovery of its "oversight" costs at the Oroville site (approximately $150,000). This suit also came to Judge Karlton and was consolidated with the main action.

In June 1989, L-P filed a complaint against Beazer Materials & Services, Koppers Industries and others in the United States District Court for the Eastern District

24

of California under CERCLA and state law for cost recovery (the $600,000 cost of the

CH2M Hill/L-P investigation) and for declaratory relief (holding Beazer liable to

indemnify L-P for any cost recovery from L-P by EPA).

## Interrogatory No. 13

For each SITE, IDENTIFY all orders and directives received by YOU from any
governmental agency in connection YOUR LIABILITY.

## Supplemental Responses

### A.    August 14 Supplemental Response

To the extent the information requested is known to the responsible individuals

within the company, it has been provided on a site-specific basis in our Responses to

Interrogatory Nos. 8, 9, 11 and 12. Whatever additional information may exist would be

contained in documents relevant to such orders or directives, the non-privileged portions of

which will be made available to you for inspection at mutually convenient times upon

request.

### B.    September 18 Supplemental Response

#### 1.    Alaskan Sites

Alaskan Logging Camps

The following orders and/or directives apply generally to all KPC Logging

Camps:

> February 21, 1997 Agreement between KPC, L-P, U.S. Forest
> Service, and DOJ (see Section V).

> October 30, 2000 letter from James Bartelme (USFS) to Chris
> Paulson (KPC).

> October 25, 2000, letter from William Brighton (DOJ) to Steve Silver
> (attorney for KPC).

> August 9, 2000, letter from Rick Cables (USFS) to Mark Suwyn (L-
> P).

June 27, 2000, letter from Rick Cables (USFS) to Chris Paulson (KPC).

April 3, 2000, letter from Rick Cables (USFS) to Chris Paulson (KPC).

For additional information regarding the administrative proceedings with respect to the Alaskan Logging Camps generally, *see* September 18 Supplemental Response to Site-Specific Interrogatory No. 12. Additional information regarding specific orders and directives directed to KPC regarding environmental conditions at individual Logging Camps appears below.

Coffman Cove

Coffman Cove had an area where buried batteries were discovered. In September 2000, KPC received a CERCLA 104(e) information request from the Regional Forest of the Forest Service indicating that the Forest Service viewed KPC as a PRP for this area. For this area of the site, the Forest Service assumed a regulatory role under CERCLA and was the primary overseer of the work. ADEC was also involved but in a secondary capacity to the Forest Service. Additional correspondence, discussions, and directives relating to the details of the Coffman Cove work include:

August 2, 2000, letter from Rick Cables (USFS) to Chris Paulson (KPC).

August 28, 2000, CERCLA Time-Critical Removal Action Memorandum.

June 20, 2002, letter from Steve Brink to Chris Paulson.

December 6, 2001, letter from Jennifer Roberts (ADEC) to Barry Hogarty (KPC).

September 7, 2001, letter from Keith Simila (USFS) to Barry Hogarty (KPC).

July 5, 2001, letter from James Caplan (USFS) to Chris Paulson (KPC).

June 26, 2001, Work Order (USFS) to Barry Hogarty (KPC).

June 18, 2001 (received by KPC) letter, James Caplan (USFS) to Chris Paulson (KPC).

March 22, 2001, CERCLA Time-Critical Removal Action Memorandum.

March 26, 2001, CERCLA Time-Critical Removal Action Memorandum.

June 12, 2000, letter from Ron Klein (ADEC) to Barry Hogarty (KPC).

August 11, 1997, letter from Lynn Kent (ADEC) to Barry Hogarty (KPC).

November 21, 2000, letter from Glenn Miller (ADEC) to Barry Hogarty (KPC).

December 14, 2000, letter from Anne Marie Palmieri (ADEC) to Barry Hogarty (KPC).

August 17, 2000, letter from Rick Cables (USFS) to Chris Paulson (KPC).

August 17, 2000, letter from Rick Cables (USFS) to Michelle Brown (ADEC).

August 22, 2000, letter from Sally Schlichting (ADEC) to Barry Hogarty (KPC).

August 22, 2000, letter from Keith Simila (USFS) to Chris Paulson (KPC) and Lynn Kent (ADEC).

