```
 1        IN THE UNITED STATES DISTRICT COURT

 2            MIDDLE DISTRICT OF ALABAMA

 3              NORTHERN DIVISION

 4

 5   GAIL BEDSOLE TATUM, as Mother and

 6   Administratrix of the Estate of

 7   MELANIE CHAMBERS, a Deceased Minor

 8   Child,

 9        Plaintiff(s),

10   v.  CIVIL ACTION NO. 2:06-CV-00083-LES-CSC

11                        (LEAD CASE)

12   PACTIV CORPORATION and

13   LOUISIANA-PACIFIC CORPORATION,

14        Defendant(s).

15

16      VIDEO DEPOSITION TESTIMONY OF:

17            JOHN IRA ROBERTS

18

19

20   Commissioner:

21   Renny D. McNaughton

22   May 4, 2007

23   Andalusia, Alabama
```

```
1            S T I P U L A T I O N

2            IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of Jacky

5    Partridge, may be taken before Renny D.

6    McNaughton, Court Reporter and Notary

7    Public, State at Large, at the Comfort Inn,

8    131 West Bypass, Andalusia, Alabama, on the

9    4th day of May, 2007, commencing at

10   approximately 9:00 a.m.

11           In accordance with Rule 5(d) of the

12   Alabama Rules of Civil Procedure, as

13   amended, effective May 15, 1988, I Renny D.

14   McNaughton, am hereby delivering to Eason

15   Mitchell the original transcript of the oral

16   testimony taken the 7th day of May, 2007,

17   along with exhibits.

18           Please be advised that this is the

19   same and not retained by the Court Reporter,

20   nor filed with the Court.

21

22

23
```

```
 1                I N D E X

 2       EXAMINATION BY:              PAGE NO.

 3     Mr. Mitchell                   8, 269

 4     Mr. Arnold                     131

 5     Mr. Berghoff                   204

 6              E X H I B I T S

 7     Plaintiff's

 8     No. 1                          21

 9     No. 2                          28

10     No. 3                          30

11     No. 4                          32

12     No. 5                          33

13     No. 5A                         35

14     No. 6                          37

15     No. 7                          40

16     No. 8                          43

17     No. 9                          47

18     No. 10                         53

19     No. 11                         55

20     No. 12                         113

21     No. 13

22     No. 14                         116

23
```

1    Defendant's

2    No. 1                              140

3    No. 1A                             141

4    No. 2                              208

5    No. 2A                             210

6    No. 3                              235

7    No. 4                              240

8    No. 5                              242

9    No. 6                              252

10   No. 7                              254

11   No. 8                              255

12   No. 9                              257

13   No. 10                             259

14   No. 11                             264

15   No. 12                             265

16

17

18

19

20

21

22

23

```
 1             A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF (S):

 4    W. Eason Mitchell

 5    The Colom Firm

 6    P.O. Box 866

 7    Columbus, Mississippi 39703

 8

 9    Gregory A. Cade

10    Robert L. Palmer

11    The Environmental Litigation Group

12    3529 7th Avenue South

13    Birmingham, Alabama   35255

14

15    Douglas S. Arnold

16    Akila Sankar McConnell

17    Alston & Bird

18    1201 West Peachtree Street, N.W.

19    Atlanta, Georgia   30309

20    404-881-7000

21

22

23
```

```
1    Mark R. Ter Molen

2    Mayer, Brown, Rowe & Maw

3    71 South Wacker Drive

4    Chicago, Illinois  60606

5    312-782-7711

6

7    Erick Opsahl

8    Kimberly-Clark Corporation

9    1400 Holcomb-Bridge Rd

10   Roswell, Georgia  30076

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
1            I, Renny D. McNaughton, a Court

2    Reporter of Greenville, Alabama, and a

3    Notary Public for the State of Alabama at

4    Large, acting as Commissioner, certify that

5    on this date, pursuant to the Alabama Rules

6    of Civil Procedure, and the foregoing

7    stipulation of counsel, there came before me

8    at the Comfort Inn, 131 West Bypass,

9    Andalusia, Alabama, commencing at

10   approximately 9:00 a.m. on the 4th day of

11   May, 2007, John Ira Roberts, witness in the

12   above cause, for oral examination, whereupon

13   the following proceedings were had:

14

15            THE COURT REPORTER:  Usual

16            stipulations?

17         MR. MITCHELL:  Yes, sir.

18         MR. TER MOLEN:  The same as

19            yesterday.

20         MR. MITCHELL:  The only thing I

21            think we might could add to the

22            usual stipulations is that -- that

23            the objections will be waived
```

```
 1              until time of use.  I think the

 2              standard stipulations are trial

 3              but --

 4              MR. TER MOLEN:  Why don't we go

 5              off the record for a minute here.

 6              (Off-the-record.)

 7              MR. MITCHELL:  Standard

 8              stipulations.

 9              JOHN IRA ROBERTS

10   (being first duly sworn, was examined

11   and testified as follows:)

12              EXAMINATION

13   BY MR. MITCHELL:

14       Q   Would you please state your name

15   for the record, sir.

16       A   John Ira Roberts.

17              THE COURT REPORTER:  You need to

18              speak up so everyone in the room

19              can hear you.

20       A   John Ira Roberts.

21              MR. MITCHELL:  Could we get off

22              the record for just a moment.

23              THE VIDEOGRAPHER:  Okay.  One
```

```
1              moment.
2                  (Off-the-record.)
3                  THE VIDEOGRAPHER:  We're on the
4              record.
5    BY MR. MITCHELL:
6         Q    I need you to state your name for
7    the record, please, sir.
8         A    John Ira Robert.
9         Q    Mr. Roberts, I am Eason Mitchell,
10   and I have a few questions to ask you about
11   the operation of the former Louisiana
12   Pacific wood treatment facility located
13   between Lockhart and Florala, Alabama.  And
14   we'll ask you to please say "yes" or "no" if
15   I ask you a question so that the
16   court reporter can get it.  Now, may -- may
17   we just refer to this as the "facility" and
18   you'll understand what I'm talking about?
19        A    Fine.
20        Q    Okay.  Do you have a name that
21   you go by or a nickname?
22        A    Yes.  Buck.
23        Q    And do you prefer that I call you
```

```
1    Buck or Mr. Roberts?

2         A    Buck.

3         Q    All right.

4         A    I'm not mister.

5         Q    All right.  Thank you.  Buck,

6    approximately, where were you born?  Where

7    did you live when you were born?

8         A    Well, I was born in Florala.  I

9    lived about seven miles east of Florala.

10        Q    And when -- how old are you?

11        A    I'm 58, I think is right.

12        Q    All right.  Now, did -- did you

13   go to school in Florala?

14        A    Yes.

15        Q    All right.  And where was the

16   school when you went to the school?

17        A    Florala.  The elementary school

18   was at Lockhart and the high school was at

19   Florala.

20        Q    All right.  And how close was the

21   high school where you went to high school

22   from the facility?

23        A    Basically, across the branch
```

```
 1    so-to-speak.  I'm talking less than a half a

 2    mile.

 3         Q    And what grade did you start at

 4    that high school?

 5         A    Ninth grade.

 6         Q    Okay.  Was there a middle school

 7    back in those days?

 8         A    No.  No.

 9         Q    So then would it be fair to say

10    you went to the Lockhart Elementary School

11    through the eighth grade --

12         A    Right.

13         Q    -- and then at the ninth grade,

14    you moved to the Florala High School?

15         A    Right.

16         Q    Is that the high school that's in

17    the present location of the Florala High

18    School?

19         A    Yes, sir.  That's the present

20    school as of today.

21         Q    All right.  And how far did you

22    go through high school?

23         A    I went through the 12th grade,
```

```
 1    graduated.

 2         Q    Did you -- after high school, did

 3    you receive any more formal education?

 4         A    No, sir.  I graduated in '67.  In

 5    '68 I was drafted in the military.

 6         Q    And what was your job in the

 7    military?

 8         A    Basically, a wheeled vehicle

 9    mechanic.

10         Q    A what?

11         A    Wheeled vehicle mechanic.

12         Q    Okay.  And between '67 when you

13    graduated and '68 when you got drafted,

14    what -- did you work anywhere?

15         A    I was a mechanic for McDaniel

16    Motor Company, which was the Chevrolet

17    dealer in Florala at that time.

18         Q    And how long were you in the

19    military?

20         A    Two years.

21         Q    Did you go to Vietnam?

22         A    No.

23         Q    So you -- when did you get out of
```

1    the military?

2         A    May of '70.

3         Q    I assume in the military you had

4    training and education on the operation or

5    the maintenance of wheeled vehicles?

6         A    Mostly hands-on so-to-speak.

7         Q    Did you receive any training in

8    the military concerning hazardous chemicals,

9    toxic waste, or environmental matters?

10             MR. TER MOLEN:  Objection.

11             Foundation.

12        A    No, sir, I did not.  The only

13   extra training that would even closely

14   contend to that was basically a two-week

15   course in demolition.

16        Q    Is demolition how to blow things

17   up?

18        A    Right.

19        Q    That's probably not related to

20   this, but why does a wheeled mechanic need

21   to know how to blow something up?

22        A    My orders was lost at that time

23   and they didn't have nowhere to put me.  So

```
1      they put me through this two-week course.

2           Q    Okay.  All right.  So you got out

3      of the military about 1970?

4           A    Yeah.

5           Q    All right.  And where did you go

6      to work next?

7           A    I went to work for Hooten

8      Equipment Company there in Florala, which

9      was the John Deere dealer.

10          Q    And that's tractors and -- and --

11     and -- and farm implements?

12          A    Right.

13          Q    All right.  And what did you do

14     for Hooten Implement?

15          A    Mechanic, whatever come up.  A

16     lot of times we was assembling equipment

17     that would come in.  Just anything,

18     basically, dealing with farm equipment.

19          Q    And did John Deere or Hooten

20     Equipment provide you with any training or

21     education in toxic chemicals or handling

22     toxic waste, hazardous waste, or

23     environmental matters of any type?
```

```
 1                MR. ARNOLD:  Object to the form

 2           of the question.

 3      A     No, sir.

 4      Q     And then how long did you work

 5 for Hooten?

 6      A     Seventy-three or '74.  I'm

 7 reckless with dates.  I think it was '74.

 8      Q     And where did you go to work

 9 then?

10      A     I went to work for International

11 Paper Company.

12      Q     What did you do for International

13 Paper?

14      A     Well, basically, it was

15 mechanicing, welding.  What it was, it was a

16 wood screw.  At that time the first

17 automated or automatic pulpwood machines had

18 come into existence.  International Paper

19 Company actually invented the -- well, the

20 men working for International had invented

21 them, and they had the patent and everything

22 on it.

23      Q     And when you worked for
```

1      International Paper, did you have any

2      training or education in the handling of

3      toxic waste, toxic chemicals, hazardous

4      waste or environmental matters of any type?

5                  MR. TER MOLEN:  Objection.

6                  Compound.  Foundation.

7      A     No, sir.  No, sir.

8      Q     Now, where was the International

9      Paper facility located where you worked?

10     A     It was located there at Lockhart.

11     But, basically, we worked in the woods.  We

12     cut wood all around.  They owned the

13     woodland that you see that's -- basically,

14     that's around Lockhart there.

15     Q     Did they make any paper at

16     that -- at that location?

17     A     No.

18     Q     Did they use any hazardous

19     chemicals to your knowledge at that

20     location?

21     A     No.

22     Q     Did they treat wood at that

23     location?

```
1          A    No.

2          Q    Did they treat wood anywhere near

3    Lockhart or Florala?

4               MR. TER MOLEN:  Objection.

5               Foundation.

6          A    International Paper Company?

7          Q    What did they -- what did they do

8    with their product?

9          A    Basically, they cut the wood.

10   Our part of it that we cut, we just cut

11   pulpwood.  At that time, it was going to

12   Panama City to the paper mill.

13         Q    Okay.  How long did you work for

14   International Paper?

15         A    Seventy-eight I think it was.

16   Yeah, '78.  When we started with the crew

17   with International, it was set up to run --

18   well, it was going to run seven years.  We

19   run it six years and six months, and they

20   shut it down.

21         Q    Do you know why it was set up to

22   run seven years?

23         A    Well, I didn't at the time.  But,
```

```
 1    supposedly, later that was the tax

 2    limitations that they could -- some way --

 3    big business --

 4         Q    Okay.

 5         A    -- wrote it off.

 6         Q    Now, after you left International

 7    Paper, where did you go to work?

 8         A    Lockhart Lumber Company.

 9         Q    And can you tell us whether or

10    not that was the Lockhart Lumber Company

11    that became TMA, that became Louisiana

12    Pacific, that operated the facility that we

13    described when we started this deposition?

14         A    Yes, sir, it was.

15         Q    Okay.  May I just call it the

16    "facility."  I'll just call it the

17    "facility."

18         A    Fine.

19         Q    Okay.  After you went -- when you

20    first went to work for Lockhart Lumber,

21    what -- what was your job?

22         A    I was hired on as a millwright.

23         Q    Now, can you please explain to
```

1     the court and the ladies and gentlemen of

2     the jury what a millwright is?

3          A     Well, there it meant anything,

4     basically.  But it's the upkeep, setting up

5     maintenance on the equipment.

6          Q     Does the position of millwright

7     involve fabrication?

8          A     Definitely, there.

9          Q     All right.  Can you tell the

10    court what you mean by fabrication?

11         A     Well, basically, part of the

12    equipment was bought, but as far as log

13    runs, stuff to handle the lumber, conveyor

14    chains, that kind of stuff, we made it.  We

15    even set down -- we built the trim saws

16    for -- that trimmed the lumber at the

17    sawmill and the plainer mill.  Cut off saws,

18    we would build the assembly for that.

19    Everything.  Basically, they didn't buy

20    nothing that what we could manufacture.

21         Q     When you say "we," did you take

22    part in that manufacture?

23         A     I'm -- I'm afraid so.

1          Q     And did you weld metal?

2          A     Yeah.

3          Q     All right.

4          A     Definitely.

5          Q     And did you take part in -- in

6     general maintenance of the facility?

7          A     Yes.  They had oilers and all in

8     the sawmill and had people that done the,

9     more less I reckon you would call it, the

10    lower maintenance.  But, yes, we worked on a

11    little bit of all of it there.

12         Q     Okay.  When you say "we," were

13    you included in that?

14         A     Right.

15         Q     All right.  And how long did you

16    work for at the facility?

17         A     Well, 21 years I think is right.

18    It wasn't long after I went there that TMA

19    bought out or -- I'm learning now that it

20    was some kind of merger.  But as far as we

21    knowed it, they had bought it out.

22         Q     And what year did you leave the

23    facility?

1        A    Well, I stayed with it until it

2    was shut down -- the operation was shut

3    down.  What was that, '9 -- '99?

4        Q    Is that your best recollection?

5        A    I think that's right.

6        Q    Did your duties change in the 21

7    years that you were working at the facility?

8        A    Basically, no.

9        Q    All right.  And --

10       A    I, more less, I went from lower

11   millwright -- you know, some of them moved

12   on, moved out and left.

13       Q    And did you work there on a

14   full-time basis?

15       A    Yes, sir.  Our work week normally

16   included at least 50 hours a week.

17       Q    And you did that 21 years?

18       A    Basically, yes.

19            (Whereupon Plaintiff's

20            Exhibit Number 1 was marked and

21            attached to the deposition.)

22   BY MR. MITCHELL:

23       Q    Buck, I'm going to show you

1    what's been marked as Roberts Plaintiff's

2    Exhibit 1, which is a photograph and ask you

3    to look at that.  Can you tell me whether or

4    not Exhibit 1 fairly and accurately depicts

5    the view of the facility in 1978,

6    approximately, the time when you went to

7    work there?

8              MR. TER MOLEN:  Do you mean

9              including the labels that are on

10             there or do you intend to go

11             through that separately?

12             MR. MITCHELL:  I'm going to ask

13             about the labels separately.

14             MR. TER MOLEN:  All right.

15             MR. MITCHELL:  I did not --

16   BY MR. MITCHELL:

17        Q    I'm not asking about the labels.

18   Just is -- is that picture accurate?

19        A    Yeah, as near as I can tell it

20   is.

21        Q    Okay.  Now, would you look at the

22   labels and the areas that are outlined on

23   Exhibit 1.

```
 1          A    As far as I can tell, they --

 2     they're pretty well accurate, I mean as far

 3     as everything.

 4          Q    Do -- do the labels on

 5     Plaintiff's Exhibit 1 fairly and accurately

 6     describe the location or objects or

 7     buildings at the facility in 1978 when you

 8     went to work there?

 9          A    Yes, they do.

10          Q    Now, would it be possible for you

11     to hold that up and turn it around so that

12     the videographer can -- can get that on --

13     on the video.

14          A    (Witness complied.)

15          Q    And can you -- would you hold it

16     to the side just a little bit where you can

17     see it, too.  All right.  Can you turn it

18     just a little bit so hopefully both of you

19     can look at it.

20          A    (Witness Complied.)

21          Q    Now, I'm going to hand you a pen

22     to use as a pointer, if I could.  And would

23     you please go over Plaintiff's Exhibit 1 and
```

1     point to the different buildings and labels

2     on that exhibit and just explain to us what

3     those things are.

4          A     Well, the entrance came in --

5     actually, they had the scales the timber

6     come through.  And it -- the scales at the

7     office.  It was unloaded and stored at

8     the -- in the racks -- I mean the runs --

9     log runs.  And it was picked up then and

10    went back to the sawmill and all.

11         From the sawmill, it went to the --

12    stacked in the -- up.  It was later dried in

13    the -- in the dry kilns here.  And from the

14    dry kilns it was more less stored in the

15    sheds again until they got ready to run it

16    through the plainer mill.  And it was --

17    after it was run through the plainer mill,

18    it was put back in the sheds and stored.

19         Over here, this is the shop where they

20    kept up the equipment, the rolling stock.

21    At that time, the -- the only difference I

22    can see in this, to the side of this over

23    here was a welding shop, basically, where we

```
 1    -- we all worked here.

 2         Q    And what is labeled for that?

 3         A    Well, actually, it was tied in

 4    with the sawmill building.  It was -- this

 5    offset here --

 6         Q    All right.

 7         A    -- was actually the shop we

 8    worked in.

 9         Q    And that would be directly to the

10    east or left of the label that says "wood

11    storage" and right over the label that says

12    "sawmill building"?

13         A    Right.

14         Q    Okay.

15         A    Some of the lumber went to the

16    treatment plant and all.  The difference

17    that's not showed here was there was a

18    merchandiser they called it, was a chip mill

19    set up over here.

20         Q    "Here," you're talking about down

21    on the lower end?

22         A    Yeah.

23         Q    And --
```

1          A     I'm talking about all it was, was

2     a large chipper with -- they was log runs,

3     chains so-to-speak.  It was built right

4     there, everything but the chipper.  All

5     right.  And the railroad track come on down

6     from here.  There was a spur made and it

7     went in.

8          They high graded the pulpwood.  Got

9     barn poles, fence posts, that kind of stuff

10    out of it.  And from there it went to the

11    treatment plant, these poles and all did,

12    was treated.

13         They was a small post peeler set up

14    back behind this chip mill part back here.

15    It was -- basically, the way they're showing

16    the tepee burner, all of this would have

17    been to the south of the tepee burner.

18         Q     Where is the boiler on

19    Plaintiff's Exhibit 1?

20         A     Back here (indicating).

21         Q     All right.  And are the labels

22    then fairly and accurate descriptive --

23         A     The only thing that's left off is

1      the -- that I can tell, is actually it don't

2      give no reference to the chip mill.

3            Q     No -- no label for the chip mill?

4            A     Right.

5            Q     Can you point out where that chip

6      mill is?

7            A     Basically, this is it right here,

8      I'm thinking (indicating).  The way they've

9      got it, it's hard to tell.

10           Q     And have you drawn in an area

11     with red ink that shows where the chip mill

12     is?

13           A     Yes.

14           Q     And can you tell us what this

15     large area here is that's -- that's --

16     that's unlabelled?

17           A     All right.  This -- this was

18     stored -- after the posts and lumber was

19     treated, these runs here was used, depending

20     on how much we had in stock.  They was

21     certain area -- over here, that was

22     basically designated for the pulpwood and

23     posts that was stored until they could get

1    it through the chip mill.

2        We have used it to put the green lumber

3    and air dry some of the lumber.  The

4    production at the sawmill was larger than

5    what we could get through the dry kiln.  So

6    we have stored lumber over here for it to

7    air dry.

8            (Whereupon Plaintiff's

9        Exhibit Number 2 was marked and

10       attached to the deposition.)

11   BY MR. MITCHELL:

12       Q    Okay.  Thank you.  We would offer

13   Plaintiff's Exhibit 1.

14       Mr. Roberts, I'm going to show you

15   what's been marked Plaintiff's Exhibit

16   Roberts 2 and ask you to look at that

17   document and photograph.

18       A    Basically, the biggest difference

19   between this and the other one, that one of

20   the -- that the number 1 pond has been

21   closed.  It shows up on this map.

22       Q    Does Plaintiff's Exhibit 2 fairly

23   and accurately depict the view of the

1    facility in 1982?

2        A    Yes, sir, it does.

3        Q    And are the labels and outlined

4    buildings on Plaintiff's Exhibit 2 fair and

5    accurate?

6        A    Yes.  It's still no mention of

7    the merchandiser or the chip mill on it.

8        Q    And those are the -- those are

9    the things that you wrote in to Plaintiff's

10   Exhibit 1?

11       A    Right.

12       Q    Now, could you please look at

13   Plaintiff's Exhibit 1 and Plaintiff's

14   Exhibit 2 and -- and hold up Plaintiff's

15   Exhibit 2 where the videographer and the

16   jury can see it.  You can point to it.  Take

17   your pointer.  Turn it up a little bit.

18   Could you please take your pointer and just

19   explain to us any differences or changes

20   that occurred from 1978 to 1972 -- 1982.

21       A    The treatment pond that was right

22   here that was -- where the creosote was

23   reclaimed is missing.

1          Just one minute, please.

2                    (Phone Beeped.)

3          Q    Do you need to take a break?

4          A    Yeah, just a short -- just a

5     minute.

6               MR. MITCHELL:  We're off the

7               record.

8       (Whereupon, a short break was taken.)

9     BY MR. MITCHELL:

10         Q    Will you hold that up and finish

11    answering the question.

12         A    During the time it was covered in

13    and covered up and this is the area it was

14    in right here.

15         Q    Is there any other difference or

16    changes that are substantial that you can

17    notice?

18         A    Not really.

19               (Whereupon Plaintiff's

20               Exhibit Number 3 was marked and

21               attached to the deposition.)

22    BY MR. MITCHELL:

23         Q    Okay.  I'd like you to please

1    look at Plaintiff's Exhibit Roberts 3.  Look

2    at that so you can identify it.  Can you

3    please tell me whether or not Plaintiff's

4    Exhibit 3 fairly and accurately depicts a

5    view of the facility in 1985?

6         A    Yes.  It's -- it shows basically

7    everything.  The treatment pond is missing

8    that was --

9         Q    Let me ask you the question.  And

10   are the labels -- let me ask you the

11   question again, if I could, because I've got

12   to ask the question, if you don't mind.

13   Just does Plaintiff's Exhibit 3 fairly and

14   accurately depict the view of the facility

15   in 1985, just the picture part?

16        A    Yes, sir.

17        Q    All right.  And are the labels on

18   Plaintiff's Exhibit 3 a fair description of

19   the buildings and outlines shown on that

20   exhibit?

21        A    Yes, sir.

22        Q    All right.  Now, can you please

23   explain any differences or changes in the

1    facility that occurred between 1982 and

2    1985, and use your pointer to show us where

3    those changes are and what they were?  If

4    you can, hold that up where we can see it on

5    the video.  Thank you.

6         A    The tepee burner in this area was

7    removed, and basically that's it.

8              (Whereupon Plaintiff's

9              Exhibit Number 4 was marked and

10             attached to the deposition.)

11   BY MR. MITCHELL:

12        Q    Okay.  Will you please look at

13   what -- just look at what's been marked as

14   Plaintiff's Exhibit Roberts 4.  Can you tell

15   me whether or not Plaintiff's Exhibit

16   Roberts 4 fairly and accurately depicts a

17   view of the facility in 1986?

18        A    Yes, it does.

19        Q    All right.  And are the labels

20   and outlines on Plaintiff's Exhibit 4 fairly

21   -- do they fairly and accurately depict the

22   buildings and other objects on that

23   facility?

1          A    They do.

2          Q    All right.  Now, is there

3     anything on there that's not labelled that

4     you would like to label for reference?

5          A    No, sir.

6          Q    All right.  Can you please take

7     Plaintiff's Exhibit 4 and -- and hold it up

8     where the court can see it and take your

9     pointer and please tell us any differences

10    or changes that occurred at the facility

11    between 1985 and 1986?

12         A    Basically, I don't see it.

13    They're basically showing the same -- the

14    same thing really that --

15         Q    Is there anything that you

16    remember changing that's not on the exhibit?

17         A    Between '85 and '86, I don't

18    remember.

19              (Whereupon Plaintiff's

20         Exhibit Number 5 was marked and

21         attached to the deposition.)

22    BY MR. MITCHELL:

23         Q    Okay.  And I would like you to

1     please look at what's been marked as

2     Plaintiff's Exhibit Roberts 5.  Can you tell

3     me whether or not Plaintiff's Exhibit 5

4     fairly and accurately depicts a view of the

5     facility in 1987?

6          A     Yes, it does.

7          Q     Okay.  And are the labels fair

8     and accurate descriptions of -- of the

9     buildings or other objects on that location?

10              MR. TER MOLEN:  I'm going to

11              object here.  This -- this -- at

12              least my exhibit has handwritten

13              notations on it that are not typed

14              in.

15              MR. MITCHELL:  Excuse me.  What

16              number exhibit was that?

17              THE WITNESS:  Five.

18              MR. MITCHELL:  May we exchange?

19              MR. TER MOLEN:  That's fine.

20              MR. MITCHELL:  And I'm handing

21              Mr. Ter Molen Plaintiff's Exhibit

22              5 and Mr. Roberts Plaintiff's

23              Exhibit 5A.

```
 1              (Whereupon Plaintiff's

 2         Exhibit Number 5A was marked and

 3         attached to the deposition.)

 4    BY MR. MITCHELL:

 5         Q    And I'm going to ask you the same

 6    question, just about the view, Buck.  Does

 7    that -- does that view fairly and accurately

 8    depict the facility in 1987, just the view?

 9         A    Yes, it does.

10         Q    Do the -- the -- do the printed

11    labels fairly and accurately depict the

12    names and conditions of the buildings or

13    locations of the buildings and other objects

14    on the facility?

15         A    Yes.  The difference where it was

16    handwritten, it shows the pond that was

17    closed and the chip mill.

18         Q    All right.  And whose handwriting

19    is that?

20         A    It's mine.

21         Q    And can you take your pointer,

22    hold that up, and show us where you have

23    written in any changes or additions?
```

1          A     The chip mill that was here and

2     the pond that was over here.

3          Q     And does -- were those ponds to

4     be -- things you added in to be added or

5     were they things that had changed?

6          A     Well, from '86 to '87, the '86

7     didn't have it.  This is just a picture that

8     I had that I was just trying to remember,

9     and I -- I didn't know it was coming back in

10    this room today.  But I had wrote in the

11    chip mill was here and that the pond was

12    over here.

13              MR. TER MOLEN:  Historically is

14              what you're saying?

15              THE WITNESS:  Right.  Yeah.

16              MR. MITCHELL:  Did you get -- I

17              assume you're on the record.

18    BY MR. MITCHELL:

19         Q     Okay.  So where you wrote in

20    pond, that's where the pond used to be?

21         A     Yeah.  It's showed on the --

22         Q     And you're pointing to the pond,

23    pond 1 on Plaintiff's Exhibit 1?

1          A     Right.

2          Q     So would you -- did you mean to

3     tell us that the pond -- the pond was gone

4     in 1987?

5          A     That was just one that I had

6     looked at that I just -- I don't know.  I

7     just scribbled it in looking at it.

8          Q     Was that pond there in 1987?

9          A     No.

10         Q     Okay.  And we would offer 1

11    through 5 -- 5A.

12              MR. TER MOLEN:  In evidence --

13              MR. MITCHELL:  Yes.

14              MR. TER MOLEN:  -- you're saying?

15              Okay.  Well, we will reserve

16              objections at this stage.

17              (Whereupon Plaintiff's

18              Exhibit Number 6 was marked and

19              attached to the deposition.)

20    BY MR. MITCHELL:

21         Q     I would like you to look at

22    what's been marked as Roberts Exhibit 6.

