# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| M.C. who sues by and through her mother and next friend, GAIL TATUM | ) ) ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION NO. 2:06- |
| vs. | ) ) | CV-00083-LES-CSC |
| PACTIV CORPORATION and LOUISIANA-PACIFIC CORPORATION, | ) ) ) ) | (LEAD CASE) |
| Defendants. | ) | |

## NOTICE OF TAKING DEPOSITION OF DEFENDANTS
## PURSUANT TO RULE 30(b)(5) and (6)

Please take notice that the Plaintiff will take the depositions of the representative or representatives of (1) Defendant Pactiv Corporation and (2) Defendant Louisiana-Pacific Corporation before a notary public, court reporter, or before some other officer authorized by law to administer oaths. The depositions will be recorded by videotape in addition to stenographic means.

| Deponent: | Date, Time, and Location: |
|---|---|
| Corporate Representative(s) of Defendant Pactiv Corporation | Monday, September 24, 2007 9:00 a.m. Embassy Suites 300 Tallapoosa Street Montgomery, AL 36104 |
| Corporate Representative(s) of Defendant Louisiana-Pacific Corporation | Wednesday, September 26, 2007 1:00 p.m., or upon completion of the deposition of PACTIV Embassy Suites 300 Tallapoosa Street Montgomery, AL 36104 |

1

## COURT REPORTER

The depositions will be taken pursuant to the FEDERAL RULES OF CIVIL PROCEDURE, before a court reporter, or before some other officer authorized by law to administer oaths.  The oral examination will continue from day to day until completed. Additionally, the depositions will be videotaped.  You are invited to attend and cross examine.

Pursuant to Rule 30(b)(5) of the FEDERAL RULES OF CIVIL PROCEDURE, the deponents are requested to produce for inspection and copying any and all documents upon which examination is requested.  Defendants are requested to identify and provide copies of all documents requested at least five (5) days before the first scheduled deposition.  A list with identification is sufficient for documents previously provided to Plaintiffs if provided during this requested time.

Further note that pursuant to Rule 30(b)(6), said corporate deponents shall "designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf", and that "The person(s) so designated shall testify as to matters known or reasonably available to said organization.

Further note that pursuant to Rule 30(b)(6), said corporate deponents shall "designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf", and that "The person(s) so designated shall testify with in-depth knowledge of the documents herein requested for said deposition."

## DEFINITIONS

1.    "Document" is used herein in its broadest sense to mean every document or other record of any kind, including without limitation, any written, printed, typed, recorded, filmed or graphic matter, however produced or reproduced, and any written or original, master, duplicate or copy.  "Documents" shall further include oral or visual records or representations (including, without limitation, photographs, microfiche, microfilm, videotape, sound recordings, motion pictures), and computer, electronic, mechanical or electric records or representations of any kind, including without limitation, any tapes, cassettes, disks, diskettes, recordings, programs, etc.  Documents shall include without limitation, any record of all or any portion of any discussion, communication, agreement, conversation, interview, meeting, conference, conclusion, fact, impression, occurrence, photographs, opinion, report, or other similar matter.

2.   If any defendant refuses to produce any document requested under a claim of privilege, then said defendant must state with respect to each such document the date of its preparation, the author(s), the recipient(s), the specific privilege claimed, and a sufficiently detailed description of the document in order to enable the plaintiffs and the court to evaluate the merit of such privilege. <u>A privilege list is required.</u>

3.   The applicable time period is from the date that you or your predecessor or any Defendant began operation of the facility to present, unless otherwise indicated.

4.   Whenever appropriate, the singular form of a word shall be interpreted in the plural and vice versa.

5.   This deposition notice is directed to each of the separate defendants in this case. Consequently, as used herein, the terms "deponent," "you," and "your" refer to the deponent and to all of its directors, officers, employees, and agents, to all of its <u>predecessors</u> and/or successors in interest (whether by purchase, merger, consolidation, and/or otherwise), to all of its subsidiaries, divisions, joint ventures, and/or affiliates, to any other entity and/or entities in which it owns and/or has owned any interest and/or share, and to its representatives, servants, distributors, insurance carriers, and attorneys, and/or anyone else acting on its behalf.

6.   The term "relate to" including, but not limited to, its various forms such as "relating to," shall mean: consist of, refer to, reflect, regarding, or be in any way relevant to the matter.

7.   "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any matters which might otherwise be construed to be outside the scope.

8.   "Communication" means any transfer and/or exchange between two or more persons of any information, whether by written, oral, electronic, and/or other means, including, without limitation, personal conversations, correspondence, telephone calls, telegrams, emails, and/or any other Document. THIS DEFINITION INCLUDES ALL COMMUNICATIONS FOR WHICH YOU MAY CLAIM A PRIVILEGE (IF A PRIVILEGE IS CLAIMED, PLEASE SPECIFY THE PRIVILEGE). A PRIVILEGE LIST IS REQUIRED AS DESCRIBED ABOVE.

9.   "Person" or "Individual" means the plural as well as the singular and includes without limitation any natural person as well as any firm, corporation, unincorporated association, partnership or other form of legal entity unless the context indicates otherwise.

10.  "State," "identify" (or "identity"), or "describe," when referring to any natural person (whether connected with identification of Documents, Communications, and/or otherwise), means to set forth the full name, present or last known residential and business addresses and phone numbers, including employer, title, and position of each such person for the period(s) to which any request herein refers, and the relationship of any such natural person to any of the parties to this

lawsuit. Once a person has been thus identified in a response, it shall be sufficient thereafter when identifying that person to merely state his or her full name.

11. "State," "identify," or "describe," when used in connection with a corporation, business, and/or government entity (whether connected with identification of documents, communications, and/or otherwise), means to state the full name and principal address of such entity, the name of the chief operating officer of such entity, the state of incorporation or other organization of the entity, the principal place of business of the entity, and the nature of the entity's functions for the period(s) including the relationship of such entity to any of the parties to this lawsuit.

