IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GAIL BEDSOLE TATUM, as Mother
and Administratrix of the
Estate of MELANIE CHAMBERS, a
deceased minor child,

    Plaintiff,

vs.                                    CIVIL ACTION NO. 2:06CV83-LES
                                    (LEAD CASE)

PACTIC CORPORATION and
LOUISIANA-PACIFIC CORPORATION,

    Defendants.

_____/

    James J. J. Clark, Ph.D., being duly sworn, deposes and says:

1.     I work at 201 Wilshire Boulevard, Second Floor, Santa Monica, California. I graduated in 1987 with a Bachelor's Degree in Biochemical and Biophysical Sciences from the University of Houston. In 1993, I received a Masters degree in Environmental Health Sciences from the University of California at Los Angeles School of Public Health. I earned a Doctorate in Environmental Health Sciences from the University of California at Los Angeles School of Public Health in 1995. I have also been trained and certified under OSHA 29 CFR1910.120 for Hazardous Waste Operations & Emergency Response. I am an active member of various professional societies including the American Public Health Association (APHA), the International Society of Environmental Forensics (ISEF), the California Redevelopment Agency (CRA), and the Association for Environmental Health and Sciences (AEHS).

2.     I am presently the Principal Toxicologist at Soil Water Air Protection Enterprise in Santa Monica, California. I write frequently on matters related to chemicals in



1

the environment and public health. I have been retained as an expert toxicologist in the above matter.

3. From 1987 through 1992 I worked as a toxicological researcher at the University of California at Los Angeles Department of Medicine Pulmonary Division under the supervision of physicians who were investigating the pulmonary toxicity of air pollutants. The research included epidemiological evaluations of populations exposed to criteria pollutants, the potentiating effects of inhaled beta-agonists on the hyper-reactive responses of asthmatic patients, patients with chronic-obstructive pulmonary disease (COPD), and patients with interstitial lung disease to criteria pollutants including ozone and oxides of sulfur. While studying in my graduate programs at UCLA, I also worked for environmental consulting companies involved in human health risk assessments and toxicological evaluations of contaminants. After completing my doctoral thesis on a novel multi-pathway risk model, I worked as a Senior Environmental Health Scientist at ChemRisk evaluating the toxicological impacts of contaminants in selected populations and coordinating regional air pollution studies. My previous work experience included considerable risk assessment, evaluation of environmental toxic exposures, design and execution of environmental monitoring and health assessment studies and modeling of exposure to toxic compounds. I also have participated in and/or directed numerous air/emission-related risk assessments including toxicological assessment of metals and volatile organic substances from mobile and stationary sources. I have continued to research the effects of contaminants in the environment and have presented those results at numerous professional assemblies and in a recently published college textbook. Specifically, I have studied the toxicological effects of many chemicals including metals such as arsenic, cadmium, beryllium, lead, zinc, polyaromatic hydrocarbons, dioxin, and dioxin-like compounds for over 17 years as part of my training in toxicology and daily work experience as a Toxicologist.

4. I have attached hereto as Exhibit "A" my curriculum vitae which accurately reflects my professional standing and experience in the field of toxicology.

2

5. I have been retained by the plaintiffs in this action to provide impartial professional opinions with respect to the plaintiff's claims of exposure and toxic causation. In connection with this litigation I have reviewed the following documents:

   A. Environmental sampling report of work performed by 3TM in the Florala and Lockhart communities;

   B. Aerial photographs of the facility dating back to the 1940s;

   C. Documents too numerous to list, including but not limited to, documents from Louisiana Pacific Lumber, United States Environmental Protection Agency (USEPA), and the Alabama Department of Environmental Management (ADEM), such as:

     1) LPL Lockhart Biennial Reports

     2) USEPA files related to the Resource Conservation and Recovery Act (RCRA) Assessment of the facility including workplans and investigation reports;

     3) Correspondence with ADEM;

     4) LPL Lockhart Financial Reports;

     5) LPL Lockhart's Permits including the National Pollution Discharge Elimination System (NPDES);

     6) Noncompliance Noticifcation Forms from the Alabama Department of Environmental Management;

     7) Spill History at the site as documented in LP Lockhart's Permits;

     8) Workplans for the investigation of the site; and

     9) LPL RCRA Assessment Report.

D. Analytical results from environmental sampling performed by SWAPE in the communities of Florala and Lockhart;

E. Analytical results from blood samples collected by SWAPE from current and past residents of the communities of Florala and Lockhart;

F. Numerous peer-reviewed human epidemiological and toxicological studies on pentrachlorophenol (PCP), polychlorinated dibenzo-*p*-dioxins (dioxins) and dioxin-like compounds, polychlorinated dibenzofurans (furans), creosote, polyaromatic hydrocarbons (PAHs), chromium, and arsenic and epidemiological studies of communities exposed to these compounds.

6. A review of the documents above demonstrates that a wood treatment facility operating in the Florala/Lockhart communities (the Facility), from at least the 1960's to the mid 1990's. The facility used a variety of chemicals including PCP, CCA, and creosote as insecticides to treat wood. The Facility released dioxins and other hazardous substances into the surrounding community. Wood waste and ash from incineration activities on site containing PCP, dioxins and dioxin-like compounds, furans, creosote, PAHs, chromium, and arsenic were dumped on the site and left exposed to the wind, creating a secondary airborne contaminant plume. Wastewater from the facility was also injected into boilers at the site, increasing the amounts of airborne contaminants in the community.

