1           IN THE UNITED STATES DISTRICT COURT
                            FOR
2              THE MIDDLE DISTRICT OF ALABAMA

3

4

5
MC, etc.
6
        vs.                        CIVIL ACTION NO.
7                                  2:06-CV-83
PACTIV CORP., et al.
8

9

10

11            ORIGINALLY FTR DIGITALLY RECORDED
            AND THEN STENOGRAPHICALLY TAKEN
12             AND TRANSCRIBED THEREAFTER

13

14              JOINT MOTION TO COMPEL

15

16

17              *  *  *  *  *  *  *  *  *

18

19

20

21  BEFORE:        The Hon. Charles S. Coody

22  HEARD AT:      Montgomery, Alabama

23  HEARD ON:      April 10, 2007

24  APPEARANCES:   Robert Palmer, Esq.
                   mark Termolen, Esq.
25                 Bernard, Taylor, Esq.

```
 1   WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
     THE HON. CHARLES S. COODY ON APRIL 10, 2007 AT THE
 2   UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

 3

 4              THE COURT:  Good morning.

 5              MR. TERMOLEN:  Good morning, Your Honor.

 6              MR. PALMER:  Good morning.

 7              THE COURT:  We are here in M. C. versus Pactiv

 8   Corporation, two thousand six civil eighty-three, is the

 9   lead case.  This is on a Joint Motion to Compel by

10   Pactiv that relates to the meetings that were held.  And

11   the Motion to Compel -- as I understand it, and make

12   sure that my understanding is correct -- that the Motion

13   to Compel really goes to deposition questions that were

14   posed to certain people who were there who were

15   instructed not to answer on the basis of privilege.  Is

16   that essentially correct?

17              MR. TERMOLEN:  Yes, Your Honor

18              (Inaudible)

19   day, Your Honor.

20              It also goes to documents related to those

21   public meetings, such as site issues and letters that we

22   understand based on deposition testimony were

23   distributed to the, quote, "community as a whole,"

24   inviting individuals to attend those public meetings.

25              THE COURT:  I have trouble understanding how
```

```
 1   privilege applies at a public meeting.

 2           MR. PALMER:  Well first, Your Honor, it was

 3   not a public meeting.  There were no public meetings.

 4   In our response we've attached --

 5           THE COURT:  Well, was everyone there a client?

 6           MR. PALMER:  They were either clients or

 7   prospective clients.  They were not permitted to come

 8   into the meetings unless they were there for the purpose

 9   of consultation to determine whether or not they wanted

10   the Environmental Litigation Group to represent them in

11   connection with a case against these defendants.  And it

12   is clear under Alabama law, which applies, that the

13   privilege is not waived simply because you have two or

14   more people who are jointly represented or potentially

15   jointly represented by the same lawyer.

16           THE COURT:  Plainly, that's not a -- not

17   everybody -- Well, so if a husband and wife showed up at

18   the meeting, and the husband was the only one who was

19   potentially a client, the husband is the only one you

20   let in?

21           MR. PALMER:  That's right.  What we did was,

22   we, at the very outset of the meeting -- now I was at

23   these meetings, but I have been at a lot of our meetings

24   that we do, and the way we do this is that we announce

25   at the very outset, "If you're not here to consult us,
```

1  you know, we're here to talk about potential litigation,

2  if you're not here to consult us in connection with

3  possibly hiring us for this litigation, then you're not

4  welcome to attend."

5           If people leave sometimes, other than the ones

6  who stay, are -- we deem them to be considering hiring

7  us.  Whether they ultimately do or not, whether we

8  accept them or not.

9           THE COURT:  At that point that's really sort

10 of immaterial.

11          MR. PALMER:  In addition, just to make sure

12 the record is clear, the only letters that have ever

13 been sent, have been sent to individuals who actually

14 did sign either contract or signed something indicating

15 they wanted to be represented.

16          THE COURT:  There was nothing distributed at

17 the meeting?

18          MR. PALMER:  Nothing distributed at the

19 meetings.  There are -- My understanding is, there is no

20 sign-in sheets of any sort.  They're talking about

21 sign-in sheets, there were multiple meetings.  The

22 subsequent meetings, people who indicated they wanted to

23 be represented were sent letters.  And only those

24 individuals who had already indicated a desire to be

25 represented were sent letters.

1           So when you represent a large number of people

2    in mass tort litigation, sometimes you have to have

3    large meetings with these individuals.

4           THE COURT:  I see.

5           MR. PALMER:  Context is everything, and it's

6    very important to understand the context in which the

7    defendants are making this motion.  They have stated

8    that they felt like they could not conduct discovery

9    without finding out what went on at these meetings.  But

10   the truth of the matter is they were given the

11   opportunity to take discovery first.  And at their

12   request the depositions were broken into two

13   depositions; one for discovery purposes and one for

14   preservation of testimony.

