HUGHES.TXT

1

```
 1              !!! ROUGH DRAFT !!!
 2
 3
 4              VIDEOGRAPHER:  We are here in
 5  the case of Gail Bedsole Tatum, as Mother
 6  and Administratrix of the Estate of Melanie
 7  Chambers, a deceased minor child, versus
 8  Pactiv Corporation and Louisiana-Pacific
 9  Corporation.  Civil Action Number
10  2:06-CV-00083-LES-CSC.  We are taking the
11  deposition of Debra D. Hughes at Comfort Inn
12  in Andalusia, Alabama.
13              MR. SOSTRIN:  For the Record
14  that should be Debra B. Brooks Hughes on the
15  notice.
16              I'm Matthew Sostrin with
17  Mayer, Brown, and I represent Pactiv and
18  TMA.
19              MR. LOCKARD:  Skip Lockard on
20  behalf of Louisiana-Pacific.
21              MR. MITCHELL:  My name is
22  Eason Mitchell, and I represent the
23  Plaintiffs.
```

♀

2

```
 1              MR. ROWE:  Mark Rowe also with
 2  the Plaintiffs.
 3              DEBRA B. HUGHES,
```

HUGHES.TXT

15    Q.    No.  And what were you hoping
16  to accomplish by talking to Mr. Cade or by
17  going to Mr. Cade?
18    A.    I wanted to find out if that's
19  why my daddy got sick.  I wanted to find out
20  if that's what killed my dad plus all these
21  other people once I started digging and he
22  agreed to help me.
23    Q.    Did you say all these other

♀

68

1  people once you started digging?
2    A.    Once I did my list and I saw
3  all the deceased ones and the sick ones and
4  everything, my heart went out to them just
5  like it did with myself on my dad so I
6  wanted to know why they were sick like this
7  too.  Florala's got a small population.  I
8  read the newspapers everywhere and we have 5
9  people dead in the funeral home in a week
10  compared to they have maybe three people
11  dead in a week.
12    Q.    When you were reviewing the
13  Florala news, was that in the library?
14    A.    That was at the news office.
15    Q.    At the news office, okay?
16    A.    Yes.
17    Q.    I'd like to take you through
18  some of the statements that are made in your
19  affidavit here if I could?
20    A.    Okay.  I guess starting on
                    Page 56

HUGHES.TXT

21  page two.  It talks about this first meeting

22  that was held, I guess in October 2003.

23       A.    Okay.

                                                    69

 1        Q.    Is that right?

 2        A.    That's correct.

 3        Q.    I guess you say it took place

 4  in the middle of October.  Do you have

 5  anyway of pinning down an exact date on

 6  that?

 7        A.    16th.

 8        Q.    The 16th?

 9        A.    The 16th.

10        Q.    How do you know it's the 16th

11  good memory I'm impressed?

12        A.    I've worked on this a very

13  long time and it was very important to me.

14  At this time, I dealt with a lot of

15  employees, so it just stuck.

16        Q.    Do you remember about how many

17  former employees came to that meeting?

18        A.    I think there was 177.  The

19  very first meeting.

20        Q.    Was it just them.  Did any of

21  them bring like family members or anyone?

22        A.    No.  I personally stood at the

23  door and told them they couldn't come in.

                                                    70

HUGHES.TXT

1        Q.      So you stood at the door and
2    you told anyone that wasn't a former
3    employee that they couldn't come in?
4        A.      That's correct.
5        Q.      Did you have to turn people
6    away?
7        A.      Yes.
8        Q.      The only?
9        A.      The only spouse was let in
10   there if their suppose was blind crippled
11   needed some kind of assistant couldn't hear
12   couldn't talk.  I let them in.
13       Q.      How many of those would there
14   have been?
15       A.      Maybe 40.
16       Q.      Okay.  How many people do you
17   think you turned away if any?  Actually told
18   them no you couldn't come in?
19       A.      Maybe 40.
20       Q.      Another 40.  And who else was
21   at this meeting other than obviously you and
22   the former employees?
23       A.      Greg Cade.

♀

1        Q.      Greg Cade?
2        A.      Yes.
3        Q.      Anyone else?
4        A.      No.
5        Q.      No one else from his office?
                    Page 58

HUGHES.TXT

6       A.      Not that I recall.

7       Q.      Any like environmental

8   consultants or anyone like that?

9       A.      No.

10       Q.      Any doctors, toxicologists?

11       A.      No.

12       Q.      So it's just you, Mr. Cade,

13   and these former employees?

14       A.      That's correct.

15       Q.      And some of their spouses?

16       A.      That's correct.

17       Q.      Who needed assistance.  You're

18   pretty certain of that 177 number?

19       A.      Almost positive.

20       Q.      Did you keep a list or how did

21   that work?

22       A.      I did a sign-in sheet due to

23   the fact I wanted to see how many people

♀

72

1   were interested, which I gave to Mr. Cade.

2       Q.      So there was a line in sheet

3   that listed every earn in that meeting?

4       A.      Yes.

5       Q.      And Mr. Cade has that?

6       A.      Yes.

7       Q.      Now who spoke at the meeting.

8   Who sort of took the lead on it?

9       A.      I got up.  I introduced

10   Mr. Cade.  I turned it over to him.  He took

Page 59

HUGHES.TXT

11  it over then he had a question and even

12  session, so everybody had an opportunity to

13  speak.

14          Q.      What did Mr. Cade talk about?

15                  MR. ROWE:  I'm going to object

16  to that.  I don't know if that's an

17  appropriate inquiry or not.  They came that

18  there as potential clients and seeking legal

19  advice and to the extent that any legal

20  advice was disseminated, I don't think

21  there's something that she could talk about.

