(2007-11-13) Ezell, Kenneth.txt

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5   CASE NUMBER:   2:06-CV-00083-LES-CSC

6   GAIL BEDSOLE TATUM, AS MOTHER AND

7   ADMINISTRATRIX OF THE ESTATE OF MELANIE

8   CHAMBERS, A DECEASED MINOR CHILD,

9              Plaintiff,

10              vs.

11  PACTIV CORPORATION, ET AL.,

12              Defendants.

13

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by and

16  between the parties through their respective

17  counsel, that the video deposition of Roy

18  Kenneth Ezell may be taken before Sara

19  Mahler, CCR, at the Embassy Suites, at 300

20  Tallapoosa Street, Montgomery, Alabama

21  36104, on the 13th day of November, 2007.

22

23        DEPOSITION OF ROY KENNETH EZELL

2

1           IT IS FURTHER STIPULATED AND

2   AGREED that the signature to and the reading

3   of the deposition by the witness is not

Page 1

(2007-11-13) Ezell, Kenneth.txt

4  waived, the deposition to have the same

5  force and effect as if full compliance had

6  been had with all laws and rules of Court

7  relating to the taking of depositions.

8          IT IS FURTHER STIPULATED AND

9  AGREED that it shall not be necessary for

10  any objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties

13  may make objections and assign grounds at

14  the time of the trial, or at the time said

15  deposition is offered in evidence, or prior

16  thereto.

17          IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21          * * * * * * * * * * * *

22

23

3

1          * * * * * * * * * * * *

2              I N D E X

3            EXAMINATION

4                              PAGE

5  By Mr. Palmer ...................... 10

6          PLAINTIFF'S EXHIBITS

7                              PAGE

8  Exhibit 1 - A copy of the

9          subpoena ................. 11

Page 2

(2007-11-13) Ezell, Kenneth.txt

10  Exhibit 2 - Mr. Ezell's drawing

11           of the plant layout ...... 85

12  Exhibit 3 - Correspondence to the

13           environmental manager ... 132

14  Exhibit 4 - Document referencing

15           Mr. Ezell as

16           environmentalist ........ 134

17  Exhibit 5 - Letter from LP to Ed

18           Hughes of ADEM, 4/22/97 . 151

19  Exhibit 6 - Document referencing

20           Mr. Ezell as

21           environmental.

22           coordinator ............. 155

23  Exhibit 7 and 8 - Documents

4

 1           referencing new well .... 155

 2  Exhibit 9 - Environmental log

 3           book ................... 158

 4  Exhibit 10 - Monitoring well log

 5           sheet .................. 162

 6  Exhibit 11 - 6/27/94 notice of

 7           violation .............. 174

 8           * * * * * * * * * * * *

 9

10

11

12

13

14

(2007-11-13) Ezell, Kenneth.txt

15

16

17

18

19

20

21

22

23

5

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             NORTHERN DIVISION

4

5   CASE NUMBER:   2:06-CV-00083-LES-CSC

6   GAIL BEDSOLE TATUM, AS MOTHER AND

7   ADMINISTRATRIX OF THE ESTATE OF MELANIE

8   CHAMBERS, A DECEASED MINOR CHILD,

9             Plaintiff,

10            vs.

11  PACTIV CORPORATION, ET AL.,

12            Defendants.

13

14

15  BEFORE:

16            SARA MAHLER, Commissioner.

17

18  APPEARANCES:

19            ROBERT LESLIE PALMER, ESQUIRE, of

20  ENVIRONMENTAL LITIGATION GROUP, 3529 Seventh

(2007-11-13) Ezell, Kenneth.txt

21  Avenue South, Birmingham, Alabama 35222,

22  appearing on behalf of the Plaintiff.

23

                                          6

1  APPEARANCES:  (Cont.)

2          GREGORY A. CADE, ESQUIRE, of

3  ENVIRONMENTAL LITIGATION GROUP, 3529 Seventh

4  Avenue South, Birmingham, Alabama 35222,

5  appearing on behalf of the Plaintiff.

6          ORLYN O. LOCKARD, ESQUIRE, of

7  ALSTON & BIRD, 1201 West Peachtree Street,

8  Atlanta, Georgia 30309, appearing on behalf

9  of the Defendant, Louisiana-Pacific

10  Corporation.

11          MATTHEW SOSTRIN, ESQUIRE, of MAYER

12  BROWN, 71 South Wacker Street, Chicago,

13  Illinois 60606, appearing on behalf of the

14  Defendant, Pactiv Corporation.

15          ALSO PRESENT:  JEFF TOTHEROW

16                         MICHAEL BARTLETT

17          * * * * * *

18

19          I, SARA MAHLER, CCR, a Court

20  Reporter of Wetumpka, Alabama, acting as

21  Commissioner, certify that on this date, as

22  provided by the Federal Rules of Civil

23  Procedure and the foregoing stipulation of

                                          7

(2007-11-13) Ezell, Kenneth.txt

1   counsel, there came before me at the Embassy

2   Suites, 300 Tallapoosa Street, Montgomery,

3   Alabama 36104, beginning at 10:40 a.m., Roy

4   Kenneth Ezell, witness in the above cause,

5   for oral examination, whereupon the

6   following proceedings were had:

7           VIDEOGRAPHER:  Here begins

8   videotape number one in the deposition of

9   Kenneth Roy Ezell, in the matter of Melanie

10  Chambers, et al., versus Pactiv Corporation,

11  et al., case number 2:06-CV-83-LES.  We're

12  on the Record at 10:41 a.m. on Tuesday,

13  November 13th, 2007.

14          This deposition is taking

15  place at the Embassy Suites in Montgomery,

16  Alabama.  The videographer is Jeff Totherow.

17  Would Counsel please identify yourselves and

18  state whom you represent.

19          MR. PALMER:  Yes.  My name is

20  Robert Leslie Palmer.  I am one of the

21  attorneys representing the Plaintiffs in

22  this case.

23          MR. CADE:  My name is Gregory

                                        8

1   A. Cade, for the Plaintiffs.

2           MR. SOSTRIN:  I'm Matthew

3   Sostrin from Mayer, Brown, for Defendant,

4   Pactiv Corporation.

5           MR. LOCKARD:  Skip Lockard, on

                Page 6

(2007-11-13) Ezell, Kenneth.txt

6  behalf of Louisiana-Pacific and the

7  deponent, Kenneth Ezell.

8          VIDEOGRAPHER:  Would the court

9  reporter please swear in the witness.

10          ROY KENNETH EZELL,

11  being first duly sworn, was examined and

12  testified as follows:

13          COURT REPORTER:  Usual

14  stipulations?

15          MR. PALMER:  If by usual

16  stipulations you mean all objections except

17  as to form and responsiveness are reserved

18  until the time of trial, that's acceptable

19  to the Plaintiffs.

20          MR. LOCKARD:  That's fine.

21          MR. SOSTRIN:  And I think we

22  have one other just stipulation or just a

23  matter of Record.  Mr. Palmer, if you want

9

1  to go ahead.

2          MR. PALMER:  The Plaintiffs'

3  action against Pactiv has been resolved.

4  The final paperwork has not been completed

5  yet.  And Pactiv's Counsel is here with the

6  express understanding that he will not raise

7  any objections or say anything else on the

8  Record.

9          He did ask whether he could

10  wink to Counsel for Louisiana-Pacific, and I

Page 7

(2007-11-13) Ezell, Kenneth.txt

11  told him that was between him and Counsel

12  for Louisiana-Pacific.

13              MR. LOCKARD:  And I said no.

14              MR. PALMER:  But in any event,

15  he's here as a nonparticipant, and that's

16  because of the resolution of the case

17  against Pactiv.

18              MR. SOSTRIN:  That is

19  essentially our understanding.  We do have

20  an agreement in principal to settle this

21  litigation, but as Mr. Palmer said, it's not

22  finalized yet.  So that's why I'm still here

23  today.

10

1               And I think we also have the

2   understanding that nothing in this

3   deposition would be used against Pactiv

4   should something happen, you know, with that

5   settlement were Pactiv not to be, you know,

6   dismissed from the case.  Is that accurate?

7               MR. PALMER:  That's correct.

8               MR. SOSTRIN:  I think we're

9   all set, then.

10              MR. LOCKARD:  If you guys are

11  through, one more minor bit of housekeeping.

12  It's not really a stipulation, but I just

13  want to make sure I don't forget at the end,

14  Mr. Ezell will reserve the right to review

15  his transcript and sign.

16                        EXAMINATION
                          Page 8

(2007-11-13) Ezell, Kenneth.txt

17   BY MR. PALMER:

18          Q.      (BY MR. PALMER):  Good

19   morning, Mr. Ezell.

20          A.      Good morning.

21          Q.      I apologize that you had to

22   sit out and wait for a while, while we were

23   organizing these little details.

                                                    11

1           A.      That's okay.

2           Q.      The first thing I want to get

3    straight is your full name.  I'm not sure

4    whether we even got your correct full name

5    on --

6           A.      It's Roy Kenneth instead of

7    Kenneth Roy.

8           Q.      Okay.  So, your name is Roy

9    Kenneth Ezell?

10          A.      Yes.

11          Q.      Is there any kind of Junior in

12   that?

13          A.      No.

14          Q.      I heard Mr. Lockard say that

15   he represents you in this matter; is that

16   correct?

17          A.      That's correct.

18          Q.      When did you hire Mr. Lockard

19   for that purpose?

20          A.      Two weeks ago, thereabouts.

21                  (Whereupon, Plaintiff's

(2007-11-13) Ezell, Kenneth.txt

22                    Exhibit 1 was marked for

23                    identification.)

                                                    12

1        Q.    Was it after -- Well, let me

2   hand you what I am marking as Plaintiff's

3   Exhibit 1.  Before you answer any questions,

4   you can look at it.  I'm going to give a

5   copy to your --

6               MR. PALMER:  You have to mark

7   the one on yours.

8        Q.    Take a moment to look at it,

9   if you would.  Have you had the opportunity

10  to look at the document marked as

11  Plaintiff's Exhibit 1?

12       A.    Yes.

13       Q.    Were you served with a copy of

14  this subpoena?

15       A.    Yes.

16       Q.    It has your name incorrect.

17  Is your address correct?

18       A.    Yes.

19       Q.    And did you hire Mr. Lockard

20  to be your counsel after receiving the

21  subpoena?

22       A.    Yes.

23       Q.    Did you have any previous

                                                    13

1   relationship with Mr. Lockard?

(2007-11-13) Ezell, Kenneth.txt

2          A.      Met with him one time.

3          Q.      Did he represent you as a

4    lawyer in any capacity prior to the time

5    that you hired him in connection with this

6    subpoena?

7          A.      No.

8          Q.      Did anyone at Mr. Lockard's

9    firm represent you prior to you hiring

10   Mr. Lockard at this deposition?

11         A.      No.

12         Q.      All right.  You're in a

13   deposition.  Do you understand the nature of

14   what a deposition is?

15         A.      Sort of.

16         Q.      All right.  Let me go through

17   it with you a little bit.  You understand

18   that it's a formal setting in which we're

19   asking questions and you answer the

20   questions?

21         A.      Right.

22         Q.      And you were shaking your head

23   up and down.  You understand that the court

                                              14

1    reporter has to be able to get your words,

2    so you need to be able to answer yes, no, or

3    whatever your answer is.

4          A.      Okay.  Yes.

5          Q.      And you also understand that

6    you're testifying under oath?

                        (2007-11-13) Ezell, Kenneth.txt
 7        A.      Yes.

 8        Q.      You understand that when you

 9  speak, that you have to testify from your

10  firsthand knowledge?

11        A.      Yes.

12        Q.      All right.  Do you understand

13  that this testimony can be used in court?

14        A.      Yes.

15        Q.      Is there anything that would

16  interfere with your testimony today, such as

17  taking medications?

18        A.      No.

19        Q.      Are you on any medications

20  now?

21        A.      No.

22        Q.      Have you ever had a stroke or

23  anything like that?

                                              15


 1        A.      No.

 2        Q.      Okay.  Now, referring again to

 3  the document that has been marked as

 4  Plaintiff's Exhibit 1, which is the

 5  deposition subpoena related to deposition

 6  notice, it refers to -- or it requests you

 7  for documents -- or it requests documents.

 8  Did you see that?

 9        A.      Yes.

10        Q.      Do you have any documents that

11  are responsive to the document request?

12        A.      No.  I reviewed it and I don't

(2007-11-13) Ezell, Kenneth.txt

13    have any in my possession.

14          Q.    All right.  Did you review any

15    documents in preparation for this

16    deposition?

17          A.    No.  I don't have any to

18    review.

19          Q.    Well, I understand that you

20    didn't have any documents, but you may have

21    reviewed something in connection with --

22          A.    No, I have not.

23          Q.    Okay.  Have you done anything

                                                  16

 1    to prepare for this deposition?

 2          A.    (Witness shakes head in the

 3    negative.)

 4          Q.    You have to answer verbally,

 5    if you would.

 6          A.    Oh.  No.

 7          Q.    Have you had any conversations

 8    with anyone, and I'm not going to ask you

 9    about -- I don't want you to tell me the

10    content of any conversations you've had with

11    your lawyer, but have you had any

12    conversations with anyone in preparation for

13    this deposition?

14          A.    No.  I met with him one time.

15          Q.    When did you meet with

16    Mr. Lockard?

17          A.    Two weeks ago.

(2007-11-13) Ezell, Kenneth.txt

18      Q.      Two weeks ago.  Where did you
19  meet with him?
20      A.      Opp, Alabama.
21      Q.      And how did it come about that
22  you decided to hire Mr. Lockard?
23      A.      Because of the wording of the

17

1   deposition.  It said:  Consult a lawyer.
2       Q.      Okay.  But I understand that.
3   What I was getting at, was what made you
4   select Mr. Lockard?
5       A.      They offered Mr. Lockard at
6   the meeting we had offered for legal counsel
7   and I accepted.
8       Q.      Okay.  And who -- At what
9   meeting was this?
10      A.      Two weeks ago.
11      Q.      Okay.  And who was "they"?
12  You said:  They offered Mr. Lockard.
13      A.      Mr. Lockard and Mr. Matthew.
14      Q.      Mr. Sostrin?
15      A.      There you go.
16      Q.      You're not represented by
17  Mr. Sostrin, are you?
18      A.      No, I'm not.
19      Q.      Is Mr. Lockard the only
20  attorney representing you?
21      A.      Yes.
22      Q.      I'm not sure I understand who
23  they -- you're referring to "they" offered

(2007-11-13) Ezell, Kenneth.txt

18

1   Mr. Lockard.   How did you know Mr. Lockard

2   was available to represent you?

3           A.      Because it come up in our

4   meeting.

5           Q.      Okay.   What meeting was that?

6           A.      Two weeks ago.

7           Q.      Okay.   And that was in Opp?

8           A.      In Opp.

9           Q.      Okay.   How did the meeting

10  come about?

11          A.      We met before that -- I don't

12  know what -- it's been a month, two months

13  ago.

14          Q.      All right.   Where did you meet

15  one month or two months ago?

16          A.      In Opp, Alabama.

17          Q.      At your house?

18          A.      No.

19          Q.      Okay.   Where did you meet in

20  Opp?

21          A.      Executive Inn.

22          Q.      And who was at that meeting?

23          A.      Mr. Lockard, and I can't

19

1   pronounce his last name.

2           Q.      Mr. Sostrin?

Page 15

                         (2007-11-13) Ezell, Kenneth.txt
3          A.      There you go.

4          Q.      And Mr. Sostrin doesn't

5   represent you?

6          A.      No.

7          Q.      And how long did the meeting

8   last?

9                  MR. LOCKARD:  Are we talking

10  about the first one?

11                 MR. PALMER:  I'm talking about

12  the first meeting that he had that was more

13  than a month ago -- I'm sorry, he said two

14  months ago.

15         A.      About an hour.

16         Q.      And what was the purpose of

17  that meeting?

18         A.      They contacted me about this

19  litigation and I agreed to meet with them.

20         Q.      Okay.  Had you ever met

21  Mr. Lockard before?

22         A.      No.

23         Q.      And who contacted you?


                                                20


1          A.      Mr. Lockard.

2          Q.      Mr. Lockard.  Did he call you

3   up?

4          A.      On the phone, yeah.

5          Q.      Okay.  And then he met with

6   you at the Executive Inn?

7          A.      Yes.

8          Q.      And Mr. Sostrin was there?
                          Page 16

(2007-11-13) Ezell, Kenneth.txt

9    A.    Yes.

10    Q.    Was there anyone else there?

11    A.    No.

12    Q.    And what was the purpose of

13  that meeting?

14    A.    Just for information about the

15  litigation.

16    Q.    Okay.  They wanted to find out

17  information from you?

18          MR. LOCKARD:  You don't need

19  to get into conversations that we had.

20          MR. PALMER:  Well, actually,

21  I'm talking about the meeting before he

22  hired you as a lawyer.

23          MR. LOCKARD:  Well, just for

21

1  the Record, and going forward in the

2  deposition, our position will be that the

3  attorney/client privilege extends to

4  communications with former employees, about

5  activities and the scope of their prior

6  employment, which would apply, I believe, to

7  Pactiv at that first meeting as well as to

8  Louisiana-Pacific.  So we are going to

9  assert the attorney/client privilege as to

10  the contents of that meeting.

11          MR. PALMER:  Okay.  Do you

12  have any authority for that?

13          MR. LOCKARD:  I didn't bring

Page 17

(2007-11-13) Ezell, Kenneth.txt
14  any case law authority with me, no, but

15  that's going to be our position, for the

16  Record.

17              MR. PALMER:  Are you

18  instructing him not to answer?

19              MR. LOCKARD:  I'm instructing

20  him not to discuss the contents of any

21  meeting that we've had, yes.

22              MR. PALMER:  Whether it was

23  before or after he hired you?


                                            22


1               MR. LOCKARD:  Whether it was

2   before or after he hired me for the narrow

3   purpose of defending him and preparing him

4   for the deposition or responding to the

5   subpoena.

6               I'm saying that our

7   conversations prior to that time are also

8   attorney/client privilege on the grounds

9   that he's a former employee and those

10  conversations relate to such employment.

11              MR. PALMER:  And you

12  understand that the attorney/client

13  privilege with respect to employees extends

14  not to former employees unless they were in

15  the capacity like a CEO?

16              MR. LOCKARD:  I'm not going to

17  debate it with you on the Record.  My

18  position is that those conversations would

19  be covered by the attorney/client privilege.
                    Page 18

(2007-11-13) Ezell, Kenneth.txt

20          MR. PALMER:  Is it your

21   position that any former employee is subject

22   to the attorney/client privilege?

23          MR. LOCKARD:  I'm not going to

                                                    23

1   debate it with you on the Record.   My

2   position is that my conversations with

3   Mr. Ezell are subject to the attorney/client

4   privilege.

5          MR. PALMER:  Okay.  Would you

6   mark this point in the Record?  We may need

7   to contact the Court for an emergency

8   telephonic hearing.  Okay?  Thank you.

9          Why don't we call the Court

10   during the lunch break?

11          MR. LOCKARD:  You're free to

12   proceed however you wish.

13      Q.     (BY MR. PALMER):  Have you

14   ever met with Louisiana-Pacific's general

15   counsel?

16      A.     No.

17      Q.     Do you now know Laura Ellison

18   Proctor at all?

19      A.     No.

20      Q.     Okay.  Have you ever met with

21   Bernard Taylor?

22      A.     No.

23      Q.     Have you ever met with Doug

(2007-11-13) Ezell, Kenneth.txt

24

1   Arnold?

2        A.        No.

3        Q.        Have you ever met with Josh

4   Becker?

5        A.        No.

6        Q.        Have you ever met with Dennis

7   Bailey?

8        A.        No.

9        Q.        Have you ever met with Austin

10  Huffaker?

11       A.        No.

12       Q.        Have you ever met with John

13  Berghoff?

14       A.        No.

15       Q.        Mark Ter Molen?

16       A.        No.

17       Q.        Jamie Hamberg?

18       A.        No.

19       Q.        Roberta Wertman?

20       A.        No.

21       Q.        Tommy Wells?

22       A.        No.

23       Q.        John Aaron Earnhardt?

25

1        A.        No.

2        Q.        Edwin Bryan Nichols?

3        A.        No.

4        Q.        Other than Mr. Lockard, have

(2007-11-13) Ezell, Kenneth.txt

5    you ever met with any lawyers from his firm?

6         A.    No.

7         Q.    Other than Mr. Sostrin, have

8    you ever met with any lawyers from his firm?

9         A.    No.

10        Q.    All right.  You have corrected

11   us on your name.  Your name is Roy Kenneth

12   Ezell, you said?

13        A.    Right.  Uh-huh.

14        Q.    What is the date of your

15   birth, sir?

16        A.    6/1/60.

17        Q.    And where were you born?

18        A.    Opp, Alabama.

19        Q.    Have you lived in Opp your

20   entire life?