June 19, 1995, letter from Anne Archie (USFS) to Thomas Hicks (KPC).

December 29, 1999, letter from Keith Simila (USFS) to Barry Hogarty (KPC).

Margaret Bay, Alaska

Additional correspondence, discussions, and directives regarding Margaret Bay include:

June 18, 2002, letter from Steve Brink (USFS) to Chris Paulson (KPC).

April 8, 1999, letter from Robert Simmons (USFS) to Owen Graham.

Thorne Bay, Alaska – Logging Camp and Sort Yard

Additional correspondence, discussions, and directives regarding Thorne Bay Logging Camp include:

August 13, 2002, letter from Steve Brink (USFS) to Chris Paulson (KPC).

September 20, 2001, letter from David Verbrugge (ADEC) to Barry Hogarty (KPC).

27

June 1, 2000, letter from Sally Schlichting (ADEC) to Mike Jaynes (KPC).

June 1, 2000, letter from Ron Klein (ADEC) to Barry Hogarty (KPC).

Thorne Bay, Alaska:  Landfills

At the Thorne Bay Landfills, KPC received a CERCLA 104(e) information request from the Regional Forester of the Forest Service during August 1995 indicating that the Forest Service viewed KPC as a potentially responsible party ("PRP") at the site. During September 1996, it became evident that the Forest Service intended to undertake a time critical removal action at the site.  In an effort to control the scope of the work and the resultant costs (which the Forest Service would seek to recover from KPC), KPC sought out the Forest Service and was able to negotiate an agreement whereby KPC would undertake the work under the direction of the Forest Service.  That agreement took the form of the 1997 CERCLA administrative order noted above.

Ward Cove, Alaska

At Ward Cove, it was understood from informal communications with regulatory agencies as well as the experience of a similar pulp mill (Alaska Pulp Corporation) that closed in 1993 in Sitka, Alaska that EPA and ADEC expected KPC to undertake a thorough cleanup of the site under CERCLA.  EPA investigated the Site itself and indicated to KPC that it viewed Ward Cove as a "NPL caliber" site (meaning it could be placed on the National Priorities List).  Consequently, KPC moved in a proactive manner in late 1996 to engage EPA and ADEC in a dialogue of cleanup issues.  That effort resulted in the 1997 CERCLA administrative order.  For additional responsive information, see September 18 Supplemental Response to site Interrogatory No. 12.

### 2. Non-Alaskan Sites

All additional responsive information is set out in the September 18 Supplemental Responses to Site-Specific Interrogatory Nos. 11 & 12 for the Non-Alaskan Sites.

### Interrogatory No. 17

For each SITE, separately state the amount of YOUR LIABILITY that resulted from sudden and accidental discharges or releases.

### Supplemental Responses

#### A. August 14 Supplemental Response

Because the Court has not made – or been asked to make – a determination as to what constitutes "sudden and accidental discharges or releases," our substantive Response to this Interrogatory necessarily is preliminary and conditional on the Court's eventual construction of the policy language at issue. Our position, which comports with decisions by the courts of Alaska, Washington and Oregon, is that "sudden and accidental" means "unexpected and unintentional." Under this definition and based on the facts as we currently understand them, all of L-P's and KPC's environmental liabilities resulted from "sudden and accidental discharges or releases."

Even if the unresolved legal issue did not prevent a definitive Response, the factual information linking particular "discharges" or "releases" to discrete quantities of property damage simply is not available to our clients at this time. Because such facts are irrelevant in the context of the underlying claims, KPC and L-P have yet to attempt an allocation of their liabilities that resulted from any specific releases/exposures. Assuming that such an allocation is possible (or even necessary), it will be the subject of expert testimony.

B. September 18 Supplemental Response

Plaintiffs have no additional responsive information at this time.

## Interrogatory No. 18

For each SITE, separately state the amount of YOUR LIABILITY incurred as DEFENSE COSTS and/or DEFENSE EXPENDITURES.