23    Does plaintiff's Roberts Exhibit 6 fairly

```
 1    and accurately depict a view of the facility

 2    in 1990?

 3         A    Yes, it does.

 4         Q    And do -- can you tell us whether

 5    or not the labels and outlines on

 6    Plaintiff's Exhibit 6 fairly and accurately

 7    depict the location and names of the

 8    different buildings and objects at the

 9    facility?

10         A    Yes, it does.

11         Q    Can you hold up Plaintiff's

12    Exhibit 6 where it can be seen and point out

13    any changes that occurred between 1987 and

14    1990 and explain those to us.

15         A    All right.  The ponds -- in '87

16    the picture showed for two ponds, pond 2 and

17    pond 3, and they've been filled in -- took

18    off.

19         Q    Are there any other substantial

20    changes or differences that you would like

21    to point out?  I'm not trying to tell you

22    there are any.  I'm just asking to make

23    sure.
```

```
1          A     No, they're not.

2          Q     All right.  Is there anything

3     that you remember that would have changed

4     the view of the facility between '87 and '90

5     that is not fairly and accurately shown on

6     Plaintiff's Exhibit 6?

7          A     No, sir.

8          Q     Now, that we've gone a few years,

9     Buck, could you hold up 6 where the

10    videographer can see it.  And just take your

11    pointer and -- and point out where different

12    types of buildings and structures, storage

13    areas are located so that we can -- you can

14    describe those to us.

15         A     Well, your treatment plant was

16    here, the boiler room was here, the dry kiln

17    was here, the plainer mill, lumber sheds,

18    sawmill, storage sheds, and shop.

19         Q     Okay.  And what is -- what was

20    this area -- if you could, hold that up.

21    This area here on the south end, the lower

22    part, what -- what was that used for?

23         A     This was the pond area that was
```

1    closed.  Now, this is where the lumber was

2    stacked once it was treated, the posts and

3    poles and stuff.

4         Q    Okay.  And what is -- what is

5    this piece of machinery that's unlabelled

6    here almost in the middle of the photograph?

7         A    This is where I was telling you

8    was the chip mill.

9         Q    Okay.

10        A    The tepee burner that was shown

11   earlier and the chip mill setting behind it.

12        Q    All right.  Is the tepee burner

13   there?

14        A    It's gone.

15        Q    It's gone.

16        A    It's gone.

17             (Whereupon Plaintiff's

18             Exhibit Number 7 was marked and

19             attached to the deposition.)

20   BY MR. MITCHELL:

21        Q    All right.  I would like you to

22   please look at Plaintiff's Exhibit Roberts

23   7.  Tell us whether or not that fairly

```
 1    accurately depicts a view of the facility in

 2    1992.

 3         A    Yes, it does.

 4         Q    And can you tell us whether

 5    the -- the labels and outlines set out on

 6    Plaintiff's Exhibit 7 are fair and accurate

 7    depictions of names for the different

 8    buildings and objects located on the

 9    facility?

10         A    It does with one exception.  This

11    storage shed someone has drawed, this is

12    not -- this is not a accurate description.

13    It was all more less together.  Right there

14    is a little bit of a area somehow.  I don't

15    understand.  I would like to see a -- a

16    better photograph than that.  But --

17         Q    All right.

18         A    This building was all together,

19    the treatment here.

20         Q    And when you say "this building"

21    --

22         A    I'm talking about this -- this

23    right here (indicating).
```

1        Q     Where it says "treatment

2    building" and where it says --

3        A     Where it says "storage shed" is

4    what my question is.  This -- it's not a

5    accurate description of a storage shed being

6    there.

7        Q     What was there?

8        A     It was where they stacked the

9    lumber that was treated, basically.

10       Q     How -- how would you -- how would

11   you change it to label it accurately?

12       A     There was no shed there.  I mean,

13   basically, you see in '90 it's showing just

14   one here.  There was not one built.  Look in

15   your '93 picture and see if you see one.

16       Q     Yeah.  I'm going to show you that

17   in just a moment.

18       A     Well --

19       Q     You don't remember there being

20   two different buildings?

21       A     No.

22       Q     Okay.  Other than that, are there

23   any changes?

1           A     Basically, no.

2                 (Whereupon Plaintiff's

3           Exhibit Number 8 was marked and

4           attached to the deposition.)

5     BY MR. MITCHELL:

6           Q     I'm going to ask you to please

7     look at Plaintiff's Exhibit Roberts 8.  And

8     just as to the view, does Plaintiff's

9     Exhibit 8 fairly and accurately depict the

10    view of the facility in 1993?

11          A     Yes, it does.

12          Q     All right.  And I think you asked

13    to see that before.  What -- does that

14    refresh your recollection or help you with

15    any differences or changes you would like to

16    make?

17          A     Well, I can't be sure, but after

18    thinking, during this time we was cutting --

19    I'd have to go back.  Somebody would have to

20    pull the records to see that.  But we was

21    going heavy two by tens.  And with the

22    two by tens, we couldn't -- like I said

23    before, we couldn't get them through the dry

```
 1    kiln fast enough.  So they selected and we

 2    stacked a slew of them, green two by tens,

 3    and I think that's what they've got labelled

 4    as a shed, that was stacked up there out

 5    there after -- but there was not a shed

 6    there.

 7         Q    To make sure I understand, and I

 8    don't want to lead you or put words in your

 9    mouth, but you -- I think you've told us

10    what's labelled building or a shed to the

11    right of the treatment facility building is

12    actually a large stack of lumber and --

13         A    Right.

14         Q    -- not a building?

15         A    Right.

16         Q    Okay.  Could you please go back

17    at Plaintiff's Exhibit 7, and does that

18    memory help you with telling us what is

19    labelled as a storage shed on Plaintiff's

20    Exhibit 7?

21         A    Well, that -- that's my only

22    explanation of it, because it was not a shed

23    there.
```

1          Q    All right.  And then could you

2    change what's storage shed to two by ten

3    lumber stack?

4          A    Right.

5          Q    Would you like --

6          A    I -- I can't be positive, but

7    there was not a shed there.

8          Q    Is it two by ten --

9          A    What I'm --

10         Q    I didn't mean to interrupt you.

11   Go ahead.

12         A    Well, that -- that's my -- in my

13   mind thinking, that's the only explanation

14   for it.

15         Q    Is that your best recollection?

16         A    Yes, it is.

17         Q    And could you just scratch out

18   storage shed there.

19         A    I'll just put lumber.

20         Q    All right.  And, now, does

21   Plaintiff's Exhibit 7 fairly and accurately

22   depict a view of the facility, and is it

23   fairly and accurately labelled?

```
1          A     Yes, it is.

2          Q     All right.  Would you go back to

3     Number 8 and change any labeling you would

4     like on -- on number 8.

5          A     Well, they don't even have it

6     labelled on number 8.

7          Q     Okay.

8          A     They just show the drawing of it.

9          Q     And is that outline, which would

10    be to the right or the east of the treatment

11    cylinder building, the stack of lumber that

12    you're describing?

13         A     That's --

14         Q     I think I asked you before, but

15    does Plaintiff's Exhibit 8 fairly and

16    accurately depict a view of the facility?

17         A     Yes, it does.

18         Q     1993.  And could you please hold

19    that up so the ladies and gentlemen of the

20    jury and the court could see it.  And just

21    turn it a little bit.  And just take your

22    pointer and explain to us what these

23    different things that you see on Plaintiff's
```

```
1    Exhibit 8 are.

2         A    Go back over all of them is what

3    the question you want?

4         Q    Yes, sir.  Just describe the

5    facility again.

6         A    Well, your sawmill.  From the

7    sawmill, you got your storage areas and then

8    the -- it went to the dry kiln.  And then

9    you've got the -- stored in these sheds

10   here.  Usually, it was dried in the dry

11   kiln, stored here, went through the plainer

12   mill, and then it was stacked under here, as

13   dressed lumber, and here in the storage

14   shed.  You've got your shop over here, your

15   boiler room here.

16        Q    Where were the treatment

17   cylinders?

18        A    The treatment cylinders were

19   here.

20             (Whereupon Plaintiff's

21             Exhibit Number 9 was marked and

22             attached to the deposition.)

23
```

```
1    BY MR. MITCHELL:

2         Q    Thank you.  I would like you to

3    please look at Plaintiff's Exhibit Roberts

4    9.  And let me -- tell us whether or not

5    that fairly and accurately depicts a view of

6    the facility in 1994?

7         A    Yes, it does.

8         Q    And with the exception of the

9    storage shed next to the treatment cylinder

10   buildings that you relabelled, are the

11   labels and outlines fairly and accurately

12   depicting the different objects and building

13   located at the facility?

14        A    Yes, it does.

15        Q    All right.  Now, I'd like to go

16   back and ask you a question about

17   Plaintiff's Exhibit 8, if you could.

18        A    All right.

19        Q    Can you hold that up so it can be

20   seen.  Do you see the area here in the

21   middle/lower part of the photograph, which I

22   believe would be the bottom or the south end

23   of the facility.  Just the general area that
```

1    I'm pointing to.

2          A    All right.

3          Q    And can you tell us what those

4    dark areas are shown in -- in Plaintiff's

5    Exhibit 8?

6          A    It's got to be the lumber stacked

7    out.  Is this what you're referring to,

8    these -- like this or down here?

9          Q    Well, all of it.  The dark

10   areas -- looks like roads here in the middle

11   and then there's dark areas.  What is all

12   that?

13         A    Well, it was lumber stored from

14   the treatment -- a lot of it in here.  I

15   don't understand just exactly the question

16   you're -- what you're wanting to know.  But

17   this had to be stacks of lumber or -- here.

18         Q    Are the --

19         A    We had runs.  Basically, they put

20   the treated timbers down and set the lumber

21   on it, the treated lumber.  Sometimes the

22   dressed lumber -- I mean, not the dressed

23   lumber, but the rough lumber was put over

```
1    there to air dry.

2         Q    Is the treated lumber a different

3    color?

4         A    Definitely.

5         Q    So is that -- is the dark area --

6    any different lumber area different from the

7    light colored lumber area?

8              MR. TER MOLEN:  Objection.

9              Foundation.

10             MR. ARNOLD:  Object to the form

11             of the question.

12        A    Well, this -- this has got to be

13   stacks of lumber here and all.  But unless

14   it could have been equipment parked, but I'd

15   like to see a more accurate map of it

16   really.

17        Q    All right.  Can you look at

18   the -- sort of the star shaped road area in

19   the triangle on the very bottom of

20   Plaintiff's Exhibit 8.  Do you see -- do you

21   see that road that looks like a star down

22   there?

23        A    Uh-huh.
```

```
1          Q    Can you point that out?  What is

2     that area down here in the bottom of

3     Plaintiff's Exhibit 8?

4          A    This is where you was referring,

5     right?

6          Q    Yes, sir.  That whole area.

7     South -- that south triangle.

8          A    Well, basically, this was where

9     when we came in, the -- the star, this was a

10    road that went around by the chip mill, what

11    makes it look like a star.  In '93, I think

12    they had done away with the railroad track

13    and everything where they used to haul the

14    chips away from the -- but the railroad spur

15    run here and this was more less a driveway.

16         All right.  Actually, at times they was

17    stuff stacked all out here.  I'm talking

18    about poles, sometimes dress lumber -- I

19    mean, not dress lumber but treated lumber.

20         Q    Okay.  When -- when you say you

21    would like to see a more detailed photo --

22         A    As far as to the question as to

23    what it is exactly, to -- to be able to
```

1    tell.

2         Q    Just a closer view?

3         A    Right.

4         Q    Okay.  I just receive

5    notification that our tape is about to run

6    out.  We need to take a break.

7              THE VIDEOGRAPHER:  We're going

8              off the record.  This is the end

9              of tape 1.

10    (Whereupon, a short break was taken.)

11              THE VIDEOGRAPHER:  We're back on

12              the record this is the beginning

13              of tape 2.

14    BY MR. MITCHELL:

15         Q    I may have asked you this, I've

16    forgot during our break.  Can you tell me

17    whether or not Plaintiff's Exhibit Roberts 9

18    fairly and accurately depicts the view of

19    the facility in 1994?

20         A    Yes, it does.

21         Q    All right.  And with the

22    exception of the storage shed to the right

23    of the treatment cylinder building that you

1    relabelled as stack lumber, are the labels

2    and other outlines fair and accurate

3    depictions of the objects and buildings

4    located on the facility in 1994?

5         A    Yes, it is.

6         Q    And can you tell us whether or

7    not there were any changes between '93 and

8    '94?

9         A    No.  There's -- there's no

10   changes that I see right off.

11        Q    And are those photographs

12   consistent with your memory?

13        A    Yeah.

14             (Whereupon Plaintiff's

15             Exhibit Number 10 was marked and

16             attached to the deposition.)

17   BY MR. MITCHELL:

18        Q    All right.  I would like you to

19   please examine what's been marked as

20   Plaintiff's Exhibit Roberts 10.  I'll ask

21   you if Plaintiff's Exhibit Roberts 10 fairly

22   and accurately depicts a view of the

23   facility in 1997?

```
 1          A    Yes, it does.

 2          Q    And with the exception of the

 3     stack of lumber that you would -- the

 4     storage shed label that you would relabel as

 5     a stack of lumber, does that Plaintiff's

 6     Exhibit 10 show a fair and accurate

 7     depiction of the outlines and names of the

 8     buildings and objects located on the

 9     facility in 1997?

10          A    Yes, it does.

11          Q    Can you point out any differences

12     that occurred between 1994 and 1997?

13          A    Basically, there's no difference

14     in it to point out.

15          Q    I'd like you to look at -- look

16     at Plaintiff's Exhibit 10.  And I would like

17     for you to look at this light area in the

18     center of the photograph underneath the word

19     "treatment" in treatment cylinder building

20     that goes sort of north/south.  Can you

21     point that out?

22          A    This is the area where the ponds

23     that was earlier labelled, I think it's 2
```

```
1    and 3, was closed, filled in, and they're

2    basically covered in that gray slag rock.

3         Q    So there's not water there?

4         A    No.

5              (Whereupon Plaintiff's

6         Exhibit Number 11 was marked and

7         attached to the deposition.)

8    BY MR. MITCHELL:

9         Q    Thank you.  I would like you to

10   please look at Plaintiff's Exhibit Roberts

11   11.  Can you tell me whether or not

12   Plaintiff's Exhibit 11 fairly and accurately

13   depicts a view of the facility in 1999?

14              MR. TER MOLEN:  Objection.

15              Foundation.

16        A    Yes, it does.

17        Q    And is that your recollection of

18   approximately how long you were employed

19   there?

20        A    Yes.

21        Q    All right.  Could it be a day --

22   a year or two one way or the other?

23        A    Yes.
```

1          Q     And with the exception of the

2    possible labeling of the storage shed under

3    the -- next to the treatment cylinders

4    building, does Plaintiff's Exhibit 11 show a

5    fair and accurate depiction of the objects

6    and buildings located on the facilities?

7               MR. TER MOLEN:  Same objection.

8          A     Yes, it does.

9          Q     Thank you.  Have you had an

10   opportunity to go to the facility for any

11   reason since you left there as an employee?

12         A     No, sir, I have not.

13         Q     Okay.  I'd like to ask you a few

14   questions that -- and I don't think my

15   colleagues -- my adversary -- adversary

16   counsel would object to me saying this.

17   There's some -- there's some things -- that

18   -- that you -- that you use in your

19   terminology that we may -- we may not

20   understand what those things are.  So I'm

21   just going to ask you to explain these words

22   that you've used.  Now, you -- you -- you

23   said on the 19 -- and if you have any

1    objection to me prompting him on years.  I'm

2    just trying to make it easier and short.

3    But you said in the 1978 era, you pointed

4    out some -- the scales.  Can you just tell

5    us what you mean by "scales"?

6        A    Well, everything -- let's back

7    up.  The scales sat right beside the office.

8    When the lumber or logs come in, they --

9    that's how they were purchased.

10   Occasionally, they would be some scaled,

11   but, basically, they was purchased by

12   weight.  And they was weighed in and weighed

13   out.  Later, Louisiana Pacific's policy,

14   regardless, it went across the scales.  In

15   other words, the truck come in with supplies

16   on it or anything, it went across the

17   scales.

18       Q    And so the scales just weighed

19   things?

20       A    Right.

21       Q    And is that how the lumber was

22   measured when -- and -- and the wood was

23   measured when it came in?

```
1          A     Yes.  That's -- that's how they

2     bought the -- the logs, was by weight.

3          Q     And was the wood measured when it

4     went out?

5          A     As far -- it was weighed,

6     basically, to be sure -- they had a policy

7     that they didn't want no trucks overloaded

8     going out.  This was -- the weighing of it

9     going out came in effect with Louisiana

10    Pacific's administration.

11         Q     So do you know if -- if a load of

12    material came in and was -- was all that

13    material weighed by Louisiana Pacific?

14         A     Yes.  Yes.

15         Q     And was all the product that went

16    out weighed by Louisiana Pacific?

17         A     Yes.

18         Q     Can you -- if there was less

19    weight going out than there was coming in,

20    what happened to the difference in the

21    weight at the facility?

22              MR. TER MOLEN:  Objection.

23              Foundation.
```

```
1          Q     If you know.

2          A     Well, a lot of it -- logs, you

3    had moisture.  Your moisture dried out.  In

4    fact, you had your dry kiln to do just that

5    in the lumber.  All right.  The bark was

6    burned in a boiler.  Your waste was burned

7    in your boiler.  So you couldn't have as

8    much going out as you did coming in.

9          Q     Okay.  Thank you.  And -- and,

10   now, what's a plainer mill?  Tell us what a

11   plainer mill is.

12         A     It actually takes a rough board

13   and leaves a smooth finish.  A description

14   of a plainer mill ain't a thing but a set of

15   knives turning at a high speed that smooths

16   it off, basically.

17         Q     So -- and you say rough board,

18   after the saw has cut it?

19         A     Right.

20         Q     Has it got little splinters and

21   stuff on it?

22         A     Right.

23         Q     And the plainer mill takes all
```

1     those splinters off and makes it like, look

2     sanded looking?

3          A    Right.

4          Q    What's a tepee burner?

5          A    Basically it's a -- just a burner

6     that -- it was approximately, I don't

7     remember, 25, might have been even 30-foot

8     circle and this -- it was probably 35, 30,

9     35-foot, might have been 40, I don't

10    remember, high.  But it was large at the

11    bottom and it was more less if you reversed

12    a cup.  This one -- you know, but it got

13    smaller at the top.  The top of it had

14    screen on it.  The bottom was fixed with

15    forced air, in other words, where you could

16    burn your waste in it.

17         Q    Do you know whether or not it had

18    any pollution control devices of any type?

19              MR. TER MOLEN:  Objection.

20              Foundation.

21         A    No, sir.  It did not have

22    nothing.

23         Q    All right.  Did you -- do you

1    know first?

2         A    No.

3         Q    I mean, do you -- do you know

4    whether it had any?

5         A    It did not.

6         Q    Okay.  But let me ask the

7    question.  I first got to ask you if you

8    know if it did or not.  Do you know?

9         A    I don't know what you're wanting,

10   but it did not.

11        Q    You remember that.  All right.

12   So you're not talking -- you -- you -- are

13   you -- I want to make sure that we -- I'm

14   not misunderstood.  If I could explain my

15   question.  I asked you whether or not you

16   knew.  I didn't ask you if it -- if it had

17   them.  I asked you if you knew whether or

18   not it had them.  Do you know?  I'm not

19   asking -- don't answer the question.  Just

20   tell me whether or not you know.  If I were

21   to ask --

22        A    You -- you --

23        Q    I've confused you.  Let me -- I'm

1      sorry.  Sometimes lawyers do these things.

2      That's just -- that's my -- that's my

3      ineptness.  I'm going to ask you whether or

4      not it had any pollution control devices on

5      it.  I'm going to ask you that question.

6      But before I can ask you that question, I

7      need to find out whether or not you can ask

8      -- answer the question.  So did you know

9      whether or not, yes or no, did it have -- if

10     it had pollution control devices?  Just did

11     you -- do you know?  Can you answer that

12     question, if I ask it?

13          A     Well, the only way I can answer

14     it, by looking at it, working around it, and

15     being there, it did not have no devices on

16     it.

17          Q     Okay.  I will accept that.  Thank

18     you.  Now, what's a chip mill?

19          A     Basically, it's a chipper set up

20     to make -- making chips using process paper.

21     You debarked your logs.  The chips went

22     through a screening process.  The rejects

23     went back through your chipper.  The

1    chippers, we trucked some, and they was sent

2    to the paper mill.

3          Q    Where was the paper mill, if you

4    know?

5          A    Mobile and Panama.

6          Q    Now, when you say there was a

7    spur made on the railroad track, just tell

8    us what you mean by "spur."

9          A    Well, it was just a dead end,

10   short piece of track that was laid to put

11   the rail car -- made to put the rail cars

12   on.

13         Q    You pointed out a boiler on the

14   facility.  What -- what is a boiler?

15         A    This was a -- actually, just a --

16   a burning situation, more less just like

17   that makes steam.

18         Q    And what did it burn?

19         A    It burned mulched pine bark.

20         Q    And what was the steam used for?

21         A    Drying of the lumber, the heating

22   of the treatment -- treatment that was used

23   in the treating of the wood and all.

```
 1          Q     Would it be fair that was sort of

 2     like old timey radiators?

 3          A     Yes, sir.

 4          Q     How many boilers were there?

 5          A     There were three.

 6          Q     Do you remember what size they

 7     were?

 8          A     No, I can't -- I cannot tell you

 9     that.

10          Q     Now, you told us about a

11     treatment pond.  What -- what -- what do you

12     mean by a treatment pond?

13          A     All right.  They -- when they

14     treated the wood, it would be so much water

15     and all when they went to go back that would

16     be -- get involved.  And they would

17     actually -- there was a large pond out there

18     that the creosote and stuff was actually run

19     out -- they would pump out so much.  And

20     then the part that was mixed with the water

21     so bad would go to the pond.  And then they

22     would reclaim parts of it, more less like

23     oil on water.
```

```
1          Q     How would they reclaim it?

2          A     It would be pumped in the tanks,

3    and then the settlings would be drained out,

4    basically, and then pump pure stuff back.

5          Q     And did that water have treatment

6    chemicals in it?

7          A     Yes, it did.

8          Q     And what treatment chemicals

9    would have been in it?

10         A     Well, it would have been what you

11   were treating with.

12               MR. TER MOLEN:  Objection.

13               Foundation.

14         A     We used creosote, penta, and

15   later the CCA treatment.  Now, the CCA did

16   not go in no pond or nothing, because it was

17   a closed system.

18         Q     What's penta?

19         A     I don't know.  Something that

20   will eat you up handling it.  But what --

21   pentachlorophenol or some big something.

22         Q     Okay.  Now, you -- you pointed

23   out a location called the sawmill.  I think
```

1    we probably understand what a sawmill is,

2    but can you just describe to us what happens

3    in a sawmill.

4        A    Well, basically, you got

5    different versions.  What we had was a large

6    circular saw.  And you actually -- the

7    circular saw, you started with the round

8    log, and it cut the slabs off.  And,

9    basically, our system, we made a cant,

10   depending on the log as to the size of the

11   cant.  Basically what we done was slab two

12   sides of it where it would make a four, six,

13   eight, ten-inch thick.  Well, that led to

14   two flat sides.  This was run through a gang

15   saw.  And when it come out, you had ever

16   how -- depending how wide -- depending on

17   how you had your spacers, you'd come out

18   with that many boards.

19       Q    Other than the fuel that you used

20   to fuel the trucks and to run your machinery

21   and -- was this a petroleum facility of any

22   type?  Was there any oil wells, petroleum

23   processing done?

1        A    There was oil used with the

2    creosote and penta.  It was a crude oil that

3    was hauled in there.  And, especially, your

4    penta, it was mixed with it, with this

5    lightweight oil to transfer the penta into

6    the wood.

7        Q    Other than that, was there any

8    use of petroleum products, other than to

9    operate your machinery, your trucks?

10        A    No, sir, not that I know of.

11        Q    Was there any refinery of

12    petroleum products?

13        A    No, sir.

14        Q    Any changes made to any petroleum

15    products, other than putting something in

16    it?

17        A    No.

18            MR. MITCHELL:  And we will offer

19            1 through 9 -- 1 through 11.

20            MR. TER MOLEN:  We'll reserve

21            objections.

22            MR. ARNOLD:  Yeah, same

23            objections.

```
 1    BY MR. MITCHELL:

 2         Q    Did you ever work on the weekends

 3    at the facility?

 4         A    Yes.

 5         Q    How often?

 6         A    Basically, we done maintenance

 7    work on Saturday mornings.  And on

 8    occasions, we'd have something shut down.

 9    We have worked all weekends.  It wasn't too

10    often or nothing that we worked on Sunday,

11    unless something was broke down.  If it was

12    broke down, sometimes I have been called at

13    2 o'clock in the morning to come in and all.

14    Something go wrong with your boilers or

15    something like that.

16         Q    And did you keep the boilers

17    maintained, operating?

18         A    I done some.  We had other

19    millwrights, too, and you had your boiler

20    operators.

21         Q    Who are the boiler operators that

22    you remember throughout the years that you

23    worked at the facility, the ones that you
```

```
 1    can remember?

 2         A    Marvin Edmondson, Bud Hughes,

 3    Lonnie Ray Brooks, Ronnie Jackson operated

 4    some.  Buford Miller.  There is several more

 5    I can think of, but I can't put their names

 6    to the face.

 7         Q    Do you know what's happened to

 8    Marvin Edmondson?

 9         A    He's dead.

10         Q    Do you know what he died of?

11         A    Cancer.

12         Q    What about Bud Hughes?

13         A    He's still living, but he's in a

14    severe case -- they're telling me he's on

15    his last leg with cancer.

16         Q    Lonnie Ray Brooks?

17         A    He's dead.

18         Q    Of what?

19         A    Cancer.

20         Q    Ronnie Jackson?

21         A    He's dead, too.  He died of a car

22    wreck.

23         Q    And Buford Miller?
```

```
1          A    He's dead.

2          Q    Of what?

3          A    I don't know just what Buford's

4   problem was.

5          Q    Do you remember any boiler

6   operators that worked at the facility for

7   any length of time at the boiler who are now

8   alive?

9          A    Bud would be the -- the last

10  long-term hand that I know of, really.

11         Q    Do you know where he is; in a

12  nursing home or Hospice or at home?

13         A    He was at home, as far as I know.

14         Q    And where does he live?

15         A    He lives off of McInvale Farm

16  Road there in Florala.

17         Q    Thank you.  Can you tell me

18  whether or not there was ever any structure

19  or apparatus at the facility that was like a

20  spray field or aerator?

21         A    Yes, there was.  There was a

22  series of nozzles set up out in the pond to

23  put that water in the air with intentions of
```

1    evaporating the water to lower the level in

2    the ponds.

3         Q     How many nozzles were there?

4         A     I'm not sure.  There was, I'm

5    going to say, 40 to 50 nozzles.

6         Q     And was that -- did you -- was

7    that spray field there when you went to work

8    there?

9         A     No, sir.  We -- we put it there.

10        Q     Did you help build it?

11        A     Yes, sir.

12        Q     And can you describe, as best you

13   can, what it would look like?

14        A     Well, kind of like a orchard, a

15   grape vineyard deal, really.  But it was --

16   it was more less a -- it looked kind of like

17   a checker board and -- up on posts.  And

18   probably every 10 foot or so we had a nozzle

19   set.

20        Q     And what -- what kind of nozzle

21   was it?

22        A     Well, it wasn't your regular

23   spray nozzle.  It was a -- it wasn't nothing

```
1    like you use on a farm or anything for

2    spraying chemicals.  But all it was, it was

3    a PVC-type fitting.  And what it done, it

4    just swirled the water, and it shot it

5    straight up, basically.

6          Q    And what was the purpose of that?

7          A    To put the water in the air to

8    help the air to evaporate it.

9          Q    And was there anything in that

10   water besides water?

11         A    Well --

12              MR. ARNOLD:  Object to the form

13              of the question.

14         Q    If you know.

15         A    Well, it was where the water had

16   come from the treatment plant, so it

17   couldn't be the best.

18         Q    And did you ever get a chance to

19   get any of that water on you or have it

20   spray you?

21         A    Yes.

22         Q    What was -- what was it like when

23   it got on you or sprayed you?
```

```
1          A     It was more less sticky like.

2     But I really don't know how to explain it.

3     I mean, it's wash your hands in dirty water

4     like.

5          Q     Did -- and was there any

6     pentachlorophenol ever put into that

7     treatment pond?

8                MR. TER MOLEN:  Objection.

9                Foundation.

10         A     No, sir, I don't think there was.

11         Q     Was there penta -- was there

12    water from pentachlorophenol treatment put

13    in the treatment pond?

14               MR. TER MOLEN:  Same objection.

15         A     It could have reached out to that

16    point, but I don't really think that it

17    could get to there, at that time.

18         Q     Okay.  Now, were there ever any

19    spills of treatment chemicals on the

20    facility, small or large?

21         A     Yes, there were.

22         Q     And how often did that occur?

23               MR. TER MOLEN:  Objection.
```

```
 1              Foundation.

 2         Q    If you know.

 3         A    I can't -- I can't tell you how

 4    often.  The worst I reckon you would say, we

 5    was taking the treatment out and not giving

 6    it time to adequately dry before we rolled

 7    it out.  In other words, it was took out and

 8    placed on the runs there beside the

 9    treatment plant.  And a lot of it was

10    allowed to drip into the -- drip off there.

11         Q    And what treatment chemicals

12    dripped off, if you know?

13         A    That was with the penta and the

14    creosote.

15         Q    And what happened to those

16    chemicals after they dripped off?

17         A    They was absorbed in the ground,

18    I guess.

19         Q    Okay.  Were any of them ever

20    cleaned up?

21         A    Yes.  We would clean up, if it

22    was large enough, or, you know -- it was

23    cleaned up the best we could.
```

```
1          Q    And when you cleaned it up, what

2    did you do with it?

3          A    Basically, it wound up going back

4    to the boiler.

5          Q    What was done with it in the

6    boiler?

7          A    It was burned.

8          Q    Now, do you know whether or not

9    the boiler was a hazardous waste

10   incinerator?

11              MR. TER MOLEN:  Objection.

12              Foundation.

13         A    I don't know really what a

14   hazardous incinerator would be.  But all I

15   know it was these old boilers.

16         Q    Okay.  Did these boilers have any

17   type of pollution control device or

18   environmental device on them?

19              MR. TER MOLEN:  Same objections.

20         A    They had smoke detectors on them,

21   that if the smoke got too dark, it alarmed

22   you, let you know.

23         Q    And what -- what do you mean by a
```

1    smoke detector?  Just explain to us how that

2    worked.