12. "State," identify," or "describe," when referring to a Document, means to state the type of Document, the number of pages thereof, the subject matter thereof, the date thereof (and the date on which prepared, if different), the identity of each author, originator, and/or contributor thereof, the identity of each person who signed and/or was an addressee and/or recipient of the Document, including, without limitation, each addressee of any copy, and each present custodian of the original and each copy of the Document bearing any marking and/or notation not found on the original and/or other identified copy. Previously produced and described documents may be identified by Bates stamp number and a general description.

13. "State," "identify," or "describe," when used in connection with a Communication, means to state the subject matter communicated, the date and time when the Communication took place, the medium of Communication, the place or places where the Communication occurred, and the identity of each person who participated in, witnessed, overheard, or was otherwise contemporaneously aware of the Communication.

14. "Facility," "site," "mill" or "plant" refers to the wood processing plant located in Covington County, Lockhart, Alabama.

15. "Facilities" refers to all of your wood processing plants.

16. "ADEM" refers to the Alabama Department of Environmental Management.

17. "EPA" refers to the United States Environmental Protection Agency.

18. "SEC" refers to the Securities and Exchange Commission.

19. "SEC Disclosure Rules" concern three (3) major areas: (1) disclosure of material effects of environmental regulations on earnings, competition, and future capital expenditures; (2) environmental litigation; and (3) corporate environmental policy.

20. "Creosote," "coal tar creosote," or "creosote materials" refer to the mixture of the many chemicals they represent, including, without limitation, polycyclic aromatic hydrocarbons.

21. "PAHs" refers to Polycyclic Aromatic Hydrocarbons.

22. "CCA" means Chromated Copper Arsenate, or a group of chemicals known as Osmose.

23. "Penta" refers to Pentachlorophenol.

4

24.  "History" of the facility includes, but is not limited to: date of incorporation, sales or purchases, property transfers, type and magnitude of operations, any changes to the facility unites and operations with time, periods of shutdown/non-operation due mechanical breakdown, catastrophic events that required shutdown, the dates of such, duration, event description, the corrective actions taken, historic insurance and claims information, employment practices, management, compliance and regulatory history.  History also includes the purchase of, acquisition of, or mergers of the owners or operators of the facility/site including the terms and conditions of such transaction, environmental audits, assessments or "Due Diligence" performed on the facility as a result of the purchase of, acquisition of, or merger of the facility and any and all indemnity agreements contained in any purchase agreement, merger agreement, acquisition agreement or separate agreement between such parties regarding the facility/site, or with any of your parent, sister, subsidiary or predecessor corporations.

25.  "History" also includes the corporate history of your company and any all information and testimony regarding the merger or acquisition of assets of predecessor companies, including, but not limited to, the total purchase price which includes any stock offerings or stock swaps and the value of those stock offerings in regard to the purchase or merger of your company withy these companies, as well as  the environmental condition of the site at the time of merger or acquisition and any disclosures by any party to the merger or acquisition or to any state or federal regulatory agency with regard to the environmental condition of the site, including, but not limited to, any environmental liability associated with the site and the total sales and revenues generated by the facility located in Covington County, Lockhart, Alabama, from 1958 to present.

26.  Any other term not specifically defined may be understood according to the definitions stated in the American Heritage Dictionary, Second College Edition, published by Houghton Mifflin Company, Boston, Massachusetts; and in the context within which such words are used.


## AREAS OF TESTIMONY

The deposition will be taken upon oral examination before an officer authorized by law to administer oaths, and will concern the following subjects:

1.  The identity, job description and supervisor of each person, employee, or past employee, or agent, or contractor who is most knowledgeable on each document and each area of testimony set out in this notice.

2.   **TESTIMONY CONCERNING THE DOCUMENTS LISTED IN THE NEXT SECTION.**

3.   Testimony concerning documents previously produced or provided to Plaintiffs in this action and all documents requested by Plaintiffs in this notice or Plaintiffs' request for production of documents.

4.   Testimony concerning documents related to any of your defenses in this action.

5.   Testimony concerning documents related to any claims you may make for indemnity or contribution due to loss, costs or expenses of this action.

6.   Testimony concerning documents related to the defenses of any co-defendant in this action.

7.   Testimony concerning documents that you have provided to any co-defendant in this action, both during and before the notice of filing of this claim (including their predecessor, parent, sister, insurer, contractor, or related entity) which is related to the facility or issues of facility operation, remediation or for financial contribution.

8.   Any and all manuals and/or documents relating your corporation's public relations policy.

9.   The Deponent's document retention program and/or policy relating to the retaining, filing, indexing, accumulating, storing, compiling, retrieving and destroying of any and all documents, including documents stored at the facility and/or documents related to environmental matters.

10.  Each document requested that you contend you don't have to produce and who has possession of such document.  If said document was destroyed, why it was destroyed, who destroyed it and whether or not an electronic copy was kept of such document, and if so who has possession of such document or a copy thereof and where.

11.  Any information and documents that you provided to your workers, employees and management at the facility to describe chemicals used, effects of exposure, safety and environmental concerns, including when, how, where and what was said or provided to each employee.

12.  Any statements, video or audio recordings of witnesses, employees or former employees or contractors.  Please note that if you claim privilege or work product

6

privilege, that you must provide a privilege list as described by Defendants during depositions taken in this action on July 25 and 26, 2007.

13. Any presentations, documents, photographs, notices, letters, that you have provided to any insurance companies, adjusters, co-defendants, entities related to or predecessors or co-defendants, or any other entities where you were seeking or negotiating to seek indemnity for any losses or costs associated with the facility due to environmental contamination of any type, whether on the facility or off-site.

14. All information and reports of worker injury made to State Department of Industrial Relations.

15. Louisiana-Pacific or PACTIV's managers' environmental handbook.

16. Louisiana-Pacific's PACTIV's environmental handbook for employees.

17. The tape series of Louisiana-Pacific CEO Mark Suwyn.

18. Internal environmental auditing reports.

19. Any statements, recordings, investigations, videos or interviews of any potential witness or party to this litigation.

20. Any information or documents provided to or from any facility environmental or safety committee, including any recordings of the activities or meetings of such committee.

21. A description of documents produced to Plaintiffs in this action.

22. Whether or not you contend that any documents requested by Plaintiffs or relative to your defense or indemnity have been lost or destroyed, including the identity and fate of those documents.