7. It is my conclusion, to within a reasonable degree of scientific certainty, that:

A. Based upon the objective test results performed to date, exposure of the residents of the communities of Florala and Lockhart, Alabama (Florala/Lockhart) to toxic chemicals from the Facility has occurred;

B. The exposure of the residents to these toxic compounds has been verified by the sampling of past and current residents of the community which shows an elevated level of contaminants in their blood;

C. Based upon the history of operations at the Facility it is evident that releases of certain chemicals would have occurred over specific time frames (e.g., releases of PCP would have occurred in the late 1970s until the time copper

chromated arsenic (CCA) was used as a biocide). When further documentation is provided, emissions from the Facility of individual chemicals will be modeled to determine the concentration of the contaminants deposited on the community and in the ambient air of the community.

D. The concentration of toxic contaminants in the environment in the communities of Florala/Lockhart area has increased over time due to the operations at the Facility. For purposes of estimating the exposure of residents within the community a steady uniform concentration equal to the concentrations currently measured in the environment has been assumed. These residual concentrations do not represent a maximum exposure, rather they represent the minimum concentration left in place after decades of weathering.

E. Actual concentrations of contaminants in each of the exposed media (air, water, soil, vegetation of the communities) would have been higher at various time points, based upon the operations at the Facility (e.g., concentrations of contaminants present in the air were higher during periods of active waste burning). These concentrations will be modeled, at some future time, to estimate the range of concentrations in the media when further data is made available.

F. The preliminary assessment is based upon the residual contamination that has been measured in the environment of Florala and Lockhart, Alabama. This assessment does not include quantifiable years with the highest dioxin releases into the air.

G. Based upon the environmental sampling that has been performed to date (soils and attic dust of residences), a clear pattern of exposure to the east of the plant (predominant wind flow) is evident. The concentrations measured decrease with increasing distance from the Facility. At approximately one mile, the concentrations of dioxins and dioxin-like materials are equivalent to generally accepted levels for background in rural communities.

    H. Exposure pathways identified as being complete are:

        1) Incidental ingestion of soils impacted with chemicals,

        2) Dermal contact with soils impacted with chemicals,

        3) Inhalation of particulate matter containing residual chemicals,

        4) Incidental ingestion of soil (dust/soot/ash).

        5) Inhalation of particulate matter emitted from the facility, and

        6) Ingestion of plants that would have bioaccumulated chemicals emitted from the facility.

Three of the pathways determined to be completed were evaluated (ingestion of soils, dermal contact with soils, and inhalation of particulate matter) to calculate the current minimum risk level posed to the community by the contaminants.

    I. Preliminary risk evaluations (whether as a point estimate or a probabilistic estimate) of the residual contamination present in the Florala/Lockhart community demonstrate that the potential cancer and hazard risks are far above USEPA acceptable limits. Community members of the Florala/Lockhart area are at risk for developing a number of adverse health effects from the contaminants released by the Facility at a rate that is above acceptable risk ranges.

    J. There is strong correlation between exposure to the chemicals detected in the community and an increase incidence of cancer such lung cancer, breast cancer, skin cancer, leukemia, and non-Hodgkin's Lymphoma. Diabetes, hypertension, and cardiovascular diseases are various disease strongly correlated to arsenic and dioxin exposure. Individuals within the community will have an increased risk of developing these various cancers and diseases.

8. When further documentation is provided, the risk posed by contaminant emissions from the Facility during specific time periods will be incorporated into

a refined risk assessment of the community. Based upon the preliminary risk estimate and the history of operations at the Facility it is evident that the risk driver (chemicals that cause the greatest toxicological impact) may vary over time, but the cumulative risk to the community will be greater than initially estimated in this document.

9. Preliminary Operational History of the Facility: The Site has been operated for wood products sales since approximately 1958 under three different owners (Lockhart Lumber Company (LLC), TMA, and Louisiana Pacific Lumber (LPC)). Lockhart Lumber Company operated the site from approximately 1958 to 1978. Wood treatment operations are believed to have started around 1962 with creosote treatment operations. TMA operated the Site from approximately 1978 to 1983. PCP treatment began in approximately 1978. TMA Forest Products completed applications for hazardous waste TSDF operations in 1980. LPC purchased the plant in 1983. CCA use occurred during operation of the plant by LPC.

10. Sampling of Community by SWAPE

    A. Attic Sampling & Analysis

    Attic sampling was performed in March 2006, in 11 buildings (10 houses and 1 church) located within a one-mile radius of the former wood treatment facility. Samples were collected using a High Volume Simplified Small Surface Sampler (HVS4) in general accordance with American Society for Testing and Materials (ASTM) method D5438, "Standard Practice for Collection of Floor Dust for Chemical Analysis." At least 52 grams of attic dust were collected at each building, the minimum amount required to perform dioxin/furan, PAH, chromium, copper, and arsenic analysis. Attic dust samples were shipped to STL for analysis. PAHs were evaluated in general accordance with Method 8270C using gas chromatography/mass spectroscopy (GC/MS) single ion mode (SIM). Dioxins/furans were analyzed in general accordance with USEPA

7

above USEPA acceptable limits. Community members of the Florala/Lockhart area are at risk for developing a number of adverse health effects from the contaminants released by the Facility at a rate that is above acceptable risk ranges.

E. When further documentation is provided, the risk posed by contaminant emissions from the Facility during specific time periods will be incorporated into a refined risk assessment of the community. Based upon the preliminary risk estimate and the history of operations at the Facility it is evident that the risk driver (chemicals that cause the greatest toxicological impact) may vary over time, but the cumulative risk to the community will be greater than initially estimated in this document.

JAMES J. J. CLARK, Ph.D.

43