15          These issues primarily arose during the

16   preservation depositions, but what we really need to do

17   is to look at the context of the defendants' request for

18   information about what our clients have been saying to

19   us and what we've been saying to our clients.

20          They have filed, independently, a motion that

21   is document number seventy-one, Defendants' Joint Motion

22   for Protective Order.  The reason I mention this is

23   because of the context.  I believe they withdrew this

24   motion.  But this is extremely important, to consider

25   the context in which they are trying to invade the

```
1   attorney/client privilege.  What that motion relates to

2   is their going and contacting, directly, the wife of one

3   of our clients.

4           They went down to our client's house without

5   giving us any notice.  They took a court reporter with

6   them.  They took testimony from the client's wife, and

7   they tried to get her to say that her husband did not

8   want to hire Environmental Litigation Group.  They

9   attached a transcript of that testimony.  They then

10  arranged for our client and his wife, together, to go to

11  another lawyer to see if they would hire this other

12  lawyer.  So what they're trying to do is separate us

13  from our clients.

14          Now this is not something that we have filed,

15  this isn't something jointly filed by the defendants.

16  If their Joint Motion for Protective Order, document

17  number seventy-one, attached to which is a sworn

18  statement of Joan D. Ezel (ph.).  They subsequently

19  withdrew it when our client and his wife declined to be

20  represented by this attorney that they had arranged for

21  our client to see.  Then, when you consider that, these

22  defendants are trying to invade the attorney/client

23  privilege.

24          For whatever purpose they have, they're trying

25  to separate the attorneys in this case from their
```

```
 1   clients.  In that context, you need to look at their

 2   motion and what they're asking for.  In their motion

 3   they don't ask for specific answers to specific

 4   questions.  Just the language of the motion itself at

 5   the very end what they're asking for, they ask to compel

 6   the deponents to reappear, the plaintiffs to reappear

 7   and answer questions posed to them about these meetings.

 8   It's just kind of a vague thing about these meetings,

 9   about what went on at these meetings, what their lawyers

10   told them, what happened at these meetings.

11          They claimed that this is so they can

12   determine whether or not the statute of limitations has

13   begun to run, but if you look at the deposition that

14   they complained about, they were consistently told, "You

15   can ask questions about what these plaintiffs knew

16   themselves, when they learned it, but don't ask

17   questions about what their lawyers told them."  And that

18   is the key, because it distinguishes the primary case

19   upon which they rely.

20          If you read the In re:  Pfohl case and read

21   the facts in that case, it is very different from the

22   facts in this case.  In that case the plaintiffs failed

23   to answer specific interrogatory questions with -- they

24   responded with boilerplate answers.  And it was crucial

25   in that case, and they made specific requests to the
```

```
 1   Court.  And even that Court recognized that there is a

 2   distinction between asking a question about what your

 3   lawyer told you and about what you knew personally.

 4          If this Court grants the relief that the

 5   defendants are requesting, essentially the Court is

 6   giving them license to go out and do what they have

 7   already tried to do by contacting our clients directly

 8   and invading what should be sacred to this Court, and

 9   that is the attorney/client privilege.  The fact that we

10   represent a large number of clients should have no

11   bearing on the sanctity of that privilege.

12          THE COURT:  All right.

13          MR. TAYLOR:  Your Honor, let me respond to a

14   few things, Your Honor.  Unless the Court would like, I

15   do not intend to respond regarding the Mrs. Ezel issue,

16   which we do have counsel here today who participated in

17   that process.  I'm happy to provide further explanation

18   for --

19          THE COURT:  It doesn't seem to me that that's

20   at issue today.

21          MR. TAYLOR:  I agree, Your Honor.

22          A couple things.  This motion arose, Your

23   Honor, out of the liberal use of instructions not to

24   answer.

25          (Inaudible)
```

```
1    a series of depositions over the summer.  That's what

2    prompted this motion, as we were trying to get answers

3    to questions and were being whacked with instructions

4    not to answer.

5          Let me give the Court an example of that.  We

6    asked Miss Cobb at her preservation deposition, and I

7    believe this was on page fifty-two, lines eleven through

8    sixteen, Your Honor, whether in fact she had signed a

9    sign-in sheet when she went to these public meetings.

10   The response was she was instructed not to answer the

11   question.  We weren't even allowed to ask that kind of

12   question, Your Honor, without running into an

13   instruction not to answer.

14         Counsel today tells us well, there are no

15   sign-in sheets but we weren't allowed to inquire on that

16   respect, and we believe from certain other testimony and

17   comments made by the plaintiffs' counsel that in fact

18   there were sign-in sheets, which from our standpoint

19   would be very important.

20         THE COURT:  Why?

21         MR. TAYLOR:  Two reasons, Your Honor.  One is

22   to understand who was at these public meetings, and to

23   compare that list with the list that plaintiffs have as

24   clients.

25         THE COURT:  What difference does it make?
```

1        MR. TAYLOR:  Well, they're claiming, Your

2   Honor --

3        THE COURT:  I mean if I go to confer with a

4   lawyer about potentially engaging the lawyer and I don't

5   engage the lawyer, that conversation nonetheless still

6   is privileged, is it not?