22                  MR. SOSTRIN:  I think there's

23  a motion presented.  I mainly want to

♀

73

1  preserve the records on this.  I certainly

2  understand your objection.

3                  MR. MITCHELL:  As I understand

4  the question would have what he talked

5  about.  What have not what he said.  Subject

6  of the conversation not what -- the question

7  was what did Mr. Cade talk about.

8                  MR. SOSTRIN:  Are you saying

9  that I can ask generally about subject areas

10  but not content or.

11                  MR. MITCHELL:  I'm saying that

12  I object I'm saying that we object but we

13  have not instructed witness not to answer it

14  let us done verse.

15                  MR. SOSTRIN:  If you want to

16  take a minute go ahead.  I understand there

Page 60

HUGHES.TXT

17  is some history behind this issue.

18                  MR. MITCHELL:  Let us take a

19  break and let mark have.

20                  MR. SOSTRIN:   That's fine.

21  Fine.

22                  OFF THE RECORD:   .

23                  MR. SOSTRIN:  If I could

♀

74

1  start.   I would just say it's a little bit

2  of a difficult situation because the

3  Defendant's filed a motion to compel

4  concerning the public meetings last year

5  some time contending that either the content

6  of the meetings wasn't privileged to begin

7  with or that any privilege was waived either

8  by invoking the discovery rule and saying

9  that the plaintiffs first learned of their

10  claims at the meetings or waived because

11  during various depositions to date some of

12  the plaintiff deponents have disclosed

13  certain details of the content of the

14  meetings, themselves, but in light of the

15  pending motion that hasn't been decided,

16  we certainly I certainly understand the

17  objections that you are raising.

18                  MR. ROWE:  I think in light of

19  the fact that the issue can't be resolved by

20  us here today.  I don't think we could reach

21  an agreement among ourselves as to how far

Page 61

HUGHES.TXT

22  or to what extent those conversations could

23  be talked about, the proper vehicle is that

♀

75


 1  motion and I think we should preserve our

 2  objections here today to any of those types

 3  of conversations that Mr. Cade may have

 4  expressed with any of the folks that he

 5  would represent and your question on the

 6  floor now as I understand it is what did he

 7  talk about is that the question.

 8              MR. SOSTRIN:  Yeah I can

 9  proceed with this and if you want to start

10  objecting to the individuals questions as we

11  go or I'm not sure how you want to do this.

12              MR. MITCHELL:  We all know the

13  answer to that question, I think.  And

14  then -- I'm going to let one lawyer is doing

15  it.

16              MR. ROWE:  Go say they'd is a

17  sharing of ideas seeking the truth.

18              MR. SOSTRIN:  I'll start out.

19              MR. ROWE:  We would be

20  satisfied with that one question and she

21  gives you an answer that ends the inquiry or

22  are going to ask what did he say.

23              MR. SOSTRIN:  I'll start out

♀

76


 1  be rephrasing that question.

Page 62

HUGHES.TXT

2                  MR. ROWE:  Let me hear how you
3   would rephrase it.
4                  MR. SOSTRIN:  Let me start out
5   by saying I will rephrase it to keep it
6   broader to hopefully not get into content.
7   I will want to go further than that, and I
8   understand that you will likely be objecting
9   to those.
10                 MR. ROWE:  Yeah.  I think with
11  that proviso.
12                 MR. MITCHELL:  Let's hear the
13  new question.
14                 MR. ROWE:  Let's hear how you
15  would rephrase it.
16      Q.     (BY MR. SOSTRIN):  I think I
17  may start by asking why was Mr. Cade at the
18  meeting?
19                 MR. ROWE:  I'm going to object
20  to that question as well.
21                 MR. MITCHELL:  She's already
22  answered that question.
23                 MR. ROWE:  She invited him

♀

77

1   there as to what she said and representing
2   her and to discuss with other individuals
3   legal representation.  And so I think I
4   would have to object to it's been asked and
5   answered.
6                  MR. LOCKARD:  I think the

Page 63

HUGHES.TXT
7   proper vehicle on behalf for

8   Louisiana-Pacific and for you guys

9   privilege and instruct her not to answer.  I

10  don't think we need to debate at this point

11  the privilege or the merits of the question.

12          MR. ROWE:  That's my thinking

13  too.

14          MR. MITCHELL:  We don't want

15  to get into position where invading the

16  attorney client privilege.  What was said to

17  the lawyer what the lawyer said to the

18  client, but we don't want to draw the line

19  too early.  We want to make sure that you

20  have the right to understand that the

21  privilege is claimed and that the subject of

22  the conversation was the representation.

23  Now, the subject to you getting that

♀

78

1   information, then we intend to object at

2   that point, but we want to make sure that

3   you'd get -- that you have that.

4          MR. SOSTRIN:  I'll resume my

5   questioning.  I'm going to start where I

6   think we would all agree we're entitled to

7   ask, and if I do cross the line where your

8   opinion it's privileged, obviously, it's

9   your right to object, and if you want to

10  instruct the witness not to answer.

11          MR. ROWE:  We can start that

12  way, but we would also instruct her not to

HUGHES.TXT

13  answer.  That are the subject of that

14  motion.  I would state for the Record that

15  you still have a fruitful deposition to

16  take.  It's not like you're being burdened

17  and have received no information.  We have

18  already been here a couple of hours, and I

19  think the substance of her testimony is

20  still very much open to you, and with that I

21  guess we'll go ahead.

22        Q.    (BY MR. SOSTRIN):  I guess

23  what was the purpose of Greg Cade getting up

♀

79

1  to talk at the meeting?

2              MR. ROWE:  Go ahead.  You can

3  answer that.  Wait a minute you can answer

4  that.  What was the purpose of him getting

5  up to talk?  That's the question.