21        A.    No.

22        Q.    Where do you currently live?

23        A.    Opp.

                                              26

1         Q.    And your current residence is

2    23120 Belmont Road, Opp, Alabama.

3         A.    Correct.

4         Q.    36467?

5         A.    Yes.

6         Q.    Okay.  How long have you lived

7    there?

8         A.    Since 2000.

9         Q.    And where did you live before

Page 21

(2007-11-13) Ezell, Kenneth.txt

10  that?

11        A.      Florala, Alabama.

12        Q.      What was your address there?

13        A.      The street is 4th Avenue.  I

14  don't remember what the house number was.

15        Q.      How long did you live there?

16        A.      About nine years.

17        Q.      So, that would take you back

18  to about 1991?

19        A.      Uh-huh.

20        Q.      Where did you live before

21  that?

22        A.      East 6th Avenue.

23        Q.      In Florala?

                                                    27

1         A.      Uh-huh.

2         Q.      How long did you live there?

3         A.      From '83 until '91 or '92,

4   whatever you've said.

5         Q.      Before 1983, where did you

6   live?

7         A.      1639 Wood Avenue.

8         Q.      Wood Avenue?

9         A.      Uh-huh.

10        Q.      And where was that, Florala?

11        A.      Uh-huh.  Yes.

12        Q.      How long did you live there?

13        A.      '78 to '83, about five years.

14        Q.      All right.  And before that,

15  where did you live?

                        Page 22

(2007-11-13) Ezell, Kenneth.txt

16          A.          1607 Wood Avenue, Florala.

17          Q.          And how long did you live

18    there?

19          A.          From '60 until '78.

20          Q.          All right.  Would that be from

21    the time of your birth?

22          A.          I guess.  Uh-huh.

23          Q.          When you say you were born in

                                                        28

1    Opp, Alabama, are you referring to the

2    hospital or the facility?

3          A.          Yes.  Uh-huh.

4          Q.          Where did you attend school,

5    sir?

6          A.          Florala.

7          Q.          Did you graduate from high

8    school there?

9          A.          Yes.

10          Q.          That's Florala High School?

11          A.          Yes.

12          Q.          And before Florala High

13    School, where did you go?

14          A.          City school, Florala City

15    School.

16          Q.          What was the name of it?

17          A.          Florala City School.

18          Q.          Okay.  Is that a grammar

19    school or is that a --

20          A.          1st through 8th.

                                Page 23

(2007-11-13) Ezell, Kenneth.txt

21      Q.      Okay.  Did you attend college,

22  sir?

23      A.      Two years in junior college.


                                        29


1       Q.      And where was that?

2       A.      Lurlene B. Wallace.

3       Q.      I'm sorry, what?

4       A.      Lurlene B. Wallace.

5       Q.      When did you attend Lurlene B.

6  Wallace?

7       A.      '78 to '80.

8       Q.      And this is while you were

9  living in Florala?

10      A.      Uh-huh.

11      Q.      What did you study at Lurlene

12  B. Wallace?

13      A.      It was forestry.

14      Q.      Forestry?

15      A.      Yes.

16      Q.      And did you earn a degree?

17      A.      No.

18      Q.      How many hours credit did you

19  earn?

20      A.      Not no -- I don't remember.

21      Q.      You don't remember?

22      A.      No.

23      Q.      Why did you end up not earning


                                        30

(2007-11-13) Ezell, Kenneth.txt

1  a degree?

2       A.    Started dating my wife and

3  then got married.

4       Q.    All right.

5       A.    Or my ex-wife.

6       Q.    What kind of courses did you

7  take in the forestry -- in your forestry

8  major?

9       A.    It was, like, physics,

10 calculus, algebra, some English.

11      Q.    Any other science classes?

12      A.    It seemed like there was

13 biology or something like that.

14      Q.    Okay.  You mentioned physics,

15 calculus, algebra and biology.

16      A.    (Witness nods head in the

17 affirmative.)

18      Q.    How many physics classes did

19 you have?

20      A.    One.

21      Q.    One.  And was that just a

22 basic physics class?

23      A.    I take it, it was, yes.

                                        31

1       Q.    Okay.  Like Physics 101,

2  Introductory?

3       A.    Yeah.

4       Q.    And biology, how many biology

5  classes did you take?

Page 25

(2007-11-13) Ezell, Kenneth.txt
```
 6      A.      One.
 7      Q.      One.  And was that also
 8 introductory?
 9      A.      All of them was entry.
10      Q.      Okay.  Same thing with
11 calculus, one class?
12      A.      Uh-huh.
13      Q.      Algebra one class?
14      A.      Uh-huh.
15      Q.      Any other science classes you
16 took?
17      A.      Not that I remember.
18      Q.      Besides English, do you
19 remember any other subjects you studied
20 while at Lurlene B. Wallace?
21      A.      There was like a speech class,
22 and I took golf a couple of semesters, but
23 other than that, that's all I can remember.
```

                                                  32

```
 1      Q.      I guess I don't have to ask
 2 you what your favorite class was.
 3      A.      It was golf.
 4      Q.      Are those all the science
 5 classes -- The physics, calculus, algebra,
 6 and biology, are those all the science
 7 classes you took?
 8      A.      That's all I can remember.
 9      Q.      Okay.  In high school, did you
10 take any science classes?
11      A.      Biology and chemistry.
```
                          Page 26

(2007-11-13) Ezell, Kenneth.txt

12        Q.        Just one biology class?

13        A.        All I can remember -- Yeah, I

14    believe so.

15        Q.        One chemistry class?

16        A.        Yeah.

17        Q.        Did you take physics in high

18    school?

19        A.        No.

20        Q.        Did you have any other types

21    of math class in high school?

22        A.        Algebra 1 and 2.  I think

23    first year was, like, general math, I think,

                                                    33

1    like, in the 9th grade.

2        Q.        All right.  Do you have any

3    additional education, other than what you've

4    told us about?

5        A.        No.

6        Q.        Have you attended any kind of

7    seminars over the years?

8        A.        I don't understand what you're

9    talking about, what you're saying.

10        Q.        Well, we've talked about

11    formal education, now I'm talking about

12    little less formal education.  For example,

13    lawyers attend seminars for continuing legal

14    education, and doctors do the same type of

15    thing, and other people attend seminars

16    where they try to learn something about the

                    (2007-11-13) Ezell, Kenneth.txt
17  business they're in, or to keep up

18  certifications.

19          A.      Right.

20          Q.      Did you ever have to attend

21  any other types of seminars?

22          A.      Not, per se, seminars.

23          Q.      Okay.  Would you explain that,


                                                      34


 1  please.

 2          A.      Only thing we would -- I

 3  didn't do anything to further my education.

 4  The job, we went to classes like purchasing

 5  classes and stuff like that.

 6          Q.      Okay.  All right.  Do you

 7  maintain a personal library?

 8          A.      No.

 9          Q.      Okay.  You don't have any

10  books at all?

11          A.      No.

12          Q.      Okay.  Have you ever had a

13  personal library?

14          A.      No.

15          Q.      Did you have textbooks that

16  you bought when you were in college?

17          A.      Yes.

18          Q.      And you didn't keep those?

19          A.      I sold them.

20          Q.      Sold them.  Did you sell them

21  immediately after you finished the classes?

22          A.      Yes.

                                Page 28

(2007-11-13) Ezell, Kenneth.txt

23      Q.      Do you like to read?


                                                35


1       A.      No.
2       Q.      You don't like to read.  How
3   often would you say, since the time that you
4   graduated -- or finished at Lurlene B.
5   Wallace, how often would you say that you
6   read a book?
7       A.      A complete book, never.
8       Q.      Never?
9       A.      Never.
10      Q.      You haven't read a complete
11  book since you finished at Lurlene B.
12  Wallace?
13      A.      No.
14      Q.      Okay.  Have you read any
15  portions of books?
16      A.      If you call magazines or
17  something like that or an article, but no
18  hardback books, no.
19      Q.      Okay.  What magazines do you
20  read?
21      A.      Whatever is on the counter in
22  the doctor's office or whatever.
23      Q.      Okay.  If you're in a doctor's


                                                36


1   office, what magazines would you pick up?

(2007-11-13) Ezell, Kenneth.txt

2        A.       Housekeeping or Popular

3   Mechanics, Sports Illustrated.

4        Q.       Okay.  Do you ever read Time

5   Magazine?

6        A.       No.

7        Q.       Newsweek?

8        A.       I've picked them up, but never

9   sit down and read it, per se.

10       Q.       Have you ever subscribed to

11  any magazines?

12       A.       No.

13       Q.       Your entire life?

14       A.       Not that I remember.

15       Q.       Do you subscribe to a

16  newspaper?

17       A.       No.

18       Q.       Have you ever subscribed to a

19  newspaper?

20       A.       No.

21       Q.       Do you read a newspaper?

22       A.       On occasion.

23       Q.       And can you be a little more

                                                37

1   specific than on occasion?

2        A.       It's hard to say.

3        Q.       Okay.  Would it be more or

4   less than once a week?

5        A.       It would be less.  Probably

6   less than once a month.

7        Q.       Okay.  So, only a few times a

(2007-11-13) Ezell, Kenneth.txt

8  year?

9       A.      Uh-huh.   Correct.

10      Q.      And when you do read the

11  newspaper, what portion would you read?

12      A.      Local.

13      Q.      Okay.  Just local news?

14      A.      (Witness nods head in the

15  affirmative.)

16      Q.      Have you ever done any type of

17  teaching?

18      A.      Yes.  We used to travel and

19  teach a class with LP.

20      Q.      Okay.  Who's we?

21      A.      Who's we?

22      Q.      You said "we" used to travel.

23      A.      Employees.


                                      38


1       Q.      Employees.  And what did you

2   teach?

3       A.      We conducted a class --

4   team-leadership-type classes.

5       Q.      You conducted those classes?

6       A.      There was, like, three or four

7   on a team.

8       Q.      Okay.

9       A.      And we had different parts.

10      Q.      Okay.  All right.  What parts

11  could you teach?

12      A.      No particular part.  We had a

(2007-11-13) Ezell, Kenneth.txt

13  book, a guideline that we went by, and we

14  traded around different parts.  I only did

15  that once -- I take that back, twice.

16       Q.    Okay.  Twice.  Do you remember

17  when it was?

18       A.    It was probably in the '90s.

19  That's about as far as I can narrow it down.

20       Q.    You said you would travel

21  around for this.  Do you recall where this

22  occurred?

23       A.    Evergreen, Alabama and West

                                                  39

1   Bay.

2        Q.    West Bay?

3        A.    Florida.

4        Q.    Okay.  Do you recall when it

5   was that you were in Evergreen, Alabama?

6        A.    No.

7        Q.    Do you recall when you were in

8   West Bay, Florida?

9        A.    No.

10       Q.    Do you recall which was first?

11       A.    West Bay.

12       Q.    Do you recall how close the

13  West Bay teaching and the Evergreen teaching

14  were from each other?

15       A.    It was only a few months.  It

16  was less than a year.

17       Q.    Okay.  So, this would have

18  been -- Both of them would have been within

                        Page 32

(2007-11-13) Ezell, Kenneth.txt

19   the same year in the 1990s?

20          A.      (Witness nods head in the

21   affirmative.)  Yes.

22          Q.      With West Bay being first?

23          A.      Yes.


                                              40


1           Q.      Do you belong to any type of

2    vocational or professional associations?

3           A.      No.

4           Q.      Have you ever?

5           A.      No.

6           Q.      All right.  I want to talk a

7    little bit about your employment history, if

8    I may.

9           A.      Okay.

10          Q.      I want to start off, what is

11   the first job you ever held?

12          A.      Bagging groceries.

13          Q.      Okay.  Where was that?

14          A.      Sims Grocery, Florala,

15   Alabama.

16          Q.      And when did you bag

17   groceries?

18          A.      I was fifteen.  So that would

19   have been about '75.

20          Q.      Okay.

21          A.      '74, '75.

22          Q.      All right.  And how long did

23   you do that?

(2007-11-13) Ezell, Kenneth.txt

41

1        A.      For about a year, year and a
2  half.
3        Q.      All right.  And what did you
4  do next?
5        A.      Cleaned up at the sawmill.
6        Q.      And when was that?
7        A.      That's from '76 to '78, '79.
8        Q.      Okay.  I'm assuming that the
9  bagging of groceries was a part-time job?
10       A.      Yes.
11       Q.      And the sawmill was --
12       A.      Was part time.
13       Q.      -- part time?  All the way
14  through the end of 1979, you said?
15       A.      Best I can recollect.
16       Q.      Okay.  When you say the
17  sawmill, what sawmill are you referring to?
18       A.      Lockhart.
19       Q.      Okay.  And do you recall who
20  owned that sawmill?
21       A.      Started it was Lockhart Lumber
22  Company.  When I was doing the cleanup, it
23  was -- I think TMA had bought it out, TMA

42

1  Forest Products.
2        Q.      All right.  And then after
3  you -- Well, tell me a little bit about the

(2007-11-13) Ezell, Kenneth.txt

4  cleanup.  What kind of cleanup did you do?

5        A.      I cleaned the mill house floor

6  in the sawmill part.

7        Q.      And what did that entail?

8        A.      Just cleaning up the --

9  Cleaning sawdust out from under the roller

10 beds where the lumber run and stuff and

11 cleaning the hoppers.

12       Q.      How did you clean the sawdust

13 out?

14       A.      With a shovel and a broom.

15       Q.      Okay.  And what did you do

16 with the sawdust?

17       A.      Put it in the hoppers

18 underneath the mill.

19       Q.      I'm sorry, what?

20       A.      The hoppers.  There's chains

21 that would take it to bins outside.

22       Q.      All right.  And is that the

23 only thing you did was to clean up the

43

1  sawdust?

2        A.      (Witness nods head in the

3  affirmative.)

4        Q.      So, you spent all the time

5  that you were there --

6        A.      During that time, yeah.  I

7  come in after the mill shut down and worked

8  for a couple of hours.

(2007-11-13) Ezell, Kenneth.txt

9          Q.      Okay.  And then you said --
10    When did the mill shut down?
11          A.      Five o'clock.
12          Q.      Okay.  That's what you meant.
13    I thought you were talking about it was shut
14    down.  Okay.  You came in after five o'clock
15    and you cleaned up the sawdust, and then
16    when the sawdust was cleaned up your job was
17    done?
18          A.      Right.  Uh-huh.
19          Q.      How long would that take you?
20          A.      Two to three hours, depends on
21    how big the mess was.
22          Q.      All right.  And was this
23    treated lumber?

                                                44

1          A.      No.
2          Q.      Okay.  This was just plain
3    lumber?
4          A.      Well, it wasn't even lumber,
5    it was where the lumber was being sawn.
6          Q.      Oh, I see.  Okay.  Sawdust
7    from trees?
8          A.      Yes.
9          Q.      All right.  When you finished
10    with that job, what did you do next?
11          A.      Started working in the office,
12    scaling logs.
13          Q.      At which office?
14          A.      Main office, Lockhart.
                    Page 36

(2007-11-13) Ezell, Kenneth.txt

15          Q.      That's still Lockhart Lumber?

16          A.      No.  It was TMA, TMA at the

17    time.

18          Q.      And you were working in the

19    office?

20          A.      Just part time.

21          Q.      Part time.  And what were you

22    doing?

23          A.      Scaling logs.


                                            45


1          Q.      Scaling logs?

2          A.      Uh-huh.

3          Q.      Can you tell us what that

4    means?

5          A.      Go out and physically measure

6    the log and tell them how many board feet

7    was in the log.

8          Q.      Would that take you around the

9    entire plant?

10          A.      No, just the log yard.

11          Q.      Just the log yard.  And was

12    this part-time or full-time work?

13          A.      Part time.

14          Q.      Part time.  How long did you

15    do this?

16          A.      To the end of '80, somewhere

17    in 1980, when I dropped out of junior

18    college.

19          Q.      All right.  And what did you

(2007-11-13) Ezell, Kenneth.txt

20   do next?

21         A.    Did that to -- for a couple of

22   years.  I went from scaling logs to running

23   the scales, operating the scales, weighing

46

1    trucks in and out.  And then we went into

2    purchasing.

3          Q.    All right.  Did I understand

4    that even after you dropped out of junior

5    college in 1980, that you, for a short time,

6    continued to scale logs?

7          A.    Uh-huh.

8          Q.    And only now you were working

9    full time?

10         A.    Yes.

11         Q.    And then how long did that

12   last?

13         A.    '80, '81.  The times are very

14   vague right in there.  I can't remember

15   that.

16         Q.    All right.  And then the next

17   thing you did was you started to operate the

18   scales?

19         A.    Yes.

20         Q.    How long did you operate the

21   scales?

22         A.    That was kind of a combined

23   job.  That's what happened.

47

(2007-11-13) Ezell, Kenneth.txt

1      Q.      You were still scaling logs?

2      A.      Scaling logs.

3      Q.      And also operating the scales?

4      A.      Operating the scales.

5      Q.      Okay.  And what's involved in

6  operating the scales?

7      A.      Putting the ticket in and

8  letting it punch it.  It tells it the weight

9  of the truck when it comes in and when it

10  leaves.  You put it back in there and let it

11  punch the ticket.

12      Q.      All right.  So, that's a

13  fairly simple operation?

14      A.      Very simple operation.

15      Q.      How long did you operate the

16  scales?

17      A.      Like I said, '81, it might

18  have been into '82.

19      Q.      All right.  I think you said

20  then you moved to purchasing.

21      A.      Yes.

22      Q.      And when you moved to

23  purchasing, did you completely cease scaling

48

1  logs and operating the scales?

2      A.      Yes.

3      Q.      And purchasing was a full-time

4  job?

Page 39

(2007-11-13) Ezell, Kenneth.txt

5      A.      Yes.

6      Q.      After you dropped out of

7   junior college, was your work from that time

8   forward full time?

9      A.      Yes.

10     Q.      What did you do in purchasing?

11     A.      Purchased materials to run the

12  plant.

13     Q.      And this was approximately

14  1982 that you began?

15     A.      Somewhere along in there, yes.

16     Q.      How long did you work in

17  purchasing?

18     A.      To about 1998.

19     Q.      And when you worked in

20  purchasing, where would you be working,

21  generally?

22     A.      I was in the automotive shop.

23  There was a supply room where all the parts

49

1   were kept.  There was a small office in it.

2      Q.      And that was your office?

3      A.      Yes.

4      Q.      Were you the only person that

5   was working in purchasing?

6      A.      About the beginning, Willard

7   Kelly was purchasing.

8      Q.      Is he still alive?

9      A.      No.

10     Q.      Did he retire?

Page 40

(2007-11-13) Ezell, Kenneth.txt

11          A.      I don't know if he retired or
12   not.
13          Q.      Well, he apparently -- You
14   said: In the beginning.  Apparently, he no
15   longer worked in purchasing?
16          A.      Right.  He went out and he was
17   doing the superintendent's job.
18          Q.      Okay.
19          A.      I didn't really understand the
20   question.
21          Q.      I'm sorry.  I beg your pardon?
22                  MR. PALMER:  Let's go off the
23   Record for just a minute.


                                                    50


1                   VIDEOGRAPHER:  Off the Record;
2    the time is 11:17 a.m.
3                       (Recess taken.)
4                   VIDEOGRAPHER:  Back on the
5    Record, the time is 11:21 a.m.
6           Q.      (BY MR. PALMER):  Mr. Ezell,
7    the -- we're now in the automotive shop, and
8    you began working there in purchasing in
9    about 1982; correct?
10          A.      Correct.
11          Q.      And when you began working
12   there, you were working with Willard Kelly?
13          A.      He was doing the purchasing at
14   the time and I took it over from him.
15          Q.      Okay.  And so, you were there

                          Page 41

(2007-11-13) Ezell, Kenneth.txt

16  at the same time he was, primarily to learn

17  from him?

18          A.      Yeah.  We went through a

19  training stage, yes.

20          Q.      Okay.  And then after you were

21  trained, he moved to the supervisor

22  position?

23          A.      Yes.

                                                        51

1           Q.      And approximately when was

2   that?

3           A.      About two months after.

4           Q.      All right.

5           A.      We were both kind of in

6   training at the same time, doing the same --

7   you know, he was doing the supervisor

8   training and I was doing that and we were

9   still together.

10          Q.      All right.  Now -- So, after

11  Willard Kelly left, sometime in 1982, all

12  the way through 1998, you were the sole

13  person responsible for purchasing?

14          A.      Yes.

15          Q.      And was that -- There was no

16  other person that did any kind of purchasing

17  for the plant?

18          A.      Willard Kelly would still do

19  the purchasing if I wasn't available, if I

20  was on vacation or out sick or whatever.

21          Q.      All right.  What types of --

                        Page 42

(2007-11-13) Ezell, Kenneth.txt

22  Strike that.

23          Everything the plant had to

52

1   purchase, unless you were on vacation, you

2   were purchasing?