## Supplemental Responses

A. August 14 Supplemental Response

This information is not available at this time. First, neither L-P's nor KPC's accounting records break out such information, i.e., "defense costs" and "defense expenditures" are not reported separately from remediation expenses. Second, many such costs may pertain to both "defense costs" and "remediation costs" and cannot be differentiated. Moreover, because the Court eventually must define what constitutes a "defense expenditure" as opposed to a "liability expenditure," any allocation by KPC and L-P would necessarily be preliminary and conditional. Third, the AIG policies at issue provide coverage for "Ultimate Net Loss," which is defined to include, *inter alia*, defense costs, settlement amounts, and judgments. For coverage purposes, then, KPC and L-P had no reason to keep records of which expenses fell into which categories, and they did not. However, such an analysis could be made from original invoices (currently in storage), which could be made available for inspection by defendants at mutually convenient times.

B. September 18 Supplemental Response

The issue of the allocation of L-P and KPC's environmental expenses between "defense" and "indemnity" expenditures will affect neither the Plaintiffs' ability to access the excess policies at issue in this case, nor the amount of coverage available to Plaintiffs. Contrary to the contention advanced by Defendant AIG, by the time L-P made its demand for coverage on AIG for the L-P and KPC environmental liabilities, the underlying

Hartford primary policies had been entirely exhausted by the payment of judgments and settlements (and the deductibles had also been fully exhausted by L-P's payment of defense and indemnity amounts). Therefore, the suggestion that the primary policies may have been "prematurely exhausted" is without merit.

## Interrogatory No. 19

For each SITE, IDENTIFY all PERSONS which may have knowledge of YOUR activities at the SITE.

## Interrogatory No. 20

For each SITE, IDENTIFY all PERSONS which may have knowledge of any and all releases of HAZARDOUS MATERIAL at the SITE.

## Supplemental Responses

### A. August 14 Supplemental Response

Prior to 1996 – 1997, when most of the remediation efforts commenced, L-P was organized along regional lines: Southern Division; Northern Division; Western Division. At that time, each division had a Division Environmental Manager. In addition, for specific projects, often there were Environmental Project Managers. Subsequently, L-P shifted to a Product Line organization and each product line was supported by its own environmental management team.

The following environmental managers were most familiar with the remediation efforts undertaken by L-P/KPC: Western Division: Kelly Stalker*; Elizabeth Smith*; Jim Miller*; Kirk Girard*; Dwayne Arino; Jeff Pluim; Bob Vogt*; Neil Sherman; Jennifer Gommersall*. Northern Division: Jamie Angley; Jim Evensen*; Randy Sandberg*; Sue Somers*; Keith Seelig*; Glen Patrick*; Don Gray*; Mike Anderson; Don Sodersten. Southern Division: Jason Sanders*; Jim Boswell*; Randy Bennett*; Larson Harsey*; Geri Shoop*; John Harrie*; Barabara McGuinness*; Tracy Gibson*; Wally Benbenick*; Scott

Jacobs*.  KPC/Alaska: Randy Sandberg*; Andy Malloy*; Barry Hogarty*; Ray

Hendricks*.

(* indicates that the individual is no longer with L-P.)

      B.  September 18 Supplemental Response

          1.    Alaskan Sites

Alaskan Logging Camps

      The persons identified below, under "Thorne Bay, Alaska – Landfills," would all

have information on the activities at the Thorne Bay Logging Camp and Sort Yard.

Margaret Bay and Coffman Cove

      The following persons would have information concerning the historical

operations at Margaret Bay and Coffman Cove:

| NAME | START DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | END DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | LAST KNOWN CONTACT INFORMATION |
|---|---|---|---|
| Owen Graham | 1978 | 2001 | 907-225-1421 |
| Tom Hicks | 1978 | 1999 | 907-247-2630 |
| George Woodbury | 1965 | 1986 | 907-874-4140 |
| Don Finney | 1954 | 1978 | 907-247-8598 |
| Walt Begalka | 1955 1988 | 1978 1993 | 907-225-4223 |
| Larry Clark | approximately 1965 | 2001 | reportedly lives in Idaho; no number as of now |
| Ron Quick | 1980 approximately 1987 | 1985 2000 | 360-274-8658 |
| Ned Colville | approximately 1975 | Approximately 1990 | |
| Dick Ingles | 1964 | 1983 | |