3         A    Simply, it was in the stack.  It

4    was a reflector on one side with a light

5    shining through it.  And if it got so dark

6    that it couldn't read through the smoke,

7    well, it would alert.

8         Q    Was that smoke detector used

9    consistently?

10        A    Well, it had an on and off switch

11   on it.

12        Q    Was it ever turned off?

13        A    Yes.

14        Q    How often?

15             MR. TER MOLEN:  Objection.

16             Foundation.

17        A    On occasions.  What it would do,

18   you had a large buzzer that would go off and

19   it was -- when it -- when it came on, they

20   would a lot of times go by and flip the --

21   flip it off.  And sometimes it was turned

22   off intentionally, depending on the material

23   and all they was burning.

1          Q      What do you mean "depending on

2    the material"?

3          A      Well, we used the boiler to get

4    rid of a lot of the waste.  And the stuff --

5    even the broke up creosote and penta boards

6    and everything was run through the "Hog," we

7    called it.  In other words, a crushing deal,

8    where it was made into smaller pieces and

9    run through your boiler.

10         Q      And what do you mean by "run

11   through the boiler"?

12         A      Well, they was burned in the

13   boiler is what I'm saying.  They was used as

14   fuel to fire the boiler.

15         Q      And was the pollution control

16   device disconnected or turned off at those

17   time?

18              MR. TER MOLEN:  Objection.

19              Foundation.

20         Q      If you know.

21         A      It depends.  I didn't know a lot

22   of times because -- different operators and

23   all operated different, and you didn't

```
 1    know -- basically, as long as it kept your

 2    steam pressure, they wasn't concerned.

 3         Q    Was any difference in the

 4    operation of the boiler during the daytime

 5    hours than at nighttime hours, when you were

 6    at the plant at night?

 7              MR. TER MOLEN:  Objection.

 8              Foundation.

 9         A    Basically, the only thing, you

10    would go in and rather than worrying with

11    the smoke detectors, a lot of times they

12    would -- if you went back at night, they'd

13    be turned them off and all.

14         Q    Do you know whether or not there

15    was any difference in the fuel put into the

16    boiler during the nighttime hours when you

17    went back to work at night versus the

18    daytime hours?

19              MR. ARNOLD:  Objection to the

20              form of the question.  Foundation.

21         A    Well, they've been treated stuff

22    left in there to be burned at night.  I know

23    of that happening.  But I wasn't there a lot
```

```
1    of nights, I mean very seldom at night,

2    so --

3         Q    What do you mean by "treated

4    stuff left there to burn at night"?

5         A    Well, you would have some of it

6    that wouldn't go through the Hog that would

7    actually be throwed -- throwed in the boiler

8    itself.

9         Q    Treated lumber?

10        A    Yes, sir, it have been.

11        Q    With pentachlorophenol?

12             MR. TER MOLEN:  Objection.

13             Foundation.

14        A    Yes, sir.

15        Q    Do you know what chemicals were

16   used to treat the lumber that was put into

17   the boiler?

18        A    Well, they wasn't a lot of it,

19   but they was some of it creosote and some of

20   it penta.  There's even been some CCA burned

21   in it that's not supposed to be.

22        Q    Now, was there any difference in

23   the practice that you have just described,
```

1    the operation of the boiler, the fuel used

2    in the boiler, during your entire term of

3    employment between --

4        A    Basically, it was all the same.

5    We tried different -- we used shavings to

6    fuel the boiler, pine bark.  We've tried

7    sawdust.  Basically, your sawdust, you'd

8    have to dry it before it become

9    satisfactory, and that process took too

10   long.  Waste wood, like I say, was run

11   through the Hog.  All this was mixed in the

12   fuel house.

13       Q    Was there any difference in the

14   operation of the fueling of the boiler and

15   operation of the pollution control device

16   during the time that LP Corporation operated

17   the facility versus the other companies?

18           MR. ARNOLD:  Object to the form.

19           MR. TER MOLEN:  Objection.

20           Foundation.

21       A    Negative.  There was no

22   difference that I remember.

23       Q    The same process that you've

1      described to us was the same during all the

2      term and operation of the facility?

3               MR. TER MOLEN:  Same objection.

4         A    Basically, yes, it was the same.

5         Q    What differences would there have

6      been?

7         A    I don't -- I don't know.  I mean,

8      if the -- it was basically the same boilers

9      through all three administrations that I was

10     there.  So I don't know what changes you

11     would have made or --

12        Q    Were any changes made in the

13     operation of the boiler, in the way they put

14     the fuel in?  Buck, did -- did all three of

15     them put waste treatment chemical material

16     into the boiler?

17               MR. TER MOLEN:  Objection.

18        Q    Or was there any difference in

19     these -- in the way the different companies

20     operated that facility?

21               MR. TER MOLEN:  Objection.

22               Foundation.

23        A    They all operated basically the

```
1    same, as far as get rid of the waste through

2    the boiler, as best we could.

3          Q    Do you remember whether or not

4    there was ever a -- any type of filter

5    system to filter toxic chemicals or

6    hazardous wastes out of the water?

7                MR. ARNOLD:  Objection to the

8                form of the question.  Foundation.

9          A    Yes, sir.  We have -- we've built

10   a deal, run your water across sawdust.  In

11   other words, use the sawdust to help filter

12   it.  We used shavings.  And, in other words,

13   you go in there and change your shavings or

14   sawdust regularly and the water running

15   through it.  More less scatter your sawdust

16   or shavings out, run a pipe down and then

17   spray it out and let it come back through it

18   to filter it out.

19         Q    Well, what did you filter out

20   into the shavings or the sawdust?

21         A    Creosote, penta.  And --

22         Q    And -- and what was done with the

23   shavings or sawdust after it was used to
```

```
1    filter the treating chemicals?

2         A    They were burned in the boiler.

3         Q    Do you know how much of these

4    shavings and sawdust were burned in the

5    boiler from the filtering of the treatment

6    chemicals?

7              MR. TER MOLEN:  Objection.

8              Foundation.

9         A    How much?

10        Q    Yes, sir.

11        A    I can't answer that.  I mean,

12   we've tried several different things and

13   this -- we done this over a period of time.

14   And one occasion we done it, we were trying

15   to -- we changed sawdust weekly.  And you're

16   probably talking three or four tons of

17   sawdust.  Then we got to not changing it so

18   regular -- I mean, changing it more often

19   but using less and all, so --

20        Q    Over what period of time was that

21   sawdust filter operation, in your best

22   judgment?

23        A    Lord, I don't remember.  I mean
```

1    that -- we done it for a while.  It was done

2    I'm gone say for a couple of years there

3    with this particular operation I'm thinking

4    about, on up until before the ponds was

5    closed and all.

6         Q    What company was operating the

7    facility at that time?

8         A    Louisiana Pacific.

9         Q    And you said there were three or

10    four tons of sawdust weekly.  Was that all

11    contaminated sawdust?

12              MR. ARNOLD:  Objection to the

13              form of question.  Misstates the

14              witness's testimony.  Lack of

15              foundation.

16              MR. TER MOLEN:  Objection.

17              Foundation.

18         A    Yes.  It had the oil residue and

19    all from the treatment.

20         Q    Did it have treatment chemicals

21    in it?

22              MR. TER MOLEN:  Objection.

23              Foundation.

1          A     Yeah.

2          Q     And do you know what chemicals

3    were in it?

4          A     They was creosote and penta,

5    basically.

6          Q     Was there any other method ever

7    used -- let me ask you this.  How did the

8    treatment chemicals get mixed in water?

9          A     All right.  When you pull your

10   chemicals out, you would basically, more

11   less like oil and water, you would pull out

12   what you could of the pure stuff and then

13   you would have so much that would be mixed

14   that you would wind up taking a vacuum,

15   pulling a vacuum on the cylinder.  And this,

16   you would get water and a certain amount of

17   your chemicals left over.

18         Q     Do you know what a retort is?

19         A     A what?

20         Q     Retort.

21         A     No, sir, I do not.

22         Q     And tell us this -- tell us what

23   a treatment cylinder is.  Just describe what

1    it looks like.

2          A    It's simply a large tank with one

3    end of it open.  It was more less like a

4    trolley on -- with trails inside the

5    cylinder.  All right.  You load your lumber

6    and all on the trolley and push it inside

7    the cylinder.  All right.  This end is fixed

8    where it's pressure tight.  Usually, with

9    what we had, just carried a large series of

10   bolts, and you run these bolts up with it.

11   Had a gasket and all.  And you started

12   filling it.  When you got it filled with

13   your chemical, why you started building

14   pressure.

15         Q    How did you build pressure on it?

16         A    We could do it with either air or

17   we could do it with the steam or your --

18   like the pump we pumped it in there with

19   would build so much, itself.

20         Q    And how long were these

21   cylinders?

22         A    The largest ones that was used

23   over there was 90-foot.

1           Q     How many cylinders were there?

2           A     There was five.

3           Q     And was -- were there five

4    cylinders during the entire operation by

5    Louisiana Pacific?

6           A     No.  There was five cylinders

7    there.  But, see, the -- I can't remember

8    the date.  But the -- see, the creosote was

9    shut -- phased out, basically, and all.

10   They come in and x-rayed the tanks and

11   showed that they were -- weren't worthy

12   of -- in other words, it was a risk using

13   them.  So they quit using the large tank,

14   the 90-foot, and one other one there,

15   period.  And also they quit creosote and

16   all.

17          Q     When did they quit creosote?

18          A     I don't know.  But you can go

19   back to the -- on these.  It was prior to

20   closing the ponds.  So --

21          Q     Well, just look.  Just go ahead

22   and look.

23          A     So it must have been around -- it

1    could have been as early as '85, because the

2    ponds is there in '87, '86.  I'm gone say

3    somewhere around probably '85.

4        Q   And that's your best judgment?

5        A   Yes.

6        Q   And until that time, were five

7    treatment cylinders used?

8        A   There was various -- they wasn't

9    used continuously, because one cylinder was

10    set up for a CCA, and we didn't start back

11    with the CCA until after they had quit with

12    the creosote and penta.  And, in other

13    words, they didn't treat with the CCA while

14    they was using the creosote.

15        Q   How did the water get into the

16    treatment cylinders with the chemicals?

17        A   Well, one part was condensation.

18    One part was when you pump this, like,

19    creosote back in, you could reclaim it, but

20    you would still have a certain amount of

21    water in the system we had.

22        Q   Where did the water come from?

23        A   Out of the ponds and the

1    condensation.

2        Q    Well, how did -- how did it get

3    in there to start with, though?  I mean --

4        A    Once the system started, why it

5    got there.  I mean, there was no -- you've

6    got a pond over here and you're reclaiming

7    it.  Once you start it, why even you doing

8    your best to get it back, you're going to

9    get a certain amount of water.  I mean, to

10   start the initial setup, they probably

11   wasn't no water in your -- with your

12   creosote or anything.  But once you got

13   started, you was gone have some.

14       Q    Were the treatment cylinders ever

15   used to dry poles or lumber?

16       A    Yes, they was.  They was raw

17   steam put inside the -- push -- put the wood

18   in it, or poles, or whatever, and raw steam

19   was put around it and pressurized.

20       Q    Why did they treat or dried in

21   the cylinders instead of the lumber kiln?

22       A    Well, we wasn't set up to put the

23   poles and round stock inside the -- the

1      regular dry kiln.  Plus, the regular dry

2      kiln stayed to capacity with just the

3      sawmill -- with lumber from the sawmill.

4          Q     So how -- how was it dried?

5          A     Supposedly, we put the -- I mean

6      we put the raw steam into the cylinder with

7      the poles there, the heat, hoping to push

8      the moisture out.  It did help some, but it

9      wasn't foolproof.  I mean it's -- it still

10     left a higher moisture content than what you

11     needed.

12         Q     And did any of that moisture get

13     into or mix with treatment chemicals?

14         A     The only way it could have would

15     have been through the pond.  I mean the --

16     when you pulled the vacuum trying to -- the

17     reason for pulling the vacuum on the

18     cylinder once you treated, you could set

19     there and let it drip and all, but the

20     vacuum more less eliminated your waste when

21     you opened the door of it pouring out by

22     pulling the vacuum on it.

23         Q     And when you pulled the treatment

1    chemicals out, what was done with them?

2         A    All right.  The -- the better

3    part, if you was treating, went back to your

4    holding tank.  All right.  When you got what

5    you could that way, well, you went back,

6    pulled your vacuum, and a lot of times this

7    water went back to your ponds and all.  And

8    then you reclaimed what you could off of

9    that.

10        Q    And did that water have treatment

11   chemicals in it?

12        A    Yes, there would be some.  Yes.

13        Q    And what chemicals, if you know?

14             MR. TER MOLEN:  Objection.  Asked

15             and answered.

16        A    That was creosote and penta.

17        Q    Now, when the -- would there be

18   any water in chemicals that were put into

19   the holding tanks?

20        A    There would be very little, but

21   some, yes.

22        Q    And -- and was anything done

23   besides just having a tank to hold it to sit

1    there?

2         A    We had coil.  More less we

3    made -- looked similar to a hot water tank

4    element, put raw steam in it and run through

5    this coil and boil it out -- boil your water

6    out.

7         Q    Where would the water go?

8         A    In the air.  I mean it would just

9    be evaporated in the air.

10        Q    Would it be this -- how large

11   were these tanks?

12        A    Well, some of them was 24-foot

13   across, about approximately 30-foot high.

14   Some of them was 24-foot, 20.  They would

15   have the tanks with a top on them, and then

16   they would be an opening between the top and

17   the side of the tank for the fumes to

18   evaporate out of.

19        Q    Assume that water boils at

20   212-degrees, I believe, were the -- was the

21   treatment chemicals kept hotter than

22   212-degrees?

23              MR. TER MOLEN:  Objection.

```
 1                  Foundation.

 2          A    Most of the time they was --

 3    tried to regulate it and keep it.  Once they

 4    would get it hot enough and get the water,

 5    basically, out of it, it was kept -- before

 6    they treated, they would warm it just below

 7    boiling a lot of times.

 8          Q    And how many -- were -- were the

 9    treatment chemicals kept in different tanks?

10          A    Yeah.

11          Q    All right.  How many tanks --

12    penta tanks were there?

13                  MR. TER MOLEN:  Objection.

14                  Foundation.  Time frame.

15          A    There was just one large penta

16    tank.

17          Q    Over what time period was it

18    used?

19          A    Well, when I went there, they was

20    using it.  And I'm not sure that the penta,

21    itself, was used along the time Louisiana

22    Pacific went there.

23          Q    All right.  And was that penta
```

```
1    tank kept hot?

2              MR. TER MOLEN:  Objection.

3              Vague.  Lack of foundation.

4         A    Usually, it was heated before

5    they treated.  In other words, on weekends

6    or something, they allowed it to cool back

7    down.

8         Q    And was it vented?

9         A    Yes.

10             MR. MITCHELL:  Okay.  I think

11             we're out of tape.

12             THE VIDEOGRAPHER:  We're going

13             off the record.  This is the end

14             of tape 2.

15      (Whereupon, a short break was taken.)

16             THE VIDEOGRAPHER:  We're back on

17             the record.  This is the beginning

18             of tape 3.

19   BY MR. MITCHELL:

20        Q    Mr. Roberts, I would like for you

21   to recall what you called the CCA system.

22   Now, tell us what we -- what you mean when

23   you say CCA?
```

```
 1         A    Well, that was just a term for

 2    the treatment used in the cylinders.

 3    Treatment of wood.  And it was a water-based

 4    salt solution that -- in this system, it was

 5    what they called a flows system.  It was

 6    pumped from one tank into your treating

 7    cylinder and then back to the -- once it

 8    done the treatment, it was sent back to the

 9    holding tank.

10         Q    Do you know what CCA stood for?

11         A    I have heard it, but I ain't gone

12    attempt to say that.

13         Q    Would the words copper chromate

14    arsenate refresh your recollection?

15         A    Yeah.

16         Q    Do you know whether or not it had

17    arsenic in it?

18         A    According to the tags that was

19    stamped on each lumber -- each piece of

20    lumber, it did have arsenic in it.

21         Q    What -- what tags are you talking

22    about?

23         A    Well, the -- I guess it was state
```

```
1    law.  But there at the end, each board or

2    whatever that was treated had to have a tag

3    put on it.

4         Q    And what did the tag say?

5         A    The -- tell you not to burn it,

6    tell you what kind of treatment it was

7    and -- basically.

8         Q    You say at the end; when did that

9    start?

10        A    I'm not sure.  I mean, the last

11   of the treatment, we was to put tags on each

12   one.  I remember that.

13        Q    You're telling me that -- that

14   Louisiana Pacific Corporation put a tag on

15   each piece of lumber sold and treated with

16   CCA informing the consumer not to burn it,

17   that was dangerous and toxic?

18        A    Right.

19             MR. TER MOLEN:  Objection.

20             Foundation.

21        Q    Did that same company burn that

22   treated wood and -- and wood waste in its

23   own boilers at the facility in these towns?
```

```
1                MR. ARNOLD:  Object to the form

2           of the question.

3      A    We got rid of some of it that

4  way.

5      Q    Did you ever have to clean or

6  screen or filter the CCA material?

7      A    Yes, sir.  When it -- when you

8  pumped it from the tank into the cylinder,

9  it was filtered before it went back to the

10  holding tank.

11      Q    Okay.  How was it filtered?

12      A    Basically, it was a big,

13  sock-type filter that it went through.

14      Q    And what would the filter catch

15  or filter out of the solution?

16      A    You would have particles.  Just

17  like particles of sawdust that would come

18  off your lumber or whatever.  And you would

19  have -- every now and then there would be a

20  more less mixture of the CCA or where it

21  would stick to the sawdust, and all that

22  would be more less in a little small lump

23  that you would catch.
```

1          Q     And what was done with the

2    material caught in the CCA filters?

3          A     Well, it got -- to start with,

4    they -- they burned it, put it in with the

5    wood waste and burned it.  There at the end,

6    there was some of it, we got to putting it

7    in barrels -- hazardous waste barrels.

8          Q     And do you know how many times

9    this filter was changed on a weekly basis?

10               MR. ARNOLD:  Object to the form

11               of the question, foundation.

12         A     Usually, it was checked after

13   each -- each treatment, so-to-speak,

14   depending on the -- how bad it was stopped

15   up or whatever, whether we went ahead or

16   reused it.

17         Q     And how often was the filter

18   disposed of?

19         A     It wasn't, that I can remember.

20   Really, it was more less a -- like I say,

21   like a sock-type deal that it was pumped in.

22   And it was used over and over.

23         Q     And how often was the -- the gum

1    or the material caught in the filter

2    disposed of?

3         A    Every couple of treatments you

4    had some.

5         Q    About how much?

6         A    Well, most of the time it was --

7    it wasn't no large amount.  I mean,

8    basically, it depended on how clean you kept

9    your wood when --

10   (Answer interrupted by hotel personnel.)

11        A    -- during the time getting it

12   back and forth to your -- what I'm saying is

13   if you let your wood get dirty, I'm talking

14   about as far as it fell in the dirt or

15   anything before you got it up and got it

16   loaded in your trolleys to go inside the

17   tank, well, you have to get all that off of

18   it or else when this solution went in, it

19   was going to wash a certain amount off and

20   wind up in your filter.

21        Q    Are you saying that it wasn't --

22   how much would be in the filter, in ounces

23   or pounds, as best you can tell us in

```
1    measurement?

2              MR. ARNOLD:  Object to the form

3              of the question.

4         A    I can't -- I don't know.  They

5    would probably be -- the canister and all

6    stood so high but -- for this thing.  I

7    really don't know just how to answer that,

8    honestly.

9         Q    Can you tell me in volume?  Would

10   it be a cup full or a bucket full, or how

11   much would be disposed of?

12             MR. TER MOLEN:  Object to the

13             form of the question.  Ambiguous

14             and calls for speculation.

15        A    If -- if you treated a week on a

16   normal basis and your lumber was clean, you

17   wouldn't have a five gallon bucket.

18   Basically it -- I mean it wouldn't -- it

19   wasn't near what some of it was, you know.

20        Q    And you say it wasn't -- what do

21   you mean by "it wasn't near what some of it

22   was"?

23        A    Well, with the creosote and the
```

```
1    penta -- which with the open system, they

2    didn't take as much pain about keeping the

3    wood clean.  All right.  We would have

4    buildup inside the cylinders with it worse.

5    I'm talking about as far as your sand, wood

6    particles, and the creosote, and penta

7    mixing together with it in there.  You would

8    have to go in and scrape all that out.

9         Q    And that was for penta and

10   creosote?

11        A    Yes.

12        Q    You didn't have to do that for

13   CCA?

14        A    You had some, but it wasn't

15   nothing compared to what the other was.

16        Q    Well, you say that the -- it

17   wasn't a five gallon bucket full.  How --

18   how full would that five gallon bucket be?

19        A    I'm talking about there wouldn't

20   hardly be a five gallon bucket of it.  It

21   would be pretty close to being full, but I'm

22   talking, you know --

23        Q    Three to five gallons?
```

1      A     Yeah, something like that.

2      Q     Is that your best judgment?

3      A     Yes.

4      Q     Is that your best recollection?

5      A     Yes.

6      Q     And about how often would that

7   CC -- three to five gallons of CCA be put

8   into the burner to burn?

9           MR. ARNOLD:  Objection to the

10              form of the question.  Asked and

11              answered.

12      A     Well, I'd say once a week,

13   something like that.

14      Q     Excuse me.  Is that your best

15   judgment?

16      A     Yes, sir.

17      Q     Your best recollection?  Now,

18   this -- you said during the use of the

19   creosote and the pentachlorophenol, there

20   would be a buildup in the cylinders?

21      A     Yes.

22      Q     And describe that to us?

23      A     Well, you would get a certain

1     amount of buildup.  Your dirt and all would

2     be there, and it would build up in your

3     cylinder.  And you would have to go in and

4     scrape it out and all.

5          Q     How often would you have to go in

6     and scrape it out?

7          A     It varied.  Sometimes you might

8     go six or eight months before you would have

9     to do it, or something like that.  But it

10    would get so built up, you'd mess your

11    trolley up if you didn't clean it out and

12    all, so-to-speak, pushing it in and out.

13         Q     And when you cleaned it out, what

14    would be done with the waste material left

15    in the boiler that was cleaned out?

16         A     Most of the time the waste

17    material from the cylinder would go to the

18    boiler.

19         Q     And what was done with it at the

20    boiler?

21         A     It was burned.

22         Q     And was that pentachlorophenol

23    waste --

```
1          A    Yes.

2          Q    -- as well as creosote?

3          A    Yes.

4          Q    And how long a period of time did

5     this occur at the facility?

6               MR. TER MOLEN:  Objection.  Asked

7               and answered.

8          A    You said how long?

9          Q    Yes, sir.  Over what period of

10    time.

11         A    Well, the whole time they treated

12    with it, basically.

13         Q    Okay.  And how much in pounds or

14    in gallons, or any way you can describe it,

15    would be cleaned out, approximately, every

16    six months from each of these cylinders?

17              MR. ARNOLD:  Object to the form

18              of the question.  Mischaracterizes

19              the witness's testimony.

20         Q    If you know.

21         A    I don't know.  That would have

22    been -- pound-wise it would have been heavy,

23    because of the dirt and all.  Burning it in
```

```
 1    the boiler, sometimes we've had problems

 2    with -- the boilers had grates in them with

 3    holes for the air to come through, and it

 4    would be so heavy that it would stop the

 5    grates in the boilers up.  So then you had

 6    more problems.

 7         But poundage-wise, I don't know.  It

 8    would -- how to put that to you.

 9         Q    Your best judgment.

10              MR. TER MOLEN:  Object to

11              speculation.

12         A    I don't know.  I would say four

13    to five hundred pounds every time you

14    cleaned it out.

15         Q    Is that your best -- go ahead.

16    Excuse me.

17         A    Basically, that's -- I don't

18    know, really, how to answer your question

19    there?

20         Q    All right.  Is that your best

21    judgment?

22              MR. TER MOLEN:  Objection.

23         A    Yes.
```

106

1      Q     Best recollection?

2             MR. TER MOLEN:  Objection.

3             Speculation.

4      A     Yes.

5      Q     How much -- how much would that

6  be in volume, in buckets or pans or however

7  you measure?

8             MR. TER MOLEN:  Same objections.

9      A     We used a -- we call it a pan on

10  a forklift a lot.  Usually there would be a

11  pan half full or something like that.

12     Q     How big was the pan?

13     A     Probably five by eight.

14     Q     And how high?

15     A     Most of the time about a foot

16  high.

17     Q     You're talking five feet wide,

18  eight feet long, and a foot high?

19     A     Yeah.  Yeah.

20     Q     Now, did you ever put any pipes

21  or other apparatus into the boiler stacks

22  when you were a millwright?

23     A     Yes, sir.  We attempted to -- we

1   put a nozzle head inside the smokestack of

2   number 1 and number 2 boilers.  What I'm

3   saying, the two boilers was served by one

4   smokestack, and this nozzle head was

5   supposed to be the -- to evaporate the waste

6   water.  We pump the -- it wasn't a thing in

7   the world but a series of nozzles on the end

8   of the pipe and pump the water up to this.

9          Q    Did you install it yourself?

10         A    Yes, sir, I helped.  I done most

11  of that myself.

12         Q    I thought you said the smoke --

13  did the smokestack have a light detector on

14  it?

15         A    It had a smoke detector.

16         Q    Did it detect where was the

17  nozzle --

18         A    This was installed above all

19  that.

20         Q    Why?

21         A    Well, for obvious reasons.  I

22  reckon so the smoke would go on out the --

23  the top, you know.  But really as far as the

```
1    water, it didn't change the smoke that much.

2    But it was -- the smokestack was hot and the

3    heat coming up, and the idea was to

4    evaporate it.

5         Q    And what was evaporated?

6         A    The waste water.

7         Q    From the pond?

8         A    Right.

9              MR. ARNOLD:  Object to the form

10             of the question.  Ambiguous.

11        Q    Did that waste water have any of

12   the treatment chemicals in it?

13             MR. TER MOLEN:  Objection.

14             Foundation.

15        A    Yes, sir.  It was from the ponds.

16        Q    Do you remember about what year

17   that occurred?  Let me ask you this.  Let me

18   withdraw that question.  Do you remember

19   what company was operating the facility when

20   you installed that nozzle system into the

21   boiler stacks to spray the toxic chemical --

22   the toxic waste into the stack?

23             MR. ARNOLD:  Object to the form
```

```
1              of the question.
2         A    I'm not sure.  I think it was
3    towards the beginning of the LP
4    administration.  I'm not sure.
5         Q    And I'm going to ask that
6    question again because there was an
7    objection.  Do you remember who the operator
8    or owner of the facility was at the time
9    that you installed the nozzle that you've
10   just described into the boiler smokestack?
11        A    When you say an "operator," are
12   you talking about was the manager?
13        Q    Who -- who was the -- what
14   company was running it?
15        A    I think it was on the -- the
16   early of the LP administration.
17        Q    Is that your best judgment and
18   recollection?
19        A    Yeah.
20        Q    Do you know what was done with
21   the ashes from the boiler?
22        A    Yes, sir.  They was took out and
23   scattered all over.
```

```
1                (Phone beeped)

2        Q    Do you need a break?

3        A    I'll get back.  Go ahead.  The

4   question as far as the ashes?

5        Q    Yes, sir.

6        A    They was scattered usually on the

7   backside of the land they had.  Either south

8   of the chip mill -- basically, where the

9   chip mill area was.

10       Q    Were they covered up?

11       A    Excuse me.  Sometimes they was

12  and sometimes they wasn't.

13       Q    Can you just take one of the

14  exhibits that you have and show us on the

15  picture where we could see where --

16       A    They were scattered in this area

17  on here(indicating).

18       Q    The lower right-hand side of the

19  triangular facility map?

20       A    Yeah.

21       Q    And you showed that, I believe,

22  on Plaintiff's Exhibit Number 11, is that

23  correct?
```

1  A Yeah.

2  Q About how often were the boilers

3 cleaned out, if you know?

4  A Every three weeks.

5  Q When was it cleaned out?

6  A Well, usually it was cleaned out

7 on Friday.  Friday or Saturday morning.  You

8 had one -- usually on Thursday one was shut

9 down and a different one every week.  So it

10 was three-week intervals.