23. Any documents that you have provided to any experts, witnesses or persons who you expect to give testimony in this case.

24. The identity of each and every former and/or current employee, including their name, position/title, address and telephone number, including cause of death if applicable, and  including, but not limited to, contractors, and/or subcontractors

retained who have been assigned any of the following job assignments from inception to the present to perform in any one or more of the following capacities at the facility: (1) Plant Manager; (2) Operations Manager/Supervisor; (3) Sales Manager; (4) Treating Supervisor; (5) Safety Director; (6) Risk Manager; (7) Industrial Hygienist; (8) Environmental Director; (9) Environmental Engineer; (10) Environmental Auditors and or Assessors; (11) Geologist; (12) Hydrologist; (13) Health and human Resources Manager; (14) Public Relations Director; (15) Environmental Consultant; Environmental Pre-operation and Post-operation Compliance and Attorneys (16) Dioxin Task force Team Members.

25.  The employees at the facility, including, but not limited to, the number, job title or position, duties and number of shifts during each year of historical operations.

26.  The chain of command from local manager to the president and CEO of your corporation for each year during which you operated the facility and how your company educated its employees in environmental matters from CEO to labor.

27.  Selection, training, education, literacy and certification of employees who worked at the facility for any matters related to health, environmental or safety matters. This includes the criteria or reasons persons were assigned to certain jobs or tasks.

28.  The personnel file of every person who was a manager or supervisor at the facility and every employee who you contend was trained, certified or responsible for handling of hazardous waste at the facility during the relevant time period.

29.  Company travel and planes related to travel of Ronnie Paul to the State of Alabama and all payments to and contacts with Ronnie Paul from 1997 to Present.

30.  The selection of employees for environmental positions or positions relative to compliance with environmental or safety rules and regulations at the facility.

31.  All inspections of the facility for environmental, safety or hazardous chemical factors for each year during the relevant time period, including the nature of the inspection, the name of the person or entity conducting the inspection and any documentation associated with inspection.

32.  Training for each and every employee for each year during the relevant time period, including the nature of the training, all documents associated with the training, the entity or person who provided the training concerning safety, hazardous chemicals, or environmental factors.  Include any records or methods used to determine employee participation.

8

33.  Whether or not you contend that any other person or entity is responsible for training and education of employees of the facility during the relevant time period.

34.  All certifications of operators or applicants of pesticides or wood treatment chemicals.

35.  Safety equipment or exposure prevention equipment supplied to workers and employees at the facility, including what devices, when used, how often, and including how much, when and where they were purchased.

36.  Alternatives considered or available for pollution control equipment.

37.  The identity of people, contractors, past employees, or employees who knew, did or were responsible for management environmental policies and compliance for each item in the areas of testimony set out in this notice.

38.  Safety equipment and chemical exposure prevention equipment that was provided to employees.

39.  Travel data and flight records concerning trips by any management or environmental managers to the facility.

40.  Supervision and control of any employees of your company or predecessors who you know were charged, indicted, investigated or convicted of criminal or regulatory violations related to environmental matters.

41.  The training and certification of employees for application of pesticides and/or wood treatment chemicals and their relationship to the day to day activities at the facility.

42.  What you now admit should have been done both in operation and technology to prevent environmental damage at or in the vicinity of the facility. This includes what you would have done differently if you had the knowledge that you now have concerning the operation of the facility and nature of the chemicals used.

43.  Air Permits, Title V permits and any other emission permits, including, but not limited to, the preparation and submission of such permit applications, and data gathered to prepare such applications for submittal to the appropriate regulatory agencies, including your compliance or lack of compliance and, air pollution

9

control devices implemented at the facility, including, but not limited to, the type of devices installed, when such devices were installed, the testing of these devices, and supervision to ensure their proper use and compliance.

44.     The submission of air emission related data required by regulatory agencies.

45.     Solid and hazardous waste, storage, use and disposal, including, but not limited to, RCRA Part A, RCRA Part B, RCRA investigations and assessments, Hazardous Waste Permits, Solid Waste Permits, Post Closure Plans and Closure Plans.

46.     Permitting and regulatory information referencing pesticide use and application as a matter of compliance with State and Federal law, or any applicable regulations or standards.

47.     Any and all regulatory information relating to compliance and enforcement, including but not limited to Compliance Orders, Consent Decrees, injunctions, lawsuits, penalties, fines, public complaints, Notices of Deficiencies, Notices of Violations, Notification of Exceedences, Compliance Evaluation Inspections, citations and compliance sampling.

48.     RCRA investigations at the facility, CERCLA investigations and any State or Federal Clean Air Act or Clean Water Act reporting requirements or violations for the facility.  This is intended to include any environmental audits, reports or plant environmental reports conducted by, or on behalf of your corporation and/or any regulatory agency for the facility, whether specifically prepared for reasons required by law or for any other purpose.

49.     State and Federal Community-Right-To-Know compliance, violation, and/or procedural protocol referencing community health concerns and documentation of such.

50.     Investigations related to the facility, including but not limited to, regulatory agency investigations, internal investigations, independent third-party investigations including all reports, correspondence, data, graphs, figures and diagrams prepared in connection with them, along with their findings and follow-up action taken.

51.     Compliance with rules and regulations of the Alabama Department of Environmental Management and compliance with the rules and regulations of the U.S. Environmental Protection Agency.

52.    All court orders or agreements with any regulatory agencies, which in any way affected your operation of the facility.

53.    Any citations or warnings that you have received from any regulatory agencies at any plant or facility operated or formerly operated by you between 1970 and the Present.

54.    Everything you did to comply and prove compliance with environmental regulations, including tests and studies, including where you obtained them and who you relied upon and what your company did or did not do to ensure compliance with environmental regulations and safety at the facility.

55.    Any and all information that you provided to medical providers, employees and community emergency responders and any other persons concerning the nature of the hazardous chemicals stored at your facility, or any hazardous chemicals which could have emanated from your facility and if you failed to do so, your reasons and documents related to such decision.

56.    Each and every thing you did to inform the community or medical providers or any other persons concerning chemicals used at or emanating from the facility which could have caused health hazards or effects in the surrounding area.