7        MR. TAYLOR:  Well, Your Honor, under -- from

8   my perspective, it goes to a broader issue, which is the

9   issue that plaintiffs' counsel --

10       THE COURT:  Well when I ask you a question,

11  first I expect an answer to it, Counsel.

12       MR. TAYLOR:  I'm sorry, Your Honor.  I don't

13  mean to dodge the question at all.

14       Your Honor, these were clearly -- From the

15  limited testimony we have, Your Honor, this was not a

16  session where counsel with these clients -- these

17  individuals were occurring with seeking legal advice.

18  And I point Your Honor to what a different plaintiffs'

19  counsel did in his own voir dire of his own client, Ms.

20  Dorothy Davis, when initially he's

21       (Inaudible)

22  Teresa Mitchell posed an objection when we began asking

23  Miss Davis about what happened at these public meetings.

24  And I would reiterate, Your Honor, that it was

25  Miss Davis herself who characterized these meetings as

1   public meetings.  And Miss Theresa Mitchell asked

2   Miss Davis were there individuals present at these

3   meetings who were not clients.  Miss Davis answered,

4   "Yes."  Mr. Mitchell and other counsel for plaintiffs

5   then withdrew his objection and allowed some questioning

6   by the Defense of his client --

7           THE COURT:  Well look, what y'all argued to me

8   at this juncture strikes me as capable of resolution

9   only by an evidentiary hearing, at which I would

10  probably have to conduct in an ex parte fashion with

11  bringing all those people in here and trying to find out

12  what the heck happened.  And frankly, I'm not interested

13  in conducting a mini trial before a trial on the merits

14  of this case.

15          It seems to me to be a very inefficient use of

16  both the Court and counsel's time to resolve something

17  about which I'm not confident there is any need for

18  discovery.  Why are you interested in what happened at

19  those meetings?

20          MR. TAYLOR:  Your Honor, the primary reason --

21          THE COURT:  What Rule twenty-six discovery

22  related to the merits or defense can arise from knowing

23  everything that happened at those meetings?

24          MR. TAYLOR:  Statute of limitations, Your

25  Honor.

```
 1              THE COURT:  How is the statute of limitations
 2   dependent upon what happened at those meetings?
 3              MR. TAYLOR:  Your Honor, the limitation
 4   period, as the Court I know is well aware here, is two
 5   years.
 6              THE COURT:  I'm aware of that.
 7              MR. TAYLOR:  And the plaintiffs state in their
 8   complaints that they were unaware of facts giving rise
 9   to the basis of their claims for a period of two years
10   before their claimed case is filed.  Based on the
11   affidavit supplied by plaintiffs', I believe she's a
12   paralegal, Miss Debra Hughes, she states, and this is
13   the only indication we have of any dates at all, Your
14   Honor, she states in her affidavit that the first public
15   meeting happened in, I believe it was mid two thousand
16   three.  The last complaint, Your Honor, was filed in
17   this case in mid two thousand six.  Some of these
18   individuals were subject to a
19              (Inaudible)
20   agreement that we entered into with plaintiffs' counsel,
21   but surely not all of it.  And it would be critical to
22   our being able to put together a fair statute of
23   limitations motions --
24              THE COURT:  But what you want to know about
25   the statute of limitations is dependent on what one or
```

1    more of the plaintiffs knew, and if they knew nothing,

2    then whatever they knew could only have come from

3    whatever a lawyer told them, correct?

4        MR. TAYLOR:  If they knew nothing, then

5    whatever they knew in let's say mid two thousand three

6    would only have come from what a lawyer told them.

7        THE COURT:  And under the confines of these

8    meetings as they have been described to the Court, why

9    isn't that privileged?

10       MR. TAYLOR:  Well, Your Honor, two reasons.

11       THE COURT:  I mean you might like to know it,

12   but that begs the question of whether under the law you

13   can know it.

14       MR. TAYLOR:  I understand, Your Honor.  And

15   we've argued in our motion -- There are at least two

16   reasons, Your Honor.  One is the plaintiffs themselves

17   have raised the issue of circular three oh nine, the

18   so-called savings provision, saying that their

19   complaints should be -- they should be allowed to file

20   complaints on the basis of that provision and that the

21   case ought to be cited, Your Honor.

22       We believe it's very clear that when the

23   plaintiffs themselves put that at issue, they can't use

24   the attorney/client privilege as a sword as well as a

25   shield, Your Honor, because they are themselves now

1   putting at issue what their clients do and when their

2   clients knew it.  And that is critical, as I said --

3          THE COURT:  It seems to me that you're

4   confusing two different things.  I mean what clients

5   knew and what a lawyer told them are two different

6   things.  I mean to begin with, what a lawyer says to a

7   client I suppose technically is hearsay, and I'm not

8   sure it really qualifies of something the client knows.