6              MR. SOSTRIN:  Yeah.

7              MR. ROWE:  I object to the

8  form of the question.

9        Q.    You can answer.

10             THE WITNESS:  Can I answer?

11             MR. ROWE:  See if you

12  understand that question and see if you can

13  answer that.

14       A.    I had invited Mr. Cade to come

15  to talk to this group former employees to

16  find out for Mr. Cade to find out what they

17  to do this say and for them to find out what

Page 65

HUGHES.TXT

18  Mr. Cade had to say to see if we had enough

19  to proceed W and basically it was an

20  informative meeting for him to come to

21  figure out whether or not they wanted

22  representation or not.

23          Q.      When you say whether or not we

♀

80

1  had enough to proceed with, what do you mean

2  by that exactly?

3          A.      See if enough people were

4  interested in coming to spend their time

5  with an unknown man and a woman that was

6  just from Florala.

7          Q.      I guess to proceed with what,

8  though, what was the next step that you were

9  anticipating?

10              MR. ROWE:  Let me object to

11  that as well.  That's not her call to say

12  what was her next step is that the question

13  what was her next step or what was

14  Mr. Cade's next step.

15              MR. SOSTRIN:  I don't want to

16  get into too much talk between lawyers but I

17  think she had testified that she called the

18  people to the meeting and called Mr. Cade to

19  see if they had enough something to proceed

20  and I'm just wondering what she meant by

21  what she meant by whether we had enough to

22  proceed.

23              MR. ROWE:  All right try that.
                        Page 66

HUGHES.TXT

♀

81

 1              THE WITNESS:  Okay.  These
 2   former employees each one of them not did a
 3   different job but each one of them had a
 4   different story to they'll.  That's what I
 5   wanted Mr. Cade to hear.  I wanted him to
 6   talk to 5 people that had worked at the
 7   treating plant.  I wanted him to talk to 5
 8   people that had worked at the boiler room.
 9   I wanted him to talk to 5 people a had just
10   stood there at the green chain.
11        Q.    Were you thinking of filing a
12   lawsuit at the time?
13        A.    I did not know if this was
14   lawsuit material.  That's why I invited him
15   down here as somebody 245 was an expert.
16        Q.    But you were considering it?
17        A.    No.  I didn't this have no
18   idea if we did or did not have a case.
19        Q.    Okay.  Now, did Mr. Cade give
20   a presentation to the group?
21              MR. ROWE:  Object to the form
22   of the question.  The distinction between a
23   present takes and talk.  I don't know what

♀

82

 1   the word presentation means in that context.
 2   Presentation to me indicates some planned.

Page 67

HUGHES.TXT

3      Q.     You can even the question if

4   you understand?

5      A.     I can rephrase it if you want.

6             MR. MITCHELL:  Of course we

7   object.

8             MR. SOSTRIN:  You can object

9   to form if you want but we should keep it

10  moving.

11            MR. ROWE:  I want to get the

12  opportunity to clarify the form.  I'm not

13  sure what a presentation is.  To me it

14  connotes a speech of some type instead of a

15  question and answer type period.

16            MR. SOSTRIN:  Okay.  Well,

17  I'll ask it this way, and I think you might

18  have said some of this already.

19     Q.     (BY MR. SOSTRIN):  What did in

20  Cade do at the meeting.  I'll let you

21  describe it?

22     A.     He told the group.

23            MR. ROWE:  Now.

♀

1             MR. SOSTRIN:

2             MR. ROWE:  That's my problem

3   with all this.

4             MR. SOSTRIN:  For this

5   question I don't want to get into content at

6   all.

7             MR. ROWE:  I don't want to

8   start anything that Mr. Cade did at that

HUGHES.TXT

9  meeting.

10      Q.    I want to know what Mr. Cade

11  did at that meeting?

12             MR. ROWE:  He spoke and

13  listened.

14      A.    He spoke and listened to them.

15      Q.    There was a period where

16  Mr. Cade spoke and it was followed by a

17  question and answer section?

18      A.    Yeah.

19      Q.    That first part where Mr. Cade

20  spoke, how long did that last for, if you

21  remember?

22      A.    Prior to the question and

23  answer session?

♀

84

1      Q.    Right.

2      A.    I would have to stop and

3  recall maybe 15 to 20 minutes.

4      Q.    And how long was the question

5  and answer session?

6      A.    Approximately an hour and a

7  half to two hours.

8      Q.    So the whole meeting in total

9  lasted 2 hours, 2 and a half hours?

10      A.    Approximately 3.

11      Q.    3.  Now what did Mr. Cade

12  speak?

13             MR. ROWE:  I object I instruct

Page 69

HUGHES.TXT
14  her not to answer.

15      Q.    Do you understand that your

16  attorneys instruct you not to even that

17  question?

18      A.    Yes.

19      Q.    If not for the instruction

20  would you be able to answer that question?

21          MR. ROWE:  I object to that

22  question as well.

23          MR. MITCHELL:  Was that a

♀

                                        85


1   question to me or to her.

2           MR. SOSTRIN:  To her.

3           MR. ROWE:  But for instructing

4   her not to answer could she answer.

5       Q.    (BY MR. SOSTRIN):  Yeah do you

6   remember what Mr. Cade said at the meeting?

7           MR. ROWE:  I object to that

8   too is the question that object to

9   everything.

10          MR. LOCKARD:  You can't have

11  these speaking objections.

12          MR. ROWE:  Sure we can.  Why

13  can't we -- why can't we have a speaking

14  objection.

15          MR. SOSTRIN:  All I'm trying

16  to do is verify that you are instructing her

17  not to answer and find out if she's going to

18  do that or not.

19          MR. ROWE:  I think he just
                    Page 70

HUGHES.TXT

20  asked if she is going to follow that

21  instruction.