3       A.      Other than logs or raw

4   materials.

5       Q.      Okay.  Who purchased the logs?

6       A.      They had foresters.

7       Q.      Do you remember any of their

8   names?

9       A.      Not in a certain order, but

10  one of them was Scotty Beck and another one

11  was Mack Campbell.  There was two or three

12  more, but I don't remember their names.

13      Q.      All right.  You also said you

14  didn't purchase the raw materials.

15      A.      Right.

16      Q.      Okay.  What raw materials are

17  you referring to?

18      A.      The stuff for the mill, like

19  the logs.

20      Q.      Okay.  Logs?

21      A.      Uh-huh.

22      Q.      Okay.  I understood you to be

23  talking about two different things.  So,

53

(2007-11-13) Ezell, Kenneth.txt

1 really, you're only talking about the logs?

2        A.      Right.  Raw materials.  That's

3 the only thing there is.  Everything is made

4 from the log.

5        Q.      What were the -- Give me some

6 idea of the primary items that you would be

7 purchasing.

8        A.      Gasoline, oil, greases, repair

9 parts, treating chemicals, most anything

10 that was an everyday to keep the mill

11 running.

12        Q.      Okay.  When you refer to the

13 treating chemicals, you're referring to the

14 Creosote?

15        A.      Yes.

16        Q.      You're referring to the

17 Pentachlorophenol?

18        A.      Yes.

19        Q.      And you're referring to the

20 copper chromated arsenate?

21        A.      Yes.

22        Q.      But you refer to that as CCA;

23 right?

                                              54

1        A.      Yes.

2        Q.      If I use the term "CCA" during

3 this deposition, you'll understand that's

4 copper chromated arsenic?

5        A.      Yes.

6        Q.      Did you have any other

(2007-11-13) Ezell, Kenneth.txt

7  abbreviated version of referring to

8  Pentachlorophenol?

9        A.    We just called it Penta.

10       Q.    Okay.  All right.  Starting in

11  1982, when you first began purchasing, were

12  you purchasing all three of these

13  substances?

14       A.    I know I was purchasing

15  Creosote, and Penta.  CCA, I don't remember.

16       Q.    Okay.  But you might have

17  been?

18       A.    I might have been.

19       Q.    All right.  Now, ending in

20  1998, when you were no longer purchasing, as

21  of the last time that you were purchasing

22  materials --

23       A.    Yes.

                                              55

1        Q.    -- did you -- were you still

2  purchasing Creosote, Penta, and CCA?

3        A.    No.

4        Q.    Okay.  Were you purchasing any

5  of them?

6        A.    In 1998, there might have been

7  a purchase of CCA.

8        Q.    All right.  All right.  So,

9  the CCA it might have been that you recall

10  purchasing in 1982 -- as early as 1982 and

11  as late as 1998?

Page 45

(2007-11-13) Ezell, Kenneth.txt

12          MR. LOCKARD:   Objection to

13  form.

14          A.      Yes.

15          Q.      All right.  But it might be

16  that it was a little bit less than that time

17  period?

18          A.      Yes.

19          Q.      All right.  That's the best of

20  your recollection?

21          A.      Yes.

22          Q.      All right.  Creosote you

23  recall purchasing in 1982?

                                                56

1           A.      Yes.

2           Q.      But you do not recall

3  purchasing Creosote in 1998?

4           A.      No.

5           Q.      Okay.  When was the last time

6  that you recall purchasing Creosote?

7           A.      Mid-'80s.

8           Q.      Can you be any more specific

9  than mid-'80s?

10          A.      No.  I don't remember a

11  specific year.

12          Q.      Okay.  What do you define the

13  mid-'80s as?

14          A.      Anywhere from '84 to '88,

15  somewhere in that time frame.

16          Q.      All right.  With respect to

17  the Penta, you recall purchasing Penta as of

(2007-11-13) Ezell, Kenneth.txt

18  1982?

19       A.      Yes.

20       Q.      And do you recall purchasing

21  Penta as of 1998?

22       A.      No.

23       Q.      Okay.  When was the last time

57

1  you recall purchasing Penta?

2        A.      Basically, the same time frame

3  as the Creosote.

4        Q.      Into the mid-'80s?

5        A.      Somewhere in the '80s.

6        Q.      Do you recall the volume of

7  Creosote that you purchased?

8        A.      No, I don't.

9        Q.      When you purchased the

10  Creosote, did you have paperwork you had to

11  complete?

12       A.      Just a purchase order.

13       Q.      Okay.  Do you recall how

14  frequently you purchased Creosote?

15       A.      It varied.

16       Q.      Okay.  Can you give me an

17  estimate?

18       A.      Maybe one or two loads a week,

19  semi loads.

20       Q.      Okay.  And when you say semi

21  loads, you're talking about a

22  tractor-trailer rig?

(2007-11-13) Ezell, Kenneth.txt

23          A.      Yes.

                                                    58

1           Q.      Maybe one or two loads a week?

2           A.      It would vary, but most of the

3    time it was, like, one or two loads a week.

4           Q.      When you were purchasing the

5    Penta, do you recall how much you would

6    purchase?

7           A.      It was hard.  I don't remember

8    that because it was -- it was bought in big

9    blocks and it was mixed over long periods of

10   time, and that's hard to say on the volume

11   of it.

12          Q.      How was the Penta delivered?

13          A.      Semi load.

14          Q.      So, when you received it, it

15   was --

16          A.      It was stored.

17          Q.      -- it was delivered as a load

18   in a semi?

19          A.      Yes.

20          Q.      Okay.  And you don't recall

21   the frequency of those loads?

22          A.      No, I don't.

23          Q.      Do you recall whether it was

                                                    59

1    more than a few times a year?

2           A.      It was more than once a year,

(2007-11-13) Ezell, Kenneth.txt

3    but that's about as -- all I can say.

4        Q.        Now, with respect to the CCA,

5    do you recall the volume of the CCA that was

6    purchased?

7        A.        We bought it by the tanker

8    load.  But volume-wise, I couldn't give you

9    an accurate.

10       Q.        When you say tanker load, are

11   you talking about typical tanker rig truck?

12       A.        It's what they hauled it in,

13   yes.  It's a smaller rig because the stuff

14   was so heavy.

15       Q.        And how frequently would you

16   be purchasing a tanker load?

17       A.        I'd say once a year, maybe.

18   Like I say, it could vary more than that.

19       Q.        Is once a year an estimate or

20   is that a minimum estimate or . . .

21       A.        That's just a ballpark.

22       Q.        Ballpark figure.  So, you

23   don't recall more than once a year buying a

                                              60

1    tanker load of CCA?

2        A.        No, I don't recollect, no, I

3    do not.  It could have been more.

4        Q.        But you don't recall?

5        A.        I can't.

6                  MR. LOCKARD:  Just give him

7    your best estimate, your best answer.

                    Page 49

(2007-11-13) Ezell, Kenneth.txt

8      Q.      Okay.  Were you ever involved

9  in the treating of lumber with any of these

10  substances?

11      A.      No.

12      Q.      After you finished working

13  as a -- in the purchasing department in

14  1998, what did you do next?

15      A.      Went to dry end supervisor.

16      Q.      What is the dry end

17  supervisor?

18      A.      After it leaves the kiln to

19  the drying process, the planing process and

20  the shipping process.

21      Q.      How long were you a dry end

22  supervisor?

23      A.      Until the plant shut down.

61

1      Q.      And when was that?

2      A.      In '99.

3      Q.      So, for about a year?

4      A.      Yeah.

5      Q.      And what was it drying from?

6      A.      Steam.

7      Q.      Steam?

8      A.      Well, it heated coils.  It was

9  a dry process, but it was from the boiler,

10  from the boiler.

11      Q.      Was any of this lumber

12  treated?

13      A.      No.

Page 50

(2007-11-13) Ezell, Kenneth.txt

14        Q.        After the plant shut down in

15   1999, where did you go?

16        A.        B and H Contract.

17        Q.        And when the plant shut down

18   in 1999, who was your employer?

19        A.        Louisiana-Pacific.

20        Q.        Have you worked for

21   Louisiana-Pacific since that time?

22        A.        No.

23        Q.        And you began working with B

                                                    62

1   and H Contractors?

2        A.        Yes.

3        Q.        And how long did you work

4   there?

5        A.        Until present time.

6        Q.        Present time.  So, you're

7   still working for B and H Contractors?

8        A.        Yes.

9        Q.        And where are they located?

10        A.        Florala.

11        Q.        Is that entity related to

12   Louisiana-Pacific?

13        A.        No.

14        Q.        All right.  Let's go

15   through -- When you were in the purchasing

16   department, who was your immediate

17   supervisor?

18        A.        Roy Ezell.

                        Page 51

(2007-11-13) Ezell, Kenneth.txt

19    Q.    And are you related to Roy

20 Ezell?

21    A.    Son.

22    Q.    You're his son?

23    A.    Yes.


                                            63


1    Q.    Is he also Roy Kenneth?

2    A.    No, just Roy.

3    Q.    He's just Roy Ezell?

4    A.    Uh-huh.

5    Q.    And what was his position at

6 the time you were in the purchasing

7 department?

8    A.    Plant manager.

9    Q.    Did you report to him

10 directly?

11    A.    Uh-huh.  Yes.

12    Q.    Who hired you to be in the

13 purchasing department?

14    A.    It was when Tenco -- TMA

15 Forest Products handled it.  I don't know

16 exactly who put me in that position.

17    Q.    All right.  Was your father

18 the plant manager the entire time that you

19 were in the purchasing department?

20    A.    When he was in TMA, I believe

21 he wasn't plant manager.  He was, like,

22 plant superintendent or something.

23    Q.    All right.  Your father was

(2007-11-13) Ezell, Kenneth.txt

64

1   the top man at the plant when he was the
2   plant manager?
3          A.     Yes.
4          Q.     Did you -- Other than your
5   father, did you report to anyone else during
6   the time that he was the plant manager?
7          A.     Accounting.
8          Q.     Okay.  And what did you report
9   to accounting for?
10         A.     Spending.
11         Q.     And who did you report to
12  there?
13         A.     There was several of them.
14  There was Eddie Carroway, Sue Wilkerson, Sue
15  Garrett, Dennis -- I don't remember his last
16  name, but his first name was Dennis.
17         Q.     Now, we've used the term, and
18  this is my fault, I said "report to", were
19  any of these people in the accounting
20  department your supervisor?
21         A.     No.
22         Q.     Okay.  Who was your
23  supervisor?

65

1          A.     Plant manager.
2          Q.     And that would be your father?
3          A.     Yes.

(2007-11-13) Ezell, Kenneth.txt

4        Q.        Was he the plant manager

5    during most of the time that you were in the

6    purchasing department?

7        A.        Most of the time, yes.

8        Q.        Do you recall when he became

9    the plant manager?

10        A.        No, I don't.

11        Q.        Can you estimate at all?

12        A.        No, I don't remember what his

13    title was when it was TMA.  It seemed like

14    it was plant superintendent, which that

15    might be -- it could have been the same.  I

16    don't know.

17        Q.        All right.  When you became

18    drying supervisor, who did you report to?

19        A.        Sherrie Brooks the plant

20    manager.

21        Q.        Sherrie Brooks?

22        A.        Yeah.

23        Q.        Do you recall when she became

                                                    66

1    plant manager?

2        A.        '97, '98, somewhere along in

3    there.

4        Q.        Okay.  Somewhere -- Was she

5    the plant manager during any of the time

6    that you were in the purchasing department?

7        A.        Yes.

8        Q.        Okay.

9        A.        For a very -- No, she was not.

                        Page 54

(2007-11-13) Ezell, Kenneth.txt

10          Q.      She was not?

11          A.      She was not.

12          Q.      Was your father plant manager

13   during any of the time that you were a

14   drying supervisor?

15          A.      No.

16          Q.      Okay.  So, then, did your

17   father retire at roughly the same time that

18   you became drying supervisor?

19          A.      No.  It was about a year, year

20   and a half, something like that, difference.

21          Q.      Okay.

22          A.      It was kind of like -- There

23   was a lull there when they was trying to

                                                    67

1    find a plant manager.

2           Q.      Okay.  So, he left as the

3    plant manager before you left the purchasing

4    department, but they didn't replace him

5    until after you had become the drying

6    supervisor?

7           A.      I was -- During a short period

8    of time there, I was doing the purchasing, I

9    also was in the quality control and the

10   sawmill part.

11                  And -- I'm getting my dates

12   confused.  When my father left, they went to

13   a centralized purchasing system and all the

14   parts were bought out of -- or they

                    Page 55

                    (2007-11-13) Ezell, Kenneth.txt
15  consolidated the buying.  For the last year

16  and a half or two years, the plant was

17  operating out of Evergreen, Alabama.

18          Q.      So, then you went to quality

19  control during that time?

20          A.      Yes.

21          Q.      So, actually, you went from

22  the purchasing department to quality control

23  then to the drying supervisor?


                                                    68


1           A.      Right.

2           Q.      Okay.

3           A.      A long time ago.

4           Q.      So, when your father retired,

5   you moved from the purchasing department to

6   quality control, roughly, the same time?

7           A.      About the same time, yes.

8           Q.      And that would have been about

9   what year?  1998 is what you said before.

10          A.      It could have been '97.

11          Q.      Okay.

12          A.      I don't remember exact dates.

13          Q.      All right.  And then you went

14  from quality control to the drying

15  supervisor in approximately what time?

16          A.      In about a year's time.

17          Q.      Okay.  So, you were in quality

18  control for about a year?

19          A.      Yeah.

20          Q.      And what did you do in quality
                        Page 56

(2007-11-13) Ezell, Kenneth.txt

21  control?

22          A.      I took dry end readings.  I

23  made sure that the lumber coming out of the

69

1   dry kilns were at the proper moisture

2   percentages.  Graded lumber, checked behind

3   the graders, went to the sawmill and

4   measured lumber to make sure it was meeting

5   the right dimensions.

6           Q.      Okay.  And you said you took

7   dry end readings.  What does that mean?

8           A.      Took a probe and had needles

9   that you stuck in the lumber and it would

10  tell you the moisture content as it came out

11  of the kiln.

12          Q.      Are you saying dry end, E-N-D?

13          A.      Yes.

14          Q.      I didn't know whether you were

15  saying that or some other word that I wasn't

16  recognizing.  Okay.  And the purpose was to

17  check the moisture?

18          A.      The moisture content.

19          Q.      Okay.  And then you also said

20  you graded lumber.

21          A.      I checked behind the graders.

22          Q.      Okay.

23          A.      I wasn't a lumber grader, but

70

(2007-11-13) Ezell, Kenneth.txt

 1  I checked behind the . . .

 2        Q.      In this case, when you're

 3  saying grading, you're talking about --

 4        A.      Grade stamp.  Like a number

 5  one board or a number two or a number three,

 6  or cull.

 7        Q.      When was the first time that

 8  you ever heard of Creosote?

 9        A.      In the '70s.

10        Q.      And how did you hear about

11  Creosote?

12        A.      Working at the plant.

13        Q.      Okay.  When was the first time

14  you ever heard of Pentachlorophenol?

15        A.      About the same time frame, at

16  the plant.

17        Q.      You learned about it at the

18  plant?

19        A.      Yeah.

20        Q.      When was the first time that

21  you ever heard of CCA?

22        A.      It was later on, because it

23  wasn't being used very much back then.


                                        71


 1        Q.      But you learned about it at

 2  the plant?

 3        A.      By the plant.

 4        Q.      Did you ever, in school,

 5  either in high school or in junior college,
                      Page 58

(2007-11-13) Ezell, Kenneth.txt

6   study Creosote or Pentachlorophenol or CCA?

7          A.      No.

8          Q.      Did you, in school, ever study

9   any chemicals?

10         A.      Chemistry class, you know,

11  chemistry experiments.  No special -- I

12  couldn't name them, per se, no.

13         Q.      Nothing other than just

14  ordinary chemistry?

15         A.      No.

16         Q.      When you went to work and were

17  first introduced to these chemicals, did you

18  receive any training about these chemicals?

19         A.      Not for purchasing purposes,

20  no.

21         Q.      Okay.  Did you receive any

22  training for any other purpose, other than

23  the purchasing, about these chemicals?

72

1          A.      No.

2          Q.      Okay.  Have we discussed every

3   job that you had at that plant?

4          A.      Yes.  Yes.

5          Q.      Okay.

6          A.      I kept the environmental

7   records, too.  I'm about to forget that one.

8          Q.      Okay.  Why would that be so

9   easy to forget?

10         A.      Well, purchasing, I did the --

Page 59

(2007-11-13) Ezell, Kenneth.txt

11    I just kept the environmental records and

12    did the testing at the same time.  It wasn't

13    a continuous job, it was just part of it.

14         Q.    Okay.  What -- During what

15    time period did you keep the environmental

16    records?

17         A.    Late '80s until the closure of

18    the plant -- or when I got out of

19    purchasing, which would have been '97 or

20    '98.

21         Q.    Okay.  And what records did

22    you keep?  You said environmental.

23         A.    Test results.


                                                 73


1         Q.    Okay.  Could you identify

2    specific types of -- I mean, do you have,

3    like, form XYZ 9500?

4         A.    No.

5         Q.    You don't remember the forms?

6         A.    No.  It was just test results

7    from the laboratory.

8         Q.    Okay.  What types of test

9    results?

10         A.    It was on monitoring wells.

11         Q.    Okay.  And during the time

12    that you were in purchasing, that was the

13    only time that you had anything to do with

14    these environmental records?

15         A.    Yes.

16         Q.    What percentage of your time,

                          Page 60

(2007-11-13) Ezell, Kenneth.txt

17    during the time that you were in purchasing,

18    was sent keeping the environmental records?

19          A.    A very small percentage.

20          Q.    Can you estimate?

21          A.    Probably five percent.

22          Q.    Five percent.  All right.

23    Even if you didn't have any form numbers, do

74

1    you remember, other than saying test

2    results, what types of records you had of

3    environmental -- or what types of

4    environmental records you had?

5          A.    Correspondence.

6          Q.    Okay.  Like letters, you mean?

7          A.    ADEM.

8          Q.    I'm sorry, what?

9          A.    From ADEM.

10          Q.    Are you referring to the

11    Alabama Department of Environmental

12    Management?

13          A.    Yes.

14          Q.    How soon after you began

15    keeping environmental records did you have

16    any correspondence with ADEM?

17          A.    I didn't have correspondence

18    myself, I just kept files -- put the letters

19    in a --

20          Q.    Okay.  Let me rephrase that.

21    How soon after you began keeping

(2007-11-13) Ezell, Kenneth.txt

22  environmental records did you keep the

23  correspondence from ADEM?

75

1         A.      I don't understand your

2  question.

3         Q.      Well, you said you kept

4  environmental records.  That's how you

5  described the job.

6         A.      I put them in folders and put

7  them in the file.

8         Q.      Okay.  Were you responsible

9  for reading them or reviewing them?

10        A.      No.

11        Q.      How did you know which files

12  to put them into?

13        A.      It had ADEM on it, in the ADEM

14  file.

15        Q.      Okay.

16        A.      Lab results went in the lab

17  file.

18        Q.      Okay.  How many different

19  files did you have, then?

20        A.      Not very many.

21        Q.      Okay.  And the ADEM file was

22  one file.  You said lab results was another

23  file.  Did you have any other environmental

76

1  records?

(2007-11-13) Ezell, Kenneth.txt

2          A.      No.

3          Q.      All right.  So, there was two

4    files?

5          A.      (Witness nods head in the

6    affirmative.)

7          Q.      During the entire period from

8    the late 1980s until the time you left

9    purchasing?

10         A.      Yes.

11         Q.      And how big was the ADEM file?

12         A.      One folder.

13         Q.      Could you -- Using your hands,

14   could you show us how big that was.

15         A.      Probably that big,

16   (indicating).

17         Q.      Okay.  So, that would be less

18   than an inch thick?

19         A.      Yes.

20         Q.      And, again, using your hands,

21   can you show us how big the lab results'

22   file would be?

23         A.      Over several years, it was

                                                      77

1    half a file drawer.

2          Q.      Hold it up again.

3          A.      About a half of a file drawer

4    (indicating).

5          Q.      All right.  And that was from

6    the late 1980s until the time you left

                      Page 63

                    (2007-11-13) Ezell, Kenneth.txt
 7  purchasing?

 8          A.      Yes.

 9          Q.      So, you say about half a file

10  drawer?

11          A.      Yes.

12          Q.      That would be -- Hold your

13  hands up one more time.

14          A.      (Witness complies.)

15          Q.      That's about two feet?

16          A.      About that, yes.

17          Q.      All right.  Now, you referred

18  to lab results, did the plant have a lab?

19          A.      No.

20          Q.      So, where did these lab

21  results come from?

22          A.      From the laboratories we sent

23  the samples off to.


                                                    78


 1          Q.      And what laboratories did you

 2  send them to?