Thorne Bay, Alaska -- Landfills

KPC's response number 9 (January 1996) to the August 1995 CERCLA 104(e) request identified the following people as having relevant information concerning the Thorne Bay Landfills:

| NAME | START DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | END DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | LAST KNOWN CONTACT INFORMATION |
|---|---|---|---|
| Daniel N. Bates | | | P.O. Box 19362 Thorne Bay, AK 99919 |
| Dan V. Bates | | | 406-763-5316 |
| Byron Bennett | | | 1250 - 150th Avenue SE Bellevue, WA 98007 |
| Mike Berkey | | mill closure | 007-828-3359 |
| Walt Begalka | 1955 1988 | 1978 1993 | 907-225-4223 |
| John E. Blubaum | late 1960's | mill closure | reportedly lives in Idaho |
| Ben Chaco | | mill closure | 907-828-3960 |
| Randy Claasen | | mill closure | 907-247-7977 |
| Ed Clark | | | 907-828-3956 |
| Larry Clark | approximately 1965 | 2001 | reportedly lives in Idaho |
| C. Scott Cleveland | | | 907-225-9779 |
| Larry Coleman | | | 1384 Camino Magenta Thousand Oaks, CA 91360 |
| Lonnie Coleman | | | 206-427-7346 |
| Ned Colville | approximately 1975 | 1990 | |
| Jack Dupertius | | mill closure | 907-828-3456 |
| Gene Feind | | | 907-247-8685 |
| Don Finney | 1954 | 1978 | 907-247-8598 |
| Zeke Flerchinger | | | |
| Owen J. Graham | 1978 | 2001 | 907-225-1421 |
| Dale Green | | | P.O. Box 19162 Thorne Bay, AK 99919 |
| Russell H. (Patches) Henry | | | 907-225-3321 |
| Tom Hicks | 1978 | 1999 | 907-247-2630 |

| NAME | START DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | END DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | LAST KNOWN CONTACT INFORMATION |
|---|---|---|---|
| Barry Hogarty | 1995 | 2002 | 907-225-0288 |
| Frank Hughes | | | 360-665-3683 |
| Dick Ingles | | | |
| Lloyd Jones | | | |
| Don Larsen | | | 907-828-3975 |
| Fred Lecour | | | 907-828-3474 |
| Coy Lester | | | 907-225-2197 |
| Tim Lindseth | | | 907-828-3950 |
| Allen Linn | | | 206-866-9738 |
| Joe Logan | | | |
| Ron Lundamo | | | 907-247-8375 |
| Richard A. Madden | | | 907-225-5509 |
| Gerald Manier | | | P.O. Box 19408 Thorne Bay, AK 99919 |
| Cliff McCarty | | | |
| Steve Metcalf | | | 907-828-3951 |
| Larry Nagy | | | |
| Bob Nicholson | | | 907-828-8845 |
| Gerald Pitcher | | | 907-828-3321 |
| Ron Quick | 1980 1987 | 1985 2000 | 360-274-8658 |
| Dan Rochester | | | 907-828-3920 |
| Mike Shafer | early 1980's | mill closure | 907-828-3990 |
| Steve Seley, Sr. | | | 5511 North Tongass Highway Ketchikan, AK 99901 |
| Russell Shaffer | | | Thorne Bay, AK 99919 |
| Joe Shelly | | | 907-755-2978 |
| Jack Simms | | mill closure | 907-828-3959 |
| Allen Strahle | | | 206-446-2341 |
| Brian Thompson | | | 907-828-3981 |
| Jack Willford | | | 503-457-4367 |
| George Woodbury | 1965 | 1986 | 907-874-4140 |

Ward Cove, Alaska

Ward Cove employed thousands of people over the years. The task of compiling supervisory and management personnel from the start in 1954 through closure would require extensive review of archived materials. The persons identified below represent many of the key management and operational personnel at Ward Cove from the late 1960's through closure. They would be able to provide additional information and names of employees with relevant information:

| NAME | START DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | END DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | LAST KNOWN CONTACT INFORMATION |
|---|---|---|---|
| Steve Hagan | 1970s | Mill closure | Manager of pulp mill at Port Alice, Vancouver Island |
| Maxine Doyle | 1970s | Mill closure | 907-225-2235 |
| Ralph Lewis | late 1960s | Mill closure | 360-758-7729 623-583-1335 |
| Robert Higgins | late 1960s | Mill closure | |
| Allyn Hayes | late 1960s | Mill closure | 907-247-8369 |
| Ed Zastrow | late 1960s | Mill closure | 907-225-2814 |
| Dan Loitz | early 1970 | Mill closure | Portland, OR |
| Ed Fisher | late 1950s/early 1960s | mid to late 1980s | 907-247-9806 |
| Ray Hendricks | early 1960s | Mill closure | 907-225-3564 |
| Richard Shen | approximately 1994 | Mill closure | Unknown |
| John Keinegger | | | 907-247-2366 |
| Kenny Kardt | approximately late 1960s | early 1990s | unknown; unsure if alive |
| Ralph Dale | reportedly start of mill in early 1950s | Mill closure | 907-225-4292 |
| Jim Heimrich | late 1980s/early 1990s | Mill closure | |
| Andy Malov | 1996 | 2001 | 425-227-6170 |
| Bettie Jo Westergard | | | |
| Clyde Johnson | late 1950s | early 1990s | 503-344-2232 |
| Martin Pihl | 1970s | 1994 | 907-225-2048 |
| Marcel "Mel" Mountain | 1980s | | unknown |
| Richard Hopson | 1950s/1960s | 1970s | unknown; unsure if alive |

| NAME | START DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | END DATE OF L-P OR KPC EMPLOYMENT (APPROX.) | LAST KNOWN CONTACT INFORMATION |
|---|---|---|---|
| Don Pearson | 1950s/1960s | 1970s | unknown; unsure if alive |
| Don Groves | 1950s/1960s | 1970s | unknown; unsure if alive |
| Mark Lundberg | 1995 | Mill closure | unknown |
| Roland Stanton | 1950s | 1970s | 907-225-3406 |
| Keith Williams | | | |
| Ray Cowan | approximately 1980s | mid 1990s | 907-247-8166 |
| Jim Eakes | approximately 1970s | late 1980s | 907-225-5741 |
| Jim Amos | approximately 1970s | Approximately mid 1980s; sporadic employment | 907-225-3408 |
| Jon Sportsman | | | |
| Katy French | late 1980s | 1996 | 907-225-3380 |
| Phil Benning | 1980s | Current employee | 907-225-8435 |
| Rick Benner | | | |
| Hank Rambosek | approximately 1980s | Mill closure | 907-247-8606 |
| Jack Shearhouse | 1970s | Mill closure | |
| Dick Williams | | | |
| Jim Graham | | | |
| Ken Kiffer | | | |
| Phil McElroy | 1970s | Mill closure | 907-225-3634 |

2.    **Non-Alaskan Sites**

Arcata, California

The following additional individuals would have information regarding the operations and hazardous materials used, stored or found at the Site:

Ken Cole, former Plant Manager

Mick Allen, former Plant Environmental Manager.

Caspar Landfill, California

The following additional individuals would have information regarding the operations and hazardous materials used, stored or found at the Site:

Herb Shannon, former Plant Manager

Bob Vogt, former Plant Environmental Manager

Rob Cimmiyotti, former Plant Superintendant

Neil Sherman

Jeff Pluim

Kirk Girard, former environmental manager.

Cloverdale, California

The following additional individuals would have information regarding the operations and hazardous materials used, stored or found at the Site:

Bob Vogt, former Plant Environmental Manager

Neil Sherman

Jeff Pluim

Kirk Girard, former environmental manager.

Fort Bragg, California

The following additional individuals would have information regarding the operations and hazardous materials used, stored or found at the Site:

Herb Shannon, former Plant Manager

Bob Vogt, former Plant Environmental Manager

Rob Cimmiyotti, former Plant Superintendant

Neil Sherman

Jeff Pluim

Kirk Girard, former environmental manager.

Oroville, California

The following additional individuals would have information regarding the operations and hazardous materials used, stored or found at the Site:

Rick Grimm, former Plant Manager

Bob Greer, former Production Superintendent

Alan Fischer, Plant EMS champion

John Shoemaker, Maintenance Superintendent

Bill Hoseman, former Plant Environmental Manager.