11  Q Can you just -- it may be obvious

12 to some of us who know or some of the people

13 who know, but why was the boiler shut down

14 on Thursday to clean it on Friday?

15  A So it would cool down.

16  Q Okay.

17  A A lot of times you would have to

18 shut it down on Wednesday.  A lot of times

19 they have to put it out because it was so

20 hot inside.

21  Q How were the ashes removed?

22  A You put a man inside the rear of

23 the boiler.  Usually it would take two.  One

1    would throw them through the opening, and

2    the other one would load them into a pan or

3    ever how we could get rid of them -- ever

4    what we could to get rid of them.

5        Q    And was that the same pan that

6    you used to carry the waste product to the

7    boiler?

8        A    Basically, yes.

9        Q    Used it to carry the ashes away?

10       A    Yeah.

11       Q    And where were the ashes put

12    again?

13       A    They were scattered out on the

14    grounds.

15       Q    About how many pan fulls would

16    you obtain when cleaning out the boiler?

17       A    This varied considerably.

18    Sometimes it would be drastic and all.  A

19    lot of times you would have three pans --

20    three of these pans rounded up that you

21    would get out.

22       Q    When you say "rounded up," you

23    mean up to the top?

1          A     Yeah.

2          Q     And then further than the top?

3          A     Just rounded up good is what I'm

4     talking about.  Well --

5               (Whereupon Plaintiff's

6          Exhibit Number 12 was marked and

7          attached to the deposition.)

8     BY MR. MITCHELL:

9          Q     It may be easier to draw.  Let me

10    give you a blank sheet of paper that's

11    marked Plaintiff's Exhibit Roberts 12.  And

12    can you just --

13         A     Well, what I'm saying, if you

14    had -- what we had done, we had built pans,

15    we called them.  It served the same purpose

16    as a front-end loader bucket.  All it was,

17    we had log forks or either use the

18    forklifts.  You would take a sheet of -- a

19    piece of metal and you would build you what

20    would serve as a bottom.  You would take

21    heavy channel and put on the sides,

22    basically.  And you would put pockets for

23    the lift blades to go in.  I mean, actually,

1    they served the same purpose of the bucket,

2    really.  So --

3         Q    Can you -- can you draw what you

4    mean by rounded up on the pan?

5         A    Well, not really.  But --

6         Q    Can you make a sideways view?  Is

7    that possible?

8         A    Well, that's -- when I say

9    "rounded up," I'm talking you would have

10   some of it -- you know, they wouldn't do it

11   bad enough for it to run off but -- and all,

12   but you just have it rounded up in the

13   center portion from both ways.

14        Q    Can you just write "side view" on

15   that so we'll --

16        A    I'm no artist.  I don't know as

17   far as -- well, I don't know much else to

18   draw what y'all want.  Looking at it from

19   the side, that would be what I'm talking

20   about.

21        Q    And that rounded portion would be

22   to the extent to which the ashes -- will --

23        A    Yeah.

1        Q    -- would be put in there?

2        A    Yeah.

3        Q    We would offer 12.  Since you're

4    being such a good artist, I'm going to give

5    you another sheet of paper.  Can you draw

6    me, as best you can, what a tepee burner

7    looks like?  That's a private joke among us.

8    I didn't draw one too well.

9        A    Y'all keep saying tepee burner.

10   You know, there was two of these there one

11   time.

12       Q    How long?

13       A    You thought you had done your

14   history.  They was one at the sawmill that

15   was there for the same purpose, to burn the

16   bark and waste, that the storm got and all.

17       Q    Do you know when the storm got

18   it?

19       A    It had to have been around '78,

20   somewhere, '77, something like that, that it

21   got it.  All right.  You'd have a -- these

22   things had a large door in it.  And it was

23   walled up.  This was solid metal.  You had a

1     screen over the top here.

2          Q    Okay.  Can you just write in

3     "screen" there.

4          A    But basically, it was just solid

5     metal sides all the way around it.  The way

6     the thing was made, it was -- if you took

7     a -- if you took this sheet of paper -- give

8     me another sheet of paper.

9          Q    I have to mark it.

10          A    I'm trying to explain it.  You

11     don't need no evidence.

12               (Whereupon Plaintiff's

13          Exhibit Number 14 was marked and

14          attached to the deposition.)

15     BY MR. MITCHELL:

16          Q    I'm just going to put "14" on

17     that sheet of paper.

18          A    But if you took -- you keep

19     saying a tepee burner.  If you took enough

20     pieces like this and made you a 30-foot

21     circle, 24-foot, all right, and put it

22     together, this thing was solid, except the

23     top had the screen top over it.  You had the

1    air forced in at the bottom that you put

2    ever what you wanted to burn in and it --

3    that --

4         Q    What was the tepee burner used to

5    burn?

6         A    Any kind of scrap, ever what

7    wanted -- waste.  Ever what you wanted to

8    put in it.

9         Q    When you say "waste," what do you

10   mean?

11        A    Well, pine bark, the wasted

12   treated boards, whatever.  Ever what you

13   wanted to.  This -- usually it burned 7 days

14   a week, 24 hours a day normally.  The only

15   difference you had, what we -- the way we

16   was running, you had a conveyor chain that

17   went to the top carrying your bark and stuff

18   up there.  When it got up here, it just fell

19   down.

20        Q    What was done with the ashes from

21   the tepee burner?

22        A    Basically, they were scattered

23   around on the yard.

1          Q     Do you know whether or not any

2     people that worked there ever got any --

3     like a lot of pimples or something?

4               MR. TER MOLEN:  Pardon?

5          Q     A lot of pimples.  Did anybody

6     ever get a lot of pimples on their face or

7     bodies?

8               MR. TER MOLEN:  Objection.

9          A     Yeah.  Some of them would break

10    out as far as with the creosote or the

11    penta.  The penta, some of them did show up

12    more so with more less like a rash or

13    something.

14         Q     Describe that to me.

15              MR. TER MOLEN:  Objection.

16              Again, foundation.

17         A     Well, it's -- it would be just

18    small pimples like on the skin, face, and

19    arms.  Breaking out.

20         Q     And how often did that occur?

21              MR. TER MOLEN:  Same objection.

22         A     It's hard to say as far as how

23    often.  I -- I don't know how to answer

1    that.

2         Q    Did you -- I didn't mean to

3    interrupt you.  I'm sorry.

4         A    No, I'm through.

5         Q    Did you -- did you ever break out

6    with pimples?

7         A    Basically, what it done to me --

8    affect different people different.

9              MR. TER MOLEN:  Objection.

10             Foundation.

11        A    It would blister.  Blister me and

12   I would peel off.  More less like sunburn.

13        Q    How often did that occur?

14        A    If I got the right dose of it,

15   near about every time.

16        Q    How often did you get a right

17   dose of it?

18        A    Enough.  I don't know how -- how

19   to answer that.  It would -- you would

20   gradually, just like being in the sun, you

21   would gradually get toughened or -- to -- to

22   it to a certain extent.  But I don't think

23   you ever get immune to it, as far as it

1    blistering you or anything.

2         Q    And where would this stuff come

3    from that blistered you?

4         A    Well, I'm talking out of the

5    cylinders, off of the wood.  Anywhere there

6    was penta or creosote.  If you got it on

7    you, it would -- you know, it stood a chance

8    to blister you.

9         Q    Well, when you were working

10   around this stuff, what did you do to keep

11   the fumes from blowing on you?

12              MR. ARNOLD:  Object to the form

13              of the question.

14        A    You had to get on the downhill

15   side -- the downwind side.  We didn't have

16   nothing to keep it off of you, basically.

17   Myself, I always wore long sleeve shirts and

18   tried to keep gloves on and everything.

19        Q    On the downwind side?

20        A    You're right.  In other words,

21   when you pull that hot cylinder and that --

22   the fumes and all of it off of it, you

23   definitely -- ever which way the air was

1    blowing, you definitely get on the other

2    side.

3         Q    What about the spray fields?

4              MR. TER MOLEN:  Objection.  Asked

5              and answered.

6         A    The spray field never was --

7    never did blister or break out nobody that I

8    know of.  I mean, it was just -- what I'm

9    talking about the breaking out was more less

10   from the direct contact with the -- the

11   chemical.

12        Q    And did all -- did the work --

13   I'm not -- is there anything else you had to

14   stay on the downwind side of?

15        A    Basically, that was the biggest

16   problem.  The only problem we had would --

17   as being a millwright with it, I have been

18   inside those cylinders welding pipes and

19   cutting pipes out and everything, and now

20   that -- that would get rough.  But

21   basically, that's it.

22        Q    Did any of the management of TMA,

23   Lockhart Lumber, or Louisiana Pacific

```
1     Corporation or Pactiv Corporation ever

2     inform you that the chemicals that you were

3     using and exposed to were known or probable

4     human carcinogens?

5              MR. TER MOLEN:  Objection.

6              Foundation.  Compound.

7     A     Were known to what now?

8     Q     Did anybody ever tell you that

9     those chemicals could cause cancer?

10    A     No.

11    Q     Did you ever --

12    A     Not to my recollection, they did

13    not.

14             MR. TER MOLEN:  Same objection.

15    Q     Did anybody during your term of

16    employment ever provide you with any

17    education, training in the nature of

18    hazardous materials you were handling?

19             MR. TER MOLEN:  Same objection.

20    A     No, sir.

21    Q     Did anybody during the term of

22    your employment ever tell you anything about

23    the hazardous, toxic nature of the chemicals
```

1    you were handling, other than what you

2    learned from being exposed to it and you've

3    described?

4                MR. TER MOLEN:  Same objection.

5        A    No, sir.

6        Q    And your answer is?

7        A    No, sir.

8        Q    Did they or did they not?

9        A    No, they did not.

10       Q    Did anyone -- did you live in the

11   Florala community during this period of time

12   you worked at the mill?

13       A    For a short time I did.  But --

14   no, now, wait a minute.  I reside seven

15   miles east of Florala.  That's basically it.

16   So --

17       Q    Do you -- did you ever have any

18   other courses or safety training about how

19   to handle and dispose of toxic or hazardous

20   waste?

21               MR. TER MOLEN:  Objection.

22               Foundation.

23       A    No, sir.

```
1                 MR. MITCHELL:  Let us take a

2                 short break and maybe we can break

3                 for lunch and be -- be through.

4        (Whereupon, a short break was taken.)

5                 THE VIDEOGRAPHER:  Back on the

6                 record.

7   BY MR. MITCHELL:

8        Q    Buck, when you were employed at

9   the facility, did they ever dispose of any

10  material, other than wood, that came from

11  the outside, any other machinery or

12  facilities or other material?

13                MR. TER MOLEN:  Objection.  Vague

14                and compound.

15       A    The material that was disposed of

16  was, like I said, some of the waste from the

17  treatment plant was disposed of in the

18  boiler.

19       Q    Did you work there when they

20  bought the plywood factory?  You didn't work

21  there?  You don't --

22       A    Yeah.

23       Q    Okay.
```

```
1          A     Yeah.  TM -- they didn't --

2     the -- the plywood mill was here at River

3     Falls.  When TMA bought it out, they bought

4     the five locations, if I understood it

5     right.  Actually, there was a sawmill here

6     in Andalusia, plywood mill at River Falls,

7     and Lockhart, and Brantley, the sawmill at

8     Brantley.

9          Q     Do you know -- did -- did any of

10     those mills treat lumber?

11          A     The one at Evergreen.  One of

12     them was Evergreen, they did.  Basically, it

13     was CCA, if I think right.  I couldn't swear

14     to that.

15          Q     Do you know what happened to the

16     wastes from the treat -- the other treatment

17     facility and the plywood mill when they were

18     closed down?

19               MR. ARNOLD:  Object to the form

20               of the question.  Foundation.

21          A     Yes.

22          Q     What happened?

23          A     When the plywood mill was closed
```

1    down, basically the waste was burnt.  Yes,

2    it was burnt.

3         Q    Do you know where it was burnt?

4         A    Part of it was burnt right there

5    on site.

6         Q    On what site?

7         A    Where the plywood mill was, over

8    here at River Falls.

9         Q    And where was the rest of it

10   burnt, if you know?

11             MR. TER MOLEN:  Objection.

12             Foundation.

13        A    Well, there was some of the

14   timbers out of the building that was

15   actually hauled to different places and all.

16   And in transit and everything else, there

17   was a little bit of it done away at

18   Lockhart.

19        Q    And was that treated timber?

20             MR. TER MOLEN:  Objection.

21             Foundation.

22        A    Basically that wasn't treated,

23   what I'm talking about.

1          Q     You showed us some railroad

2     tracks and railroad spurs on Plaintiff's

3     Exhibits 1 through 11.  Did that -- were

4     those railroad tracks and railroad spurs

5     ever removed or changed?

6          A     Yes, sir, I think so.

7          Q     Were they made with cross ties?

8          A     Yes, sir.

9          Q     Were the cross ties treated

10    lumber?

11         A     Yes, sir.

12         Q     Do you know what kind of treated

13    lumber they were?

14         A     Creosote.

15         Q     And what was done with those

16    cross ties when those rail road tracks were

17    moved at the facility, if you know?

18               MR. TER MOLEN:  Objection.

19               Foundation.

20         A     Well, the junked ones or busted

21    up ones, they was burnt.  Part of them was

22    burnt in the boiler.  I'm talking about --

23    anybody knows that you don't burn a good

1    cross tie.  I'm talking about the cull and

2    scrap stuff.

3        By MR. MITCHELL

4            MR. MITCHELL:  I might have one

5                or two questions after lunch, but

6                if I do, it will be very brief.

7                So why don't we take a lunch break

8                and come back in whatever amount

9                of time everybody needs.

10           MR. TER MOLEN:  Well, first to

11               prepare cross, I mean, I

12               understand you're -- you're saying

13               now you might be brief but -- and

14               we can go off the record, too, and

15               talk.  We don't still need to be

16               on the record.

17    (Whereupon, a short break was taken.)

18           THE VIDEOGRAPHER:  Back on the

19               record.

20   BY MR. MITCHELL:

21       Q    Buck, when you went to the high

22   school there, in Florala, did you ever smell

23   anything different?

```
1              MR. TER MOLEN:  Objection.

2              Vague.  Foundation.

3              MR. ARNOLD:  Objection.

4         A    Basically, we didn't notice

5    the -- no different at that time.

6    Understand you've got a -- a large wooded

7    area that part of it has been cleaned out

8    since then.  They're telling me that you can

9    -- you could before it was shut down, smell

10   some of it when they would pull the

11   cylinders over there.

12        Q    Is that when you were in high

13   school?

14        A    No.

15        Q    I'm talking about when you were

16   in school -- going to school.

17        A    No.  I didn't never smell it like

18   that when I was in school.

19        Q    What about when you were in -- in

20   the -- at -- let's -- you just didn't smell

21   it -- you couldn't smell it?

22        A    No.

23        Q    Was there ever any smoke on the
```

1    highway?

2         A    Yes, sir.

3         Q    Tell me about that.

4         A    Well, we -- I say smoke.  There

5    was -- really, it was ashes -- ash dust.  We

6    come up with the idea one time to clean the

7    ashes out, to save the man from having to

8    get inside the hot boiler, we was going to

9    take a fan and use it for a suction.  But if

10   you relate to where 55 is to the boiler, we

11   was about to close 55 with ash dust, because

12   we didn't have no recovery system.  We was

13   blowing them straight out.  Thought we could

14   contain them to the pan, but we couldn't do

15   it.  And the dust -- which, now, that was a

16   one time deal, because we realized how

17   stupid it was.

18        Q    What about smoke?

19             MR. ARNOLD:  Object to the form

20             of the question.  Ambiguous.

21             Foundation.

22        A    On a certain overcast time, your

23   smoke would hover down, which -- and get

```
1    low.  But under normal conditions, your

2    smoke got away and everything was pretty

3    clear.

4         Q    At the facility?

5         A    Right.

6         Q    Okay.  Thank you.

7      (Whereupon, a lunch break was taken.)

8              THE VIDEOGRAPHER:  We're back on

9              the record.  This is the beginning

10             of tape 3.

11                      EXAMINATION

12   BY MR. TER MOLEN:

13        Q    Sir, I'm going to start out after

14   lunch here today.  I'm going to ask you some

15   questions about your background.  Are you

16   married?

17        A    Divorced.

18        Q    Can you tell me your wife's

19   name -- your former wife's name?

20        A    Angela Norris.

21        Q    Do you have any children?

22        A    Yes.  Two daughters.

23        Q    What are their names, sir?
```

```
1          A     Vicki Lynn Jordan and Tammy

2    Virginia Cook.

3               MR. MITCHELL:  Can I interrupt

4               you, please, Counsel?

5               MR. TER MOLEN:  Sure.

6               MR. MITCHELL:  Mr. Buck, they --

7               we were talking about hit men.

8               This is not a joke.  They're not

9               going to send somebody down to

10              mess with your kids.  They just

11              want to make sure that one of them

12              is not on the jury.

13              THE WITNESS:  Well, I just hope I

14              don't find them if they do.

15              MR. MITCHELL:  Well, they just

16              want -- he just wants -- and I

17              didn't -- I didn't go through

18              talking to you about it.  He wants

19              to make sure that he hadn't got

20              any of your kin folks or somebody

21              that's your friend that ends up on

22              the jury.

23              THE WITNESS:  Not a problem.
```

```
1               MR. MITCHELL:  I'm sorry.  I --

2               MR. TER MOLEN:  No, I appreciate

3               that, Counsel.  That's a good

4               clarification.

5    BY MR. TER MOLEN:

6         Q    Sir, what -- what are the ages of

7    your daughters?

8         A    Thirty, and 32, I think is right.

9         Q    Do either of them live in the

10   area?

11        A    Yes.  My youngest daughter lives

12   about half a mile from me.

13        Q    And is that Vicki Lynn?

14        A    Right.

15        Q    You said a half from here.  A

16   half mile from Andalusia?

17        A    From me.

18        Q    Oh, from you.  Okay.

19        A    Right.

20        Q    Florala.  Here.  Okay.  Great.

21   And is she married with children?

22        A    She's married and has one

23   daughter.
```

1          Q     Okay.  And is your former wife

2     still in the area?

3          A     Yes.

4          Q     Is she living in Florala?

5          A     She lives about 10 miles east of

6     Florala.

7          Q     Do you have any siblings,

8     nephews, nieces, other relatives at all in

9     the Florala/Lockhart area?

10         A     Yes, sir.

11         Q     Can you identify those for me?

12         A     All right.  I've got two sisters.

13    Sara Morris, Alice Fuller.  And the other

14    one is in Eufaula.  Well, one is in Eufaula,

15    and one is at Niceville, Florida.

16         Q     And these sisters, do they have

17    children of their own?

18         A     Yes.  Sara Morris has two

19    children.  A son in Washington D. C. right

20    now and a daughter living in Lockhart.

21    Alice Fuller has one son living here in

22    Florala and one daughter living at Fort

23    Walton.  And you want the other ones?

```
 1        Q    Yes, please.

 2        A    All right.  Mary Aplin at

 3   Eufaula.  She has three children.  One of

 4   them living -- in fact, he graduates from

 5   Auburn the 11th of this month.  And one is

 6   in Atlanta, and one is in Dothan.  The one

 7   in Niceville, Victoria Keller, she doesn't

 8   have any children.

 9        Q    Okay.  So to be clear, sir, you

10   do have four sisters?

11        A    Right.

12        Q    Okay.  That's helpful.  And can

13   you give me the ages, please, of the -- of

14   your nephews and nieces?

15        A    Lord, no.

16        Q    All right.

17        A    I can't remember that.  Sara

18   Morris' son, Ronald, he's -- he's about 42,

19   43, something like that.  He's got a career

20   in the military.  In fact, he's at the

21   Pentagon working.  All right.  Sara --

22   Sherry Morris, she's -- she's 32, 34,

23   something like that.
```

```
 1          Q    And did both the son and Sherry

 2     grow up in the Florala/Lockhart area?

 3          A    Yes.

 4          Q    And then the child of your other

 5     sister in the area of -- did that child also

 6     grow up in the Florala/Lockhart area?

 7          A    Yes.

 8          Q    They all went through the Florala

 9     high school?

10          A    Yes.

11          Q    And then the daughter, pardon me,

12     the children of your other sister, is it

13     Mary Aplin?  Did any one of them grow up in

14     the Florala/Lockhart area?

15          A    They did until they was -- the

16     girl, Jenna, is the oldest, and she was

17     approximately 10 when they moved to Eufaula.

18     They went -- the boy, Joy, he was 8,

19     approximately, when they left.  And Josh,

20     the one in Atlanta, he was approximately 6

21     when they left and went to Eufaula.

22          Q    Okay.  Sir, are you being

23     represented by any of these gentlemen who
```

```
1    are over here today?  Are any of these

2    gentlemen your -- acting as your lawyer

3    today?

4         A    I reckon all of them are.

5         Q    Okay.

6         A    I mean.

7         Q    All right.  And you're aware that

8    you're a plaintiff in a lawsuit against LP

9    and Pactiv, is that correct?

10        A    Right.

11        Q    Okay.  Now, are any of the other

12   relatives who we've described, your former

13   wife, son, daughter, sisters, nephews,

14   nieces, are any of those other individuals

15   also plaintiffs?

16        A    No.

17        Q    Have you had any discussions with

18   any of them about whether they should or

19   shouldn't be a plaintiff?

20        A    No.

21        Q    Are any of them suffering any

22   injuries that, as far as you know, they

23   attribute to what we're calling the
```

1    "facility"?

2         A    Not that I know of.  There may be

3    a correction on that but -- of what have

4    just told you.  Because in the group,

5    there's a sign that listed -- Joe Aplin may

6    be on that.  I'm not sure.  He's a former

7    employee of the Lockhart mill.

8         Q    So, in other words, he may be a

9    plaintiff?

10        A    Right.

11        Q    You're -- you just don't know, is

12   that correct?

13        A    I'm not -- I'm not sure whether

14   he ever signed the paper or not.

15        Q    Okay.  Okay.  And you're not

16   aware -- as far as you know, he's not

17   suffering any disease or illness that he

18   attributes to the facility?

19        A    No, not that I know of.

20        Q    Have you been through this

21   process before, sir, this what we call a

22   deposition?  Have you gone through this

23   before?

```
1           A    Not really.  Not this.

2           Q    Okay.  Have you testified in

3    court before?

4           A    Yes.  I was a witness.

5           Q    For what matter, sir?

6           A    In a criminal case.  They was

7    trying to prove wrongful death against

8    General Motors in a vehicle accident.  I was

9    there as a mechanic that had worked on the

10   car.

11          Q    I see.  You were testifying for

12   General Motors?

13          A    I was supposed to have been for

14   the other fellow, but, as it was, it didn't

15   last long.  So they wiped it out.

16          Q    Sir, do you suffer any injuries

17   or illnesses that you believe are

18   attributable to the facility?

19          A    Yes.  I believe the skin

20   condition I have, as far as my hands, which

21   is nothing -- and all, I believe that the

22   treatment is -- the treating and the wood

23   chemicals, I believe, is partial to that.  I
```

1    may be wrong.

2         Q    Okay.

3         A    Also, the only thing other than

4    that is high blood pressure that really

5    gives me a problem.

6              (Whereupon, Defendant's

7              Exhibit Number 1 was marked and

8              attached to the deposition.)

9    BY MR. TER MOLEN:

10        Q    I'd like to show you a document

11   that we marked as Defendant's Roberts Number

12   1.  Sir, can you tell me what this document

13   is that we're putting before you?

14        A    It's where I had filled out what

15   was my ailments.  And this is, basically,

16   right here to start with, my address, so on

17   and so forth.  Life history.

18        Q    This is a six-page document,

19   right?

20        A    Right.

21        Q    And is all the handwriting on

22   this document your handwriting, sir?

23        A    Yes, it is.

```
1              Q    Okay.  If I could direct your

2    attention to page -- what's marked at the

3    bottom as page 3 of Exhibit 1.  Do you see

4    that?

5              A    Page 3?

6              Q    I'm sorry.  Let's start at the

7    bottom of page 2.  Do you see at the bottom

8    of page 2 where it says "personal injury

9    claims"?

10             A    This one goes 1 to 3.

11                  (Whereupon, Defendant's

12             Exhibit Number 1A was marked and

13             attached to the deposition.)

14   BY MR. TER MOLEN:

15             Q    Okay.  That's not good.  We'll

16   mark this as -- as Roberts 1A.  And let's

17   use this one.  Please take a look at Roberts

18   1A and just confirm for me, please, that

19   that is also a -- that is also the document

20   that you filled out with your handwriting

21   and that document is complete?

22             A    Yes, it is, except most of the

23   handwriting is mine.  The -- on page 2, this
```

1     up here at the top, this ain't my writing.

2     This -- but I was in -- the addresses and

3     all, somebody else filled that in.  I didn't

4     do that.

5              Q     Where it says "address" --

6              A     Right.

7              Q     --  that's filled in by somebody

8     else?

9              A     That's not mine.

10             Q     Did you talk to someone else

11    about the form?

12             A     Huh-uh.

13             Q     You're shaking your head.  Do you

14    mean no?

15             A     No.

16             Q     Well, describe to me how this

17    form came to you.  Did it come in the mail,

18    did someone hand it to you?

19             A     It was handed to me by the -- no,

20    this came in the mail.  This did.

21             Q     This came in the mail.

22             A     Yes.

23             Q     And then we -- what -- did that

```
1    include instructions?  Were you to fill it

2    out and send it back in the mail?

3         A    Well, it was pretty much

4    explanatory to fill out.  But, yes, this

5    came in the mail.

6         Q    And, sir, did you then fill it

7    out and send it back in the mail, or did

8    someone come and pick it up from you?  Do

9    you recall?

10        A    No.  I handed it back to them at

11   the meeting they had.

12        Q    Okay.  So there was a meeting?

13        A    Florala.  Right.

14        Q    A meeting held at Florala?

15        A    Right.

16        Q    And at that meeting you handed

17   this in?

18        A    Right.

19        Q    And I take it there were other

20   people at that the meeting and they were all

21   handing in their forms, as well?

22        A    Yeah.

23        Q    And did you receive a call from
```

1    anybody after that meeting asking you

2    questions about, for example, the address

3    information here?

4         A    No.

5         Q    So as far as you -- you recall,

6    after you -- when you handed this form in,

7    let's start there, this address section was

8    blank?

9         A    Right.

10        Q    Okay.

11        A    But, basically, it's the same

12   information is on it, if you will, wrote --

13   look, where I wrote it on the front on page

14   1.  Someone just took and put the

15   information on the back in the slot that I

16   should have put it in, I guess.

17        Q    Understand.  Understand.  Then at

18   the bottom, sir, of page 2, you see where it

19   says "personal injury claims"?

20        A    Right.

21        Q    Looking at the exhibit we've

22   marked as 1 A.  Okay.  And then carrying

23   over to the top of page 3, you see it says

1    "kidney problems" here, correct?

2        A    Right.  Right.

3        Q    And then at the top of page 3, it

4    says "high blood pressure," and then it says

5    "high cholesterol"?

6        A    Right.

7        Q    Do you see those -- those three?

8        A    Right.

9        Q    Okay.  And then let me start with

10   kidney problems.  I understand you do have

11   some kidney issues?

12       A    I have had kidney problems,

13   kidney stones.  And as far as -- as far as I

14   know, I'm carrying one now.  But --

15       Q    Okay.

16       A    The kidney stone.

17       Q    And I'm not trying to put words

18   in your mouth, but based on what you said

19   earlier, is it fair to say you do not

20   believe the kidney problems you just

21   described are associated with the facility?

22       A    I do not know.

23       Q    Do not know.  Okay.  Have you

1     ever asked a medical doctor whether the

2     kidney issues are associated?

3          A     Yes.  All he tells me -- that's

4     Dr. Clemmons --

5          Q     Okay.

6          A     -- with Southeast Medical Center

7     in Dothan, he says that the area, and he's

8     not talking just Florala, but he's

9     talking --

10         Q     Couple --

11         A     -- is higher in -- this area is

12    higher in kidney stones situation, you know,

13    problems, than anywhere in the states that

14    he knows of.

15         Q     And has he given you any reason

16    as to why he thinks that may be the case?

17         A     No.

18         Q     Okay.  Have you asked any other

19    physician, besides Doctor -- is it Clemmons?

20         A     No, sir.

21         Q     And is Dr. Clemmons your regular

22    physician?

23         A     No, sir.  He's a -- he's a

```
 1    urologist specialist.

 2         Q    Okay.  How many times have you

 3    seen Dr. Clemmons?

 4         A    Four or five, six times.  I'm not

 5    sure.

 6         Q    When did you begin seeing him?

 7         A    I'm not sure about the dates.

 8    But I was transported from Florala Hospital

 9    by ambulance to Southeast Medical Center,

10    and he -- I've been seeing him since then.

11         Q    Okay.  Can you give me an

12    approximate year?  Was it the 1980s?  1990s?

13         A    No.  It was in 1990 -- '95, '96,

14    something like that.  It may have been

15    later.  I'm not sure.

16         Q    Okay.  And what was the -- what

17    was the reason, sir, that you were at

18    Florala Hospital?

19         A    The kidney stones.

20         Q    The kidney stones.  And you came

21    in and they diagnosed the problem as being

22    kidney stones and then had you sent down to

23    the specialist, Dr. Clemmons?
```

1        A     After they couldn't do nothing or

2    what they was doing hadn't showed no results

3    and after a severe attack, well, they put me

4    in the ambulance and carried me.