57.    Whether or not you complied with the EPA record keeping requirements of the wood treatment facility checklist dated June 19, 1996, at any time and the nature of each act of compliance as set out or described in the wood preserving report, appendices C through F, of the EPA.

58.    Whether or not you contend that the United States Environmental Protection Agency Office of Air Quality Planning and Standards of Emission Factor Group concerning emission factor documentation for AP-42 Sec. 10.8, the Wood Preserving Final Report, sets forth accurate methods for determining and measuring the quantity of waste emanating from your facility and if not why not and what methods would you contend are more accurate.

59.    Whether or not you contend  that you or chemicals emanating from the facility are exempt from CERCLA, or any other Federal or State law.

60.    Your compliance with the Emergency Planning and Community Right to Know Act, also known as SARA Title III.

11

61.     All programs related to storm water discharge, the National Pollutant Discharge Elimination System, Alabama Department of Agriculture regulations, Safe Drinking Water Act, Toxic Substances Control Act and/or Federal Insecticide, Fungicide and Rodenticide Act.

62.     All acts, regulations, decrees and agreements which you contend control, affected or regulated your handling, disposal, storage or use of hazardous chemicals at the facility during the relevant time period.

63.     All correspondence to and from any ADEM and EPA concerning operation of this or any other facility in the State of Alabama, including the preparation of such reports.

64.     The laws and regulations you contend applied to operation of this facility.

65.     Your compliance (or failure to comply) with OSHA Right to Know, 29 CFR 1910.1200, and what information and documents that were provided to employees.

66.     Any notices of any type of violations of any environmental laws or regulations or of any damages caused by release or exposure to toxic chemicals in the State of Alabama.

67.     The Deponent's policy and/or practice of dispensing or selling treated lumber products to employees or any person, including the expected use of such material.

68.     The disposal and/or treatment of sludges, process waste and wastewater from process operations and/or operational units for each type of waste for each year of operation.

69.     The locations of natural or manmade surface water flows, discharge points, ditches, streams, creeks, ponds or drainages on or in the vicinity of the facility and changes to their locations and/or size over time.

70.     Any investigations of natural or manmade surface water flows or ponds in the vicinity of the facility including but not limited to: memoranda/reports of any site investigations, engineering, or other documents, including data collected in the vicinity of these surface water pond, and chemical constituent concentrations in its sediments, adjacent soil and water and any modifications to these water structures,

12

including, but not limited to: movement of each segment, closures of segments, cleaning-out (excavations), enhancements and the disposal of material removed from them.

71.   Historic rates of discharges to surface water and/or ponds on or in the vicinity of the facility as a result of operations at the facility, including the chemical constituents and concentrations contained in them.

72.   Arguments between your operations section and "corporate" concerning use of wood fired boilers for chemical waste disposal.

73.   The disposal of excavated soils or sludges from the facility.

74.   Disposal of hazardous waste generated, used or stored at the facility, including the quantity of waste shipped off-site for each year of operation, its source and who paid for disposal.

75.   Transportation of hazardous waste from the facility.

76.   The operation of boilers at the facility.

77.   The disposal of Pentachlorophenol, creosote, CCA, contaminated waste (or any other hazardous waste at the facility) in the boilers or by burning. This includes your contentions, if any, that facility boilers or fire at the facility was a proper, safe or effective method of waste disposal and the effective operating temperatures of those boilers, burners or fires.

78.   The operation of and disposal of waste from the following methods and areas:

        a.    Ponds;
        b.    Aeration/spray field systems;
        c.    TeePee burners;
        d.    Injection into boilers, boiler exhaust or boiler smoke stacks;
        e.    Thermal evaporation;
        f.    Effluent filter or collection sawdust;
        g.    Drippage or waste collection areas;
        h.    Burning;
        i.    Burying;
        j.    Onsite disposal by any means;
        k.    Transportation and disposal to approved facilities, unapproved facilities, or any other entities or locations;

l.     Thermal evaporation and dehydration of treatment chemicals in holding tanks.

79.    The operation or failure of operation of pollution control devices at the facility, including disconnection.

80.    The purchase, operation and use of environmental equipment at the facility.

81.    Turning off or disconnection of pollution control devices at this facility, or any facility operated by your corporation.

82.    The dumping, disposal and fate of boiler ash.

83.    All environmental pollution control devices used at the facility and any devices or methods used to dispose of hazardous chemicals, or mixtures of hazardous chemicals at the facility, including any improvements to devices or methods used to dispose of hazardous chemicals, or mixtures of hazardous chemicals at the facility.

84.    Documents produced by Defendants show that Defendants learned of the hazards or lack of effectiveness of the spray evaporation system formerly used for pond water evaporation at the facility.  You will be asked what you learned, how you learned it, what, if anything, you did in response and to provide all documents associated with the matter.

85.    Why Louisiana-Pacific did not inform regulators about the extent of buried waste discovered at the facility within a few years of purchase.

86.    Why Louisiana-Pacific and PACTIV did not immediately inform regulators that a large amount of waste had been buried (or hidden) under the concrete drip pad.

87.    Why Defendants did not inform regulators or the community of the amount and nature of hazardous waste burned at the facility

88.    Each action you took in connection with the release or threat of release of any hazardous or toxic substance from the facility, and why and when you took each such action.

89.    Each action you declined to take in connection with the release or threat of release of any hazardous or toxic substance from the facility, and why you declined to take such action.

90.    The purchase of containers for the shipment of hazardous waste and the amount, if any, that was placed in containers for shipment, including the source of the waste, including the number of containers purchased each year.

91.    Plant construction diagrams, design, layout, and photos, including, but not limited to, property descriptions, maps, drawings, survey information, and locations of buildings, operational units, treatment systems, lagoons, ponds, land fields, spray irrigation fields, waste piles, creosote hole, disposal areas and storage area.

92.    Buildings and operational units, including treatment retorts, waste storage areas, boiler waste disposal areas and water collection,  including, but not limited to, the dates of construction/modification/replacement, physical features, period of use, historical use, fuel sources and types, design, height, capacity, type, and use of each building and unit and any changes with time.

93.    All photographs, drawings, maps, plats, and schematic diagrams, prepared by your and/or your consultants and contractors associated with the facility and the surrounding vicinity as a function of time, including but not limited to, aerial, fly-by and ground level photographs, including any in electronic format.