9   So that's sort of a threshold question that really

10  disturbs me in this case.  I mean we're talking about

11  advice mixed with fact.  But if a lawyer conveys a,

12  quote, fact to a client, does the client know it for the

13  purposes of the statute of limitations?

14         MR. TAYLOR:  Your Honor, my view is that our

15  view is, Your Honor, if a lawyer tells an individual a

16  fact, and let's put this in the context of the kind of

17  recruiting meetings here where individuals came to these

18  public meetings to learn information that if the lawyer

19  tells a client a fact, it's the same thing as a client

20  reading that information in the newspaper.  Regardless

21  of the source, Your Honor, the client is apprised of

22  that factual information, whether it be a lawyer, a

23  website or a number, the client then knows of that fact.

24         I don't see any distinction there, Your Honor,

25  with regard to the source.  Whatever the source may be,

```
 1   that individual then knows that fact.
 2           THE COURT:  For the purposes of the statute
 3   beginning to run.
 4           MR. TAYLOR:  Correct.
 5           THE COURT:  Well, I'm not quite sure I'd go as
 6   far as you go, but at least I suppose it's true that the
 7   client would know that someone told him something that
 8   was represented to be a fact.
 9           MR. TAYLOR:  Correct.
10           THE COURT:  What if it was wrong?
11           MR. TAYLOR:  Well, we -- if
12           (Inaudible)
13   that plaintiff are claiming that their diseases were
14   caused by the exposure to
15           (Inaudible)
16   facility, of course we contend that that's wrong here.
17   But I don't think that changes the analysis because the
18   point is whether it's a newspaper article that's raising
19   questions about gee, could certain conditions that are
20   being reported by individuals in the Florala-Lockheart
21   area because by chemicals at the plant, or with the
22           (Inaudible)
23   attorney saying we believe that chemicals X, Y, Z can
24   cause conditions D, E and F.  Regardless of the source,
25   Your Honor, again, it's whether it's wrong or not, that
```

1    individual has been put on notice that they may have a

2    claim.

3              THE COURT:  What's necessary for the statute

4    to begin to run under these circumstances?

5              MR. TAYLOR:  That the plaintiffs, Your Honor,

6    had knowledge, which they knew based on which they knew

7    or should have known.

8              THE COURT:  Of what?  What should they either

9    -- what should they have known?

10             MR. TAYLOR:  That the injuries of which

11   they're complaining may have been caused --

12             THE COURT:  It is injury dependent, then, is

13   it not?

14             MR. TAYLOR:  Well, to the extent that --

15             THE COURT:  What if they didn't have an

16   injury?  What if they seemed perfectly healthy and

17   someone says you know, you have been exposed to this,

18   you could come down with something bad, does the statute

19   begin to run because there is the possibility that I may

20   get sick, or does the statute wait until I am sick?

21             MR. TAYLOR:  Your Honor, I am not sure that is

22   presented by these cases.  My understanding is that all

23   of these cases present claims by individuals who claim

24   an injury.  They all involve individuals who claim they

25   have been injured as opposed to --

 1            THE COURT:  So the question is really

 2   dependent upon when the injury occurred, is it not?

 3            MR. TAYLOR:  The question is -- Let me put it

 4   this way:  If plaintiffs had an injury, were suffering

 5   from an injury at the time they became aware of the

 6   facts that should have pointed them in the direction of

 7   filing a lawsuit against this facility, then yes, the

 8   statute should have begun running.  And if they deny

 9   having an injury, and if they did not have an injury at

10   that time, I would reserve that question, Your Honor,

11   because I don't --

12            THE COURT:  I presume you know that the people

13   you deposed attended a meeting.

14            MR. TAYLOR:  We know based on the testimony

15   that -- in depositions what we were allowed to ask some

16   limited questions, Your Honor.  We understand that there

17   were between two and four meetings, and we understand

18   that some or all of these plaintiffs attended to some or

19   all of these meetings.  And we have been told, at this

20   stage again, Your Honor, the only source we have for any

21   timing at all is the affidavits supplied by plaintiffs

22   in their response --

23            THE COURT:  Now it's fairly safe to assume

24   what I'm about to say.  And it's an assumption that I

25   frankly would be comfortable with.  If I attended a

 1  meeting and I had an injury, it's very likely that at

 2  that meeting one or more people suggested to me that

 3  there is a cause for that injury.

 4          MR. TAYLOR:  Your Honor, there could well be,

 5  and I --

 6          THE COURT:  Is that what you really want to

 7  know, is whether or not they were told by the lawyers

 8  that this is the cause of your injury?

 9          MR. TAYLOR:  That's very much part of it, Your

10  Honor.

11          THE COURT:  Why isn't that protected by the

12  attorney/client privilege?