22              MR. SOSTRIN:  I need to know

23  if she was capable to answer the question

⚥

86

 1  and if not it's a moot point that's all I'm

 2  going to do.

 3              MR. MITCHELL:  It requires a

 4  yes why or no answer.

 5       Q.    (BY MR. SOSTRIN):  If not for

 6  your counsel's objection would you be able

 7  to answer my question?

 8       A.    Yes.

 9       Q.    Yes.  Are you going to abide

10  by your counsel's instruction not to answer?

11       A.    Yes.

12       Q.    Okay.

13              MR. SOSTRIN:  That's all I

14  need.  And I.

15       Q.    I think we'll probably do the

16  same thing.  But do you recall what any of

17  the questions were to Mr. Cade during the

18  question and answer session?

19              MR. ROWE:  We'll object to the

20  question.

21              MR. MITCHELL:  And you're

22  asking yes or no?  You're asking for a yes

23  or no.

⚥

HUGHES.TXT
87

1           MR. SOSTRIN:
2      Q.    I guess with that question, I
3 was.  Do you remember what some of the
4 questions were to Mr. Cade?
5           MR. ROWE:  Do you remember
6 what some of the questions were to Mr. Cade.
7      A.    Yes.
8      Q.    What were those questions?
9           MR. ROWE:  Don't answer.
10      Q.    Do you understand that your
11 attorney is instructing you not to answer?
12      A.    Yes.
13      Q.    And are you going to abide by
14 that instruction?
15      A.    Yes.
16      Q.    Did you ever consider inviting
17 ADEM to the meeting?
18           MR. ROWE:  I'm sorry.
19      Q.    Alabama Department of Energy
20 and Management?
21           MR. ROWE:  I'm sorry did you
22 ask did she ever consider?
23      Q.    Yeah.  Did you ever consider

♀

88

1 inviting the Alabama Department to the
2 meeting to hear what your concerns were?
3      A.    No.
4      Q.    Any other agency?
                        Page 72

HUGHES.TXT

```
 5        A.     No.
 6        Q.     Moving on from that, your
 7  affidavit talks about a second meeting, I
 8  guess was in December, 2003?
 9        A.     That's correct.
10        Q.     And what was that meeting?
11  Let me ask that better.
12               MR. ROWE:  What was that
13  meeting?
14        Q.     Who attended that meeting?
15        A.     The former employees, their
16  families, and the citizens of the
17  surrounding towns.
18        Q.     Okay.  I guess you were at the
19  meeting?
20        A.     Correct.
21        Q.     Mr. Cade was at the meeting?
22        A.     Correct.
23        Q.     Was anyone else?
```

♀

89

```
 1        A.     Yes.
 2        Q.     With Mr. Cade?
 3        A.     Yes.
 4        Q.     And who would that have been?
 5        A.     Some of his paralegals.
 6        Q.     Do you remember their names?
 7        A.     No.
 8        Q.     Okay.  Other than you,
 9  Mr. Cade, his paralegals, and sort of the
```

Page 73

HUGHES.TXT
10  people in the community there, was anyone
11  else at that meeting?
12          A.      No.
13          Q.      Okay.  Do you remember about
14  how many people were at that meeting?
15          A.      Almost eight hundred.
16          Q.      Eight hundred.  Did you keep a
17  sign-in sheet for that one too?
18          A.      I did.
19          Q.      What was -- can you describe
20  that piece of paper for me.  What did it
21  look like.  What was on it?
22          A.      It was ledger pads and when
23  they walked through they had to sign in.

                                                90

 1  That was it.
 2          Q.      Was it just their name or were
 3  you getting more information than that?
 4          A.      Just names.
 5          Q.      How many pages would that have
 6  been?
 7          A.      26 names to a page.  Maybe 30.
 8          Q.      30.  Okay.  So you said it was
 9  former employees and their families at that
10  time?
11          A.      And the citizens.
12          Q.      And the citizens.  Did you not
13  let anybody into this meeting?
14          A.      I did.
15          Q.      Who would that have been?
                        Page 74

HUGHES.TXT

16    A.    An editor of the newspaper.

17    Q.    Okay.  And he was from?

18    A.    She.

19    Q.    She?

20    A.    Florala.

21    Q.    Florala news?

22    A.    Correct.

23    Q.    Why did she show up?

♀

91

1    A.    She wanted to do a story and
2    take some pictures.  And Mr. Cade and I
3    decided it wasn't good.

4    Q.    Do you know how she found out
5    about the meeting?

6    A.    She's in it.  She's in this.

7    Q.    She's a plaintiff?

8    A.    Yes.

9    Q.    Did you let her attend in her
10    capacity as a plaintiff and just not as a
11    reporter?

12    A.    Well when I told her she
13    couldn't bring her camera in, she got mad
14    and left.

15    Q.    Okay.  So she was the only
16    person that you denied entry to?

17    A.    That's correct.

18    Q.    Okay.  Your affidavit here on
19    page 2 in the last full paragraph says I
20    confirm that every attendee was there for

Page 75

HUGHES.TXT
21  the purposes of determining whether he or

22  she Knight might need legal representation

23  in the joint matter being discussed?

♀

1       A.      That's correct.

2       Q.      Is that correct?  What did you

3  do at that December meet to do that?

4       A.      Do me again.

5       Q.      I guess how did you confirm

6  with each attendee that they were there for

7  legal advisor legal representation?

8       A.      Most of them you can look at

9  them and tell that they have some kind of

10  mental, physical problem the some of them I

11  knew.  And basically if they wasn't there to

12  sign up then they didn't need to be there

13  and that's why they were there.

14       Q.      Did you ever ask them, either

15  individually or the group the question like

16  that, and you there for legal

17  representation?