 3          A.      I can't remember the name of

 4  it.  One of them was in Ruston, Louisiana.

 5  It was Enviro something.  I don't know.  I

 6  can't remember the last name.  Envirolabs.

 7  I can't remember that one.  And the very

 8  last one I'm just drawing a blank right this

 9  second, the one we was sending it to towards

10  the end.

11          Q.      STL, does that ring a bell?

12          A.      No, it doesn't.  I'm drawing a
                         Page 64

(2007-11-13) Ezell, Kenneth.txt

13   blank on it.  I can't.

14        Q.      Okay.  Now, the labs -- You're

15   talking about these lab reports.  Who did

16   you get these from?

17        A.      They come in the mail.

18        Q.      They came in the mail?

19        A.      Uh-huh.

20        Q.      And who were they addressed

21   to?

22        A.      I don't remember that.  They

23   come from the office down to me.


                                            79


1         Q.      Okay.  So, that's what I was

2    trying to make -- Did someone physically

3    hand them to you?

4         A.      Most of the time I picked them

5    up in my basket that was in the main office.

6         Q.      Okay.  So, you didn't get them

7    in the mail?

8         A.      No, I didn't personally.

9         Q.      Someone else got them in the

10   mail?

11        A.      Right.

12        Q.      And you weren't responsible

13   for reading them?

14        A.      No.  Just filing them.

15        Q.      Do you recall who read them?

16        A.      At the plant?  I don't know of

17   anybody who read them at the plant.  It was

(2007-11-13) Ezell, Kenneth.txt

18  just -- It was a requirement from ADEM, you

19  had to have the results on-site.

20        Q.     Okay.  Were these lab results

21  the results of some type of testing at the

22  plant?

23        A.     Off-site.


                                              80


1        Q.     Off-site?

2        A.     The stuff that was being

3  tested was from the plant sent off-site to

4  be tested.

5        Q.     Okay.  What was it that they

6  were testing?

7        A.     The monitoring wells.

8        Q.     The monitoring wells.  And who

9  did the testing of the monitoring wells?

10        A.     I did.

11        Q.     You did.  Okay.  And did you

12  send the samples from the monitoring wells

13  to these labs?

14        A.     Yes.

15        Q.     How many monitoring wells were

16  there?

17        A.     A specific number, I don't

18  remember.  It was twenty something.

19        Q.     How often did you take samples

20  from the wells?

21        A.     Most of the time it was twice

22  a year.

23        Q.     Describe how you would take

(2007-11-13) Ezell, Kenneth.txt

81

1  the samples.

2          A.      From start to the beginning?

3          Q.      Well, I've not taken these

4  samples and I'm sure the jury hasn't taken

5  these samples, so if you could just describe

6  what it was like taking these samples, what

7  you had to do.

8          A.      You had to open the well

9  twenty-four hours ahead of time.  You had to

10  take measurements of the water table.  You

11  had to pump three times the volume of the

12  well down by using what they call bailers,

13  little plastic tubes that you pulled up and

14  you put it in.  And you had to pump three

15  times the volume out.

16              And you had to wait

17  twenty-four hours for it to recover to make

18  sure you got a true sample, I take it.

19  That's just one of the requirements.

20              And when we come back we would

21  take and reopen the wells the next day, bail

22  the water out, fill the bottles up, fill the

23  paperwork out, ship them to the lab.

82

1          Q.      All right.  And you did this

2  for all twenty, plus, wells?

(2007-11-13) Ezell, Kenneth.txt

3      A.      No.

4      Q.      Okay.

5      A.      I don't know who dictated it.

6  I don't know if ADEM dictated it or

7  whatever.  There was just certain wells we

8  tested.

9      Q.      You said you did this twice a

10  year?

11      A.      On a regular basis, yes.

12      Q.      Earlier you said twice a year,

13  now you're saying on a regular basis.  Do

14  you really know how --

15      A.      Sometimes the State would come

16  and we'd have to split samples with them

17  during the year.

18      Q.      All right.

19      A.      And that would be an extra

20  one.

21      Q.      Okay.  When you did it --

22              MR. PALMER:  Why don't we go

23  off the Record for a minute.

                                            83

1              VIDEOGRAPHER:  This marks the

2  end of tape number one in the deposition of

3  Roy Ezell.  Off the Record; the time is

4  11:54 A.M.

5              MR. PALMER:  Also, I want to

6  just make sure -- I'm sure you're aware you

7  can't talk to them about the case right now.

8              MR. LOCKARD:  I don't know

(2007-11-13) Ezell, Kenneth.txt

9    that I agree with that.

10                    (Recess taken.)

11                    VIDEOGRAPHER:   This is the

12    beginning of tape number two in the

13    deposition of Roy Kenneth Ezell.   Back on

14    the Record; the time is 12:04 p.m.

15         Q.     (BY MR. PALMER):   Mr. Ezell, I

16    should have said this before we got back on

17    the Record, but I think I told you earlier,

18    if you need to stop and take a break, just

19    let me know.

20         A.     Okay.

21         Q.     And the same thing is true if

22    you get hungry and decide that it's time to

23    eat lunch, let us know.


                                                  84


1          A.     Okay.

2          Q.     Let's go back to these

3    monitoring wells.   Approximately how many of

4    the wells would be sampled?

5          A.     It would vary at different

6    times.

7          Q.     What's the least number of

8    wells that were monitored or sampled?

9          A.     Well, there was, like, four.

10         Q.     Okay.   And what's the largest

11   number that were sampled?

12         A.     Probably ten or twelve.

13         Q.     Okay.   And were there any

                             Page 69

(2007-11-13) Ezell, Kenneth.txt

14  wells that were never sampled?

15        A.      No.

16        Q.      All right.  I'm going ask

17  you -- I've asked my partner to rip off a

18  piece of paper, if he could.

19              MR. CADE:  Sure.

20        Q.      Blank paper.  And I'm going to

21  hand it to you and I'm going to ask you if

22  you would to -- and you don't have to be Van

23  Gogh, but I'd like to have you take your

                                            85


1  time and draw kind of a map of the plant, if

2  you would.

3              MR. LOCKARD:  Do the best you

4  can.

5        A.      (Witness complies.)  What time

6  frame are you talking about?

7        Q.      If there were changes, then we

8  will respect that.  We'll make notations of

9  that.  As for now, you can show the -- I

10  guess the plant as it was when it closed.

11        A.      That's basically it

12  (indicating).

13                  (Whereupon, Plaintiff's

14                  Exhibit 2 was marked for

15                  identification.)

16        Q.      What number are we on?  2.

17  That's what I thought.  All right.  I'm

18  going to hand what has now been marked as

19  Plaintiff's Exhibit 2 back to you.  I'm

Page 70

(2007-11-13) Ezell, Kenneth.txt

20    going to ask you, using a red pen that I'm

21    going to hand you, to put little Xs where

22    the monitoring wells were located.

23         A.    That's going to be hard to do.

86

1         Q.    To the best of your

2    recollection.

3         A.    (Witness complies.)  Where I

4    drawed it, this circles on around this way

5    (indicating).  And there was one right

6    there, (indicating).  There's more

7    available, but circling on around, the way I

8    drawed it, I can't --

9         Q.    Let me hold it so you can see

10    it.  You see, I'm holding it in what we

11    would call a landscape view with Plaintiff's

12    Exhibit 2.

13              MR. PALMER:  Can you see it?

14              MR. LOCKARD:  Can you just

15    flip it?

16         Q.    (BY MR. PALMER):  It's the

17    landscape view, meaning that the eleven is

18    across and the eight and a half is up and

19    down on the page.  Plaintiff's Exhibit 2 is

20    at the bottom of that.  And you have put

21    some Xs up on the upper, right-hand

22    corner --

23         A.    Corner.

(2007-11-13) Ezell, Kenneth.txt
87

1        Q.        -- of your paper, from that
2   orientation.  And if I'm understanding you
3   correctly, I think you said that there were
4   some more wells that would be above --
5        A.        Right.
6        Q.        -- the far right side of the
7   upper -- of the paper?
8        A.        Basically, continuing straight
9   up like I've got them drawn right there
10  (indicating).
11       Q.        Continuing straight up from
12  where they were.
13       A.        Not a straight line, but kind
14  of a staggered line.
15       Q.        All right.  And the -- Over
16  here, this square that you've labeled right
17  here (indicating), it says --
18       A.        Treatment plant.
19       Q.        -- treating plant.
20       A.        I just put T plant.
21       Q.        Okay.  And then below that it
22  says:  Planer.
23       A.        Yes.

88

1        Q.        And then there's one that
2   says:  D kiln, that's drying kiln?
3        A.        Uh-huh.
4        Q.        And then you have one
                        Page 72

(2007-11-13) Ezell, Kenneth.txt

5    that's --

6         A.    Boiler.

7         Q.    -- boiler.  Okay.  And it

8    looks like this is lumber shop.

9         A.    Lumber shed.

10        Q.    Lumber shed.  Okay.  And --

11        A.    A shop is automotive shop.

12        Q.    Automotive shop.  Okay.  The

13   office --

14        A.    The main office?

15        Q.    Okay.

16        A.    The two lines below it there

17   is the main entrance.

18        Q.    Okay.  And then over here

19   (indicating), this says --

20        A.    That's the log yard.

21        Q.    -- log yard.

22        A.    Where logs were stored.

23        Q.    And then you have -- What does

                                              89

1    this say there (indicating)?

2         A.    That's the sawmill.

3         Q.    Sawmill.  And you have old

4    chip mill.

5         A.    Yes.

6         Q.    And then you have lumber --

7         A.    Lumber shed.

8         Q.    -- a lumber shed.  And a

9    parking lot.

                    Page 73

(2007-11-13) Ezell, Kenneth.txt

10      A.      Uh-huh.

11      Q.      And this other long --

12      A.      That's just an extension of

13   the sawmill.

14      Q.      Okay.

15      A.      It just was an L shape.

16      Q.      Okay.  Now, the treating

17   plant, I take it that's where the lumber was

18   treated?

19      A.      Yes.

20      Q.      Okay.  And it was treated with

21   these chemicals; Penta, Creosote, and CCA?

22      A.      Yes.

23      Q.      And the wells were all, it

90

1   looks like on the picture here, to the right

2   and possibly above the treating plant?

3      A.      Correct.

4      Q.      All right.  Now, do you recall

5   which direction is north?

6      A.      Straight here.

7      Q.      Straight down.  So this map is

8   going to be oriented the exact opposite

9   of -- Actually, I'm going let you write it

10   on here.  Let me give you one different

11   color here.  Use this purple Highlighter, if

12   you would, to indicate which direction is

13   north.

14      A.      (Witness complies.)

15      Q.      All right.  Thank you.  Now,

(2007-11-13) Ezell, Kenneth.txt

16   using that I can refer to your drawing.  So

17   it appears that the monitoring wells were

18   all on the western side of the plant and to

19   the south?

20       A.     Yes.

21       Q.     Now, how far away were the

22   monitoring wells from the treating plant?

23       A.     The one X right here

91

1   (indicating), right close by, it was right

2   out.  It was like an L section of the

3   building.  It was right next to the wall,

4   right outside the treating plant.  These

5   were probably two hundred fifty, three

6   hundred feet (indicating).  The closest one

7   here, and as you got up further around, it

8   got further away.

9       Q.     All right.  And you have

10  another one, it looks like it's right next

11  to the treating plant.

12       A.     Right.  It was out from where

13  the -- where the cylinders discharge this

14  way (indicating).

15       Q.     That would be to the south?

16       A.     To the south.  And it was

17  right at the end of the -- out from the end

18  of where the rails were, they pulled out.

19       Q.     When you say the cylinders

20  discharged in the direction -- in the

Page 75

(2007-11-13) Ezell, Kenneth.txt

21  southerly discharged, what do you mean by

22  discharged?

23        A.      When they're opened and

92

1   closed.  The lumber pulled in and out.

2         Q.      Okay.  The two wells that you

3   show right next to the treating plant, are

4   those the only two that were right next to

5   the treating plant?

6         A.      That I recall.  It seemed like

7   there was one here (indicating), but it was

8   abandoned.

9         Q.      All right.  Let me let you

10  draw that with a read X also.

11        A.      It was somewhere around there

12  (indicating), but it was abandoned.

13        Q.      Okay.  Why don't you write

14  abandoned by that one.

15        A.      I don't know if that is the

16  proper word.

17        Q.      What do you want to call it?

18              MR. CADE:  Inactive, maybe.

19              THE WITNESS:  Let's say

20  inactive.

21        Q.      All right.  Other than those

22  first three -- First of all, how far away

23  from the treating plant was that inactive

93

(2007-11-13) Ezell, Kenneth.txt

1  well?

2         A.       Probably a hundred, hundred

3  and fifty feet.

4         Q.       A hundred or a hundred and

5  fifty feet.  Other than the two that were to

6  the western side of the treating plant, were

7  there any other monitoring wells that were

8  close to the treating plant?

9         A.       I don't understand what you

10  said.

11        Q.       Those two wells that you said

12  were right next to the plant.

13        A.       The two right next to the

14  plant.  These were down from the plant.

15        Q.       You said they were, like, two

16  hundred --

17        A.       A hundred and fifty to two

18  hundred feet.

19        Q.       Approximately.

20        A.       That's here, now, when you got

21  -- these things went --

22        Q.       The closest would be a hundred

23  and fifty, two hundred feet?

                                             94

1         A.       Right.

2         Q.       And it would expand out from

3  there?

4         A.       Right.

5         Q.       And from what you told me, you

                       Page 77

(2007-11-13) Ezell, Kenneth.txt

6  did not monitor or take samples from all the

7  wells?

8          A.      Correct.

9                  MR. LOCKARD:  Object to the

10  form.

11                 MR. PALMER:  What's your

12  objection to the form?

13                 MR. LOCKARD:  Well, it

14  mischaracterizes what he said.  I think what

15  he said was he didn't sample them on all

16  occasions.  I think you asked him whether he

17  sampled all of them or there were any that

18  weren't sampled, and I don't think that's

19  his testimony.

20                 MR. PALMER:  All right.  I

21  disagree with you, but let's just clear it

22  up.

23          Q.     (BY MR. PALMER):  There were

95

1  wells that you did not sample; correct?

2          A.      At specific times, yes.

3          Q.      Okay.  Were there wells that

4  you never sampled during the whole time that

5  you were there?

6          A.      I don't remember that, now.

7          Q.      You don't remember?

8          A.      I can't say that for definite.

9          Q.      Okay.  Were there wells that

10  you sampled more frequently?

11          A.     Yes.

Page 78

(2007-11-13) Ezell, Kenneth.txt

12      Q.      Which wells would those be?

13      A.      Those in this area here

14  (indicating).

15      Q.      You're referring to the area

16  that's the closest to the hundred and fifty,

17  two hundred feet?

18      A.      Yes.   This one here was a

19  pretty regular one (indicating) and these

20  around this area (indicating).

21      Q.      And so, one of the wells that

22  is to the northwest corner of the treating

23  plant you say was fairly regular?

                                                96

1       A.      Yes.

2       Q.      How often is fairly regular?

3       A.      Just about every time we

4   sample.

5       Q.      Just about every time.  Okay.

6   Were there any wells that you don't remember

7   ever sampling?

8       A.      I can't remember that.  I

9   don't know.

10      Q.      How about the inactive well?

11      A.      I didn't sample it, myself.

12  Then I don't know if --

13      Q.      That's the question.  You

14  don't recall sampling it?

15      A.      Not myself, no.

16      Q.      All right.  And during the

                Page 79

(2007-11-13) Ezell, Kenneth.txt

17  time that you were sampling the wells, who

18  else, if anybody, was responsible for

19  sampling wells?

20      A.    Like I said, ADEM come and did

21  their own sampling, and then ERM Southeast,

22  our consulting firm, came in and sampled.

23      Q.    Where is ERM located?

97

1       A.    Georgia.

2       Q.    Now, when you began sampling

3   the wells, what was the first year you

4   recall sampling the wells?

5       A.    I don't remember.  I'm sorry.

6   I don't know.

7       Q.    Sometime while you were

8   purchasing -- in the purchasing department?

9       A.    Yes.

10      Q.    Do you recall whether it was

11  in the late '70s or early '80s?

12      A.    It would be in the '80s.

13      Q.    In the '80s.  Sometime in the

14  1980s?

15      A.    Yes.

16      Q.    And where did you go to get

17  your training to sample the wells?

18      A.    Didn't go anywhere for

19  training.

20      Q.    Okay.  Did you receive any

21  training to sample the wells?

22      A.    I sampled with the State and

(2007-11-13) Ezell, Kenneth.txt

23  just watched them.  And also ERM Southeast

98

1  come down and we did sampling together.  I

2  just assisted.

3          Q.      You just followed?

4          A.      Right.

5          Q.      Did they know that they were

6  teaching you how to sample the wells?

7          A.      I cannot say that.  I don't

8  know.

9          Q.      Did you ask any questions when

10  you were with ADEM?

11          A.      Yes.

12          Q.      And what kind of questions did

13  you ask them?

14          A.      Just how often we're supposed

15  to change your gloves.  Just general

16  questions.

17          Q.      Did you ask them anything

18  about how to take the samples?

19          A.      The proper way, yes.

20          Q.      All right.  Did -- Who did you

21  talk to at ADEM?

22          A.      I don't have no names.

23          Q.      You don't remember any names?

99

1          A.      No.

(2007-11-13) Ezell, Kenneth.txt

2        Q.       The -- During what period did

3    the plant treat lumber?

4        A.       All the time I was there,

5    except they tapered off right there toward

6    the end of the plant closure.

7        Q.       And when you say tapered off,

8    was it over a long period of tapering off or

9    over a short period that it was tapering

10   off?

11       A.       It was over a gradual period

12   of time.  It wasn't a short period of time.

13       Q.       When did it begin tapering

14   off?

15       A.       I'd say a couple of years

16   before it closed down.

17       Q.       Okay.  So, the plant closed

18   down in 1999?

19       A.       Uh-huh.

20       Q.       And so, maybe in 1997 it began

21   tapering off?

22       A.       It's possible.

23       Q.       Did the -- So, prior to that

                                                        100

1    time that it began tapering down -- or

2    tapering off, did the plant continue to

3    treat the same amount of wood?

4        A.       No.

5        Q.       Okay.  Was there an increase

6    or a decrease in the amount of wood that was

7    being treated?

(2007-11-13) Ezell, Kenneth.txt

8          A.      A big decrease.

9          Q.      Okay.  When did the decrease

10    begin?

11         A.      Sometime during the '90s.

12         Q.      Okay.  Can you be more

13    specific than that?

14         A.      No, I cannot.

15         Q.      Prior to that decrease

16    beginning in the 1990s, did the plant

17    continue to treat, roughly, the same amount

18    of wood?

19         A.      It varied.

20         Q.      Up and down?

21         A.      Yes.

22         Q.      Was there a typical amount

23    that was treated over that time period?

                                                    101

1          A.      No.  There is no way you could

2     really gauge it.

3          Q.      Okay.  When you first began

4     working there, do you recall anything about

5     the volume of lumber that was treated?

6          A.      No, I don't really.  It wasn't

7     my part of the operation or anything.

8          Q.      Who was it that purchased the

9     lumber?  You said it was foresters, and you

10    mentioned a Scotty Beck.

11         A.      Purchased the logs, yes.

12         Q.      Purchased the logs.  What

                          Page 83

(2007-11-13) Ezell, Kenneth.txt

13  percentage of the lumber was treated when

14  you first started working in the purchasing

15  department?

16          A.       I have no idea.

17          Q.       You have no idea.   Okay.

18  Would you -- I want to slowly go through the

19  technique that you used to monitor the wells

20  or sample the wells.   I know you've

21  described it briefly, but I want to get into

22  a little more detail about that.   First of

23  all, what equipment did you use in sampling

102

1   the wells?

2           A.       The bailers that were -- The

3   instruments that you -- The things you

4   bailed the water out with.   They were

5   individually -- They had a container that

6   they stayed in all the time.   They never

7   used the same one, you know, on a different

8   well.

9                    They had an electronic

10  measuring device that would sound off when

11  it hit the water, and you would take your

12  measurement and then you would pump it down

13  and take your measurement.   And a pH meter

14  and a specific conductancy meter.

15          Q.       Okay.   Two meters, a bailer

16  and you mentioned something, a fourth thing.

17  I should have written it down.   First of

18  all, let's go with the bailer.   Tell me what

Page 84

(2007-11-13) Ezell, Kenneth.txt

19   the bailer -- What did the bailer look like?

20        A.    It's just -- It looks like a

21   piece of pipe.  It's smaller than the well

22   casing, and it had, like, a ball in the

23   bottom of it.  And when it went down, it


                                               103


1   pushed the ball up.  When you picked back up

2   on it, it would seal it off, and it would

3   hold about a quart of water, or a --

4   somewhere around a quart of water.