Dated:  September 18, 2002

DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP


Robin L. Cohen, Esq.
R. Edward Poole, Esq.
Kenneth H. Frenchman, Esq.
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
1177 Avenue of the Americas
New York, NY 10036
Phone: (212) 835-1400
Fax: (212) 997-9880

Mark E. Ashburn, Esq.
Ashburn & Mason, P.C.
1130 West Sixth Avenue
Suite 100
Anchorage, AK 99501
Phone: (907) 276-4331
Fax: (907) 277-8235

Attorneys for Plaintiffs Ketchikan Pulp
Company and Louisiana-Pacific Corporation

# SINNOTT, DITO, MOURA & PUEBLA
### A PROFESSIONAL CORPORATION

TWO EMBARCADERO CENTER
SUITE 2330
SAN FRANCISCO CA 94111-5810
(415) 352-6200
FAX (415) 352-6224

707 WILSHIRE BLVD.
SUITE 3200
LOS ANGELES, CA 90017
(213) 996-4200
FAX (213) 892-8322

E-MAIL SDMP.COM

Our File
188,255

September 30, 2002

*VIA FACSIMILE & U.S. MAIL*

Kenneth H. Frenchman, Esq.
Dickstein, Shapiro, Morin & Oshinsky LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036

Re:    *Ketchikan Pulp Company, et al. v. Granite State Insurance Company, et al.*

Dear Mr. Frenchman:

We have reviewed your clients' supplemental responses to interrogatories (Sets One and Two). The supplemental responses resolve some of the problems associated with your clients' initial responses. In certain key aspects, however, your clients' supplemental responses still fail to provide sufficient information on which to base an informed selection of appropriate sites. With this letter we hope to continue the productive meet and confer process over those responses. For the reasons set forth below, we respectfully request further supplementary responses to the following interrogatories:

First Set of Specially Prepared Interrogatories

Interrogatory No. 6:    This request seeks a description of releases of hazardous materials at each site. Your clients' supplemental response takes two forms. First, a general response is provided, and is entitled the "August 14 Supplemental Response." This response indicates that escape of pollutants from L-P's property or migration from soil to groundwater will be the subject of expert testimony. The expert testimony alluded to relates to the behavior of the pollutants after their release, but does not address the releases themselves. This statement fails to address the question. The interrogatory seeks a description of how the pollutants were released from their containment vessels into the environment, not what happened after

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
September 30, 2002
Page 2

the release. As discussed below, we request supplemental responses as to the nature and timing of any releases at the sites.

The August 14 Supplemental Response also continues to refer Defendants to information on "unusual or extraordinary events" that would be contained in documents. This response remains problematic. Rule 33(d) requires your client to either describe the documents with specificity, or produce them. Moreover, such a response is not consistent with the purpose of the Court's case management directives. Please supplement your clients' responses to this interrogatory to identify actual releases to the environment.

In addition to the August 14 Supplemental Response, your clients provide a September 18 Supplemental Response, limited to an agreed to set of sites. These responses provide generalized statements about operations at the sites, but little specific information regarding actual releases. For example, the response for the Ward Cove site indicates that "certain types of spills and releases associated with pulp mil operations of the[sic] were repeated with some frequency". No information is provided as to the actual nature of the releases, except that they were of a "certain type". Please describe the nature of the spills and releases referred to, and please explain what "some frequency" means.

As another example, the Ward Cove response also refers to "releases of PCB-containing fluids from transformers, and spills of products and waste products due to operational upsets and accidents". A meaningful response to this interrogatory requires a description of how and when PCB-containing fluids were actually released from the transformers.

As a final point, the September 18 Supplemental Responses also refer to unspecified documents. The Ward Cove response indicates that records of spills would be kept in the 1990s, and that it would be "less likely" that records would exist prior to that time. If L-P cannot document the historical releases that allegedly gave rise to contamination at its property, it should say so. Otherwise, we are entitled to time, place and material-specific information concerning these release events.

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
September 30, 2002
Page 3

Interrogatory No. 7:  This interrogatory seeks information on the timing of the releases at the sites. The supplemental responses link this interrogatory with the response to Interrogatory Number 6, described above. The response to Interrogatory Number 6, however, provides no information regarding the timing of actual releases at any of the sites.

Interrogatory No. 10:  This interrogatory seeks information regarding the timing of any alleged property damage, personal injury or bodily injury. No coverage is provided under the subject policies for injuries taking place outside their respective policy periods. Accordingly, this information is critical to your clients' claims for coverage, and will significantly influence decisions on initial trial site selection.