5        Q     And it was during that visit with

6    Dr. Clemmons when he told you that, for

7    whatever reasons, he thinks there's a higher

8    incident of kidney stones in this area?

9        A     Right.

10       Q     Then, sir, at the top of page 3,

11   you talk about high blood pressure.  Do

12   you -- and I, again, don't want to put words

13   in your mouth here, but do you attribute

14   high blood pressure to your work at the

15   facility?

16       A     I can't say that it's doing it.

17       Q     Okay.

18       A     It could be part of it.  But I'm

19   no doctor and I don't know, and they can't

20   nobody else tell me.

21       Q     Have you asked any physician

22   about your high blood pressure?

23       A     Yes.  But --

```
1          Q    Go ahead.  I'm sorry.

2          A    They don't know what's causing it

3     definite.  I mean --

4          Q    All right.  When did the high

5     blood pressure first begin occurring, from

6     your standpoint?

7          A    I'm gone say the late '80s, I

8     started having it.  Now, dates, I can't

9     remember what --

10         Q    But your best recollection, in

11    the late 1980s?

12         A    Uh-huh.

13         Q    I'm sorry, that was a yes?

14         A    Huh?

15         Q    That was a yes?

16         A    Yes.

17         Q    Okay.  I'm sorry.  I'm not being

18    rude.  I'm just trying to make sure the

19    court reporter gets it down here.

20         A    I know, I forget.

21         Q    Then, sir, you also say in this

22    form on the top of page 3 of what we're

23    calling Exhibit 1A, you talk about high
```

1    blood pressure there, sir.  And is -- I'm

2    sorry.  You're talking about high

3    cholesterol.  We've already covered high

4    blood pressure.  The high cholesterol.  Is

5    the high cholesterol a condition that you

6    attribute to the facility?

7          A    I feel the same about it as I do

8    the blood pressure.  I don't -- I can't

9    pinpoint what's causing it.

10         Q    Okay.  And the same as I asked

11   you for -- for blood pressure.  Have you

12   asked physicians about the high cholesterol?

13         A    They can't tell me what's causing

14   it.

15         Q    And when did you first begin

16   suffering from high cholesterol, sir, from

17   your standpoint?

18         A    About the same time as the high

19   blood pressure they detected.

20         Q    Now, sir, you mentioned when I

21   began asking you about health concerns that

22   you think might be associated with the

23   facility, you mentioned to me some skin

1    conditions or a skin condition?

2         A    Right.

3         Q    Can you identify or is there a

4    term for that skin condition?

5         A    It's skin cancer, they -- they

6    claim, and all.

7         Q    Have you seen any medical

8    personnel about the skin condition?

9         A    Just the local physicians there

10   in Florala.  He tells me there's nothing

11   really -- he said stay out of the sun some,

12   will help and all this.

13        Q    And which physician is it that

14   you've seen for the skin condition?

15        A    Vishwanath.

16        Q    Pardon?

17        A    Vishwanath.

18        Q    Vishwanath.  Okay.  And when did

19   you first see him for the skin condition?

20        A    Lord, I don't know.  Probably

21   2002, something like that.

22        Q    Okay.

23        A    I'm not sure.

```
 1          Q    And have you undergone any

 2    operations for the skin condition, sir?

 3    Have you undergone any medical procedures --

 4          A    No.

 5          Q    -- for the skin condition?

 6          A    No.

 7          Q    Are you taking any medications

 8    for the skin condition?

 9          A    Just try to keep some cream on it

10    occasionally when it does flare up.

11          Q    Okay.  And Dr. Vishwanath is

12    attributing the skin to being in the sun a

13    lot?

14          A    Well, he doesn't know.  Part of

15    it is age, part of it he doesn't know.

16          Q    Okay.  And, sir, with respect to

17    the cholesterol, are you taking any

18    medication for the cholesterol?

19          A    Yes, sir.

20          Q    Can you just tell me what that

21    is?

22          A    Crestor.

23          Q    Okay.  And how long have you been
```

```
 1   taking that?

 2        A    Approximately a year and a half

 3   now.

 4        Q    All right.  And before you were

 5   taking that medication, sir, were you taking

 6   any other kinds of medication?

 7        A    Yes.  But I can't tell you what

 8   it was.

 9        Q    And you've been taking medication

10   for cholesterol for -- for a number of years

11   of different kinds.  Is that fair to say?

12        A    I'm going to say for the last

13   five, probably.

14        Q    And for the kidney issues, for

15   the kidney stones, any medication --

16        A    There's nothing -- nothing I take

17   for that.

18        Q    Go in and they give you

19   ultrasound treatments or something of that

20   nature?

21        A    And hope you pass it.

22        Q    Right.  All right.  Sir, you were

23   born in this area, is that -- is that
```

1    correct?

2         A    Right.

3         Q    And do you live now in the -- in

4    a family house you inherited from your

5    parents?

6         A    Right.

7         Q    And did your father work in this

8    area?

9         A    Yes, sir.

10        Q    Where -- where did he work?

11        A    He farmed up there.

12        Q    Okay.  He farmed the -- is it

13   115-odd acres that you folks own?

14        A    He owned 160-something acres

15   there.  162, I think it was.

16        Q    Okay.

17        A    Because he farmed.

18        Q    All right.  And you -- you say in

19   your -- the questionnaire, sir, in Exhibit

20   1A on page 7 there, you say there's

21   114-acres that you own currently.

22        A    That's -- that's mine.

23        Q    That's yours?

```
1          A    Right.

2          Q    Okay.  And other siblings of

3   yours own other acreage?

4          A    Right.

5          Q    Okay.  And you raised your family

6   at this farm -- your family farm, is that

7   right?

8          A    No.  We -- well, we did live on

9   it.  The property is in two different

10  sections of the county, and the -- we lived

11  for a while at the other -- that's

12  approximately 10 miles to where it's at out

13  of Florala.  All right.  My wife and I

14  divorced.  All right.  She turned around,

15  moved the kids -- she got custody of the two

16  girls.  She moved back to Florala.

17         Q    Okay.  How old was she when

18  she -- how old were the children when that

19  happened?

20         A    Six and eight, I think is right.

21         Q    And, approximately, when was

22  that, sir?

23         A    I can't tell you that.
```

1        Q    All right.  In the 1980s, 1990s?

2        A    Yes.

3        Q    1980s?

4        A    Yeah.

5        Q    Okay.  Did any of your children

6    go to work at the Lockhart facility?

7        A    Go to work?

8        Q    Did any of your children work at

9    the Lockhart facility?

10       A    No, sir.

11       Q    And none of your sisters worked

12   at the Lockhart facility?

13       A    No, sir.

14       Q    And none of your brothers-in-law

15   work at the Lockhart facility?

16       A    No.  My brother-in-law did work.

17       Q    Okay.  Is that the one you

18   mentioned before --

19       A    Right.

20       Q    -- who might be -- anybody

21   besides that one brother-in-law?

22       A    No, sir.

23       Q    And do you know how long that one

1    brother-in-law -- you don't know if he did

2    work at the facility at all; is that fair to

3    say?  You don't know if he did work there?

4         A    He did work there.

5         Q    He did work there.  Do you know

6    what period of time?

7         A    He worked there on two different

8    occasions, but I can't tell you for just how

9    long.

10        Q    Okay.  Do you know what jobs he

11   had?

12        A    He was a millwright.

13        Q    Same as you?

14        A    Right.

15        Q    You helped get him the job?

16        A    No.  In fact, he was working

17   there when I went there.

18        Q    And as I understand it, when Mr.

19   Eason asked you just before we took a break

20   for lunch if you ever smelled anything when

21   you were at the high school, your answer

22   was -- was no.  When you were attending high

23   school --

```
1          A    As I remember, we didn't smell

2    nothing.

3          Q    Okay.

4          A    Didn't.  It could have been

5    there.

6          Q    And then when you were -- there's

7    a school -- is that W.S. Harlin?

8          A    Right.

9          Q    And is that the elementary

10   school?

11         A    Right.  And junior high.

12         Q    And junior high.  Where is that

13   located in relation to the facility?

14         A    Like the crow flies, probably a

15   mile and a half or less.

16         Q    All right.  In which compass

17   direction?

18         A    It would be northwest.

19         Q    Okay.  Northwest of the facility.

20   All right.  Did you ever smell anything when

21   you were at W.S. Harlan, as far as you can

22   recall?

23         A    Not that I can recall.
```

1          Q    All right.  And if I may --

2          A    But, now, there's something needs

3     to be -- prior to the time I went to work

4     there, they started treating.  All right.  I

5     graduated from the high school in 1967.  And

6     if you will get down and think, I don't

7     think there was no treating done there until

8     about '68.  Now, you need to -- because

9     there for a long time, they just -- they

10    were strictly a sawmill.

11         Q    Well, and it was always primarily

12    a sawmill, is that correct?

13         A    Right.  Right.

14         Q    Yeah.  Okay.  And we'll talk more

15    about that in a few minutes.  Sir, if I

16    could ask you to turn to the last page of

17    Exhibit 1A.  Do you see at the top, it says

18    "Form C"?  Do you see that?

19         A    Yes, sir.

20         Q    At the very top it says, if I'm

21    reading this right, "McDaniel Motor

22    Company"?

23         A    Right.

1      Q    In this you see the purpose of

2  Form C is talking about additional exposure

3  locations and dates of exposure.  Can you

4  tell me, sir, why you put McDaniel Motor

5  Company there?

6      A    That's where I worked there in

7  Florala.

8      Q    Okay.  And were you being

9  exposed, as far as you believe, to chemicals

10  at that work environment at the McDaniel

11  Motor Company?

12      A    No, as far as no more than being

13  in town.

14      Q    Okay.  So, in other words, this

15  was in town, in Florala?

16      A    Right.

17      Q    And that's why you put it in

18  there?

19      A    Right.

20      Q    But is it fair to say that as far

21  as the high school and as far as the

22  elementary and junior high, you don't recall

23  any specific instance of smelling anything?

1        A    No, sir.

2        Q    Okay.  It is fair to say that,

3    right, you don't recall any instance, is

4    that correct?

5        A    Correct.

6        Q    Okay.  Thanks.  Sir, looking at

7    page 3 again of Exhibit 1A.  There's a J.F.

8    Holley, do you see there, on A1, as the

9    physician --

10       A    Right.

11       Q    -- you've identified.  Can you

12    tell me what the -- why it was you were

13    seeing him?  There's a blood poisoning

14    indicated here.

15       A    Right.

16       Q    Can you tell me what that was

17    about, sir?

18       A    I had received a cut on my leg.

19    And I developed blood poisoning.  And before

20    we could do anything or -- it was to the

21    point that they was about ready to try and

22    amputate it.  For two weeks it was

23    supposedly touch and go with it.  That was

1    when I was seeing him.

2         Q    And you were able to make a full

3    recovery from that incident?

4         A    Yes.

5         Q    Okay.  Good.  And then moving

6    down, page 3, there's a Wheeler Gunnels.  Am

7    I reading that right?

8         A    Right.

9         Q    Can you tell me what the purpose

10   was of seeing Dr. Gunnels?

11        A    Appendicitis.

12        Q    Appendicitis.  You had your

13   appendix removed?

14        A    Right.

15        Q    Okay.  And that was in the early

16   1970s?

17        A    Right.

18        Q    Okay.  Very good.  And then

19   moving through there, there's a Dr. Potter?

20        A    He was a physician for -- they

21   carried you to.  Really, Dr. Potter,

22   Dr. Marsh, and Dr. Hosiose, if anything

23   happened, they was there at the Florala

1    hospital, the ones you seen.  They wasn't

2    there together, but over the period of time

3    Dr. Potter left, and, actually, Dr. Hosiose,

4    and Dr. Marsh come in.

5         Q    Okay.  And did you see them for

6    specific issues?

7         A    If I remember right, Dr. Potter,

8    I had cut my hand and had to receive

9    stitches, from the sawmill.

10        Q    Okay.

11        A    Dr. Hosiose, a large drill press,

12   I let it snatch me into it, and he put

13   stitches above this eye.  I think there was

14   about 12 stitches up here.  And Dr. Morris,

15   I seen him.  We was having electrical

16   trouble at the sawmill and the

17   electrician -- let me back up a little.  We

18   had floating -- what they call a floating

19   neutral current.  If you -- you couldn't

20   pinpoint where our problem was.  The

21   electrician was hooked onto a motor with his

22   instrument, and I was going down the line

23   tripping breakers to tell which one

1    developed the short.  And when I tripped a

2    breaker, it blowed up.  Well, it burned my

3    hand, my right arm, third degree burns and

4    all.  And, well, that's -- that's --

5    Dr. Morris treated me for that.

6         Q    Okay.  Good.  Have we already

7    talked about Doctor, is it Hosiose, Hosiose?

8    Dr. H, starts with an H?

9         A    Hosiose?

10        Q    Yeah.

11        A    Yeah, we talked about that.

12        Q    We talked about him.  All right.

13   Okay.  Have you ever been a smoker?

14        A    No, sir.  I chew tobacco on

15   occasion but that's it.

16        Q    How long have you been chewing

17   tobacco?

18        A    Lord, I don't know.  Since back

19   in the '70s.

20        Q    Okay.  Sir, if I can refer you

21   to -- again, to page 7 of Exhibit 1A.  You

22   can look there.  There's a section F there

23   toward the bottom.

```
1          A     Right.

2          Q     Do you see that?  Do you see

3    where -- is that your handwriting where you

4    filled in the value of the property before

5    contamination was $800,000?

6          A     I did not write that in there.

7          Q     Okay.  Do you know who did write

8    that in there?

9          A     No, I do not.

10         Q     Okay.  Did you give that

11   information to anybody?

12         A     No, I did not.

13         Q     Okay.  Just looking at page 7

14   there, going through C, D, E, and F, is any

15   of that written in your handwriting?

16         A     Yes.  The -- the portion, other

17   than the amount wrote in there, is all of my

18   handwriting.

19         Q     Okay.  So you put in 1,200 square

20   feet, and you put 114-acres.  And there's

21   farming, and is that pasture?

22         A     Pasture.

23         Q     Farming, pasture.  Okay.  All
```

1    right.  Do you know who put in the $800,000?

2         A    I do not.

3         Q    Do you agree with that number?

4         A    No.

5         Q    Okay.  What would you put in

6    there, if anything?

7         A    I hadn't really thought about it.

8    I mean, that's the reason, when I filled it

9    out, I left it blank.  I mean --

10        Q    Okay.  Are you aware, sir -- has

11   anybody told you that there is contamination

12   associated with the facility on any of the

13   114-acres that are yours?

14        A    No, sir.

15        Q    Okay.

16        A    They have not.

17        Q    Okay.  So sitting here today,

18   you're not aware if there's any

19   contamination on your property or not, is

20   that fair to say?

21        A    No, I am not aware.

22        Q    Okay.  Sir, during your morning

23   deposition session, there was some

```
 1      discussion about some other boiler operators

 2      and their current status, their current

 3      condition --

 4           A    Right.

 5           Q    -- here.  And there was some --

 6      Bud Hughes was one of those individuals.

 7           A    Right.

 8           Q    And if I recall correctly, you

 9      indicated that Mr. Hughes isn't doing that

10      well medically right now?

11           A    Right.

12           Q    That he's in the hospital or he's

13      in care?

14           A    He's at home, as far as I know.

15           Q    Okay.

16           A    They just told me that he was in

17      bad shape.  That was the words that was

18      spoken, the last I heard.

19           Q    All right.  Do you know how old

20      Mr. Hughes is now?

21           A    Not really.  But he's, I'm going

22      to say, 75.

23           Q    Seventy-five or so?
```

```
1          A    Right.

2          Q    Okay.  And has anybody told you

3     whether or not his current condition is

4     associated with his work at the facility?

5          A    I do not know.

6          Q    Okay.  Do you know if he's a

7     plaintiff in this -- in this lawsuit?

8          A    I'm not sure.

9          Q    Okay.

10         A    He did work there, I know that.

11         Q    All right.  Then we also talked

12    about, is it Ronnie, Ronnie Ray Brooks?

13         A    Lonnie.

14         Q    Lonnie.  Okay.  Thank you.

15    Lonnie Ray Brooks.  And Mr. Brooks is passed

16    away?

17         A    Right.

18         Q    Do you recall approximately when

19    he passed away?

20         A    I'm gone say 2001.

21         Q    All right.  Do you know

22    approximately how old he was when he passed

23    away?
```

```
1          A     I'm gone say he was approximately

2     65, 68, something like that.

3          Q     Do you know if his relatives are

4     bringing a lawsuit on his behalf against the

5     companies here today?

6          A     As one of them, I do not know

7     that.  But, yes, I think his daughter may be

8     involved in it.

9          Q     His daughter may be involved in

10    it.  Okay.

11         A     Right.

12         Q     And is it Mr. Ronnie Jackson,

13    Ronnie Jackson, you mentioned him?

14         A     Right.

15         Q     And if I wrote this down

16    correctly, he has also passed away?

17         A     Right.

18         Q     And how old is -- first of all,

19    when did he pass away?

20         A     Ronnie?

21         Q     Yes.

22         A     Ronnie died in a car wreck.

23         Q     Oh, that's right.  I'm sorry.
```

```
1      And that was in the last three years or so?

2           A    In -- yeah.

3           Q    Okay.  And then a Mr. Miller, if

4      I wrote this down right, Buford Miller?

5           A    Right.

6           Q    Is that right?  Has he passed

7      away?

8           A    I'm not sure --

9           Q    Okay.

10          A    -- to be honest with you.  I'm

11     gone say 2001.

12          Q    Okay.

13          A    If I had to make a guess.

14          Q    Do you know approximately how old

15     he was when he passed away?

16          A    Buford was 70, probably.

17          Q    And is he -- is his family

18     bringing a lawsuit on his behalf, as far as

19     you know?

20          A    Not that I know of.

21          Q    Okay.  Has anybody told you that

22     his condition was associated with his work

23     at the facility?
```

```
 1        A    No, sir.

 2        Q    Then we also discussed or you

 3   mentioned that I think at -- at times when

 4   individuals were exposed directly to

 5   treatment chemicals at the facility?

 6        A    Yes, sir.

 7        Q    They developed, I think you used

 8   the words "pimples" or "rash"?

 9        A    Yes.

10        Q    And can you give me the names,

11   sir, of those individuals?

12        A    Well, there would have been

13   Donald Ezell, Wayne Wise.  Donnell

14   Bradberry, I think, had some of it.  Walt

15   Kimbrough.  That's basically all I can --

16        Q    Best you can think of.  And you

17   know that these individuals suffered pimples

18   or rashes because you saw them with that

19   condition?

20        A    No, sir, I didn't say that.

21        Q    All right.  Well, I just want to

22   be clear here.  So -- so how do you know

23   that they suffered that condition?
```

```
1          A    All right.  They -- they told me
2     they was breaking out with it.  But I didn't
3     see it now.
4          Q    Okay.
5          A    Now, I have had -- personally, I
6     have had the creosote break me out, but then
7     later it would blister me.  What affects one
8     one way, won't affect everybody else the
9     same.
10         Q    I understand.  I understand.  Did
11    you or anybody else tell any management at
12    the company about this issue?
13         A    No.
14         Q    No.  Okay.  Sir, when did you
15    first become aware that there were people
16    who were thinking about bringing a lawsuit
17    against the companies here today?
18         A    It was approximately two and a
19    half years ago.
20         Q    Can you tell me how that
21    happened?
22         A    Word of mouth.
23         Q    Word of mouth?
```

1         A     Right.

2         Q     So somebody told you?

3         A     Yes, sir.

4         Q     Who was that?

5         A     Well, I think the first one that

6     mentioned it to me was Ronnie Jackson.

7         Q     Okay.  And did he give you a call

8     or come over to your house?  How -- what was

9     the context?

10        A     We was talking personal.

11        Q     Okay.  And was he encouraging you

12    to -- to -- to join up?

13        A     Not really.  We was talking

14    insofar as the amount of cancer and

15    everything that had showed up, just like we

16    talked -- in the boiler firemen and

17    everything.  So --

18        Q     Okay.  Did you attend any

19    meetings in the Florala/Lockhart area, where

20    the lawyers were talking about potentially

21    bringing a lawsuit against the companies

22    here?

23             MR. PALMER:  Wait.  Wait.  Wait a

```
 1              minute.  You're asking about

 2              content in that question.

 3               MR. TER MOLEN:  I said -- can you

 4              read the question back, please.

 5               THE WITNESS:  Yes, sir, we had a

 6              meeting.  I can't give you the

 7              date on it, but there was a

 8              meeting.

 9    BY MR. TER MOLEN:

10         Q    How many meetings did you attend?

11         A    In all, I think there's been,

12    what, three.  Two or three that I've been

13    to -- that I've attended.

14         Q    Okay.

15         A    Anything else --

16         Q    Are you aware of other meetings

17    that were held that you did not attend?

18         A    No, sir.

19         Q    Sir, as I understand it, you said

20    you lived in the Florala/Lockhart area all

21    your life, correct?

22         A    Except two years --

23         Q    Except for military?
```

1        A    -- in the military.

2        Q    Except for military service,

3    right?  And I would like to ask you about a

4    couple other businesses that I understand

5    were in this area at different points in

6    time, all right?

7        A    All right.

8        Q    Jackson Lumber, does that ring a

9    bell at all?

10       A    Yes, sir.

11       Q    Can you tell me about Jackson

12   Lumber and where it was located?

13       A    Basically, it was located in

14   Lockhart.  It was -- the Jackson Lumber I

15   hope you're talking about is -- was back in

16   the era of my parents and all, as far as a

17   sawmill and all.

18       Q    Okay.  Do you recall or know what

19   different operations occurred at the Jackson

20   Lumber facility?

21       A    All I know is what I've heard.  I

22   mean, they had a sawmill, a plainer mill,

23   and everything right there.

1          Q     All right.

2          A     The Lockhart pond that you see as

3    you cross, they used it to hold their logs.

4          Q     I see.

5          A     That was what it was damned up

6    for originally.

7          Q     Okay.  And the Lockhart pond is

8    that pond that's immediately north of 55,

9    just north of the facility?

10         A     Right.

11         Q     Okay.

12         A     Right.

13         Q     And so that pond was damned up to

14   hold logs for Jackson Lumber?

15         A     Right.

16         Q     I see.  Okay.  And was there a

17   boiler at all on the Jackson Lumber

18   property?

19         A     Now you're asking questions that

20   I can't really tell you.  But I think there

21   was.  Now, I saw some pictures that were

22   made that had the history, and I think

23   there -- there was boilers there.

```
1          Q    A boiler there.  All right.

2    Tepee burners, too?

3          A    No.

4          Q    Not as far as you're aware?

5          A    No.

6          Q    Was there any treatment -- was

7    there any wood treatment occurring at the

8    Jackson Lumber facility?

9          A    Not that I know of.

10          Q    Okay.  All right.  Is there a

11    company -- moving to a different company.

12    Sir, is there a company called Hanson or

13    Hinson Pole, something like that?

14          A    Yes, there used to be.

15          Q    All right.  Can you tell me about

16    that company?

17          A    Yes, sir.  It was -- it was

18    mostly -- well, it was just simply --

19    International and Scott had the -- the

20    priority of the woodland.  The woodland that

21    you see that more less reaches from Opp to

22    Florala -- and between them and Scott, well,

23    there was a need for poles.  I'm talking
```

1    about electric poles and everything.  Hinson

2    Pole Company, what they would do, they would

3    bring in -- in other words, they didn't cut

4    nothing but prime straight poles.  For a

5    long time they -- they peeled them, put them

6    back in rail cars and shipped them to

7    Montgomery to be treated.  Later dates, it

8    got to be just trucked up there.  But they

9    was a pole facility.  I mean that was it.

10        Q    All right.  Where were they

11   located?

12        A    All right.  Coming back this way,

13   from -- coming up 55 from the Lockhart pond,

14   between there and the railroad tracks where

15   the railroad tracks used to be --

16        Q    Okay.

17        A    -- if you're coming this way,

18   they would have been on the right.

19        Q    And did they have a boiler

20   operation as well?

21        A    Now, you know, I don't remember.

22   But I think they air dried those poles.  I

23   don't think they had one.

1       Q     What would they do with their

2    waste wood or waste bark?  Do you know?

3       A     I really don't know.

4       Q     Okay.

5       A     I -- I sure don't.

6       Q     Okay.  Let me shift gears and ask

7    you about another company, sir.  T&L

8    Sawmill, or something like that, does that

9    ring a bell?

10      A     T&L does not.

11      Q     Okay.  Were there any other

12   sawmills in the Florala/Lockhart areas,

13   other than those at the facility or

14   associated with Jackson Lumber, which we've

15   talked about already?

16      A     The only other one I knowed of or

17   heard of was Briton Lumber Company in

18   Lakewood, Florida.

19      Q     Okay.

20      A     That's just across the -- the

21   state line, actually.

22      Q     Okay.  And what do they do at

23   Briton?

1       A    All I know was it was a sawmill.

2   I guess they made lumber.

3       Q    Do you know if they had a boiler

4   operation there?

5       A    No, sir, I do not.

6       Q    Do you know if they did any wood

7   treatment there?

8       A    No, sir, I do not.

9       Q    Moving on to another company,

10  sir.  Merritt Metals?

11          MR. MITCHELL:  How do you spell

12          that?

13      A    I think it's M-E-R-R-E-T-T.  I'm

14  not sure about that.  They made doorknobs.

15  Just all different kinds of little things.

16  They was located actually right across the

17  street from where the post office is now in

18  Lockhart.

19      Q    And do you recall if they were

20  using various chemicals in connection with

21  their metal working and fabricating

22  operations?

23      A    Well, I don't know just what they

```
1    was using.  They did have a -- a small deal

2    with chrome plating, ever what it takes to

3    do that.  I was told.  Now, that's all I

4    know.  I never worked there.

5         Q    Are you aware of Merritt getting

6    in trouble with the state for creating some

7    contamination in the area?  Didn't hear

8    that?

9         A    Huh-uh.

10        Q    I'm sorry, that's a no?

11        A    No, sir.

12        Q    Yeah.  All right.

13        A    They went out of business before

14   it got to where they was checking.

15        Q    Have you ever heard of a company

16   called Lockhart Oil?  Does that ring a bell?

17        A    There used to be a filling

18   station there.  They called it Lockhart Oil

19   Well.  But I mean, that was -- they used to

20   be a kind of a chain of stores they called

21   Oil Well stations.

22        Q    Gotcha.  Where was that filling

23   station located?
```

1      A      That was right there on 55.

2      What's called the Penny Mart now.

3      Q      So that's right there by the

4      facility?

5      A      No.  It's coming on up 55.  Right

6      there in Lockhart I'm talking about.  Right

7      beside of 55.

8      Q      Okay.

9      A      It's called a Penny Mart now.  It

10     wasn't a thing in the world but service

11     station.  They just put a little old derrick

12     out there that's --

13     Q      It was their marketing gimmick?

14     A      Right.

15     Q      The videographer tells me we need

16     to stop so he can change his tape.  So let's

17     take a short break, and we'll come right

18     back, all right?

19             THE VIDEOGRAPHER:  We're going

20             off the record.  This is the end

21             of tape 4.

22     (Whereupon, a short break was taken.)

23             THE VIDEOGRAPHER:  We're back on

```
1              the record.  This is the beginning

2              of tape 5.

3   BY MR. TER MOLEN:

4       Q    Sir, we've been talking about

5   some other facilities in the

6   Lockhart/Florala area.  And the last one we

7   discussed with the filling station that was

8   so-called Lockhart Oil Well.  I want to ask

9   you, sir, about some other industry in the

10  area.  Were there, as far as you're aware,

11  any sewing plants?

12      A    Yes, sir.  At one time Florala

13  had three different textile factories there.

14      Q    Can you identify those for me,

15  sir, by -- by name and location?

16      A    Well, Franklin Fergison was the

17  largest.  Basically, I can't tell you the

18  streets.  I go through it every day, but I

19  don't listen to the street names.  It's

20  located in Florala.  All right.  You had

21  Covington Industries.  I think was the way

22  it was listed.  It was right there on the

23  corner where 331 turns to the left.  331 and
```

1    55 intersect right there.  It was on the

2    right.  You had Sweatt.

3        Q    Could you spell that for me, sir?

4        A    S-W-E-A-T-T, I think is right.

5    It was located straight across from where 85

6    turns south, go one block and then turn

7    right.  It was on the left.

8        Q    All right.  Any other textile or

9    sewing facilities, sir, that you're aware of

10    in the Florala/Lockhart area?

11        A    Well, there's one there now, but

12    this one hadn't been there all that long.

13    It's -- all of the other ones has shut down.

14    There was one other one.  Dr. Holley had one

15    move in there, but it was more less a small

16    operation.  And it was on the left there,

17    downtown Florala.

18        Q    Okay.

19        A    The one that's there operating

20    now is Quick Industries.

21        Q    Can you spell that for me, sir?

22        A    Q-U-I-C-K.

23        Q    Okay.  It's Quick, just like it

1    sounds.