94.    The use of specific wood treating preservatives, by chemical name, commercial product name/number and chemical composition used at the facility, including, but not limited to, the time period of use, the types of preservatives used, the volumes of chemicals used by month and year, MSDS Sheets, product labels, hazardous waste manifest records and chemical inventory reports.

95.    Any and all chemicals stored, mixed or utilized in any part of the operations, processes, maintenance, cleaning, or treating at the facility, including, but not limited to, chemical name, commercial product name/number chemical composition, the volume of chemicals used by month and year, MSDS Sheets, product labels, hazardous waste manifest records and chemical inventory reports and its purpose and use.

96.    Suppliers of any and all preservatives and/or chemical utilized in any part of the operations, processes, maintenance, cleaning, or treating at the facility.

15

97.    The operational history of the facility, including, but not limited to, the days and hours of operation, periods of shutdown/non-operation, operational and maintenance records/reports, processes and techniques utilized and changes in type(s) or method(s) of process(es) utilized.

98.    The types, dimensions, and numbers of each wood product that was treated/processed at the facility throughout its history, by month and year, as well as the volume of preservative used, by month and year, including, but not limited to, treating logs and inventory reports.

99.    Upsets, spills, fires (including intentional burns and unintentional fire events), leaks, incidences, and other occurrences/events at the facility, including all reporting and actions taken.

100.    Air modeling simulations undertaken by, or on behalf, your corporation, for the facility in question, for any purpose, including the computer program used, assembled information and data ('raw' data), input and output data sets, assumptions and hypotheses made and conclusions derived from these simulations.

101.    Environmental submissions related to the facility, including but not limited to, environmental data associated with the EPA's Toxic Release Inventory (TRI - Form R).

102.    The amount or quantity of any and all hazardous chemicals emitted by your corporation at the facility during its term of operation during the relevant time period for each month of operation, including the time of day or night such emissions normally occurred.

103.    The amount and quantity of hazardous chemicals emitted by your corporation from each of the sources, including burning in the facility's boilers, thermalization, evaporation, aeration, whether by discharge into the air, soil, or water or by dust.

104.    The volume of wood treated, including the type of treatment chemical used, for each of the years that your corporation operated the facility. This includes the amount of treatment chemical injected or pressured into various amounts and types of wood.

105.    The quantity and type of each wood treatment chemical used by your corporation at the facility during the term of its operation which was purchased by you.

16

106.  The quantity and type of each wood treatment chemical which was disposed of by you, including records and methods of disposal.

107.  Any reports or studies whether generated by you or any other entity which you have made, studied or consulted which predicts the:

      a.  Amount of expected treatment chemical necessary to treat your products, or the

      b.  Amount of waste that should be expected to result from wood treatment operations.

108.  The hours and dates of operation of the facility during the relevant time period.

109.  The amount and kind of all hazardous chemicals purchased by you, including the amount and type of hazardous chemicals that you contend were emitted into the air, water or ground at the facility for each year of operation.

110.  The amount and types of any chemicals that you contend that you were entitled to emit from the facility, or that was safe to emit.

111.  Any studies that you conducted or consulted to determine the amount and nature of hazardous chemicals emitted from the facility.

112.  Material safety data sheets concerning hazardous chemicals used at the facility for each year during the time period that hazardous chemicals were used at the facility.

113.  The use and identification of carrier agents, whether it be water, diesel fuel, coal tar distillates, wood treatment oil for solvents, or wood treatment chemical carriers for each year of operation.

114.  All studies or information concerning the amount of chemicals lost or the amount of waste created by your wood treatment operations, or any similar wood treatment operations.

115.  The nature of each and every wood treatment chemical used by your corporation at the facility, including its color, odor, taste, detection, contaminants, hazardous nature, carcinogenity, mutantogenicinty, health affects caused by exposure, and the amount of both time and amount for all health affects.

116.  What you contend is produced, both in quantity and quality, from burning pentachlorophenol in the facility boilers.

117.  The fate of arsenic and/or hexavalent chromium compounds placed in fires or wood fired boilers similar to the facility boilers.

118.  The nature and amount of any material placed in the facility boilers, or disposed of at the facility other than lumber sales.

119.  Any other facilities that you contend emitted hazardous chemicals which affected the Plaintiffs, Florala or Lockhart communities, including the name of the facility you claim emitted such chemicals, the nature of the chemicals emitted, when they were emitted, the amount emitted, and the information that you rely upon to make such contention.

120.  Your method of determining the quantity and nature of hazardous waste generated or emanating from your facility by any means and of any type.

121.  Different wood treatment methods used by you at the facility for each year, including the amount of lumber treated by each method.

122.  The classification for each source of air, water or ground contamination.

124.  The nature of chemical constituents and percentage composition of each chemical constituent of each and every wood treatment chemical used by you at the facility, and the period of time that such chemicals were used, including, but not limited to, Creosote, Pentachlorophenol, Copper naphthenate, solubilized copper-8-quinolinolate, Alkyl ammonium compound, waterborne preservatives, Acid copper chromate, Ammouniacal copper arsenate, Ammoniacal copper zinc arsenate, chromated copper arsenate Type A, chromated copper arsenate Type B, chromated copper arsenate Type C, chromated zinc chloride, any other treatment chemicals, any measurements made of waste emanating and/or emissions at the facility, including quantity, quality, and when they were made or manufactured.

125.  Any research done by or know to you prior to or during the times that your company used wood fired boilers or TeePee burners for disposal of pentachlorophenol, creosote or CCA waste, which research concerned the safety of these activities.

126.  Your methods and data for determining the values, types and quantity of fugitive emissions from creosote treated wood, CCH treated wood, Pentachlorophenol treated wood and any other type of chemical treated wood for each year during the

18

operation of the facility and also fugitive emissions related to each aspect of your wood treatment operation.

127. Your methods and data for determining each and every source of emission of hazardous chemicals at the facility for each year during its operation by you.

128. The emission and methods of determining the amount of emissions or contamination by ash waste stored or emanating from the facility for each year during the relevant time period.