13          MR. TAYLOR:  Well I can tell you three

14  reasons, Your Honor.

15          THE COURT:  Putting the

16          (Inaudible)

17  issue and whether it's waived under those circumstances,

18  but putting that aside, just good old privilege law, why

19  isn't that protected?

20          MR. TAYLOR:  Well, again, I'm going to mention

21  two points, then, if we're going to take the

22          (Inaudible)

23  issue out of the equation here, one is that Mr. Mitchell

24  again, during one of these depositions, himself withdrew

25  his objection that there was an attorney/client

 1   privilege after he conducted his own voir dire of his

 2   own plaintiff, his own client, Miss Davis and determined

 3   from her testimony that in fact the privilege should not

 4   apply because there were individuals present who were

 5   not clients.  Again, plaintiffs' own counsel withdrawing

 6   his objection after conducting the voir dire of his own

 7   client.

 8           Secondly, Your Honor, during one of the

 9   preservations, during the initial preservation

10   deposition, testimony was elicited during the direct by

11   plaintiffs' counsel of their own client as to

12   substantive matters that were discussed during at least

13   one --

14           THE COURT:  Now you're arguing to me there was

15   a waiver.

16           MR. TAYLOR:  Well that's waiver, but that's a

17   different waiver than the surplus three oh nine

18   argument.

19           THE COURT:  I understand that.

20           MR. TAYLOR:  Yeah.

21           THE COURT:  Address yourself to that.

22           MR. PALMER:  Yes, Your Honor.  First of all,

23   it's clear under Alabama law that even if there's a

24   partial disclosure, it is not a waiver unless it's

25   basically substantially everything.

```
 1              Secondly, just to make sure it's clear --
 2              THE COURT:  I'm not sure I agree with you
 3    that's the extent of Alabama law, but that remains to be
 4    seen.  But go ahead.
 5              MR. PALMER:  Secondly, Mr. Mitchell apparently
 6    at the time of the discovery deposition when he --
 7              THE COURT:  This is Miss Davis's deposition?
 8              MR. PALMER:  I believe that's correct.
 9              MR. TAYLOR:  It was.
10              MR. PALMER:  Okay.  When he did that --
11              THE COURT:  Do I have that full deposition?
12              MR. PALMER:  Yes.  I have provided both the
13    discovery and preservation depositions, all of them, for
14    everybody.
15              THE COURT:  All right.  I just didn't remember
16    if it was the complete deposition.
17              MR. PALMER:  But Mr. Mitchell did not -- he
18    did not attend these meetings.  He apparently didn't
19    know at the time exactly how these meetings were
20    conducted.  And so he didn't continue with the
21    attorney/client privilege objection as he should have.
22              It's our contention that was not a complete
23    waiver under the -- If you look at the advisory
24    committee comments, I think it's to Rule five ten.  And
25    there is some case law that I have cited from the
```

```
 1   advisory committee comments that say that.  But the

 2   other issue that the defendants raise in saying there

 3   was a waiver, they persist in the saying that direct

 4   testimony was elicited about the substance of the

 5   conversations.  That is not correct.

 6          What occurred in the direct examination was

 7   questions about what the clients knew themselves.

 8   Whether it came from the meeting or not, if you go back

 9   and look at the very case that the defendants cited, the

10   In re:  Pfohl case -- I'm assuming I'm pronouncing that

11   correctly, it's P-f-o-h-l -- in the In re:  Pfohl case

12   the critical distinction there was that the plaintiffs

13   had not been willing to testify or give evidence about

14   what they knew themselves.  And that's why the Court

15   allowed the waiver under Section three oh nine of the

16   attorney/client privilege.

17          In this case, the depositions are replete with

18   instances in which I specifically told Defense counsel,

19   "Ask your questions about what these people knew.  Don't

20   ask questions with what their attorneys told them.

21   Don't ask questions about what they told their

22   attorneys, but ask questions -- you can ask anything

23   about the circumstances of the meetings.  You can ask

24   when they knew these various things."

25          Now obviously they can make whatever inference
```

1    they want to about how they learned these facts at these

2    facts of these meetings, but that distinction is a

3    critical distinction, even under the *In re:  Pfohl* case,

4    which itself acknowledged that there's a distinction in

5    the law concerning the attorney/client privilege between

6    what the client knew and asking specifically about what

7    the attorney told the client.  We have no problem with

8    them asking questions for the statute of limitations

9    purpose.  We said that in our response.  We said that

10   during the depositions about what these plaintiffs

11   themselves knew, they can explore that complete.  We

12   have no problem with that.  I don't want them asking

13   questions --

14            THE COURT:  I understand.

15            What is your view about when the statute

16   begins to run under these circumstances?