18       A.      I always left that up to Greg

19  at the time and when Eason came in Eason

20  started doing it.

21       Q.      Was Eason at that meeting?

22       A.      No.

23       Q.      So was there ever an

♀

HUGHES.TXT

1  announcement at that meeting by anyone
2  either you are or Mr. Cade or his
3  paralegals, I guess, that if you weren't
4  there for legal representation, you should
5  leave?
6          A.      Maybe in a roundabout way.
7          Q.      What do you mean by that?
8          A.      I mean it wasn't like -- it
9  wasn't like Greg got up and said if you're
10  here for a check you can go.  We made sure
11  that there was something wrong with either
12  each person that was there or a spouse or a
13  mother or a child or something before.  So
14  that's why they were there for legal
15  representation.
16          Q.      I guess what I'm trying to
17  figure out is how did you make sure of that
18  that each person there had something wrong
19  with them?
20          A.      The population of Florala is
21  less than 2 thousand.  The population of
22  Lockhart is around 7 hundred.  I know
23  everybody.  I know everybody.  I've always

♀

94

1  known everybody.  And I'm not exaggerating.
2  I know everybody.  I can tell you where they
3  live and who they're married to.  I know.  I
4  just know.
5          Q.      Of the eight hundred or so

Page 77

HUGHES.TXT
6  that were there, how many of them were sort

7  of what I'll call uninjured family members

8  that were there with someone else?

9          A.    Physically, that I could see

10  or knowing?

11                MR. ROWE:  Could you say the

12  question.  Again I missed it.

13          Q.    (BY MR. SOSTRIN):  I'll let

14  you answer how you want.  How many of the

15  eight hundred that were there were family

16  members because they were only there as

17  family members and because they were there

18  accompanying someone who was injured?

19          A.    Maybe 25 that was requiring

20  assistance.

21          Q.    25?

22          A.    Spouses daughters, pushing in

23  husband, son, father, whatever.

♀

95

1          Q.    Were there big families there

2  or family members that just came with even

3  though their family member might not have

4  needed assistance just because they wanted

5  to hear what was being said?

6          A.    Not necessarily, no.

7          Q.    Not necessarily?

8          A.    They were former employee

9  their spouse, three kids if these he they've

10  got kids, their kids because somebody in

11  that family was sick.

                    Page 78

HUGHES.TXT

12      Q.    I guess that's what I'm
13  asking.  There were a lot of people that
14  brought their whole family along?
15      A.    Maybe former employee, 10 at
16  the most that was tailing behind them.
17      Q.    Okay.  Now I don't want to get
18  into any content yet of what was said, but
19  what happened at this meeting?
20          MR. ROWE:  Object to the form.
21  What happened at the meeting.
22      Q.    You can answer if you can?
23          MR. ROWE:  Can you answer that

96

1  question.
2      A.    They signed in.  Greg talked
3  if they wanted to sign up.  They signed up
4  through the paralegals and they left.
5      Q.    So Mr. Cade gave another talk?
6          MR. ROWE:  Object to the
7  question.  Can I give you my form objection
8  to that?
9          MR. SOSTRIN:  Yeah.
10          MR. ROWE:  I think the
11  question did he give talk.  I think it's
12  obvious that he talked at the meeting
13  whether he gave talk is another matter.
14      Q.    (BY MR. SOSTRIN):  What did
15  Mr. Cade do at the meeting?
16      A.    I introduced him he introduced
                Page 79

HUGHES.TXT
17  his self.  He made the call on

18  representation told them if they had a

19  medical problem that they need to talk to

20  one of his assistants that's it.

21              MR. ROWE:  That's enough.

22  We're starting to get into content.

23              MR. SOSTRIN:  That's the

97

1  problem I did have with.

2              MR. ROWE:  The answer is

3  Mr. Cade did talk.

4       Q.    Did Mr. Cade give any sort of

5  I want to say like a preplanned

6  presentation?

7              MR. ROWE:  Don't answer that.

8              MR. SOSTRIN:  You're

9  instructing her not to answer?

10             MR. ROWE:  Yeah.

11             MR. SOSTRIN:  On what ground?

12             MR. ROWE:  I think it was

13  privileged.

14      Q.    Did he gave a --Do you know

15  whether his presentation was preplanned?

16  Did Mr. Cade give a formal presentation to

17  the group?

18             MR. ROWE:  I'm going to object

19  to that.  If you can answer that, try it.

20      A.    Did you say formal?

21      Q.    Yeah.

22      A.    No.
                    Page 80

HUGHES.TXT

23        Q.      Did he have any visual aids?

♀

                                                    98

1         A.      No.

2         Q.      Not like a PowerPoint

3  presentation?

4         A.      No.

5         Q.      He just talked to them?

6         A.      Nods head, yes.

7         Q.      Was there a similar sort of

8  question and answer session like the first

9  meeting?

10        A.      Yes.

11        Q.      So people from the audience

12  could ask questions?

13        A.      Yes.

14        Q.      And he would answer them?

15        A.      Yes.

16        Q.      Do you remember what Mr. Cade

17  talked about at the meeting.  I'm asking if

18  you remember?

19        A.      Yes.

20        Q.      Can you tell me what Mr. Cade

21  talked about?

22                MR. ROWE:  No she can't.

23                MR. SOSTRIN:  Are you

♀

                                                    99

1  instructing her not to answer?

Page 81

HUGHES.TXT

2              MR. ROWE:  Yes, I am.

3      Q.    Do you understand that your

4  attorney is instructing you not to answer?

5      A.    Yes.

6      Q.    Do you intend to follow his

7  instruction?

8      A.    Yes.

9              MR. ROWE:  Let me ask her a

10  question do you intend to follow my

11  instruction every time I testimony you not

12  to answer.