5        Q.    Essentially, it's a pump?

6        A.    It's just a pump.

7        Q.    And that was used to pump

8   water out of the well?

9        A.    Yeah.

10        Q.    And I think you said earlier

11   that you were supposed to pump out three

12   times the volume of the well.  How did you

13   know what volume of the well was?

14        A.    By the measurement of the

15   electronic device.

16        Q.    That's the one I couldn't

17   remember, the electronic device.  First of

18   all, was there an official name for the

19   bailer?

20        A.    No.

21        Q.    You just called it a bailer?

22        A.    I just called it a bailer.

23        Q.    Okay.  And then the electronic

                    Page 85

(2007-11-13) Ezell, Kenneth.txt

104

1  device, was there a name for that?
2       A.      That's the best one I've got,
3  right there.
4       Q.      That's what you call it, an
5  electronic device.  Do you know what it was
6  electronically measuring?
7       A.      It had a metal tip on the
8  bottom, when it touched the water, it would
9  sound off.
10       Q.      It would sound off.  And did
11  it display some numbers?
12       A.      It had increments.  It had the
13  tape that -- the lead that went down, it had
14  measurements on it.  And then the top of the
15  casing of the well, you had a specific
16  elevation for it, and you took that
17  measurement and you figured how deep the
18  well was.
19       Q.      Okay.  That's to determine how
20  deep the well is?
21       A.      Or how deep the water is.
22       Q.      How deep the water is.
23       A.      Sorry.  The depth to the

105

1  water.
2       Q.      How did you know what the
3  volume of the well was?

Page 86

(2007-11-13) Ezell, Kenneth.txt

4   A.  Multiplication table that we

5 had.

6   Q.  All right.  And what did you

7 multiply?

8   A.  The depth.  The top of the

9 water to the total depth of the well, you

10 took that number and multiplied it by a

11 factor and it gave you the amount of water

12 that was involved, like, two gallons or one

13 gallon or whatever it may be.

14   Q.  All right.  And when you baled

15 the water out, where did you put the water

16 that you bailed out?

17   A.  In a five-gallon bucket.

18   Q.  Okay.  And usually, how much

19 did you bail out of any particular well?

20   A.  Four to five gallons.  It

21 depended on how much volume was in it.

22   Q.  But that typically would be

23 four to five gallons?

106

1   A.  Most of them were.  Some of

2 them might be more at different times of the

3 year because of the water table.

4   Q.  All right.  What was the most

5 you remember baling out?

6   A.  Probably ten gallons.

7   Q.  Okay.  And what's the least

8 you remember baling out?

(2007-11-13) Ezell, Kenneth.txt
```
 9        A.      I don't remember that.
10        Q.      Okay.  And then you said you
11   put them into five-gallon pails?
12        A.      Yes.
13        Q.      And where did those
14   five-gallon pails go?
15        A.      Took them to the treatment
16   plant.
17        Q.      To the treatment plant.  And
18   what was done with it at the treatment
19   plant?
20        A.      It was poured into the tank in
21   the water that was used to treat with.
22        Q.      All right.  You also had a pH
23   meter, you said.
```

                                              107

```
 1        A.      Yes.
 2        Q.      And what was done with the pH
 3   meter?
 4        A.      You just poured some water in
 5   a clean bottle and stuck a tip in it and
 6   took a reading.  It could tell you how much
 7   the pH was, like, 7.1 or whatever.
 8        Q.      And you wrote that down?
 9        A.      Yes.
10        Q.      And is that one of the things
11   that you sent to the lab?
12        A.      Yes.
13        Q.      All right.  And what was the
14   other meter you referred to?
```
                      Page 88

(2007-11-13) Ezell, Kenneth.txt

15      A.      A specific conductancy meter.

16   It read the iron in the water, and iron

17   molecules in the water.  It would give you a

18   higher reading if it had more iron in the

19   water.

20      Q.      Okay.  Is that something you

21   wrote down as well?

22      A.      Yes.

23      Q.      Is that something you sent to

108

1   the lab?

2      A.      Yes.

3      Q.      You took a sample of the water

4   as well?

5      A.      Yes.

6      Q.      Okay.  What did you put the

7   sample of water into?

8      A.      The labs would send

9   prepackaged bottles and stuff from the lab.

10   It had all the preservatives already in it.

11   We just filled it to the fill line and

12   packed it and shipped it.

13      Q.      All right.  Other than the

14   reading from the pH meter and the specific

15   conductancy meter and the sample itself, did

16   you send anything else to the lab?

17      A.      No.

18      Q.      Other than those items, did

19   you use any other equipment or items in

Page 89

(2007-11-13) Ezell, Kenneth.txt
20  taking the samples from the wells?

21         A.      Just rubber gloves.

22         Q.      You wore rubber gloves?

23         A.      Yeah.   Rubber gloves.


109


 1  Supposed to wear gloves.

 2         Q.      Did this procedure change

 3  anytime during the time period you were

 4  taking samples from the wells?

 5         A.      No.

 6         Q.      Did the procedure change, or

 7  was it different in any way, with respect to

 8  any different wells?

 9         A.      No.

10         Q.      You used the same procedure

11  for every well?

12         A.      I used the same procedure for

13  every well.

14         Q.      And over the entire time

15  period that you were taking samples?

16         A.      Yes.

17         Q.      And earlier you said "we".

18  Who else would have taken samples?

19         A.      There wasn't.   There was

20  usually somebody helping me hold the bottle

21  or whatever, an employee.

22         Q.      Who else would help you?

23         A.      Different employees.

(2007-11-13) Ezell, Kenneth.txt

1          Q.      Do you recall any of the
2    specific ones?
3          A.      Chester Norris, Freddy
4    Commander, Willard Kelly.  That's the three
5    that comes to mind.
6          Q.      Okay.  Now, was there ever a
7    time that you used water or poured water
8    into any of these wells with a hose?
9          A.      No.  No.
10         Q.      And you're positive of that?
11         A.      I didn't, myself, no.
12         Q.      Were you the one who
13   personally mailed these samples back to the
14   lab?
15         A.      I shipped them, yeah, UPS.
16         Q.      When you took these readings
17   and these measurements, did you understand
18   anything about what they meant?
19         A.      Just the pH.  And it just
20   measured alkalinity in the water.  That's
21   all I know.
22         Q.      And what does it mean for the
23   water to be alkaline?

                                          111

1          A.      I have no idea.  I just know
2    that there is pH in the water that you
3    drink.
4          Q.      Okay.  So, you don't really

                    (2007-11-13) Ezell, Kenneth.txt
5  understand what that means?

6          A.      No, I do not.

7          Q.      You were just taking the

8  samples, you didn't have an understanding of

9  what the samples meant?

10         A.      No.

11         Q.      I want to make sure I'm clear

12 on something.  The lab reports that came

13 back --

14         A.      Yes.

15         Q.      -- you filed --

16         A.      Uh-huh.

17         Q.      -- did they mean anything to

18 you?

19         A.      (Witness shakes head in the

20 negative.)

21         Q.      Do you know who at the plant

22 read those lab reports?

23         A.      Specifically, no, I don't.


                                                    112


1          Q.      Do you have any idea who did

2  it?

3          A.      No.

4          Q.      Was there any type of

5  environmental engineer at the plant?

6          A.      No.

7          Q.      Was there anybody at the plant

8  who was trained as an environmental

9  scientist of any sort?

10         A.      Not that I know of.
                        Page 92

(2007-11-13) Ezell, Kenneth.txt

11        Q.      Let me ask you a few questions

12   about -- I think you said you left

13   Louisiana-Pacific when the plant closed in

14   1999.

15        A.      Yes, sir.

16        Q.      Have you done any work for

17   Louisiana-Pacific since that time?

18        A.      No.

19        Q.      Have you received any kind of

20   compensation from Louisiana-Pacific since

21   that time?

22        A.      No -- I take it back.  Explain

23   what you're talking about by that.


                                            113


1         Q.      Any money.

2         A.      No.  I got a retirement.

3         Q.      Okay.  You receive a

4    retirement check?

5         A.      No.  I don't receive a

6    retirement check.  I've got a retirement

7    account.

8         Q.      Okay. I see.  Okay.  It's

9    still with Louisiana-Pacific?

10        A.      It's still there.

11        Q.      Because you're not retired?

12        A.      Right.

13        Q.      Do you own any stock in

14   Louisiana-Pacific?

15        A.      Seventy-five shares.

                    Page 93

(2007-11-13) Ezell, Kenneth.txt

16      Q.      Do you know what that's worth?

17      A.      No.

18      Q.      Have you ever been involved in

19  any lawsuits?

20      A.      No.

21      Q.      Have you ever given testimony

22  before?

23      A.      Pertaining to what?

                                                114

1       Q.      In any kind of lawsuit.

2       A.      One.

3       Q.      Okay.  And what was that case?

4       A.      It was a theft case.

5       Q.      Was that a criminal case?

6       A.      Yes.

7       Q.      And did you give the testimony

8   in court?

9       A.      A deposition.  I don't even

10  know if it was called a deposition.  It was

11  just a D.A. and a deputy.

12      Q.      Was there a court reporter

13  taking testimony?

14      A.      No.  It was just a recording.

15      Q.      Okay.  And were you sworn?

16      A.      Yes.

17      Q.      Was that a case that involved

18  you?

19      A.      I was at the site, but it

20  didn't involve me.

21      Q.      You were a witness?

(2007-11-13) Ezell, Kenneth.txt

22          A.      I was a witness, yeah.

23          Q.      Have you ever been inside a

115

1   courtroom before?

2           A.      No.

3           Q.      Have you ever had to hire a

4   lawyer before this time?

5           A.      No -- Well, divorce.  A

6   divorce lawyer.  That was it.

7           Q.      All right.

8           A.      There wasn't a court -- There

9   wasn't no court to it.

10          Q.      At least you weren't in the

11  court room?

12          A.      I wasn't in the court room.

13          Q.      What made you think that you

14  needed to hire a lawyer for this deposition?

15          A.      Just the terminology and all I

16  didn't understand of the subpoena.

17          Q.      Okay.

18          A.      And it suggested consult my

19  lawyer.  So I took it I needed to.

20          Q.      Let me ask you about --

21                  MR. PALMER:  Do we still have

22  the Exhibit Number 2?

23                  MR. LOCKARD:  It's right here

116

(2007-11-13) Ezell, Kenneth.txt
1  (indicating).

2         Q.     (BY MR. PALMER):  Do you

3  recall any ponds on the facility?

4         A.     Yes.

5         Q.     And do you recall where those

6  ponds were located?

7         A.     Yes.

8         Q.     Let me give you another color

9  here.

10               MR. PALMER:  Pink is fine.

11        Q.     I want you to draw where the

12 ponds are located.

13        A.     There's three.  There's

14 another one.

15        Q.     To the south of the two ponds

16 that you're drawing?

17        A.     Yes.  And those are not --

18 They're about the same size.  I just run out

19 of room.

20        Q.     How big are the ponds?

21        A.     Guessing, probably an acre.

22        Q.     Each one of them is an acre?

23        A.     Probably.  I'm just guessing,

                                              117


1  now.  I'm not good at that.

2         Q.     All right.  Now, were all

3  three of those ponds there when you first

4  began working in the purchasing department?

5         A.     Yes.

6         Q.     And were all three of those
                        Page 96

(2007-11-13) Ezell, Kenneth.txt

7    ponds there when you no longer worked at the

8    purchasing department?

9        A.    No.

10       Q.    Okay.  Which of the ponds were

11   still there?

12       A.    All three of them are closed.

13       Q.    All three of them are closed.

14   Okay.  How were they closed?

15       A.    They was filled in and capped

16   with clay, and the last two were capped with

17   a gravel.

18       Q.    Okay.  I'm going to let you

19   use my red pen again.  First of all, I want

20   you to write pond by those two ponds that

21   you've drawn.  And you said there was a

22   third pond that was to the south.

23       A.    Yes.

                                          118

1        Q.    And you've indicated that the

2    first pond, being the most northerly one,

3    was the first one to be capped.

4        A.    Yes.

5        Q.    And it was capped with clay?

6        A.    Yes.

7        Q.    And then the other two ponds

8    to the south of that were ultimately capped

9    with gravel?

10       A.    No.  They were capped with

11   clay and then a gravel over it.

                    Page 97

(2007-11-13) Ezell, Kenneth.txt

12        Q.        Do you recall when the first
13    pond was capped?
14        A.        Not a specific date, no, I do
15    not.
16        Q.        Do you recall approximately
17    when?
18        A.        No, I don't.
19        Q.        Do you recall which decade?
20        A.        Not being -- I do not.
21        Q.        Okay.  Do you recall when the
22    second two ponds were capped?
23        A.        In the '80s.

                                            119

1        Q.        In the '80s.  And do you
2    recall, were they capped at the same time?
3        A.        Yes.
4        Q.        Okay.  What was -- The first
5    pond, which is to the north, what was the
6    purpose of that pond?
7        A.        It had Creosote in it, so I
8    take it was something to do with the
9    Creosote process.
10        Q.        Okay.  How about the pond to
11    the immediate south of that, the middle
12    pond?
13        A.        I believe it was an overflow
14    pond.
15        Q.        Just in case?
16        A.        Just in case that one filled
17    up, it was an area to run to.
              Page 98

(2007-11-13) Ezell, Kenneth.txt

18    Q.    And the most southerly pond,

19  which is not shown on your map, but which

20  was directly to the south you indicated of

21  the other two ponds, what was in it?

22    A.    I believe -- My understanding,

23  it was just the runoff from one pond to the

120

1  other, to the other, just in case, I reckon,

2  rainfall or whatever.

3    Q.    Did you ever have to do

4  anything with the ponds?

5    A.    Not that much, no, sir.  I was

6  strictly -- I was in the purchasing end of

7  it at that time.

8    Q.    Were you involved in any way

9  with the disposal of any of the chemicals

10  used in the treatment process?

11    A.    Disposal?

12    Q.    Uh-huh.

13    A.    Yeah.  I shipped the hazardous

14  waste off-site.

15    Q.    All right.  That's another

16  job, then, that you had?

17    A.    It was part of the purchasing

18  deal.

19    Q.    Okay.  And you shipped the

20  hazardous waste off-site during what time

21  period?

22    A.    I started doing it probably in

Page 99

(2007-11-13) Ezell, Kenneth.txt
23    the late '80s.

                                                        121

1          Q.      Late '80s.  And when did you
2    cease doing that?
3          A.      In the '90s, late '90s.
4          Q.      Where did you ship them to?
5          A.      Emelle.
6          Q.      And how frequently did you
7    ship the waste to Emelle?
8          A.      It varied.
9          Q.      Can you give me an average
10   frequency?
11         A.      It varied.  It was -- Before
12   the remediation process started, maybe a
13   drum every year, year and a half, two years.
14   After they did the remediation, started
15   collecting the Creosote and all and shipping
16   it off, it was so many drums a year, a few
17   drums a year.
18         Q.      This remediation process
19   you're talking about, when did that begin?
20         A.      Specific time, I can't -- I
21   don't recall.
22         Q.      Do you recall which decade?
23         A.      I can't recall specifically,

                                                        122

1    no.
2          Q.      Other than occasionally

(2007-11-13) Ezell, Kenneth.txt

3  sampling, together with someone from ADEM,

4  or receiving and filing ADEM correspondence,

5  did you have any other relationship with

6  ADEM?

7          A.      No.

8          Q.      Did you ever receive any

9  training from ADEM?

10         A.      No.

11         Q.      Did you ever receive any

12 training from the Environmental Protection

13 Agency?

14         A.      No.

15         Q.      Did you ever have any meetings

16 with anyone from ADEM?

17         A.      I would go with them to the

18 site.

19         Q.      To what site?

20         A.      To the treatment plant,

21 whatever they wanted to look at.

22         Q.      All right.  And how often

23 would that occur?


                                              123


1          A.      It varied.  Most of the time,

2  about once a year.

3          Q.      Why would you be the one going

4  with them?

5          A.      Because I was familiar with

6  the monitoring wells and stuff.

7          Q.      So, would it be fair to say

(2007-11-13) Ezell, Kenneth.txt

8    that you'd be the person at the plant who is

9    most familiar with the monitoring wells?

10        A.    Yeah.

11        Q.    Did you have any meetings with

12   anyone -- from the Environmental Protection

13   Agency?

14        A.    I remember EPA showing up --

15   They come two or three times, but I didn't

16   meet them myself.

17        Q.    Okay.  Do you remember the

18   names of any people that you dealt with at

19   ADEM?

20        A.    No, I don't.

21        Q.    Do you remember the names of

22   anyone you dealt with at EPA?

23        A.    No.  I didn't deal with


                                            124


1    anybody at EPA.

2         Q.    You said they came --

3         A.    I remember they come to the

4    site.

5         Q.    Okay.  Did they go out and

6    look at the wells?

7         A.    I wasn't with them.  I

8    couldn't.

9         Q.    Okay.  Do you recall who went

10   with them?

11        A.    No, I don't.

12        Q.    Okay.  Do you recall any scrap

13   lumber being burned?

                    Page 102

(2007-11-13) Ezell, Kenneth.txt

14     A.     Yeah, there was some lumber
15 that got burned, yes.
16     Q.     Okay.  Do you recall the
17 lumber being burned in the boilers?
18     A.     Yes.
19     Q.     And when it was burned in the
20 boilers, do you recall how frequently that
21 was?
22     A.     I can't -- I don't remember --
23 I don't know.


                                            125


1     Q.     Were you ever involved in
2 burning lumber in the boilers?
3     A.     Myself, no.
4     Q.     So, do you recall who was?
5     A.     The boiler firemen.
6     Q.     All right.  And would this
7 have been treated lumber?
8     A.     Some of it could have been.  I
9 don't know.  I couldn't tell you.
10     Q.     You just don't know?
11     A.     I don't know.
12     Q.     But you do recall lumber being
13 burned in the boilers?
14     A.     Yes.
15     Q.     And it was scrap lumber?
16     A.     Oh, scrap.  Uh-huh.
17     Q.     All right.  I'd like you to
18 refer again to Plaintiff's Exhibit 1.  When

(2007-11-13) Ezell, Kenneth.txt

19  you received this subpoena and related

20  documents, did you read it?

21        A.      Uh-huh.  Yes.

22        Q.      And I think you said you had

23  difficulty understanding it.

126

1         A.      Well, all this legal

2   mumbo-jumbo, how to interpret it.

3         Q.      All right.  You did understand

4   that it, obviously, required you to appear

5   for testimony?

6         A.      Yes.

7         Q.      Okay.  And you did understand

8   that it requested documents?

9         A.      Yes.

10        Q.      Okay.  And you read the list

11  of documents that it was requesting?

12        A.      Yes.

13        Q.      And did you make a

14  determination, with respect to each

15  individual request, that you did not have

16  documents in your possession?

17        A.      Yes.

18        Q.      Okay.  So, you no longer have

19  any documents in your possession that relate

20  to your employment with Louisiana-Pacific?

21        A.      None at all.

22        Q.      Do you recall ever receiving

23  any consent decrees with ADEM?

(2007-11-13) Ezell, Kenneth.txt

127

1          A.      Consent decree?  I don't
2    understand what you're talking about.
3          Q.      You don't know what a consent
4    decree is?
5          A.      No.
6          Q.      Okay.  Do you recall the plant
7    ever being fined?
8          A.      I don't, personally, remember,
9    no.
10              MR. PALMER:  All right.  Well,
11    I'm getting kind of hungry.  I'd kind of
12    like to break for lunch.  Is everybody
13    agreeable to that?
14              VIDEOGRAPHER:  This marks the
15    end of tape number two in the deposition of
16    Roy Kenneth Ezell.  Off the Record; the time
17    is 12:47 p.m.
18                  (Recess taken.)
19              VIDEOGRAPHER:  This is the
20    beginning of tape number three in the
21    deposition of Roy Kenneth Ezell.  Back on
22    the Record; the time is 1:46 p.m.
23          Q.      (BY MR. PALMER):  Mr. Ezell,

128

1    did you have a good lunch?
2          A.      It was okay.  I wasn't very
3    hungry.

(2007-11-13) Ezell, Kenneth.txt

4      Q.      Who was responsible at the

5  plant for safety?

6      A.      There was no safety person

7  on-site.

8      Q.      Was there a safety person

9  off-site?

10     A.      There was -- Mason Halacker

11  was -- did come around and do safety

12  meetings and stuff.

13     Q.      Mason who?

14     A.      Halacker.

15     Q.      How do you spell that?

16     A.      I don't know.

17     Q.      Was he a Louisiana-Pacific

18  employee?

19     A.      Yes.

20     Q.      And where was he stationed?

21     A.      I think his office was in

22  Evergreen.

23     Q.      Evergreen?

                                    129

1      A.      Uh-huh.

2      Q.      During what period did he do

3  these safety briefings?

4      A.      I know he did it in the '90s.

5  I don't know if it was in the '80s or not.

6      Q.      How often did he do this?

7      A.      Wasn't a set period of time.

8  They just called safety meetings every so

9  often.