The August 14 Supplemental Response indicates that "property damage alleged[sic] commenced with the date on which the property was first exposed to hazardous materials in the course of KPC or L-P operations at the sites and continued from that initial exposure until remediated". However, no information on the timing of the exposures is provided, thus no meaningful information on the actual timing of the alleged property damage is covered by the response. Instead, the September 18 Supplemental Response simply refers to the supplemental responses to Interrogatory Numbers 6 and 7. These responses provide no real information as to the timing of the alleged property damage.

Interrogatory No. 17:  This interrogatory seeks information on the amount of your clients' alleged liabilities attributable to sudden and accidental releases. The supplemental responses, indicate that L-P is unprepared to make such an allocation at this time. If L-P cannot allocate its alleged damages between those caused by sudden releases, and those resulting from gradual releases, it should say so. Otherwise, we are entitled to this information in a timely fashion. The relevance of the information sought should not require explanation.

Interrogatory No. 18:  This interrogatory asks your client to state the amount of defense costs it claims to have incurred with respect to each site. Your client essentially refuses to respond to the interrogatory claiming that the response will "neither affect the Plaintiffs' ability to access the excess policies at issue in this case, nor the amount of coverage available to Plaintiffs." Our clients contend that defense costs are not reimbursable under their policies, as to

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
September 30, 2002
Page 4

otherwise covered occurrences (if any exist), for which primary insurance was artificially exhausted. Your client may not unilaterally deny access to information based on the assumption that their position on a disputed issue will prevail.

## Second Set of Specially Prepared Interrogatories

Interrogatory Nos. 16-18:

These interrogatories asks your clients to state their contention on the number of occurrences they believe have given rise to the alleged liabilities at issue in this litigation. They also seek a description of each occurrence, and the amount of liability associated with each. The supplemental response does not provide any additional information, except that "neither KPC nor L-P has made a final determination of the 'number of occurrence.'" Their failure to do so is apparently the result of their belief that the existence and nature of the occurrence for which they seek coverage are not relevant to this dispute. The existence of a covered occurrence, however, is a predicate to coverage under the policies at issue in this case. The number of occurrences affects the potential applicable underlying limits and retentions. It also affects the total amount of potential limits available under policies issued by Defendants. The timing, nature and number of occurrences are central to the matters being litigated in this case. We again remind you that your client has alleged breach of contract against our clients. Breach of an insurance contract requires tender of an at least potentially covered occurrence, coupled with denial of policy benefits. Your clients cannot state a good faith cause of action for breach of contract, but disavow the ability to articulate the type, nature and number of covered occurrences tendered to our clients. At paragraph 20, your clients' complaint alleges that the subject liabilities arise out of "occurrences that resulted in property damage." Our clients are entitled to information characterizing and quantifying the alleged occurrences.

As part of the meet and confer process, we previously limited the number of sites for which supplemental responses would be required. In the interest of resolving the ongoing disputes over your clients' responses, we are willing to further narrow the list. If your clients will agree to provide further supplemental responses to the foregoing interrogatories, we will agree that those responses can be limited to Ward Cove, Thorne Bay, Arcata, Fort Bragg and Caspar.

I:\WPDOCS\AIGRCLOUPACLETTERS\frenchman.004.wpd

*Sinnott, Dito, Moura & Puebla*

Kenneth H. Frenchman, Esq.
September 30, 2002
Page 5

We will make every effort to continue any productive meet and confer dialogue in order to come to a reasonable resolution of the foregoing.  If possible, we would like to avoid motion practice on these issues.  Absent a commitment from your clients to supplement their responses, however, we will be forced to seek an order from the Court compelling such responses.  As you know, submissions on site selection are currently scheduled for October 7, 2002.  Absent some agreement on these issues, and the entry of a further stipulation on an extension of the October 7th deadline, we will be forced to file our compel motion on that date.

If, after considering the issues contained in this letter, you wish to discuss the matter further, please feel free to contact us.  If, on the other hand, you are unwilling to address the issues outlined above, please advise at the earliest opportunity, so that we may seek guidance from the Court.  You may contact me directly at (415) 352-6210.

Very truly yours,

SINNOTT, DITO, MOURA & PUEBLA, P.C.

Kenneth H. Sumner
KHS/sb

cc: Mike O'Clair