2         A     All right.  And it's on the left

3    coming out 331 before you get into Florala.

4         Q     How long has that --

5         A     Be on the right.

6         Q     How long has that been there,

7    sir?

8         A     Three and a half, four years or

9    longer.

10        Q     Sir, we've talked about a number

11   of different facilities:  Jackson Lumber,

12   Hinson Pole, Merritt Metals, Lockhart Oil

13   filling station, the different textile

14   facilities.  Do you know, sir, if any

15   employees at a facility -- the Lockhart

16   facility we're talking about -- who came to

17   the facility after working at one or more of

18   these other operations?

19        A     Well, I'm sure there was, but

20   right off the top of my head I can't.  The

21   Merritt Metals, I'm sure some of them had

22   went down.  They had closed down, and I'm

23   sure some of them went to -- I believe Joe

1    Hamilton that used to work at the sawmill, I

2    think he did work at Merritt Metals, which

3    he's deceased now.

4        Q    All right.  Can you think of

5    anyone else, sir?

6        A    Paul Hattaway, I think, worked

7    for Merritt Metals and worked for Lockhart

8    Lumber.

9        Q    Is he still with us?

10       A    Yeah, he's still living.

11       Q    Is he in the Florala/Lockhart

12   area?

13       A    Yeah, he's in Florala.

14       Q    Is he a plaintiff in this

15   lawsuit, as far as you know?

16       A    I do not know.

17       Q    Can you think of anybody else?

18       A    No, sir, right off.  I'm sure

19   there's several more, a small town like

20   that, and all.

21       Q    Sure.  Sure.  Sir, I would like

22   to ask you a few questions about the

23   facility operations here.  And just to make

1    sure that I understand this correctly, I

2    want tell you why I understand it and ask

3    you if I've got it right.  Okay?  I mean, as

4    I understand it, that -- and recognizing you

5    started there in 1978 or thereabouts --

6         A    Right.

7         Q    -- that there would be a wood

8    that was -- trees that were cut down and

9    then the trunk -- tree trunks would be

10   brought in to the facility.

11        A    Right.

12        Q    Right so far?  Okay.  And then

13   once those tree trunks got to the facility,

14   they would be debarked, the bark would be

15   taken off, and then they would go through

16   some initial trimming and cutting to have --

17   roughly form the board shapes.

18        A    Right.

19        Q    Is that?  Okay.

20        A    Basically, yes.

21        Q    Okay.  And then, as I understand

22   it -- and let me back up here and ask.  Your

23   job at the facility from the day you started

1    until the day you left was a millwright,

2    correct?

3         A    Right.

4         Q    And is it fair to say that you

5    were never involved in -- in purchasing

6    materials for the facility?

7         A    Yes, sir, that's fair.

8         Q    That's fair to say.  Okay.

9         A    The only thing I ordered from

10   time to time was metal.

11        Q    All right.  And your basic work

12   location, you identified for us on some of

13   the exhibits that your lawyer, Mr. Eason --

14   Eason showed you earlier, you identified a

15   shop in the kind of upper left-hand corner

16   or northwest corner.  Was that your primary

17   location?

18        A    Yes, sir.

19        Q    Primarily your time was spent in

20   that shop?

21        A    Depending on breakdowns.

22        Q    I understand.  If there was a

23   break down, you would go to the break down;

```
1    otherwise, your focus was in that shop?

2         A    Right.

3         Q    Okay.

4         A    Unless we was rebuilding or

5    something of that nature.

6         Q    Okay.  Now, the different

7    chemicals that you talked about earlier with

8    response to some of Mr. Eason's questions

9    that were used for treatment at the

10   facility, those were bought by the facility,

11   right?

12        A    Right.

13        Q    And some of those chemicals were

14   rather expensive, if you know?

15        A    I'm sure.

16        Q    And it's fair to say the company

17   didn't want to waste or lose any of those

18   chemicals unless it was absolutely

19   necessary, correct?

20        A    Correct.

21        Q    Okay.  And so recognizing that

22   the facility had -- I'm going to kind of

23   break it into two different operations.  You
```

1     had the wood that came in that would be cut,

2     sized, dried, and then shipped out without

3     any treatment as kind of the first category.

4     And then you had the wood that would come

5     in, you cut, size it, dry it, and then treat

6     it as the second category, okay?  Are you

7     with me so far?

8          A    Right.

9          Q    Okay.  And, as I understand it,

10    the wood that came in and was cut and

11    shipped but was not treated, that that was

12    always the majority of the business that was

13    done by the facility.  Cutting, selling --

14    cutting and then selling untreated wood; is

15    that fair to say, if you know?

16         A    I feel like it would be

17    60 percent.

18         Q    All right.

19         A    Approximately.  If we had --

20         Q    For the period of time that you

21    worked there?

22         A    Right.

23         Q    And your understanding, is it

1    fair to say, sir, that there weren't any

2    treatment operations at all at the facility

3    until the late 1960s or early 1970s?

4        A    I'm not sure.  You asked a

5    question as to when I was at the high school

6    about the smell, and that -- I got to

7    thinking.  I do not remember any smell.  And

8    I know that when the mill was first put

9    there, what was it, '61, didn't y'all -- I

10   think.

11       Q    We're not allowed to testify here

12   today.

13       A    Well, anyway, the -- there was a

14   time that before they got into the treatment

15   and all.  So I'm not sure what year they got

16   into the treating or whatever.

17       Q    Okay.  All right.  Fair enough.

18   The -- the wood that was treated, sir, am I

19   right in understanding that the treat -- the

20   wood would not be treated until it had

21   already been cut, dried, and was otherwise

22   ready to go out the door; is that fair to

23   say?

```
1        A    Yes, basically.  Yeah.

2        Q    Okay.  And so that after it

3   was -- after it was treated, it would be

4   ready to be sold?

5        A    Right.

6        Q    Okay.  And, again, I -- your --

7   your work, primarily, you were not working

8   in the treatment facility; is that fair to

9   say or not?

10       A    Not all the time, no.  If they

11  had problems, yes.

12       Q    Okay.

13       A    I've been there in -- in all of

14  it.

15       Q    I understand.  You've been there.

16  I'm not -- not trying to say you were never

17  there.  But your -- your focal point was

18  working in that shop area, and you would go

19  to the treatment area if there were

20  problems, correct?

21       A    Right.

22       Q    Okay.  And it's fair to say, sir,

23  there weren't problems every day, correct?
```

1       A    No, sir --

2       Q    Okay.

3       A    -- there was not problems every

4  day.

5       Q    And it's fair to say that

6  sometimes a week would go by without a

7  problem, correct?

8       A    Very seldom, but it did happen.

9       Q    Okay.  And the same is true for

10  all the other areas in the facility, besides

11  the shop area; you would go there if there

12  was a problem?

13       A    Right.

14       Q    Okay.  Then the -- so getting

15  back to the wood that was treated.  Sir, the

16  wood that was treated would not be cut after

17  it was treated, correct?

18       A    There was occasions that it was.

19       Q    Okay.  What were those occasions?

20       A    Well, maybe you had a order for a

21  certain length treated board, and maybe they

22  could see a way that they could cut it and

23  sell it and still come out; they would do

1    it.

2         Q    All right.  So on occasion, there

3    would be times when treated was cut?

4         A    Right.

5         Q    But that surely was not the norm,

6    is that correct?

7         A    No, that's not normal.

8         Q    Okay.  Sir, your current

9    employment, can you describe for us your

10   current employment?

11        A    I work for Covington County Road

12   Department.

13        Q    And what do you do for them, sir?

14        A    Well, I mechaniched for a little

15   while.  The last little bit I've been

16   running a motor grader.

17        Q    I'm sorry, running a --

18        A    Motor grader.

19        Q    Motor grader.  Okay.  Is that a

20   full-time job?

21        A    Yes, sir.

22        Q    And how does that pay compare to

23   your work at the Lockhart facility?  Are

1    you -- is it more, less now versus what you

2    were getting paid before?

3         A    Well, compared to the time, for

4    the area, it's close to the same.

5         Q    Close to the same.  Okay.  Very

6    good.  Sir, when you left the Lockhart

7    facility, were there any documents

8    associated with the work -- any papers

9    associated with the work that you took home

10   with you?

11        A    No, sir.

12        Q    Okay.  And have you looked, since

13   you got involved in this lawsuit, have you

14   looked around your house for any papers or

15   materials that might be related to your role

16   of work at the facility?

17        A    Not really, because there's none

18   there.

19        Q    There's none there.  All right.

20   Do you know, sir, Mr. Roy Ezell?

21        A    Yes, sir.

22        Q    What -- what's your opinion of

23   Mr. Ezell?

```
 1          A     Well, I ain't got no problem with

 2     Roy.  There's -- Roy rules -- they had a

 3     saying there that it was "Ezell way or none

 4     at all."  And that was, basically, you

 5     know -- he wasn't right all the time, but he

 6     was still the boss.

 7          Q     Is he an honest man from your

 8     point?  Is he an honest man -- Mr. Ezell, is

 9     he an honest man?

10          A     As far as I know.  I hadn't had

11     no financial dealings or nothing.  I don't

12     know what you determine honesty.

13          Q     Okay.  He's never misrepresented

14     anything to you; is that fair to say?

15          A     Well, I wouldn't -- we've had our

16     differences, there's no doubt.  I mean, you

17     don't work with a fellow 20 years and not

18     have none.  But overall, why I reckon we got

19     along fair.

20          Q     All right.  Has he ever told you

21     something that you discovered wasn't true?

22          A     Yes.

23          Q     What -- what -- what is that?
```

```
 1        A    I don't think that needs to be
 2   brought out here.
 3        Q    Does it relate to the work?
 4        A    No.
 5        Q    Okay.  It relates to personal
 6   issues?
 7        A    Yes.
 8        Q    Okay.  Did he ever tell you
 9   anything associated with the plant, what
10   we're calling the "facility," or the
11   facility operations that wasn't true?
12        A    Well, that depends.  He has told
13   me some things that he was wrong about.
14   And, in his opinion, he thought he was
15   right, but he was still wrong.  I mean,
16   definitely.  Now, as far as trying to just
17   out and tell me lie, I couldn't say he was
18   trying to do that.  So I guess the answer to
19   your question would be no.
20        Q    That he's never misrepresented
21   anything to you?
22        A    Well, basically, yes, what you're
23   saying.
```

```
 1          Q    Well, with respect to the

 2     facility, you're saying -- I just want to be

 3     clear here.  As I understand it, what you're

 4     saying is that Mr. Ezell has on occasion

 5     has, like all of us, has made some mistakes?

 6          A    That's right.

 7          Q    And that with respect to the

 8     facility and the operation of the facility

 9     and putting any personal life issues aside,

10     that he has not misrepresented to you --

11     he's not lied to you about the facility or

12     the facility operations?

13              MR. PALMER:  You're talking about

14              intentional versus unintentional?

15         Okay.

16          Q    Yes.  Is that clear?

17          A    I don't think he has

18     intentionally lied to me.

19          Q    Okay.

20          A    If that's your question.

21          Q    That's my question.

22          A    I'm getting --

23          Q    Yeah.
```

```
1              MR. MITCHELL:  Please, do not
2              interrupt the witness.
3        A    I'm getting sidetracked with what
4    you're -- the way you keep stating it.  I
5    mean, I don't know how -- I don't know
6    the -- I don't know what you're looking for,
7    as far as a answer.  You ain't stayed with
8    nobody 21 years, yourself, and somewhere
9    down the line you've lied to them.  Now,
10   like I say, I don't understand the -- the
11   answer you're looking for.  But we had our
12   differences.  And there have been some
13   things he told me wasn't right.  But now as
14   far as him telling me that intentionally, I
15   don't know that.  So --
16       Q    Let me step back here and make
17   sure I understand.  Because you -- what
18   you're saying, as I understand, is that any
19   time you work with anybody, whether it's
20   Mr. Ezell or anybody else, for 21 years,
21   you're going to have your differences,
22   correct?
23       A    Right.
```

1      Q    Let me put it this way:  If -- do

2  you trust Mr. Ezell?

3      A    That would -- that would be to

4  the point as to how much trust or what are

5  we talking when we say trust.  In other

6  words, I've had enough dealings to know

7  that -- with him that I don't want to be a

8  business partner with him today, I'll say

9  that.  I don't know what you're looking for.

10     Q    And your view is that whenever

11 you work with someone as long as you worked

12 with Mr. Ezell, you find out things and,

13 therefore, you -- you'd be weary of anybody

14 you worked with that long; is that fair to

15 say?

16     A    No, that ain't what I'm saying.

17     Q    Okay.  What about Mr. Partridge?

18 Are you familiar with Mr. Partridge, who

19 worked at the facility?

20     A    Yeah.

21     Q    And what were Mr. Partridge's

22 duties at the facility?

23     A    Well, he was a forklift driver.

1    He handled most of the -- a lot of the

2    loading of the trucks.  He wrote up the

3    tickets, so-to-speak.  Actually worked as a

4    shipping clerk.  On weekends, on occasions,

5    he'd help clean the boiler, stuff like that.

6    He has worked some at the treatment plant

7    and all.

8         Q    Do you know what time frame he

9    worked at the treatment plant?

10        A    Just on occasions.  I'm talking

11   about temporarily.  Maybe run over there and

12   load the carts or something like that for

13   them to push in or stuff like that, that I

14   know of.

15        Q    Okay.  Is it fair to say, as far

16   as you know, his primary duties were working

17   in the office?

18        A    His primary duties was lift truck

19   operator.

20        Q    Okay.

21        A    Forklift operator, however you

22   want to say it.

23        Q    Okay.  Good.  Did you work

1    closely with Mr. Partridge?

2         A    No.

3         Q    Do you know him socially at all?

4         A    Yes, sir.

5         Q    Do you have contact with him

6    outside of work?

7         A    Yes, sir.

8         Q    When is the last time you had any

9    contact with Mr. Partridge?

10        A    I think he called me last night,

11   I think it was.  It was yesterday evening or

12   last night one.

13        Q    Was there any discussion about

14   the lawsuit at all?

15        A    He asked if I was still supposed

16   to come up here today.

17        Q    And what did you tell him?

18        A    I told him yes, as far as I

19   knowed.

20        Q    And are you aware that he is

21   supposed to be testifying as well?

22        A    If I understand it right, he was.

23        Q    Did you discuss what the

```
1    questions might be and what the topics might

2    be?

3           A     We discussed it as far as -- I

4    believe he -- he made the statement that all

5    he knowed to do was get up there and tell

6    y'all what he -- what he knowed and that was

7    it.

8           Q     Are you aware that he's a

9    plaintiff in this lawsuit as well?

10          A     Yes, sir.

11          Q     Okay.  Have you discussed with

12   him what his issues are and why he's a

13   plaintiff?

14          A     Not really.

15          Q     Okay.  Has he told you anything

16   at all about what his condition --

17   conditions are and what he thinks is

18   associated with the facility?

19          A     Not really.  No.

20          Q     Okay.  Have you discussed your --

21   the fact that you're coming here as a

22   witness today with anybody else besides

23   Mr. Partridge?
```

```
1        A    No, sir.

2        Q    Okay.  Okay.  Thank you.  I have

3   no further questions at this time.

4                    EXAMINATION

5   BY MR. ARNOLD:

6        Q    Mr. Partridge -- I'm sorry.

7   Mr. Roberts.  I had Partridge on my mind.

8   My name is Doug Arnold.  We met earlier.  I

9   represent Louisiana Pacific.  We appreciate

10  your patience.  And I have a couple

11  questions also, if that's okay.

12       A    Go ahead.

13       Q    All right.  You testified earlier

14  that you worked, basically, five days a

15  week.  And on Saturdays there was sometimes

16  maintenance, and on most Sundays you were

17  off, or at least many Sundays, is that

18  correct, sir?

19       A    Most Sundays we was off.

20       Q    Okay.  What was your average work

21  day?  What time did you get in?

22       A    We usually run from six to five.

23       Q    Okay.  So you were usually off by
```

1    5 p.m.

2          A     Yeah.

3          Q     And that was consistent every day

4    of the week?

5          A     Right.

6          Q     And in your position as a

7    millwright who was your immediate

8    supervisor?  Who did you report to?

9          A     Roy Ezell.

10         Q     Roy Ezell.  Okay.  And if Roy

11   Ezell was absent, who would make the

12   decision, if a decision was needed?

13         A     Well, Tobe Kelly -- I told you

14   wrong there, because most of the time I did

15   answer to Tobe.  If it was something that I

16   needed or if we didn't agree or whatever, I

17   went to Roy.  But really and truly, Roy was

18   plant supervisor, and he was the kind of man

19   that more less -- he operated hands on.

20         Q     Okay.

21         A     In other words, he didn't just

22   send Tobe down there to do something.

23   Without a doubt, Tobe was really over it,

1    but yet Roy would be down there, too.

2         Q    Okay.

3         A    As long as me and Roy worked

4    together, well, we both -- in other words,

5    Tobe was the immediate, I reckon, in chain

6    of command, so-to-speak.

7         Q    Okay.  Was Roy there most days at

8    the plant?

9         A    Yeah.

10        Q    When you had to come in to do

11   maintenance on the -- on a Saturday, would

12   Roy be there sometimes also?

13        A    Very seldom.  He might come --

14   come around, but he'd probably leave or

15   whatever, unless there was something we was

16   having problems with sure enough.

17        Q    If you or someone in the

18   millwright shop needed to purchase

19   something, maybe new equipment, maybe order

20   metal, would that be something -- who would

21   have to approve that before you could make a

22   purchase?

23        A    Most of the time we went to the

1    purchasing agent, and he would handle it

2    from there.

3         Q    Okay.  Do you know whether the

4    purchasing agent had to then consult with

5    Roy, or did he just make the purchase

6    himself?

7         A    Well, I think it depended on the

8    amount.

9         Q    Okay.

10        A    In other words, if it was a large

11   load of metal or something, why -- most of

12   the metal was prefigured.  I'm talking about

13   if we had a job coming up over such and

14   such, they would have the metal and stuff

15   ordered before we got on the job, just about

16   it.

17        Q    Okay.  What about with regard to

18   other purchases that might be needed for the

19   site?  If something large needed to be

20   purchased, maybe something broke that needed

21   to be replaced for the boiler, something

22   needed to be purchased for the sawmill,

23   would -- would Roy Ezell have to be involved

```
1     in that decision at all?

2          A    Yes, sir.

3               (Whereupon, Defendant's

4          Exhibit Number 2 was marked and

5          attached to the deposition.)

6          Q    Okay.  I'm going to show you

7     a -- it's a large document but really just

8     for a single-page purpose.  So I didn't want

9     to alarm you.  So this is going -- this will

10    be 2?  Okay.  This will be Defense Exhibit 2

11    for Mr. Roberts' deposition.  And, Counsel,

12    I've tabbed the page.  I'm going to be

13    looking at on page -- it has a number.  The

14    bates numbers LPC00048509.  It's just

15    diagram --

16               MR. MITCHELL:  509.

17         Q    Yeah, 509.  I was just going to

18    work off that diagram, if it's okay, to ask

19    some questions about the facility

20    operations.

21               MR. MITCHELL:  Could we maybe

22          make that page a separate -- could

23          we go ahead --
```

```
1              MR. ARNOLD:  We could.

2              MR. MITCHELL:  Or we could use

3         the Bates stamp, whatever.  I just

4         don't want to get lost in this

5         stuff.  One.

6              MR. ARNOLD:  Okay.  Agreed.

7              MR. MITCHELL:  Why don't we make

8         that a separate number?

9              MR. ARNOLD:  Okay.  Let's make

10        that 2A.

11             MR. MITCHELL:  So, for the

12        record, Exhibit Defense what?

13             MR. ARNOLD:  2A.

14             MR. MITCHELL:  Defense Exhibit 2,

15        which consists of Bates stamps

16        LPC00048497 through LPC00048656 is

17        Exhibit 2.  And then within that

18        exhibit, page LPC00048509 is

19        Exhibit 2A.

20             MR. ARNOLD:  Correct.  Thank you,

21        Counsel.

22             MR. MITCHELL:  I just want to be

23        able to read back and be able to
```

```
 1              find it.
 2                  (Whereupon, Defendant's
 3              Exhibit Number 2A was marked and
 4              attached to the deposition.)
 5    BY MR. ARNOLD:
 6         Q    Okay.  Mr. Roberts, looking at
 7    this layout in front of you, does that
 8    appear to be a layout of the Lockhart
 9    facility?
10         A    Yes, sir.
11         Q    All right.  What I was going to
12    ask you, if you could just bear with me, was
13    to walk through the steps starting -- the
14    operation of the mill starting with logs
15    that were brought onto the site, and just
16    explain, if you could, for a moment, where
17    logs were brought onto the site were first
18    taken, using that layout if it's helpful.
19         A    All right.  When they came in off
20    55, either way, they went across the scales.
21    And the scales, all right, depending on what
22    it was, mostly logs, all right, they went
23    around, and it was unloaded back over here.
```

1    All right.  When we was buying pulpwood --

2         Q    A good suggestion, I know.

3    Sorry.  If you mind holding that up to the

4    video so that way we can all follow.

5         A    All right.  It was brought in.

6         Q    Maybe turn a little bit more that

7    way.  Thank you, sir.

8         A    Brought across the scales --

9         Q    Okay.

10        A    -- located in front of the

11   office.  All right.  In turn, they was

12   unloaded in this area mostly.

13        Q    Okay.

14        A    All right.  As long as the chip

15   mill was running, they bought pulpwood at

16   chip -- at the pulpwood prices.  In turn,

17   they high graded.  When I say "high graded,"

18   they took and they cut barn poles, fence

19   posts, even logs was brought out of this

20   pulpwood price lumber -- I mean wood.  All

21   right.  They was brought back across the

22   track, put into the sawmill, the logs was.

23   All right.  The logs was put on.  Most of

1    them was bought tree length, so-to-speak.

2    In other words, if a log would cut out three

3    16-foot logs, it was bought that way.

4         All right.  The cutoff saw system, if

5    the cutoff saw operator saw that maybe there

6    was a bad crook, knot or something, he could

7    get a 12-foot log and make it make higher

8    yielding lumber than he could by running it

9    on 16, he cut it.

10        All right.  He run it on -- this one

11   went on in the sawmill -- in the debarker.

12   The debarker was took off -- the bark was

13   took off of it.  It went on to the sawmill.

14   Went on to the carriage.  They made cants

15   out of it.  It come out in lumber.  There

16   was also a chipper at the sawmill for the

17   waste wood.

18        You cut the logs.  You had to cut them

19   at least six inches longer here.  Then it

20   was trimmed again before it went out the

21   sawmill.

22        Q    Okay.

23        A    Usually, if it was 16-foot

1    boards, when it come across here, it wound

2    up 16' 2", something, approximately.  What

3    it had to be, it had to be enough that it

4    was trimmed again when it went through the

5    plainer.  But, anyway, it left the sawmill,

6    went out here to the stacker.  All right.

7    It was stacked in small bundles here.  All

8    right.  When it come to here, it was broke

9    down, restacked, and air sticks was put

10   between each layer of the lumber here.

11       All right.  It was stacked around in

12   different places.  They're showing right

13   there is the green stacking area right

14   there.  All right.  They took -- took it,

15   then loaded it in the dry kiln here where

16   they dried it.  It was then took, stored in

17   this shed mostly.

18       All right.  From here, it would come

19   back to the plainer mill.  All right.  When

20   it got back to the plainer mill, they

21   plained it off.  All right.  When they done

22   that --

23       Q    I'm sorry to interrupt,

1     Mr. Roberts.  Could you just turn that a

2     little bit toward the camera.  Thank you.

3          A     All right.  When it left the

4     plainer mill, it was stacked here, or in

5     certain cases, it was loaded onto trucks and

6     it went back out the gate.

7          Q     Okay.  Thank you.  Now, I'm sorry

8     --

9          A     What.

10         Q     I was just going to ask you a

11    follow-up question.

12         A     Now, what was treated went on to

13    the treating plant and went from there on.

14         Q     Okay.  Just -- you don't have to

15    hold that up.  Thank you very much.  When

16    the logs went through, I think you

17    mentioned, the first -- one of the first

18    places they went was in that log processing

19    line to the cutoff saw?

20         A     Right.

21         Q     Which, as I understand it, they

22    take the irregularly shaped logs and cut

23    them into straighter lengths, is that -- is

```
1    that correct?

2         A    Basically, yes.

3         Q    What was done with the -- the cut

4    ends?  Where did those go, if you recall,

5    sir?

6         A    All right.  When they bought

7    timber for here, most of the time there was

8    nothing as far as a end left.

9         Q    Okay.

10        A    In other words, the loggers would

11   mark the logs as far as if it made three

12   16-foot cuts -- see, we would have to have

13   50 foot of lumber -- 50 foot of wood,

14   because each cut had to be at least 6 inches

15   over.

16        Q    Okay.

17        A    So you're talking 48-feet, plus

18   18 inches.  You know, anyway.  All right.

19   If it was -- worked out, he decided -- the

20   cutoff saw operator decided that this -- it

21   would be better off maybe to cut a 12 and

22   then whatever, most of the time, this log

23   went in random.  The last part went in as a
```

1   random length.  All right.  When they got

2   through with it at the carriage, they went

3   ahead and cut it.  When they got through

4   there and all, if there was extra waste or

5   anything, it went to the chipper.

6        Q    Okay.

7        A    All right.  But this -- this

8   random-length stuff come back across the

9   trim saws over here.  All right.  Once it

10  was in boards and the trim saw operator

11  looked at it, if it made a better -- in

12  other words, if you had a 16- or 18-foot

13  piece, let's say, and he thought he could

14  upgrade that piece of lumber, in other

15  words, make it from a number 2 to a number 1

16  by cutting 2 more foot of it off, he done

17  it, or cutting 4 foot of it off, he done it,

18  and then it went.

19       Q    Okay.

20       A    Now, does that answer --

21       Q    It does.  Thank you.  That was --

22  that's actually very helpful.  And then

23  after going through the cut saw, you

1    mentioned there was debarking, just taking

2    the bark off the log?

3        A    Right.

4        Q    Do you recall what was done with

5    the bark itself?

6        A    It was burned in the boil.

7        Q    So it was used as feed stock in

8    the boiler?

9        A    Right.

10       Q    Is that correct, sir?  And you

11   also mentioned that saw logs that came onto

12   the property went over to the chipper mill

13   area?

14       A    Right.

15       Q    Is that right, sir?

16       A    Right.

17       Q    Do you recall what was done

18   with -- anything that was cut or chipped in

19   that area and not used as the pole or post?

20       A    As long as the tepee burner was

21   standing, it went in it.

22       Q    Okay.  And once those were gone,

23   sir, do you recall where that wood went?

1        A    Part of it went to the boiler.

2        Q    Also to be used as feed stock for

3   the boiler?

4        A    Right.

5        Q    And once the logs entered the

6   sawmill, what sort of wood was generated

7   during that process?  Were there, for

8   instance, shavings or sawdust or ends,

9   anything like that, sir?

10       A    Basically, sawdust was all.

11       Q    Okay.

12       A    Sawdust, the cutoffs, and

13  everything went to the chipper.  They

14  couldn't have the sawdust in the chips.

15  There was a shaker screen and everything

16  back there trying to keep the chips as

17  uniform as possible.

18       Q    Okay.

19       A    All right.  The sawdust went out.

20  And later we had a local use of it.  These

21  people put it in their chicken houses --

22       Q    Okay.

23       A    -- as bedding for chicken houses.

```
1        But we burned some of that in the boiler.

2            Q    Some of the sawdust, sir?

3            A    Yes, sir.

4            Q    Okay.

5            A    The problem, there was so much

6    water in it, you would have problems.

7            Q    Okay.  And then I think you said

8    a moment ago once the lumber leaves the

9    sawmill, it then would go to the stacker?

10           A    Right.

11           Q    Okay.

12           A    It left -- left the sawmill, went

13   to the stacker.

14           Q    Okay.

15           A    There was strips put between each

16   layer trying to keep it from gluing.

17           Q    And then from there it went into

18   the dry kiln?

19           A    Right.

20           Q    Okay.  And then once it exited

21   the dry kiln and cooled, was the next place

22   it was taken the plainer mill, is that

23   correct, sir?
```

1          A     Right.

2          Q     Were there any extra shavings or

3     wood generated from the plainer mill?

4          A     Right.  The cutoffs and the

5     savings basically went to the boiler.

6          Q     Again, to be used as feed stock

7     for the boiler, is that correct?

8          A     Right.

9          Q     Okay.  Let me -- if it's okay,

10    Mr. Roberts, I want to look back on what was

11    Plaintiff's Exhibit Number 1, this 1978

12    photograph, if that's okay.

13         A     All right.

14         Q     If you can find your copy

15    there --

16         A     What year?

17         Q     It was --

18         A     Seventy-eight?

19         Q     -- probably bottom one in the

20    stack.  Okay.  Looking at this aerial

21    photograph and looking at the exhibit we

22    were talking about just a moment ago,

23    Defense Exhibit 2 A, there seemed to be some

1        building and areas you've described a moment

2        ago that don't appear marked in this photo.

3        I think one you testified about earlier was

4        the chip mill?

5                A       Right.

6                Q       Okay.

7                A       This -- the chip mill and the

8        post peeler, this sawdust bin and all that

9        is not showed on here.