129. Each and every method of your identification of solvent and hazardous waste, and standards for generation of waste.

130. Your contentions regarding the quantity and nature of chemicals used at, emitted from, and/or released from the facility.

131. The history of the wood preserving site and the facility in Lockhart, Alabama, regarding its use and ownership dating back to when the wood treating operations began.

132. Environmental communications and/or documents concerning the facility, including, without limitation, internal memoranda, correspondence, permit applications, reports, closure reports/documents, independent third-party reports or documents between facility personnel and regulatory agency personnel, and vice versa.

133. Any and all insurance policies, insurance agreements under which any insurance policy may be invoked to satisfy part of all of the judgment which may be entered in this action, or to indemnify or pay any costs of defense, including the name of the person(s) or entity insured, the name of the insurer, the policy number, dates of coverage and the amount of any liability insurance coverage, including any agreements or settlements which may alter or amend any form or amount of coverage or indemnity under those policies.  This also applies to excess coverage and/or re-insurance agreements.

134. Any insurance carrier or insurance policy which has paid any claims in any way related to losses in whole or in part which included a wood treatment facility and

in particular the facility in issue, whether or not the claim was admitted or disputed.

135.  All claims and notices produced to your insurance carriers or indemnitors related in whole or part to indemnity or insurance coverage for any activities, losses or matters related to the facility and all presentations, correspondence, studies, material or other arguments, facts or materials that you used to support, argue or settle that claim.

136.  All settlement agreements, all documents and all other matters concerning the case of *Ketchikan Pulp Co., et al. V. Ace Indemnity Ins., et al.*, Case Nos. A01-223-CV-JWS and A02-0102-CV-JWS, in the U.S. District Court for the District of Alaska, and *Granite State Ins. Co., et al. v. Louisiana-Pacific Corp., et al.*, Case No. 4:01-CV-04842-CW, in the U.S. District Court, California Northern District (Oakland).

137.  All depositions and discovery which existed or were taken in *Ketchikan Pulp Co., et al. V. Ace Indemnity Ins., et al.*, Case Nos. A01-223-CV-JWS and A02-0102-CV-JWS, in the U.S. District Court for the District of Alaska, and *Granite State Ins. Co., et al. v. Louisiana-Pacific Corp., et al.*, Case No. 4:01-CV-04842-CW, in the U.S. District Court, California Northern District (Oakland).

138.  Your contribution or payment for remediation and/or occupation at the site.

139.  The percentage, if any, that your company has agreed to allocate to their share of responsibility for contamination at the site versus responsibility and share of the Co-Defendant and to what extent that division applies to responsibility for off-site contamination by air pathway.

140.  Notices that you have provided to any co-defendant in this action, including their predecessor, parent, sister or related entity concerning the facility. (Note applicable time period in definitions.)

141.  Negotiations for contributions to compliance with environmental regulations at the facility from 1982 to the present.

142.  Your acceptance or rejection of responsibility for the alleged cost of clean-up and/or environmental compliance at the facility.

143.    Your communication with any other Defendant in this action concerning environmental remediation, cost of environmental remediation, environmental quality, compliance with environmental regulations.

144.    Whether or not you contend that any other person or entity is responsible for hazardous waste emanating from the facility during the relevant time period.

145.    Whether or not you contend that any other person or entity is responsible for inspection of the facility during the relevant time period.

146.    Whether or not you contend that any other person or entity is responsible for any claim made by any plaintiffs in this action.

147.    Any agreements related to your purchase and operation of the facility including any indemnity agreements or agreements to distribute and share cost of environment study remediation or other matters and all documents related to those agreement and any claims that you may have asserted under those agreements.

148.    Control of the facility location and/or your contribution to expense of control, security, remediation and/or prevention of future contamination.

149.    The corporate structure and/or corporate flowchart of each Deponent, including the following: (a) the full and exact legal name in which its charter and articles of incorporation were issued; (b) the date and place of incorporation; (c) the names and relationships of any corporations or other business entities affiliated with each Deponent, including but not limited to, parent corporations and/or subsidiary corporations; and (d) the identities and addresses of the officers and board members of any and all corporations previously identified, including the identity of each member of any corporate environmental committees.  This area of testimony relates to the entity which operated the facility up to the present entity or defendant.

150.    Any and all Shareholders' Annual Reports for all corporations which had ownership or liability of the facility.

151.    The financial status of the facility, including tax returns, financial statements, ledgers, profit and loss statements and/or accounting records reflecting total revenues and/or total expenditures on an annual basis for the relevant time period.

152.   All Board, Shareholders, Board Committee, Environmental Committee and compliance Committee meeting minutes of your corporation and the corporation which operated, owned or were responsible for the facility.

153.   Corporate Policy Manuals and/or documents that govern the conduct of business operations, management, regulatory compliance, environmental protection policies, and safety policies of all of your companies including, but not limited to, Strategic Planning, Functional Planning, Financial Planning, Financial Record-Keeping, Capital Budgeting, Capital Expenditures, and Tax Planning for those activities.  Including your financial ability to provide alternative means of waste disposal.

154.   Any and all manuals and/or documents relating to employee benefit plans.

155.   Budgetary requests, budgetary increases and/or expenditures for environmental matters regarding the facility.

156.   The cost or your contribution to clean-up, maintenance or environmental compliance at the facility from 1958 to the present.

157.   The Deponent's plans or knowledge of the likely closing date or depletion date for the facility based upon any reasons, including depletion of forest products, markets or any other projections or predictions concerning the time during which the facility was expected to operate from time of purchase until closure.

158.   All requirements of your probation resulting from any criminal convictions and any of your company's efforts to prevent or minimize criminal responsibility of its officers, employees, directors and facilities.

159.   Costs of pollution control and devises used at the facility and costs or alternative methods of pollution control.

160.   Costs of savings from both transportation and disposal of all amounts of hazardous chemicals disposed of by burning, burial or dumping at the facility.

161.   Costs of savings from both transportation and disposal of all amounts of hazardous chemicals disposed of by discharge at the facility.

162.   Affairs overseen by the Environmental Affairs Committee of the Board of Directors related to any site in the State of Alabama.

163.   Affairs overseen by the Environmental Affairs Committee of the Board of Directors related to any site in the United States.