17            MR. PALMER:  Under Section three oh nine, the

18   statute begins to run when the victim knows or should

19   have known that he had an injury that was caused by

20   exposure to the defendants' product.  And it's a -- it's

21   a -- there is ample case law, I don't have it handy

22   right here, but there is case law that that indicates

23   it's not just knowledge of the injury, it's not just

24   knowledge of the exposure, but it's knowledge that links

25   the two.

```
 1              THE COURT:  Well how does one acquire the
 2    knowledge that is essentially causation?
 3              MR. PALMER:  Well, but it doesn't mean that
 4    the plaintiff necessarily has to have, you know,
 5    expertise or detailed knowledge.  It's when the
 6    plaintiff knew or should have known, which means that
 7    the plaintiff would have some --
 8              THE COURT:  Well, a friend says to him you
 9    know, I think it was caused by your exposure.  Is that
10    sufficient knowledge to put him on notice?
11              MR. PALMER:  I think that would be, depending
12    upon -- I don't know whether that would be enough
13    information to answer the question.  If that's all the
14    facts you have?  I don't think so.  I think it depends
15    on what the friend says.  If the friend says Hey, I saw
16    this newspaper article, or I read about this stuff that
17    says, you know --
18              THE COURT:  Well what if he says I was looking
19    on the Internet last night and, you know, in California
20    there have been a thousand people who have gotten sick
21    from this stuff and they have got the same stuff you do,
22    is that enough?
23              MR. PALMER:  It is a fact-based question.  I
24    don't think it's enough necessarily in that case, but it
25    is a fact-based question, one that goes to the jury to
```

1   determine whether or not there is sufficient information

2   there.  Whether the plaintiff had enough information to

3   know -- whether the plaintiff knew or should have known.

4         I think for a court to make the determination

5   whether or not the plaintiff knew or should have known

6   that there's going to have to be just like any summary

7   judgment type issue, there's going to have to be so much

8   evidence that's going to be clear as a matter of law.

9         THE COURT:  Well, if a lawyer says your

10  exposure caused the same injury, is that sufficient?

11        MR. PALMER:  Well, typically lawyers don't say

12  that.  Typically, mass tort lawyers say we will look

13  into this for you.  You know, if you have an injury --

14        THE COURT:  Well, if the lawyer says there is

15  this possibility, if the lawyer says all of the studies

16  have been done that collectively shows there is a

17  probability that a disease such as you may have can be

18  caused by -- now those are non-committal statements, if

19  you will.  And we'll be happy to look into that for you,

20  but is the possibility sufficient?

21        MR. PALMER:  I don't think it is.  And I don't

22  have a case I can cite off the top of my head under

23  three oh nine, but just to give you an analogous case,

24  it's an Alabama case under the F. E. L. A. which also

25  has a discovery statute so it's very similar to this,

1   but it's *Thomas Edison Wilkerson versus*, I believe it

2   was *Norfolk Southern Railroad*.

3          THE COURT:  I'm not familiar with it.

4          MR. PALMER:  And I don't have the exact

5   citation, but may I --

6          THE COURT:  Get it to me after this is over.

7          MR. PALMER:  I will do that.  Let me write

8   this down.

9          THE COURT:  And to opposing counsel.

10          MR. PALMER:  Certainly.

11          The *Wilkerson* case involved a situation where

12   an individual went to a lawyer for a screening for

13   asbestosis.  And he was screened for asbestosis and

14   initially there was some indication on the report from

15   the physician that it appeared that there were some

16   radiographic markings on his x-ray, those x-rays -- but

17   the expert declined to diagnose it as asbestosis and

18   told the lawyer that.  And so the law rejected the

19   cases.  Of course years later the client had been

20   exposed further, and of course asbestosis is a

21   progressive disease.

22          The plaintiff then went to another lawyer, and

23   that was my firm, but went to my firm and he was

24   screened again.  He was determined to have asbestosis,

25   and then in the course of his deposition, of course the

1    issue came up when did he know or should have known.

2    Because that's the same standard in the F. E. L. A.

3    context.

4         In that case, of course what the Alabama

5    Supreme Court ruled under the F. E. L. A. statute was

6    that the mere screening was insufficient to trigger the

7    statute because there were other factors.  The fact that

8    the case had been rejected, the expert said there was

9    radiographic markings but that the individual did not

10   have asbestosis.  The individual then went to his

11   regular pulmonologist, and the pulmonologist said he

12   didn't have asbestosis and later testified against him

13   as a defense expert, not as a plaintiff's physician.

14        But in any event, the Court determined that

15   that was insufficient, that you actually had to have

16   first of all a diagnosis that is going to be a

17   sufficient diagnosis, but you have to have sufficient

18   knowledge that it's going to be sufficient to go to

19   trial.  And so based on that case, I would argue that

20   you don't have that knowledge just from saying we will

21   check you out.  Because that's not knowledge that your

22   disease in fact is a disease that could be caused by or

23   may have been caused by the defendant's toxins.  That's

24   the same type of standard that exists in *Serpla* (sic.).