13             THE WITNESS:  Yes.

14             MR. ROWE:  I'm trying to short

15  sir cut that she will not answer if I tell

16  her to.

17      Q.    (BY MR. SOSTRIN):  Do you

18  remember what some of the questions were to

19  Mr. Cade?

20      A.    Yes.

21      Q.    Can you tell us what those

22  were?

23      A.    No.

100

1             MR. ROWE:  I instruct her not

2  to answer.

3      Q.    Do you understand that you

4  have been instructed by your attorney not to

5  answer that question?

6      A.    Yes.

7      Q.    And are you going to abide by

HUGHES.TXT

 8  his instruction?

 9        A.     Yes.

10                MR. ROWE:  Do we have to do

11  this every time.

12                MR. MITCHELL:  Let's take a

13  short break.

14                MR. ROWE:  I'm just going to

15  do with this line of questioning anyway.

16  Let's finish it up.

17                MR. MITCHELL:  Let's just get

18  off the Record a moment, may we?

19                MR. SOSTRIN:  That's fine.

20                     (Recess taken.)

21                MR. MITCHELL:  Back on the

22  record.

23        Q.     (BY MR. SOSTRIN):  Ms. Hughes,

♀

                                        101


 1  I just have a couple more questions about

 2  your affidavit and this meetings and

 3  hopefully won't be controversial but we'll

 4  see.  Do you remember the exact date of this

 5  December meeting?

 6        A.     December the 8th.

 7        Q.     December the 8th.  What did

 8  you do to sort of publicize the meeting?

 9  How did people know to show up?

10        A.     I remember a lot of it was

11  word of mouth.  A lot of it was phone calls

12  to me.  I may or may not -- I may or may not

                     Page 83

HUGHES.TXT

13  have placed an add.  I don't remember.

14       Q.    Okay.  I meant to ask you too

15  about the sign-in sheet for the eight

16  hundred.  Do you know what happened to that?

17       A.    Greg.

18       Q.    Greg.  All right now the one

19  last thing I wanted you to ask you about the

20  affidavit here.  On page two there is a

21  paragraph in here about your time as a

22  substitute teacher?

23       A.    That's correct.

♀

102

1       Q.    How long have you done that

2  for?

3       A.    I started in 1995, and I quit

4  doing it in 2002.

5       Q.    95 to 2002?

6       A.    That's correct.

7       Q.    How often would do you that?

8       A.    Out of the 9 month period

9  probably two months.

10       Q.    Out of school session,

11  probably two months?

12            MR. MITCHELL:  Can we take a

13  break now that we've moved onto the next

14  subject?

15            MR. SOSTRIN:  Let's take a

16  break.

17            (Recess taken.)

18       Q.    (BY MR. SOSTRIN):  All right.

Page 84

HUGHES.TXT

 5      Q.    Any like State Department of
 6  Education?

 7      A.    No.

 8      Q.    One last question that to go
 9  to the public meetings I hope they weren't
10  going to be controversial.  We were Paulk
11  talking about the sign-in sheets that you
12  gave to Mr. Cade?

13      A.    Correct.

14      Q.    Did he take the sheets right
15  at the meeting or was it at a later time?

16      A.    At the end of the meeting.

17      Q.    So at the end of the meeting
18  Mr. Cade took the sign-in sheets?

19      A.    And if he forgot them I may
20  have sent them.

21      Q.    Do you remember if he forgot
22  them?

23      A.    Once.

⚥

112

 1      Q.    Which meeting was it at?

 2      A.    Neither one of these.

 3      Q.    Neither one of these.  That
 4  was my next follow-up question, beyond these
 5  two meetings that were discussed in this
 6  affidavit have there been other large scale
 7  meetings?

 8      A.    Yes.

 9      Q.    Do you remember the dates of
10  those or to the best that you can remember.

Page 92

HUGHES.TXT

11  I guess I'll limit to the question to the

12  time before the lawsuits were filed in

13  January of 06?

14        A.    We haven't had a meeting where

15  everybody could go since it was the first

16  part of 2005, I think yeah 2005.

17        Q.    Do you remember a month?

18        A.    It was the last organized

19  meeting, and it wasn't really a meeting.  It

20  was questionnaires.  Do you know what I'm

21  saying?  It was questionnaires that had to

22  be filled out.  It was for people to come in

23  that needed help.

♀

113

1         Q.    So the main purpose of that

2   meeting was just to fill out the plaintiff

3   questionnaires?

4         A.    That's correct.

5         Q.    Okay.  I guess your

6   questionnaire was dated April 05.  Does

7   that?

8         A.    That would be when they were

9   here.

10        Q.    Sound right.  Okay.  So I we

11  have the October 2003 meeting with the

12  employees, we have the December 2003 meeting

13  and then we have this early 2005 meeting.

14  Were there any other organized meetings?

15        A.    We did have an organized

Page 93

HUGHES.TXT

16  meeting in 2004.

17       Q.     To 2004.  Do you remember when

18  that would have been?

19       A.     That's when I met Eason.  It

20  was getting to be cool weather.  It was

21  raining.  Jackets was required, maybe the

22  end of October.  First of November.

23       Q.     Okay.  So about October of

                                              114

1  November, 2004?

2       A.     That's correct.

3       Q.     Now who was at that meeting?

4       A.     Are you talking about

5  attorneys or people.

6       Q.     Both.  Why don't we?

7       A.     A general who was there.

8       Q.     Yeah?

9       A.     The attorneys.  The citizens,

10  the former employees, myself.

11       Q.     Okay.  Which?

12       A.     And paralegals.

13       Q.     Which attorneys were there?

14  You mentioned Eason?

15       A.     It was Greg and Eason and then

16  the paralegals, Wendy, Michael, Chrissy, and

17  maybe Laura.