(2007-11-13) Ezell, Kenneth.txt

10          Q.      More than once a year?

11          A.      Yes.

12          Q.      More than twice a year?

13          A.      Yes.

14          Q.      More than three times a year?

15          A.      He would just come every so

16    often.  We had in-plant safety meetings

17    every monthly.

18          Q.      And who led those?

19          A.      Plant manager.

20          Q.      Plant manager?

21          A.      Uh-huh.

22          Q.      During what time period?

23          A.      Huh?


                                                130


1           Q.      The whole time you were at the

2     plant, the plant manager did a safety

3     meeting every month?

4           A.      For a certain period of time.

5     I don't know when they exactly started and

6     when they exactly stopped.

7           Q.      Was it in later years, earlier

8     years?

9           A.      Later years.

10          Q.      Later years.  But you don't

11    know exactly when it started?

12          A.      No.

13          Q.      What kind of things were

14    discussed at the monthly safety meetings?

                    (2007-11-13) Ezell, Kenneth.txt
15        A.        Just wear your steel-toed

16   shoes, safety hats, safety glasses, just

17   general safety stuff.

18        Q.        Was there ever any discussion

19   of the effects of the chemicals that were

20   being used?

21                  MR. LOCKARD:  Objection to

22   form.

23                  MR. PALMER:  What's your


                                                  131


 1   objection to form?

 2                  MR. LOCKARD:  I don't know

 3   what you mean when you say effects of the

 4   chemicals.

 5        Q.        (BY MR. PALMER):  Okay.  Was

 6   there ever any discussion during these

 7   safety meetings about the hazardous nature

 8   of Pentachlorophenol?

 9                  MR. LOCKARD:  Objection to

10   form as well.  Go ahead.

11        A.        Hazardous specifically, no, I

12   don't recall.

13        Q.        Okay.  Was there ever any

14   discussion of the hazardous nature of CCA?

15                  MR. LOCKARD:  Same objection.

16        A.        Not that I recall.

17        Q.        Was there ever any discussion

18   of the hazardous nature of creosote?

19                  MR. LOCKARD:  Same objection.

20        A.        I don't know.

(2007-11-13) Ezell, Kenneth.txt

21      Q.      When Mason Halacker came for

22  his periodic meetings in the 1990s, did he

23  ever discuss the hazardous nature of any of

                                                    132

1   those three chemicals?

2               MR. LOCKARD:  Same objection.

3       A.      Not that I recall.

4       Q.      Who was the environmental

5   manager of the firm -- at the plant?

6       A.      At the plant?  Environmental

7   manager was no such title.

8       Q.      There's no such title?

9       A.      No.  Not that I know of.

10      Q.      You never heard of it?

11      A.      Not the environmental manager,

12  no.

13              (Whereupon, Plaintiff's

14              Exhibit 3 was marked for

15              identification.)

16      Q.      What number are we on?  Let me

17  hand you now what has been marked as

18  Plaintiff's Exhibit 3.

19              MR. LOCKARD:  Do you have an

20  extra copy of that one?

21              MR. PALMER:  No, I didn't make

22  an extra copy of that one, based on your

23  last comment.

                                                    133

(2007-11-13) Ezell, Kenneth.txt

1        A.        That wasn't my title.

2        Q.        What wasn't your title?

3        A.        Environmental manager.

4        Q.        Do you have any idea why you

5   were receiving correspondence addressed to

6   environmental manager?

7        A.        Not with that title, no, I

8   don't.  I didn't receive pay or anything for

9   any title of that such.

10        Q.        So, you definitely were not

11   the environmental manager?

12        A.        I was not the environmental

13   manager, no.

14        Q.        And you're not qualified to be

15   an environment manager?

16        A.        No.

17        Q.        All right.  Who was the

18   environmental supervisor down at the plant?

19        A.        I don't know.

20        Q.        Was there one?

21        A.        Not that I know of.  There

22   wasn't a position that I know of.

23        Q.        Have you ever heard of the

                                                134

1   environmental supervisor there?

2        A.        No.

3                    (Whereupon, Plaintiff's

4                    Exhibit 4 was marked for

5                    identification.)

(2007-11-13) Ezell, Kenneth.txt

6      Q.      Let me hand you now what's

7   been marked as Plaintiff's Exhibit 4.   Have

8   you had a chance to look at Plaintiff's

9   Exhibit 4?

10      A.      Uh-huh.

11      Q.      Do you see that it refers to

12   you as the environmental supervisor?

13      A.      Environment manager and

14   supervisor.   That was not my title.

15      Q.      You were not the environmental

16   supervisor?

17      A.      No, I was not.

18      Q.      There was no environmental

19   supervisor.

20      A.      There was no environmental

21   supervisor.

22      Q.      Was there a safety director at

23   the plant?

                                        135

1      A.      No.

2      Q.      Was there a risk manager at

3   the plant?

4      A.      No.   Not that I know of.

5      Q.      And there's no industrial

6   hygienist at the plant?

7      A.      Industrial hygienist?

8      Q.      Have you ever even heard of an

9   industrial hygienist?

10      A.      I've heard of it, but I've

Page 111

(2007-11-13) Ezell, Kenneth.txt

11  been out of it so long, I don't know

12  which --

13          Q.      There wasn't one at the plant?

14          A.      Not that I know of.

15          Q.      There wasn't any environmental

16  director there?

17          A.      Not an environmental director,

18  no.

19          Q.      So, there wasn't any

20  environmental engineer?

21          A.      No.

22          Q.      Any environmental auditor?

23          A.      Not on-site, no.

                                                136

1           Q.      Was there one off-site?

2           A.      I don't know.  I just know

3   there wasn't one at the plant.

4           Q.      Do you recall one?

5           A.      No.

6           Q.      Was there any geologist at the

7   plant?

8           A.      No.

9           Q.      Was there ever a geologist

10  that came to the plant?

11          A.      I don't know, unless it was,

12  like, ERM.

13          Q.      But you don't know?

14          A.      No.

15          Q.      In fact, isn't it true that

16  there wasn't anyone on-site with any

                        Page 112

(2007-11-13) Ezell, Kenneth.txt

17  training or certification in environmental

18  management?

19          A.      On-site, not that I know of.

20          Q.      Did Louisiana-Pacific ever

21  take any action to assess the health of the

22  community surrounding the plant?

23          A.      I have no knowledge of that.


                                                137


1           Q.      You're not familiar with that

2   at all?

3           A.      No.

4           Q.      Do you know whether

5   Louisiana-Pacific ever took any action to

6   determine whether or not any of the

7   properties surrounding the plant had been

8   contaminated?

9           A.      They had did some off-site

10  drilling right off to the north side of the

11  property -- I mean, west side of the

12  property.

13          Q.      West side.  And that was the

14  ones that you showed us from the map that

15  you drew?

16          A.      Yes.

17          Q.      All right.  And was that on

18  the property or off the property?

19          A.      I don't know if it was on our

20  property or not.  It was across the creek,

21  that's all I can tell you.  Now, if it was

(2007-11-13) Ezell, Kenneth.txt
22  on LP property, I don't know.

23          Q.      All right.  Fair enough.


                                          138


1   The -- So, all of those wells that you

2   showed on the west side of the plant were

3   across the creek from --

4           A.      No, no.  There was only two

5   across the creek.

6           Q.      Okay.  So, that's not shown on

7   the map that you drew?

8           A.      No.  They're all in the same

9   area.  There's just a creek separating two

10  from the rest of them.

11          Q.      Okay.  So, that long line that

12  you showed that was a north/south line, that

13  was --

14          A.      I showed you that was diagonal

15  or not in a straight line.  Those two are

16  off further than the rest of them.

17          Q.      Okay.  Would they also be

18  further to the south -- to the north?

19          A.      To the north, no.

20          Q.      I'm sorry.  Further to the

21  south?

22          A.      No.  They're right along right

23  the middle ways with the rest of the pond --


                                          139


1   with the wells.
                        Page 114

(2007-11-13) Ezell, Kenneth.txt

2      Q.      What -- During what time
3  period of the day did you take the samples
4  from the wells?
5      A.      In the morning.
6      Q.      In the morning.  At any
7  particular time?
8      A.      No.  I just had to beat UPS.
9      Q.      Beat UPS so you could ship it
10 off?
11     A.      Right.  They usually run
12 sometime after lunch.
13     Q.      And during the time that you
14 were doing this, did you ever have occasion
15 to put a hose into the monitoring wells?
16     A.      No.
17     Q.      Do you know whether anyone
18 else put a hose into the monitoring wells?
19     A.      Not that I know of.
20     Q.      Would it have been procedure
21 to pump water into the monitoring wells?
22     A.      Not that I know of.
23     Q.      You never heard of anybody

                                        140

1  doing that?
2      A.      No.
3      Q.      Did the plant operate at
4  night?
5      A.      Just the boiler.
6      Q.      What was the boiler doing at

                    Page 115

                    (2007-11-13) Ezell, Kenneth.txt
 7  night?

 8          A.      Using steam to dry the

 9  lumber -- The lumber-drying process was a

10  twenty-four-hour-a-day job.

11          Q.      Okay.  Was there someone there

12  to feed the boiler?

13          A.      Yeah.

14          Q.      Was the -- The boiler was wood

15  fed?

16          A.      It was not.

17          Q.      Or it was --

18          A.      It was waste products from

19  wood.

20          Q.      Waste products from wood.  And

21  some of that waste product was treated?

22          A.      Not that I know of.

23          Q.      Now, when you say:  Not that I

                                                    141


 1  know of, are you saying you don't recall?

 2          A.      I don't recall.

 3          Q.      Okay.  Was there any

 4  difference in the waste wood that was burned

 5  in the boiler during the day and the waste

 6  wood that was burned in the boiler at night?

 7          A.      Not that I know of, no.

 8          Q.      Did the boilers produce any

 9  kind of dust?

10          A.      Dust?  Ash?

11          Q.      Smoke.

12          A.      Smoke.  Yeah, it would smoke
                            Page 116

(2007-11-13) Ezell, Kenneth.txt

13  occasionally.

14       Q.     Were they -- Can you describe

15  the smoke?

16       A.     Kind of light blue to dark

17  black.

18       Q.     Did Louisiana-Pacific

19  employees ever have any kind of dust masks

20  that they were given to wear?

21       A.     They were available, yes.

22       Q.     Can you describe what those

23  masks looked like?

                                         142

1        A.     They were a regular particle

2   mask.

3        Q.     Like a little paper dust mask?

4        A.     Uh-huh.

5        Q.     Did you have any kind of

6   respirators with cartridges?

7        A.     At the treating plant.

8        Q.     At the treating plant?

9        A.     Yes.

10       Q.     Did those employees wear the

11  respirators?

12       A.     When I was over there, they

13  did, but knowing if they wore them all the

14  time, no, I don't know.

15       Q.     Did anyone else at the plant

16  have respirators like that?

17       A.     Not that I recall.

(2007-11-13) Ezell, Kenneth.txt

18    Q.    Do you know why they were

19  wearing respirators like that?

20    A.    Because of the treating

21  chemicals, I guess.

22    Q.    Those chemicals were

23  dangerous?

143

1              MR. LOCKARD:  Objection to

2  form.

3    Q.    Why would the chemicals cause

4  them to where the respirators?

5    A.    Why?  I reckon it would be bad

6  for your health, I reckon.

7    Q.    Did anyone say that?

8    A.    Not that I recall.

9    Q.    Were any of the employees

10  working at the treating plant ever

11  monitored?  Let me --

12              MR. PALMER:  That's kind of a

13  vague question, before you object.

14    Q.    Did any of them ever wear the

15  type of monitors that calculates particles

16  in the air?

17    A.    I remember on one occasion,

18  they had some kind of a little air pump.  I

19  don't remember who done it, but I remember

20  them wearing an air pump one time to check

21  air quality in the treating plant area.

22    Q.    And was it just one person?

23    A.    I don't know for sure.  I just

Page 118

(2007-11-13) Ezell, Kenneth.txt

144

1  remember the pump.

2        Q.      Do you recall when that was?

3        A.      No, I don't.

4        Q.      Do you recall what a consent

5  decree is?

6        A.      No.

7        Q.      You have no idea what a

8  consent decree is?

9        A.      No.

10        Q.      Do you recall ADEM taking any

11  kind of action at the plant to require the

12  plant to change any of its habits or

13  practices?

14        A.      Not that I know of personally,

15  but they could have.  I don't recall of any.

16        Q.      When you were sampling those

17  monitoring wells, what federal regulations

18  and statutes did you have to comply with?

19              MR. LOCKARD:  Object to the

20  extent that you are asking him for a legal

21  collusion, but you can answer what you know.

22        A.      I don't know.

23        Q.      You don't know?

145

1        A.      No.

2        Q.      Okay.  That's fair enough.

(2007-11-13) Ezell, Kenneth.txt

3   Were there any wells, monitoring wells, that

4   you were told not to sample?

5          A.      No.

6          Q.      Was the plant always in

7   compliance with law, as far as the use of

8   those three chemicals, the Creosote the

9   Pentachlorophenol and the CCA?

10                 MR. LOCKARD:  Objection.

11  Calls for legal conclusion.

12         A.      I don't know for sure.

13         Q.      You don't know.  Do you recall

14  any violations at all?

15         A.      I remember us getting some --

16  they got some violation letters, but the

17  content of them, I don't remember.

18         Q.      Did you have to read any of

19  those letters?

20         A.      No.  I filed them.  I filed

21  them.

22         Q.      You filed them.  Do you know

23  whether the problems that were cited in

                                              146

1   those letters were corrected?

2          A.      I don't know.

3          Q.      You mentioned Sherrie Brooks

4   earlier.

5          A.      Yes.

6          Q.      And what was her position?

7          A.      Plant manager.

8          Q.      And she became plant manager

                    Page 120

(2007-11-13) Ezell, Kenneth.txt

9    when?

10          A.       Somewhere around '97, '98,

11   somewhere in that area.  She was a plant

12   manager for about a year or so before the

13   plant shut down.

14          Q.       Before she became plant

15   manager, where at the plant did she work?

16          A.       She didn't.

17          Q.       She didn't?

18          A.       (Witness shakes head in the

19   negative.)

20          Q.       She just came in from outside?

21          A.       Uh-huh.

22          Q.       Was she a Louisiana-Pacific

23   employee already?

                                                 147


1           A.       I don't know.

2           Q.       You don't know.  Was she

3    Ronnie Paul's girlfriend?

4           A.       I have no idea.

5           Q.       You don't know?

6           A.       No.

7           Q.       I believe you said that your

8    father, Roy Ezell, was the plant manager.

9           A.       Right.

10          Q.       During most of the time that

11   you worked in the purchasing.

12          A.       Yes.

13          Q.       And that he was your immediate

                              Page 121

(2007-11-13) Ezell, Kenneth.txt

14    supervisor?

15         A.    Yes.

16         Q.    Is that correct?  And Ronnie

17    Paul was his immediate supervisor?

18         A.    I would say so, yes.

19         Q.    And Harry Merlo was Ronnie

20    Paul's supervisor?

21         A.    He was CEO of the company.

22         Q.    Okay.  So, Harry Merlo was the

23    CEO of Louisiana-Pacific?

                                              148

1          A.    Yes.

2          Q.    Did you ever meet Mr. Merlo?

3          A.    No.

4          Q.    Did you ever meet Mr. Paul?

5          A.    He come to the plant on

6    occasion.

7          Q.    How did he arrive at the

8    plant?

9          A.    By vehicle.

10         Q.    Pardon?

11         A.    By vehicle.

12         Q.    Your vehicle?

13         A.    No.

14               MR. LOCKARD:  I think he said

15    by vehicle.

16         Q.    Oh, by vehicle.  I thought you

17    said my.  What kind of vehicle was it?

18         A.    It was a company vehicle.

19         Q.    Company vehicle.  Did he ever

(2007-11-13) Ezell, Kenneth.txt

20  fly into the plant -- or into Florala?

21      A.      Yeah.

22      Q.      Do you ever recall any of the

23  -- any waste water being poured onto the

149

1  ground at the plant?

2      A.      Waste water?

3      Q.      Water that had Creosote or CCA

4  or Penta in it.

5      A.      I don't remember any specific

6  time, no.

7      Q.      Do you remember it generally

8  happening?

9      A.      No.

10      Q.      Do you ever hear -- Did you

11  ever hear anybody talking about that?

12      A.      Not that I remember, no.

13      Q.      Do you remember anything being

14  poured into the ponds?

15      A.      Other than being discharged

16  from the treating plant?

17      Q.      Yes.

18      A.      They put some kind of

19  chemicals, seems like it was hydrogen

20  peroxide, in the ponds.

21      Q.      Do you know why that was being

22  done?

23      A.      That was in the clean-up

(2007-11-13) Ezell, Kenneth.txt
150

1  process.

2          Q.      That was during the

3  remediation?

4          A.      It was before the remediation.

5  It was before the pond closures.

6          Q.      That was done for all three

7  ponds?

8          A.      Two, I believe.

9          Q.      Do you recall any vegetation

10  around the plant?

11          A.      Grass and trees, yes, sir,

12          Q.      Do you recall how the grass

13  and trees looked?  Did it look normal?

14          A.      Yeah.

15          Q.      Do you recall seeing any dead

16  vegetation?

17          A.      Not specifically, no.

18          Q.      Earlier, I believe you

19  testified that your responsibility was to

20  file correspondence from ADEM and EPA.

21          A.      Yes.

22          Q.      And I believe you testified

23  that you didn't have any communications,

151

1  yourself, with ADEM or EPA.

2          A.      Not that I recall, no.

3          Q.      Okay.  So, you just don't

4  recall it?

Page 124

(2007-11-13) Ezell, Kenneth.txt

5        A.      I don't recall it.  Those two

6   right there.  I filed them.  I never paid

7   attention to it.

8        Q.      And you also don't recall any

9   kind of violations, specifically, you said.

10       A.      Not specifically, no.

11                   (Whereupon, Plaintiff's

12                   Exhibit 5 was marked for

13                   identification.)

14       Q.      I'm going to hand you a

15  document marked as Plaintiff's Exhibit 5.

16               MR. LOCKARD:  Let me take a

17  quick look at it.

18               MR. PALMER:  Certainly.

19               MR. LOCKARD:  I'll hand it to

20  you in one second.

21               MR. PALMER:  Take your time.

22  I apologize.  I would have had an extra copy

23  if you hadn't have said you didn't really

                                          152

1   need them.

2               MR. LOCKARD:  Well, I said I

3   really didn't need number 1, which was the

4   depo notice, which I really don't need.

5               MR. PALMER:  I misunderstood

6   you then.

7               MR. LOCKARD:  That's fine.

8               THE WITNESS:  I haven't got my

9   glasses.  I can't read that.  I can't adjust

(2007-11-13) Ezell, Kenneth.txt
10 it.

11          Q.      Do you want to borrow my

12 reading glasses?

13          A.      I don't know if it would help

14 or not.

15          Q.      Probably not.

16          A.      I lost mine over the weekend.

17 I can't read it.  So I can't . . .

18              MR. LOCKARD:  If you can't

19 read it, he can probably read you the

20 portions that he's interested in, if you

21 can't see it.

22          A.      I can't read it.  My eyes

23 won't focus on it.


                                                    153


1          Q.      This is a letter on

2 Louisiana-Pacific letterhead.  It's

3 addressed to Ed Hughes, Alabama Department

4 of Environmental Management.  It's dated

5 4/22/97.  And it's written and signed by

6 Kenneth Ezell.

7          A.      Right.

8          Q.      And it concerns a violation.

9          A.      Violation of?

10          Q.      Well, it was a

11 failure-to-report violation?

12              MR. LOCKARD:  It's pretty

13 short.  If you want to just read him the

14 first . . .

15          Q.      This letter that appears to be
                        Page 126

(2007-11-13) Ezell, Kenneth.txt

16  one that you wrote.  It says:  Dear

17  Mr. Hughes, I'm writing this letter in

18  response to your letter of violation dated

19  April 8th, 1997.  In your letter, you stated

20  that no monitoring report was received for

21  the month of February.

22          Please find enclosed a copy of

23  the letter and violation form, also a copy

154

1  of the monitoring report for February.

2          Also enclosed is a copy of the

3  receipt of notice from the Postal Service

4  where the letter was signed for as per your

5  conversation with Randy Bennett.

6          Do you recall that at all?

7      A.    I don't recall that letter.

8      Q.    Do you know whether there were

9  any other notices of violation?

10     A.    Only one -- Only thing else I

11  remember, one time we got one because of

12  some kind of file wasn't on-site.  It was in

13  Conroe, and we couldn't produce it in a

14  timely manner, and we got written up for it.

15     Q.    Do you recall any violations

16  that had to do with chemicals being

17  released?

18     A.    No, I do not.  Not that I know

19  of.  I don't remember.