10               Q       Okay.

11               A       They -- over here they show the

12       sawmill building and all because it was all

13       hooked in.  They got the chipper separated

14       out here and all that.

15               Q       Okay.

16               A       So --

17               Q       And I think you testified earlier

18       that the welding shop isn't marked on this

19       here either.

20               A       It's not marked on this, no.

21               Q       Okay.

22               A       But, see, you've got it here.

23               Q       And I guess on either diagram, we

1    don't have the scales shown that we talked

2    about that weigh the logs when they come in?

3         A    No, they don't show up here.

4         Q    Okay.

5         A    They was between the office and

6    Highway 55.

7         Q    In the Plaintiff's Exhibit 1, do

8    you see marked "stacker" that we talked

9    about, where the wood was stacked up after

10   it left the sawmill?

11        A    Well, it's hard to determine.

12   They've got this -- I'm guessing that this

13   would have been it right here.

14        Q    Okay.  Do you -- okay.

15        A    Like I said now, I can't be --

16   see, there's not a permanent -- or to me --

17   that looks like a building.  But it was

18   located somewhere in that vicinity.

19        Q    Okay.  If you could, turn it to

20   the camera and point to the approximate

21   location where you think the stacker was on

22   the photo.

23        A    It was approximately right here.

1        Q    Okay.  Anything else that in

2   looking again at this Plaintiff's Exhibit 1,

3   this aerial photograph, that's missing or

4   not otherwise identified at the site?

5               MR. MITCHELL:  I want to object

6               to the form.  I think you asked

7               two questions -- might have asked

8               two questions in one.  And I'm --

9               not you can't ask the question,

10              but I just want to make sure it's

11              not confusing.  And when you say

12              "missing," did you mean like not

13              in the picture or just not

14              labelled in the picture?  I didn't

15              understand.

16       Q    I'm sorry, Mr. Roberts, let me

17   rephrase my question.  Do you see anything

18   else in Plaintiff's Exhibit 1 that's not

19   identified as a structure that you recall

20   was at the site?

21       A    No.

22       Q    Okay.  Let me ask you about one

23   other that just caught my eye.  Do you see

```
1    anywhere on Plaintiff's Exhibit 1 the fuel

2    depot?

3          A    (Indicating.)

4          Q    That building right there?

5          A    Evidently that's it.

6          Q    Okay.  You want to turn to

7    show --

8          A    It would have been in this

9    vicinity right here.

10         Q    Okay.

11         A    It shows up as something.  But --

12         Q    Okay.  Thank you.  I'm done with

13   that aerial photograph.

14         A    Well, I've got a question.  I

15   want somebody to tell me why this lumber

16   shed keeps showing up beside this treatment

17   plant.

18         Q    That's a fair question,

19   Mr. Roberts.  I don't have an answer.  Let

20   me ask you one other quick question about

21   Defendant's Exhibit 2 A.  There's a building

22   just to -- just above the boiler house

23   that's marked "wood" -- "wood fuel," and I
```

1    wondered if you recall, sir, what that

2    building was for?

3         A    Wood fuel, where are you seeing

4    that?

5         Q    Right here, Mr. Roberts.

6         A    All right.  That was a dust house

7    is what we called it.

8         Q    Okay.  And what was a dust --

9    dust house, Mr. Roberts?

10        A    All right.  When everything went

11   through the -- the Hog or crusher, it went

12   through the Hog, even like I was talking

13   the -- see, a lot of times, even the

14   cleanout I was talking about out of the

15   cylinders and everything, it didn't go in to

16   be throwed directly into the boiler.

17        Q    Okay.

18        A    All right.  It was bumped -- in

19   other words, you had your -- you had a huge

20   hopper.  All right.  The dump truck would

21   come up there and back up there and dump

22   into this.  Dump the bark.  All right.  This

23   penta or creosote or whatever you cleaned

1    out, would be dumped on top of this bark and

2    it would every bit be run through this Hog

3    that we called it, crusher, excuse me.  Or

4    whatever.  All right.  In turn, it went into

5    the dust house.

6         Q    Okay.

7         A    All right.  Then they've got it

8    showed odd, but it should have been

9    connected.  There was a chain run from the

10   bottom of this all the way to feed the bark.

11        Q    Okay.  I would like to ask you,

12   Mr. Roberts, to take another look at what

13   was Plaintiff's Exhibit Number 2.  It was a

14   photo dated 1982.  It should be probably the

15   next one in the bottom.  Looking at that

16   photograph, Mr. Roberts, can you see the

17   sawmill, itself, in that photograph or just

18   the outline that someone has made there?

19        A    Well, actually, you can't tell

20   much about the photograph if it wasn't for

21   the outlines.  The outlines is what

22   designates.  In your picture here, you --

23   you don't have them connected, the welding

1    shop and the sawmill, and here it's all

2    hooked together.

3         Q    Okay.  Could we also look just a

4    moment, Mr. Roberts, at what was marked

5    Plaintiff's Exhibit Number 3.  It's the

6    photograph dated 1985.  I think you

7    testified earlier, Mr. Roberts, that there

8    was an aeration system with spray nozzles on

9    one of the ponds.  Do I recall that

10   correctly?

11        A    Right.

12        Q    And I think you described it

13   almost like a grid --

14        A    Right.

15        Q    -- type system?  In this

16   photograph, in Plaintiff's Exhibit Number 3,

17   in the pond 3 area, there looks to be the

18   faint contours of a -- of a grid system.  Is

19   that --

20        A    That's where it was at.

21        Q    That's where it was?

22        A    Right.

23        Q    The aeration system?

```
1          A    Right.

2          Q    Okay.  And I believe you

3    testified earlier, Mr. Roberts, that only

4    one pond had that --

5          A    Right.

6          Q    -- aeration system?  So that was

7    pond number 3?

8               MR. TER MOLEN:  I'm sorry, that a

9               yes, pond number 3?

10              THE WITNESS:  Sir?

11              MR. TER MOLEN:  You said yes, it

12              was pond number 3?

13              THE WITNESS:  Right.

14              MR. TER MOLEN:  Okay.  I'm sorry.

15              I heard that.

16              MR. MITCHELL:  You're talking

17              about what's marked pond 3 on

18              Plaintiff's Exhibit 3?

19              MR. TER MOLEN:  Right.

20              MR. ARNOLD:  That's correct.

21              MR. MITCHELL:  All right.

22   BY MR. ARNOLD:

23         Q    If we could, take a quick look at
```

```
1      the next exhibit that this -- it's towards

2      the bottom.  This will be Plaintiff's

3      Exhibit Number 4, the map dated 1986.

4      Again, looking at this map, Mr. Roberts,

5      looking at the sawmill -- sawmill building,

6      for example, can you actually see the

7      building in that photograph?

8           A    No, sir.

9           Q    Okay.  Can you see the plainer

10     mill building in that photograph?

11          A    Not really.

12          Q    How about can you see, sir, the

13     storage shed in that -- this aerial

14     photograph?

15          A    No, sir.

16          Q    Can we look, then, at what was

17     marked Plaintiff's Exhibit Number 7, 1992

18     aerial photograph.

19          A    Number 7?

20          Q    Yes, sir.  Again, Mr. Roberts, if

21     you look, for instance, at the saw -- the

22     area marked "sawmill," can you actually see

23     the sawmill building there, sir?
```

```
1          A     No, sir.

2          Q     Over in the left-hand corner

3   where there's an area marked "shop," can you

4   see the shop building --

5          A     No, sir.

6          Q     -- in that photograph?  Okay.

7   Okay.  Mr. Roberts, if you don't mind, I

8   wanted to take a quick look with you at

9   Plaintiff's Exhibit Number 8, which is the

10  1993 photo.  I believe you testified

11  earlier, Mr. Roberts, and then reminded us

12  just a moment ago that that building that's

13  marked to the right of the treatment

14  cylinder building is not, in fact, a

15  building at all to your recollection?

16         A     There wasn't one there.

17         Q     And I believe you testified

18  earlier, sir, that you thought that that was

19  an area where lumber might have been

20  stacked?

21         A     Right.

22         Q     Okay.  When Mr. Mitchell asked

23  you questions earlier about this photograph,
```

```
 1    he asked you some questions about the lumber

 2    that is in the photograph to the area just

 3    below the chipper mill.  Do you recall that,

 4    sir, Mr. Mitchell asking that question?

 5         A    Yeah.  Yes.

 6         Q    And looking at this photo, is

 7    there any way for you to tell whether the

 8    lumber that appears stacked there is treated

 9    or untreated?

10         A    I'm afraid not.

11         Q    I believe Mr. Mitchell also asked

12    you a question about the "star area," as he

13    described it at the bottom of the photo.  Do

14    you recall that?

15         A    Yes, sir.

16         Q    Can you tell looking at this

17    photograph what exactly is there?

18         A    Well, it looked like a road

19    Intersection, basically.  I can't tell you

20    what's there, not from this.

21         Q    Okay.  Thank you.  Then if we

22    look very quickly, and I appreciate your

23    patience, Mr. Roberts, as what was
```

```
1      Plaintiff's Exhibit Number 9, the 1994

2      photograph.  Again, I believe you testified

3      earlier that the building designated storage

4      shed, to your recollection, was not there.

5           A    No.

6           Q    Okay.  And if you look

7      immediately before the storage shed in the

8      area that goes down to the edge of the

9      cleared-out property, can you discern

10     anything in that photograph, timber or

11     anything else?  Okay.

12          A    No, sir.  You can't tell from

13     that, or I can't.

14          Q    Okay.  Thank you.  And then,

15     again, I apologize, the last but not least

16     of these photos, Exhibit Number 10 --

17     Plaintiff's Exhibit Number 10, the 1997

18     photo, looking at that photo, Mr. Roberts,

19     can you see the sawmill itself or just the

20     area they've designated the sawmill?

21          A    Just the area they've marked out.

22          Q    Okay.  And is that also the case,

23     Mr. Roberts, for the shop?
```

```
1          A    Right.

2          Q    And, again, we have the storage

3     shed that doesn't exist, is that correct,

4     sir?

5          A    Right.

6          Q    Okay.  Thank you.  That's all the

7     questions I have about those photographs.

8     Mr. Roberts, do you recall whether there was

9     a drip pad at the Lockhart site?

10         A    A what?

11         Q    A drip pad.  An area used for

12    placing the wood falling treatment?

13         A    There was not for years.  And I

14    can't tell you when, but that's what makes

15    me question the shed factor they've got,

16    because the treatment plant shed was added

17    onto.  And what it done -- you see, to start

18    with, when they pulled the cylinders, I'm

19    talking about these trolleys that it was on,

20    it was in the open.  When -- when they

21    pulled them, in other words, it could rain

22    on it or whatever.  There was nothing.  All

23    right.  Later the shed was extended over the
```

1    existing rails that was there for the

2    trolley.  This shed was not in existence.

3         Now, this was cemented between the

4    rails and everything, at that time.  And

5    there was an area, if you will notice in

6    these pictures, the offset like in the

7    build --

8         Q    I apologize, Mr. Roberts.  Would

9    you mind turning that toward the camera.

10   Thank you.

11        A    It was offset.  This was

12   designated to be used as a drip pad over

13   here, the more less offset in the building.

14        Q    Okay.  I think we're almost out

15   of tape, Mr. Roberts.  So we may just take a

16   quick break and let them change over, if

17   that's okay.

18             THE VIDEOGRAPHER:  Going off the

19             record.  This is the end of tape

20             5.

21   (Whereupon, a short break was taken.)

22             THE VIDEOGRAPHER:  We're back on

23             the record.  This is the beginning

1             of tape 6.

2                 (Whereupon, Defendant's

3             Exhibit Number 3 was marked and

4             attached to the deposition.)

5    BY MR. ARNOLD:

6        Q    Mr. Roberts, before our break, I

7    was asking you a couple of questions about

8    the drip pad at the facility.  And what I

9    would like to do is show you an exhibit.

10   This would be marked Defendant's Exhibit

11   Number 3 for the Roberts deposition.  And

12   sir, as before, I'm only going to ask you

13   about an item on a couple of particular

14   pages.  In this case, sir, I'm looking at

15   the page number -- the last three numbers in

16   the right lower-hand corner are 549.

17               MR. MITCHELL:  For the record,

18             Defendant's Exhibit Roberts 3 is

19             LPC000595425 through LPC00059597.

20               MR. ARNOLD:  Thank you, Counsel.

21               MR. MITCHELL:  I just don't want

22             to get lost.

23

1    BY MR. ARNOLD:

2         Q    And, again, sir, you can

3    certainly look through the document.  I'm

4    going to ask you about a particular page

5    just because it had to do with the drip pad.

6              MR. MITCHELL:  What page is that?

7         Q    It is -- the last three numbers

8    are 549 in the lower right-hand corner.  If

9    you look, Mr. Roberts, at the paragraph in

10   the middle of that page, it actually is just

11   a single sentence there.  Where it says,

12   "Part of the current drip pad."  I wanted

13   to -- going back to the time when you

14   started at the plant, I think you said you

15   started in either 1977 or 1978?

16        A    Seventy-eight.

17        Q    Seventy-eight.  Thank you, sir.

18   Do you recall that there was a drip pad in

19   place when you started there?

20        A    No, sir.

21        Q    Okay.  If you look in the next

22   paragraph, there's a sentence there about

23   Koppers.  And it says, "The site was

```
 1    purchased by Koppers in 1981 and they added
 2    to the original treating plant slab with the
 3    1981 and 1985 additions."  Do you recall the
 4    Koppers Company coming on the site at any
 5    point in time?  With -- regarding --
 6         A    Wait a minute.  Wait a minute.
 7         Q    I'm sorry.  Regarding the drip
 8    pad?
 9         A    As far as knowing it was Koppers,
10    I do not know.
11         Q    Okay.
12         A    There was some people come at the
13    time about -- about the time this top was
14    put on there was some come.  But as far as
15    knowing -- I remember seeing them in there.
16    As far as to the drip pad -- that was
17    constructed in 1968 --
18         Q    Yes, sir.
19         A    -- that amounted to cement
20    between the rails.
21         Q    Okay.  Thank you, sir.
22         A    As far as that -- other than
23    that, that was it.
```

```
 1              MR. MITCHELL:  Excuse me,

 2              Counsel, this -- I want to see

 3              where the error is.  In -- in a

 4              hearing before Judge Watson, he

 5              asked both defendants if these

 6              were the proper defendants named

 7              and if these were all the

 8              defendants that operated the

 9              facility.

10              MR. ARNOLD:  But, Counsel, can we

11              just --

12              MR. MITCHELL:  Now, did Koppers

13              own this facility at any time?

14              MR. ARNOLD:  Can we go off the

15              record for a minute?

16              MR. MITCHELL:  Yeah, that's fine.

17               (Off-the-record.)

18              THE VIDEOGRAPHER:  Back on the

19              record.

20   BY MR. ARNOLD:

21       Q    The only other question I had

22   regarding this exhibit, Mr. Roberts, was if

23   you look at the cover page, just at the
```

1    front, you see at the bottom here, it says a

2    company, McPherson & Associates, structural

3    engineers, do you see at the bottom, sir, of

4    the exhibit?

5                MR. MITCHELL:   What page is that?

6        Q    It's the cover page.

7        A    Well --

8        Q    Actually, I hadn't asked -- the

9    only question I was going to ask you, sir,

10   is whether you recall this company,

11   McPherson & Associates, coming onto the site

12   to do an assessment of the drip pad?

13       A    I did not.

14       Q    Okay.

15       A    I do not.  And what year was they

16   supposed to have done it, '96?  October 6,

17   '96?

18       Q    It appears that way.  You don't

19   recall?

20       A    I do not recall no such company

21   coming.

22       Q    Okay.  All right.  I don't think

23   I have anymore questions about this exhibit.

1      I think earlier, Mr. Roberts -- I'm sorry,

2      I'm going to switch gears on you again and

3      ask you some questions about the wood

4      treatment chemical, if that's okay?

5           A    Go ahead.

6           Q    Okay.  I believe, sir, you

7      testified earlier that the facility ceased

8      to use pentachlorophenol prior to the site

9      closing, as a wood treatment chemical.

10          A    Yes.  They did use the penta

11     before -- during the time of the wood

12     treatment, they did use penta.

13          Q    And was there a point in time

14     where they stopped using penta at the

15     facilities?

16          A    Yes, sir.

17               (Whereupon, Defendant's

18          Exhibit Number 4 was marked and

19          attached to the deposition.)

20     BY MR. MITCHELL:

21          Q    Okay.  I wanted to show you what

22     we will mark as Roberts Defendant's Exhibit

23     Number 4 for your deposition, which is a

```
1     letter.  In the first paragraph of this

2     letter, Mr. Roberts, do you see the sentence

3     that begins, "This is to advise you"?  Is

4     that a -- I'm sorry, sir, is that a yes?

5          A     Yes, I read the --

6          Q     Okay.

7          A     What's the question?

8          Q     My question is whether the date

9     that's in that first sentence that says it's

10    the last --

11         A     I can't -- I can't tell you that

12    now.  I can't remember dates like that.  I

13    mean, I --

14         Q     Okay.  I was simply going to ask

15    you the question:  If that date or time

16    frame, March 1984, is consistent with your

17    recollection of when pentachlorophenol --

18         A     Probably is.

19         Q     -- stopped to be used?  Okay.

20    That was my only question about that letter.

21    Thank you.  Now, I also believe,

22    Mr. Roberts, also earlier today you

23    testified that the facility used creosote at
```

1    a point in time to treat wood.

2         A    Right.

3         Q    Is that correct, sir?

4         A    Right.

5         Q    And I believe you also testified

6    that at a point in time the facility stopped

7    using creosote to treat wood?

8         A    Right.

9         Q    Okay.  In fact, I think you

10   testified previously, Mr. Roberts, that you

11   thought that that date might have been

12   around 1985, is that correct, sir?  Am I

13   recalling your testimony correct?

14        A    Right.

15             (Whereupon, Defendant's

16             Exhibit Number 5 was marked and

17             attached to the deposition.)

18   BY MR. ARNOLD:

19        Q    Okay.  Let me show you what

20   we're -- will be marked as Defense Exhibit

21   Number 5 to your deposition.  And I have a

22   couple questions about the information

23   that's listed in paragraphs three, four, and

```
1      five.  But take as much time as you would to

2      look that document.  It's from EPA, U.S.

3      Environmental Protection Agency.

4                MS. McCONNELL:  Oh, I'm sorry,

5                you have -- did you read the note

6                on that -- oh, no.  You --

7                MR. MITCHELL:  Let's ask the

8                witness what the document is.

9                MR. ARNOLD:  Sure.  I was just

10               giving him a chance to review it.

11               MR. MITCHELL:  I don't -- I don't

12               want any -- I don't want -- I

13               don't want any of these lawyer

14               witnesses now.

15               MR. ARNOLD:  I understand.

16               THE WITNESS:  They're talking

17               about the impoundment.  Are they

18               talking about the ponds;

19               impoundment 2 and impoundment 3?

20     BY MR. ARNOLD:

21          Q    Mr. Roberts, I'm not certain my

22     questions are going to actually be regard to

23     paragraph 3 -- basically paragraph 3 and
```

```
 1    some information that follows.

 2              MR. MITCHELL:  May we just step

 3              outside, not necessarily take a

 4              break?

 5              THE VIDEOGRAPHER:  Are we going

 6              off the record?

 7              MR. CADE:  Yes.

 8              THE VIDEOGRAPHER:  Are we off?

 9              MR. CADE:  Yes.

10                (Off-the-record.)

11              THE VIDEOGRAPHER:  Back on the

12              record.

13    BY MR. ARNOLD:

14         Q    Have you had a chance to look at

15    the document, Mr. Roberts?

16         A    Yes, sir.

17         Q    My question, Mr. Roberts, is

18    whether in paragraph 3, on the first page,

19    where it says that "as of October 31st,

20    1985, the last wood treatment with creosote

21    occurred," whether that was consistent with

22    your recollection?

23         A    Yes, sir.  Somewhere thereabouts.
```

```
1          Q    Okay.  And then the paragraph

2     that follows, sir, that's number -- number

3     4, all right, there's a reference to a

4     company, I will probably pronounce it wrong,

5     Cahaba Pressure Treated Forest Products,

6     purchasing and removing 110,640 pounds of

7     creosote coal tar solution.  Do you recall,

8     sir, a company by that name coming to the

9     site to collect the remaining creosote?

10         A    No, sir.

11         Q    Okay.

12         A    Which now I -- I was in and out.

13    I wasn't there all the time.

14         Q    Okay.  And that's my only two

15    questions regarding that document.  Thank

16    you, sir.  The other wood treatment

17    chemical, Mr. Roberts, you testified earlier

18    about was CCA --

19         A    Yes.

20         Q    -- if I recall?  And I believe

21    your earlier testimony was that the facility

22    resumed using CC -- CCA after it stopped

23    using pentachlorophenol, is that correct,
```

```
1    sir?

2                MR. TER MOLEN:  Objection.

3            Misstates testimony.

4         A    I think so, thereabouts.

5         Q    Okay.  And, sir, do you recall --

6    stop that -- with that question there.  If

7    it's okay, Mr. Roberts, I was going to ask

8    you a few questions about the treatment box.

9    I believe you testified earlier,

10   Mr. Roberts, that the pond number 1 -- and

11   it may be helpful if we look back at -- see

12   maybe one of the aerial photographs with a

13   picture of the ponds will help out.  Let's

14   look at -- if you could look, sir, at

15   Plaintiff's Exhibit Number 1, the 1980 --

16   1978 aerial.

17        A    All right.

18        Q    I believe you testified earlier,

19   Mr. Roberts, that pond 1 was closed around

20   1980; am I recalling that correctly?

21        A    Yes, approximately.

22        Q    Okay.

23        A    I'm guessing at the dates now.
```

1          Q     Okay.  Do you recall, sir,

2     approximately when pond 2 was taken out of

3     service?

4          A     All right.  It was shortly after

5     you stopped with your treatment of creosote,

6     and, evidently, the two paragraphs above

7     where you started, they're talking about

8     impoundment number 2 and impoundment number

9     3.  So they're giving a date here of

10    November 6, '85.

11         Q     And is that date consistent with

12    your recollection, sir?

13         A     Somewhere along there, yes.

14    Because when they quit with the creosote,

15    they had to do away with it.

16         Q     So is my -- my understanding

17    correct, sir, that pond number 2 was used to

18    take the waste water from the creosote used?

19         A     Yes, sir.

20         Q     So it's your testimony or your

21    recollection that once the creosote was no

22    longer used, pond 2 was taken out of

23    service?

1      A     Right.

2      Q     Okay.  Thank you, sir.  Other

3    than -- Mr. Roberts, other than water

4    associated with using pentachlorophenol or

5    creosote, what other water was generated

6    from facility operations, whether -- you

7    know, whether it's from lumber or something

8    else?  Can you recall any?

9      A     Well, you had condensation to the

10   point when the -- you change the temperature

11   drastic.  But other than that, rain water --

12     Q     Okay.

13     A     -- falling in the ponds.

14     Q     Was there any rain water

15   associated with the boiler operation?

16     A     None of this water from the

17   treatment plant.

18     Q     No, no.  I just meant apart from

19   the treatment plant, any water associated

20   with operating the boiler that you can

21   recall?

22     A     Definitely.  You've got to have

23   water to make steam.

1        Q    Okay.  Was there any water

2    generated as a result of using it in the

3    boiler that didn't have to be discharged,

4    that you can recall?

5        A    Repeat that question again.

6        Q    Sure.  As part of the boiler

7    operation, was there any water left over

8    that was discharged or had to be discharged

9    from the boiler?

10       A    You would have a blow down,

11   basically, every few days to be sure that

12   the -- the valve and everything inside your

13   boiler was working properly and that you

14   could blow it out if you needed to.

15       Q    Okay.

16       A    Other than that, that was --

17   basically, no is the answer to your

18   question.

19       Q    Okay.  Fair enough.  How about

20   with regard to the dry kiln, was there any

21   water generated as a result of putting wood

22   in the dry kiln?

23       A    You would have the steam coming

```
1     back.  All right.  We had a reclaim system

2     from the dry kiln that actually brought part

3     of this water back, because it more less a

4     closed system, it was not contaminated.  And

5     you had your boiler chemicals that you had

6     already put in the water, and it actually

7     saved them money reusing this water because

8     the chemicals -- the boiler chemicals is

9     already in it.

10         Q    Okay.  Do you recall a point in

11    time, Mr. Roberts, where pond number 3 was

12    used to either store rain water or for fire

13    fighting purposes?

14         A    Negative.

15         Q    Don't recall that?

16         A    Negative.

17         Q    Now -- I'm sorry.  Go ahead.  I

18    was going to ask you, Mr. Roberts, do you

19    recall -- I'll ask it this way:  You

20    testified earlier that for using CCA, there

21    was no waste water generated from the CCA

22    process, is that correct?

23         A    No, there was not.
```

1        Q    There was no water generated.  So

2   there was no water associated --

3        A    There was water added along,

4   depending on the weight of the solution you

5   wanted.  But there was no -- in other words,

6   you didn't use the heat on the treatment

7   itself.  And it was a water-based solution

8   that went through it.  So, basically, there

9   was no water wasted or generated.

10       Q    Okay.  So there was no -- if I

11  understand your testimony, sir, there was no

12  water generated from that process that was

13  then discharged to a pond?

14       A    No.

15       Q    Mr. Roberts, once pond number 2

16  was closed, do you recall that it was

17  actually -- whether it was excavated or any

18  of the sludge and sediment was cleaned out?

19       A    Yes, sir, it was.

20       Q    Okay.

21       A    It was cleaned out.  There was a

22  solution poured in it of peroxide, and there

23  was also ashes was brought in to try to soak

```
1    up what was left, scattered out over it.

2         Q    Okay.

3         A    But they still didn't get it all.

4         Q    And, sir, do you recall whether

5    that material that was dug out from the pond

6    was then taken off site for disposal?

7         A    Most of it was hauled to Emelle,

8    Alabama.

9         Q    And do you recall the company,

10   sir, that hauled it off to Emelle, Alabama?

11        A    I think it was Godwin Trucking or

12   Godwin Industries, something like that.

13             (Whereupon, Defendant's

14             Exhibit Number 6 was marked and

15             attached to the deposition.)

16   BY MR. ARNOLD:

17        Q    Let me mark as our next defense

18   exhibit number -- let me show you, sir, what

19   we marked as Defense Exhibit Number 6 to

20   your deposition.  I'll give you a chance to

21   take a look at that for a moment.  And tell

22   me when you're -- you've had chance to look

23   at it, sir.
```

```
1          A     I was there.

2          Q     Okay.  And you've mentioned you

3     recall that the material from the pond was

4     sent to a location in Emelle, Alabama, is

5     that correct, sir?

6          A     All right.

7          Q     Does the name at the top of this

8     document, Chemical Waste Management, do you

9     recall whether that was the name of the

10    company that operated that facility in

11    Emelle?

12         A     I don't know.

13         Q     Okay.

14         A     I think the trucks was Godwin

15    trucks, a local company.

16         Q     Okay.

17         A     That -- that's all I know.

18         Q     Okay.  You don't recall the name

19    of the company in Emelle?

20         A     I don't know.  I didn't handle

21    none like this.

22         Q     Okay.  I just wanted to double

23    check.  Thank you, sir.  Mr. Roberts,
```

1    earlier you testified that one of the

2    activities you performed was removing ash

3    from the boilers, is that correct, sir?

4        A    I have done it, but that wasn't

5    normally my job.

6        Q    Okay.  But you did do it on

7    occasions, sir?

8        A    I have.

9        Q    And I think earlier you drew, as

10   a exhibit to your deposition, a depiction of

11   the pan that was used for collecting the

12   ash?

13       A    Right.

14       Q    Okay.  I just want to show you a

15   photograph, if it's okay, sir.

16       A    It will be fine.

17            (Whereupon, Defendant's

18            Exhibit Number 7 was marked and

19            attached to the deposition.)

20   BY MR. ARNOLD:

21       Q    This will be Defense Exhibit

22   Number 7 to Mr. Roberts' deposition.

23       A    If you had it, you ought not had

1    me drawing it.

2         Q    Well, I forgot I had it after you

3    had already drawn it.  I apologize.

4              MR. MITCHELL:  This is number 7?

5         Q    That's correct, Counsel.  And my

6    question is simply this, Mr. Roberts,

7    whether that pan that's shown in that second

8    photograph is -- either was one of the pans

9    that was used to collect the ash?

10        A    Right.

11        Q    Okay.  That's the only question I

12   had about that.  I just wanted to make sure

13   I had the right pan.  And I think you

14   testified earlier, Mr. Roberts, there was a

15   point in time where the ash was taken to a

16   container, as opposed to taken out to, I

17   think you said the south area of the

18   facility.  Do you recall that, sir?

19        A    Most of it was scattered on the

20   south area side.