164.   Your investigation or receipt of Plaintiffs' counsel credit and financial reports and status.

165.   Criminal investigations, charges, indictments, or convictions of your company, its predecessors, or any of its management or personnel entrusted with environmental management during the applicable time period.

167.   Air monitoring or sampling performed at, or in the vicinity of, the facility, including but not limited to: ambient temperature, wind speed and wind direction at noted anemometer heights, barometric pressure, cloud conditions, concentration measurements of chemical constituents including particulate matter and constituents grouped according to their physical or chemical characteristics.

168.   Surface and subsurface water flow and /or contaminant transport modeling simulations undertaken by, or on behalf of, your corporation, for the facility in question for any purpose, including the computer program used, assembled information and data ('raw' data), input and output data sets, assumptions and hypotheses made, model calibrations, verifications, model applications, conclusions derived from these simulations, Groundwater Monitoring Reports, water sampling, water sampling results, water sampling results reported to regulatory agencies, Groundwater Assessments, Site Characterization Reports, Groundwater Sampling Reports, Groundwater Corrective Action Plans, Groundwater Remediation Programs, Corrective Action Performance Evaluation Reports, and all appendices, tables, figures, measurements, maps data, logs, results and attachments that accompany such reports, plans, studies and assessments. Please note that this area includes the means by which or determination of sampling, monitoring or removal site locations were selected.

169.   Sampling, boring or well locations on, or in the vicinity of, the facility associated with 'free' product  or concentrated areas of wastes, and  measurements and samplings of dissolved constituent concentrations in water or air collected on, or in the vicinity of, the facility, including but not limited to: chemical constituent sampled, analytical result, method of analysis, qualifiers, depth of sample, units of measurement, detection limits and selection of test times and locations.

170.    All domestic and other public and/or private wells on, or in the vicinity of, the facility.

171.    The identification and abandonment of wells on property in the vicinity of the facility or on the facility itself, including, but not limited to: well identification program, well locations, owners, dates of construction and abandonment, method and procedures of abandonment, well information records (depth, capacity, screened intervals, uses of water), measurement records, pumping rate records, chemical concentration samples, hydraulic and analytical date used to assess possible well abandonment, including your reasons for abandonment.

172.    Soil borings, soil samples and sediment samples collected on, or in the vicinity of, the facility, including, but not limited to, name, date of construction/replacement, date of sample, depth of sample, lithologic logs, boring depth, ground surface and top of casing elevation, location description and survey coordinates, concentration measurements of chemical constituents, method of analysis, analytical result, qualifiers, units, comments and all other measurement, lab, and analytical data associated with such, including any photographs or descriptions of those borings or samples.

173.    Risk assessments or health assessments performed on or offsite of the facility, including any in electronic format.

174.    Industrial hygiene studies, employee monitoring, medical surveillance data, health surveys, occupational health studies and/or exposure monitoring performed at any and/or all of your corporations' facilities for any and all types of health exposures in wood product manufacturing.    This includes health profiles, comparative community studies, community health profiles, epidemiology studies or any other health studies performed on the nearby residences and/or communities at any and/or all of your corporation's wood product processing facilities.

175.    Documentation and/or activities of the Dioxin Task Force or any similar internal or external organization, which studied or studies issues associated with dioxin and/or furan formation and releases as a matter of environmental compliance, concerns, or health risk.

176.    Demographic or epidemiological studies conducted by, or on behalf of your corporation relating to nearby residences or the community where the facility is located, or in any community in the vicinity of a wood product manufacturing facility.

177.  Scientific literature, worker studies, community studies, animal studies, epidemiological studies, toxicological studies and reports regarding the health effects of creosote, creosote constituents, pentachlorophenol, dioxins, CCA, or chemicals used, either presently or in the past, at the facility.

178.  Testing at the facility site or elsewhere within a five mile radius of the facility, whether it be blood, soil, air, dust attic samples, or any other form of environmental testing, including the date on which the tests were performed, what entities and persons were involved in the testing, all reports concerning the testing and the nature and purpose of the testing.

179.  All safety and exposure studies done or funded by you at the facility, or any other wood product facility operated by your corporation at any time.

180.  Any reasons or purposes that you contend that trial plaintiffs' diseases were caused by any other condition or circumstance other than exposure to hazardous chemicals emitted by your facility.

181.  Your contentions, if any, that hazardous chemicals emitted by your facility do not generally cause the type of health conditions of the trial plaintiffs.

182.  The sampling analysis methods that you contend are proper for determination of off-site contamination and determination of Plaintiffs' exposure to hazardous substances.

183.  The methods that you contend should be used in order to determine Plaintiffs' (or Plaintiffs' decedents) exposure to chemicals and substances alleged to have come from your facility, including primary and secondary air exposure, dust, soil, ingestion, or absorption.

184.  The relationship of the chemicals which Plaintiffs allege in their Complaint (CCA, arsenic, dioxin/furans, pentachlorophenol, creosote and their constituents) to have emanated from your facility with the likely cause of Plaintiffs' (or Plaintiffs' decedents) diseases (Ewings Sarcoma, lung cancer and brain tumor).

185.  The amount of exposure that you contend would be required both in amount and in distance and time for a person to suffer ill health effects from the hazardous chemicals that were emitted from the facility.

186.  Any studies that you conducted or consulted to determine any health effects related to hazardous chemicals emitted from the facility.

187.  The nature of any ill health effects that you contend or admit could or would result from exposure to the hazardous chemicals used or emitted from the facility, including the amount of chemical, concentration and time required to produce any adverse health effects.

188.  All information received by you, or provided by you, from or to any trade associations during the relevant time period concerning wood treatment, the operation of the facility, the operation of your corporation, or the safety of the wood treatment chemicals used by your corporation, or any other environmental matter.

189.  Risk assessments to workers or persons in the vicinity of this facility or any other facility which provide data which you contend is relevant to this facility.

190.  The name, address and written report of each and every person, corporation, entity which have been employed by you to do environmental or health studies related to wood treatment facilities, or the community of Florala/Lockhart.

191.  Any and all compounds detected in any creosote, pentachlorophenol or CCA samples, or samples of their waste at the facility for each year such chemicals were used.