25        THE COURT:  So when we get down to the crux of

```
 1   this matter, the crux of this matter, putting aside the

 2   privilege question, is whether there is anything that

 3   could have happened at those meetings that would provide

 4   those individuals sufficient knowledge such as to

 5   trigger the statute.

 6            MR. TAYLOR:  I think that's correct, Your

 7   Honor.

 8            THE COURT:  How could that be?  How could

 9   anyone tell them anything that would be sufficient to

10   trigger the statute?  There's no doctor who examined any

11   of them at those meetings, from what I understand.

12            MR. TAYLOR:  We don't know, but we would

13   assume that.

14            THE COURT:  It was lawyers talking to him.

15   And with all due respect, I'm not sure that anything a

16   lawyer says under those circumstances is sufficient to

17   trigger the statute.

18            MR. TAYLOR:  I respectfully disagree, Your

19   Honor.

20            THE COURT:  All right.  It seems to me that

21   your briefs on this issue don't really address that

22   point.

23            MR. TAYLOR:  We'll be happy to supplement it,

24   if Your Honor --

25            THE COURT:  And I would like both sides to
```

```
 1   supplement that, though.  Ten days enough?

 2              MR. TAYLOR:  That's just fine, Your Honor.

 3              MR. PALMER:  There is one issue with that,

 4   Your Honor, and that is that the real problem with why

 5   the briefs don't have enough on that is that this is an

 6   attempt to -- they're referring to specific depositions

 7   here, but they're not referring to the specific facts of

 8   these particular plaintiffs.  And the problem is that

 9   the statute issue is going to be specific to each

10   plaintiff.

11              I don't think we're going to be able to give

12   you briefs that are going to satisfy you in this

13   context.  I think what's going to have to happen is that

14   they're going to have to address this on an individual

15   case-by-case basis.  And I would suggest that the proper

16   thing to do is, these cases are going to be set for

17   trial --

18              THE COURT:  I'm not sure I agree with you

19   about this particular question, though.  It seems to me

20   that the heart of the question really is, you have

21   described the meetings as consultation meetings to

22   afford the plaintiff or putative plaintiffs an

23   opportunity to determine if they wish to be represented

24   by you or your firm.  Under those circumstances, the

25   question becomes could you at those meetings have told
```

1    them anything that would have caused the statute to

2    commence running?

3          And you can assume that they said all of you

4    are sick, because -- but you know, if during a trial you

5    put a lawyer on the stand to prove that kind of

6    causation, I don't think seven oh two would permit that

7    testimony.  I don't think *Daubert* would permit that

8    testimony.

9          Now if that's the case, is that the same

10   standard that applies to -- I mean really the question

11   is what does the law say about what a plaintiff has to

12   know in order to trigger the running of the statute.

13   And because we know there were only lawyers and clients

14   there in that discussion, can a lawyer say anything?

15         MR. TAYLOR:  I understand the question, Your

16   Honor, and we will address that.

17         THE COURT:  All right.  Ten days to file the

18   briefs.

19         Yes, sir?

20         MR. PALMER:  Your Honor, on

21         (Inaudible)

22   of Alexander City, I think you fleshed out a lot of the

23   issues and we appreciate that, but I just wanted to

24   raise a couple of very quick points.

25         THE COURT:  Sure.

```
 1              MR. TAYLOR:  We

 2              (Inaudible)

 3    my colleague just said on this matter.  One, I heard the

 4    Court say that since we know that only lawyers and

 5    clients were at the meeting --

 6              THE COURT:  Well, I'm assuming that.  I know

 7    you want the in-laws, and earlier I asked the question

 8    did wives come in?  Were there children in there?  Were

 9    there newspaper reporters in there?  Obviously, if those

10    facts were added to the mix, it would be very different.

11              MR. TAYLOR:  Well, it is very different.

12              THE COURT:  What do we know about it?

13              MR. TAYLOR:  Well here's what we know.  What

14    we know is that plaintiffs' counsel, Mr. Palmer, has

15    already explained to the Court that he wasn't there.

16    And what we know is that these opponents have said that

17    large people -- large numbers of individuals from the

18    community were there.  That's in the testimony.  What we

19    know is that the deponents have testified that there

20    were letters sent out to the entire community.

21              What we know is that the deponents have

22    testified that large numbers of people from almost the

23    entire city of Florala was there.  We don't know whether

24    or not all of those people who were there were clients.

25    And we also know that wives and sisters and cousins were
```

1    there, based on the testimony --

2            THE COURT:  Well they don't have to be

3    clients, they simply have to be putative clients.  Would

4    you agree with that?

5            MR. TAYLOR:  Well that's possible, Your Honor,

6    but just one analogy.  And to get to the point that I'm

7    trying to make, because I understand what the Court is

8    asking for us to do that, and we will respond, but this

9    is very similar, this kind of meeting.