18       Q.     Okay.  If you remember, about

19  how many people attended that meeting total?

20       A.     There was two meetings.  Same

21  day one was earlier one was later.  Like 4

                  Page 94

HUGHES.TXT

22  and 7 o'clock.  And I think we had 1169

23  people all together.

♀

115

1        Q.      1169?

2        A.      That's correct.

3        Q.      W-O-W.  What was the purpose

4  of the two meetings?

5        A.      Because of the number of

6  people we couldn't fit them all.

7        Q.      Was that the Florala meeting

8  haul?

9        A.      That's correct.

10       Q.      And would people just show up

11  whatever time worked for them?

12       A.      That's correct.

13       Q.      Hopefully we can avoid what

14  was the purpose of those meetings if you

15  know?

16               MR. ROWE:  If you know the

17  general purpose if it was to talk tore if it

18  was.

19       A.      Greg introduced Eason.

20       Q.      We don't need to get into

21  content?

22       A.      Greg introduced Eason so that

23  everybody would know him and at this time

♀

116

HUGHES.TXT

1  Eason had already been everywhere.  People
2  were calling me at two o'clock in the
3  morning saying who's this man knocking on my
4  door.  A lot of people already knew him but
5  some of them didn't.  That and they wanted
6  to Connecticut gate the people that were
7  missing limbs, they actually -- we kind of
8  divided them up in groups, mentally ill from
9  the disabled to the blind to the whatever.
10      Q.    So to assess their various
11 injuries and health condition?
12      A.    That's correct.
13      Q.    I guess there were two
14 meetings but how long did they last?
15      A.    Approximately 2 and a half to
16 3 hours each.  If I'm not mistaken it was
17 from 4 to 7 and from 7 to 10.
18      Q.    Okay.  And did Eason or Greg
19 talk at the meetings?
20      A.    Yes.
21      Q.    Yes was there a similar sort
22 of question and answer?
23      A.    No.

♀

117

1       Q.    And I just have to ask this
2  and then we can hopefully move on.  What did
3  Greg or Eason say at the meeting?
4            MR. ROWE:  Obviously I would
5  ask you not to not to answer that question.
6       Q.    Do you understand that your

HUGHES.TXT

 7    attorney is instructing you not to answer?
 8         A.    Yes.
 9         Q.    And are you going to abide by
10    that instruction?
11         A.    Yes.
12               MR. SOSTRIN:  See that's easy.
13         Q.    Was there a sign-in sheet for
14    those two meetings?
15         A.    Yes.
16         Q.    And can you just describe to
17    me what that would have looked like was it
18    like the prior ones?
19         A.    Actually it was a composition
20    notebook.
21         Q.    And would people just write
22    their names in there or give more
23    information like the injuries they had?

♀

118

 1         A.    Just the names.
 2         Q.    Do you know what happened to
 3    the two notebooks?
 4         A.    I personally know that Wendy
 5    took them.
 6         Q.    Wendy?
 7         A.    Gorman, paralegal for Greg
 8    Cade.
 9         Q.    Okay.  So I guess we've
10    covered the four sets of meetings, the
11    October of '03, the December of '03, these

Page 97

HUGHES.TXT
12  October, Novemberish 2004, and then the

13  early 2005 meetings?

14          A.      That's correct.

15          Q.      And were there any other ones?

16          A.      The October -- I mean the

17  April 05 was not like a meeting.  It was

18  like if you need some help kind of meeting.

19          Q.      Right.  , okay.  But other

20  than those three or four were there any

21  other organized?

22          A.      That's all I remember.

23          Q.      Okay.  Apart from whatever

♀

                                                    119


1  went on at the meetings, did you do anything

2  else to sort of sign up plaintiffs for these

3  lawsuits?

4          A.      Me personally.

5          Q.      You personally?

6          A.      No.

7          Q.      No.

8          A.      No.

9          Q.      Did you go around sort of talk

10  to people asking them if they wanted to sign

11  up?

12          A.      No.  Everybody that signed up

13  either called me, we discussed it on the

14  phone.  If I didn't know if their health

15  problem was significant enough, I gave them

16  the phone number for them to call.

17          Q.      If people reached out to you
                        Page 98

HUGHES.TXT

18  you would talk to them and get them?

19        A.    I would forward them on.

20        Q.    Okay.  If you said if their

21  health problem was significant enough?

22        A.    Well and of course and I

23  pecked this up from Greg and Eason.  They

♀

                                                    120


 1  would ask do you need representation.  Do

 2  you have a medical problem are you a former

 3  employee.  If one of those answers was yes,

 4  I'd say you need to call.

 5        Q.    Okay.

 6              MR. ROWE:  You need to call

 7  Greg Cade.

 8              THE WITNESS:  That's correct.

 9        Q.    Were there any potential

10  plaintiffs that you talked to whose health

11  conditions weren't serious enough where you

12  thought -- where you didn't forward their

13  call or their information?

14        A.    No.  I never denied nobody.

15              MR. ROWE:  Let me clarify

16  something I don't think she said she denied

17  anybody I think she forwarded it to Greg

18  Cade.

19              MR. SOSTRIN:  Whatever your

20  testimony is on the Record there govern, if

21  it ever comes up.

22        Q.    Throughout this process, if

                    Page 99

HUGHES.TXT

 7        Q.    Do you know whether he's
 8   currently a plaintiff in this litigation?
 9        A.    Yes.
10        Q.    Is he?
11        A.    Yes.
12        Q.    Okay.  When your father and
13   mother separated when you were about in the
14   second grade and he started to live next
15   door, was there anybody else that lived in
16   the house with him?
17        A.    No.
18        Q.    He lived by himself?
19        A.    Yes.
20        Q.    And is that true the entire
21   time that he lived in that house?
22        A.    That's correct.
23        Q.    I think you indicated that you

♀

181

 1   haven't had any of your doctors tell you
 2   that any of your physical conditions are
 3   related to your facility is that right?
 4        A.    That's correct.
 5        Q.    Have you ever asked any of
 6   your doctors?
 7        A.    No.
 8        Q.    And I don't mean to get into
 9   the meetings again I'm going to try too keep
10   it simple don't tell me the contents?
11        A.    Okay.