20     Q.    Did the plant have an

Page 127

(2007-11-13) Ezell, Kenneth.txt
21  environmental coordinator?

22       A.      No.

23       Q.      Have you ever heard the term

155

1  "environmental coordinator" before?

2        A.      No.

3        Q.      So, you were not the

4  environmental coordinator?

5        A.      No.

6                (Whereupon, Plaintiff's

7                Exhibit 6 was marked for

8                identification.)

9        Q.      I'm going to hand you what has

10  been marked as Plaintiff's Exhibit 6.  Let

11  me just make it easier.  There's a reference

12  to you as being the environmental

13  coordinator.

14       A.      Environmental coordinator.

15  No, I didn't hold that title.

16       Q.      Okay.

17                MR. PALMER:  Skip, I do have

18  extra copies of these because I had made

19  them before I misunderstood your comment.

20                MR. LOCKARD:  Not a problem.

21                THE WITNESS:  Bits and pieces

22  right here.  I can't read it very good.

23                (Whereupon, Plaintiff's

156

(2007-11-13) Ezell, Kenneth.txt

```
 1                Exhibits 7 and 8 were
 2                marked for
 3                identification.)
 4      Q.      (BY MR. PALMER):  Do you
 5  recognize Plaintiff's Exhibit 7 and 8?
 6      A.      Not specifically, no, I don't.
 7      Q.      On Plaintiff's Exhibit 7, do
 8  you recognize any of the handwriting?
 9      A.      No, I don't.
10      Q.      On the third page of
11  Plaintiff's Exhibit 7 there's a paragraph
12  ten that refers to a new well that was dug,
13  and it has a handwritten note:  Kenneth,
14  question mark, to check his notes.  Does
15  that mean anything to you?
16      A.      No, it don't.
17      Q.      If a new well was drilled at
18  the plant, who would have been involved in
19  that?
20      A.      ERM Southeast.  They did all
21  the well drilling.
22      Q.      Okay.  Would you have been
23  involved when they drilled wells, would you
```

157

```
 1  have gone out with them?
 2      A.      I would go by occasionally,
 3  but I wasn't assigned to go with them, no.
 4      Q.      Did you take notes?
 5      A.      No, I did not.
```

Page 129

(2007-11-13) Ezell, Kenneth.txt

6       Q.      Did you ever take notes of

7   anything that you did in connection with the

8   wells, other than the -- what we've already

9   talked about, the results --

10      A.      Just the weather conditions

11  and stuff like that.  That's all.

12      Q.      Were those notes sent to the

13  lab, or were they filed somewhere?

14      A.      I don't recall if I sent them

15  to the lab or not.

16      Q.      Do you know what happened to

17  the records that you kept at the plant?

18      A.      No, I do not.

19      Q.      Are you familiar with the

20  Community Right To Know Act?

21      A.      No, not specifically, no.

22      Q.      Have you ever heard of it?

23      A.      It seems like I have.

                                        158

1       Q.      When do you think you might

2   have heard of it?

3       A.      I don't know.  I couldn't tell

4   you.

5       Q.      It sounds familiar?

6       A.      I've heard that term before.

7       Q.      But you don't know what it

8   means?

9       A.      I reckon it's a right for them

10  to know facts about what you're doing.

11      Q.      Did you keep an environmental
                    Page 130

(2007-11-13) Ezell, Kenneth.txt

12  log book?

13          A.      No, not that I know of.  I

14  don't remember.  When you say environmental

15  log book, can you give me a little bit more

16  of what you're talking about?

17          Q.      That's the term, I'm just --

18  You're not familiar with the term?

19          A.      No.

20                  MR. LOCKARD:  If you don't

21  know what he's asking you.

22                  (Whereupon, Plaintiff's

23                  Exhibit 9 was marked for

                                                        159

1                   identification.)

2           Q.      I'm going to hand you

3   Plaintiff's Exhibit 9 in just a moment.

4   First, I want to ask you if you recognize --

5   I don't know if you can read it from here,

6   if I hold it farther away.

7           A.      Environmental log book.  It

8   does not look familiar, but it's been a long

9   time ago.

10                  MR. LOCKARD:  Why don't you

11  take a look.

12                  MR. PALMER:  I'm going to.  I

13  want him to see the environmental log book.

14                  MR. LOCKARD:  I want him to

15  take a look at it.

16                  MR. PALMER:  I'm going to.

Page 131

(2007-11-13) Ezell, Kenneth.txt

17    Q.    The third page has

18 environmental log book on it and it has a

19 picture on it, too.  Does that look familiar

20 at all to you?

21    A.    It seems like I've seen that

22 I'm not sure.

23    Q.    I'm going to hand you the

160

1 whole document, Plaintiff's Exhibit 9, and

2 ask you to take a look at it.

3         MR. PALMER:  Sorry, I don't

4 have a copy of that.

5    A.    I do remember it now.

6    Q.    Pardon me?

7    A.    I do remember this.

8    Q.    Okay.  What is an

9 environmental log book used for?

10    A.    It's just general notes.

11    Q.    Who kept the environmental log

12 book?

13    A.    I generated it.  I think I

14 kept it.

15    Q.    You generated it?

16    A.    Yeah.  I think this is part of

17 what I did.  I can't -- I can't -- I can't

18 -- I can't read it, so I can't elaborate on

19 it.

20    Q.    You definitely remember an

21 environmental log book now?

22    A.    I generated that, but I don't

Page 132

(2007-11-13) Ezell, Kenneth.txt

23  remember what -- what it's for.  I don't

                                                        161

 1  remember.  I'm trying to read some of it,

 2  too, as far as checked the wells and stuff.

 3        Q.      Do you recall when you first

 4  began keeping an environmental log book?

 5        A.      Not up here, I don't

 6  (indicating).  I was trying to see what the

 7  dates on these were.  I can't even read the

 8  date.  Is it '97?

 9                MR. LOCKARD:  If you're having

10  problems reading it, just tell him what you

11  recall.

12        A.      Without being able to read it,

13  I don't recall anything because I can't see

14  the data of what's on here to recall.

15        Q.      But you do recall keeping a

16  log?

17        A.      For a short period of time,

18  yes.

19        Q.      Was it in later years or

20  earlier years?

21        A.      I can't remember.  I can't see

22  the dates.  I can't tell you.  I can't

23  remember.

                                                        162

 1        Q.      You don't even recall when it

                    (2007-11-13) Ezell, Kenneth.txt

2   was?

3          A.      I see dates on there, but I

4   can't read them.  So I can't tell you.

5          Q.      You do recognize Plaintiff's

6   Exhibit 9 as being a log book that you

7   created?

8          A.      Yes.

9                  (Whereupon, Plaintiff's

10                 Exhibit 10 was marked for

11                 identification purposes.)

12         Q.      I'm now going to hand you what

13  has been marked as Plaintiff's Exhibit 10.

14  Take your time looking at it, but let me

15  know when you've had a chance to review it.

16         A.      This looks like a log sheet

17  where I was checking the depths of the

18  wells.

19         Q.      Is that your handwriting?

20         A.      No, I don't think it is.  It

21  might be.  I don't know.

22         Q.      Too bad.  I was going to say

23  that if it is your handwriting, I'd like you

                                            163


1   to teach my partner, Greg Cade, how to

2   write.

3          A.      It looks like a monitoring

4   well log sheet, but it's a little too neat

5   for me.

6          Q.      Did you read the second page?

7          A.      I can't read it, like I said.

                        Page 134

(2007-11-13) Ezell, Kenneth.txt

8          Q.       Give it back to me.  I'll read

9    it.  First of all, you said this is a --

10         A.       It looks like a monitoring

11   well log sheet.  When we took the -- I'm

12   just -- I'm blurred in vision.  It looks

13   like measurements, and it looks like it's

14   got monitoring wells on it.

15         Q.       All right.  There's a column

16   that says:  Well ID, and it has what looks

17   like PW-1 and -2.  It has numbers on it.

18   Were the wells all numbered?

19         A.       Yes.  Not those numbers.  Most

20   of it was like a M-W.

21         Q.       Okay.  There's also a list

22   that has M-Ws on it, and it begins with 8 or

23   -- I'm sorry.  Maybe they're out of order.


                                               164


1    It has 8, 9 -- The first ones, the ones that

2    say P-W, are 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

3    11 and 12.  And they seem to be in order.

4    It says:  Pumping wells.

5          A.       Yes.

6          Q.       And then monitoring wells, it

7    says:  M-W, 8, 9, 12, 14, 10, 11, 5, 4-A,

8    3-A, 2-A.  Do you remember those numbers at

9    all?

10         A.       Uh-huh.

11         Q.       If I gave you those numbers,

12   would you be able to show me specifically

                    Page 135

(2007-11-13) Ezell, Kenneth.txt

13  where each of those wells were?

14          A.      Not specifically, no.

15          Q.      We didn't discuss the pumping

16  wells before.  What are the pumping wells?

17          A.      Pumps in the remediation.

18          Q.      Those wells were drilled for

19  the purposes of remediation?

20          A.      Yes.

21          Q.      And what was done with those

22  wells?  I mean, what was the function of the

23  wells?

                                                    165

1           A.      They pumped water out of the

2   ground.  It went to the treating plant where

3   the oil and materials were separated, and

4   then the water went to the city, and the

5   oils and stuff was collected and sent to

6   barrels and shipped to Emelle.  I don't know

7   what the name of it was.

8           Q.      Emelle.  There's a column also

9   that says:  Product.  What does that mean?

10          A.      Do what, now?

11          Q.      Right after the column that

12  says:  Well ID or monitoring wells as a

13  column, it says:  Product.  And it has

14  numbers like -- The pumping well says:

15  23.04 for product, and that's pumping well

16  5.  And you have the monitoring wells that

17  have numbers like 5.67 or 8.78 or 11.83.  Do

18  you know what the column product means?

                    Page 136

(2007-11-13) Ezell, Kenneth.txt

19      A.      Column product?

20      Q.      The column is labeled:

21  Product.

22      A.      No, I don't.  That sounds like

23  the height of the watering well.


                                              166


1           Q.      All right.  Then there's a

2   column that says:  H2O.  What does that

3   refer to?

4           A.      Water, I take it.  Oh, I know

5   what you're talking about now.  The product

6   -- On those pumping wells there was a layer

7   of water, and the thicker -- the oils were

8   on top of it.  That's what that's for.  I

9   knew what you were talking about when you

10  said product, that's the oil on top of it.

11          Q.      I'm just reading what the

12  column says.

13          A.      The product is the oils that

14  was in the ground.

15          Q.      The chemicals, too, or just

16  oil?

17          A.      I don't know.  It was a black,

18  liquid-ish oil.

19          Q.      Okay.  When it says something

20  like:  23.04, what does that mean to you?

21          A.      I'd have to read it, go all

22  the way across the column.

23          Q.      I'll read you the whole

(2007-11-13) Ezell, Kenneth.txt

167

1    column, then.  It says:  P-W 5 is the well

2    ID number.  And then it says:  23.04.  Then

3    it has H2023.05.

4          A.    Okay.  That's the depth to the

5    oil, and then there's a depth to the water.

6          Q.    Okay.  So, if it's 23.04 to

7    the oil, and it's 23.05 to the water, that

8    means that .01 is the -- is that the height

9    of the --

10         A.    That's the thickness of the

11   stuff on top.

12         Q.    Okay.  And what are we

13   referring to here, is this, like, feet, or

14   what is it?  23.04 feet?

15         A.    Yes, I think it is.

16         Q.    You think it's feet?

17         A.    Yeah.

18         Q.    And then there's another

19   column that says:  Product.  And it says:

20   25.83 on this particular line.  And then it

21   says:  H2027.36.

22         A.    That would be the same

23   reference.

168

1          Q.    But it's on the same pump, not

2    line.  In other words, it says:  Well ID.

3    Product H20, product H20.

Page 138

(2007-11-13) Ezell, Kenneth.txt

4        A.      I don't know if it was a

5   comparison between two different times or

6   something.  I don't know.  That's a long

7   time ago.

8        Q.      There's also -- I just

9   realized where it says:  Pumping wells, it

10  says:  Dash FT.  I guess that means feet?

11       A.      Feet, yeah.

12       Q.      There's a line also that says

13  P-I-E-Z-O-M-E-T-E-R-S.  Do you know what it

14  that is?

15       A.      Do what, now?

16       Q.      It's P-I-E-Z-O-M-E-T-E-R-S.

17  Have you ever heard that term before?

18              MR. LOCKARD:  I don't think

19  he's heard it yet.

20       A.      I don't recall, if I have.

21              MR. LOCKARD:  He's saying

22  Piezometer.

23       A.      Unless that was the type of

                                      169

1   equipment used or the name of that

2   electronic device.

3        Q.      I was hoping to get you to say

4   it before your counsel said it.

5        A.      I don't know.

6        Q.      Have you ever heard the term

7   "piezometer"?

8        A.      Not that I recall, but I'm

(2007-11-13) Ezell, Kenneth.txt

9  pretty sure.

10      Q.      There's also a reference to

11  steam gauges.   What is that?

12      A.      Steam gauges?

13      Q.      You don't know what that

14  means?

15      A.      Steam gauge?

16      Q.      I'm sorry.   Stream gauges.

17      A.      Recording inches or feet.

18  There was some gauges -- There was gauges in

19  the creeks, like, little metal strips, and

20  we'd check the height of the stream.

21      Q.      And then you have SG-1, 2, 3.

22      A.      That's what they are.

23      Q.      On the second page of

                                          170

1  Plaintiff's Exhibit 10 there's a comment,

2  and it refers to P-W -- Well, actually it

3  says:  R-W.  Do you know what R-W is?  I

4  don't see it on here.

5      A.      That would be one of those

6  remediation wells.

7      Q.      Okay.  It's remedial.  It

8  says:  R-W 3 abnormally high.  Will inform

9  Kenneth Ezell.  Do you have any idea what

10  that refers to?

11      A.      The height of the well,

12  probably the volume.  We had to periodically

13  go over there and adjust the pumping rates

14  on the pumps to keep them pulling down.

                    Page 140

(2007-11-13) Ezell, Kenneth.txt

15          Q.      This is during the
16  remediation?
17          A.      (Witness nods head in the
18  affirmative.)
19          Q.      What exactly does remediation
20  mean to you?
21          A.      Recovery of water and oil out
22  of the ground, send it to the plant to be
23  separated.  Water being discharged to the

                                               171

 1  City sewage system and then the oil, heavy
 2  oils, sent to an off-site disposal facility.
 3          Q.      Meaning, an environmental
 4  disposal facility?
 5          A.      Right.
 6          Q.      Or hazardous waste facility?
 7          A.      Right.
 8          Q.      Do you remember how long this
 9  remediation process took?
10          A.      It seemed like it was
11  somewhere in the '90s, and it was in
12  operation when the mill shut down.
13          Q.      So, was it more than one year
14  long?
15          A.      Yes.
16          Q.      Was it more than two years
17  long?
18          A.      Yeah.
19          Q.      Was it five years long?

(2007-11-13) Ezell, Kenneth.txt
20      A.      I think so.

21      Q.      Would it be fair to say that

22  in layman's terms that a remediation is

23  cleaning up the property from these

                                            172

1   hazardous chemicals?

2               MR. LOCKARD:   Objection to

3   form.

4               MR. PALMER:   What's your

5   objection to form?

6               MR. LOCKARD:   I don't think

7   you can define the terms for him like that.

8       Q.      Okay.

9       A.      We was pumping oil out of the

10  ground.

11      Q.      This is oil that's

12  contaminated with those three chemicals,

13  Pentachlorophenol and CCA and Creosote;

14  correct?

15      A.      Some of them.  I don't know if

16  it was all three of them or not.

17      Q.      Okay.  And the reason for

18  pumping it out is because those chemicals

19  are hazardous; correct?

20      A.      It was to clean up the

21  environment, yeah.

22      Q.      And that's the reason why the

23  oils that had those chemicals in it was sent

                                            173

(2007-11-13) Ezell, Kenneth.txt

1  to Emelle, the hazardous waste facility;

2  correct?

3            MR. LOCKARD:  Object to the

4  form.

5        A.      To fill in those guidelines.

6        Q.      And so, it is fair, then, to

7  say the whole purpose of the remediation was

8  to clean up the property from this hazardous

9  waste; isn't that true?

10            MR. LOCKARD:  Objection to

11  form.

12        A.      Yes.

13        Q.      And it took at least five

14  years to do that?

15        A.      At least.  It was an ongoing

16  process.  I believe it was five.  It might

17  could have been longer.  It could have been

18  shorter.  I don't remember the dates.

19        Q.      I'm going to show you, again,

20  Plaintiff's Exhibit 5 that refers to a

21  violation.  Do you remember that?

22        A.      I don't remember specifically.

23        Q.      Well, I'm going ask you again.

174

1  I think earlier you said you didn't remember

2  any violations and I showed you that letter.

3  Do you remember any other violations that

4  you received notice of while you were

Page 143

                    (2007-11-13) Ezell, Kenneth.txt
5   working at the plant?

6         A.      Not that I remember.  I didn't

7   keep everything and commit it to memory.

8                        (Whereupon, Plaintiff's

9                        Exhibit 11 was marked for

10                       identification.)

11        Q.      I'm going to hand you what has

12  been marked as Plaintiff's Exhibit 11.

13        A.      I can't read the violation.  I

14  can't --

15        Q.      All right.  This is dated June

16  27th, 1994.  It's a notice of violation.

17  And, again, it's Plaintiff's Exhibit 11.

18  Notice of violation from the Alabama

19  Department of Environmental Management.

20  It's addressed to you for Louisiana-Pacific,

21  notice of violation.  It has number

22  ALD095687786.  And it says:  On June 2nd,

23  1994, Tiffany Dinsmore of this agency

                                                    175


1   conducted an inspection of your facility.

2   Do you remember Tiffany Dinsmore?

3         A.      No, I don't.

4         Q.      Then it says:  The purpose of

5   this inspection was to determine

6   Louisiana-Pacific Company's compliance with

7   the applicable standards outlined in the

8   Alabama Department of Environmental

9   Management's Administrative Code, Division

10  14.
                    Page 144

(2007-11-13) Ezell, Kenneth.txt

11              Have you ever read a copy of

12  that, the Alabama Department of

13  Environmental Management Code,

14  Administrative Code, Division 14?

15          A.      No.

16          Q.      Then it says:  Violations

17  observed at the time of the inspection are

18  listed below.  Please refer to the specific

19  rule cited for details of each violation.

20              Did the plant have a copy of

21  the ADEM Administrative Code, Division 14?

22          A.      No.  I think that's what we --

23  That was the one I was referring to earlier.


176


1  There was some kind of copy of a document we

2  was supposed to have on plant site.  They

3  had it in the Conroe office and they didn't

4  have it on the plant site.

5              I don't know if that's what

6  they're specific thinking, but I remember

7  one of them was a violation was we was

8  supposed to have it on the facility site and

9  it was in the main office or regional

10  office.

11          Q.      All right.  Then it refers to

12  a couple of different rules and some

13  violations.  First rule,

14  335-14-6-.23(4)(a)(3).  Then it says:  This

15  rule states that a drip pad must have a curb

Page 145

(2007-11-13) Ezell, Kenneth.txt

16  or berm around the perimeter.  Are you

17  familiar with that rule?

18      A.    I remember they had to put a

19  berm around the drip pad area, yes.

20      Q.    But do you remember the rule?

21      A.    No, I don't.

22      Q.    Then it says:  At the time of

23  the inspection and as indicated in the drip


                                              177


1  pad certification performed by Jones and

2  Neusey, dated April 28th, 1994,

3  Louisiana-Pacific's drip pad did not have a

4  curb or berm around the entire perimeter of

5  the drip pad.  Do you remember that?

6      A.    I remember it went partially

7  around the drip pad.

8      Q.    So, do you remember that

9  having to be corrected?

10      A.    Yes, I do now.

11      Q.    All right.  The next one

12  refers to another rule, I'm not going to

13  read the number because it doesn't mean

14  anything to you, does it?

15      A.    No, it don't.

16      Q.    And it has the violation.  It

17  says:  This rule states that a drip pad must

18  be maintained such that they remain free of

19  cracks, gaps, corrosion or other

20  deterioration that could cause hazardous

21  waste to be released from the drip pad.
                    Page 146

(2007-11-13) Ezell, Kenneth.txt

22            Are you familiar with that

23  rule at all?

                                           178

 1        A.      I remember that.

 2        Q.      Do you remember this event?

 3        A.      I remember the event, but, no,

 4  I don't remember the rule.

 5        Q.      Okay.  And you didn't remember

 6  this event before I showed you Plaintiff's

 7  Exhibit 11?

 8        A.      No, I did not.

 9        Q.      Then it says:  At the time of

10  the inspection and as indicated in the drip

11  pad certification performed by Jones and

12  Neusey dated April 28th, 1994,

13  Louisiana-Pacific's drip pad had hairline

14  cracks in the concrete floor.