21             (Whereupon, Defendant's

22             Exhibit Number 8 was marked and

23             attached to the deposition.)

```
 1   BY MR. ARNOLD:

 2        Q    Okay.  I'm going to show you what

 3   we've marked Defendant's -- as a Defendant's

 4   Exhibit Number 8 to your deposition.  Again,

 5   it's just another photograph.  And my -- my

 6   question was simply this -- again, I'm sorry

 7   we didn't have this in hand earlier.  I just

 8   wanted to ask you if that was -- that

 9   photograph is the container that was used

10   for the ash?

11        A    This was done right at the end of

12   the operation.

13        Q    Okay.

14        A    That was -- that was -- that was

15   the system right there for years.

16        Q    Okay.

17        A    But this deal right here, after

18   that -- was brought right at the tail end of

19   operation.

20        Q    Okay.

21             MR. MITCHELL:  And, for the

22             record, let -- let it be shown

23             that when he said "this deal right
```

```
 1                here," he was holding what's been

 2                marked as Roberts Defendant's

 3                Exhibit 8.

 4        Q    Correct.  Thank you, Counsel.

 5   Mr. Roberts, you also testified earlier

 6   certain wastes from using pentachlorophenol

 7   was put into the facility boiler, is that

 8   correct, sir?

 9        A    Right.

10                (Whereupon, Defendant's

11                Exhibit Number 9 was marked and

12                attached to the deposition.)

13   BY MR. ARNOLD:

14        Q    I'm going to show you what we're

15   marking as Defense Exhibit Number 9 to your

16   deposition and ask you to take a look at

17   that, please, sir.  And just let me know

18   when you've had a chance to look at that

19   document, please, sir.

20        A    What was the date you had that

21   you closed penta, that last date you had,

22   since you're getting down to dates?

23        Q    Well, sure.  I think the date
```

1    that you're referring to is an earlier

2    letter.  Let me see if I can find it.  It

3    was Exhibit Number -- let's see.  I

4    apologize.  Four, there it is.  Thank you.

5    And my only --

6         A    See, the dates on here coincide

7    with the date here?

8         Q    Yes, sir.

9         A    Ain't a thing in the world but

10   covering his butt.

11              MR. TER MOLEN:  I'm sorry?

12        A    He's covering -- I mean they're

13   covering.  Yes, they got rid of it.  They

14   ceased operation the 15th of March in '84,

15   and this right here, the 15th of March of

16   '84, "We've ceased burning pentachlorophenol

17   waste in the facility boilers."  If they got

18   rid of it and quit, there would be no more

19   in the boilers, if they got rid of it.

20        Q    And that was my only question,

21   Mr. Roberts.  I just wanted to ask you if --

22   if -- if that practice stopped at about the

23   same time or no later than the time they

```
1    stopped using pentachlorophenol?

2         A    It had to have.

3              (Whereupon, Defendant's

4         Exhibit Number 10 was marked and

5         attached to the deposition.)

6    BY MR. ARNOLD:

7         Q    Okay.  I just wanted to double

8    check those dates.  I'm going to show you

9    what we marked as Defendant's Exhibit Number

10   10 to your deposition.  And I just have

11   another question about dates.  Have you had

12   a chance to look at that document,

13   Mr. Roberts?

14        A    Is this all of it?

15        Q    That's the only part of it we

16   received.  And my question, sir, related to

17   the last sentence in that first paragraph

18   under "text" where it says, "No sludge from

19   the wood treating system was being burned in

20   the boilers."  Do you see that there, sir?

21        A    I see it.

22        Q    And then you look up at the top

23   by inspection date, it says April 1, 1985?
```

```
1           A     Right.

2           Q     And my question to you,

3    Mr. Roberts, is whether that --

4           A     The date on this letter, March of

5    '85?

6           Q     Yes, sir.  I just wanted to

7    confirm that, to the best of your

8    recollection, that practice had stopped;

9    putting waste material into the boiler

10   April 1985?

11          A     Right.

12          Q     Okay.  And if I could ask you

13   just one more moment, sir, to look at the

14   paragraph below that.  It's actually the

15   last complete sentence on that page.  Do you

16   see where it says, sir, "Sawdust is used as

17   an absorbent for any leaks and spills and

18   this is removed from the wood treating area

19   in drums."  Do you recall that practice,

20   sir, putting in spilled sawdust -- sawdust

21   used to collect spills in the drums?

22          A     I do not.

23          Q     You do not.  Okay.  Let me ask
```

```
 1    you, if I could, Mr. Roberts, just a couple

 2    more questions about material that was

 3    generated during the wood treatment process.

 4    I apologize.  We're almost to the end.

 5         A    I hope.

 6         Q    Okay.  I understand.  I

 7    appreciate your patience.  Do you ever

 8    recall, sir, a Koppers Company coming on

 9    site to remove material used in the CCA

10    process?

11         A    Yes, sir.

12         Q    Okay.  Did they -- how did they

13    collect that material?  Was it in drums

14    or --

15         A    Right.  It was --

16         Q    Okay.

17         A    -- in drums.

18         Q    Okay.  Do you recall how often

19    they came on site to collect?

20         A    No, I do not.  I do know we built

21    a special deal to hold the drums.

22         Q    Okay.

23         A    That's -- that's all I know.
```

1          Q    Okay.

2          A    It was basically a pan -- a

3     larger pan set up with the forklift where

4     when the truck came, it was put in drums.

5     And it was fixed to where you could run a

6     lift into it, pick it up, pull up to the

7     back of a truck and load it in the van.  He

8     strapped it to the sides and left.

9          Q    Okay.  And did that material that

10    was taken away by Koppers, was that material

11    related to the CCA process, leftover CCA

12    material, sir?

13         A    There was some.  All right.

14    Basically, what I remember going in there --

15    and I ain't trying to open another can of

16    worms here, but the system that was

17    installed to recover the creosote and penta

18    out of the branch that we was told that

19    would be run for 99 years or the duration,

20    as long as the plant runs, or it was to all

21    be dug up.  Well, that system was shut down.

22    They dug, but they ain't got it all.

23         Now, the reclaim from that system was

```
1     loaded in drums and put -- and shipped out.

2     Now, that's -- that was what most of the --

3     that I remember went on the -- in the drums.

4          Q    Okay.  And, Mr. Roberts, just to

5     make sure I understand your testimony, you

6     also recall that some of the material was

7     related to use of CCA?

8          A    No.

9          Q    No.

10         A    Some of it was.

11         Q    Yeah.  That -- I'm sorry, sir.  I

12    misspoke.  I meant to say just some of it.

13    Okay.  Do you remember, sir, what a company

14    called Hickson Corporation, whether they

15    ever came to remove material from the site?

16         A    What?

17         Q    Hickson Corporation.

18         A    Hickson?

19         Q    Yes, sir.

20         A    Not by that name, I can't.

21         Q    Okay.

22         A    What were they supposed to

23    remove?
```

1      Q     I'm not sure, sir.  That's the

2   reason I asked you.  Do you recall, sir, a

3   company called Terra First coming to the

4   site to remove any material?

5      A     Huh-uh.  What was the base on

6   these two companies you just named?  What

7   was the addresses for them?

8      Q     Oh, I'm sorry, sir.  For Hickson

9   Corporation, I believe Connelly, Georgia.

10      A     All right.  What about the other

11   one?

12      Q     Vernon, Alabama, I believe, for

13   Terra First, sir.  Doesn't ring a bell?

14      A     No, sir.

15             (Whereupon, Defendant's

16             Exhibit Number 11 was marked and

17             attached to the deposition.)

18   BY MR. ARNOLD:

19      Q     Okay.  Mr. Roberts, I'm going to

20   show you what we marked as Defendant's

21   Exhibit Number 11 to your deposition.  If

22   you could, just take a moment to look at

23   that, please, sir.

1          Okay.  Thank you.  I just had a couple

2     questions about that.  Have you had a chance

3     to look at this exhibit?

4          A    Yeah.

5          Q    In the first sentence there, sir,

6     it says, "This letter is to confirm that I

7     performed safety information meetings at

8     your location as follows."  And it lists the

9     Evergreen plant and the Lockhart plant.  Do

10    you see that, sir?

11         A    Right.

12         Q    Do you recall the representatives

13    of the Koppers Company coming to the

14    facility to perform safety operations?

15         A    No.  I was a millwright.  I

16    wasn't a treatment plant operator.  I don't

17    know nothing about this.

18         Q    Okay.  I wasn't certain.  I just

19    wanted to ask.

20              MR. MITCHELL:  What number is

21         this?

22              (Whereupon, Defendant's

23         Exhibit Number 12 was marked and

1          attached to the deposition.)

2     BY MR. ARNOLD:

3          Q     This is going to be Defense

4     Exhibit Number 12 to Mr. Roberts'

5     deposition.  Look at that for just a moment,

6     sir.  My question, Mr. Roberts, will be with

7     regard to the name down at number 20 on the

8     second page of that exhibit.  And just tell

9     me when you've had a chance to look at it.

10         A     That's mine.

11         Q     Okay.  You anticipated my

12    question.  That's your name, sir, there,

13    your signature out to the right?

14         A     Right.

15         Q     Second page of Exhibit Number 12?

16         A     Yes, sir, that's it.

17         Q     Okay.  Now, do you recall this

18    environmental training event that's

19    described on the first page?

20         A     To be honest with you, I do not.

21         Q     Okay.  But if you turn to this --

22    just turn one more moment, Mr. Roberts, to

23    the second page where you did confirm

```
 1    that -- down at 20, that is your signature?

 2         A    Right.  I was there.

 3         Q    Okay.  So while you don't recall

 4    it sitting here today, Mr. Roberts, you

 5    believe that you did sign this sign-in

 6    sheet --

 7         A    I signed it, yes.

 8         Q    -- for the training listed at the

 9    top?

10         A    Right.

11         Q    Okay.

12              MR. MITCHELL:  What was the date

13              of that sheet?

14         Q    Let's see, the training date in

15    the right-hand corner, it says 2/26/97, I

16    believe.  Okay.  Mr. Roberts, I think that I

17    have no more questions.  If I could just

18    take a moment and look at my notes.  Go off

19    the record.

20              THE VIDEOGRAPHER:  Okay.

21              THE WITNESS:  I want to ask you

22              one.

23              MR. MITCHELL:  We're back on.
```

```
1                THE VIDEOGRAPHER:  We're back on.

2                One moment.

3                MR. MITCHELL:  If you're going to

4                let him ask you one question.

5     BY MR. ARNOLD:

6          Q    Well, that's not generally how it

7     works.  But --

8          A    Like I say, I don't remember this

9     sheet.  And it's kind of odd that the

10    training facility is -- must be prepared to

11    accommodate 25 people and 60-something

12    signed the list.  I don't understand -- like

13    I say, I don't remember it.  I signed it.

14    It's my signature.  So that's all I want to

15    say.

16         Q    Okay.  Okay.  I appreciate that,

17    Mr. Roberts.  Thank you.  We can go off the

18    record.

19     (Whereupon, a short break was taken.)

20               THE VIDEOGRAPHER:  Back on the

21               record.

22    BY MR. ARNOLD:

23         Q    Mr. Roberts, I just wanted to
```

1    confirm, during the break I told you that I

2    was done and I did not have anymore

3    questions.  I just wanted to thank you again

4    for your time and your patience.  Thank you,

5    sir.

6           A     Not a problem.

7                 FURTHER EXAMINATION

8    BY MR. MITCHELL:

9           Q     And I'm Eason Mitchell back and

10   sometimes known as Mr. Eason and sometimes

11   known as Mr. Mitchell.  Mr. Eason is what

12   most judges call me.  So that's all right.

13   That's what almost every judge I practice in

14   front of calls me, Mr. Eason.

15                MR. TER MOLEN:  It's a wonderful

16            name.

17          Q     Buck, you -- in your examination

18   by the defendants, correct me if I wrong, I

19   think you told us that you observed or told

20   about pimples or breakouts on Donald Ezell,

21   Wayne Wise, Donnell Bradley, and Walt

22   Kimbrough.  Have you remembered anymore

23   since that question was asked?

```
1        A    No.

2        Q    All right.  What happened to

3    Donald Ezell?

4             MR. TER MOLEN:  Objection.

5             Foundation.

6        Q    If you know?

7             MR. TER MOLEN:  Same objection.

8        A    He had cancer.

9        Q    Is he alive or dead?

10       A    Dead.

11       Q    Wayne Wise?

12            MR. TER MOLEN:  Objection.

13            Foundation.

14       A    He's dead.

15       Q    Do you know why?

16       A    Cancer.

17       Q    Donnell Bradley -- Bradberry?

18            MR. TER MOLEN:  Objection.

19            Foundation.

20       A    He's alive.  He's living there in

21   Lockhart.

22       Q    Do you know if he's sick or --

23       A    No.  He's still working, I think.
```

```
1          Q     Okay.  And Walt Kimbrough?

2                MR. TER MOLEN:  Objection.

3                Foundation.

4          A     He lives east of -- west of

5    Lockhart.  And he's still alive.  Walt is --

6    the only problem I know of he's got is a bad

7    hearing loss problem.

8          Q     Did any of the corporations that

9    operated the facility ever provide you with

10   a number or a person to ask questions about

11   the nature of the materials and the

12   chemicals that you were exposed to?

13               MR. ARNOLD:  Object to the form

14               of the question.  No foundation.

15         A     No.  No, sir, not that --

16         Q     And I think you were asked if you

17   didn't tell the -- if -- if you told the

18   company anything about these pimples that

19   you heard about on the other men and was

20   breaking out your skin.  Was there any

21   reason why you didn't tell the company?

22         A     Well, most of them know -- most

23   of them knew that -- I mean, you had a job
```

```
1      to do and that was it.  Either that or you

2      go out the gate, basically, is what I meant.

3          Q    All right.  You said that you

4      talked to Ronnie Jackson about two and a

5      half years ago.  Who -- who was Ronnie

6      Jackson?

7          A    Well, he was a night watchman,

8      really.  He was a true friend of mine.  And

9      really he -- he helped me there with my

10     small farming operation part of the time.

11         Q    And what did Ronnie Jackson tell

12     you in that conversation that you were asked

13     about by the defense attorney?

14             MR. TER MOLEN:  Objection.  Asked

15                 and answered.

16         A    I don't know just what you're

17     referring to.  I mean it don't --

18         Q    What did Ronnie Jackson say when

19     y'all had the talk about the facility two

20     and a half years ago?

21         A    Well, he said that there was

22     going to be a lawsuit --

23             MR. TER MOLEN:  Same objection.
```

```
1                  Asked and answered.  Hearsay.

2         A     -- so -- and all.

3         Q     Did he tell you anything about --

4    that he knew about the operation of the

5    facility or anything he had done?

6         A     No, sir.

7         Q     Okay.  In one of your questions,

8    they asked you that -- about cutoffs.  And

9    you said that sometimes you would cut it if

10   they could sell it and come out.

11        A     Right.

12        Q     And -- and -- and you would cut

13   it.  Was that -- was that treated lumber on

14   occasion?

15        A     Yes.

16              MR. TER MOLEN:  Objection.  Asked

17           and answered.

18        Q     And where did the cutoffs go?

19              MR. TER MOLEN:  Objection.

20           Foundation.

21        Q     What was done with them?

22              MR. TER MOLEN:  Same objection.

23        A     Part of them was burnt in the
```

```
 1   boiler.  I won't say all of them was, but

 2   part of them was.

 3       Q    The ones that weren't burned,

 4   what happened to them?

 5       A    A lot of them got buried.

 6       Q    Okay.  You were asked about the

 7   people over you in the hierarchy.  Tobe

 8   Kelly, I believe, is a person you named.

 9   What has happened to Mr. Kelly?

10           MR. TER MOLEN:  Objection.

11           Foundation.

12       A    He died of cancer.

13       Q    Okay.  Do you know a man named

14   Ronnie Paul?

15       A    Yes.

16       Q    And have you ever seen him at the

17   facility?

18       A    Yes.  He was supposed to be

19   vice-president of the Louisiana Pacific

20   Corporation.

21       Q    And how often did you observe

22   Mr. Paul there at the facility?

23       A    Different intervals.  There
```

1    wasn't no set -- you might see him three

2    months, it might be six months, depending on

3    the situation.

4         Q    And did he ever talk to the men?

5         A    Yes.

6              MR. ARNOLD:  Object to the form

7              of the question.

8         Q    And in his talks to the men, did

9    he ever give you any education or warning

10    about the nature of the chemicals you were

11    dealing with?

12              MR. ARNOLD:  Object to the form

13              of the question.  No foundation.

14              Ambiguous.

15        A    Not that I recall.

16        Q    Did he ever give you any

17    instructions or warnings about the burning

18    of the treated wood or hazardous waste?

19              MR. ARNOLD:  Object to the form

20              of the question.  Ambiguous and no

21              foundation.

22        A    No.

23        Q    Can you tell me the names of the

1    workers that you can remember who -- who

2    worked in the treatment facility?  Let's

3    just say prior to 1995.

4         A    Prior to '95.  Wayne Wise, Walt

5    Campbell, Van Wagner, Donnell Bradberry,

6    Chester Ray Norris.  Some of the earlier

7    ones that worked there, there was a Jackson

8    man.  I can't recall -- it will come to me

9    after a while.  I can't tell you right now

10   his first name.

11        Q    Now, Walt Kimbrough, did you tell

12   us what happened to him?

13             MR. ARNOLD:  Object to the form.

14        A    He's still alive.

15        Q    Van Wagner?

16        A    He had a massive heart attack.

17   Dead.

18        Q    Chester Ray Norris?

19        A    He's still living.

20        Q    Where is he living?

21        A    Off County Road 45.  Leave 55,

22   heading east, he's on the right,

23   approximately four miles.

```
1          Q     And the Jackson man you told me

2     about?

3          A     He's dead.

4          Q     What of?

5                MR. TER MOLEN:  Objection.

6                Foundation.

7          A     I don't know.

8          Q     Is that Ronnie's cousin?

9          A     He would have been a distant

10    cousin.

11         Q     You answered a question and said

12    something about high grading pulpwood for

13    fence posts and barn poles.  Do you remember

14    that?

15         A     Yes.

16         Q     And when those fence posts or

17    barn poles was high graded for fence posts

18    or barn poles, was that to be made into

19    treated wood -- treated lumber?

20         A     The barn poles and fence posts

21    was.

22         Q     All right.  And what was done

23    with the cutoffs from the barn poles and
```

```
 1   fence posts, if there were any?

 2        A    It was burned in the tepee

 3   burner, at that time.

 4        Q    Now, you -- you -- you described

 5   something called an air stack between the

 6   lumber.

 7        A    Right.

 8        Q    Can you -- can you describe that

 9   just a little better.

10        A    It ain't a thing in the world but

11   a -- take a dressed board and you rip it in

12   one inch strips.  So, basically,

13   three-quarter by one inch, and you want them

14   every 18 inches or so apart.  All right.

15   The lumber is stacked on it.  The way --

16   they just laid between the lumber simply --

17   if you stack the lumber on top of each other

18   and it's green, it will glue bad before it

19   dries.  And, basically, that's what this

20   stick done, was kept apart.

21        Q    Was just allow the air to

22   circulate --

23        A    Right.
```

```
 1          Q    -- among all the boards?

 2          A    Right.

 3          Q    And separate all the boards while

 4     it was drying?

 5          A    Right.

 6          Q    And were those air sticks used to

 7     separate treated lumber?

 8          A    Most of the time --

 9               MR. TER MOLEN:  I'm sorry, I

10               didn't hear the question.

11          Q    Were they used to separate

12     treated lumber to dry?

13               MR. TER MOLEN:  Treated lumber.

14          Q    Treated lumber.

15          A    Yes.  They -- we used -- a lot of

16     times they would cut thinner strips if we

17     had to treat something to put between it.

18     In other words, if you had the two boards

19     laying tight on top of one another, the

20     liquid couldn't get between it as good.

21     They would use a thinner strip so they could

22     get more of the boards inside the cylinder

23     at the same time.
```

1        Q     And were strips used when the

2    treated lumber was drying on the facility

3    lumberyard so that the air could circulate

4    among all the boards?

5        A     Yeah.  Yeah.

6        Q     And was that all the time?

7        A     Yes, basically.  Yeah.

8        Q     Now, can you tell us about --

9    tell us about the cutoffs, where a piece of

10   lumber would be cut off for some reason

11   before it was sold?  Did that include the

12   CCA lumber at -- as well?

13       A     Yes.

14       Q     And where would those CCA

15   impregnated cutoffs go after the lumber was

16   cut?

17       A     All right.  Let me back up.

18   Mostly the CCA was not cut.  But on

19   occasions -- and it did make it's way to the

20   boiler.  Most of the time it was precut.  In

21   other words, it was treated as ever what

22   length was and it was sold that way.

23       Q     Okay.  Now, you were asked about

```
 1      the water and the sludge from the cleanup of

 2      the last pond.  Do you remember that?

 3           A     Yeah.

 4           Q     What -- do you know what the

 5      sludge on the bottom of the pond was like?

 6           A     Mulk.  Yeah.

 7           Q     What?

 8           A     You would -- you would have

 9      strips, even after they had dug it and

10      cleaned it, that -- I don't know how to

11      explain it, really.  But if you see a --

12      just like on a ditch bank or something, you

13      see the -- where the water has run, there

14      will be lower places.  All right.  A lot of

15      times on these high places, you would see

16      the -- the creosote pattern show up on the

17      side of the pond.  Which they had got in

18      there and basically dug, and that's what he

19      had the things and all where they hauled it

20      out.  But you still had this certain amount

21      of buildup around it.

22                MR. MITCHELL:  I think we need to

23                change tapes.
```

```
 1                THE VIDEOGRAPHER:  We're going

 2                off the record.  This is the end

 3                of tape 6.

 4      (Whereupon, a short break was taken.)

 5                THE VIDEOGRAPHER:  We're back on

 6                the record.

 7   BY MR. MITCHELL:

 8        Q    You were asked about the --

 9   Mr. Arnold asked you about the material that

10   was taken to a mill by, you said, Godwin or

11   Godwin Trucking?

12        A    Well, yeah.

13        Q    That was from the last pond

14   cleaned out.  Or you tell me.  Was it all

15   the ponds or the last one?

16        A    The last one.  Well, two and

17   three was closed together, basically.

18        Q    What happened to the water and

19   sludge that was in the first pond that was

20   closed?

21        A    It more less went over -- over

22   the hill.

23        Q    What do you mean "over the hill"?
```

1        A    Well, it was -- it was drained

2    down and --

3            MR. TER MOLEN:  Objection.

4            Foundation.

5        A    They was sawdust, bark, and all

6    put in there trying to soak up part of the

7    residue and all.  And then it was -- started

8    hauling dirt, putting in it.

9        Q    And what was done with that bark

10    and sawdust used to soak up the residue from

11    the bottom of the pond closure?

12            MR. TER MOLEN:  Objection.

13            Foundation.

14        A    Part of it was burnt and part of

15    it was buried.

16        Q    About what part was burnt and

17    what part was buried?

18            MR. TER MOLEN:  Objection.

19            Foundation.

20        A    It's hard to say.  I would say

21    the biggest part of it was buried.  And what

22    do you mean by "biggest part"?  Can you give

23    us an idea, your best judgement in

1    percentages?

2             MR. TER MOLEN:  Same objection.

3        A    I don't know.  Man, it's hard to

4    give you a figure.  I'd say probably at

5    least 75 percent of it was buried.

6        Q    And the other 25?

7        A    Burned.

8        Q    Was the amount of -- of waste in

9    the first pond closure about the same as the

10   amount of waste in the last pond closure?

11            MR. TER MOLEN:  Objection.

12            Foundation.

13       A    It would be strictly my opinion,

14   but I would have to say that the first

15   pond -- it may have been on account of the

16   way it was done, but I would think the first

17   pond would have been a little bit heavier

18   with the creosote contaminate.

19       Q    I would like to show you Defense

20   Number 6 that Mr. Arnold gave you and ask

21   you if you could look at that figure there.

22   I believe that's amount -- is that -- can --

23   what does Defendant's 6 say is the amount,

1    the weight, of the toxic waste that was

2    taken the fill -- hazardous waste landfill

3    by Godwin Trucking?

4              MR. ARNOLD:  Objection.

5              MR. TER MOLEN:  Objection.

6              Foundation.

7        A    925.80 tons.

8        Q    And do you have an opinion or

9    judgment from your own observations whether

10   the waste from the first pond closure that

11   was burned and buried on the site was more

12   or less than that amount shown on

13   Defendant's Exhibit 6 of 925 --

14             MR. TER MOLEN:  Same objection.

15             Asked and answered.

16       Q    -- tons?

17       A    Well, it's been too long to be

18   sure.  If my memory is right, the first pond

19   was smaller in size than number 2 pond or --

20   and all.  So I would have to think that if

21   you closed number 1, even though I said I

22   thought there was more contaminant, that

23   there would have probably been less to haul

```
1    off in number 1 than what you're showing

2    there.  But this is for 2 and 3, am I

3    reading -- is that right now?  This receipt,

4    is this for ponds 2 and 3?

5              MR. ARNOLD:  I'm not in a

6              position to answer, but I don't

7              know the answer to that question.

8                 (Phone ringing)

9                 (Off-the-record.)

10   BY MR. MITCHELL:

11        Q    Excuse me.  You were asked about

12   boiler chemicals.  What are boiler

13   chemicals?

14        A    Boiler chemicals?

15        Q    Uh-huh.

16        A    More less water softeners,

17   basically.

18        Q    Do you know what was in those

19   chemicals?

20        A    No, I can't tell you that.

21        Q    And what was done with them?

22        A    Well, they was put in the water

23   that went -- each boiler would have a
```

1     buildup of -- on your flues and everything.

2     And each boiler, they would take a sample.

3     And they had a -- had a deal set up that

4     would actually siphon so much and actually

5     pump so much chemical.  In other words, each

6     tank was supposed to have been regulated

7     different -- each boiler, I'm talking about.

8          Q     Okay.  And did you have any

9     cooling towers on the boiler water

10    reclamation system?

11         A     Not really.

12         Q     You were asked something about

13    the --

14         A     Let me correct something.  As for

15    a cooling tower, the distance between the

16    dry kiln and the boiler, the steam line was

17    overhead.  All right, it was a four-inch

18    pipe going, feeding the dry kiln.

19    Underneath it was the reclaim pipe up in the

20    air, underneath the four-inch.  The

21    four-inch was insulated.  So, I guess, if

22    you wanted to, you could call this pipe

23    would be the cooling system, as it went back

1     the distance going back to the boiler.

2          Q     Were there any anticorrosive

3     chemicals put into the boiler?

4               MR. ARNOLD:  Object to the form

5               of the question.  Ambiguous.

6          A     I don't know.

7          Q     You said something about a

8     practice of burning -- some of the burning

9     being stopped in '85.  Did -- was CCA waste

10    burned after 1985?

11         A     Well, it would have to have been

12    after '85 if -- yes, it was some burned.

13    Because we didn't start treating with CCA

14    until they had done away with the penta and

15    the creosote.

16         Q     And was the practice that you

17    described earlier of burning the CCA filter

18    materials and cutoffs, did that continue

19    during the entire time that Louisiana

20    Pacific used CCA for wood treating at the

21    facility?

22         A     Well, now, part of it did go --

23    some of that waste, mostly from the filter

1    system, was put in the drums, but there was

2    some of it was burned, too.

3        Q    And was for the -- did that

4    continue the entire time?

5            MR. ARNOLD:  Object to the form

6                of the question.  Asked and

7                answered.

8        A    Right.  The -- the -- later, like

9    I said, when they got to hauling the waste

10   to Emelle from the reclaim system, there was

11   less of it put in the boiler.

12       Q    But was it still put in the

13   boiler?

14       A    Yeah.

15       Q    Now, did any inspectors from the

16   company or any other companies or regulatory

17   agents ever come and ask you or any of the

18   other men, to your knowledge, about the

19   practices and what was being done to handle

20   toxic waste at that facility to confirm what

21   upper level corporate management had told

22   them?

23           MR. ARNOLD:  Object to the form

```
 1                  of the question.  No foundation.

 2                  Ambiguous.

 3                   MR. TER MOLEN:  Could you read

 4                  that question back, please.  I'm

 5                  sorry.

 6     (Whereupon, the question was read back.)

 7                   MR. TER MOLEN:  Objection.

 8                  Compound.  Foundation.

 9          A    I'm gone have to say no.

10          Q    Is that the truth?

11          A    Yes, sir.

12          Q    Thank you.

13          A    I know he's got where we went

14     to -- they had the little school meeting but

15     that's all.  My answer really would be no.

16                   MR. MITCHELL:  And that's all I

17                  have, gentlemen.  Thank you very

18                  much.  Are we finished?

19                   MR. TER MOLEN:  I have nothing

20                  further.

21                   MR. ARNOLD:  I have nothing

22                  further.

23                  DEPOSITION CONCLUDED
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                    CERTIFICATE

 2    STATE OF ALABAMA

 3    COUNTY OF BUTLER

 4        I hereby certify that the above and

 5    foregoing deposition was taken down by me in

 6    stenotype and the questions and answers

 7    thereto were transcribed by means of

 8    computer-aided transcription, and that the

 9    foregoing represents a true and correct

10    transcript of the testimony given by said

11    witness upon said hearing.

12        I further certify that I am neither of

13    counsel, nor of kin to the parties to the

14    action, nor am I in anywise interested in

15    the result of said cause.

16

17        _____

          RENNY MCNAUGHTON

18        Notary Public

19        My Commission Ends 11/06/07

20

21

22

23
```