192.  Any voluntary consumer awareness programs or other programs in which you participated concerning the nature of the chemicals used at your facility.

193.  Your contentions concerning the identity and nature of chemicals used at or emitted from the facility including your contentions on adverse health effects and time of exposure and amount required to cause adverse health effects.  What do you contend is bad enough to cause disease and if you contend that no adverse health effects caused to Plaintiffs and what type disease do you admit it does cause.

194.  What you contend are authoritative sources for information to calculate or determine amount of exposure and effects of exposure to chemicals used at or emitted from the facility.

195.  Any medical or environmental research funded or partially funded by you.

196.  Any studies on your employees or neighborhoods surrounding any of your facilities, whether by you or by any other entity.

197.   Any and all information and testimony concerning notice or expected expense for treating workers for either acute or chronic exposure to metals or toxic chemical at your facilities during the relevant time period.

198.   Your reasons, if any, for not testing for dioxin/furans in soil, water or air emissions, both on site and off site, including the selection, method and results of any dioxin/furan test sites if samples were taken.

199.   Whether or not you sampled air quality or historical air quality on site or off site and if not, why.

200.   What, if anything, you did or didn't do to determine locations of well sites and/or sampling times and locations.

201.   The history of soil excavations and remediation efforts conducted on, or in the vicinity of the facility.

202.   Everything done in connection with the remediation of the facility, including results of air samples, soil samples, water samples, or other tests.

203.   Appraisals of any and all property, residential or commercial, within a two mile radius of the facility or along the flood plain down gradient of the facility, as well as any and all purchases and/or leases of parcels of residential and/or commercial properties in the vicinity of the facility.

204.   All tolling agreements or agreements to toll statute of limitations with the plaintiffs or any other parties in this action.

205.   Any of your defenses to this action.

206.   All issues set out in the plaintiff's complaint.

207.   All of your other facilities which were sold to or purchased from any other Defendant in this action or their predecessors.

208.   Any communications and information provided to experts employed or consulted relative to the claims, defenses, facts and/or allegations in this action.

27

209.   Your duties related to operation of the facility and release or control of hazardous substances.

210.   The breach of your duty to control release of hazardous substances.

211.   The best practices for operation of the facility, pollution control devices and environmental protection during each year of operation.

212.   Issues regarding spoliation as defined by the Alabama Pattern Jury Instructions.

213.   Your pattern and practice of disregarding or violating environmental laws and regulations within the State of Alabama, including citations, warnings and contamination at other Alabama sites owned or operated by you.

214.   Any activities, notices, citations or other matters which occurred outside the State of  Alabama which could or reasonably should have put your company on notice that proper environmental protection was not being practiced in the State of Alabama or that there existed a failure or questionable compliance of your environmental management, employee training or corporate detection.

215.   Issues related to determination of damages, including the net worth of your company.

216.   Knowledge, position, activities and expected testimony of John Harrie, Ronald Paul and those persons listed in either Defendants' Rule 26 disclosures.

217.   The identity of each and every employee or contractor of the Deponent who was ever present at the facility, including the date of their presence and purpose from January 1, 2002, to present.  Please include the dates that they were present at the facility.

218.   The spoliation, destruction of documents, tampering of witnesses, contacts with plaintiffs and plaintiffs' families during the pendency of this litigation, or after you received notice of the fact that plaintiffs made claims against your company.

## DOCUMENTS REQUESTED

In accordance with Rule 30(b)(5) of the *FEDERAL RULES OF CIVIL PROCEDURE*, the Plaintiff requests that each Deponent produce, prior to or at the deposition(s) of its representative(s), the following books, papers, documents, and/or tangible things, if not already produced in this case:

1.  **EACH AND EVERY DOCUMENT EVIDENCING, REFERRING, OR RELATING IN ANY WAY TO EACH AND EVERY AREA OF TESTIMONY SET OUT ABOVE**.

2.  Documents related to any of your defenses in this action.

3.  Documents related to any claims that you may make for indemnity due to loss, cost or expense of this action.

4.  Documents related to the defenses of any co-defendant in this action.

5.  Documents that you have provided to any co-defendant in this action, including their predecessor, parent, sister or related entity.

6.  Notices that you have provided to any co-defendant in this action, including their predecessor, parent, sister or related entity concerning the facility, or its environmental condition or liabilities.

7.  All documents that you were required to generate or maintain under any statutes or any state or federal regulation, identifying who kept such documents, where such documents were kept, when they were generated and the nature and content of such documents.

8.  All documents requested by Plaintiffs in Plaintiffs' request for production of documents.

9.  Documents described in either Defendants' Rule 26 disclosures.

**Please note that a privilege list is required for any documents not produced, as described by defendants' counsel in depositions taken July 25 and 26, 2007, and as described in the definition section of this notice.**

Respectfully submitted this 10th day of August, 2007.

/s/ W. Eason Mitchell
W. EASON MITCHELL (MIT020)
The Colom Law Firm, LLC
Post Office Box 866
Columbus, MS 39703-0866
Telephone: 662-327-0903
Facsimile: 662-329-4832
emitchell@colom.com


## Certificate of Service

I, W. Eason Mitchell, hereby certify that on August 10, 2007, I electronically served the foregoing *Notice of Taking Deposition of Defendants Pursuant to Rules 30(b)(5) and (6)* to the following via e-mail:

Douglas Sheppard Arnold, Esq.
Dennis R. Bailey, Esq.
John C. Berghoff, Jr., Esq.
John A. Earnhardt, Esq.
R. Austin Huffaker, Jr., Esq.
Orlyn O. Lockard, III, Esq.
Edwin Bryan Nichols, Esq.
Laura Ellison Proctor, Esq.
Matthew C. Sostrin, Esq.
Mark R. Ter Molen, Esq.
H. Thomas Wells, Jr., Esq.
Bernard Taylor, Sr., Esq.
Gregory Andrews Cade, Esq.
Robert L. Palmer, Esq.
Richard Elder Crum, Esq.
Sean A. Simmons, Esq.
Roberta M. Wertman, Esq.


/s/ W. Eason Mitchell
W. EASON MITCHELL (MIT020)

30