10           Based upon what we know, it's very similar to

11   if the plaintiffs' attorney were standing on the street

12   corner and had some people walking by that they invited

13   to come by the street corner and listen to them talk

14   about these issues regarding the situation *Lockheart*

15           (Inaudible)

16   and made statements.  I think that the Court would agree

17   with us that anybody who just happened to be walking by,

18   we would have a right, you know, if that person walked

19   by and signed a sheet, and/or just walked by and heard

20   what the lawyers had to say, that we would have a right

21   to talk to that person about what the lawyer had to say.

22           I'm trying to take it totally out of the realm

23   of where Counsel has indicated that people were there,

24   we were clients or putative clients.

25           THE COURT:  Well, I agree with you under those

 1   circumstances, obviously.

 2         MR. TAYLOR:  And if that's the case, Your

 3   Honor, and I appreciate that, and if there were people

 4   at that meeting who fell into that category, we should

 5   at least, and I'm not certain if the Court has ruled on

 6   this claim, we would at least, I think, have a right or

 7   at least to ask the Court to provide us with copies of

 8   the sign-in sheets so that we could look at the sheets,

 9   look at the dates and figure out who was there.  I mean,

10   that's one of our requests for relief.  We also

11   requested copies of the letters that went out to the

12   community.

13         THE COURT:  Well, let me be clear.  I did not

14   mean to imply that the additional briefs would resolve

15   all of the issues.  It does seem to me, for example,

16   that the mere fact of somebody attending the meeting is

17   not privileged.  Any more so than the fact that I may

18   have conferred with the lawyer, that fact is not

19   privileged, it seems to me, under most circumstances.

20   There are some aberrations in criminal law that might

21   have a little bit different application, but in the

22   civil law context it's hard for me to imagine that the

23   mere fact that I have consulted with the lawyer is

24   itself privileged.

25         So I'm not sure that I don't agree that the

 1    sign-in sheets are not subject to production.

 2            MR. PALMER:  There are no sign-in sheets.

 3            THE COURT:  Well, and that's what you've said.

 4    So if there are no sign-in sheets, what is the proper

 5    response to a Rule thirty-four request?  It's to say

 6    under oath there are no sign-in sheets.  And if in fact,

 7    and the lawyers have this somewhat difficult problem of

 8    having both factual knowledge and also being the lawyer,

 9    but under the circumstances it's not uncommon for a

10    lawyer to simply file their own affidavit saying there

11    are no sign-in sheets.  I mean, that's the right

12    response.  Have you done that?  Not that I'm aware of.

13            MR. PALMER:  The reason we haven't done that

14    is because we wanted to avoid the ethical issue of the

15    lawyer becoming a witness.

16            THE COURT:  Well, sometimes lawyers have to

17    become witnesses.  You know, if you conducted the

18    sessions at least for that limited purpose, that's the

19    only response.  But I leave that up to you and whatever

20    else there may be of that.  So I don't intend that by

21    requesting additional briefs on that particular issue to

22    suggest that that resolves all of the other issues that

23    may pertain in the cause.  But it is certainly

24    fundamental, because it goes to the heart of the

25    question and it goes to the Rule twenty-six question as

1   of whether discovery is related to a claim or defense.

2           And, you know, if I determine that it's not,

3   then it seems to me that what happened in the meetings,

4   or what could have possibly have happened in the

5   meetings, is not discoverable regardless, whether it's

6   privileged or not.

7           MR. PALMER:  Your Honor, with respect to

8   whether or not the requested discovery is even relevant,

9   the Defense keeps saying that they believe that there

10  are people whose statutes would have run if they had

11  received information the first meeting.  But we disagree

12  with that.

13          THE COURT:  I understand.

14          MR. PALMER:  And we don't think that anybody's

15  statute, based on when they were filed, including the

16  tolling agreement period would have run, they were all

17  filed timely.  So that's a factual issue that really --

18  and whether or not the requested discovery is even

19  relevant.

20          One other thing I wanted to ask.  My plate is

21  kind of full.  Can we have twenty days?

22          THE COURT:  Sure.  We're not under any great

23  time constraints in this quest.  All right.  Twenty days

24  to file the briefs.

25          Thank you, Counsel.  We'll be in recess.

```
 1              (Whereupon, the proceedings were concluded.)

 2                     *  *  *  *  *  *  *  *  *

 3                 COURT REPORTER'S CERTIFICATE

 4

 5              I certify that the foregoing is a correct

 6    transcript from the record of proceedings in the

 7    above-entitled matter as prepared by me to the best of

 8    my ability.

 9

10              I further certify that I am not related to any

11    of the parties hereto, nor their counsel, and I have no

12    interest in the outcome of said cause.

13

14              Dated this 23rd day of April 2007.

15

16                      /s/  Mitchell P. Reisner
                        MITCHELL  P.  REISNER,  CM, CRR,
17                      Official US Dist. Court Reporter
                        Registered Professional Reporter
18                      Certified   Real-Time   Reporter

19

20

21

22

23

24

25
```