Page 149

HUGHES.TXT

12          Q.     My question is at any of the
13   meetings that we discussed did anybody ever
14   use any kind of a visual aid or visual
15   presentation?  Don't tell me what was in it?
16               MR. ROWE:  If there was one.
17          A.     Yes.
18          Q.     which meetings was that?
19          A.     The one that was the end of
20   October, first of November of 2000 -- I have
21   not -- I have to check my notes.
22          Q.     The one about October November
23   2004?

♀

1          A.     That's correct.  Wait a minute
2   that's not true.  That's not true.  The
3   cousin that I talk about Ronnie that is now
4   deceased he got in a car wreck.  Eason
5   interviewed him the night before he wrecked
6   that was November the 9th.  So this when I
7   met Eason it was cold weather.  It was
8   raining I've got that part right and then
9   they came back a couple of months later and
10   that's when Eason had a visual had because
11   he actually had my first cousin on there
12   talking.
13          Q.     So you think in other words
14   it's meetings were sometime after?
15          A.     One was after November the
16   14th when Ronnie got killed.  He got in the
17   wreck the 10th, and he died the 14th.  So he
                    Page 150

HUGHES.TXT

18  actually -- Eason and Greg both came back

19  somewhere between the November the 14th, and

20  December the 31st.  After the October when

21  everybody met Eason to begin with.

22        Q.    Okay.  So we've got the one in

23  October, November, 2004, and then we've got

♀

183

1  another one?

2        A.    November/December of the same

3  year.

4        Q.    Okay.  On that

5  November/December of 2004 meeting that we're

6  now talking about are you saying that there

7  was some sort of a visual presentation?

8        A.    Yes.

9        Q.    And that was the interview

10  with Ronnie Jackson?

11        A.    Yes.

12        Q.    Is that accurate.  Other than

13  that interview was were there any other

14  visual aids or visual presentations used in

15  the meetings that you can recall?

16        A.    No.

17        Q.    The November/December one that

18  we're now talking about where was that

19  located?  Also at the armory?

20        A.    Wait a minute here.  Ronnie

21  did get killed November 2004.  Eason showed

22  us this visual the next year.  It was prior

Page 151

HUGHES.TXT

23  to my mother dying in 2005.  The way I know

184

1   this is because my mother got sick in
2   October.  I moved in with her.  When the
3   people came to Florala to make -- to finish
4   up the tape, my husband with them because I
5   couldn't go.  So we had a meeting right
6   around October or November of 2005 because I
7   didn't go my husband went in my place.
8   That's when everybody saw the visual.
9       Q.    We're talking about the
10  interview or the video of Ronnie?
11      A.    Uh-huh.
12      Q.    Was there any other visual
13  that you're aware of?
14      A.    As they was riding the streets
15  in Lockhart, my husband had the video camera
16  out the window or either he was driving or
17  the other person had the video camera out
18  the window so they just done some streets
19  and bringing you back to you no I letting
20  everybody see where they were at and that's
21  when they let them do the talking.
22      Q.    And who was the other person
23  with your husband that you just mentioned?

185

1       A.    Eason's daughter Ally.
2       Q.    Did they also show that at the
                        Page 152

HUGHES.TXT

3   2005 meeting is that what you're trying to
4   tell me?
5         A.      That's when they showed it.
6         Q.      Anything other than the Ronnie
7   Jackson and the video you just told me about
8   that they showed?
9         A.      That's it and my husband had
10  to tell me about this.
11        Q.      Did he mention anything else
12  that they showed?
13        A.      Melanie Chambers was on it.
14  Other than that I don't recall anything else
15  he told me.
16        Q.      When your husband attended
17  that 205 meeting, did he also keep sign-in
18  sheets in your absence?
19        A.      I have no clue.
20        Q.      Don't know?  Are you aware of
21  any sign-in sheets that any sign-in sheets
22  that relate to that 2005 meeting?
23        A.      No.

♀

186

1         Q.      Did your husband ever tell you
2   what happened at that 2005 meeting?
3         A.      Not really.  My mother was so
4   sick we didn't really even talk about it.  I
5   just know that he said that they showed this
6   slide.
7         Q.      Do you recall anything else at
                        Page 153

HUGHES.TXT

8  all about it?

9       A.     No.  I don't know how many

10  people were there, nothing.

11      Q.     Okay.  Again, I don't want to

12  know about any conversations that you had

13  with your attorneys, okay, but you mentioned

14  that you went to see Steve stance son is

15  that the right name?

16      A.     Steve Sansom S-A-N-S-O-M.

17      Q.     And he gave the have you the

18  phone number of Greg Cade?

19      A.     That's correct.

20      Q.     And you contacted Mr. Cade?

21      A.     That's correct.

22      Q.     And my question is with Steve

23  or Greg Cade or attorneys with his firm or

187

1  attorneys with Eason's firm, have you spoken

2  to any other attorneys about the Lockhart

3  mill?

4       A.     No.

5       Q.     Do you know a gentleman by the

6  name of Wayne Adams?

7       A.     Yes.

8       Q.     Tell me what you know about

9  Wayne.

10      A.     He's a little younger than I

11  am.  He's got two children that by a

12  previous marriage he's raising now.  He

13  works all the time.  He works for a company

Page 154