15            Do you remember that?

16        A.      Yes.

17        Q.      Do you remember having to

18  correct that?

19        A.      Yes.

20        Q.      Then it says:

21  Louisiana-Pacific Company should submit

22  documentation to indicate that the above

23  violations have been corrected within thirty

                                           179

(2007-11-13) Ezell, Kenneth.txt

1  days of the receipt of this notice.

2           Do you remember doing that?

3      A.    That was not part of my job.

4  That was --

5      Q.    But this letter is addressed

6  to you.

7      A.    Yes.

8      Q.    So, who would have done that?

9      A.    I take it, corporate office.

10      Q.    So, when you received this

11  letter, what did you do with it?

12      A.    Filed it.

13      Q.    Did you give a copy of it to

14  anybody?

15      A.    It goes through -- It went

16  through the office personnel before it come

17  to me.

18      Q.    It's addressed to you.

19      A.    I know.  But all ADEM went

20  through the plant manager.

21      Q.    And that would have been your

22  father?

23      A.    Right.

                                        180

1      Q.    So, the only thing -- Even

2  though the letter is addressed to you, the

3  only thing you did to it was file it?

4      A.    I'm pretty sure I glanced at

5  it, but I didn't have anything to do with

6  the corrections.

                    Page 148

(2007-11-13) Ezell, Kenneth.txt

7        Q.        Did it seem strange to you
8   that your name was the name to whom the
9   Alabama Department of Environmental
10  Management sent correspondence, but you
11  didn't have anything to do with it?
12       A.        Probably because I was with
13  them -- accompanied them when they toured
14  the plant.
15       Q.        Did you ever tell them that
16  you were not the environmental manager?
17       A.        I never told them I was.
18       Q.        Did you ever tell them you
19  were not?
20       A.        No.  Not that I remember.
21       Q.        When you received those
22  letters and items that indicated that you
23  were environmental supervisor and

                                        181

1   environmental manager and whatnot, did you
2   take any effort to correct that?
3        A.        I did not, no.
4        Q.        Do you have any -- Did you
5   take any effort to find out why you were
6   being listed as such?
7        A.        No.
8        Q.        So far we've looked at two
9   violations.  And before I showed you the
10  violations, you said you didn't remember
11  them.

(2007-11-13) Ezell, Kenneth.txt

12     A.     They didn't come up.  I mean,

13  I don't remember them.

14     Q.     I would like you to think

15  hard, now, before I have to keep showing you

16  stuff, do you have any other recollections

17  of any other violations at the plant?

18     A.     There may have been.  I don't

19  know.  I don't remember.

20     Q.     Do you remember any violations

21  that dealt with the emissions from the

22  boilers?

23     A.     No, I don't.

                                          182

1      Q.     You don't?

2      A.     Not me.  Not that I know of.

3  There might be, you know, I don't know, but

4  I do not recall.

5      Q.     Have you had any conversations

6  with your parents about this case?

7      A.     They contacted me a couple of

8  times and said -- what was the name, Eason.

9      Q.     You mean both your mother and

10  your father contacted you?

11     A.     They were both sitting at the

12  table when I went by to see them, yeah.

13     Q.     Okay.  And what kind of

14  conversation did you have?

15     A.     Just general conversation.

16     Q.     Okay.  Did you -- I mentioned

17  to you before the attorney whose name is

(2007-11-13) Ezell, Kenneth.txt

18    Dennis Bailey.

19        A.       I've heard that name before.

20        Q.       You've heard that name before?

21        A.       Yeah.

22        Q.       Did you make an arrangement

23    for him to come and see your mother?


                                              183


1             A.       I did not, no.

2             Q.       Did you know that he came to

3    see your mother?

4             A.       I know they met with him for

5    something, for what, I have no idea.

6             Q.       So, both your father and your

7    mother met with him?

8             A.       I do not know that.

9             Q.       Were you present when he came

10   by to speak to them?

11            A.       No.  I wouldn't know the man

12   if I seen him.

13            Q.       Are you aware that your father

14   is one of our clients?

15            A.       I did know that until a while

16   back, but he says he's not.  I don't know.

17            Q.       Does your father, these days,

18   say the same thing about -- I mean, is he

19   consistent in what he says these days?

20            A.       No.

21            Q.       And that's because he has

22   Alzheimers?

(2007-11-13) Ezell, Kenneth.txt
23          A.      Yes.


                                              184


 1          Q.      So, sometimes he doesn't
 2   remember?
 3          A.      Yeah.
 4          Q.      All right.  Do you remember --
 5   You do remember the event that -- where
 6   Dennis Bailey came to your home -- your
 7   mother's home?
 8          A.      No, I don't.
 9          Q.      You don't remember that?
10          A.      No.
11          Q.      Did you ever hear about that?
12          A.      I remember them saying that
13   they met with Dennis Bailey.  That's all I
14   know.
15          Q.      Okay.  And did your father say
16   that, too?
17          A.      I don't remember which one
18   said it, but one or the other said it.
19          Q.      Okay.  Do you remember any
20   discussion about your parents going to see
21   another lawyer?
22          A.      They said they went to give a
23   deposition in Andalusia.  That's all.


                                              185


 1          Q.      Okay.  Do you remember them
 2   talking about going to meet a lawyer who --
                        Page 152

(2007-11-13) Ezell, Kenneth.txt

3  that Louisiana-Pacific was referring them

4  to?

5        A.      Yeah.

6        Q.      Okay.  Do you remember who

7  that lawyer was?

8        A.      No, I don't.

9        Q.      Was your conversation with

10  your mother or your father about that trip?

11        A.      I don't remember which one it

12  was.

13        Q.      Okay.  Do you recall how

14  they -- how they got out to see that lawyer?

15        A.      No, I don't.

16        Q.      Did they say that someone

17  drove them there?

18        A.      I don't know.

19        Q.      Do you know whether someone

20  made an appointment for them to go?

21        A.      I do not know.

22        Q.      And you don't remember who

23  that lawyer was?

                                          186


1        A.      No, I don't.

2        Q.      But you are aware now that

3  your father is a plaintiff in this case?

4        A.      I hear he is and he says he's

5  not.  I don't know one way or the other.

6        Q.      Have you ever heard him say he

7  was?

(2007-11-13) Ezell, Kenneth.txt

8      A.      No.  He's always denied it.

9      Q.      And you are here being

10  represented by Mr. Lockard?

11     A.      Yes.

12     Q.      And you understand that he

13  also represents Louisiana-Pacific?

14     A.      I know he's a lawyer for

15  Louisiana-Pacific.

16     Q.      Are you aware that he is the

17  lawyer for Louisiana-Pacific in the case on

18  the opposite side from your father?

19     A.      Yes.

20             MR. LOCKARD:  I don't mean to

21  interrupt, but if you're close to a good

22  stopping point, can we take a break?

23             MR. PALMER:  We can take a

                                      187

1  break.

2              VIDEOGRAPHER:  This marks the

3  end of tape number three in the deposition

4  of Roy Kenneth Ezell.  Off the Record; the

5  time is 2:55 p.m.

6                  (Recess taken.)

7              VIDEOGRAPHER:  This is the

8  beginning of tape number four in the

9  deposition of Roy Kenneth Ezell.  Back on

10  the Record; the time is 3:11 p.m.

11     Q.      (BY MR. PALMER):  How are you

12  doing, Mr. Ezell?

13     A.      Holding up.

                  Page 154

(2007-11-13) Ezell, Kenneth.txt

14      Q.      Do you see that light back
15  there, that's the end of the tunnel.
16      A.      Oh, is it?  Are you talking
17  about that little-bitty light over there?
18      Q.      All right.  Were you
19  responsible for getting the air permits at
20  the plant?
21      A.      No, I wasn't.  Not
22  specifically, no.
23      Q.      Do you know anything about air

                                    188

1  permits at the plant?
2      A.      They was in the process of
3  getting one.  That's all I remember.
4      Q.      When was that?
5      A.      In the late '90s.
6      Q.      Before the late 1990s, did the
7  plant have an air permit?
8      A.      Not that I know of.
9      Q.      Did the plant have --
10      A.      Or I don't remember.
11      Q.      You don't remember?
12      A.      Huh-uh.
13      Q.      Did the plant have a Title 5
14  Permit?
15      A.      Yeah.
16      Q.      And when did it have the Title
17  5 Permit?
18      A.      I just remember seeing the big
                        Page 155

(2007-11-13) Ezell, Kenneth.txt

19  tall book, that's all.

20      Q.    A big what?

21      A.    A big, thick book, the Title 5

22  Permit book.  And that's the only thing I

23  remember.

189

1       Q.    When do you recall seeing

2   that?

3       A.    It was in the '90s.  It might

4   have been before.  I don't have an exact

5   date.

6       Q.    Did the plant have any kind of

7   air pollution control devices?

8       A.    Air pollution control devices?

9   It had smoke detectors on the stacks.

10      Q.    And the stacks were on what?

11      A.    Boilers.

12      Q.    How many boilers were there?

13      A.    Three.

14      Q.    And what were the smoke

15  detectors like?

16      A.    It showed a light across the

17  -- through the stack.  And it had a

18  reflector beam that read the density or

19  whatever back through it.

20      Q.    Did you have anything to do

21  with the purchase of the smoke detectors?

22      A.    I bought replacements for

23  them, yes.

(2007-11-13) Ezell, Kenneth.txt

190

1      Q.      And this is not just something
2  you went down to Home Depot and picked up?
3      A.      No.
4      Q.      We're talking about smoke
5  detectors that you had to order from some
6  place?
7      A.      Right.
8      Q.      Where did you order them from?
9      A.      Honeywell was the name of the
10 company, but I don't remember where the
11 location was at.
12     Q.      When was the first time that
13 you had any dealings with the smoke
14 detectors?
15     A.      Buying them?
16     Q.      Uh-huh.
17     A.      They were in use when I
18 started purchasing.
19     Q.      Were the smoke detectors the
20 same type during the entire time that you
21 were in the purchasing department?
22     A.      When I ordered them, all of
23 them was the same.

191

1      Q.      So, there was never any
2  upgrade?
3      A.      No.

(2007-11-13) Ezell, Kenneth.txt

4     Q.     Same old model?

5     A.     Same old model.

6     Q.     Did you do the maintenance on

7 the smoke detector?

8     A.     No, I didn't.

9     Q.     Pardon?

10     A.     No.

11     Q.     Who maintained them?

12     A.     I do not know.

13     Q.     Did you ever have to fill out

14 any purchase department paperwork for repair

15 work?

16     A.     No.

17     Q.     Was all repair work done

18 internally?

19     A.     As far as I know.

20     Q.     Were there -- Besides these

21 smoke detectors on the three boilers, was

22 there any kind of -- any other kind of air

23 pollution control equipment?

                          192

1     A.     Not that I know of.

2     Q.     You don't remember any?

3     A.     No.

4     Q.     You said the boilers ran

5 twenty-four hours a day.

6     A.     Uh-huh.

7     Q.     How about the smoke detectors,

8 were they in operation twenty-four hours a

9 day?

(2007-11-13) Ezell, Kenneth.txt

10      A.      They were supposed to be.

11      Q.      Were they ever turned off?

12      A.      I don't know.  I wasn't a

13  boiler operator.

14      Q.      Did you ever have to -- Did

15  the purchasing department arrange for any

16  air modeling?

17      A.      Air modeling?  I don't

18  understand the question.

19      Q.      Have you ever heard the term

20  "air modeling"?

21      A.      No.

22      Q.      As far as you know, then,

23  there was no air modeling done at the plant?


                                          193


1       A.      Air modeling?  I don't know

2   what you're talking about.

3       Q.      You don't even know what it

4   is?

5       A.      No.

6       Q.      Was air pollution ever an

7   issue, as far as you knew, while you worked

8   at the plant?

9               MR. LOCKARD:  Object to the

10  form.  Go ahead.

11      A.      Not that I know of.

12      Q.      Do you recall the plant ever

13  sending a letter to residents of the

14  community, warning them about the dangers of

(2007-11-13) Ezell, Kenneth.txt

15    the chemicals that it was using?

16              MR. LOCKARD:  Objection to

17    form.

18         A.    A letter?  No.  Not that I

19    know of.

20         Q.    Do you recall the plant ever

21    warning the community about the dangers of

22    Creosote, Pentachlorophenol or CCA?

23              MR. LOCKARD:  Same objection.


                                        194


1          A.    I don't recall.

2               MR. PALMER:  What exactly is

3    your form of objection?

4               MR. LOCKARD:  Well, I don't

5    understand what you mean by dangers.

6               MR. PALMER:  Okay.

7          Q.    You don't recall any kind of

8    warning at all?

9          A.    Not that I know of, no.  I

10   don't recall any.

11         Q.    Have you ever heard of

12   Dioxins?

13         A.    I've heard the term, yes.

14         Q.    Do you recall a time when

15   documents were destroyed at the plant?

16         A.    No, not to my knowledge.

17         Q.    Whenever someone from ADEM or

18   EPA came through the plant, did you have

19   advance knowledge of that?

20         A.    Just when they called me from

                    Page 160

(2007-11-13) Ezell, Kenneth.txt

21  the office and told me they was on-site.

22       Q.    Do you know whether there were

23  any changes made in the operations in

                                            195

1  anticipation of their arrival?

2        A.    Well, I would tell the

3  treatment plant operator that ADEM is

4  on-site, but I don't know any, you know,

5  procedures or anything that would change.

6        Q.    Do you know John P. Harry?

7        A.    John P. Harry?  I don't recall

8  that name, no.

9        Q.    Was any of the -- This oil

10  that you referred to that had the Creosote

11  and the Pentachlorophenol and CCA in it, was

12  any of that oil ever used to control dust on

13  the dirt roads in Florala?

14             MR. LOCKARD:  Objection to

15  floral.

16        A.    In Florala?

17        Q.    Or Lockhart or anywhere around

18  there.

19        A.    Not to my knowledge.  I don't

20  recall that.

21        Q.    I think earlier you said that

22  you had not received any compensation from

23  Louisiana-Pacific since the time that you

                                            196

(2007-11-13) Ezell, Kenneth.txt

1  left its employment in 1999; correct?

2        A.      Correct.

3        Q.      Have they made any promises to

4  you in connection with this litigation?

5        A.      No.

6        Q.      Have they made any offers to

7  you?

8        A.      No.

9        Q.      Have you had any conversations

10 with Mr. Lockard or any other attorneys

11 since this deposition began during the

12 breaks about the content of the deposition?

13       A.      No, I have not.

14       Q.      I believe you have said that

15 you have heard of Dioxins.

16       A.      I've heard that term.  I don't

17 know what it is.

18       Q.      Have you been tested to

19 determine whether or not you have any Dioxin

20 in your blood?

21       A.      No.

22       Q.      Have you got any plans to be

23 tested?

                                          197


1        A.      No.

2        Q.      Are you concerned at all?

3        A.      No.

4                MR. PALMER:  Mr. Lockard, you

5  have instructed the witness not to answer
                    Page 162

(2007-11-13) Ezell, Kenneth.txt

6    with respect to conversations that Mr. Ezell

7    had with Alston & Bird attorneys before he

8    hired you.  Are you continuing in that

9    instruction?

10              MR. LOCKARD:  Actually, I

11   wanted to address that with you, if you're

12   done with the rest of the questioning.  But

13   I'll tell you that I believe that the

14   attorney/client privilege applies to all the

15   conversations that I've had with Mr. Ezell.

16              However, I understand that you

17   may take issue with that position.  And

18   rather than bothering Judge Coody with it or

19   potentially subjecting Mr. Ezell to having

20   to come back and take up anymore of his

21   time, I'm willing to allow him to answer

22   whatever questions you want to ask him about

23   the meeting that we had before he received

198

1    the deposition notice, provided that we

2    understand -- we have an understanding I'm

3    not waiving any privilege that would apply

4    to any other conversation that he and I may

5    have had.

6              MR. PALMER:  Okay.

7              MR. LOCKARD:  Assuming that

8    that's okay with him.

9              MR. PALMER:  I'll ask the

10   questions and you can -- I'm not expecting

Page 163

(2007-11-13) Ezell, Kenneth.txt

11  you to waive any privilege.

12          MR. LOCKARD:  Fair enough.

13          MR. PALMER:  But I'm also not

14  agreeing that any privilege exists.

15          MR. LOCKARD:  That's fine.

16  You don't agree that one exists.  I don't

17  necessarily concede that it doesn't.  And to

18  prevent Mr. Ezell from having to come back

19  or having to deal with this at a later time,

20  I would just as soon that you just ask him

21  the questions, as long as we have that

22  understanding.

23          MR. PALMER:  Okay.  We have

                                                199

1  that understanding.

2      Q.      (BY MR. PALMER):  Mr. Ezell,

3  you met before you hired -- and I'm not

4  talking about when you hired Mr. Lockard to

5  be your attorney, I'm talking about now the

6  meeting you were referring to earlier.

7      A.      Right.

8      Q.      And I believe you said it was

9  in Opp.  And I've forgotten where you said

10  it was in Opp.

11      A.      Executive Inn.

12      Q.      Executive Inn in Opp.  And it

13  was about an hour long?

14      A.      Yes.

15      Q.      And Mr. Lockard was there?

16      A.      Yes.

                    Page 164

(2007-11-13) Ezell, Kenneth.txt

17      Q.      And were there any other

18  lawyers there?

19      A.      Matthew.

20      Q.      Anybody else from Alston &

21  Bird?

22      A.      No.

23      Q.      And what did you discuss?


                                            200


1       A.      It was kind of a broad-type

2   meeting, broad term, mostly what my job

3   consisted of, what my -- I think the

4   question came up why I hadn't joined the

5   litigation and stuff like that.  And it was

6   just a very broad, nothing specific, type

7   meeting.

8       Q.      Okay.  So, they traveled all

9   the way to Opp just to find out why you had

10  not joined the litigation?

11              MR. LOCKARD:  Don't speculate

12  about why I came to Opp.

13      A.      I have no idea why he came to

14  Opp.

15              MR. LOCKARD:  Tell him what

16  you remember.

17      Q.      Do you remember how the

18  meeting was set up?  Did they call you and

19  ask you to meet with them?

20      A.      Skip called me and asked me if

21  I would mind meeting with him, and I told

(2007-11-13) Ezell, Kenneth.txt

22  him no.

23          Q.      Did he tell you why he wanted

201

1   to meet with you?

2           A.      To discuss this case, or the

3   aspects of this case.

4           Q.      So, you had no problem meeting

5   with him?

6           A.      No.

7           Q.      Okay.  And what kinds of

8   questions did he ask you?

9           A.      How long I'd been employed, a

10  lot about when I was employed, what kind of

11  duties I had.  Questions about the boiler

12  operations.  Some stuff about the treatment

13  plant.  Just broad -- Just a real broad

14  term, nothing specific.

15          Q.      Did he show you any documents?

16          A.      No.

17                  MR. PALMER:  Well, thank you,

18  Mr. Ezell.  I don't have any further

19  questions for you.  And I appreciate you

20  coming to sit for this deposition.

21                  THE WITNESS:  Okay.  Thank

22  you.

23                  MR. LOCKARD:  I know that Matt

202

1   doesn't have any questions.  I might.  But
                    Page 166

(2007-11-13) Ezell, Kenneth.txt

2  now that you're finished with your portion

3  of the examination, I'd like to talk to

4  Mr. Ezell about that, if you can give me

5  just a few minutes.

6          VIDEOGRAPHER:  Off the Record;

7  the time is 3:24 p.m.

8              (Off-the-Record discussion

9                  was held.)

10          VIDEOGRAPHER:  Back on the

11  Record; the time is 3:28 p.m.

12          MR. LOCKARD:  For the Record,

13  I have no questions for Mr. Ezell.

14          MR. PALMER:  Thank you again,

15  Mr. Ezell.

16          VIDEOGRAPHER:  This marks the

17  end of tape number four, and concludes the

18  deposition of Roy Kenneth Ezell.  Off the

19  Record; the time is 3:28.

20  (The deposition was concluded at 3:30 p.m.,

21  November 13th, 2007.)

22

23

203

1          REPORTER'S CERTIFICATE

2  STATE OF ALABAMA,

3  ELMORE COUNTY,

4          I, Sara Mahler, Certified Court

5  Reporter and Commissioner for the State of

6  Alabama at Large, do hereby certify that the

Page 167

(2007-11-13) Ezell, Kenneth.txt

7  above and foregoing proceeding was taken

8  down by me by stenographic means, and that

9  the content herein was produced in

10  transcript form by computer aid under my

11  supervision, and that the foregoing

12  represents, to the best of my ability, a

13  true and correct transcript of the

14  proceedings occurring on said date and at

15  said time.

16          I further certify that I am neither

17  of kin nor of counsel to the parties to the

18  action; nor in any manner interested in the

19  result of said case.

20

21

22  _____
                  Sara Mahler, CCR
23                  ACCR #420